Harry A. Olivar, Jr. (Cal. Bar No. 143089)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
harryolivar@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
David Myre (Cal. Bar No. 304600)
Jesse Bernstein (admitted *pro hac vice*)
Jacob J. Waldman (admitted *pro hac vice*)
Leigha Empson (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
davidmyre@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for the C3 Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST,<br><br>          Plaintiff,<br><br>     vs.<br><br>C3.AI, INC., et al.,<br><br>          Defendants. | Case No. 4:22-cv-01413-HSG<br><br>**THE C3 DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Judge:  Hon. Haywood S. Gilliam, Jr.<br>Courtroom:  2, 4th Floor<br>Hearing Date:  August 17, 2023<br>Hearing Time:  2:00 p.m. |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ................................................................................ 1

ISSUES TO BE DECIDED.................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

RELEVANT FACTUAL BACKGROUND .......................................................................... 5

I.      C3'S RELATIONSHIP WITH BAKER HUGHES....................................................... 5

II.     C3'S DISCLOSURES ABOUT ITS RELATIONSHIP WITH BAKER HUGHES ........... 5

III.    C3'S POST-IPO GROWTH............................................................................................ 7

IV.     PLAINTIFFS' ALLEGATIONS..................................................................................... 7

ARGUMENT ......................................................................................................................... 8

I.      PLAINTIFFS HAVE FAILED TO PLEAD SECURITIES ACT CLAIMS ........................ 8

        A.      Plaintiffs Do Not Plead an Actionable Misrepresentation or Omission................... 9

                1.      General Statement About C3's Partnership with Baker Hughes.................. 9

                2.      Statements Acknowledging the Size of Baker Hughes' Sales Force .......... 11

                3.      Statement About Revenue Recognized from Baker Hughes
                        Partnership ................................................................................................ 11

        B.      Plaintiffs Have Not Pleaded Violations of Items 303 and 105 ............................... 13

                1.      Item 303....................................................................................................... 14

                2.      Item 105....................................................................................................... 15

        C.      The Statute of Limitations Bars the Securities Act Claim Against Mr. Abbo
                in Its Entirety, and Against All Defendants in Part................................................. 16

II.     PLAINTIFFS HAVE FAILED TO PLEAD EXCHANGE ACT CLAIMS ...................... 17

        A.      Plaintiffs Have Failed To Plead an Actionable Misrepresentation or
                Omission.................................................................................................................... 17

                1.      Statements Regarding Baker Hughes' 12,000-Person Sales Force............ 17

                2.      Alleged Failure To Disclose Internal Restructuring .................................. 20

                3.      General Statements About C3's Partnership with Baker Hughes .............. 21

        B.      Plaintiffs Have Failed To Plead a Strong Inference of Scienter ............................. 21

|   |   | 1. | Plaintiffs Have Failed To Plead Intent To Defraud | 22 |
|   |   | 2. | Plaintiffs Have Not Adequately Alleged Motive | 26 |
|   |   | 3. | Plaintiffs Ignore Non-Culpable Inferences | 30 |
|   | C. | Plaintiffs Have Failed To Plead Loss Causation | | 30 |
|   |   | 1. | Plaintiffs Fail To Plead a Corrective Disclosure | 31 |
|   |   | 2. | Plaintiffs Cannot Remedy Their Deficient Corrective Disclosure Allegations by Claiming Materialization of Undisclosed Risks | 32 |
|   | D. | Plaintiffs Have Failed To Plead a Section 20A Claim | | 34 |

III.  PLAINTIFFS HAVE FAILED TO PLEAD CONTROL PERSON LIABILITY ............. 34

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Al-Thani v. Wells Fargo & Co.*,
   2009 WL 55442 (N.D. Cal. Jan. 7, 2009) ................................................................. 35

*In re All Terrain Vehicle Litig.*,
   771 F. Supp. 1057 (C.D. Cal. 1991) ....................................................................... 18

*Amorosa v. AOL Time Warner Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ............................................................................. 16

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012) .................................................................. 13

*In re Autodesk, Inc. Sec. Litig.*,
   132 F. Supp. 2d 833 (N.D. Cal. 2000) .................................................................... 22

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   566 F. App'x 93 (2d Cir. 2014) ............................................................................... 30

*Bao v. Solarcity Corp.*,
   2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ............................................................... 35

*Berg v. Velocity Fin., Inc.*,
   2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ........................................................... 15

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................................ 10, 11

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ............................................................ 33

*In re Bus. Objects S.A. Sec. Litig.*,
   2005 WL 1787860 (N.D. Cal. July 27, 2005) ........................................................ 13

*Caldwell v. Berlind*,
   543 F. App'x 37 (2d Cir. 2013) ............................................................................... 17

*Callan v. Motricity Inc.*,
   2013 WL 195194 (W.D. Wash. Jan. 17, 2013) ...................................................... 28

*In re Canandaigua Sec. Litig.*,
   944 F. Supp. 1202 (S.D.N.Y. 1996) ....................................................................... 14

*CheckOut Holdings, LLC v. Amplified Holdings, Inc.*,
   64 F. App'x 631 (9th Cir. 2003) ............................................................................. 23

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
  565 F. Supp. 3d 478 (S.D.N.Y. 2021) ................................................................ 20, 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .......................................................... 21, 22, 26

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................ 10

*Curry v. Yelp Inc.*,
  2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) .............................................. 28

*Curry v. Yelp Inc.*,
  2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ........................................ 18, 19

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ........................................................ 13, 23, 24

*In re Dothill Sys. Corp. Sec. Litig.*,
  2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ................................................ 30

*In re DraftKings Inc. Sec. Litig.*,
  2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) .................................................. 15

*In re Eventbrite Sec. Litig.*,
  2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) .............................................. 10

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) .............................................. 28

*In re Fastly, Inc. Sec. Litig.*,
  2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ........................................ 21, 29

*In re FVC.COM Sec. Litig.*,
  32 F. App'x 338 (9th Cir. 2002) .................................................................. 25

*In re Gap Stores Sec. Litig.*,
  457 F. Supp. 1135 (N.D. Cal. 1978) ............................................................ 35

*Gaylinn v. 3Com Corp.*,
  185 F. Supp. 2d 1054 (N.D. Cal. 2000) .................................................. 22, 24

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ...................................................................... 21

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
  100 F. Supp. 2d 1086 (C.D. Cal. 1999) ...................................................... 18

*Golubowski v. Robinhood Mkts., Inc.*,
  2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) .......................................... 15, 16

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. Nov. 16, 2020)..................................................... 11, 29

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000)......................................................................... 35

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008)........................................................................... 28

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
  2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)....................................................... 25

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
  522 F. Supp. 3d 660 (N.D. Cal. 2021) ................................................................ 24

*Jui-Yang Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ..................................................... 11

*Kairalla v. Advanced Med. Optics, Inc.*,
  2008 WL 2879087 (C.D. Cal. June 6, 2008) ...................................................... 10

*Karri v. Oclaro, Inc.*,
  2020 WL 5982097 (N.D. Cal. Oct. 8, 2020) ...................................................... 20

*Kong v. Fluidigm Corp.*,
  2022 WL 445764 (N.D. Cal. Feb. 14, 2022)....................................................... 27

*Lechner v. Infusystem Holdings, Inc.*,
  2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ................................................... 13

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..................................................................... 23, 24

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)......................................................................... 31

*Manger v. Leapfrog Enter., Inc.*,
  229 F. Supp. 3d 1126 (N.D. Cal. 2017) ............................................................ 20

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. 2019) ........................................................ 14, 19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008)........................................................... 21, 23, 24, 27, 32

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018)........................................................................... 31

*In re Nektar Therapeutics Sec. Litig.*,
  34 F. 4th 828 (9th Cir. 2022)....................................................................... 19, 31

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. July 13, 2020) ............................................... 25, 26, 29

*In re Netflix, Inc. Sec. Litig.*,
  964 F. Supp. 2d 1188 (N.D. Cal. 2013) ....................................................... 34

*In re Netflix, Inc., Sec. Litig.*,
  923 F. Supp. 2d 1214 (N.D. Cal. 2013) ....................................................... 15

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
  2016 WL 7475555 (N.D. Cal. 2016) ..................................................... 8, 9, 18, 27

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) .............................................................. 31, 32

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................. 17, 25

*In re Obalon Therapeutics, Inc.*,
  2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) ............................................. 16

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
  50 F. Supp. 3d 1328 (C.D. Cal. 2014) ..................................................... 29

*Or. Pub. Emps. Ret. Fund v. Apollo Grp.*,
  774 F.3d 598 (9th Cir. 2014) .............................................................. 17

*Osher v. JNI Corp.*,
  256 F. Supp. 2d 1144 (S.D. Cal. 2003) ..................................................... 28, 29

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) .............................................................. 18

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F. Supp. 2d 211 (D. Mass. 1999) ....................................................... 28

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ..................................................... 20

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. July 21, 2020) ............................................. 24

*Plevy v. Haggerty*,
  38 F. Supp. 2d 816 (C.D. Cal. 1998) ....................................................... 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ......................................................... 23, 25, 26

*Prodanova v. H.C. Wainwright & Co.*,
  993 F.3d 1097 (9th Cir. 2021) .............................................................. 22

*In re Restoration Robotics, Inc. Sec. Litig.*,
    417 F. Supp. 3d 1242 (N.D. Cal. 2019) ............................................................. 10

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ......................................................... 9, 10, 11, 20, 27

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................................. 9

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................. 24

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................. 34

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ........................................................................... 35

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ....................................................................... 22, 29

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) ............................................................... 32

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................................. 23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................................. 18

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ............................................................................. 16

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
    771 F. App'x 494 (2d Cir. 2019) ....................................................................... 14

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
    552 U.S. 148 (2008) ........................................................................................... 17

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ................................................................................ 14

*In re Talis Biomed. Corp. Sec. Litig.*,
    2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................... 17, 22, 23

*Terenzini v. GoodRx Holdings, Inc.*,
    2022 WL 122944 (C.D. Cal. Jan 6, 2022) ......................................................... 21

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020) .................................................................. 25, 29

*In re Veritas Software Corp. Sec. Litig.*,
  2003 WL 27386177 (N.D. Cal. Dec. 10, 2003) ................................................... 12, 13

*Webb v. Solarcity Corp.*,
  884 F.3d 844, 856 (9th Cir. 2018) ............................................................................ 27

*Welgus v. TriNet Grp.*,
  2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) .......................................................... 34

*Weller v. Scout Analytics, Inc.*,
  230 F. Supp. 3d 1085 (N.D. Cal. 2017) .................................................................... 10

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................................. 27, 29

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................................... 30

*Willard v. UP Fintech Holding Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021) ...................................................................... 21

*Williams v. Boeing Co.*,
  517 F.3d 1120 (9th Cir. 2008) .................................................................................. 16

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .................................................................................... 30

*Xiaojiao Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) .................................................................... 34

*Yaron v. Intersect ENT, Inc.*,
  2020 WL 6750568 (N.D. Cal. June 19, 2020) ..................................................... 32, 33

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................... 13, 21, 22, 24, 28, 34

**Statutory Authorities**

15 U.S.C. § 77m ......................................................................................................... 16

**Rules and Regulations**

17 C.F.R. § 229.105 .................................................................................................... 15

17 C.F.R. § 229.303(b)(2)(ii) ..................................................................................... 14

Fed. R. Civ. P. 9(b) ........................................................................................... 1, 9, 17, 33

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 1

Fed. R. Civ. P. 15(c)(1)(B) ......................................................................................... 16

1

## NOTICE OF MOTION AND MOTION

2          PLEASE TAKE NOTICE THAT on August 17, 2023 at 2:00 p.m., or on such other date set

3    by the Court, before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2, 4th Floor, United States

4    Courthouse, 1301 Clay Street, Oakland, California, Defendants C3.ai, Inc. ("C3" or the "Company")

5    and Thomas M. Siebel, Edward Y. Abbo, David Barter, and Lorenzo Simonelli (together, the

6    "Individual Defendants" and with C3, the "C3 Defendants") will and hereby do move this Court for

7    an order dismissing Plaintiffs' Amended Complaint (ECF No. 71, the "Complaint") in its entirety

8    and with prejudice for failure to state a claim upon which relief may be granted.  This motion is

9    made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities

10   Litigation Reform Act of 1995 ("PSLRA"), and is based upon the following Memorandum; the

11   arguments of counsel; and any additional material as may be submitted to the Court before decision.

12

## ISSUES TO BE DECIDED

13          1.      Have Plaintiffs failed to plead adequately that the C3 Defendants violated Sections 11

14   and 15 of the Securities Act of 1933 ("Securities Act"), where the Complaint identifies no materially

15   misleading statements or omissions and does not allege that the Individual Defendants controlled

16   the making of the alleged misstatements or omissions?

17          2.      Are Plaintiffs' Securities Act claims time-barred as to Mr. Abbo, and as to certain of

18   the alleged misstatements?

19          3.      Have Plaintiffs failed to plead adequately that the C3 Defendants violated Section

20   10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), where the Complaint identifies no

21   materially misleading statements or omissions and does not plead that the alleged misstatements or

22   omissions were made with intent or deliberate recklessness?

23          4.      Have Plaintiffs failed to plead that the C3 Defendants violated Section 20A of the

24   Exchange Act where the Complaint does not plead a primary violation and does not plead that the

25   Individual Defendants traded contemporaneously with Plaintiffs and to Plaintiffs' disadvantage?

26          5.      Have Plaintiffs failed to plead that the Individual Defendants violated Section 20(a)

27   of the Exchange Act where the Complaint does not plead a primary violation and does not allege

28   facts sufficient to suggest that the C3 Defendants controlled the alleged misstatements?

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

C3 is a leading artificial intelligence software company.  C3 was founded by Thomas Siebel, a well-known and respected Silicon Valley entrepreneur who is now piloting a second highly-successful company.  Plaintiffs allege that C3, Mr. Siebel, and three other current and former C3 executives and directors, who themselves spent decades building careers and reputations, suddenly and implausibly decided to commit securities fraud and engage in insider trading.  But Plaintiffs' support for these accusations consists largely of challenges to a handful of redundant, plainly immaterial public statements.  Notably, Plaintiffs target C3's partnership with Baker Hughes—one of the world's leading oil and gas services companies—even though Baker Hughes is an example of C3's *successful* strategy of partnering with companies that subscribe to, and resell, C3 products. The strategy has generated hundreds of millions in revenues and commitments, and Plaintiffs do not and cannot challenge the actual, disclosed numbers.   Further, Plaintiffs cannot deny that C3's partnerships, on which they base their claim, *significantly increased* C3's revenue, commitments, and customer counts between December 9, 2020 and December 2, 2021 (the purported "Class Period").  *See, e.g.*, Ex. A[1] (Dec. 1, 2021 Form 8-K) at 5 (disclosing year-over-year increases in revenue, remaining commitments, and customer base of approximately 41%, 74%, and 63%, respectively).

Unable to rely on the Company's disclosures of revenue and other data, Plaintiffs instead challenge inactionable purported omissions about internal business decisions, as well as obviously immaterial statements concerning how many Baker Hughes salespeople were marketing C3 products over time and whether those salespeople "sat outside" the central Baker Hughes organization.  Plaintiffs' focus on these immaterial areas fails to plead falsity or scienter because:

- With revenue and other data accurately reported, statements about the Baker Hughes partnership, the number of Baker Hughes salespeople marketing C3 products, or C3's internal sales structure could not have misled a reasonable investor (and C3 disclosed the supposedly concealed risks);

- There is no "cogent and compelling" inference of fraudulent intent as required by the PSLRA—indeed, the IPO Registration Statement disclosed, among other things, that C3 expected revenues to *slow down*, which is completely at odds with a fraudulent scheme to

---

[1]   The exhibits are attached to the Declaration of Harry A. Olivar, Jr.

lure investors into buying stock;

- Plaintiffs have no viable theory that "materialization" of risk or other supposed revelation of "truth" about C3's public statements caused C3's stock price to fall; even the equity analysts cited in the Complaint blamed other factors (about which C3 had *warned* investors); and

- Plaintiffs offer no facts sufficient to support the inference that any Individual Defendant "controlled" alleged statements by any other Defendant.

As detailed below, the reasons for dismissal are apparent on the face of the Complaint:

      ***First***, the Complaint fails to plead a materially misleading statement or omission.  Plaintiffs take issue with statements about the number of Baker Hughes salespeople marketing C3 products, but these are obvious puffery and hyperbole, nor would a reasonable investor have been misled into thinking that literally *every one* of Baker Hughes' salespeople was consistently marketing and selling C3 products.  In fact, the Registration Statement warned that C3 could not guarantee Baker Hughes would devote adequate resources to marketing C3 products.  The Complaint also claims that it was misleading not to disclose precisely where the partnership with Baker Hughes was situated within Baker Hughes' organization.  But the Complaint nowhere identifies a single affirmative statement by C3 on this topic, quibbling instead that C3 omitted that the partnership's salesforce supposedly "sat outside" Baker Hughes' central organization.  And this logistical detail is immaterial, and in any case inaccurate: the companies formed a unit dedicated exclusively to the partnership ("BHC3") that was designed to (and did) facilitate access to the broader Baker Hughes customer base.  Similarly, Plaintiffs identify no misleading statements regarding the structure of C3's internal sales team, and, regardless, courts routinely recognize that a business has no obligation to disclose every internal organizational decision (and here C3 expressly warned it might restructure its sales team).  Plaintiffs also claim it was "misleading" for C3 to suggest in its IPO Registration Statement that the Company had recognized revenue from the Baker Hughes relationship.  But, again, Plaintiffs do not contest the accuracy of those revenue disclosures, including that Baker Hughes paid tens of millions of dollars to C3 for its products and services.

      ***Second***, Plaintiffs fail to plead fraudulent intent.  Despite C3's enviable growth since its IPO, the Registration Statement's 35 pages of Risk Factors candidly warned investors that, among other things, C3 had "limited operating history, which makes it difficult to evaluate [its] prospects

and future results," had a history of operating losses, and was uncertain that its business model would ever sustain profitability. The Registration Statement even disclosed that C3 expected its revenue growth to slow down and that it could not "guarantee" its strategic partners would "devote the resources necessary to . . . result in increased customer usage . . . or increased revenue." Ex. B (Prospectus) at 21-22. It is not plausible, much less cogent or compelling, to infer that executives who were seeking to deceive investors and prop up the stock price nonetheless disclosed the expectation that revenue growth would slow.

Further, Plaintiffs offer no particularized facts suggesting any Defendant had any knowledge that their statements could be misleading, much less that four accomplished and respected software pioneers and business executives suddenly decided to put their decades-strong reputations on the line to sell stock improperly. Plaintiffs instead rely on general, routinely rejected allegations that, merely by virtue of their titles and active management, they *would* have possessed information contrary to the alleged misstatements. Nor have Plaintiffs made even the basic showing that Defendants' stock sales were unusual in nature, size, or timing, as necessary to establish scienter (and, as to Mr. Simonelli, the trades they allege as his are not even trades made on his account). Similarly, vague allegations about unidentified contrary information raised at unspecified meetings and in unidentified reports are insufficient.

*Third*, Plaintiffs fail to meet the basic loss causation requirement that they plead disclosure of facts that corrected supposed prior falsehoods. Plaintiffs instead theorize that undisclosed risks concerning C3's sales "materialized" as supposedly disappointing earnings performance. But "materialization" of undisclosed risk is not a viable loss causation theory in the Ninth Circuit, and even if it were, C3 *disclosed* each risk that purportedly "materialized." Plaintiffs' novel theory that Defendants' stock sales constituted "materialization" is similarly non-viable and, again, C3 warned that large stock sales could cause C3's stock price to decline.

*Fourth*, Plaintiffs fail to plead a primary securities law violation, or virtually any Plaintiff stock trades contemporaneous with the Individual Defendants' alleged sales, as required for a Section 20A claim.

*Finally*, Plaintiffs rely on legally insufficient allegations about the Individual Defendants'

1  positions at C3 or general "hands on" management, which is inadequate to allege control over

2  specific violations as necessary to plead a control-person claim under Section 15 and Section 20(a).

3  The Complaint should be dismissed in its entirety, with prejudice.

4  **RELEVANT FACTUAL BACKGROUND**

5  ## I.    C3'S RELATIONSHIP WITH BAKER HUGHES

6  Founded in 2009, C3 provides applications under a software-as-a-service ("SaaS") model

7  that requires customers to pay recurring subscription fees, as well as for consumption and services.

8  *See* ¶ 4.[2]  C3 has an internal salesforce (¶ 9) and has developed partnerships with technology leaders

9  such as Google and Microsoft to help market C3's products to customers in particular industries

10  (¶¶ 58, 124).   C3 entered into one such partnership in June 2019 with Baker Hughes. ¶ 77.

11  Specifically, C3 entered into a three-year agreement under which Baker Hughes was both a user of

12  C3 products and the exclusive reseller of C3 products to customers in the oil and gas industry.  ¶ 77.

13  As explained in the Registration Statement, Baker Hughes sold C3 products under the "BHC3"

14  brand.  ¶ 10.  Baker Hughes made minimum total commitments to C3 of $50 million, $100 million,

15  and $170 million for the fiscal years ending April 30, 2020, 2021, and 2022, respectively.  ¶ 77.

16  The terms provided that each year, $39.5 million of that commitment would come from Baker

17  Hughes through subscription fees with the rest of the total yearly commitment coming from the sale

18  of C3 products and cash.  *See* ¶ 77.  C3 often referred to the future revenue obligations Baker Hughes

19  (and other customers) owed to C3 under existing contracts as the remaining performance obligation

20  ("RPO").  ¶ 13.  The Baker Hughes contract was extended in June 2020 by two years for a total five-

21  year commitment.  ¶ 63.

22  ## II.    C3'S DISCLOSURES ABOUT ITS RELATIONSHIP WITH BAKER HUGHES

23  On December 9, 2020, C3 filed a final prospectus—which was made part of the Registration

24  Statement—with the SEC in connection with its initial public offering.  ¶ 1.[3]   That prospectus

25

26  [2] Citations to allegations in the Complaint refer to the relevant paragraph number.

27  [3] Relevant excerpts of the final Prospectus, dated December 8, 2020, are attached as Exhibit
B to the Olivar Declaration.  The final Prospectus was incorporated into the Registration Statement,
dated December 7, 2020, excerpts of which are attached hereto as Exhibit C.  The Prospectus and

28  Registration statement together are referred to as the "Registration Statement."

explained the terms of the Baker Hughes partnership, including the minimum commitment, subscription fees, and BHC3 branding.  ¶¶ 75, 77.  The Registration Statement also disclosed that C3 recorded approximately $46.7 million in revenue related to the Baker Hughes relationship for Fiscal Year 2020, made up of approximately $40 million from Baker Hughes direct purchases and approximately $6 million from Baker Hughes reselling C3 products.  Ex. B at F-40.

       The Registration Statement also contained more than 35 pages of risk disclosures concerning C3's revenues, sales, and lack of profitability, including:

- "Our historical revenue growth should not be considered indicative of our future performance."  Ex. B at 16.

- "[W]e expect our revenue growth to slow."  *Id.* at 16.

- "We have a history of operating losses and may not achieve or sustain profitability in the future."  *Id.* at 9, 16, 18.

- "Our quarterly results of operations and key metrics may vary significantly in the future as they have in the past, particularly in light of our dependence on a limited number of high-value customer contracts, and period-to-period comparisons of our results of operations and key metrics may not be meaningful."  *Id.* at 27.

- "Numerous factors may impede our ability to add new customers, including but not limited to . . . failure to attract and effectively train new sales and marketing personnel, failure to develop or expand relationships with partners and resellers . . . or failure to ensure the effectiveness of our marketing programs. If we are not able to attract new customers, it will have an adverse effect on our business, financial condition and results of operations."  *Id.* at 17.

- "[W]e cannot guarantee that the partners with whom we have strategic relationships will continue to devote the resources necessary to expand our reach and increase our distribution" or that such partners "will prioritize or provide adequate resources to selling our AI Suite and AI Applications."  *Id.* at 22.

- "Our revenue growth depends in part on the success of our strategic relationships with third parties, including channel partners, and if we are unable to establish and maintain successful relationships with them, our business, operating results, and financial condition could be adversely affected."  *Id.* at 21.

- "Even if we are successful in establishing and maintaining these relationships with third parties, we cannot assure you that these relationships will result in increased customer usage of our AI Suite and AI Applications or increased revenue to us."  *Id.* at 22.

- "In addition, our business would be adversely affected if our marketing and sales

efforts are not successful and generate increases in revenue that are smaller than anticipated. If our marketing and sales efforts are not effective, our sales and revenue may grow more slowly than expected or materially decline, and our business may be significantly harmed." *Id.* at 24.

- "Factors that may cause fluctuations in our quarterly results [include] . . . our ability to develop and retain talented sales personnel who are able to achieve desired productivity levels in a reasonable period of time and provide sales leadership in areas in which we are expanding our sales and marketing efforts; changes in the way we organize and compensate our sales teams." *Id.* at 27.

- "RPO is not necessarily indicative of future revenue growth," C3 "may experience variations in [its] RPO from period to period," and it was "important to review RPO in conjunction with revenue and other financial metrics." *Id.* at 65.

## III.   C3'S POST-IPO GROWTH

Although C3 warned investors that its business prospects were uncertain, the Company continued its growth following the IPO. C3 reported Fiscal Year 2021 results in June 2021,[4] which included increased revenues and RPO. *See* Ex. D (2021 Form 10-K) at 65, 66. Baker Hughes alone generated more than $35 million in direct fees and $20 million from reselling C3 products, an increase of nearly $14 million in resale revenue over Fiscal Year 2021. *See* Ex. E (2022 Form 10-K) at 126. Further, C3's December 1, 2021 disclosures for Q2 2022 (ending October 31, 2021) reported revenue of $58.3 million—a more than 40% increase year-over-year. *See* Ex. A at 5. The same disclosure revealed a customer count increase of 63% and RPO growth of 74%. *See id.* at 5. In every single quarter of the Class Period, C3 increased its revenues and exceeded the projections and guidance it had provided to investors. *See* Exs. A, F-H. Nonetheless, as C3 had warned investors in its Registration Statement and subsequent SEC filings, its Q2 2022 disclosures showed that growth had slowed. Investors were disappointed, C3's stock price dropped, and, predictably, lawsuits followed.

## IV.   PLAINTIFFS' ALLEGATIONS

Notwithstanding C3's strong growth, the Complaint alleges that C3's SEC filings and public statements misstated or omitted certain material information about the structure and success of the Baker Hughes partnership and about a mid-2021 restructuring of C3's internal sales division.

---

[4] During the Class Period, C3's fiscal year ran from April 1 through March 31.

1   Plaintiffs allege that defendants misled investors about: (i) general descriptions of C3's Baker

2   Hughes partnership (*e.g.*, ¶¶ 74, 130, 144); (ii) revenue recognized from the Baker Hughes

3   partnership (*e.g.*, ¶ 77); (iii) the number of Baker Hughes salespersons to whom C3 had access (*e.g.*,

4   ¶¶ 75, 124, 126, 128, 132); and (iv) the purported failure to disclose C3's internal sales restructuring

5   (*e.g.*, ¶ 119).   Plaintiffs also purport to plead scienter on the basis of stock sales (¶ 157), and

6   Defendants' positions at the Company or attendance at unspecified meetings or access to unspecified

7   data (¶¶ 168, 206, 215, 219, 222, 224).

8        Plaintiffs seek to plead loss causation by claiming that C3 concealed risks relating to Baker

9   Hughes that "materialized" as disappointing performance in mid-2021—when C3's revenue

10  actually *increased* by 19% (¶¶ 174-84)—and through the novel theory that certain post-IPO stock

11  sales constitute materialization of undisclosed risks (although the Registration Statement warned

12  stock sales could cause stock price declines (Ex. B at 46-47) (¶¶ 185-88)).   Indeed, all but one of

13  the pleaded declines in C3 stock allegedly occurred after an earnings disclosure (¶¶ 174, 177, 180)

14  or a stock sale (¶ 188).   Plaintiffs also claim that December 1, 2021 disclosures about C3's internal

15  sales restructuring, the prior structure of the Baker Hughes sales team, the departure of C3's CFO,

16  and results that certain analysts found "disappointing" (¶¶ 189-202) were corrective disclosures.

17       Plaintiffs purport to represent classes who purchased C3 Class A common stock (i) pursuant

18  and/or traceable to the Registration Statement, and assert claims under Section 11 of the Securities

19  Act; (ii) during the Class Period, and assert claims under Section 10(b) of the Exchange Act; and

20  (c) contemporaneously with the Individual Defendants' Class Period sales, and assert claims under

21  Section 20A of Exchange Act.  ¶ 2.

22                                    **ARGUMENT**

23  **I.    PLAINTIFFS HAVE FAILED TO PLEAD SECURITIES ACT CLAIMS**

24       Section 11 requires Plaintiffs to allege "(1) that the registration statement contained an

25  omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is,

26  it would have misled a reasonable investor about the nature of his or her investment."  *Norfolk Cnty.*

27  *Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. 2016) (Gilliam, J.).

28       "The particularity requirements of Rule 9(b) apply to claims brought under section 11 when

such claims are grounded in fraud." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012).  "Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." *Id.* at 876. Here, Plaintiffs' Section 11 claim sounds in fraud, as it arises from allegations that C3 knowingly made misrepresentations in its Registration Statement regarding its partnership with Baker Hughes and omitted discussion of BHC3.  *E.g.*, ¶¶ 69-78.  Plaintiffs' attempt to disclaim fraud (¶ 96) is "unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *Norfolk Cnty.*, 2016 WL 7475555, at *2; *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud").

## A. Plaintiffs Do Not Plead an Actionable Misrepresentation or Omission

Plaintiffs allege only three statements in the Registration Statement are misleading: (1) a general description of the Baker Hughes partnership (¶ 74); (2) a statement about the size of Baker Hughes' sales organization (¶ 75); and (3) a statement about the revenue recognized from the Baker Hughes relationship (¶ 77).  None of these is alleged to be false, and none is materially misleading.

### 1. General Statement About C3's Partnership with Baker Hughes

Plaintiffs allege that C3's general description of its strategic partnership with Baker Hughes in the Registration Statement was misleading.  The challenged statement is:

> Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes . . . .

¶ 74 (Statement #1).[5]  Plaintiffs do not allege this description of C3's strategy was false; nor do Plaintiffs dispute that C3 had actually executed this strategy with Baker Hughes or that Baker Hughes—which had a three-year minimum commitment of $320 million—was a strategic vertical

---

[5] References to "Statement #_" refer to the numbered statements in Appendix A, an appendix of the statements alleged in the Complaint to be false or misleading.

partner in the oil and gas industry.  Aside from the conclusory allegation that Statement #1 "would be misleading to a reasonable investor" (¶ 73), there is no allegation "that Defendants falsely represented their actual partnership plans and expectations" or that this statement was otherwise misleading, as necessary to render Statement #1 actionable.  *In re Rigel Pharms.*, 697 F.3d at 882.

At most, Plaintiffs appear to complain that the above representation was "misleading" because it omitted "that C3 did not have engagement with the Baker Hughes 12,000-person salesforce, but instead set up a separate sales division that relied on a subset of salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce."  ¶ 76.[6]  Even assuming this is Plaintiffs' allegation, omissions are actionable only where they render an affirmative statement materially misleading, *i.e.*, where the statement "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Here, the above general statement "create[d] no affirmative impression, either way, regarding" the size, nature, or skill of Baker Hughes' sales team working as part of the partnership with C3.  *See Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *4 (C.D. Cal. June 6, 2008).  The allegedly omitted facts simply "bear no connection to the substance of" C3's representation, and are therefore inactionable.  *In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (quoting *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1041 (N.D. Cal. 2017)).  At most, Plaintiffs' theory "essentially crumbles into an efficacy" argument about C3's strategy, which is not sufficient to plead falsity.  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019) (dismissing claims premised on alleged poor quality of marketing).

Regardless, comments about strategic partnerships and their value are routinely dismissed as classic corporate puffery.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) ("Both Verizon and AT&T are strong partners" dismissed as

---

[6] Paragraph 76 applies only to the "foregoing statement," which is Statement #2.  But because no other allegation of falsity is provided for Statement #1, the C3 Defendants assume the allegations in paragraph 76 apply to Statement #1 as well.

puffery); *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *13 (N.D. Cal. Apr. 27, 2017) ("statements that by June 2015, the Lenovo partnership would have 'meaningful revenue impact'" dismissed as puffery); *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *13 (N.D. Cal. Nov. 16, 2020) (Gilliam, J.) ("[w]e believe this [IB partnership] serves as a strong validation of our technology" dismissed as puffery (modifications in original)).

### 2. Statements Acknowledging the Size of Baker Hughes' Sales Force

Plaintiffs also allege as misleading the statement in the Registration Statement that C3 was "jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization." ¶ 75 (Statement #2). The Complaint never alleges that C3 was not jointly marketing and selling products to oil and gas companies under BHC3, nor that the statements as to the size of the Baker Hughes organization were false.

Plaintiffs instead allege that this statement, like Statement #1, was misleading because the company "fail[ed] to disclose the fact that C3 did not have engagement with the Baker Hughes 12,000-person salesforce." ¶ 76. But, like Statement #1, Statement #2 did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"; it did not state, suggest, or imply that ***all*** the people in Baker Hughes' salesforce were actively working for C3. *Brody*, 280 F.3d at 1006. Further, Statement #2 was not misleading because the Registration Statement warned investors of the very risk identified by Plaintiffs: C3 "cannot be certain that [strategic partners] will prioritize or provide adequate resources to selling our AI Suite and AI Applications." Ex. B at 22. Because there was nothing misleading about C3's description of Baker Hughes' salesforce, it is not actionable. *In re Rigel Pharm.*, 697 F.3d at 880 n.8 (no requirement to disclose every relevant fact, "even if investors would consider the omitted information significant," as long as "the omissions do not make the actual statements misleading").

### 3. Statement About Revenue Recognized from Baker Hughes Partnership

The final statement claimed to be actionable under the Securities Act is C3's disclosure that "[d]uring the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first

year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement."  ¶ 77 (Statement #3).  Plaintiffs assert that "it was impossible for C3 to have recognized revenue for the arrangement for fiscal year ending April 30" (¶ 77), based entirely on allegations attributed to a confidential witness dubbed FE-1, who purportedly claimed that Baker Hughes brought in no deals by April 30, 2020.

This assertion fails for several reasons.  Critically, it is contrary to C3's unchallenged financial figures.  As the Registration Statement explains, "the Company recognized total revenue of $46.7 million related to [the Baker Hughes] arrangement," and "[t]he Company recognized subscription revenue from direct subscription fees from [Baker Hughes]" of $40.4 million.  Ex. B at F-40.  The difference between those figures necessarily includes deals brought in by Baker Hughes that generated several million in revenues.  Thus, the same Registration Statement incorporated into the Complaint (*see* the C3 Defendants' concurrently filed Request for Judicial Notice at 1-2) contradicts the hearsay attributed to FE-1.[7]  *See In re Veritas Software Corp. Sec. Litig.*, 2003 WL 27386177, at *3 (N.D. Cal. Dec. 10, 2003) ("In analyzing a motion to dismiss, the Court may disregard factual allegations if such allegations are contradicted by the facts established by reference to exhibits attached to the complaint.").

Regardless, Plaintiffs ignore that C3 was guaranteed certain revenue amounts from its Baker Hughes arrangement—which was well-known to investors.  Immediately preceding the challenged statement, the Registration Statement explains that Baker Hughes had a minimum commitment of $50 million for the fiscal year ended April 30, 2020, which included $39.5 million in direct subscription fees "with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization."  ¶ 77.  Even if Baker Hughes had not been successful in reselling C3's products (which it was), C3 would receive $39.5 million in subscription fees and millions more from Baker Hughes' minimum commitment.  *See* Ex. B at 67.[8]  Plaintiffs never challenge the accuracy

---

[7] These figures are confirmed by C3's 10-K for Fiscal Year 2022, which reported just over $5.9 million in revenue from customers "related to the Baker Hughes arrangement" in Fiscal Year 2020.  Ex. E at 126.  This, too, is not challenged by Plaintiffs.

[8] These figures are likewise confirmed by C3's 10-K for Fiscal Year 2022.  Ex. E at 126.

1    of those results anywhere in the Complaint.  For this reason as well, Plaintiffs' claim that it was

2    "impossible" for C3 to recognize revenue from the partnership (¶ 78) is unsupported.

3         Further, the hearsay attributed to FE-1 is unreliable.  *First*, as above, it is contrary to

4    unchallenged disclosures in the Registration Statement and other disclosures.  *In re Veritas*, 2003

5    WL 27386177, at *3.  *Second*, Plaintiffs fail to plead FE-1's position, duties, or responsibilities with

6    any particularity, describing FE-1 as a "former Vice President" (¶ 55).  *Applestein v. Medivation,*

7    *Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014)

8    (declining to credit confidential witness allegations where "Plaintiffs do not describe the job

9    responsibilities of CW–1 and CW–3").  *Third*, Plaintiffs' allegations suggest FE-1 worked at C3

10   only from March to May 2020—just two of the 12 months of the Fiscal Year ended April 30, 2020,

11   and well before C3's IPO.  ¶ 55 (alleging FE-1 joined C3 in March 2020); *see Lechner v. Infusystem*

12   *Holdings, Inc.*, 2017 WL 11593803, at *5 (C.D. Cal. Dec. 15, 2017) (rejecting allegations that "pre-

13   or post-dated FE1's three-month employment" and "constitute[d] second-hand knowledge, largely

14   consisting of hearsay statements").  *Fourth*, Plaintiffs nowhere allege that FE-1 had any

15   responsibility for the Baker Hughes partnership, but only that FE-1 "recalled hearing" an

16   unidentified employee discuss Baker Hughes.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

17   981, 996-1000 (9th Cir. 2009) (confidential witnesses were "simply not positioned to know the

18   information alleged" and "report[ed] only unreliable hearsay").  *Fifth*, the meetings at which FE-1

19   claims to have overheard the information attributed to FE-1 were, by Plaintiffs' own allegations,

20   meetings to discuss "*new* sales leads," ¶ 55 (emphasis added), and so offer no insight into what sales

21   had occurred prior to FE-1's short stint at C3.  And *finally*, the Complaint thus lacks "adequate

22   corroborating details" for FE-1's supposed allegations—particularly by contrast to the unchallenged

23   financial statements—as necessary to credit anonymous allegations.  *In re Daou Sys., Inc.*, 411 F.3d

24   1006, 1015 (9th Cir. 2005); *see also In re Bus. Objects S.A. Sec. Litig.*, 2005 WL 1787860, at *6

25   (N.D. Cal. July 27, 2005) ("[B]esides the statements of these three confidential witnesses, Plaintiffs

26   have offered the Court no corroborating evidence[.]").

27        **B.**   **Plaintiffs Have Not Pleaded Violations of Items 303 and 105**

28        Recognizing their inability to identify actionable misstatements in the Registration

1    Statement, Plaintiffs allege that C3 was required, under Item 303 and Item 105 of Regulation S-K,

2    to disclose that Baker Hughes was allegedly using a less experienced salesforce at the time of the

3    Registration Statement.  ¶¶ 79-89.  These allegations similarly fail.

4                    1.    **Item 303**

5          Item 303 requires that registrants "[d]escribe any known trends or uncertainties that have

6    had or are reasonably expected to have a material favorable or unfavorable impact on net sales or

7    revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).  Here, Plaintiffs

8    have not adequately alleged that the nature of Baker Hughes' sales force constituted a "known trend

9    or uncertainty" such that disclosure was required under Item 303.[9]

10         *First*, the nature of the Baker Hughes sales team is not the type of information that must be

11   disclosed under Item 303.  This is because "[t]here is a significant difference between events and

12   trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials,

13   and competitive marketing strategies and plans . . . . [T]he latter are competitive business judgments

14   that management makes to improve the business, and need not be disclosed." *In re Canandaigua*

15   *Sec. Litig.*, 944 F. Supp. 1202, 1210-11 (S.D.N.Y. 1996).  The structure of the Baker Hughes/C3

16   sales team constitutes a business judgment that is not required to be disclosed.  *See Steamfitters'*

17   *Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) ("[T]he business

18   strategy decision on which [plaintiffs] rely is not the type of disclosure Item 303 requires. The SEC

19   'has never gone so far as to require a company to announce its internal business strategies.'" (quoting

20   *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015)); *McGovney v. Aerohive*

21   *Networks, Inc.*, 367 F. Supp. 3d 1038, 1054-55 (N.D. Cal. 2019) (dismissing allegations that

22   defendant did not disclose "sales strategy failures" and had "replaced knowledgeable, experienced

23   sales personnel and implemented cost-cutting measures that left the sales organization understaffed

24   and ill-equipped to service existing customers and develop new opportunities").

25         *Second*, even assuming a duty to disclose, the Registration Statement provided disclosures

26   ─────────────────────

27         [9] The requirement that "known" trends or uncertainties be disclosed has an accompanying
     scienter requirement. *In re Talis Biomed. Corp. Sec. Litig.*, 2022 WL 17551984, at *21 (N.D. Cal.
     Dec. 9, 2022) (dismissing claims under Items 303 and 105 for failure to plead knowledge).  Plaintiffs
28   fail to plead scienter, and their Item 303/105 theories fail for this reason as well. *See infra* at § II(B).

1   regarding the Baker Hughes partnership sufficient to fulfill any duty under Item 303.  *See*

2   *Golubowski v. Robinhood Mkts., Inc.*, 2023 WL 1927616, at *7 (N.D. Cal. Feb. 10, 2023) (no

3   violation of Item 303 where risks were disclosed).  As detailed above, the Registration Statement

4   specifically disclosed, among other things, that C3 "cannot guarantee" its strategic partners "will

5   continue to devote the resources necessary to expand our reach and increase our distribution" or

6   "will prioritize or provide adequate resources to selling our AI Suite and AI Applications," that "we

7   cannot assure you that these relationships will result in increased customer usage . . . or increased

8   revenue," and that absent such relationships "our business, operating results, and financial condition

9   could be adversely affected."  Ex. B at 21-22.  Plaintiffs' allegation that C3 failed to disclose

10  "material known risks related to the Baker Hughes partnership" and "a risk that Baker Hughes would

11  not perform effectively" (¶ 84) ignores these disclosures.  *See, e.g.*, *In re Netflix, Inc., Sec. Litig.*,

12  923 F. Supp. 2d 1214, 1221 (N.D. Cal. 2013) ("Plaintiffs' pleadings do not actually show that

13  Defendants withheld information about a known trend or uncertainty in the streaming market, since

14  Defendants repeatedly stated that success in the streaming market depended on multiple factors,

15  especially Netflix's ability to keep its subscriber base large and happy."); *Golubowski*, 2023 WL

16  1927616 at *7 (dismissing Item 303 claim where risk disclosures covered the alleged risks).

## 2.   **Item 105**

18          Similar to Item 303, Item 105 requires a "discussion of the material factors that make an

19  investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.  To the extent

20  Plaintiffs' Section 11 claim is premised on a violation of Item 105, it fails for the same reason as the

21  Item 303 allegations.  *See Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *10 (C.D. Cal. Jan. 25,

22  2021) (dismissing Item 105 claims for the same failures leading to dismissal of Item 303 claims).

23  Specifically, Plaintiffs fail to articulate any theory as to how Baker Hughes' organization or the

24  structure of its salesforce could be a material factor—indeed, Plaintiffs do not dispute that,

25  regardless of that structure, Baker Hughes was responsible for shortfalls on its commitments of $320

26  million over three years.  *See In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *37 (S.D.N.Y.

27  Jan. 10, 2023) ("Item 105 . . . requires disclosure of the 'most significant risk factors' associated

28  with the security."); *see also Velocity Fin.*, 2021 WL 268250 at *10 (no Item 105 claim where

1    "Plaintiff has not adequately alleged how Defendants would have known about the . . . risks at the

2    time of the IPO to include a more specific warning").

3           Finally, the Registration Statement actually did warn that "[w]e cannot be certain that these

4    partners," such as Baker Hughes, "*will prioritize or provide adequate resources* to selling our AI

5    Suite and AI Applications."  Ex. B at 22 (emphasis added).  The disclosures in the Registration

6    Statement again doom Plaintiffs' assertion that C3 "did not disclose 'material factors' that would

7    make an investment in [C3] speculative or risky."  *Golubowski*, 2023 WL 1927616 at *8 (no Item

8    105 claim where risk was expressly disclosed).  Plaintiffs' Item 105 assertions fail.

9           **C.      The Statute of Limitations Bars the Securities Act Claim Against Mr. Abbo in
                Its Entirety, and Against All Defendants in Part**
10

11          The Securities Act requires that an action be brought "within one year after the discovery of

12   the untrue statement or the omission, or after such discovery should have been made by the exercise

13   of reasonable diligence."  15 U.S.C. § 77m.  Mr. Abbo was first named as a Defendant in the

14   Amended Complaint, which was filed on February 15, 2023, more than a year after the final alleged

15   corrective disclosure on December 1, 2021 (¶ 193).  *See Amorosa v. AOL Time Warner Inc.*, 409 F.

16   App'x 412, 416 (2d Cir. 2011) (disclosure date under Section 11 is the date on which the claim

17   should have been discovered through reasonable diligence); *In re Obalon Therapeutics, Inc.*, 2019

18   WL 4729461, at *12 (S.D. Cal. Sept. 25, 2019) (similar).  The Securities Act claim against Mr. Abbo

19   is thus untimely.  *See, e.g.*, *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996) (affirming

20   dismissal where defendants were added to Securities Act claim after statute of limitations expired).

21          Plaintiffs' claims based on Statements #2 and #3 are untimely against all Defendants.  An

22   amended complaint relates back to the date of an earlier pleading only when "the amendment asserts

23   a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to

24   be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Further, "[c]laims arise out of

25   the same conduct, transaction, or occurrence if they 'share a common core of operative facts' such

26   that the plaintiff will rely on the same evidence to prove each claim."  *Williams v. Boeing Co.*, 517

27   F.3d 1120, 1133 (9th Cir. 2008).  Neither Statement #2 or #3 is identified as misleading in the

28   original complaint, so Plaintiffs' Securities Act claim based on those statements rests on new facts

1   not previously pleaded.  *See Caldwell v. Berlind*, 543 F. App'x 37, 40 (2d Cir. 2013) ("[E]ven where

2   an amended complaint tracks the legal theory of the first complaint, claims that are based on an

3   entirely distinct set of factual allegations will not relate back.").

4   ## II.   PLAINTIFFS HAVE FAILED TO PLEAD EXCHANGE ACT CLAIMS

5         To state a claim for a violation of Section 10(b), Plaintiffs must allege:  "(1) a material

6   misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

7   misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

8   misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re NVIDIA Corp. Sec.*

9   *Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*

10  *Inc.*, 552 U.S. 148, 157 (2008)).  A claim under Section 10(b) is subject to the heightened pleading

11  requirements of Rule 9(b) and the PSLRA.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598,

12  604 (9th Cir. 2014).  "Rule 9(b) applies to all elements of a securities fraud action, including loss

13  causation," *id.* at 605, and scienter, *i.e.*, "the defendant's intention 'to deceive, manipulate, or

14  defraud,'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Plaintiffs have

15  failed to adequately allege several elements of a Section 10(b) claim, each of which is dispositive.

16        A.      **Plaintiffs Have Failed To Plead an Actionable Misrepresentation or Omission**

17        Plaintiffs have failed to allege with particularity why any statement or purported omission

18  asserted in support of their Exchange Act claim was materially false or misleading.

19              1.      **Statements Regarding Baker Hughes' 12,000-Person Sales Force**

20        Plaintiffs identify as misleading several statements about the Baker Hughes salesforce, such

21  as that C3 had "12,000 people selling" for C3 at Baker Hughes, and allege those statements were

22  false because "C3 did not have access to the full 12,000-person Baker Hughes salesforce."[10]  These

23  claims fare no better than those identified in support of the Securities Act claim.

24        *First*, Plaintiffs never dispute the size of Baker Hughes' salesforce.  *See, e.g.*, ¶ 140 (stating

25  C3 was selling "with the active engagement of Baker Hughes, which has a 12,000-person sales

26  ─────────────────────────

27  [10] Statements #4-6 (¶¶ 124, 126, 128), #8-13 (¶¶ 132, 134, 136, 138, 140, 142), #15-17
    (¶¶ 146, 148, 151).  Statement #12, which makes the unchallenged claim that Baker Hughes "has a

28  12,000-person sales organization" is the only alleged misstatement attributed to Mr. Simonelli in
    connection with Plaintiffs' Exchange Act claims.

organization"); ¶ 153 (describing Baker Hughes as a "12,000-person sales organization").  Further, these statements say nothing about the size, nature, or skills of the specific Baker Hughes sales team working on the C3 partnership.  They are thus inactionable for the same reasons as Statements #1 and #2 identified in the Securities Act discussion (*see supra* at § I(A)).  *See Norfolk Cnty.*, 2016 WL 7475555 at *3 ("The facts purportedly inconsistent with Defendants' representations do not plausibly support an inference that the representations were false or misleading.").

 *Second*, any salesforce statements that Plaintiffs claim to be false are classic puffery that no reasonable investor would have taken literally.  *See, e.g.*, ¶ 138 (statement that Baker Hughes has "12,000 people selling C3 for us all around the world every day"); ¶ 132 (statement that Baker Hughes' sales team was "selling for us around the world into every oil and gas company on the planet").  Plaintiffs cannot suggest that reasonable investors would have understood these statements to mean that every single Baker Hughes salesperson sold C3 products every day into every oil and gas company.  Rather, these are obvious hyperbole "that no reasonable investor would rely on [] when considering the total mix of available information."  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000); *see also Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) (recognizing "exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely") (quoting *In re All Terrain Vehicle Litig.*, 771 F. Supp. 1057, 1060 (C.D. Cal. 1991)); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998) (statements "best described as hyperbole or corporate puffery" cannot support a claim); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (some statements are "such obvious hyperbole that no reasonable investor would rely upon them").  Notably, Plaintiffs do not point to a single analyst, investor, or market commentator that interpreted the statements about a 12,000-person salesforce in the way they allege.

 *Finally*, the statements did not alter the total mix of information in the market. The Registration Statement warned investors that C3 **could not guarantee that Baker Hughes would devote adequate resources to selling C3's products**.  Ex. B at 22.  In this context, no reasonable investor could think that every single member of Baker Hughes' 12,000-person salesforce was selling C3 products every day.  *See Curry v. Yelp Inc.*, 2015 WL 7454137, at *4, *6 (N.D. Cal. Nov.

24, 2015) (statements characterizing certain online reviews as "high-quality, authentic content" were inactionable because "no reasonable investor could have understood Defendants' statements to mean that all Yelp reviews were authentic" and thus alleged manipulation of reviews "did not significantly alter the total mix of information available to the market"), *aff'd*, 875 F.3d 1219, 1223 (9th Cir. 2017).   Reasonable investors would have understood the salesforce statements as describing Baker Hughes' size and resources, which Baker Hughes could leverage in performing its contractual commitment.  The precise activities of the Baker Hughes team at any point in time did not materially affect the information available to investors.  *See McGovney*, 367 F. Supp. 3d at 1059 (dismissing claims based on failure to disclose change in sales team quality).

The salesforce statements are also immaterial in light of C3's disclosures regarding actual revenues and benefits derived from the Baker Hughes partnership.  As noted, C3's revenue from Baker Hughes-sourced deals increased to more than $20 million in Fiscal Year 2021, when the "risks" "concealed" by these statements supposedly were "materializing."  Ex. E (2022 Form 10-K) at 126.  Plaintiffs fail to explain, in light of this sales success, "why an investor's assessment of [C3] would have changed" had they learned (and not already known) that the statements regarding the number of salespeople were hyperbole.  *See In re Nektar Therapeutics Sec. Litig.*, 34 F. 4th 828, 836 (9th Cir. 2022).  In fact, due in part to the relationship with Baker Hughes, C3's revenues increased every single quarter of the Class Period and C3 consistently beat its revenue guidance:

| Quarter | C3 Guidance | C3 Revenue |
|---------|-------------|------------|
| Q2 2021 | None | $41.3 million |
| Q3 2021 | None | $49.1 million |
| Q4 2021 | $50 million - $51 million | $52.3 million |
| Q1 2022 | $50 million - $52 million | $52.4 million |
| Q2 2022 | $56 million - $58 million | $58.3 million |

*See* Ex. F (March 1, 2021 Form 8-K) at 6; Ex. G (June 2, 2021 Form 8-K) at 4; Ex. H (Sept. 1, 2021 Form 8-K) at 4; Ex. A (Dec. 1, 2021 Form 8-K) at 5.

Nor can Plaintiffs fall back on asserting a disparity in the quality of BHC3's salespeople and other Baker Hughes salespeople.  As discussed, the quality of salespeople is not a disclosure required under the federal securities laws.  *See, e.g.*, *McGovney*, 367 F. Supp. 3d at 1049, 1059 (rejecting

liability for failure to disclose that defendant "replaced knowledgeable, experienced sales personnel and implemented cost-cutting measures that left the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities").  Further, Plaintiffs point to no representation about the experience or quality of the Baker Hughes sales team responsible for selling C3 products that the purported omission rendered misleading.  *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 387 (N.D. Cal. 2020) ("Asserting the existence of a 'scalable architecture' is not a representation that there have not been any problems with the infrastructure nor is it a promise that there will not be any future problems with scaling."), *aff'd*, 13 F.4th 940 (9th Cir. 2021).[11]

## 2.   Alleged Failure To Disclose Internal Restructuring

Plaintiffs claim that Statements #12-#18 were "also misleading" because they did not recount that in July 2021 C3 restructured its internal sales team, and then abandoned that change in November 2021.  ¶¶ 119, 143, 145, 147, 149, 152, 154.[12]  On their face the statements say nothing about C3's internal sales team.  Thus, "even if investors would consider the omitted information significant," the "omissions do not make the actual statements misleading."  *In re Rigel Pharms.*, 697 F.3d at 880 n.8; *Karri v. Oclaro, Inc.*, 2020 WL 5982097, at *7 (N.D. Cal. Oct. 8, 2020) (dismissing omission claim for failure to "allege with particularity how such an omission rendered anything in the proxy statement materially misleading"); *Manger v. Leapfrog Enter., Inc.*, 229 F. Supp. 3d 1126, 1132-33 (N.D. Cal. 2017) ("The Amended Complaint does not allege facts showing that any particular statement was rendered materially misleading because [of] the omission.").

Further, "[i]t is . . . well established that a company has no such duty to disclose changes to its business plans unless the plaintiff plausibly alleges that a company had stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors."  *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478,

_____

[11] Plaintiffs allege that in October 2021, C3 and Baker Hughes restructured their partnership to move Baker Hughes' C3-related operations to Baker Hughes' central organization.  Thus, Statements #16 and #17—both dated as of November 2021—cannot be misleading for failing to disclose that the salespeople were not working at Baker Hughes' central organization.  ¶ 152.

[12] Plaintiffs' allegation that C3 had a 700-person sales team (¶ 62) exceeds the actual number by at least a factor of 10.

495 (S.D.N.Y. 2021) (citations omitted).  By contrast, C3 expressly warned investors it was *not* committed to a specific sales strategy, but that "[f]actors that may cause fluctuations in our quarterly results of operations and key metrics include . . . *changes in the way we organize and compensate our sales teams*."  Ex. B at 27 (emphasis added).  Investors therefore understood the possibility that C3 would undertake such a restructuring, and there was no omission of material information that rendered any statements misleading.  *See In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *16 (N.D. Cal. Nov. 23, 2021) ("Contrary to the omission plaintiff seeks to emphasize throughout, defendants disclosed the risk faced."); *see also Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 624 (S.D.N.Y. 2021) (omission immaterial where risk factors provided sufficient warning).

### 3.      General Statements About C3's Partnership with Baker Hughes

Plaintiffs also allege C3 made misrepresentations to investors when it stated that Baker Hughes was a "notable partner[]" (¶ 144, Statement #14) and that "there is no better partner than Baker Hughes. They basically have a long-standing deep relationships with almost all oil and gas companies, independent national companies out there.  The collaboration is I would say is very deep if you will.  So we're collaborating on product" (¶ 130, Statement #7).  These statements are similar to the general statement in the Registration Statement (¶ 74, Statement #1) and should be dismissed as inactionable puffery, and because they are not alleged to have been false.  *See supra* at § I(A)(1); *see also Terenzini v. GoodRx Holdings, Inc.*, 2022 WL 122944, at *4 (C.D. Cal. Jan 6, 2022) (partnerships creating "deep competitive moat" were inactionable puffery).

### B.      Plaintiffs Have Failed To Plead a Strong Inference of Scienter

To plead scienter under the PSLRA, Plaintiffs "must [allege] specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (citation omitted); *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (scienter requires "specific facts indicating no less than a degree of recklessness that *strongly suggests actual intent*.") (emphasis added); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) ("mere recklessness" is insufficient to plead scienter); *Zucco*, 552 F.3d at 991 (plaintiff must plead "a highly

unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.") (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).  It is not enough to allege facts from which an inference of scienter "could be drawn;" rather, Plaintiffs must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent— inference," *Tellabs*, 551 U.S. at 323, that "a reasonable person would deem . . . *cogent and at least as compelling* as any opposing inference."  *Zucco*, 552 F.3d at 991 (quoting *Tellabs*, 551 U.S. at 309) (quotation omitted) (emphasis in original).

Further, merely alleging "a motive to commit fraud and opportunity to do so" is "not sufficient to establish a strong inference of deliberate recklessness." *City of Dearborn Heights*, 856 F.3d at 619.  Where, as here, Plaintiffs offer no plausible motive allegations, it "certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021).

### 1.   Plaintiffs Have Failed To Plead Intent To Defraud

***Defendants' Positions and Involvement:***  Plaintiffs allege that Defendants had access to information contrary to the alleged misstatements "by virtue of [their] position[s]."  ¶¶ 168, 219, 244.  But "[c]ourts have consistently rejected such general allegations as insufficient to plead scienter with the requisite specificity." *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000) (rejecting allegations that "defendants must have known of the falsity of their statements by virtue of their positions in the company"); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("[P]laintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position.").

Plaintiffs also seek inferences of scienter on the basis that Mr. Siebel "participated in the management and day-to-day operations of the Company" (¶ 204), and Mr. Abbo "kept in very close communication with a Baker Hughes executive vice president" (¶ 213).  Such allegations are also

routinely rejected as insufficient to plead scienter.  *See, e.g., Metzler*, 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard.").

   **Internal Meetings and Reports:**  Plaintiffs allege that Messrs. Abbo, Barter, Siebel, and Simonelli attended "internal meetings" and had access to "internal contemporaneous reports and data" that contradicted their statements.  ¶¶ 206, 215, 219, 222.  But the Complaint does not allege what reports any one of these Defendants reviewed or what or meetings these Defendants allegedly attended, what was discussed in those reports or meetings, or when or how the reports or data contradicted any public statement.  Such general allegations are routinely dismissed.[13]  *See, e.g., In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("General allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient."), *abrogated on other grounds by Tellabs*, 551 U.S. at 315-18; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (confidential witness statements lacked foundation because they did not "detail the actual contents of the reports the executives purportedly referenced or had access to," and witnesses "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health"); *CheckOut Holdings, LLC v. Amplified Holdings, Inc.*, 64 F. App'x 631, 633 (9th Cir. 2003) ("Mere access to corporate information is inadequate evidence of scienter."); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("Although plaintiffs refer to the existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do not allege with particularity any specific

---

   [13] These allegations are particularly weak as to Mr. Simonelli, who sat on C3's board but was not a member of management.

1   information showing" the internal data contradicted defendants' public statements).[14]

2   Plaintiffs also allege that Mr. Siebel attended certain weekly sales calls during which FE-1

3   recalls hearing the General Manager of Oil & Gas state, at some unspecified point, that Baker

4   Hughes had made no sales as of April 30, 2020.  ¶ 67.  As explained above (*see supra* at § I(A)(3)),

5   such hearsay does not establish the "reliability and personal knowledge" required to credit

6   confidential witness assertions, particularly from a former employee whose tenure Plaintiffs allege

7   lasted three months.  *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 522 F. Supp. 3d 660,

8   674 (N.D. Cal. 2021) (Gilliam, J.) (quoting *Zucco*, 552 F.3d at 995).  And this allegation relates only

9   to the single statement in the Prospectus regarding recognition of revenue from Baker Hughes,

10   which was not materially false or misleading (*see supra* at § I(A)(3)).

11   ***Mr. Siebel's Alleged Corrective Disclosure:***  Plaintiffs allege that Mr. Siebel's eventual

12   disclosure to the market that Baker Hughes had formed a new business unit—BHC3—proves that

13   "he had known all along."  ¶ 211.  To start, Plaintiffs fail adequately to plead Mr. Siebel's scienter

14   regarding the structure of this arrangement.  Rather, "the complaint must contain allegations of

15   specific ***contemporaneous*** statements or conditions that demonstrate the intentional or the

16   deliberately reckless false or misleading nature of the statements when made."  *Metzler*, 540 F.3d at

17   1066 (emphasis added).  The Complaint does not allege facts showing Mr. Siebel was aware of the

18   structure of Baker Hughes' business unit at the time the purported misstatements were made.

19   *Gaylinn*, 185 F. Supp. 2d at 1065 (cannot infer scienter based on position at the company).

20   Further, even if pleaded, Mr. Siebel's mere knowledge concerning the structure of the

21   arrangement does not plead the necessary knowledge that any statement of his could have been

22

23

24

25   [14] *See also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *30 (N.D. Cal. July 21,

26   2020) ("General allegations of Pivotal Defendants' 'interaction with other officers and employees,
their attendance at meetings, and their receipt of weekly or monthly reports are insufficient' to create

27   an inference of scienter 'more cogent or compelling than an alternative innocent inference.'")
(quoting *Daou*, 411 F.3d at 1022); *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal.

28   2020) ("Merely being present at quarterly 'all-hands' meetings does not demonstrate the requisite
personal knowledge . . . .").

1    misleading.  In particular, in light of express risk disclosures concerning the BHC3 arrangement[15]

2    (*see supra* at 5-7), the allegations do not suggest any knowledge that any identified misstatement

3    could have been, or was intended to be, misleading.  As noted above, Plaintiffs have failed to plead

4    that any statements concerning BHC3 or Baker Hughes in general were materially misleading.

5        Additionally, the fraud-by-hindsight assertion that, because the truth was eventually

6    disclosed, Mr. Siebel must have known it all along, would make scienter a foregone conclusion in

7    every case and is legally insufficient.  *See, e.g., In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341

8    (9th Cir. 2002) ("[T]he inference that the plaintiffs would have us draw is that, because the

9    defendants admit that they knew something later and the 'something' is important, they must have

10   known earlier.  That kind of bare inference by hindsight is not permitted under the PSLRA."); *In*

11   *re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) (similar).

12       ***Core Operations:***  Plaintiffs fall back on a "core operations" theory—that because alleged

13   misstatements related to Defendants' "core" business, Defendants must have known of any falsity.

14   ¶¶ 205, 214, 218, 221.  Proceeding under such a theory is "not easy," *Intuitive Surgical*, 759 F.3d at

15   1062, and "simply alleging that the partnership . . . was crucial does not give rise to a strong

16   inference of scienter."  *In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13,

17   2020) (Gilliam, J.); *NVIDIA*, 768 F.3d at 1064 (rejecting core operations theory even when "the

18   problem concerned [NVIDIA's] flagship product and was cause for concern to [NVIDIA's] two

19   largest customers"); *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936, at

20   *12 (N.D. Cal. Mar. 16, 2020) (conclusory assertion that something is a company's "core business

21   does not give rise to an inference of scienter").  Rather, Plaintiffs "must produce either specific

22   admissions by one or more corporate executives of detailed involvement in the minutia of a

23   company's operations . . . or witness accounts demonstrating that executives had actual involvement

24

---

25   [15] *See, e.g.*, Ex. B at 21 ("Our revenue growth depends in part on the success of our strategic

26   relationships with third parties, including channel partners, and if we are unable to establish and
     maintain successful relationships with them, our business, operating results, and financial condition

27   could be adversely affected."); *id* at 22 ("[W]e cannot guarantee that the partners with whom we
     have strategic relationships will continue to devote the resources necessary to expand our reach and

28   increase our distribution" or that such partners "will prioritize or provide adequate resources to
     selling our AI Suite and AI Applications.").

in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062 (internal citations omitted).  Plaintiffs have alleged neither.

*First*, Plaintiffs fail to allege an admission by any Defendant of detailed involvement in the minutiae of the Company's operations.  General statements in the Complaint that the Baker Hughes partnership was "core to [the Company's] growth strategy" or that Baker Hughes was one of the "most notable partners" are insufficient.  ¶ 205.  "Pointing to Defendants' statements . . . does not suffice under this theory" and cannot substitute for "specific admissions."  *In re Nektar Therapeutics*, 2020 WL 3962004, at *12.  And other than pointing to Mr. Abbo's general and unremarkable statement that he regularly spoke with Baker Hughes (¶ 130), Plaintiffs fail to allege any Defendant's level of involvement in that partnership.  *See NVIDIA*, 2020 WL 1244936 at *11 ("Without particularized allegations indicating Individual Defendants' detailed involvement with this level of secondary data, as opposed to higher-level information about direct sales by product type, the statements alone do not meet the standard required to show scienter under the core operations theory.").

*Second*, the Complaint does not allege that any Defendant created or was aware of any reports that contradicted any specific statements.  "Missing are allegations linking specific reports and their contents to the executives."  *Intuitive Surgical*, 759 F.3d at 1063.  Further, the assertion attributed to FE-1 that Mr. Siebel attended certain meetings, and at one or more of those meetings an unidentified speaker stated that Baker Hughes had made no sales as of April 30, 2020 (¶ 206), is insufficient *per se* (*see supra* at § I(A)(3)).  The Complaint simply fails to link Mr. Siebel to any specific report, fails to allege he even attended the meeting(s) where the "no sales" statement was made, and fails to establish any connection to the Exchange Act statements.

## 2. <u>Plaintiffs Have Not Adequately Alleged Motive</u>

Unable to plead Defendants' possession of specific information contrary to the alleged misstatements, Plaintiffs rely on purported "motive and opportunity" to commit fraud.  To start, allegations of motive and opportunity are not independently sufficient to establish scienter.  *See City of Dearborn Heights*, 856 F.3d at 619.  Even if they were, the allegations here would be insufficient.

1

(a)      Allegations of Motive to Secure Funding Are Insufficient

2          Plaintiffs allege Mr. Siebel's purported misrepresentations were "necessary to go public" in

3   that he made them "while soliciting funds from investors in C3's initial public offering" and that he

4   profited from selling C3 shares after the IPO.  ¶ 208.  At the outset, it is real-world absurd to claim

5   that Mr. Siebel's intensive efforts over more than a decade to build a successful company in an

6   immensely complex and cutting-edge field, into which venture he brought some of the most

7   prominent names in the software and technology field (and a former Secretary of State), culminated

8   in a scheme to inflate C3's stock price through vague statements about a single relationship.

9   Moreover, it is well-settled that "allegations of routine corporate objectives such as the desire to

10  obtain good financing and expand are not, without more, sufficient to allege scienter." *In re Rigel*

11  *Pharms.*, 697 F.3d at 884.  Indeed, if Plaintiffs could plead motive simply by alleging an upcoming

12  IPO, that would effectively dispense with the scienter pleading requirement for such cases. *Webb*

13  *v. Solarcity Corp.*, 884 F.3d 844, 854, 856 (9th Cir. 2018) (misrepresentations allegedly "critical to

14  the company's successful IPO" are "unhelpful" to plead scienter because "every company that goes

15  public wants to maximize its apparent profitability prior to its IPO");  *Kong v. Fluidigm Corp.*, 2022

16  WL 445764, at *6 (N.D. Cal. Feb. 14, 2022) (rejecting allegation that "defendants were motivated

17  to conceal faltering sales demand in order to raise funds through a potential public offering").

18

(b)      Allegations of Stock Sales Do Not Support Scienter

19         Plaintiffs rely heavily on allegations that Defendants' C3 stock sales were "suspicious" in

20  timing and amount. *E.g.*, ¶¶ 157, 209-10, 216, 223.  To start, "stock sales alone cannot create a

21  strong inference of scienter." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998).

22  Rather, courts must consider "(1) the amount and percentage of the shares sold; (2) the timing of the

23  sales; and (3) whether the sales were consistent with the insider's trading history." *Norfolk Cnty.*,

24  2018 WL 3126393 at *9 (quoting *Metzler*, 540 F. 3d at 1066-67); *see also id.* (stock sales "only give

25  rise to an inference of scienter when they are dramatically out of line with prior trading practices at

26  times calculated to maximize the personal benefit from undisclosed inside information").  Plaintiffs'

27  allegations do not establish that any of these factors raises an inference even of motive—much less

28  of scienter—particularly since not every Defendant even sold stock.

*First*, and critically, Plaintiffs plead no trading history at all. *See Curry v. Yelp Inc.*, 2015 WL 1849037, at *13 (N.D. Cal. Apr. 21, 2015) (dismissing claim for failure to allege trading history sufficient to show sales were suspicious). But "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco,* 552 F.3d at 1005-06 ("no inference of scienter" absent allegations that Defendants' "stock sales, though significant, are inconsistent with their usual trading patterns"). This failure alone dooms the stock sale allegations.[16]

*Second*, Plaintiffs fail to plead any facts showing that the timing of any alleged sales was suspicious. In fact, the stock sales identified in the Complaint occurred precisely when one would expect. As disclosed in the Registration Statement, Defendants were prohibited from selling shares until the end of the 180-day lock-up period (June 7, 2021) or, with certain limitations and upon meeting certain conditions, after 90 days (on March 8, 2021). Ex. B at 46. It is routine for insiders to sell stock after a lockup period expires, particularly after years of building a company. *See, e.g.*, *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) (defendant's stock sales not suspicions where "sale allowed him to capitalize on the expiration of his own ninety-day lock-up period"); *Callan v. Motricity Inc.*, 2013 WL 195194, at *25 (W.D. Wash. Jan. 17, 2013) ("Plaintiffs[] have failed to demonstrate that the stock sales were either significant or uncharacteristic, given their timing immediately after the post-IPO lock-up expired."); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 224-25 (D. Mass. 1999) ("[A]ll of the challenged sales occurred within weeks after the lock-up agreement expired, a fact which renders the sales even less suspicious.") (internal quotation and citation omitted). Further, it is unclear "why defendants—if they were so eager to rid themselves of [C3] stock—would have entered into the lock-up agreements in the first place." *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144,

---

[16] "Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history." *Zucco*, 552 F.3d at 1005; *see also Yelp*, 2015 WL 1849037 at *13 ("[A] lack of trading history due to a recent IPO may foreclose a plaintiff from one avenue of pleading scienter."); *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *15 (N.D. Cal. Nov. 14, 2016) (inability to allege history due to prior lockup "weighs against scienter").

1165 (S.D. Cal. 2003). Indeed, the lock-up agreements prevented Defendants from selling anywhere near the Company's stock price high of approximately $161. The Individual Defendants' remaining alleged sales occurred throughout 2021, and all such sales were weeks or months before the alleged corrective disclosure in December 2021 and each of the alleged negative earnings reports. *See Wenger*, 2 F. Supp. 2d at 1251 ("[N]one of the sales occurred at suspicious times, such as immediately before a negative earnings announcement").

*Third*, many sales identified by Plaintiffs were made pursuant to pre-established 10b5-1 plans (¶ 157), which "weigh[] against an inference of scienter." *In re Nektar Therapeutics*, 2020 WL 3962004, at *16; *see also In re Fastly*, 2021 WL 5494249 at *17 ("[T]hese planned sales . . . made without concern for the market, cut against a finding of scienter."); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) ("[A]utomatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter.").[17] In particular, Mr. Barter made ***no*** alleged sales outside of his 10b5-1 plan. Further, ***all*** of Mr. Siebel's sales, and all but one of the Individual Defendants' sales, that occurred after C3's internal sales force restructuring were made pursuant to a 10b5-1 plan, which precludes an inference that Defendants sought to sell stock before the (normal, and warned-of) internal sales restructuring came to light. ¶ 157; *Wenger*, 2 F. Supp. 2d at 1251.

*Fourth*, Plaintiffs fall far short of pleading that the size of the sales was unusual, offering no allegations at all as to the percentage of Defendants' holdings sold during the Class Period. *See Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020) (Gilliam, J.) (no scienter where the complaint "fails to include any allegations concerning the percentage of their holdings they sold"); *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1366 (C.D. Cal. 2014) (similar). This is unsurprising, as the Individual Defendants' holdings across the Class Period remained relatively stable.[18]

---

[17] Plaintiffs claim it is suspicious that 10b5-1 sales stopped about a year after the IPO. ¶ 167. But Plaintiffs nowhere allege any fraudulent intent at the time the 10b5-1 plans were established.

[18] *Compare* Ex. B at 154 *with* Ex. I (August 2021 Proxy Statement) at 27; and Ex. J (August 2022 Proxy Statement) at 46. The Company's Registration Statement and proxy statements each include exercisable options in each Individual Defendant's holdings, which is the appropriate way to calculate holdings in the context of a scienter analysis. *In re Silicon Graphics Inc. Sec. Litig.*,

1   *Finally*, the Complaint alleges stock sales by "Baker Hughes/Simonelli" (¶ 157) and asserts

2   that Mr. Simonelli specifically made certain stock sales (¶ 188).  This is misleading.  In reality,

3   every single sale identified was made by Baker Hughes Holdings LLC,[19] *not* by Mr. Simonelli.

4   Plaintiffs offer no facts suggesting that Mr. Simonelli, as CEO of Baker Hughes, benefited directly

5   or concretely from Baker Hughes' sales of C3 stock, nor any other reason to infer Mr. Simonelli's

6   intent from a corporate stock transaction.

7               **3.      Plaintiffs Ignore Non-Culpable Inferences**

8       Even if Plaintiffs' allegations warranted any inference of scienter, it would not be as

9   compelling as the non-culpable inference, including in particular that Defendants honestly believed

10  they had sufficiently disclosed the risks of the business.  *In re Bank of Am. AIG Disclosure Sec.*

11  *Litig.*, 566 F. App'x 93, 94 (2d Cir. 2014) (affirming dismissal for lack of scienter where more

12  plausible inference was defendants "did not think there was any need for public disclosure" in light

13  of, among other things, existing disclosures).  As noted, the Registration Statement included 35

14  pages of risk disclosures (*see supra* at 5-6), including that (i) C3 expected revenue growth to slow;

15  (ii) C3 could not guarantee that such strategic partners as Baker Hughes would provide adequate

16  resources to sell C3 products; and (iii) changes in sales structure could harm the business.  "As the

17  Ninth Circuit reasoned in an analogous circumstance, the '*detailed risk disclosure . . . negates an*

18  *inference of scienter.*'"  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007)

19  (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994)) (emphasis added);

20  *see also In re Dothill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *10 (S.D. Cal. Mar. 18, 2009)

21  ("[T]o the extent that Plaintiffs have alleged something more than mismanagement, the inferences

22  of scienter are negated by Dot Hill's risk disclosures.").

23          **C.      Plaintiffs Have Failed To Plead Loss Causation**

24      To plead loss causation, Plaintiffs must allege, with particularity, that "the defendant's

25  misstatement, as opposed to some other fact, foreseeably caused [their] loss."  *Mineworkers'*

27  183 F.3d at 986-87 ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.").

28      [19] Exs. K-M (Baker Hughes Form 4s); *see also* Exs. N and O (Baker Hughes Form 144s).

*Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)); *In re Nektar Therapeutics,* 34 F.4th at 838-39 ("revelation of . . . falsehoods" theory requires allegations that "the defendant revealed the truth through 'corrective disclosures' which caused the company's stock price to drop and investors to lose money.") (quotation omitted).  In other words, Plaintiffs must plead a specific disclosure that corrects an alleged prior falsehood.  *See First Solar*, 881 F.3d at 753 (plaintiffs must allege that defendants misrepresented or omitted "the very facts" that were subsequently revealed and caused the stock price to drop).  Plaintiffs cannot plead loss causation by alleging materialization of a concealed risk.  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 n.5 (9th Cir. 2013) ("The Ninth Circuit has not adopted the materialization of the risk approach.").

### 1.   <u>Plaintiffs Fail To Plead a Corrective Disclosure</u>

Plaintiffs claim that corrective disclosures—as opposed to a "materialization" of undisclosed risk—caused the alleged declines of C3's stock price on December 1 and 2, 2021, identifying the Company's announcement of zero growth in year-over-year, non-GAAP adjusted RPO (¶ 190), and Mr. Siebel's statements about the mid-2021 internal sales restructuring and that the C3/Baker Hughes partnership previously "sat outside" the central Baker Hughes organization as the corrective disclosure (¶¶ 191-92).

To start, the alleged corrective disclosure took place after trading hours on December 1, 2021 (¶ 190), so Plaintiffs can allege, at most, damages from a decline in C3 stock on December 2, 2021. And Plaintiffs fail to link the December 2, 2021 price decline to Mr. Siebel's comments on the December 1, 2021 earnings call concerning the reorganization of C3's internal sales structure or the structure of the Baker Hughes partnership.  The analyst reports cited in the Complaint focus on C3's "disappointing" quarterly earnings (Ex. P (Bank of America Analyst Report) at 1 ("C3.ai reported disappointing Q2 results.")) and the purportedly "abrupt" departure of CFO Barter (Ex. Q (Deutsche Bank Analyst Report) at 1, 3 ("2Q subscription revenue was below Consensus estimates; customer adds were disappointing . . . . Results this quarter raise questions about C3s product-market fit.")). The Complaint itself thus provides a "far more plausible reason" for the decline and offers no

support for the claim that the alleged losses resulted from "the practices [P]laintiffs contend[] are fraudulent." *See Metzler*, 540 F.3d at 1063, 1065 (no loss causation where earnings miss was "more plausible" cause for stock drop).[20]

Regardless, C3 had warned the market that changes to strategy and the Baker Hughes partnership could affect its results, and such a disclosed risk cannot be a corrective disclosure. *Yaron*, 2020 WL 6750568 at *10 (failure to plead loss causation where loss stemmed from "known risks" rather than "hidden risk[s]"); *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (event is not a "corrective disclosure" if it is "materialization of a known risk, rather than the disclosure of a concealed one").

### 2. Plaintiffs Cannot Remedy Their Deficient Corrective Disclosure Allegations by Claiming Materialization of Undisclosed Risks

Unable to plead a corrective disclosure, Plaintiffs resort to claiming that undisclosed risks "materialized" and caused investor losses—a theory not recognized in this Circuit. *Nuveen*, 730 F.3d at 1120 n.5. Thus Plaintiffs' assertion that the C3 Defendants concealed "risks" relating to the separate BHC3 unit created for the Baker Hughes partnership, and that those risks "materialized" in the form of "[l]ow or Missed Customer Count, RPO and Revenue Capture and Resulting Analyst Downgrades" (¶¶ 174-184) cannot plead loss causation.

Regardless, Plaintiffs fail to link C3's allegedly disappointing financial results to the risk that the alleged misstatements or omissions supposedly concealed. *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020) (loss causation inadequately alleged where complaint "fails to allege proximate cause between channel stuffing and the poor performance that led to missed guidance"). Nowhere does the Complaint allege with particularity that a misstatement about the structure of BHC3 concealed a risk that caused disappointing results. Similarly, Plaintiffs fail to tie any such disappointing results to misstatements or omissions about C3's internal sales restructuring—indeed, most of those results occurred ***before*** C3 restructured its internal sales team

---

[20] Deutsche Bank and JP Morgan even indicated that the alleged disclosures could have had a *positive* effect on C3 stock. Ex. Q (Deutsche Bank Report) at 2 ("We applaud management for its experimenting with new models." (referring to sales team reorganization)); Ex. R (JP Morgan Report) at 3 ("We believe [the partnership model] has thus far been a successful practice.").

1   in July 2021, and all of them occurred before the December 2021 announcement that it was

2   abandoning the restructuring.  ¶ 180 (asserting results from the quarter ending July 31, 2021 and

3   announced on September 2, 2021 were the final materialization of the risks).  Plaintiffs' approach

4   to loss causation would "convert the security laws into nothing more than an insurance policy for

5   investors, allowing investors to recuperate losses in the stock market without ever claiming that the

6   fraudulent scheme was disclosed to the market and thus caused those losses."  *Brown v. Ambow*

7   *Educ. Holding Ltd.*, 2014 WL 523166, at *9 (C.D. Cal. Feb. 6, 2014).

8          The analyst reports cited (and selectively quoted) in the Complaint identify factors unrelated

9   to the partnership.  *See, e.g.*, ¶ 174 ("timing of invoices pushing" and "contracts with a higher portion

10  of cancellable component"); ¶ 181 ("quarterly swings in bookings/RPO"); ¶ 182 ("RPO metrics

11  continue to be lumpy quarter-to-quarter," "some large deals pushed out of FQ1," "renewed COVID-

12  19 uncertainty").  The analyst reaction is unsurprising, given that revenues from Baker Hughes

13  significantly *increased* in 2021 relative to 2020.  Ex. E (2022 Form 10-K) at 126.

14         Importantly, C3 disclosed each of the risks that Plaintiffs claim to have materialized, warning

15  investors at the time of the IPO that (i) C3 "expected revenue growth to decline;" (ii) RPO "may

16  fluctuate between periods;" and (iii) there were numerous risks related to the Baker Hughes

17  partnership.  *See supra* at 5-6.  Contrary to Plaintiffs' assertions, any risks that did materialize were

18  not *concealed*, material risks.  *See Yaron*, 2020 WL 6750568, at *10 (no loss causation where loss

19  stemmed from "known risks" rather than "hidden risk[s]").

20         Nor can Plaintiffs allege loss causation by claiming there was "[m]assive and [u]nusual

21  insider selling" (neither of which is true) (¶¶ 185-188).  The Ninth Circuit has never recognized this

22  novel theory, and Plaintiffs fail to allege that any misstatements or omissions concealed the risk that

23  insiders might sell C3 stock.  Rather, Plaintiffs claim that "large insider sales" depressed the stock

24  price, and that the price decline "was a direct result of the nature and extent of Defendants'

25  knowledge of inside information which was not disclosed."  ¶¶ 186-87.  This assertion is, at best,

26  an allegation about motive, which fails for the reasons detailed above, and Plaintiffs' conclusory

27  allegations fail to plead what information, if any, supposedly was "revealed" to the market through

28  the alleged sales, again falling well short of the particularity required by Rule 9(b).  *Apollo*, 774

F.3d at 608.  And the Registration Statement disclosed the obvious point that sales could affect C3's stock price.  Ex. B at 46 ("Substantial future sales of shares . . . could cause the market price of our Class A common stock to decline.").

**D.**     **Plaintiffs Have Failed To Plead a Section 20A Claim**

Insider trading under Section 20A requires "a predicate violation of the securities laws" and "facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1282 (N.D. Cal. 2019).  The Complaint has failed, as addressed herein, to plead a primary violation, and so the 20A claim also fails.  *In re Netflix, Inc. Sec. Litig.*, 964 F. Supp. 2d 1188, 1199 (N.D. Cal. 2013).  Further, Plaintiffs do not "specify which of [their] sales are contemporaneous to" the alleged insider sales.  *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020).  Rather, Plaintiffs plead:

- No contemporaneous trades as to Plaintiffs **Zavalanski** and **Wensel**;

- No purchases that line up with an alleged insider sale as to Plaintiff **Linder** (*compare* ¶ 157 *with* ECF No. 71-2);

- Just two dates on which Plaintiff **Samarghandi** purchased shares and a Defendant allegedly sold shares (*Compare* ¶ 157 *with* ECF No. 30-2);

  - Both sales were pursuant to 10b5-1 plans;

  - One sale was at a price higher than Samarghandi paid, which makes it "impossible that those trades occurred with defendant at an unfair advantage," *SEB Inv. Mgmt.*, 485 F. Supp. 3d at 1136;

- No contemporaneous sales by Messrs. Barter or Simonelli (who also was not a seller).

**III.**     **PLAINTIFFS HAVE FAILED TO PLEAD CONTROL PERSON LIABILITY**

To plead control person liability under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, Plaintiffs must plead as to each Individual Defendant (i) a primary violation, and (ii) that the defendant "exercised actual power or control over the primary violator."  *Zucco*, 552 F.3d at 990.  Plaintiffs have failed to plead primary violations, so their control claims fail.  *See Webb*, 884 F.3d at 858 (dismissing Section 20(a) claim); *Welgus v. TriNet Grp.*, 2017 WL 6466264, at *27 (N.D. Cal. Dec. 18, 2017) (dismissing Section 15 claim).

Plaintiffs assert that Messrs. Siebel, Abbo, Barter, and Simonelli exercised control over the

alleged misstatements "[b]y reason of their senior management positions and/or being directors of C3." (¶ 252).  This fails because "[t]he fact that a person is a CEO or other high-ranking officer within a company does not create a presumption that he or she is a 'controlling person.'"  *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citation omitted)); *see also Bao v. Solarcity Corp.*, 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016) (chairman of the board, member of executive management team, and 30% shareholder was not a control person without more specific allegations).  Such conclusory claims that the Individual Defendants had "power and authority to control the contents of C3's SEC filings, press releases, and other market communications" and "the ability and opportunity to prevent their issuance" (¶ 35) are routinely rejected.  *See, e.g.*, *Al-Thani v. Wells Fargo & Co.*, 2009 WL 55442, at *9 (N.D. Cal. Jan. 7, 2009) (dismissing allegations that "Defendant had the ability to prevent the issuance of the statements . . . or could have caused such statements to be corrected" as "bare legal conclusions").

The claims against Mr. Abbo with respect to the SEC filings fail also because there are no allegations that he signed or was involved in preparing any filing containing a misleading statement. *See In re Gap Stores Sec. Litig.*, 457 F. Supp. 1135, 1141 (N.D. Cal. 1978) (officer not a control person where "[h]e did not sign the Registration statement or Prospectus, and there was no ostensible reason for the public to place particular reliance upon him for the veracity of the Prospectus").

Finally, that Messrs. Barter, Siebel, and Simonelli signed certain SEC filings (¶¶ 31, 33, 34, 140, 144)—without allegations that they "exercised any specific control over the preparation and release" of those filings—is insufficient.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n.13 (9th Cir. 2000) (claims that defendant "reviewed and approved" financial statements insufficient).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


DATED:  May 1, 2023                     **QUINN EMANUEL URQUHART & SULLIVAN, LLP**


                                        */s/ Harry A. Olivar, Jr.*
                                        Harry A. Olivar, Jr. (Cal. Bar No. 143089)
                                        865 S. Figueroa Street, 10th Floor
                                        Los Angeles, CA 90017

1
2

(213) 443-3000
harryolivar@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
David Myre (Cal. Bar No. 304600)
Jesse Bernstein (admitted *pro hac vice*)
Jacob J. Waldman (admitted *pro hac vice*)
Leigha Empson (admitted *pro hac vice*)
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
davidmyre@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for the C3 Defendants*