Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (pro hac vice)
Catherine Y.N. Gannon (pro hac vice)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST, et al., individually and on behalf of all others similarly situated,<br><br>                                  Plaintiff,<br><br>    v.<br><br>C3.AI, INC., et al.,<br><br>                                  Defendants. | No. 4:22-cv-01413-HSG<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Judge:     Haywood S. Gilliam, Jr.<br>Courtroom: 2, 4th Floor<br>Date:      August 17, 2023<br>Time:      2:00 p.m. |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................ 1

II. STATEMENT OF FACTS .......................................................................... 5

A. C3's Business Model Depends on the Sales Staff of Larger Companies .......................................................................................... 5

B. The C3/Baker Hughes Joint Venture was Critical to C3's Growth Strategy as Baker Hughes Provided the Manpower Required to Successfully Sell C3 Products .................................................... 6

C. C3's Registration Statement Included False and Misleading Statements About the Effectiveness of the Joint Venture ............... 7

D. The Section 10(b) Defendants Continued to Make False and Misleading Statements and Omit Material Facts Throughout the Class Period ................................................................................... 8

E. The Section 20A Defendants Made over $730 Million by Dumping C3 Stock During the Class Period—With Most Transactions Taking Place Outside of 10b5-1 Trading Plans and Within Six Months of C3's IPO ........................................................................................ 9

F. The Truth is Revealed ................................................................... 10

G. Post-Filing Investigations and Events Corroborate Plaintiffs' Allegations .................................................................................. 11

H. Defendants' Identification of False Statements in Appendix A ........... 12

III. PLEADING STANDARDS ....................................................................... 13

IV. ARGUMENT FOR THE EXCHANGE ACT CLAIMS .............................. 14

A. The Complaint Alleges Falsity .......................................................... 14

1. Defendants' misstatements regarding the number of people at Baker Hughes selling C3's products are actionable. ............ 14

2. Defendants' further statements about their partnership with Baker Hughes are also actionable. ......................................... 20

3. Defendants' statements from August 12, 2021 onward were additionally misleading for failing to disclose C3's failed reorganization of its sales team. ............................................. 22

4. Defendants' statement about revenue recognized from the Baker Hughes partnership are actionable.................................... 23

B. The Complaint Pleads a Strong Inference of Scienter ......................................... 25

1. The Complaint alleges specific facts showing that Defendants knew or recklessly disregarded the truth about the challenged statements............................................................. 26

2. The Complaint adequately pleads a core operations theory..................... 30

3. Plaintiffs' motive allegations support an inference of scienter. ........................................................................................ 32

4. C3's generalized disclosures do not absolve Defendants. ....................... 35

C. The Complaint Properly Pleads Loss Causation Through Materialization of the Risk and Corrective Disclosures ...................................... 36

1. The Complaint properly pleads loss causation through materialization of the risk............................................................. 36

2. The Complaint also adequately pleads loss causation through the December 1, 2021 corrective disclosures revealing the truth about the Baker Hughes relationship (salesforce) and the July internal salesforce restructuring. ....................... 39

D. Plaintiffs Properly Plead the 20(A) Claims........................................................ 40

E. Plaintiffs have Established Control Person Liability ............................................ 44

V. ARGUMENT FOR THE SECURITIES ACT CLAIMS................................................ 47

A. Plaintiffs Adequately Plead That the Registration Statement Contained Untrue Statements...................................................................... 47

B. The Complaint Alleges Violations of Items 105 and 303................................... 47

C. Plaintiffs' Section 11 Claims Are Timely Filed.................................................. 49

D. Plaintiffs Adequately Allege Control Person Liability for the Securities Act Claims....................................................................................... 51

VI. PLAINTIFFS' OPPOSITION TO C3 DEFENDANTS' REQUEST FOR JUDICIAL NOTICE .................................................................................... 51

A. The Ninth Circuit Cautions Against the "Overuse" of the Judicial Notice and Incorporation-By-Reference Doctrines ............................................ 51

B.   Plaintiffs Object to Incorporation and Notice of Defendants' Exhibits A-R, to the Extent Defendants Seek to Rely on Them for the Truth of Their Contents ....................................................................... 52

1.   Exhibits pursuant to the judicial notice and incorporation by reference doctrines. ................................................................. 52

2.   Exhibits pursuant to the judicial notice doctrine only .............................. 54

VII.   CONCLUSION ........................................................................................... 55

# TABLE OF AUTHORITIES

**Page**

## CASES

*Al-Thani v. Wells Fargo & Co.*,
2009 WL 55442 (N.D. Cal. Jan. 7, 2009) ........................................................................ 45, 46

*Alameda v. Nuveen Municipal High Income Opportunity Fund*,
2009 WL 1424529 (N.D. Cal. May 20, 2009) ......................................................................... 14

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................................................. 20, 35

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) .......................................................................... 46

*In re Aqua Metals, Inc. Sec. Litig.*,
2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) .......................................................................... 44

*ASARCO, LLC v. Union Pac. R. Co.*,
765 F.3d 999 (9th Cir. 2014) ..................................................................................................... 49

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................................................................... 44

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) ....................................................................................... 29

*Bao v. Solarcity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .................................................................................. 46

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................................................................. 43

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................................................... 30

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) ........................................................................... 44

*In re BofI Holdings, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ................................................................................................ 36, 38

*Brady v. Delta Energy & Commc'ns, Inc.*,
2023 WL 2683203 (C.D. Cal. Jan. 25, 2023) ..................................................................... 50, 51

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ............................................................................... 40

*Bryant v. Mickelsen*,
    551 F. App'x 348 (9th Cir. 2014) ........................................................................ 52

*Caldwell v. Berlind*,
    543 F. App'x 37 (2d Cir. 2013) .......................................................................... 50

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................................... 48

*CheckOut Holdings, LLC v. Amplified Holdings, Inc.*,
    64 F. App'x 631 (9th Cir. 2003) ......................................................................... 28

*Chu v. Sabratek Corp.*,
    100 F. Supp. 2d 827 (N.D. Ill. 2000) ................................................................. 32

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
    565 F. Supp. 3d 478 (S.D.N.Y. 2021) .......................................................... 22, 23

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................. 21

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ........................................................................... 49

*In re Connetics Corp. Sec. Litig.*,
    2008 WL 3842938 ............................................................................................. 42

*In re Countrywide Fin. Corp. Sec. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ......................................... 33, 34, 35, 41

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................. 40

*In re CRM Holdings, Ltd. Secs. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ................................................... 34

*Curry v. Yelp Inc.*,
    2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) .................................................. 18

*In re Cylink Sec. Litig.*,
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................. 43

*In re Cypress Semiconductor Sec. Litig.*,
    836 F. Supp. 711 (N.D. Cal. 1993) .................................................................... 42

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................................... 28, 37

*In re Dothill Sys. Corp. Sec. Litig.*,
    2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ..................................................... 35

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................. 36

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................. 43

*In re Fastly, Inc. Sec. Litig.*,
    2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ....................................................... 34

*Freudenberg v. E*Trade Fin'l Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2011) ................................................................... 34

*In re Gap Stores Sec. Litig.*,
    457 F. Supp. 1135 (N.D. Cal. 1978) ................................................................ 45, 46

*Gaylinn v. 3Com Corp.*,
    185 F. Supp. 2d 1054 (N.D. Cal. 2000) ................................................................ 29

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ......................................................... 33

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ................................................................... 13, 36, 40

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
    100 F. Supp. 2d 1086 (C.D. Cal. 1999) ................................................................ 17

*Golub v. Gigamon Inc.*,
    372 F. Supp. 3d 1033 (N.D. Cal. 2019) ................................................................ 47

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ................................................................................. 13

*Hampton v. Aqua Metals, Inc.*,
    2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ................................................. 22, 32

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ......................................................... 47

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) ........................................................................... 13, 14

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ......................................................................... 26, 45

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................... 22

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ............................................................................. 15

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................................... 48

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
    522 F. Supp. 3d 660 (N.D. Cal. 2021) .................................................................... 28

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016) ............................................................. 30

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
    14 F.4th 141 (2d Cir. 2021) ................................................................................... 17

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ................................................. 21, 22

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .......................................................................... *passim*

*Krupski v. Costa Crociere S. p. A.*,
    560 U.S. 538 (2010) ............................................................................................... 49

*Kuzmenko v. Lynch*,
    606 F. App'x 399 (9th Cir. 2015) ............................................................. 52, 54, 55

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ...................................................... 42

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ................................................................ 52

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .............................................................................. 28

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ......................................................................... 36, 37

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    437 F.3d 588 (7th Cir. 2006) ................................................................................. 15

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ........................................................................... 31, 32

*In re MannKind Securities Actions*,
    835 F. Supp. 2d at 819 .......................................................................................... 44

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ........................................................................................... 14, 32

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................ 48

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ......................................................................... 29, 38

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................. 42

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) .............................................................. 36, 37, 38, 39

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020) ........................................................ 34

*In re Network Assocs., Inc., Sec. Litig.*,
   2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ...................................................... 25

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018) ................................................................... 37

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................................ 13

*In re Novatel Wireless Sec Litig.*,
   2010 WL 11470156 (S.D. Cal. May 12, 2010) ..................................................... 42

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .............................................................................. 34

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) .................................................................... 4, 37, 39

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) .................................................................... 4, 28

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................................ 16

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ................................................................................ 26

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ..................................................... 49

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) ................................................................................ 17

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ........................................................ 42

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020) ................................................. 23, 28

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998)...................................................................... 17

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    2004 WL 5326262 (N.D. Cal. May 27, 2004) ........................................................ 41

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)................................................................................ 28

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)................................................................ 16, 25, 26

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014)................................................................ 26, 28, 30

*Rihn v. Acadia Pharm. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ...................................................... 31

*Rollins v. Dignity Health*,
    338 F. Supp. 3d 1032 (N.D. Cal. 2018) ................................................................ 51

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)................................................................ 26, 29, 30

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................ 28

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016).................................................................................. 25

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) .......................................................... 31, 42

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    335 F.R.D. 276 (N.D. Cal. 2020).......................................................................... 41

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011)................................................................................ 45

*Sgarlata v. PayPal Holdings, Inc.*,
    2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ...................................................... 23

*In re Silicon Graphics, Inc. Sec. Litig.*,
    970 F. Supp. 746 (N.D. Cal. 1997) ....................................................................... 42

*Silverman v. Motorola, Inc.*,
    798 F. Supp. 2d 954 (N.D. Ill. 2011) .................................................................... 38

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009)................................................................................ 48

*Smilovits v. First Solar Inc.*,
   119 F. Supp. 3d 978 (D. Ariz. 2015) ....................................................................... 38

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ...................................................... 17

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ...................................................... 47

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
   771 F. App'x 494 (2d Cir. 2019) ........................................................................... 48

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ............................................................................... 47

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ........................................................................................ 25, 26

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................... 45, 46

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ...................................................... 37

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) .................................................................. 34

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ................................................................................. 51

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................. 46

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ................................................................................. 25

*In re Veritas Software Corp. Sec. Litig.*,
   2003 WL 27386177 (N.D. Cal. Dec. 10, 2003) .................................................... 24

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................................... 14

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) .................................................................................. 38

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................................... 34

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................ 35

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. June 19, 2020) .......................................................................... 40

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ................................................................................................... 33

*Zaghian v. Farrell*,
   675 F. App'x 718 (9th Cir. 2017) ...................................................................................... 16, 48

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................................................... 30

## STATUTES

15 U.S.C. § 77k ......................................................................................................................... 13

15 U.S.C. § 77o ......................................................................................................................... 13

15 U.S.C. § 77o(a) ..................................................................................................................... 13

15 U.S.C. § 78u-4(b)(1)(B) ....................................................................................................... 14

## OTHER AUTHORITIES

Modernization of Regulation S-K Items 101, 103, and 105, 85 FR 63761, 63744-
   45 (Oct. 8, 2020) ...................................................................................................................... 48

Fed. R. Evid. 201(b) .................................................................................................................. 51

# GLOSSARY OF DEFINED TERMS[1]

| Term | Definition |
|---|---|
| **Class Period** | December 9, 2020 to December 2, 2021 (dates inclusive) |
| **Complaint or "Comp."** | Amended Class Action Complaint, filed February 15, 2023, ECF No. 71. |
| **¶ __** | Complaint, ¶ __. |
| **C3 or "Company"** | Defendant C3.ai |
| **Joint Venture Agreement** | The agreement between C3 and Baker Hughes whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries. This Agreement is attached as Exhibit 1,[2] and was amended by Exhibit 3. |
| **C3 MTD, or "Motion," or "Mot."** | The C3 Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Amended Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 105. |
| **BH MTD** | Baker Hughes' Notice of Motion and Motion to Dismiss With Prejudice; Joinder in C3 Defendants' Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, ECF No. 108. |
| **UW MTD** | Underwriter Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Amended Class Action Complaint Pursuant to Fed R. Civ. P. 12(b)(6); Joinder to C3 Defendants' Motion to Dismiss, ECF No. 113. |
| **C3 RJN** | The C3 Defendants' Request for Judicial Notice in Support of their Motion to Dismiss, ECF No. 105-2. |
| **The MTD Motions** | The C3 MTD (ECF No. 105); the BH MTD (ECF No. 108); and the UW MTD (ECF No. 113) |
| **The Motions** | The MTD Motions and the C3 RJN. |

---

[1] All other capitalized terms share the same meaning as the capitalized terms in the Complaint. All emphasized terms are added, unless otherwise indicated.

[2] The exhibits cited herein are attached to the Declaration of Reed R. Kathrein filed concurrently herewith unless otherwise indicated.

| Term | Definition |
| --- | --- |
| **Corporate Defendants** | Defendants C3 and Baker Hughes |
| **Individual Defendants** | Defendants Siebel, Abbo, Barter, and Simonelli |
| **C3 Defendants** | Defendants C3, Siebel, Abbo, Barter, and Simonelli |
| **Registration Statement** | Includes both the final Prospectus, dated December 8, 2020, and the Registration Statement, dated December 7, 2020. |
| **Underwriter Defendants** | Defendants Morgan Stanley, J.P. Morgan, BofA, Deutsche Bank, Canaccord, JMP, KeyBanc, Needham, Piper Sandler, and Wedbush. |
| **Defendants** | The Corporate Defendants, Individual Defendants, and Underwriter Defendants. |
| **Section 11 Defendants** | Defendants listed under Count I of the Securities Act (C3, Individual Defendants, Underwriter Defendants). |
| **Section 15 Defendants** | Defendants listed under Count II of the Securities Act (Baker Hughes, Abbo, Barter, and Simonelli). |
| **Section 10(b) Defendants** | Defendants listed under Count III of the Exchange Act (C3, Siebel, Abbo, Barter, and Simonelli). |
| **Section 20(a) Defendants** | Defendants listed under Count IV of the Exchange Act (Siebel, Abbo, Barter, Simonelli, and Baker Hughes). |
| **Section 20A Defendants** | Defendants listed under Count V of the Exchange Act (Siebel, Abbo, Barter, Simonelli, Baker Hughes). |
| **RPO or "Remaining Performance Obligations"** | The total future obligations customers owe to C3 under existing contracts. |

1

## I.    INTRODUCTION

2   This action arises from Defendants' misrepresentations about C3's most important strategic

3   partnership—its joint venture with oil and gas monolith Baker Hughes, and C3's own salesforce.

4   Throughout the Class Period, C3's CEO, Thomas Siebel, told investors that the full 12,000-person

5   salesforce of Baker Hughes was working to sell the products of C3, a relatively small AI startup.

6   In reality, Baker Hughes only had a small, separate, and inexperienced division devoted to selling

7   C3 products, rendering Siebel's statements that the full 12,000-person Baker Hughes salesforce

8   was working for C3 materially misleading.

9   Defendants' deception began in the Registration Statement used to take C3 public. There,

10   Defendants represented that C3 had access to and was leveraging Baker Hughes' extensive

11   marketing, sales, and services resources, including Baker Hughes' "12,000-person sales

12   organization." The Registration Statement also stated that Baker Hughes had brought in deals

13   generating revenue for C3. These representations convinced investors that the Company had the

14   necessary salesforce and deal pipeline in place to propel it into a leading enterprise AI provider.

15   The statements also allowed C3 to go public, raising over $610 million in proceeds and giving

16   corporate insiders a substantial stake in an NYSE-traded company.

17   In truth, C3 did not have access to and was not able to utilize Baker Hughes' entire 12,000-

18   person salesforce. Instead, Baker Hughes and C3 had formed a separate, discrete, unit to sell C3

19   products. This unit consisted of a small subset of salespeople who did not have the industry

20   connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce.

21   Consequently, C3 could not reap the full benefits of the Baker Hughes partnership. Moreover, as

22   detailed by a former C3 sales executive, at the time of the IPO, Baker Hughes had brought in ***no***

23   deals through its reseller agreement with C3—so it was impossible for C3 to have recognized

24   revenue through the arrangement.

25   Yet, Defendants did not come clean right after the IPO. Just the opposite, Defendants

26   doubled-down on the lie with Siebel touting to investors at least 12 separate times during the Class

27   Period that Baker Hughes' full 12,000-person salesforce was selling for C3. The Complaint also

28   explains that as a result of not having access to the full Baker Hughes salesforce, C3's growth was

1   constrained by the size of its own employee count, leading the Company to engage in a secret

2   restructuring of their existing salesforce that moved away from their signature high-touch sales

3   strategy to a more traditional and hierarchical sales structure. Defendants, however, concealed the

4   known material risks presented by the massive restructuring and reconstituting of the Company's

5   sales strategy.

6       The Complaint also shows how Defendants capitalized on their misrepresentations and C3's

7   inflated share price. For example, Defendants took advantage of an early lock-up period and

8   dumped massive amounts of their personally held C3 stock on unsuspecting investors. As a result,

9   Defendants reaped more than $730 million in unlawful proceeds.

10      Finally, the Complaint shows that when the truth emerged through Defendants' admissions

11  and C3's reporting of decreasing key financial metrics, C3's stock plummeted, declining 52% from

12  the $42.00 per share Offering price to $20.05 on the day the initial complaint was filed.

13      Faced with these detailed allegations establishing Defendants' falsity, scienter, and loss

14  causation, Defendants' Motion to Dismiss, ECF No. 105 ("Mot."), raises specious arguments that

15  either ignore or are easily belied by the Complaint.

16      ***First***, Defendants assert that their statements about C3's access to and use of Baker Hughes'

17  full 12,000-person salesforce are "obviously immaterial statements" and simply "classic puffery

18  that no reasonable investor would have taken literally." Mot. at 1, 18. But Defendants' materiality

19  challenge is undermined by the many inquiries made by securities analysts throughout the Class

20  Period about C3's access to the Baker Hughes salesforce and Siebel's repeated emphasis on the

21  importance of Baker Hughes' sales force to C3. And in this context, Defendant Siebel confirmed

22  at least twelve times that all 12,000 Baker Hughes sales employees were selling C3 products and

23  services. *See* § II.D.; Appendix E. These well-pled allegations undermine Defendants' feigned

24  challenges to materiality. Also, Defendants cannot seriously argue to the Court that Seibel's claims

25  to have access to the full 12,000-person-strong Baker Hughes sales force are puffery—while Seibel

26

27

28

1  and C3 continue to insist to the public that those same claims are true statements of fact.[3] *See*
2  § IV.A.1.

3      Defendants also claim that they are immune because they disclosed the alleged
4  misrepresented facts in boilerplate risk disclosures by stating that C3 "could not guarantee that
5  Baker Hughes would devote adequate resources to marketing C3 products." Mot. at 3. But these
6  risk warnings do not reveal that C3 *never had, and really never expected to have,* access to all of
7  Baker Hughes' 12,000-strong sales personnel to market C3 products to begin with. *See* §§ IV.A.1-
8  2 & IV.B.2.

9      **Second**, Defendants attempt to transmute Plaintiffs' claims predicated on their statements
10  that Baker Hughes had already brought in deals and generated revenue for the Company as
11  grievances about C3's variances in revenue growth. Defendants then argue that these recast revenue
12  claims are barred by assorted generalized risk disclosures. Mot. at 3-4. This is inappropriate.
13  Plaintiffs' claims are not based on Defendants' failure to warn about revenue eventually slowing
14  down or that the Company could potentially be unprofitable sometime in the future. Rather,
15  Plaintiffs allege that C3 told investors in its Registration Statement that C3 **had already** recognized
16  revenue from deals brought in by Baker Hughes through the reseller arrangement in the fiscal year
17  ending April 30, 2020. As alleged, Defendants did so, when, in fact, the Joint Venture had brought
18  in **no deals** by that date, and therefore making it impossible for C3 to have recognized **any** revenue
19  through the arrangement for that time period. ¶¶ 77-78. *See* § IV.A.3.

20      **Third**, Defendants' challenges to scienter similarly hinge on wishful thinking and a
21  mischaracterization of the record. To be clear, the Complaint includes extensive and particularized
22  allegations showing how each Individual Defendant knew or was reckless in not knowing about
23  the misrepresentations and omissions at issue (for purposes of the Exchange Act). *See* § IV.B.1.
24  Indeed, Siebel has already admitted that he knew throughout the Class Period that when he publicly
25  stated that, when the Joint Venture was originally executed, it was his understanding that it, "formed

26

27      [3] Seibel appeared before CNBC on June 2, 2023, for a segment discussing his alleged fraud. He
    was asked "did you say the 12,000 were working with Baker Hughes to sell the c3.ai product."
28  Seibel responded "I believe it's on the order of 12,000." Ex. 4 at 1:30.

1    a new business unit … that sat outside [the Baker Hughes sales] organization [and they] weren't

2    really the people with the relationships, and they weren't the people with the quotas and they

3    weren't the people with the deep industry expertise." ¶ 192. Further, Siebel's repeated

4    confirmations regarding C3's full access to the 12,000-strong Baker Hughes salesforce (*see*

5    § IV.B.1; Appendix E) suggests that Siebel paid attention to the true size of the Joint Venture

6    salesforce and thought it material to investors. *See Okla. Police Pension & Ret. Sys. v. LifeLock,*

7    *Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (defendant's extensive discussion of the subject of the

8    fraud in public statement supports scienter). The Complaint also specifically alleges that Siebel

9    attended weekly sales calls where the General Manager of the Oil & Gas segment repeatedly

10   reported that the Baker Hughes sales pipeline was "non-existent" and had made no sales as of April

11   30, 2020.

12        Plaintiffs also allege that the Joint Venture was a core operation for C3 and thus supports

13   an inference of scienter for each Defendant. This is not only because the deal represented 30% of

14   C3's overall revenues, but also due to Defendants' positioning of the Joint Venture as its "flagship"

15   partnership, which would act as C3's "significant use case" by growing its salesforce by 17x and

16   "prove the value of our C3 AI Suite." ¶ 144. *See* § IV.B.2.

17        Further, Defendants mislead this Court about Defendants' massive stock windfall by stating

18   that Defendants' stock transactions were made pursuant to 10b5-1 trading plans. In reality, ***Siebel***

19   ***and Simonelli traded more than 80% of their shares—totaling $544 million—outside of any***

20   ***10b5-1 trading plans***. ¶ 157. Likewise, more than half of Abbo's shares were traded outside of a

21   10b5-1 trading plan. (The remaining half were traded pursuant to an undated 10b5-1 trading plan,

22   rendering it impossible to discern if the plan was entered into when Abbo possessed material, non-

23   public information). *See* § IV.C.2.

24        *Fourth*, Defendants' loss causation arguments are based on two faulty premises. First,

25   Defendants' claim that "materialization" of undisclosed risk is not a viable loss causation theory in

26   the Ninth Circuit misreads *Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,

27   730 F.3d 1111, 1120 n.5 (9th Cir. 2013). The Complaint identifies the causal connection between

28   the material misrepresentation and the loss, which is all that is required at this stage of proceedings.

Second, Defendants' claim that the decline of C3 stock after the full disclosure of the fraud on December 1 actually caused by other independent factors is faulty both because the other news Defendants identified was a direct result of the facts concealed by their fraud, and because such attempts to disaggregate competing factors is improper at the motion to dismiss stage. *See* § IV.D.

**Fifth**, as for the insider trading violations under Section 20A, the Complaint establishes an independent violation of Section 10(b) and that Plaintiffs traded contemporaneously with the Individual Defendants. *See* § IV; Appendix B. C3's claims to the contrary are based on an overly narrow definition of "contemporaneous" that is not followed in this Circuit. *See* § IV.E. The Complaint also alleges that the 20A Defendants sold C3 common stock at the earliest opportunity and pursuant to a convoluted exception to the standard 180-day lock-up period, in order to exploit their possession of material, non-public information. *See* § II.F.

**Sixth**, despite Defendants' assertions to the contrary, the Complaint sufficiently alleges that the Individual Defendants and Baker Hughes had the power to influence and control—rendering them control persons under both the Securities Act and the Exchange Act. *See* §§ IV.F. (Exchange Act), V.D. (Securities Act).

## II.     STATEMENT OF FACTS

### A.     C3's Business Model Depends on the Sales Staff of Larger Companies

C3 makes and sells artificial intelligence ("AI") software and services that it sells to enterprise clients in a range of industries.[4] ¶ 4. As a relatively small company with limited profitability, C3's business model is predicated on forming sales alliances with much larger and more-established companies to reach many more customers than if C3 sold their products alone. *Id.* ¶ 128. As an example, if C3 could sell its products through Baker Hughes sales employees, it could leverage a global salesforce more than 17x its own size and trade on Baker Hughes' reputation for deep expertise and connections in the oil and gas sector. As Siebel himself confirms, the Joint Venture "gives us market leverage," "gives us 12,000 people selling for us[,] and allows

---

[4] C3 was founded by Siebel in 2009. Over the next ten years, it rebranded itself several times to exploit technology trends. For example, the company was known as "C3 Energy" in 2013, C3 IoT (internet of things) in 2016, and is now known as C3.ai (artificial intelligence). Ex. 4 at 7:00.

us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more –[board] room of Aramco, okay, but for Baker Hughes." *Id.*

**B.    The C3/Baker Hughes Joint Venture was Critical to C3's Growth Strategy as Baker Hughes Provided the Manpower Required to Successfully Sell C3 Products**

During the Class Period, Baker Hughes was easily C3's biggest customer, representing about 30% of C3's overall revenues. Ex. 5 at 17. And in June 2019, C3 entered into the Joint Venture with Baker Hughes that allowed Baker Hughes to use C3's suite of AI software for their own operations. The Agreement also granted Baker Hughes the exclusive right to resell C3 products and services to others. ¶ 63. Defendant Siebel lauded the Joint Venture as key to C3's overall growth strategy as it "establish[ed] a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate." ¶ 74. In other words, the Joint Venture was represented as a "proof of concept" to investors on the value and growth prospects of C3.

The Joint Venture Agreement was amended at least four times: September 2019 ("First Amendment"), June 2020 ("Second Amendment"), October 2021 ("Third Amendment"), and January 2023 ("Fourth Agreement"). With each amendment, Baker Hughes' annual commitments were materially downgraded and the deadline for the Joint Venture to reach peak annual revenue was extended. *Id.*

The 2019 Joint Venture Agreement also mandated that Baker Hughes maintain an undisclosed minimum number of full-time equivalent ("FTE") sales personnel "to originate and help close commercial opportunities for C3 Offerings." Ex. 1 at 7. C3, in turn, was also required to provide "train the trainer" services to Baker Hughes personnel. But unknown to investors until after the close of the Class Period, the parties amended the Agreement to eliminate a minimum FTE requirement and C3 needed only to provide "train-the-trainer services for up to 60 salespeople a year." Ex. 2 at 1-2. So, even under the most optimistic scenarios, it would take several years for 60 Baker Hughes trainers to train any material amount of the 12,000 Baker Hughes workforce to a level where they could effectively sell C3 products. *Id.*

With the Joint Venture not providing the requisite manpower to provide resource-intensive sales structure, C3 had to make changes internally. As a result, C3 restructured its own direct

salesforce in July 2021, from a strategy accounts-focused team to more of a global top-down/hierarchical model, only to have to go back to its original structure only a few months later because the new model wasn't working. ¶ 143.

## C. C3's Registration Statement Included False and Misleading Statements About the Effectiveness of the Joint Venture

The Class Period begins on December 9, 2020, when C3's IPO Registration Statement became effective. ¶ 65. As part of the offering, C3 issued 15.5 million shares of Class A common stock at the offering price of $42.00 per share. C3 collected about $610 million from investors via the IPO. *Id.*

The Registration Statement contained false and misleading statements and material omissions in three areas.

***First***, in its "Sales Alliances" section, C3 stated that: "we are jointly marketing and selling a range of Enterprise AI solutions … to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization." ¶ 75. This statement was misleading as it falsely suggested to investors that C3 had an engagement with Baker Hughes under which C3 would reap the benefits of Baker Hughes's 12,000-person salesforce. Instead, Baker Hughes and C3 had set up a separate sales division that relied on a subset of Baker Hughes sales people lacking typical industry connections, expertise, support, or mandatory sales quotas. As a result, C3 could not reap the full benefits of a partnership. ¶ 76. Such a statement would have been material to a reasonable investor as it pertained directly to C3's ability to grow its reach of potential customers (and eventually new sales).

***Second***, when describing the Company's performance, C3 stated that: "[d]uring the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement." ¶ 77. This statement was false and misleading because Baker Hughes had, in fact, brought in ***no*** deals through the reseller agreement. It was thus impossible for C3 to have recognized revenue through the arrangement for the fiscal year. ¶ 78. Such a statement would have been

material to a reasonable investor as it pertained directly to the demand for C3's products and the Company's ability to become profitable over time.

**Third**, the Registration Statement also violated Item 105 and Item 303 by failing to disclose the material known risks related to the Baker Hughes partnership. Given that Defendants knew that Baker Hughes was not using its typical salesforce, and instead had set up a separate sales division that relied on salespeople that did not have industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, there was a material risk that Baker Hughes would not perform effectively under the partnership. ¶¶ 79-89.

**D.    The Section 10(b) Defendants Continued to Make False and Misleading Statements and Omit Material Facts Throughout the Class Period**

After going public, C3 was forced to rely primarily on the much smaller salesforce that was specifically designated to operate under the Joint Venture, unlike Baker Hughes' typical 12,000-strong salesforce. ¶ 154. However, this did not stop Defendants from doubling-down on their fraud by continuing to issue false and misleading statements about whether the Joint Venture had access to the full 12,000-strong Baker Hughes salesforce—while omitting the material fact that C3's growth targets were hampered by the inadequacy and size of the real Joint Venture salesforce. *Indeed, Siebel stated that C3 had 12,000 Baker Hughes people selling for C3 at least twelve times between February 2021 and November 2021*. *See* Appendix E. Some of these statements include:

- February 2021: "***Baker Hughes has 12,000 people selling for us*** around the world into virtually oil and gas company on the planet[.]" ¶ 124.

- March 2021: "So we've aligned in oil and gas with Baker Hughes … ***that gives us access to 12,000 people now selling with us*** …. ***12,000 salespeople is a lot of capacity***." ¶ 128.

- May 2021: "I was thinking about our partnership with Baker Hughes and oil and gas, ***we have 12,000 people selling C3 for us all around the world, every day, 12,000 people***." ¶ 138.

- September 2021: "I mean, we're 700 people [at C3]. ***I have 12,000 people selling for me at Baker Hughes into oil and gas***." ¶ 148.

Without the full support of Baker Hughes' salesforce, C3 struggled to meet market expectations about subscriber revenue growth and RPO. ¶ 119. As a result, in July 2021, C3 quietly attempted to recalibrate the small salesforce by pivoting away from C3's signature high-touch sales strategy in favor of a more traditional and hierarchical sales structure. *Id.* But this new sales structure, typically used at more established software companies, also performed unacceptably and by November 2021, management scrambled to once again to revert to the high-touch, resource-intensive, customer service model from years past. ¶ 154.

## E.     The Section 20A Defendants Made over $730 Million by Dumping C3 Stock During the Class Period—With Most Transactions Taking Place Outside of 10b5-1 Trading Plans and Within Six Months of C3's IPO.

The Section 20A Defendants personally benefited from this undisclosed inside information. Indeed, these Defendants sold a staggering $730 million in C3 stock before Siebel's December 2021 admissions came to light. ¶ 157. Notably, Siebel, alone, made over $600 million by selling more than 9 million C3 shares during the Class Period. *Id.* Likewise, Baker Hughes sold more than 1.2 million shares. And Abbo and Barter sold more than 642,000 and 185,000 shares, respectively. *Id.*

Not only was the size of the Section 20A Defendants' transactions unusual, the timing and circumstances of the sales were just as suspicious. The Registration Statement included an early lock-up provision that allowed the Individual Defendants to begin selling their C3 shares after only 90 days (instead of the standard 180 days) as long as certain conditions were met—including that the price of the stock remain above a certain threshold. ¶ 156. ***The Individual Defendants took full advantage of this early termination provision to sell more than $214 million on the very first day of early trading***. ¶ 161 And by June 7, 2021—the date where the standard 180-day lock-up would have expired—Defendants Siebel and Abbo's insider sales totaled over $395 million. *Id.* They continued to dump stock at suspicious times of the year, ultimately ***profiting by more than $732 million during the Class Period***. ¶ 160; *see also* §§ IV.B.3 & IV.D.

The Section 20A Defendants' transactions were also unusual as the vast majority of shares were sold outside of any 10b5-1 trading plan. ¶ 157. As reflected in Appendix F, ***Siebel sold 83% of his shares (equivalent to $498 million), Baker Hughes sold 86% of its shares (equivalent to***

1   ***$68.1 million), and Abbo sold 56% of his shares (equivalent to $26.4 million) outside of any***

2   ***10b5-1 trading plan***. And while Defendants proclaim that the remaining shares were sold pursuant

3   to a 10b5-1 plan—these plans were undated[5]—thereby making it impossible to determine whether

4   the Section 20A Defendants executed these plans while in the possession of material, non-public

5   information. ¶¶ 157, 164.

6   **F.    The Truth is Revealed**

7           Defendants could not keep the truth about the Baker Hughes partnership under wraps for

8   long. On December 1, 2021, Siebel disclosed for the first time that C3 had undertaken a massive

9   restructuring of its direct salesforce in July, only to restructure again in the last month of the quarter.

10  Siebel stated:

11              Now historically C3 AI has relied upon a high-touch, white glove
                service strategic selling model to acquire and obtain customers. **In**
12              **July of 2021, in an attempt to further accelerate revenue**
                **scalability and customer adoption, we reorganized sales as an**
13              **independent unit along traditional hierarchically regimented**
                **selling structures like those in place at SAP and IBM. That**
14              **proved to be a mistake**.

15              While the revenue came in the quarter was strong, **the overall**
                **performance of the sales organization and specifically new sales**
16              **activity in the second quarter was unacceptable. The**
                **management team and I have spent the past month restructuring**
17              **the global sales function, molded in the traditional model that we**
                **know to be effective, as a high-touch, classic, strategic selling**
18              **machine.**

19  ¶ 191 (emphasis added).

20          On the same earnings call, C3 also revealed that it had "significantly expanded and

21  restructured its strategic relationship with Baker Hughes for the second time." ¶ 16. When pressed

22  by analysts about the impetus for the second amendment, Siebel admitted that rather than having

23  access to the 12,000-strong Baker Hughes salesforce with deep expertise as previously represented,

24  Defendants had instead created a "new business unit that was called Baker Hughes C3 [] that sat

25  _____

26      [5] Baker Hughes chooses to highlight its April 21, 2021 stock sale to show it made non-
    discretionary sales pursuant to a dated trading plan. BH Mot. at 14. However, this is the *only*
27  transaction amongst all the Defendants' transactions that was subject to a dated trading plan. The
    other $720 million was generated outside of any dated trading plans. Further, while this plan is
    dated March 22, 2021, Baker Hughes is silent on whether it possessed material, non-public
28  information at the time it entered into it. *See* § II.B-E.

outside of the [Baker Hughes sales] organization. And so they really weren't the people with the relationships, and they were the people with the quotas and they weren't the people with deep industry expertise[.]"[6] *Id.*

As a result of these disclosures, the price of C3's Class A common stock on the day the initial complaint was filed was $20.05—a 52% decline from the $42.00 per share Offering price, damaging investors. ¶ 19. Yet, Defendants contend that Plaintiffs have not asserted a claim. Their arguments are meritless.

Analysts were also perplexed. ¶ 18. For example, one analyst for Canaccord Genuity commented: "[W]e fear there's less than meets the eye with FQ2 … we're left with lingering questions," and that due to the disclosure, "total RPO was actually flat year-over-year, … which means RPO excluding Baker Hughes actually declined [by $45M]." ¶ 195. As a result, Canaccord advised its clients that: "until we get more comfort around new business visibility/execution, partner contribution, deal size and vertical diversification, etc., we continue to believe the correct rating for AI is HOLD." *Id.* Similarly, Wedbush, Bank of America, J.P. Morgan, and Deutsche Bank all downgraded C3 stock, lowered their price target, and counseled their clients to "pay attention to what we are calling 'Total Backlog'" as C3's "changes will probably increase the market's perception of execution risk." ¶¶ 196-198.

The relationship with Baker Hughes was also deteriorating throughout the Class Period. For example, from April through June 2021, Baker Hughes sold 20% of its stake in C3. ¶ 157. And two months after executing the Third Amendment, Baker Hughes' CEO, Simonelli, resigned from the C3 Board of Directors. ¶ 68.

## G.    Post-Filing Investigations and Events Corroborate Plaintiffs' Allegations

Since Plaintiffs filed their Amended Complaint in February 2023, additional facts have surfaced that strongly corroborate Plaintiffs' allegations.

---

[6] Siebel's December admissions are corroborated by FE-1, who heard during a weekly sales call, attended by both FE-1 and Siebel, that the Baker Hughes pipeline had made **no** sales for C3 as of April 30, 2020. ¶ 206.

1    On June 2, 2023, CNBC released an exposé on C3 entitled "Billionaire Tom Siebel faces

2    tumult at C3.ai as investor lawsuit, short sellers questions metrics." The article cites accounts from

3    individuals who worked for Baker Hughes during the Class Period, which completely undermine

4    Siebel's repeated representations about the size of the Baker Hughes team selling C3. Ex. 3.

5    Specifically, the Baker Hughes former employees admit stated that C3's products were "difficult

6    to learn." Additionally, they revealed that Baker Hughes' 12,000 salespeople were "not all trained

7    and qualified to sell the C3.ai product" and that "employees were not allowed to sell it without

8    going through a rigorous approval process." *Id.* at 4. As a result, the Baker Hughes former

9    employees "had no idea how the [Joint Venture] could certify 12,000 people" (*id.*)—as Siebel

10   repeatedly claimed. *See* § II.D. The article also states that "many of the 30 former C3[] employees

11   who spoke with CNBC said that the company has had a difficult time attracting new customers and

12   that those that have come in the door originated from Siebel's relationships." *Id.* at 7. Indeed, these

13   sentiments help explain why C3 only added eight customers in a recent quarter (under C3's

14   traditional definition of customer). *Id.*

15   CNBC also broadcasted its May 2023 video interview with Siebel, where he confirmed that

16   he has repeatedly touted C3's access to Baker Hughes' 12,000-person salesforce. Ex. 4 at 1:50.

17   And notably, during the interview, neither Siebel—nor the corporate representative from Baker

18   Hughes—were able to identify *any* number of Baker Hughes sales personnel who are trained to sell

19   C3 products, or how many are actively doing so. *Id.* at 2:30.

20   **H.    Defendants' Identification of False Statements in Appendix A**

21   Defendants' Appendix A (ECF No. 105-1) identifies 18 separate statements; however, these

22   can all be consolidated under three general categories.

23   ***Statements by Siebel regarding C3's access to the Baker Hughes salesforce.*** Statements

24   4-6, 8-11, 13, and 15-18, are all statements by Siebel asserting that the full 12,000-person Baker

25   Hughes salesforce was working to sell C3's products. All these statements are materially

26   misleading because C3 did not actually have access to the full 12,000-person Baker Hughes

27   salesforce. C3 had access only to a much smaller salesforce, which lacked Baker Hughes' typical

28   salesforce's expertise, experience, and access. Statements 13 and 15-18 were additionally

misleading for failing to disclose that as a result of the lack of access to the full Baker Hughes salesforce, Defendants were forced to undergo a risky restructuring of its own internal salesforce, a restructuring that ultimately failed.

**Statements about the depth of the partnership with Baker Hughes.** Statements 1, 2, 7, 12, and 14 are statements made in SEC filings regarding the scope of C3's partnership with Baker Hughes, including Defendant Abbo's statement that C3's partnership with Baker Hughes was "very deep." These statements are particularly false and misleading for mischaracterizing the depth of C3's partnership with Baker Hughes, again because C3 lacked access to the full 12,000-person Baker Hughes salesforce. Statement 14 is also false and misleading for failing to disclose C3's own internal salesforce restructuring.

**Statement about joint venture revenue recognition in fiscal year 2020.** Statement 3 is a statement in the Registration Statement representing that C3 recognized revenue from sales by Baker Hughes for fiscal year 2020. This statement was misleading because Baker Hughes had made no such sales by April 30, 2020 (the end of C3's fiscal year 2020).

## III.   PLEADING STANDARDS

In resolving a motion to dismiss, courts must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Dismissal is inappropriate "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

As for Plaintiffs' Section 11 and 15 claims under the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o, a plaintiff "need show only [1] that he bought the security and [2] that there was a material misstatement or omission" to establish a prima facie Section 11 claim. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013). And Section 15 imposes secondary liability on those who "control[] any person liable under [Section 11]." 15 U.S.C. § 77o(a). Importantly,

1    Plaintiff need not plead scienter, reliance, or loss causation for the Securities Act claims. *Hildes*,

2    734 F.3d at 859.

3              **IV.    ARGUMENT FOR THE EXCHANGE ACT CLAIMS**

4              To state a claim under Section 10(b), a plaintiff must allege: (1) a material misrepresentation

5    or omission (i.e., falsity); (2) scienter; (3) the purchase or sale of a security; (4) reliance;

6    (5) economic loss; and (6) loss causation. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.

7    27, 37-39 (2011). Here, Defendants challenge falsity, scienter, and loss causation. Each of these

8    challenges is meritless.

9    **A.    The Complaint Alleges Falsity**

10             To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission]

11   alleged to have been misleading [and] the reason or reasons why the statement [or omission] is

12   misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly

13   misleading statements and what statements were misleading, state where and when the statements

14   were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*,

15   317 F.3d 1097, 1106 (9th Cir. 2003). The Complaint does exactly that.

16             **1.    Defendants' misstatements regarding the number of people at Baker Hughes
                      selling C3's products are actionable.**

17

18             On at least dozen occasions throughout the Class Period, Siebel claimed that Baker Hughes

19   had 12,000 people selling for C3. *See* § II.D. Given these statements' obvious falsity, Defendants

20   are forced to focus instead on the argument that the statements are immaterial. Materiality is,

21   however, "a fact-specific determination that should ordinarily be assessed by a jury" and that may

22   be resolved only on a motion to dismiss if it is "so obvious that reasonable minds could not differ."

23   *Alameda v. Nuveen Municipal High Income Opportunity Fund*, 2009 WL 1424529, at *7 (N.D.

24   Cal. May 20, 2009) (holding that complaint sufficiently pled materiality).

25             Further, Siebel's statements do not even come close to being "obviously" immaterial. Mot.

26   at 2. They were highly material because C3 itself was a relatively small company with only 700

27   employees, and its relatively small salesforce would under normal circumstances constrain their

28   growth. ¶ 62. Indeed, the Tenth Circuit recently held that it was materially misleading to claim to

1    have a salesforce of "about 250" when in reality the company had about 200. *Ind. Pub. Ret. Sys. v.*

2    *Pluralsight, Inc.*, 45 F.4th 1236, 1250 (10th Cir. 2022). The extent of Siebel's misstatement is

3    considerably larger.

4            Analysts covering C3 understood the importance of C3's ability to generate sales, which is

5    why so many analysts asked about the Baker Hughes partnership during conferences and earnings

6    calls. For instance, at the Piper Sandler 2021 Global Tech Conference on September 13, 2021,

7    Arvind Ramnani, an analyst, raised the Baker Hughes partnership: "your go-to-market approach is

8    also very unique … some of the approach you've taken is I think quite different. Looking to have

9    really leveraged partners such as Baker Hughes, FIS in specific verticals, what is the rationale for

10   partnering with these vertical leaders versus sort of really going after the market by yourself?"

11   ¶ 148. Siebel responded that "it [the Baker Hughes partnership] gives us market leverage, … we're

12   700 people. I have 12,000 people selling for me at Baker Hughes into oil and gas." ¶ 148. Siebel

13   emphasized that having this massive salesforce at C3's disposal was critical. Siebel stated that

14   partnerships with companies like Baker Hughes are "useful, they're invaluable and they're core to

15   the strategy." ¶ 126. Siebel added that "in partnership with Baker Hughes, we have 12,000 people

16   selling every day into the oil and gas industry. Come on, for a company like us to get 12,000

17   people." *Id.* Siebel also made these claims in response to specific questions about the resources

18   committed by C3's strategic partners. At the March 1, 2021 earnings call, an analyst asked Siebel

19   "what kind of resources are committed from [C3's vertical partners]," to which Siebel responded

20   that "the classic case is Baker Hughes …. This is a … roughly … billion-dollar oil services

21   company that gives us access to 12,000 people now selling with us around the world." *Id. See also*

22   *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statements made in

23   direct response to analyst questions demonstrate materiality of information).

24           Defendants next argue that these claims fail because Plaintiffs never challenge the size of

25   the Baker Hughes salesforce. Mot. at 9. But that disregards the fact that what Siebel said, repeatedly,

26   was not just how large the Baker Hughes salesforce was, but that Baker Hughes' *full* salesforce was

27   working on behalf of C3 to sell C3's products. *See* § II.D. Defendants then argue that Siebel's

28   statements "say nothing about the size, nature, or skills of the specific Baker Hughes sales team

working on the C3 partnership." Mot. at 10. But the reason why Siebel doesn't describe the specific Baker Hughes sales team working on the C3 partnership is because C3 never acknowledged that Baker Hughes' sales of C3 products was being conducted by a minuscule team within Baker Hughes. Instead, whenever asked about the nature of the partnership with Baker Hughes, he responded by assuring the public that the full Baker Hughes sales team was working on the C3 partnership "every day." *Id.*; Appendix E.

Further, Defendants cannot waive these statements away as "classic puffery." "Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). For example, in *Quality Systems*, the Ninth Circuit reversed the dismissal of a securities fraud complaint where the defendants had told investors that "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales" and "[i]t's very consistent, and there's nothing out of character in the pipeline that we're reporting today versus what we have seen there the past couple of years." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). The Ninth Circuit found that these statements were not puffery because they "went beyond 'feel good' optimistic statements. In the court's view, these statements "did not just describe the pipeline in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline." *Id.* at 1144. Accordingly, they were actionable, not puffery. *Id. See also Zaghian v. Farrell*, 675 F. App'x 718, 720-21 (9th Cir. 2017) ("As to whether the statements were immaterial puffery, the alleged misrepresentations did not vaguely describe THQ's financial health, but instead addressed a particular product and the anticipated profitability of that product.").

Here too, Siebel's repeated claims related to Baker Hughes' 12,000-person salesforce working on behalf of C3 was a concrete description of C3's sales ability. They were not vague or qualitative statements. In contrast, the Defendants reported numbers, important numbers subject to objective verification.

Defendants' cases do not alter this analysis. Mot. at 18. *Splash Technology* contrasts "exaggerated" or "vague" inactionable statements with actionable statements that "imply

1  underlying factual premise" or "implicitly rest[] on factual assertions." *In re Splash Tech. Holdings,*

2  *Inc. Sec. Litig.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000). Here, the factual assertion

3  that Baker Hughes' full 12,000-person salesforce was selling on behalf of C3 was not just implied

4  but express. *Tektronix* similarly found as puffery vague and unquantifiable statements such as

5  claiming that their product has a "superior interface" and "provide a price/performance package

6  which is unmatched in the industry today." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d

7  1086, 1097 (C.D. Cal. 1999). *Plevy* treated as puffery statements such as one claiming that the

8  company's "success was due to its 'crisp execution on the timing, performance, reliability, and

9  quality' of its products" was immaterial puffery. *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D.

10  Cal. 1998). *Parnes* held that a statement boasting of "significant growth" was puffery. *Parnes v.*

11  *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997).

12        Given that none of the statements in the Complaint are nearly as vague as the statements in

13  Defendants' cited authorities, their only argument appears to be that Siebel's claims are so

14  exaggerated, so out of sync with the reality of what Baker Hughes was doing, that investors would

15  know that his statements, taken literally, were implausible and therefore must have disregarded

16  them. Mot. at 18. But Defendants point to no reasons why outsiders would have had preexisting

17  expectations about the scope of the partnership with Baker Hughes such that it would be obvious

18  that Siebel's statements that Baker Hughes' full sales team was offering C3 products could not be

19  literally true. Defendants claim that Plaintiffs do not point to any analysts, investors, or market

20  commentators who interpreted the statements this way, but they point to no reason why Plaintiffs

21  need make such allegations. Because courts must "credit the plaintiffs' plausible theory when

22  evaluating a Rule 12(b)(6) motion," it must also credit the plaintiffs' plausible interpretation of a

23  statement. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021).

24  Furthermore, Plaintiffs' interpretation is a far more plausible understanding of Siebel's statements

25  than the actual truth, which was that Baker Hughes' normal 12,000-strong sales team was selling

26  C3 products.

27        Further undercutting the claim in Defendants' motion that Siebel's statements were puffery

28  were statements made after the filing of that motion by Defendants Siebel and C3 themselves.

1    Siebel appeared before CNBC on June 2, 2023, for a segment discussing his alleged fraud. He was

2    asked, "[D]id you say the 12,000 were working with Baker Hughes to sell the c3.ai product?" Siebel

3    responded, "I believe it's on the order of 12,000." Ex. 4 at 1:30. After Siebel's interview, C3's

4    communications team contacted C3, reiterating that "Mr. Siebel stated that c3.ai had access to

5    12,000, to a 12,000-person sales organization at Baker Hughes because he believed it to be true and

6    has no reason to believe it is not true today." *Id.* at 5:00. Defendants cannot seriously argue to the

7    Court that Siebel's claims to have access to the full 12,000-person Baker Hughes salesforce are

8    puffery—while Siebel and C3 continue to insist to the public that those same claims are true

9    statements of fact.

10          Next, Defendants claim that no investor would have taken Siebel seriously because the

11   Registration Statement contained a boilerplate warning that C3 could not guarantee that Baker

12   Hughes would devote adequate resources to selling C3's products. But Defendants' argument is

13   nonsensical. In the Registration Statement, at the time of the IPO, C3 warned that it could not

14   guarantee what Baker Hughes would do going forward. Then, after the IPO, Siebel repeatedly lied

15   to investors about what Baker Hughes *had been doing*. Defendants state that although Siebel

16   phrased his comments specifically in terms of what Baker Hughes was doing, "[r]easonable

17   investors would have understood the salesforce statements as describing Baker Hughes' size and

18   resources, which Baker Hughes could leverage in performing its contractual commitment." But this

19   makes no sense. Defendants' reliance on *Yelp* falls short, because in that case "[d]efendants both

20   explicitly and implicitly acknowledged that some Yelp reviews were inauthentic. Those

21   acknowledgements, along with a common-sense understanding of what it means for a website to

22   host user-generated content, demonstrates that no reasonable investor could have understood

23   Defendants' statements to mean that all Yelp reviews were authentic." *Curry v. Yelp Inc.*, 2015 WL

24   7454137, at *6 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017). Here, there is no

25   evidence that Siebel ever acknowledged, until the end of the Class Period, that the full Baker

26   Hughes salesforce was not working on C3, and there is no reason to think ordinary investors would

27   have had a common-sense understanding that Baker Hughes was not devoting its full salesforce to

28   C3.

Defendants also argue that Siebel's false claims about Baker Hughes' use of its full salesforce were immaterial given that C3 met or exceeded its revenue projections during the Class Period. Mot. at 19. Defendants' argument, that executives can lie to investors with impunity so long as they meet their guided revenue numbers, finds no support in the caselaw. Defendants also place undue importance on C3's reported revenue. Given that C3's business is subscription based, it is unsurprising that they were able to meet their revenue numbers and the fact that they were reflects little on Baker Hughes' performance. Given that revenue is recurring under a subscription contract, meeting revenue numbers quarter to quarter is merely a matter of ensuring that customers pay their bills on time. To measure sales growth, C3, and investors, used a different metric—RPO, which stands for remaining purchase obligation and represents the total future payments customers owe to C3 under executed contracts. ¶ 13. RPO growth, therefore, represents the value of new contracts that are executed during the period, and is a better metric of sales performance than growth in revenue. ¶¶ 13, 61. C3 itself acknowledged this fact, stating in their Registration Statement that "[w]e monitor remaining performance obligations … as a key metric to help us evaluate the health of our business, identify trends affecting our growth, formulate goals and objectives, and make strategic decisions." *Id.* And because of Siebel's false boasts of having a 12,000-person salesforce working on behalf of C3, the Company's RPO growth consistently fell short of investor and analyst expectations, resulting in repeated quarterly misses and stock price declines. ¶¶ 174-183.

Finally, Defendants argue that the complaint fails to allege that Defendants misled investors about the quality and experience of the Baker Hughes sales personnel working on C3, which fell far short of the typical Baker Hughes salesforce. *See* § II.F. Defendants also assert that the quality of salespeople is not a required disclosure. Mot. at 14 (citing *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1055 (N.D. Cal. 2019)). But what Defendants ignore is that Siebel repeatedly made representations about the quality and experience of Baker Hughes' salesforce that was purportedly selling for working for C3. "[F]or example at oil and gas, we go to market with Baker Hughes. That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more –[board] room of Aramco, okay, but for Baker Hughes." ¶134. Here, Siebel chose to emphasize the industry connections of

Baker Hughes salespeople pitching C3 to oil and gas customers, thereby imparting a duty to disclose the truth.

**2. Defendants' further statements about their partnership with Baker Hughes are also actionable.**

In their Offering Materials, Defendants claimed that "we are jointly marketing and selling a range of Enterprise AI solutions … with the active engagement of Baker Hughes, which has a 12,000-person sales organization." ¶ 75. They repeated this statement in their 10-K on June 25, 2021. ¶ 140. These statements were misleading because, by claiming to investors that they are selling "with the active engagement of Baker Hughes" and raising in connection with that Baker Hughes' 12,000-person salesforce, Defendants actively created an impression that the full 12,000-person Baker Hughes salesforce was engaged with C3. *See* Appendix E. Because, as Defendants do not contest, the full salesforce was not engaged with selling C3's product, and therefore this statement was affirmatively misleading.

Defendants assert, without argument, that the statement did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists," Mot. at 10 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). But they do not explain what an investor is supposed to take from Defendants' boasting of Baker Hughes' 12,000-person salesforce if not that some meaningful part of that salesforce was engaged in selling C3 products. Defendants also quote their risk disclosure that they cannot be sure that their strategic partners, such as Baker Hughes, "will prioritize or provide adequate resources to selling our AI Suite and AI Applications." But while such a warning would inform investors of the possibility that Baker Hughes would stop providing adequate resources to the partnership, it did not diminish the misimpression that Baker Hughes was providing ample resources as of the time the statement was made. "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) (cleaned up).

On March 2, 2021, Abbo stated that "there is no better partner than Baker Hughes. … The collaboration is I would say is very deep if you will. … We're collaborating on the customer engagement to make them successful and Uwem [Ukpong] and I speak on a multiple times each week. So it's really a very deep partnership between the two companies." ¶ 130. Defendants dismiss this statement as "similar to the general statement in the registration statement" without any substantive analysis. Mot. at 21. The claim that Baker Hughes' collaboration is "very deep" is misleading when placed in context with Defendants' other statements about the Baker Hughes partnership, given that in reality the partnership with Baker Hughes only consisted of a small independent unit of sales people, who lacked "the long standing deep relationships" that Abbo falsely touted. *Id.*

In the Registration Statement, Defendants emphasized how the Baker Hughes partnership vastly increased C3's customer reach by claiming: "our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with … Baker Hughes[.]" ¶ 74. They repeated this statement in their form 10-Q filed on September 1, 2021. ¶ 144. These statements were misleading because, given the limited nature of the Baker Hughes salesforce selling C3 product, they did not materially, let alone vastly, extend their sales reach through the cooperation with Baker Hughes. Defendants next claim that this statement "'create[d] no affirmative impression, either way, regarding' the size, nature, or skill of Baker Hughes' sales team working as part of the partnership with C3." Mot. at 10 (quoting *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *4 (C.D. Cal. June 6, 2008)). But by stating that their relationship with Baker Hughes "vastly extends [C3's] reach" it necessarily created a misleading impression that a large salesforce from Baker Hughes was engaged in selling C3. *Juniper Networks* is distinguishable because there, defendants merely claimed that certain partnerships are "strong" and did not make representations on how those partnerships increased the company's capabilities. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012). In *Extreme Networks*, the court found statements to be puffery because they were "vague and do not set out with specificity the reasons for the excitement, optimism, or beliefs asserted, nor do they explain what Defendants

mean by 'progress' or 'productive discussions' with respect to the partnership." *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *13 (N.D. Cal. Apr. 27, 2017). *Aqua Metals* is distinguishable because the statement merely claimed that a partnership was "a strong validation of our technology." *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *13 (N.D. Cal. Nov. 16, 2020). Here, C3's statement was far more specific, claiming that the partnership expanded their sales reach.

### 3.    Defendants' statements from August 12, 2021 onward were additionally misleading for failing to disclose C3's failed reorganization of its sales team.

Siebel's optimistic statements about the support C3 received from the full 12,000-person Baker Hughes salesforce were also misleading because C3 was forced to undertake a risky restructuring of its own salesforce after it did not receive that support from Baker Hughes. ¶ 119. Under Ninth Circuit precedent, "allegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1020 (S.D. Cal. 2005) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995)). Because of the lack of support from Baker Hughes that C3 promised to investors, C3 could not achieve the sales growth that it promised and that investors and analysts expected. As a result, the Complaint alleges, "in July 2021, C3 quietly attempted to restructure and reconstitute the salesforce to do more with less, adopting a more traditional and hierarchical sales structure. Ultimately, the new sales structure performed unacceptably and as a result, in November 2021, management scrambled to reverse their failed reorganization." ¶ 119. Therefore, Defendants' statements after July 2021 regarding the support of the Baker Hughes salesforce were also misleading because they concealed the fact that as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, leading them to undertake a risky restructuring that moved away from their typical high touch sales strategy and adopt a more traditional and hierarchical sales structure commonly used by more established software companies. ¶¶ 143, 191. This was a "specific problem" that undermined Defendants' optimistic statements about the support they received from Baker Hughes. Defendants' citation to *Farfetch* is beside the point. There, the court held that a complaint did not allege falsity only because

defendants did not disclose that they were considering a change in business strategy. *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 495 (S.D.N.Y. 2021). Here, the Complaint alleges that the change in strategy rendered their positive and specific statements about the sales strategy they secretly abandoned misleading.

### 4.   Defendants' statement about revenue recognized from the Baker Hughes partnership are actionable.

The Offering Materials created the misimpression that C3's offerings were in high demand as Baker Hughes had already brought in sales from which C3 would recognize revenue: "during the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement." ¶ 77. This statement was misleading because, as FE-1 explained, on weekly sales calls attended by sales VPs from each industry segment, the General Manager of the Oil and Gas segment regularly reported that Baker Hughes had no sales pipeline and had made *no* sales as of April 30, 2020. ¶ 67. This internal disclosure directly contradicts the Registration Statement's claim that during the fiscal year ended April 30, 2020, C3 recognized revenue from deals brought in by Baker Hughes.

In response to these allegations, Defendants point to the Registration Statement's claim that C3 recognized revenue from its arrangement with Baker Hughes in excess of the subscription revenue from Baker Hughes. Mot. at 12. Defendants then ask the court to accept this representation as accurate and assert that it disproves the allegations that C3 did not recognize any revenue from deals brought in by Baker Hughes. But it "is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *5 (N.D. Cal. July 21, 2020) (taking judicial notice of SEC filings "for the sole purpose of determining what representations [defendant] made to the market" but not "the truth of any facts asserted in these documents"); *Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *6 (N.D. Cal. Dec. 13, 2018) (taking judicial notice of press releases incorporated by reference for the fact that press releases were issued and informed the public of the information

1   contained, but not for their truth). Defendants cite *Veritas* for the proposition that "the Court may

2   disregard factual allegations if such allegations are contradicted by the facts established by

3   reference to exhibits attached to the complaint." *In re Veritas Software Corp. Sec. Litig.*, 2003 WL

4   27386177, at *3 (N.D. Cal. Dec. 10, 2003). However, the citation to *dictum* from an unpublished

5   district court opinion from twenty years ago cannot override Ninth Circuit's holding in *Orexigen*.

6   Moreover, the *Veritas* court declined to consider any documents outside the complaint. *Id.* at *3

7   n.3. Given that Defendants' argument rests on asking the Court improperly to take judicial notice

8   of the Registration Statements for the truth of its revenue figures, it provides no legitimate basis to

9   dismiss this claim.

10      In addition, even accepting as true the Registration Statement's claim that C3 recognized

11   $46.7 million in revenue from Baker Hughes (which exceeded the subscription revenue from Baker

12   Hughes of $40.4 million) that would not establish that Baker Hughes made any actual sales, and

13   that there were any "deals brought in by Baker Hughes." This is because under the terms of the

14   contract between C3 and Baker Hughes, Baker Hughes is required to make up the shortfall in

15   revenue by paying out of pocket, if it cannot bring in a specific minimum number of deals. ¶ 63.

16   Therefore, the fact that Baker Hughes paid more than the cost of its own subscription does not

17   suggest that they actually made any sales, it simply means that one way or another, they honored

18   their contract. Bizarrely, Defendants in the next paragraph acknowledge this fact, but attempt to

19   weasel out of its implication by saying that "Plaintiffs' claim that it was 'impossible' to recognize

20   revenue from the partnership" is unsupported. Mot. at 12. But the statement that the Complaint

21   alleges to be misleading did not just claim to recognize revenue from the Baker Hughes partnership,

22   it claimed to recognize revenue from *deals brought in from Baker Hughes*, that is, sales of C3

23   products to third parties.

24      Next, Defendants try to attack the reliability of Plaintiffs' confidential witness by claiming

25   that FE-1's statements are unreliable because they contradict *the very registration statement the*

26   *Complaint alleges to be misleading*. But, as stated in the preceding paragraphs, this argument lacks

27   merit. Second, Defendants claim that the Complaint describes FE-1 with insufficient particularity.

28   To be credited on a motion to dismiss, a confidential witness "must be described with sufficient

particularity to establish their reliability and personal knowledge." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1144-45. The Complaint notes that FE-1 was a former Vice President from *at least* March to May 2020, reported directly to Siebel, and attended weekly calls with C3's entire salesforce, as well as Siebel. ¶ 55. This detailed description of FE-1 demonstrates that FE-1 was indeed in a position to hear updates on the status of Baker Hughes' sales pipeline. ¶ 55. Defendants also complain that this description cannot satisfy pleading standards for confidential witnesses, citing *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014). But given that the allegations derived from FE-1 relate specifically to what he learned on sales calls with Siebel also attending, Defendants do not explain what is insufficient about the description of his job provided in the Amended Complaint. Next, Defendants claim that FE-1's statements are unreliable because he only was a C3 employee for two of the months of the fiscal year about which he comments. Putting aside the fact that the Complaint states that FE-1 was employed at C3 from *at least* March to May 2020, Defendants also ignore that he was an employee during the *last* two months of the fiscal year, rendering it plausible that he would have heard comments about Baker Hughes' performance during the full fiscal year.

## B.     The Complaint Pleads a Strong Inference of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quotation marks and citations omitted). In this Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). The inference of scienter "need not be irrefutable … or even the most plausible." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Nor must the scienter inference be "of the 'smoking-gun' genre." *Id.* Rather, the inference of scienter must merely be one that is "cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged." *Id.* And, because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *See In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000) ("PSLRA calls for a 'strong inference,' not an outright confession or an airtight case at the pleading stage.").

1   Finally, the Supreme Court in *Tellabs* emphasized that courts should focus on "whether all of the

2   facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

3   individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

4   The Complaint pleads a strong inference of Defendants' scienter.

5               **1.    The Complaint alleges specific facts showing that Defendants knew or**
                **recklessly disregarded the truth about the challenged statements.**

6

7           Scienter can be pled by alleging that defendants actually knew of, or had access to,

8   information contradicting these challenged statements. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d

9   776, 785-86 (9th Cir. 2008). Particularized allegations demonstrating defendants' access to this

10  information and resulting recklessness are sufficient. *See In re Quality Sys., Inc. Sec. Litig.*, 865

11  F.3d at 1145 ("particularized allegations that defendants had 'actual access to the disputed

12  information' … raise a strong inference of scienter"); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir.

13  2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*

14  *Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (scienter based on "data to which [defendant] had

15  access"). Further, a reckless disregard can be proven "'if [a defendant] had reasonable grounds to

16  believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and

17  disclose such facts although he could have done so without extraordinary effort.'" *In re Oracle*

18  *Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d

19  1057, 1064 (9th Cir. 2000)); *Howard*, 228 F.3d at 1064 ("[defendant] cannot simply argue that he

20  looked the other way"). The Complaint includes sufficient evidence that each of the 10(b)

21  Defendants knew that (1) C3 did not have full access to the Baker Hughes' 12,000-person salesforce

22  and (2) C3 had massively restructured its own salesforce by pivoting away from a strategy

23  accounts-focused team to more of a globalized and hierarchical model.

24               **a.    Defendant Siebel**

25          The Scienter allegations showing that Defendant Seibel, who served as CEO and Chairman

26  of the Board of Directors of C3 at all relevant times, either knowingly or recklessly made his

27  misstatements is extensive.

28

***First***, Seibel was aware of the structure of the Joint Venture throughout the Class Period. Indeed, Seibel admitted that "***when we first put together*** the relationship … with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships and they weren't the people with the quotas and they weren't the people with the deep industry expertise[.]" ¶ 192 (emphasis added). Seibel also personally signed the Joint Venture Agreement which outlined this arrangement in the fall of 2020. Ex. 1 at 32. Accordingly, Seibel knew his statements were false at the time he made them. And even after Baker Hughes and C3 executed the Third Amendment to the Joint Venture Agreement in October 2021, which eliminated all FTE requirements for Baker Hughes personal selling C3 products and only required C3 to provide train-the-trainer services for up to 60 Baker Hughes sales people a year, Seibel stated twice more in November 2021 that Baker Hughes' entire 12,000-person sales team was selling for C3. Ex. 2 at 1; ¶¶ 151, 153. These facts undercut Defendants' argument that the "Complaint does not allege facts showing Seibel was aware of the structure of Baker Hughes' business unit at the time the purported misstatements were made." Mot. at 24. Defendants' argument that this is fraud by hindsight is undercut by Seibel's statements indicating his personal involvement with putting together the Joint Venture at the outset.

***Second***, Plaintiffs specifically allege that Seibel attended weekly sales calls with FE-1, "typically on Thursdays" where "the VPs from each segment … reported on their segment's [sales] pipeline." ¶ 67. The Complaint further alleges that FE-1 stated that between March and May 2020, the General Manager of the Oil & Gas segment *repeatedly* reported at those Thursday meetings to both FE-1 and Seibel that the Baker Hughes sales pipeline was "non-existent" and had made *no* sales as of April 30, 2020. ¶¶ 55, 67. These allegations contradict C3's December 2020 "Registration Statement [which] stated that Baker Hughes had already brought in deals generating revenue for C3." ¶ 1. Accordingly, Plaintiffs have pled what meetings Seibel attended, what was discussed, and how the data contradicted any public statement. These facts fatally undermine Defendants' claim that "the Complaint does not allege what reports any one of these Defendants reviewed or what or meetings these Defendants allegedly attended, what was discussed in those

1  reports or meetings, or when or how the reports or data contradicted any public statement." Mot. at

2  23. Therefore, Defendants' cited cases in which the complaints included none of the listed

3  information are of no use here.[7] Further, Defendants' attempts to undercut the credibility of FE-1

4  lack merit and is easily distinguishable from *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,

5  522 F. Supp. 3d 660, 674 (N.D. Cal. 2021) (the witness did not report to the defendants, did not

6  attend specific meetings with defendants, and failed to state whether defendants actually received

7  any data that contradicted their public statements).

8  **Third**, the fact that Siebel specifically addressed the number of Baker Hughes people selling

9  for C3 strongly supports scienter. *See Reese*, 747 F.3d at 572 (addressing "corrosion rate data

10  specifically, render[ed] it unlikely that [defendant] was not aware of it or the concerning aspects of

11  the company's findings"); *Okla. Police Pension & Ret. Sys.*, 780 F. App'x at 485 (defendant's

12  extensive discussion of company's ability to send real-time alerts when in reality 70% of the

13  company's alerts were stale supported scienter). Here, Siebel touted C3's ability to access "all"

14  12,000 Baker Hughes salespeople **on at least twelve occasions throughout the Class Period** and

15  confirmed those statements in a May 2023 video interview with CNBC. § II.D.

16  **Fourth**, Siebel had direct and extensive involvement in developing and marketing C3 and

17  the Joint Venture. ¶ 204. As discussed above, Siebel attended weekly sales calls where new sales

18  leads were discussed, including Baker Hughes' "non-existent" pipeline. ¶ 206. Other former

19  employees also told CNBC that Siebel was known to provide "intense oversight" at C3. *See* § II.G.

20  Siebel also knew of the massive restructuring of C3's internal salesforce to compensate for anemic

21  Joint Venture sales, as the Complaint includes an admission from Siebel that "***the management***

22  ***team and I***" had been addressing the restructuring issue. ¶ 15 (emphasis added).

23  Based on these facts, it is absurd to suggest that Siebel had no interest or access to accurate

24  information about the Joint Venture, including the size of its active salesforce at Baker Hughes and

25

---

26  [7] *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *CheckOut Holdings, LLC v. Amplified Holdings, Inc.*, 64 F. App'x 631, 633 (9th Cir. 2003); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *30; *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024 (N.D. Cal. 2020).

1    the later restructuring of C3's internal workforce. Accordingly, Defendants' cases in which the

2    defendants tried to plead scienter based on defendants' executive positions do not apply.[8]

3                    **b.      The Other Individual Defendants**

4              Simonelli is the Chairman, CEO, and President of Baker Hughes and, in his capacity as a

5    director for C3, he signed the Registration Statement in December 2021 and the 2021 10-K six

6    months later, each of which contained several misrepresentations about the Joint Venture. *See*

7    § II.C-D; ¶¶ 221-222. Defendants attempt to characterize Simonelli as an "independent director"

8    who "sat on C3's board but was not a member of management" (Mot. at 23 n.13), but he was not

9    an ordinary independent director. Given his position at Baker Hughes, he was both highly motivated

10   and had the ability monitor the status and success of the Joint Venture. ¶ 221. He also had real-time

11   Baker-Hughes-side information at his own disposal that he could use to cross-check how many

12   Baker Hughes salespeople were successfully trained on how to sell C3 products, and how many

13   were actively doing so. *See* § II.B. Additionally, as a C3 audit committee member, Simonelli would

14   have been able to readily access and understand "foundational financial documents" underlying

15   these SEC disclosures, including any statements related to the Joint Venture. ¶ 34. While

16   Defendants describe the Joint Venture as mere "minutiae"—and well beyond the radar of an

17   independent director—these characterizations are belied by the fact that Simonelli only joined the

18   C3 Board *because* of the Joint Venture's execution. ¶ 64. It is therefore implausible to argue that

19   Simonelli lacked the interest in or ability to closely monitor and interpret the progress of the Joint

20   Venture, including the size of its active salesforce at Baker Hughes and the later restructuring of

21   C3's internal workforce.

22             Similarly, Defendants Abbo and Barter are not mere "officers" as Defendants repeatedly

23   contend. Abbo was a C3 Board Director when the draft Registration Statement was submitted to

24

25         [8] *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000) (plaintiffs provided no
     other scienter allegations except for that defendants must have known of the falsity of their
26   statements through their positions in the company); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp.
     2d 833, 844 (N.D. Cal. 2000) (plaintiffs failed to plead specifics about the alleged adverse non-
27   public information); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th
     Cir. 2008) (plaintiffs did not allege how specific information related to the fraud); *S. Ferry LP, No.
28   2*, 542 F.3d at 784 (plaintiffs failed to plead actual exposure to information on behalf of defendants).

the SEC. *See* § IV.F. Indeed, Abbo only resigned from the C3 Board weeks before the start of the Class Period—and after nine years of board service. *Id.* And as CFO, Barter signed and certified the Registration Statement, 2021 10-K, and the Q1 10Q—each of which contained several misrepresentations about the Joint Venture. Abbo and Barter also attended meetings and had access to reports and data that undermined Siebel's repeated statements about the size and quality of the Joint Venture's salesforce. ¶¶ 208, 209. And they both also understood that the Joint Venture was a core operation of C3. ¶¶ 214, 215. Yet, month after month, these executives did not prevent Siebel from making misrepresentations about the Joint Venture nor did they act to publicly clarify these misrepresentations once made. ¶¶ 213-220.

Accordingly, as with Siebel, the Complaint pleads far more in support of the other Defendants' scienter than just their positions at the Company.

### 2. The Complaint adequately pleads a core operations theory.

Core operations theory supports the inference of scienter for each defendant. Information is imputed to Defendants under the core operations theory where it concerns "prominent facts" "obvious from the operations of the company." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009). *See also S. Ferry L.P., No. 2*, 542 F.3d at 782, 786 ("it may be inferred that facts critical to a business's 'core operations' … are known to key company officers … where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *accord Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008); *Reese*, 747 F.3d at 569.

The Joint Venture was part of C3's core operations. Indeed the Registration Statement states that Baker Hughes is "core to our growth strategy" and represents "a significant use case [to] prove the value of our AI Suite with a flagship customer." ¶ 205. Siebel also referred to the Joint Venture as "the classic case" of C3's goal to grow by "align[ing] with a leveraged market partner." *See In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1078-79 (E.D. Wash. 2016) (absurd for defendant to lack knowledge about product critical to company's success). Analysts also understood that the Joint Venture was essential to measuring the value of C3 and regularly considered C3's "partner

contribution" and "longer-term partnership revenues" when making their buy/hold/sell recommendations. *See, e.g.*, ¶¶ 178, 195.

Nor is there any doubt that the concealed facts here—access to a 12,000-person salesforce and a major restructuring within C3's own salesforce—were "prominent facts" that were "obvious from the operations of the company." Defendants do not dispute that C3's own salesforce numbered only 700. ¶ 148. So the ability to tap into a pool of salespeople more than 17x its own size was highly material to the Company—and to investors. So much so, that industry analysts repeatedly asked about C3's "unique" partnership model. *See, e.g.*, ¶ 148. And Siebel himself touted the importance of leveraging *all* of Baker Hughes' 12,000-person salesforce for C3 products more than a dozen times over the Class Period. *See* § II.D.

Siebel also succinctly explained the importance of the Joint Venture to C3's ability to ink more sales contracts: "it gives us leverage, I mean, we're 700 people [and now] I have 12,000 people selling for me at Baker Hughes into oil and gas." Further, "[when] we go to market with Baker Hughes [it] allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more –[board] room of Aramco, okay, but for Baker Hughes." ¶¶ 134, 148. It is therefore absurd to suggest that Defendants were simply unaware or did not monitor whether thousands of salespeople at Baker Hughes were selling C3 products. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1134 (N.D. Cal. 2020) ("the implementation of a substantial discount on Align's main revenue source squarely qualifies as 'facts critical to a business's core operations.'").

Rather than addressing these allegations head on, C3 insists that Plaintiffs fail to allege Defendants' "detailed involvement in the minutiae of the Company." Mot. at 26. But the concealed facts were not minutiae or "logistical detail[s]." *Id.* at 13. Instead, the misleading statements stem from a massive disconnect between Defendants and the market regarding the number of salespeople actively selling C3 products, and a significant departure in the sales structure they used to sell these products—or in other words, "prominent facts" that were "obvious from the operations of the company." *See Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (scienter supported by "scope and significance of the events" at issue); *Makor Issues & Rts., Ltd.*

1   *v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (finding it "exceedingly unlikely" that CEO was

2   "unaware of the problems of his company's two major products"). Plaintiffs have properly pled a

3   core operations theory of scienter.

### 3.   Plaintiffs' motive allegations support an inference of scienter.

5   The Complaint alleges that the 20A Defendants obtained *a $730 million windfall* while the

6   stock was inflated due to their misrepresentations by skirting conventional lock-up periods,

7   engaging in voluminous and well-timed open market trades, and establishing tainted 10b5-1 trading

8   plans. These facts demonstrate a strong motive to omit material information from the market.[9] *See*

9   § IV.B.3. Defendants attempt to argue that this outrageous windfall does not support scienter, but

10  their arguments fail.

11  *First*, Defendants contend that Plaintiffs plead no trading history. This is incorrect.

12  Plaintiffs provide a detailed accounting of the 20A Defendant stock sales during the Class Period.

13  ¶ 157. Plaintiffs also explain that trading of C3 stock by the Individual Defendants and Baker

14  Hughes became non-existent after the close of the Class Period. ¶¶ 162, 163. Indeed, Siebel has not

15  sold any C3 stock since November 2021. *Id.* And while Defendants make much ado about whether

16  the Complaint includes a trading period before the Class Period, this ignores that C3 was not

17  publicly traded before the Class Period. Plaintiffs need only plead "a meaningful trading history for

18  purposes of comparison." *Hampton*, 2020 WL 6710096, at *16. *See also Chu v. Sabratek Corp.*,

19  100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (where "through no fault of their own, [plaintiffs] cannot

20  show that the individual defendants' stock sales were drastically out of line with prior sales"

21  because of a lock-up, complaint adequately alleged scienter). Here, because the Class Period begins

22  at C3's IPO—and thus there is no trading period before the Class Period—Plaintiffs can

23  appropriately compare Defendants' trading history from other periods to show such a meaningful

24  comparison.

25  *Second*, Defendants' *ipse dixit* claim that the insider trading history is not suspicious ignores

26  Plaintiffs' allegations that Defendants had negotiated a convoluted exception to the standard 180-

---

27  [9] A motive is not needed plead scienter. *See Matrixx Initiatives, Inc.*, 563 U.S. at 48 ("the

28  absence of a motive allegation, though relevant, is not dispositive").

day lock-up period that hinged on the stock maintaining a 33% premium over the original IPO price for a certain amount of time. ¶ 210. Defendants also ignore that Siebel, a highly sophisticated CEO with long-time familiarity with insider trading best practices, declined to set up a Rule 10b5-1 trading plan in the lead up to the IPO. ¶ 165. Nor did Siebel enter into a Rule 10b5-1 trading plan before the 90 day "early" lock-up expired. *Id.* Instead, Siebel chose to sell more than $400 million in C3 stock before finally filing an "undated" 10b5-1 trading plan sometime around June 14, 2021. *Id.* He then sold another $200 million in stock "pursuant" to this undated plan and stopped trading altogether right before the truth was revealed.[10] ¶ 163. Such actions are patently suspicious. The other Defendants' trades fare no better, as the Complaint also presents evidence of Defendants Abbo and Barter each selling C3 shares only three weeks before the truth was revealed. ¶ 157.

**Third**, Defendants claim that "many sales identified by Plaintiffs were made pursuant to pre-established 10b5-1 plans." Mot. at 29. But, crucially, Defendants also traded most of their C3 shares *outside* of these plans, and almost all the plans Defendants identify are undated—making it impossible to discern if these plans were entered into when the Defendant did *not* possess material, non-public information. ¶ 164. Yet Defendants do not even try to establish when these 10b5-1 plans were entered into, let alone that they were entered at a time when the Individual Defendants had no access to material non-public information. Mot. at 29.

That the 20A Defendants failed to enter into 10b5-1 trading plans until months after C3's IPO is even more astonishing as Defendants characterize themselves as "respected Silicon Valley entrepreneurs" and "business executives" with "decades of experience" in public companies. Mot. at 1, 4. *In re Countrywide Fin. Corp. Sec. Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (defendant's amendments to 10b5-1 plans at the height of the market "appear to defeat the very purpose of 10b5-1 plans"). *See also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (noting that a "10b5-1 plan does less to shield [a defendant] from suspicion [when] he instituted the plan … after the start of the class period"); *George v. China Auto. Sys., Inc.*, 2012

---

[10] Defendants are incorrect in stating that Siebel did not trade before the December 2021 disclosures. In fact, Siebel sold more than $29 million of C3 stock on November 15, 2021—three weeks before his admission that the Joint Venture did not have access to Baker Hughes' 12,000-strong workforce and that C3's internal workforce was forced into multiple restructurings. ¶ 157.

WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) ("where (as here) 10b5-1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations on a motion to dismiss") (quotation marks and citation omitted). At bottom, if Defendants were sophisticated enough to negotiate a 90-day lock-up expiry exemption while drafting the Registration Statement, then they should have also known to initiate a 10b5-1 trading plan at around the same time. Yet inexplicably, Defendants failed to do so here.

Defendants are therefore not shielded from an inference of scienter where a 10b5-1 plan is entered into—or strategically amended—to profit from an inflated stock price or insider information. *See In re CRM Holdings, Ltd. Secs. Litig.*, 2012 WL 1646888, at *25 (S.D.N.Y. May 10, 2012) (discussing *In re Countrywide*, 554 F. Supp. 2d at 1069). Indeed, where (as here) 10b5-1 trading plans are entered into during the class period, they "are not a cognizable defense to scienter allegations on a motion to dismiss." *Freudenberg v. E*Trade Fin'l Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2011) (collecting cases). And Defendants' cases are not to the contrary.[11]

***Fourth***, Defendants' attempt to show that Defendants' ownership interests in the Company remained the same is belied by both the facts and the law. As for the facts, Defendants chose to compare C3's proxy statements from August 2021 and August 2022. But this comparison is highly misleading as ***Defendants had already sold $630 million in C3 before August 2021***. ¶ 157. And Plaintiffs have already alleged that Defendants sold extremely little stock—and in the case of Siebel no stock at all—after November 2021. ¶ 157. In contrast, Appendix C shows ownership percentage information from the start to the end of the Class Period, which discloses that Defendant's Siebel sold 26.4% of his ownership interest in C3 during the Class Period, Abbo sold almost 31% and Baker Hughes sold 11.4%. Appendix C. Defendants also disregard Ninth Circuit caselaw that instructs: "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Nursing Home*

---

[11] None of Defendants' cases pertain to trading plans that were either undated or filed after the beginning of the Class Period and therefore do not apply. *See In re Nektar Therapeutics*, 2020 WL 3962004, at *16 (N.D. Cal. July 13, 2020); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998).

1    *Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (where $900 million

2    in sales represented 2.1% of defendant's holdings, sales support strong inference of scienter); *see*

3    *also In re Countrywide*, 554 F. Supp. 2d at 1069 ("$474.49 million in stock proceeds" supportive

4    of scienter regardless of the percentage retained).

5            **Finally**, Defendants claim that Plaintiffs have not pled an intent on the part of Simonelli, as

6    the stock trades were made by Baker Hughes. But as President, CEO, and Chairman of Baker

7    Hughes, Simonelli's personal interest was aligned with that of his company (i.e., both Simonelli

8    and Baker Hughes would have both wanted Baker Hughes to maximize its profit from C3 stock

9    sales). Plaintiffs can therefore impute Baker Hughes' intent on Simonelli. And even putting aside

10   Baker Hughes' suspicious stock sales, Plaintiffs have already established scienter for Simonelli via

11   other factors. *See* § IV.B.1.

12          **4.      C3's generalized disclosures do not absolve Defendants.**

13          Finally, Defendants assert that this Court should dismiss this lawsuit because "Defendants

14   honestly believed they had sufficiently disclosed the risks of the business" and point to their 35

15   pages of boilerplate disclosures. Mot. at 30. But rather than diminish, C3's deceptive warnings that

16   Baker Hughes "may" not provide adequate resources to selling its products when Defendants knew

17   that this risk had materialized reinforces Defendants' scienter. *In re Alphabet, Inc. Sec. Litig.*, 1

18   F.4th at 706. The cases cited by Defendants all involve forward-looking statements that the courts

19   found not to be misleading in light of cautionary language regarding future risk. *In re Wet Seal,*

20   *Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007); *In re Dothill Sys. Corp. Sec. Litig.*,

21   2009 WL 734296, at *10 (S.D. Cal. Mar. 18, 2009). Defendants do not even contend that the

22   statements here are forward-looking. Moreover, Defendants only point to risk disclosures in the

23   Registration Statement, despite the fact that the majority of the alleged misstatements in the

24   Complaint were made after the registration statement, including numerous statements made at

25   investor conferences where Defendants can point to no cautionary language at all.

26

27

28

1    **C.    The Complaint Properly Pleads Loss Causation Through Materialization of the Risk and Corrective Disclosures**

2
3         A complaint need only provide the defendant with "some indication of the loss and the

4    causal connection that the plaintiff has in mind." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336,

5    346-47 (2005). Pleading loss causation "should not prove burdensome, for even under Rule 9(b)

6    the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss

7    causation theory and provide the court some assurance that the theory has a basis in fact." *In re*

8    *BofI Holdings, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quotation marks and citation

9    omitted). Loss causation "requires no more than the familiar test for proximate cause," and there

10   are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause."

11   *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018).

12   Allegations of a "'causal connection between the material misrepresentation and the loss'" suffice.

13   *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016). Ultimately, a complaint need only

14   "raise a reasonable expectation that discovery will reveal evidence of 'loss causation.'" *In re Gilead*

15   *Scis. Sec. Litig.*, 536 F.3d at 1057 (citation omitted).

16        **1.    The Complaint properly pleads loss causation through materialization of the risk.**

17        The Complaint first pleads that the facts concealed by Defendants caused investors' losses

18   through four announcements of poor financial performance in the form of low or missed customer

19   count, RPO, and revenue capture, which was a materialization of the risks concealed by

20   Defendants' misleading statements and omissions regarding C3's purported salesforce and

21   relationship with Baker Hughes (¶¶ 172-173) on March 1, 2021 (¶¶ 174-177), June 2, 2021 (¶¶ 178-

22   179), September 1, 2021 (¶¶ 180-184). The Complaint also pleads that Defendants' stock price

23   materially declined along with Defendants' massive insider selling eight times from March 8, 2021

24   to November 18, 2021 (¶¶ 185-188). The Complaint links the stock drops caused by Defendants'

25   massive insider selling, explaining: "Large and unusual insider trading is often seen as a signal that

26   the insiders know something the market does not. The materialization of these undisclosed risks

27   created by insider selling was foreseeable to Defendants as leading to a significant decline in the

28   price of C3's stock." ¶ 185. And, "[a]dditionally, large insider sales increase the number of shares

1   available to trade, placing downward pressure on the price of C3 stock. It was foreseeable to

2   Defendants that such sales would negatively impact C3's stock price." ¶ 186. These allegations at

3   the pleading stage suffice to plead ".a causal connection between the material misrepresentation

4   and the loss." *Lloyd*, 811 F.3d at 1211.

5         Contrary to Defendants' brief, *Nuveen* does not say Plaintiff cannot "plead loss causation

6   by alleging materialization of a concealed risk." Mot. at 31, 32. Rather, in *Nuveen*, the court noted

7   that while the Ninth Circuit has never fully endorsed the materialization of the concealed risk

8   theory, "district courts in the circuit have applied it." *Nuveen*, 730 F.3d at 1120. Ultimately, because

9   the Ninth Circuit decided *Nuveen* for other reasons, it did not reach the question of whether to

10  endorse that theory. *Id.* at 1122 n.5. Courts in the Ninth Circuit have continued to apply the theory

11  after *Nuveen*. *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *17 n.19. (N.D. Cal. Apr. 17,

12  2020), *order clarified*, 2020 WL 2519890 (N.D. Cal. May 18, 2020) (distinguishing *Nuveen* and

13  citing *Nguyen*); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018)

14  ("[W]here the alleged misstatement conceals a condition or event which then occurs and causes the

15  plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or

16  event that causes the loss."), *aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink*

17  *Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020) ("Generally, plaintiffs sufficiently plead loss causation

18  when they allege that their share's 'price fell significantly after the truth became known' through

19  an express, corrective disclosure or "through events constructively disclosing the fraud" like the

20  'materialization of [the] risk' concealed.")). More importantly, *Nuveen* holds that to prove loss

21  causation, plaintiffs need only show a "causal connection" between the fraud and the loss by

22  showing that the loss was caused by "'the very facts about which the defendant lied,'" *Nuveen*, 730

23  F.3d at 1119-20 (citation omitted); *Daou*, 411 F.3d at 1025. "Disclosure of the fraud is not a sine

24  qua non of loss causation, which may be shown even where the alleged fraud is not necessarily

25  revealed prior to the economic loss." *Nuveen*, 730 F.3d at 1120. *See also First Solar*, 881 F.3d at

26  753. Therefore, whether called a materialization of a concealed risk or not, the Complaint

27  successfully alleges what *Nuveen* requires, it identifies declines in the price of C3 stock due to

28

disappointing financial results that were ultimately caused by the facts concealed—the lack of C3's

access to Baker Hughes' full 12,000-person salesforce.

      Defendants also argue these disclosure events do not suffice because they did not directly

disclose the misstatements or omissions about the salesforce. Mot. at 32. But disclosures "need not

precisely mirror the earlier misrepresentation." *In re BofI Holdings, Inc. Sec. Litig.*, 977 F.3d at

790.[12] The Ninth Circuit's opinion in *First Solar* underscores this conclusion. There, years after the

first misstatement (involving problems with the company's products), the company issued a series

of disclosures, which included earnings releases lowering guidance. *Smilovits v. First Solar Inc.*,

119 F. Supp. 3d 978, 996-98 (D. Ariz. 2015). These releases did not mention the product problems

nor provide a reason for the lowered guidance. *Id.* Plaintiff, however, presented internal company

evidence showing that the lowered guidance resulted from the product problems at issue. *Id.* The

district court denied summary judgment as to loss causation, reasoning that "[i]f … the company's

revenues fail to meet projections because of … the very fact misrepresented—and the stock loses

value as a result, the misrepresented fact has led to the plaintiff's loss." *Id.* at 991. The Ninth Circuit

affirmed, explaining: "A plaintiff may[] prove loss causation by showing that the stock price fell

upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had

concealed the miss." *First Solar Inc.*, 881 F.3d at 753-54.[13] Here, Siebel's admission at the end of

---

[12] *First Solar*, 881 F.3d at 753 ("Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016) ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss causation calculus."); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 981 (N.D. Ill. 2011) ("a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity").

[13] Defendants' cases are inapposite. Mot. 28-30 (citing *Metzler*, 540 F.3d at 1049; *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014); *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 608). Rather, as the Ninth Circuit explained in *First Solar*, the plaintiffs in those cases specifically "plead a causation theory based on market revelation of the fraud" and so the courts in those cases "naturally evaluate[d] whether plaintiffs have pleaded or proved the facts relevant to their theory." *First Solar*, 881 F.3d at 752-54. For instance, in *Metzler*, the plaintiff pled that "Corinthian's fraud was revealed to the market, causing Metzler's losses," but "[t]he TAC does not allege that the June 24 and August 2 announcements disclosed—or even suggested—[the fraudulent activities] to the market". *Metzler*, 540 F.3d at 1049. Here, Plaintiff has not explicitly pled that Defendants' "fraud was revealed to the market," until December 2021, and thus the standard applied in Defendants' authorities is inapplicable to the prior stock drops from materialization of the risk.

the Class Period that Baker Hughes underperformed due to the structure of their partnership that excluded access to the full 12,000-person salesforce creates a plausible inference that the facts concealed by Defendants' misstatements were causally linked to the poor performance that they disclosed throughout the Class Period.

> **2.** **The Complaint also adequately pleads loss causation through the December 1, 2021 corrective disclosures revealing the truth about the Baker Hughes relationship (salesforce) and the July internal salesforce restructuring.**

On December 1, Defendant Siebel admitted that C3 did not have access to the full 12,000-person Baker Hughes salesforce, and that as a result of disappointing sales, C3 secretly undertook a failed restructuring of their salesforce, causing the price of C3 stock to plummet. ¶¶ 191-193. Defendants suggest that exogenous factors caused the December 1 and 2, 2021 stock drops. Mot. at 31-32. But the argument ignores the clear economic link between the undisclosed truth and the foreseeable investor losses that occurred on these dates. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (loss causation "inquiry requires no more than the familiar test for proximate cause"). Specifically, the lack of full support from Baker Hughes' salesforce constrained C3's ability to drive the subscriber revenue growth and RPO that investors and analysts expected. ¶¶ 125, 127, 129, 131, 133, 135,137, 139, 141. To make up for the shortfall, in July 2021, C3 secretly restructured and reconstituted its small salesforce, dropping its signature high-touch, service strategic selling model in favor of a traditional hierarchical sales structure more appropriate for well-established software companies. ¶ 191. Ultimately, the new sales structure performed unacceptably and as a result, in November 2021, management scrambled to reverse their failed reorganization. ¶¶ 143, 145, 147, 149, 152, 154. Therefore, the disclosures that caused the December 1 and 2 share price declines (i.e., C3's zero growth in year-over-year RPO (¶ 190) and Defendants Siebel's statements about the mid-2021 internal sales restructuring and that the C3/Baker Hughes partnership previously "sat outside" the central Baker Hughes organization (¶ 190)), are not confounding but rather key pieces of corrective information. *See Nuveen*, 730 F.3d at 1120 (loss causation demonstrated by tracing the loss back to the "very facts about which the defendant lied").

1    In any case, Defendants' arguments that the alleged corrective disclosures had a positive or

2    neutral impact on C3's stock price and that the stock dropped due to independent factors reduces

3    to a factual dispute inappropriate for resolution on a motion to dismiss. *In re Gilead Scis. Sec. Litig.*,

4    536 F.3d 1049, 1055, 1057 (9th Cir. 2008) (where a defendant advances an alternative loss

5    causation theory, such a dispute is a question of fact and "is best reserved for later stages of the

6    proceedings when the plaintiff's case can be rejected on evidentiary grounds"). Moreover, the

7    passages of *Yaron* and *Brown* cited by Defendants are properly read to require only that the plaintiff

8    allege a loss plausibly tied to revelation of the fraud, not disprove alternative theories. *See, e.g.*,

9    *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *5 (N.D. Cal. June 19, 2020) ("To satisfy the

10   loss causation requirement, 'the plaintiff must show that the revelation of that misrepresentation or

11   omission was a substantial factor in causing a decline in the security's price, thus creating an actual

12   economic loss for the plaintiff.'") (citation omitted). *Brown v. Ambow Educ. Holding Ltd.*, 2014

13   WL 523166, at *5 (C.D. Cal. Feb. 6, 2014) ("To show loss causation, a plaintiff must allege, in the

14   most general sense, that there is a 'causal connection between the deceptive acts that form the basis

15   for the claim or securities fraud and the injury suffered'") (citation omitted).

16   **D.      Plaintiffs Properly Plead the 20(A) Claims**

17   For a Section 20A claim, a plaintiff must plead (1) an independent violation of another

18   provision of the securities laws, (2) that defendants traded "while in possession of material,

19   nonpublic information," and (3) that trading activity of plaintiffs and defendants occur

20   contemporaneously. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D.

21   Cal. 2008). Here, Plaintiffs adequately plead an independent violation of Section 10(b) and allege

22   that Defendants sold C3 common stock while in possession of material, non-public information—

23   that C3 did not have the access to and was not leveraging Baker Hughes' "12,000-person sales

24   organization." *See* §§ II.F (stock sales), IV (10(b) violation).

25   Defendants concede (as they must) that, among Plaintiffs' transactions, Plaintiff

26   Samarghandi purchased shares of C3 common stock on August 16, 2021, contemporaneous with

27

28

1   Siebel's August 16, 2021 sale and thus has standing to bring a Section 20A claim.[14] But Defendants

2   appear to argue that since Plaintiffs did not buy contemporaneously with each of Siebel's remaining

3   Class Period sales, or with each of the remaining Defendants' Class Period sales, Plaintiffs lack

4   standing to bring Section 20A claims for these specific transactions. *Id.* Defendants are wrong.

5   "Plaintiffs ... have alleged that they made at least one trade contemporaneously with at least one of

6   Defendants' trades during the Class Period. There is no requirement that Plaintiffs establish a

7   contemporaneous trade for each and every one of Defendants' trades during the Class Period."

8   *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 WL 5326262, at *5 (N.D.

9   Cal. May 27, 2004) (granting class certification for a § 20A claim where plaintiff was able to show

10  at least one contemporaneous trade with defendants); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335

11  F.R.D. 276, 285 (N.D. Cal. 2020) (holding that plaintiff with viable § 20A claim based on one

12  insider trade gives plaintiff standing as a class representative to assert a § 20A claim that

13  encompasses other insider trades).

14          Next, as pertinent to Abbo, Barter, and Baker Hughes, Defendants urge the Court to dismiss

15  Plaintiffs' Section 20A claim because Plaintiffs' stock purchases occurred days after they sold

16  shares and are thus not "contemporaneous" as a matter of law. Mot. at 34. But the Ninth Circuit

17  has not endorsed the standard Defendants seek to impose here—i.e., that Plaintiff must have traded

18  "'on the same day,'" or "the day after" the insider's sale. *See In re Countrywide*, 554 F. Supp. 2d

19  at 1074-75 ("The duration of the period in which an insider defendant's trade can be considered

20  'contemporaneous' with the plaintiff's is 'not fixed,' and the Ninth Circuit [has] … expressly

21  declined to elaborate on its 'exact contours.'"). Courts in this Circuit have routinely found trades

22

23

24

25          [14] Defendants erroneously claim that there are "no contemporaneous trades as to Plaintiff[]
26  Zavalanski." But Plaintiff Zavalanski's March 15, 2021 purchase of 85 shares of C3 at $89.65
    followed Siebel's March 15, 2021 sale of 1,138,024 shares of C3 at $84.01. Accordingly, Plaintiff
27  Zavalanski meets even Defendants' artificially restrictive pleading standard for contemporaneous
    trading. *See also* Appendix B (examples of contemporaneous trades of c3 common stock for
28  Plaintiffs and Defendants).

to be "contemporaneous" where they were made several days to even weeks after the insider's sale.[15]

That for certain of the challenged transactions Plaintiffs purchased shares at a price lower than what Defendants sold their shares likewise does not defeat Plaintiffs' Section 20A claims for these transactions. *See, e.g.*, *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023) (rejecting defendants' argument that lead plaintiff's § 20A claim fails because insider sold his stock at a higher price than lead plaintiff's purchase price). Defendants cite no case in which that fact alone was determinative. In *SEB Inv. Mgmt. AB*, 485 F. Supp. 3d at 1136, the only case upon which Defendants rely, the court noted that a six-day gap between defendant's sale and plaintiff's purchase may be considered contemporaneous, but that there was no evidence that the "trades occurred with defendant at an unfair advantage." *Id.* Here, in contrast, Plaintiffs have alleged that they were at an informational disadvantage because they were not aware that C3 did not have Baker Hughes' entire salesforce at its disposal, or that C3 had secretly reorganized its direct salesforce, which undisclosed facts caused C3 shares to trade at inflated prices and Plaintiffs to overpay for their shares. Defendants, on the other hand, deliberately concealed that C3 was merely using a separate Baker Hughes sales division that relied on a subset of salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and traded on the basis of their knowledge contemporaneously with Plaintiffs, thereby allowing Defendants to profit on the transactions.

Finally, the fact that certain of Defendants' sales were made pursuant to a 10b5-1 trading plan does not defeat Plaintiffs' Section 20A claim. Mot. at 34; BH MTD at 14. This is because Defendants enacted these 10b5-1 trading plans *only after* they were in possession of the alleged

---

[15] *See, e.g.*, *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (permitting eight-day gap); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14-15 (five-day gap); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (finding seven-or eight-day gap "on the border of an acceptable time period"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) (concluding that six days is outer limit for contemporaneous trading); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five days); *In re Novatel Wireless Sec Litig.*, 2010 WL 11470156, at *6 (S.D. Cal. May 12, 2010) ("Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous.")

1    material, non-public information. Moreover, at the pleading stage, courts do not accept 10b5-1

2    trading plans as proof of the disputable conclusion that they rule out the possibility of trading based

3    on non-public, material information. *See Evanston Police Pension Fund v. McKesson Corp.*, 411

4    F. Supp. 3d 580, 605 (N.D. Cal. 2019) (citing *Khoja*, 899 F.3d at 999) (holding that 10b5-1 plan

5    does not immunize executive from § 20A liability).

6         Next, Baker Hughes argues that the Complaint fails to allege a predicate violation necessary

7    to establish Section 20A liability because Baker Hughes' Section 20(a) claim did not "relate[] to

8    insider trading" and cites to *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal.

9    July 1, 2008). BH Mot. at 11. But that case provides them with no support. *Batwin* clarified that

10   what it meant when it said that the Section 20(a) claim by VC defendants did not relate to insider

11   trading was that "20(a) claims against the VC defendants relate to the conduct of Occam, Krausz,

12   and Abbott, and none of these defendants are alleged to have engaged in insider trading." *Id.* Here,

13   by contrast, the Section 20(a) claims against Baker Hughes relate to the conduct of Simonelli, Abbo,

14   Siebel, and Barter, and the Complaint *does* allege that all of them engaged in insider trading, as set

15   forth in this section.

16        Baker Hughes also makes the argument that the Complaint fails to establish that during the

17   time when Baker Hughes traded, it was in possession of material, non-public information. Given

18   that the information in question is the "truth about C3's access to the Baker Hughes salesforce,"

19   this argument is ineffective. BH Mot. at 12. In any event, the Complaint alleges Baker Hughes'

20   scienter through the scienter allegations against Simonelli. ¶¶ 221-224. *In re Cylink Sec. Litig.*, 178

21   F. Supp. 2d 1077, 1087 (N.D. Cal. 2001) (scienter of executive attributable to the company). And

22   Baker Hughes' argument that Plaintiffs failed to plead scienter against it fail for the same reason.

23   BH Mot. at 13. Baker Hughes also claims that the Complaint fails to allege Baker Hughes'

24   knowledge of Siebel's false statements, but lack of knowledge of the false statements does not show

25   that they lacked knowledge of material, non-public information. Finally, Baker Hughes argues that

26   any information they had was not material, claiming that the Complaint fails to allege materiality

27   as to the misleading statements and omissions regarding the size of Baker Hughes' salesforce. *Id.*

28   As set forth in § IV.A, the Complaint amply alleges materiality.

1    **E.      Plaintiffs have Established Control Person Liability**

2         Section 20(a) imposes joint and several liability on persons who directly or indirectly

3    control a violator of the securities laws. "Whether a defendant 'is a controlling person is an intensely

4    factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the

5    corporation and the defendant's power to control corporate actions.'" *In re MannKind Securities*

6    *Actions*, 835 F. Supp. 2d at 819. "'[T]o make out a prima facie case, [plaintiffs need not] show

7    actual participation or the exercise of actual power.'" *Id.*

8         Allegations that a defendant held a high-level executive position by virtue of which the

9    defendant was involved in a company's day-to-day management will suffice to state a claim, *Atlas*

10   *v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1157 (S.D. Cal. 2008), as will a

11   defendant's actual authority, even if never exercised, to control the contents of the statements the

12   plaintiffs allege to be false. *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *29 (S.D.

13   Cal. May 23, 2017). Indeed, allegations that a high-level officer's "participation in and/or

14   awareness of [the company's] operations," and "direct and supervisory involvement in the day-to-

15   day operations of [the company]" suffice to allege control. *In re Aqua Metals, Inc. Sec. Litig.*, 2019

16   WL 3817849, at *10 (N.D. Cal. Aug. 14, 2019) (plaintiffs only had position allegations as to a

17   specific defendant, Murphy). Those are the very allegations Defendants discount as "conclusory."

18   *Compare* Mot. at 35 *with* ¶¶ 249-253.

19        The Complaint also goes well above the minimum. For example, the Complaint alleges that

20   Siebel either signed or approved a multitude of press releases, social media messages, quarterly and

21   annual reports filed with the SEC. ¶ 207. He also regularly leads C3's earnings calls. *Id.* Siebel also

22   made public statements on behalf of C3 more than twelve times over the course of the Class Period.

23   *See* § II.D; Appendix E. Siebel has also been characterized as providing "intense oversight" over

24   C3 operations. *See* § II.G. Similarly, the Complaint alleges that Barter signed the 2021 10-K and

25   the 10-Q for Q1 2022. (¶¶ 140, 144) and "had access to actual knowledge of confidential proprietary

26   information concerning the Company and its business, financial performance, operations, and

27   products" which "undermined C3's representations to investors about the quality and size of the

28   Joint Venture's salesforce." ¶ 219. Messrs. Siebel and Barters' alleged actions and responsibilities

1    pertaining to C3 are a far cry from the defendant in *Al-Thani v. Wells Fargo & Co*., 2009 WL

2    55442, at *9 (N.D. Cal. Jan. 7, 2009), who was an investment advisor and where plaintiffs had

3    provided *zero* assertions of the advisor having any control over another subsidiary.

4        As for Abbo, the Complaint alleges that he is currently the Chief Technology officer at C3,

5    and that he was also CEO of C3 for several years. ¶ 32. Abbo also served on C3's Board of Directors

6    for eleven years—including when C3 submitted its draft Registration Statement to the SEC. ¶ 32.

7    Indeed, he only resigned from the C3 Board in November 2020, mere weeks before the start of the

8    Class Period. *Id.* And like Siebel, Abbo represented C3 in public forums. ¶ 130. The Complaint

9    also states that Abbo is the only other individual besides Siebel who is characterized as part of C3's

10   "Thought Leadership." *Id.* All these facts suggest that, unlike the Vice-President of Distribution

11   from *In re Gap Stores Sec. Litig*., 457 F. Supp. 1135, 1141 (N.D. Cal. 1978), here the public would

12   have "place[d] a particular reliance upon [Abbo's extensive and recent experience at the highest

13   echelons of C3's leadership]" when evaluating C3's public filings. Abbo is a control person under

14   Section 20(a).

15       Finally, the Complaint alleges that Simonelli signed SEC filings and press releases,

16   including the 2021 10-K ¶¶ 140, 222. Further supporting control is that Simonelli was on the audit

17   committee. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1048 (N.D. Cal.

18   2016). He also was identified as an "audit committee financial expert" who "can read and

19   understand fundamental financial statements." ¶¶ 34, 35. Simonelli is also the Chairman, CEO, and

20   President of Baker Hughes, who owned 14.76% of C3 stock at the time the Complaint was filed. ¶

21   112. These facts distinguish Simonelli's position from the defendant who held no shares and was

22   only on the board for three months. Simonelli is a control person under Section 20(a).

23       Defendants' cases miss the mark. *Todd* was noting the standard for surviving summary

24   judgment on a control person allegation, not what must be pled on a motion to dismiss. *SEC v.

25   Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). *Everex* also relates to summary judgment. *Everex*, 228

26   F.3d at 1067 n.13. Defendants' citation to *Solarcity* is distinguishable because in that case, Elon

27   Musk, while a large shareholder and chairman of the board, was not alleged to be on the audit

28   committee, and the complaint only alleged that Musk signed "certain of SolarCity's financial

1 statements," not the precise financial statements alleged to be misleading. *Bao v. Solarcity Corp.*,

2 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016). *Wells Fargo* addressed what must be alleged to

3 show a parent's control of a subsidiary, which is not at issue here. *Al-Thani*, 2009 WL 55442, at

4 *9; *Gap* was a pre-*Janus* case finding that the complaint failed to allege a *primary violation* of the

5 securities law by a non-signing defendant, not a control violation. *In re Gap Stores Sec. Litig.*, 457

6 F. Supp. 1135, 1141 (N.D. Cal. 1978).

7 　　　The Complaint also properly alleges Baker Hughes' control. When a minority shareholder

8 (a) has substantial holdings of the controlled person, (b) places its designees on a board, and

9 (c) these designees sign a document containing false statements, courts will find that the minority

10 shareholder is, for pleading purposes, a controlling person. *See, e.g.*, *In re Am. Apparel, Inc.*

11 *S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug. 8, 2013) (finding that a defendant

12 owning 20% of securities whose two nominees on controlled person's board signed a 10-K showed

13 that shareholder controlled the false statements made in the 10-K); *In re UTStarcom, Inc. Sec. Litig.*,

14 617 F. Supp. 2d 964, 979-80 (N.D. Cal. 2009) (control established as to defendant who was

15 controlled person's "largest shareholder," and had nominee on board who had signed 10-Ks

16 containing false statements). Here, too, Baker Hughes owned 14.76% of C3's common stock as of

17 the issuance of the Registration Statement. ¶ 65. Baker Hughes placed a designee on the board,

18 Simonelli, Baker Hughes' CEO. ¶ 34. And Simonelli signed the Registration Statement and C3's

19 annual report. ¶¶ 34, 140. Thus, the Complaint alleges Baker Hughes' control of C3. Further

20 supporting Baker Hughes' status as a control person is the extensive relationship between Baker

21 Hughes and C3, with Baker Hughes both acting as a large customer of C3, and as a crucial source

22 of C3 sales to third parties. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal.

23 2009) (fact that company was third largest customer of issuer supports scienter). Further supporting

24 control is that the designee, Simonelli, was on the audit committee. *Thomas*, 167 F. Supp. 3d at

25 1048.

26 　　　Baker Hughes' caselaw does nothing to undermine this conclusion. BH. Mot. at 9-10. The

27 cases cited by Baker Hughes for the proposition that large minority shareholding cannot establish

28 control are distinguishable because those complaints did not contain the particularized allegations

1   in this Complaint related to Simonelli's signing of false financial statements, membership on the

2   audit committee, and status as Baker Hughes' CEO. *See In re Splash Tech. Holdings, Inc. Sec.*

3   *Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000). *Golub v. Gigamon Inc.*, 372 F. Supp.

4   3d 1033, 1053 (N.D. Cal. 2019) (same for 15.3% equity interest).

## V.      ARGUMENT FOR THE SECURITIES ACT CLAIMS[16]

### A.      Plaintiffs Adequately Plead That the Registration Statement Contained Untrue Statements

Defendants argue that the Complaint fails to allege that the misstatements in the
Registration Statement identified in the Complaint are misleading. For the reasons set forth in
§ IV.A, the Complaint plausibly alleges that the misstatements in the Registration Statement are
misleading.

### B.      The Complaint Alleges Violations of Items 105 and 303

Defendants had a duty to disclose in the Registration Statement negative trends and
uncertainties related to the Baker Hughes Partnership. A "disclosure duty exists [under Item 303]
where a trend, demand, commitment, event or uncertainty is both [1] presently known to
management and [2] reasonably likely to have material effects on the registrant's financial
condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir.
1998). "A corporation has a duty to disclose a major dispute or uncertainty that exists in an
important business relationship where the company publicly touts that specific relationship and the
uncertainty may significantly affect the corporation's financial success." *In re Hi-Crush Partners
L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013).

Defendants touted C3's partnership with Baker Hughes and access to its 12,000-person
sales staff as a platform for C3's growth and that Baker Hughes had already secured deals that
would generate future revenues. Because Baker Hughes had in truth made no sales under the
partnership and because Baker Hughes, rather than rely on its normal salesforce, was using a small
separate salesforce without Baker Hughes' typical connections or experience, significant

---

[16] Plaintiffs withdraw Section 11 and 15 claims against Abbo and their Section 15 claim against
Baker Hughes. Plaintiffs also withdraw their Section 11 claim against the Underwriter Defendants,
and the parties have stipulated to their dismissal with prejudice. *See* ECF No. 118.

1   uncertainties existed as to the Baker Hughes partnership that Defendants had a duty to disclose.

2   Defendants cite a line of cases stating that an issuer's own business strategies are not the sorts of

3   things required to be disclosed under Item 303. *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202,

4   1210-11 (S.D.N.Y. 1996); *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494,

5   498 (2d Cir. 2019); *McGovney*, 367 F. Supp. 3d at 1054-55. But those cases do not apply because

6   the Complaint does not allege a failure to disclose C3's own business strategies, but to disclose the

7   negative impacts Baker Hughes' business decisions were having on C3. Defendants also argue that

8   the Registration Statement was not misleading because it adequately disclosed risks related to its

9   strategic partners. But these generalized warnings were too vague to put investors on notice of the

10  fact that Baker Hughes was relying on an untested and inexperienced salesforce to sell C3's

11  product. ¶ 76; *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (vague

12  risk factor disclosures about product liability lawsuits could not cure omissions "because they

13  lacked specificity as to these lawsuits, their growing number, and their severe nature"). For

14  example, in *Zaghian*, 675 F. App'x at 720, the Ninth Circuit held that the defendants' generic

15  warning about a "potential failure to 'achieve sales expectations'" could not warn investors about

16  a specific known risk that its product would not appeal to a broad section of potential consumers.

17  Moreover, those generalized risk warnings were phrased in terms of the *future* performance of

18  strategic partners, even though, as of the date of the IPO, the problems with Baker Hughes had

19  materialized. Risk disclosures are misleading where a company discloses in the abstract risks that

20  have already materialized. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir.

21  2009).

22          Item 105 requires a filer's "Risk Factors" section to contain "a discussion of the material

23  factors that make an investment in the registrant or offering speculative or risky." Item 105 was

24  amended in October 2020 to expand the scope of required disclosure from "the most significant

25  factors" to "the material factors." This revision sought to "focus registrants on disclosing the risks

26  to which reasonable investors would attach importance[.]" *See* Modernization of Regulation S-K

27  Items 101, 103, and 105, 85 FR 63761, 63744-45 (Oct. 8, 2020). "The same facts underlying an

28  Item 303 [and Item 5(D)] violation may also support an Item [105] violation, and a court's rationale

1   for determining the former may also support the same determination of the latter." *Panther Partners*

2   *Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020). "[C]ourts typically

3   analyze the sufficiency of Item [105] disclosures with the familiar materiality standard." *Id.* at *10.

4   Here, reasonable investors would attach importance to the success of C3's partnership with Baker

5   Hughes, given that C3 had a relatively small salesforce and was relying on strategic partners such

6   as Baker Hughes. Defendants question why the success of C3's sales efforts would be material to

7   investors given that Baker Hughes agreed to pay a minimum amount to C3 if it could not hit its

8   minimum sales target. But this information is material because investors would have a reasonable

9   expectation that C3 would exceed its sales minimum, especially given the importance of strategic

10  partnerships to C3's business. ¶ 173. And common sense dictates that investors would find revenue

11  generated by new sales and revenue generated due to a negotiated floor to be materially different.

12  In addition, by misleading investors about the success of Baker Hughes' sales efforts, they misled

13  investors regarding the market demand for C3's product.

14  **C.**    **Plaintiffs' Section 11 Claims Are Timely Filed**

15          Plaintiffs' Section 11 claims are timely filed because they relate back to the initial complaint

16  filed in this action. "Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended

17  pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even

18  though it was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S. p. A.*,

19  560 U.S. 538, 541 (2010). "[T]he relation back doctrine of Rule 15(c) is to be liberally applied."

20  *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 (9th Cir. 1982).

21  "Rule 15 does not require that a pleading give notice of the exact scope of relief sought. Rather, it

22  must give 'fair notice of the transaction, occurrence, or conduct called into question.' So long as a

23  party is notified of litigation concerning a particular transaction or occurrence, that party has been

24  given all the notice that Rule 15(c) requires. When a defendant is so notified, 'the defendant knows

25  that the whole transaction described in it will be fully sifted, by amendment if need be, and that the

26  form of the action or the relief prayed or the law relied on will not be confined to their first

27  statement.'" *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1006 (9th Cir. 2014) (citations

28  omitted). Here, the Section 11 allegations relate back to the initial complaint because, like the initial

1    complaint, they concern misstatements regarding C3's relationship with Baker Hughes in the

2    Registration Statement in connection with the IPO transaction. The initial complaint included

3    several statements about C3's relationship with Baker Hughes, *see* Appendix D.

4        The initial complaint specifically claimed that these statements were misleading for failing

5    to disclose that C3's partnership with Baker Hughes was deteriorating; C3 was employing a flawed

6    accounting methodology to conceal the deterioration of its Baker Hughes partnership, and, as a

7    result, the Company's public statements were materially false and misleading at all relevant times.

8    ECF No. 1 ¶ 42; Appendix D.

9        The Amended Complaint, likewise, alleges that three statements in the Registration

10    Statement are misleading, as explained in Appendix D. The Amended Complaint alleges that these

11    statements were misleading because Baker Hughes was not actually deploying its 12,000-person

12    salesforce in selling C3 and had made no sales as of the end of the fiscal year ending April 30,

13    2022. ¶¶ 76, 78. Therefore, the Amended Complaint simply refines the theory of liability present

14    in the initial complaint and relates to the same transaction or occurrence. Defendants cannot rely

15    on *Caldwell v. Berlind*. It held that "[e]ven where an amended complaint tracks the legal theory of

16    the first complaint, claims that are based on an *entirely distinct* set of factual allegations will not

17    relate back." *Caldwell v. Berlind*, 543 F. App'x 37, 40 (2d Cir. 2013) (emphasis added). In

18    *Caldwell*, the initial complaint alleged that Lehman Brothers' offering materials were misleading

19    for failing to include its leverage ratio, on the grounds that Lehman's Forms 10-Q and 10-K were

20    not incorporated by reference. *Id.* The amended complaint countered that the forms 10-Q and 10-

21    K *were* incorporated by reference, but that the leverage ratios therein were false and misleading.

22    The initial complaint therefore faulted defendants for not including information that the amended

23    complaint faulted them for including. Because the two theories were contradictory, the Second

24    Circuit found relation back inappropriate. Here, by contrast, the initial complaint and the amended

25    complaint are not contradictory. Rather, the amended complaint simply refines the theory in the

26    initial complaint. More analogous is *Brady v. Delta Energy & Commc'ns, Inc.* which held that

27    where an initial complaint relied on misstatements regarding certain loans, an amended complaint

28

1   related back where it alleged similar misstatements regarding different loans. *Brady v. Delta Energy*

2   *& Commc'ns, Inc.*, 2023 WL 2683203, at \*5 (C.D. Cal. Jan. 25, 2023).

3   **D.      Plaintiffs Adequately Allege Control Person Liability for the Securities Act Claims**

4            For the same reason that Plaintiffs have alleged control person liability Under Section 20 of

5   the Exchange Act, they allege it for Section 15 of the Securities Act.

6                   **VI.      PLAINTIFFS' OPPOSITION TO C3 DEFENDANTS' REQUEST**
                                    **FOR JUDICIAL NOTICE**
7

8   **A.      The Ninth Circuit Cautions Against the "Overuse" of the Judicial Notice and
            Incorporation-By-Reference Doctrines**

9            A court is only permitted to judicially notice facts that are "not subject to reasonable

10  dispute." Fed. R. Evid. 201(b). In *Khoja*, the Ninth Circuit instructed district courts to exercise

11  caution when requested to take judicial notice of or incorporate by reference documents on a motion

12  to dismiss: "[T]he unscrupulous use of extrinsic documents to resolve competing theories against

13  the complaint risks premature dismissals of plausible claims that may turn out to be valid after

14  discovery. This risk is especially significant in SEC fraud matters[.]" *Khoja*, 899 F.3d at 998. Thus,

15  the purpose of the judicial notice rules is to allow the court or jury to consider a matter as to which

16  there can be no reasonable dispute. *Rollins v. Dignity Health*, 338 F. Supp. 3d 1032 (N.D. Cal.

17  2018). The Court also held that judicial notice of facts is not appropriate when the fact is being used

18  to rebut a complaint's allegations. *See Khoja*, 899 F.3d at 1000.

19           The judicially-created incorporation-by-reference doctrine is even narrower. Under this

20  doctrine, a reference to the document in the complaint must be extensive (*Khoja*, 899 F.3d at 907)

21  or form the basis of the claim. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (contents

22  of SEC filing forming basis of claim) (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986

23  (9th Cir. 1999)). The "'mere mention of the existence of a document is insufficient to incorporate

24  the contents of a document.'" *Khoja*, 899 F.3d at 1002 (citation omitted). "[I]f the document merely

25  creates a defense to the well-pled allegations in the complaint, then that document did not

26  necessarily form the basis of the complaint." *Id.*

27           In addition, as with judicial notice, "it is improper to assume the truth of an incorporated

28  document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

1    at 1003; *see also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1254 (N.D. Cal. 2008) ("With

2    respect to SEC filings, the Court takes judicial notice only of the statements contained therein, but

3    not for the purpose of determining the truth of those statements.") (quoting *In re Dura Pharms.,*

4    *Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1129 n.1 (S.D. Cal. 2008)). And "[a]lthough the

5    incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine

6    is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Khoja*, 899 F.3d

7    at 1003. Judicial notice is also inappropriate where the substance of the document "is subject to

8    varying interpretations, and there is a reasonable dispute as to what [it] establishes." *Id.* at 1000

9    (citation omitted).

10       Finally, the Court should reject any request to take judicial notice or incorporate by

11   reference if the documents are irrelevant. *See Kuzmenko v. Lynch*, 606 F. App'x 399, 400 (9th Cir.

12   2015) (denying "request for judicial notice of non-relevant, extra-record information discussed in

13   [petitioner's] opening brief"); *Bryant v. Mickelsen*, 551 F. App'x 348, 349 (9th Cir. 2014) (holding

14   that the court did not abuse its discretion denying request for judicial notice where petitioner did

15   not show document contained facts that were relevant).

16   **B.    Plaintiffs Object to Incorporation and Notice of Defendants' Exhibits A-R, to the Extent Defendants Seek to Rely on Them for the Truth of Their Contents**

17

18       Plaintiffs admit to the authenticity of Defendants' Exhibits A-R and that Exhibits A-D, F-
     H, and K-R were publicly available during the Class Period.[17] Plaintiffs do object, however, to
19
     Defendants' request to use any exhibit for the truth of the contents asserted therein. *See* § VI.A.
20
     Plaintiffs have organized their objections along these categories, which are also reflected in a chart
21
     summarizing the selected documents, Defendants' bases for inclusion, and Plaintiffs' responses.
22
     *See* Plaintiffs' Appendix A.
23

24       **1.    Exhibits pursuant to the judicial notice and incorporation by reference doctrines.**

25       **C3 IPO Documents and 10-K from Class Period (Defs.' Exs. B, C, D).** These exhibits are

26   copies of C3's Prospectus, Registration Statement, and 2021 10-K. Most egregiously, Plaintiffs

27   _____

28       [17] Defendants' Exhibits E, I, and J were created or made publicly available after the close of the Class Period.

object to Defendants' use of Exhibit C to "contradict[] the hearsay attributed to FE-1," as this is a highly improper application of the judicial notice doctrine. *See Khoja*, 899 F.3d at 1003 ("the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim").

Defendants also rely on Exhibits B, C, and D to assert that C3's revenues increased throughout the Class Period and that C3's risk disclosures adequately "warned investors" (Mot. at 7, 8) or were otherwise detailed and adequate. *See, e.g.*, Mot. at 7, 30-31. Plaintiffs object to judicial notice and incorporation by reference to the extent that the use of these documents is to rebut any of Plaintiffs' allegations about Defendants' risk disclosures or revenue recognition practices. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to the inclusion of these documents as they are subject to differing interpretations. *See id.* at 1000 (denying judicial notice for document that "is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes").

**Analyst Reports (Defs.' Exs. P, Q, R).** These exhibits are copies of selected analyst reports cited in the Complaint. Defendants rely on these documents to rebut Plaintiffs' loss causation arguments and assert that there was a "far more plausible reason" for the stock price decline than Defendants' omissions and misrepresentations. Mot. at 31. Thus, Defendants' requests for judicial notice and incorporation by reference should be denied. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to the inclusion of these documents as they are subject to differing interpretations. *See id.* at 1000 (denying judicial notice for document that "is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes").

**Baker Hughes Form 4s and Form 144s (Defs.' Exs. K, L).** These exhibits are copies of SEC Form 4 and Form 144 documents filed by Baker Hughes in April 2021. Defendants rely on these documents to assert that Simonelli lacked intent as he did not execute any stock trades on his individual behalf.[18] Mot. at 30. Plaintiffs object to judicial notice if the use of these documents is to rebut any of Plaintiffs' allegations where Simonelli's intent is at issue. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to their incorporation by reference as they are not extensively referenced

---

[18] Defendants omit that Simonelli is listed as the "reporting person" on each of these documents. *See* Def. Exs. K-M.

in the Complaint. *See id.* at 1002 ("mere mention of the existence of a document is insufficient to incorporate the contents of a document").

### 2.    Exhibits pursuant to the judicial notice doctrine only.

*Proxy Statements and Form 144s (Defs.' Exs. I, J, M, N).* These exhibits are copies of SEC proxy statements showing the C3 stock holdings of the Individual Defendants in October 2021 and October 2022. Defendants rely on these documents to assert that the Individual Defendants stock holdings "remained relatively stable" and that a scienter analysis should include consideration of exercisable options. Mot. at 29-30. Plaintiffs object to judicial notice if the use of these documents is to rebut any of Plaintiffs' Section 20A allegations about suspicious trading or intent. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to inclusion of Exhibit J as irrelevant as it was created 10 months after the Class Period. *See Kuzmenko*, 606 F. App'x at 400 (denying "request for judicial notice of non-relevant, extra-record information discussed in … opening brief").

*C3 Quarterly Reports and Post-Class Period 10-K (Defs.' Exs. A, E, F, G, H).* Defendants' Exhibits A, F, G, and H are copies of C3's 2021 8-K filings reflecting its quarterly reports. Exhibit E is a copy of C3's 2022 10-K filing. Defendants rely on Exhibits F-H to assert that "due in part to the relationship with Baker Hughes, C3's revenues increased every single quarter of the Class Period and C3 consistently beat its revenue guidance." Mot. at 19. Plaintiffs object to judicial notice if the use of these documents is to rebut any of Plaintiffs' allegations about Defendants' improper revenue recognition or the effect of the Joint Venture of C3 revenues. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to the inclusion of these documents as they are subject to differing interpretations. *See id.* at 1000 (denying judicial notice for document that "is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes").

Similarly, Defendants rely on Exhibits A and E repeatedly to assert that C3's revenues increased during the Class Period. *See, e.g.*, Mot. at 2, 7. Plaintiffs object to judicial notice if the use of these documents is to rebut any of Plaintiffs' allegations about Defendants' improper revenue recognition or the effect of the Joint Venture of C3 revenues. *See Khoja*, 899 F.3d at 1000. Plaintiffs also object to the inclusion of these documents as they are subject to differing interpretations. *See id.* at 1000 (denying judicial notice for document that "is subject to varying interpretations, and

1   there is a reasonable dispute as to what [it] establishes"). Plaintiffs additionally object to Exhibit E

2   as irrelevant as it was created seven months after the Class Period. *See Kuzmenko*, 606 F. App'x at

3   400 (denying "request for judicial notice of non-relevant, extra-record information discussed in

4   [petitioner's] opening brief").

5                                   **VII.   CONCLUSION**

6          The Motions to Dismiss should all be denied in their entirety. If, however, the Court grants

7   any part of any of the three Motions to Dismiss, Plaintiffs request leave to amend the Complaint

8   under Fed. R. Civ. P. 15.

9   Dated: June 30, 2023                    Respectfully Submitted,

10

11                                          /s/ *Reed R. Kathrein*
                                            Reed R. Kathrein (139304)
                                            Lucas E. Gilmore (250893)
12                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                            715 Hearst Avenue, Suite 300
13                                          Berkeley, CA 94710
                                            Telephone: (510) 725-3000
14                                          Facsimile: (510) 725-3001
                                            reed@hbsslaw.com
15                                          lucasg@hbsslaw.com

16

17                                          Steve W. Berman (pro hac vice)
                                            Catherine Y.N. Gannon (pro hac vice)
18                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                            1301 Second Avenue, Suite 2000
19                                          Seattle, WA 98101
                                            Telephone: (206) 623-7292
20                                          Facsimile: (206) 623-0594
                                            steve@hbsslaw.com
21                                          catherineg@hbsslaw.com

22
                                            *Lead Counsel and Counsel for*
23                                          *Lead Plaintiff Mark Samarghandi*

24                                          Laurence M. Rosen, Esq. (SBN 219683)
                                            355 S. Grand Avenue, Suite 2450
25                                          **THE ROSEN LAW FIRM, P.A.**
                                            Los Angeles, CA 90071
26                                          Telephone: (213) 785-2610
                                            Facsimile: (213) 226-4684
27                                          lrosen@rosenlegal.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan Stern (pro hac vice application forthcoming)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jstern@rosenlegal.com

*Counsel for Additional Plaintiffs Sharon L. Zavalanski, David Linder, and Elizabeth Wense*