# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# FORM 10-Q

**(Mark One)**

☒    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the quarterly period ended October 31, 2021**

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____**

**Commission File Number: 001-39744**

# C3.ai, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **26-3999357** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1300 Seaport Blvd, Suite 500** | |
| **Redwood City, CA** | **94063** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code: (650) 503-2200**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Class A Common Stock, par value $0.001 per share** | **AI** | **New York Stock Exchange** |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of November 29, 2021, the registrant had outstanding 101,537,340 shares of Class A common stock and 3,499,992 shares of Class B common stock.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Special Note Regarding Forward-looking Statements** |  |  |
| **Selected Risks Affecting Our Business** |  |  |
| **Part I. Financial Information** |  | 7 |
| Item 1. | Financial Statements (unaudited) | 8 |
|  | Condensed Consolidated Balance Sheets | 8 |
|  | Condensed Consolidated Statements of Operations | 9 |
|  | Condensed Consolidated Statements of Comprehensive Loss | 10 |
|  | Condensed Consolidated Statements of Redeemable Convertible Preferred Stock, Redeemable Convertible Class A-1 Common Stock and Stockholders' Equity | 11 |
|  | Condensed Consolidated Statements of Cash Flows | 13 |
|  | Notes to Condensed Consolidated Financial Statements | 14 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 44 |
| Item 4. | Controls and Procedures | 45 |
| **Part II. Other Information** |  | 46 |
| Item 1. | Legal Proceedings | 46 |
| Item 1A. | Risk Factors | 46 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 82 |
| Item 6. | Exhibits | 83 |
| **Signatures** |  | 84 |

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements about us and our industry that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this Quarterly Report on Form 10-Q, including statements regarding our future results of operations or financial condition, business strategy, plans and objectives of management for future operations, and the benefits and timing of the rollout of new technology, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "target," "will" or "would" or the negative of these words or other similar terms or expressions. These forward-looking statements include, but are not limited to, statements concerning the following:

- our expectations regarding our revenue, expenses, and other operating results, including statements relating to the portion of our remaining performance obligations that we expect to be recognized as revenue in future periods;

- our ability to acquire new customers and successfully retain existing customers;

- our ability to increase usage of our C3 AI Software, which includes our C3 AI Suite, C3 AI Applications, C3 AI Ex Machina, C3 AI CRM and C3 AI Data Vision;

- our ability to achieve or sustain profitability;

- future investments in our business, our anticipated capital expenditures, and our estimates regarding our capital requirements;

- the costs and success of our sales and marketing efforts, and our ability to promote our brand;

- our growth strategies for our C3 AI Software;

- our expectations regarding our C3 AI Software;

- the estimated addressable market opportunity for our C3 AI Software;

- our reliance on key personnel and our ability to identify, recruit, and retain skilled personnel;

- our ability to effectively manage our growth, including any international expansion;

- our ability to protect our intellectual property rights and any costs associated therewith;

- the effects of the ongoing coronavirus, or COVID-19, pandemic or other public health crises;

- our ability to compete effectively with existing competitors and new market entrants; and

- the growth rates of the markets in which we compete.

You should not rely on forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Quarterly Report on Form 10-Q primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition and operating results. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties and other factors described in the section titled "Risk Factors" contained in Part II, Item 1A of this Quarterly Report on Form 10-Q and elsewhere in this Quarterly Report on Form 10-Q. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Quarterly Report on Form 10-Q. The results, events and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Quarterly Report on Form 10-Q. While we believe that such information provides a reasonable basis for these statements, that information may be limited or incomplete.

Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

The forward-looking statements made in this Quarterly Report on Form 10-Q relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this Quarterly Report on Form 10-Q to reflect events or circumstances after the date of this Quarterly Report on Form 10-Q or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments.

**SELECTED RISKS AFFECTING OUR BUSINESS**

Investing in our Class A common stock involves numerous risks, including the risks described in the section titled "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q. Below is a summary of some of the risks and uncertainties as of the date of the filing of this Quarterly Report on Form 10-Q, any one of which could materially adversely affect our business, financial condition, operating results, and prospects. You should read this summary together with the more detailed description of each risk factor contained below.

**Risks Related to Our Business and Our Industry**

- We have a limited operating history, which makes it difficult to evaluate our prospects and future results of operations.

- Historically, a limited number of customers have accounted for a substantial portion of our revenue. If existing customers do not renew their contracts with us, or if our relationships with our largest customers are impaired or terminated, our revenue could decline, and our results of operations would be adversely impacted.

- Our business depends on our ability to attract new customers and on our existing customers purchasing additional subscriptions from us and renewing their subscriptions.

- We have a history of operating losses and may not achieve or sustain profitability in the future.

- We face intense competition and could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations.

- Our sales cycles can be long and unpredictable, particularly with respect to large subscriptions, and our sales efforts require considerable time and expense.

- If the market for our C3 AI Software fails to grow as we expect, or if businesses fail to adopt our C3 AI Software, our business, operating results, and financial condition could be adversely affected.

- If we fail to respond to rapid technological changes, extend our C3 AI Software or develop new features and functionality, our ability to remain competitive could be impaired.

- If we were to lose the services of our Chief Executive Officer, or CEO, or other members of our senior management team, we may not be able to execute our business strategy.

- The ongoing COVID-19 pandemic had and could continue to have an adverse impact on our business, our operations, and the markets and communities in which we, our partners, and our customers operate.

- Our actual or perceived failure to comply with privacy, data protection, and information security laws, regulations, and obligations could harm our business.

- If we or our third-party service providers experience a security breach or unauthorized parties otherwise obtain access to our customers' data, our data, or our C3 AI Software, our C3 AI Software may be perceived as not being secure, our reputation may be harmed, demand for our platform may be reduced, and we may incur significant liabilities.

**Risks Related to Our International Operations**

- We are continuing to expand our operations outside the United States, where we may be subject to increased business and economic risks that could harm our business.

- We are subject to governmental export and import controls that could impair our ability to compete in international markets or subject us to liability if we are not in compliance with applicable laws.

5

**Risks Related to Taxes**

- Our results of operations may be harmed if we are required to collect sales or other related taxes for our subscriptions in jurisdictions where we have not historically done so.

**Risks Related to Our Intellectual Property**

- We are currently, and may be in the future, party to intellectual property rights claims and other litigation matters, which, if resolved adversely, could harm our business.

- Indemnity provisions in various agreements potentially expose us to substantial liability for intellectual property infringement and other losses.

- Our failure to protect our intellectual property rights and proprietary information could diminish our brand and other intangible assets.

- Our use of third-party open source software could negatively affect our ability to offer and sell subscriptions to our C3 AI Software and subject us to possible litigation.

**Risks Related to Ownership of Our Class A Common Stock**

- The trading price of our Class A common stock may be volatile, and you could lose all or part of your investment.

- The dual class structure of our common stock has the effect of concentrating voting control to our Chairman and CEO, Thomas M. Siebel.

- Provisions in our corporate charter documents and under Delaware law may prevent or frustrate attempts by our stockholders to change our management or hinder efforts to acquire a controlling interest in us, and the market price of our Class A common stock may be lower as a result.

**General Risks**

- If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.

- Our business could be disrupted by catastrophic events.

6

**PART I. FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS (UNAUDITED)**

**C3.AI, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands, except for share and per share data)**
**(Unaudited)**

| | | October 31, 2021 | | April 30, 2021 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 167,436 | $ | 115,355 |
| Short-term investments | | 802,986 | | 978,020 |
| Accounts receivable, net of allowance of $57 and $812 as of October 31, 2021 and April 30, 2021, respectively[1] | | 27,168 | | 65,460 |
| Prepaid expenses and other current assets[2] | | 18,536 | | 14,302 |
| Total current assets | | 1,016,126 | | 1,173,137 |
| Property and equipment, net | | 5,239 | | 6,133 |
| Goodwill | | 625 | | 625 |
| Long-term investments | | 101,719 | | — |
| Other assets, non-current[3] | | 41,161 | | 16,582 |
| Total assets | $ | 1,164,870 | $ | 1,196,477 |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities | | | | |
| Accounts payable[4] | $ | 10,129 | $ | 12,075 |
| Accrued compensation and employee benefits | | 16,478 | | 21,829 |
| Deferred revenue, current[5] | | 71,901 | | 72,263 |
| Accrued and other current liabilities[6] | | 33,675 | | 18,318 |
| Total current liabilities | | 132,183 | | 124,485 |
| Deferred revenue, non-current | | 980 | | 2,964 |
| Other long-term liabilities[7] | | 5,197 | | 7,853 |
| Total liabilities | | 138,360 | | 135,302 |
| Commitments and contingencies (note 6) | | | | |
| Stockholders' equity | | | | |
| Class A common stock, $0.001 par value. 1,000,000,000 shares authorized as of October 31, 2021 and April 30, 2021; 101,370,907 and 98,667,121 shares issued and outstanding as of October 31, 2021 and April 30, 2021, respectively | | 102 | | 99 |
| Class B common stock, $0.001 par value; 3,500,000 shares authorized as of October 31, 2021 and April 30, 2021; 3,499,992 and 3,499,992 shares issued and outstanding as of October 31, 2021 and April 30, 2021, respectively | | 3 | | 3 |
| Additional paid-in capital | | 1,470,176 | | 1,410,325 |
| Accumulated other comprehensive (loss) income | | (240) | | 81 |
| Accumulated deficit | | (443,531) | | (349,333) |
| Total stockholders' equity | | 1,026,510 | | 1,061,175 |
| Total liabilities and stockholders' equity | $ | 1,164,870 | $ | 1,196,477 |

(1) Including amounts from a related party of $9,384 and $15,180 as of October 31, 2021 and April 30, 2021, respectively.
(2) Including amounts from a related party of $5,015 and $1,662 as of October 31, 2021 and April 30, 2021, respectively.
(3) Including amounts from a related party of $18,572 and $6,602 as of October 31, 2021 and April 30, 2021, respectively.
(4) Including amounts from a related party of $84 and $56 as of October 31, 2021 and April 30, 2021, respectively.
(5) Including amounts from a related party of $17,516 and $7,697 as of October 31, 2021 and April 30, 2021, respectively.
(6) Including amounts from a related party of $18,458 and $3,413 as of October 31, 2021 and April 30, 2021, respectively.
(7) Including amounts from a related party of $2,448 and $4,895 as of October 31, 2021 and April 30, 2021, respectively.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**C3.AI, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Revenue | | | | |
| Subscription[1] | $ 47,408 | $ 35,854 | $ 93,530 | $ 71,549 |
| Professional services[2] | 10,855 | 5,487 | 17,139 | 10,275 |
| Total revenue | 58,263 | 41,341 | 110,669 | 81,824 |
| Cost of revenue | | | | |
| Subscription[3] | 11,392 | 7,084 | 20,605 | 15,671 |
| Professional services | 4,579 | 2,997 | 8,391 | 4,909 |
| Total cost of revenue | 15,971 | 10,081 | 28,996 | 20,580 |
| Gross profit | 42,292 | 31,260 | 81,673 | 61,244 |
| Operating expenses | | | | |
| Sales and marketing[4] | 46,166 | 22,088 | 82,988 | 36,446 |
| Research and development | 36,523 | 16,134 | 63,235 | 29,398 |
| General and administrative | 15,279 | 7,562 | 27,643 | 13,249 |
| Total operating expenses | 97,968 | 45,784 | 173,866 | 79,093 |
| Loss from operations | (55,676) | (14,524) | (92,193) | (17,849) |
| Interest income | 322 | 288 | 667 | 868 |
| Other (expense) income, net | (1,372) | (578) | (2,271) | 2,440 |
| Net loss before provision for income taxes | (56,726) | (14,814) | (93,797) | (14,541) |
| Provision for income taxes | 13 | 130 | 401 | 253 |
| Net loss | $ (56,739) | $ (14,944) | $ (94,198) | $ (14,794) |
| Net loss per share attributable to Class A common shareholders, basic and diluted | $ (0.55) | $ (0.39) | $ (0.91) | $ (0.39) |
| Net loss per share attributable to Class A-1 common shareholders, basic and diluted | $ — | $ (0.39) | $ — | $ (0.39) |
| Net loss per share attributable to Class B common shareholders, basic and diluted | $ (0.55) | $ — | $ (0.91) | $ — |
| Weighted-average shares used in computing net loss per share attributable to Class A common stockholders, basic and diluted | 100,246 | 31,387 | 99,558 | 31,006 |
| Weighted-average shares used in computing net loss per share attributable to Class A-1 common stockholders, basic and diluted | — | 6,667 | — | 6,667 |
| Weighted-average shares used in computing net loss per share attributable to Class B common stockholders, basic and diluted | 3,500 | — | 3,500 | — |

(1)  Including related party revenue of $10,012 and $6,810 for the three months ended October 31, 2021 and 2020, respectively, and $20,220 and $13,620 for the six months ended October 31, 2021 and 2020, respectively.
(2)  Including related party revenue of $5,924 and nil for the three months ended October 31, 2021 and 2020, respectively, and $7,998 and nil for the six months ended October 31, 2021 and 2020, respectively.
(3)  Including related party cost of revenue of $80 and nil for the three months ended October 31, 2021 and 2020, respectively, and $197 and nil for the six months ended October 31, 2021 and 2020, respectively.
(4)  Including related party sales and marketing expense of $131 and nil for the three months ended October 31, 2021 and 2020, respectively, and $192 and nil for the six months ended October 31, 2021 and 2020, respectively.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

9

**C3.AI, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(In thousands)**
**(Unaudited)**

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| Net loss | $ (56,739) | $ (14,944) | $ (94,198) | $ (14,794) |
| Other comprehensive loss | | | | |
| Unrealized loss on available-for-sale marketable securities, net of tax | (427) | (195) | (321) | (362) |
| Total comprehensive loss | $ (57,166) | $ (15,139) | $ (94,519) | $ (15,156) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

10

**C3.AI, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF REDEEMABLE CONVERTIBLE PREFERRED STOCK,**
**REDEEMABLE CONVERTIBLE CLASS A-1 COMMON STOCK AND STOCKHOLDERS' EQUITY**
**(In thousands)**
**(Unaudited)**

**Three Months Ended October 31, 2021**

| | Redeemable Convertible Preferred Stock | | Redeemable Convertible A-1 Common Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance as of July 31, 2021** | — | $ — | — | $ — | 103,868 | $ 104 | $ 1,430,296 | $ 187 | $ (386,792) | $ 1,043,795 |
| Issuance of Class A common stock upon exercise of stock options, net of repurchases | — | — | — | — | 974 | 1 | 6,491 | — | — | 6,492 |
| Vesting of early exercised Class A common stock options | — | — | — | — | — | — | 849 | — | — | 849 |
| Vesting of restricted stock units | — | — | — | — | 29 | — | — | — | — | — |
| Stock-based compensation expense | — | — | — | — | — | — | 32,540 | — | — | 32,540 |
| Other comprehensive loss | — | — | — | — | — | — | — | (427) | — | (427) |
| Net loss | — | — | — | — | — | — | — | — | (56,739) | (56,739) |
| **Balance as of October 31, 2021** | — | $ — | — | $ — | 104,871 | $ 105 | $ 1,470,176 | $ (240) | $ (443,531) | $ 1,026,510 |

**Six Months Ended October 31, 2021**

| | Redeemable Convertible Preferred Stock | | Redeemable Convertible A-1 Common Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance as of April 30, 2021** | — | $ — | — | $ — | 102,167 | $ 102 | $ 1,410,325 | $ 81 | $ (349,333) | $ 1,061,175 |
| Issuance of Class A common stock upon exercise of stock options, net of repurchases | — | — | — | — | 2,667 | 3 | 11,491 | — | — | 11,494 |
| Vesting of early exercised Class A common stock options | — | — | — | — | — | — | 1,908 | — | — | 1,908 |
| Vesting of restricted stock units | — | — | — | — | 37 | — | — | — | — | — |
| Stock-based compensation expense | — | — | — | — | — | — | 46,452 | — | — | 46,452 |
| Other comprehensive loss | — | — | — | — | — | — | — | (321) | — | (321) |
| Net loss | — | — | — | — | — | — | — | — | (94,198) | (94,198) |
| **Balance as of October 31, 2021** | — | $ — | — | $ — | 104,871 | $ 105 | $ 1,470,176 | $ (240) | $ (443,531) | $ 1,026,510 |

11

**Three Months Ended October 31, 2020**

| | Redeemable Convertible Preferred Stock | | Redeemable Convertible A-1 Common Stock | | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | Shares | Amount | | | | |
| **Balance as of July 31, 2020** | 37,129 | $ 375,207 | 6,667 | $ 18,800 | | 31,342 | $ 31 | $ 113,518 | $ 257 | $ (293,487) | $ (179,681) |
| Repayment of shareholder loan | — | 24,546 | — | — | | — | — | 1,457 | — | — | 1,457 |
| Issuance of Class A common stock | — | — | — | — | | 1,639 | 2 | 2,726 | — | — | 2,728 |
| Vesting of early exercised Class A common stock options | — | — | — | — | | — | — | 1,107 | — | — | 1,107 |
| Stock-based compensation expense | — | — | — | — | | — | — | 5,201 | — | — | 5,201 |
| Other comprehensive loss | — | — | — | — | | — | — | — | (195) | — | (195) |
| Net loss | — | — | — | — | | — | — | — | — | (14,944) | (14,944) |
| **Balance as of October 31, 2020** | 37,129 | $ 399,753 | 6,667 | $ 18,800 | | 32,981 | $ 33 | $ 124,009 | $ 62 | $ (308,431) | $ (184,327) |

**Six Months Ended October 31, 2020**

| | Redeemable Convertible Preferred Stock | | Redeemable Convertible A-1 Common Stock | | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | Shares | Amount | | | | |
| **Balance as of April 30, 2020** | 37,129 | $ 375,207 | 6,667 | $ 18,800 | | 31,210 | $ 31 | $ 110,485 | $ 424 | $ (293,637) | $ (182,697) |
| Repayment of shareholder loan | — | 24,546 | — | — | | — | — | 1,457 | — | — | 1,457 |
| Issuance of Class A common stock | — | — | — | — | | 1,771 | 2 | 3,061 | — | — | 3,063 |
| Vesting of early exercised Class A common stock options | — | — | — | — | | — | — | 1,325 | — | — | 1,325 |
| Stock-based compensation expense | — | — | — | — | | — | — | 7,681 | — | — | 7,681 |
| Other comprehensive loss | — | — | — | — | | — | — | — | (362) | — | (362) |
| Net loss | — | — | — | — | | — | — | — | — | (14,794) | (14,794) |
| **Balance as of October 31, 2020** | 37,129 | $ 399,753 | 6,667 | $ 18,800 | | 32,981 | $ 33 | $ 124,009 | $ 62 | $ (308,431) | $ (184,327) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

12

**C3.AI, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**
**(Unaudited)**

| | Six Months Ended October 31, | |
|---|---|---|
| | 2021 | 2020 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (94,198) | $ (14,794) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities | | |
| Depreciation and amortization | 2,364 | 2,098 |
| Non-cash operating lease cost | 1,100 | 1,650 |
| Stock-based compensation expense | 46,452 | 7,681 |
| Other | (538) | (75) |
| Changes in operating assets and liabilities | | |
| Accounts receivable[1] | 39,047 | (2,380) |
| Prepaid expenses, other current assets and other assets[2] | (15,074) | (48) |
| Accounts payable[3] | (1,682) | 3,159 |
| Accrued compensation and employee benefits | (5,351) | (716) |
| Operating lease liabilities | (1,214) | (1,745) |
| Other liabilities[4] | 13,564 | 2,345 |
| Deferred revenue[5] | (2,346) | 21,661 |
| Net cash (used in) provided by operating activities | (17,876) | 18,836 |
| **Cash flows from investing activities:** | | |
| Purchases of property and equipment | (1,429) | (919) |
| Capitalized software development costs | (500) | — |
| Purchases of investments | (388,870) | (128,330) |
| Maturities and sales of investments | 461,648 | 164,098 |
| Net cash provided by investing activities | 70,849 | 34,849 |
| **Cash flows from financing activities:** | | |
| Proceeds from repayment of shareholder loan | — | 26,003 |
| Payment of deferred offering costs | (105) | (2,325) |
| Proceeds from exercise of Class A common stock options | 11,305 | 4,536 |
| Net cash provided by financing activities | 11,200 | 28,214 |
| Net increase in cash, cash equivalents and restricted cash | 64,173 | 81,899 |
| Cash, cash equivalents and restricted cash at beginning of period | 116,255 | 33,604 |
| Cash, cash equivalents and restricted cash at end of period | $ 180,428 | $ 115,503 |
| Cash and cash equivalents | $ 167,436 | $ 114,603 |
| Restricted cash included in other assets | 12,992 | 900 |
| Total cash, cash equivalents and restricted cash | $ 180,428 | $ 115,503 |
| **Supplemental disclosure of cash flow information—cash paid for income taxes** | $ 625 | $ 323 |
| **Supplemental disclosures of non-cash investing and financing activities:** | | |
| Purchases of property and equipment included in accounts payable and accrued liabilities | $ 52 | $ 146 |
| Unpaid liabilities related to intangible purchases | $ 2,500 | $ — |
| Deferred offering costs included in accounts payable and accrued liabilities | $ — | $ 2,994 |
| Vesting of early exercised stock options | $ 1,908 | $ 1,325 |

(1) Including changes in related party balances of $(5,796) and $(150) for the six months ended October 31, 2021 and 2020, respectively.
(2) Including changes in related party balances of $15,323 and nil for the six months ended October 31, 2021 and 2020, respectively.
(3) Including changes in related party balances of $28 and nil for the six months ended October 31, 2021 and 2020, respectively.
(4) Including changes in related party balances of $12,598 and nil for the six months ended October 31, 2021 and 2020, respectively.
(5) Including changes in related party balances of $9,819 and $14,780 for the six ended October 31, 2021 and 2020, respectively.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

13

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**1.   Summary of Business and Significant Accounting Policies**

*Business*

C3.ai, Inc. (including its subsidiaries, "C3 AI" or "the Company") is an enterprise artificial intelligence ("AI") software provider. C3 AI supports accelerating digital transformation in various industries with its C3 AI Suite software platform, its C3 AI Ex Machina, C3 AI CRM and C3 AI Data Vision solutions, and its prebuilt and configurable C3 AI Applications for a variety of business use cases including predictive maintenance, fraud detection, sensor network health, supply network optimization, energy management, anti-money laundering, and customer engagement. The Company supports customers in the United States, Europe, and the rest of the world. The Company was initially formed as a limited liability company in Delaware on January 8, 2009 and converted to a Delaware corporation in June 2012.

*Reclassification and Reverse Stock Split*

In November 2020, the Company amended and restated its certificate of incorporation to effect a reclassification of the Company's prior Class B common stock and Class C common stock into Class A common stock, and redeemable convertible Class B-1 common stock into a new redeemable convertible Class A-1 common stock. The rights, including the liquidation, dividend, and voting rights, are substantially identical for each class of common stock reclassified. All references to prior Class B common stock and Class C common stock have been recast to Class A common stock, and all references to redeemable convertible Class B-1 common stock have been recast to redeemable convertible Class A-1 common stock in these condensed consolidated financial statements to give retrospective effect to the reclassification for all periods presented. The Company also authorized a new Class B common stock. The rights, including the liquidation and dividend rights, of the Class A common stock and the new Class B common stock are substantially identical, other than the voting rights and conversion rights upon transfer of the Class B common stock. See *Note 8. Stockholders' Equity* for more information.

Additionally, the Company effected a 6-for-1 reverse stock split of the Company's outstanding common stock, preferred stock, and stock option awards. The par value of the common stock and preferred stock was not adjusted as a result of the reverse stock split. The authorized shares of the Class A common stock, new Class A-1 common stock, new Class B common stock and preferred stock were also adjusted to 390,000,000 shares, 6,666,667 shares, 21,000,000 shares, and 233,107,379 shares, respectively. All authorized, issued, and outstanding shares of common stock, preferred stock, stock option awards, and per share data included in these condensed consolidated financial statements have been recast to give retrospective effect to the adjusted authorized shares and reverse stock split for all periods presented.

*Initial Public Offering and Concurrent Private Placements*

In December 2020, the Company completed its initial public offering ("IPO"), in which the Company issued and sold 17,825,000 shares of its Class A common stock at $42.00 per share, which included 2,325,000 shares issued upon the exercise of the underwriters' over-allotment option to purchase additional shares. The Company received net proceeds of $694.6 million after deducting underwriting discounts and other offering expenses. In connection with the IPO:

- all 33,628,776 shares of the Company's outstanding redeemable convertible preferred stock, except the Series A* preferred stock, automatically converted into an equivalent number of shares of Class A common stock on a one-to-one basis;

- all 3,499,992 shares of the Company's outstanding redeemable convertible Series A* preferred stock automatically converted into an equivalent number of shares of Class B common stock on a one-to-one basis;

- all 6,666,665 shares of the Company's outstanding redeemable convertible Class A-1 common stock automatically converted into an equivalent number of shares of Class A common stock on a one-to-one basis; and

- the Company amended and restated its certificate of incorporation which became effective upon completion of the IPO.

Deferred offering costs consist primarily of direct and incremental accounting, legal and other fees related to the Company's IPO. Prior to the IPO, all deferred offering costs incurred were capitalized and included in other assets on the

14

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

condensed consolidated balance sheet. Upon completion of the IPO, $7.2 million of deferred offering costs were reclassified into stockholders' equity as a reduction of the IPO proceeds.

The Company also completed a concurrent private placement immediately subsequent to the closing of the IPO, in which the Company issued and sold 2,380,952 and 1,190,476 shares, respectively, of its Class A common stock at $42.00 per share to Spring Creek Capital LLC, an affiliate of Koch Industries, Inc., and Microsoft Corporation (the "Concurrent Private Placement"). The Company received aggregate proceeds of $150.0 million and did not pay underwriting discounts with respect to the shares of Class A common stock that were sold in the Concurrent Private Placement.

*Basis of Presentation and Principles of Consolidation*

The Company prepares its unaudited condensed consolidated financial statements in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Accordingly, they do not include all disclosures normally required in annual consolidated financial statements prepared in accordance with U.S. GAAP. Therefore, these unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes included in the Company's Annual Report on Form 10-K for the fiscal year ended April 30, 2021, which was filed with the SEC on June 25, 2021.

In management's opinion, these unaudited condensed consolidated financial statements have been prepared on the same basis as the annual financial statements and reflect all adjustments, which include only normal recurring adjustments necessary for the fair statement of the Company's financial position as of October 31, 2021, and the results of operations for the three and six months ended October 31, 2021. The results of operations for the three and six months ended October 31, 2021, are not necessarily indicative of the results to be expected for the full year or any other future interim or annual period.

The condensed consolidated financial statements include the accounts of C3.ai, Inc. and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

*Use of Estimates*

The preparation of the accompanying unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions about future events. These estimates and the underlying assumptions affect the amounts of assets and liabilities reported, disclosures about contingent assets and liabilities, and reported amounts of revenue and expenses. Actual results and outcomes could differ significantly from the Company's estimates, judgments, and assumptions. Significant estimates include determining standalone selling price for performance obligations in contracts with customers and estimating variable consideration, the estimated expected benefit period for deferred contract acquisition costs, the useful lives of long-lived assets and other assumptions used to measure stock-based compensation, and the valuation of deferred income tax assets and uncertain tax positions. These estimates and assumptions are based on management's best estimates and judgment. Management evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors, including the current economic environment, which management believes to be reasonable under the circumstances. The Company adjusts such estimates and assumptions when facts and circumstances dictate. Changes in those estimates resulting from continuing changes in the economic environment will be reflected in the financial statements in future periods. As future events and their effects cannot be determined with precision, actual results could materially differ from those estimates and assumptions.

*Fiscal Year*

The Company's fiscal year ends on April 30.

*Summary of Significant Accounting Policies*

The Company's significant accounting policies are discussed in *Note 1. Summary of Business and Significant Accounting Policies* in the Notes to Consolidated Financial Statements in its Annual Report on Form 10-K for the fiscal year ended April 30, 2021, which was filed with the SEC on June 25, 2021. There have been no significant changes to these policies during the three and six months ended October 31, 2021.

15

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

*Recent Accounting Pronouncements*

The Company currently qualifies as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Accordingly, the Company is provided the option to adopt new or revised accounting guidance either (1) within the same periods as those otherwise applicable to public business entities or (2) within the same time periods as private companies, including early adoption when permissible. The Company has elected to adopt new or revised accounting guidance within the same time period as private companies.

Based on the market value of our Class A common stock held by non-affiliates as of the last business day of the Company's fiscal second quarter ended October 31, 2021, the Company will cease to be an emerging growth company as of April 30, 2022.

*Recently Adopted Accounting Standards*

In August 2018, the FASB issued ASU 2018-15, *Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement that is a Service Contract*, which requires a customer in a cloud computing arrangement that is a service contract to follow the internal-use software guidance in ASC 350-40 to determine which implementation costs to defer and recognize as an asset. The guidance is effective for the fiscal year beginning May 1, 2021. Early adoption is permitted. The Company adopted this guidance effective May 1, 2021 on a prospective basis, and the adoption did not have a material impact on its condensed consolidated financial statements and related disclosures.

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740)*—Simplifying the Accounting for Income Taxes. The amendments in this update simplify various aspects of the accounting for income tax by eliminating certain exceptions to the general approach under existing accounting guidance provided by ASC 740, Income Taxes, and clarifies certain aspects of the existing guidance to promote more consistent application. The amendments in this new standard include, the elimination of exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The new standard also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill and that single-member limited liability companies and similar disregarded entities that are not subject to income tax are not required to recognize an allocation of consolidated income tax expense in their separate financial statements, but could elect to do so. The guidance is effective for the Company beginning May 1, 2022. Early adoption is permitted. The Company adopted this guidance effective May 1, 2021, and the adoption did not have a material impact on its condensed consolidated financial statements and related disclosures.

2.  **Revenue**

*Disaggregation of Revenue*

The following table presents revenue by geographical region (in thousands):

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2021 | | 2020 | | 2021 | | 2020 |
| North America [1] | $ | 43,697 | $ | 27,807 | $ | 80,149 | $ | 56,612 |
| Europe, the Middle East and Africa [1] | | 12,789 | | 12,528 | | 25,008 | | 22,781 |
| Asia Pacific [1] | | 1,777 | | 1,006 | | 5,512 | | 2,431 |
| Total revenue | $ | 58,263 | $ | 41,341 | $ | 110,669 | $ | 81,824 |

---

(1)  The United States comprised 75% and 66% of the Company's revenue for the three months ended October 31, 2021 and 2020, respectively, and 72% and 68% of the Company's revenue in the six months ended October 31, 2021 and 2020, respectively. France comprised 12% and 13% of the Company's revenue for the three months ended October 31, 2021 and 2020, respectively, and 12% and 12% of the Company's revenue for the six months ended October 31, 2021 and 2020, respectively. No other country comprised 10% or greater of the Company's revenue for each of the three and six months ended October 31, 2021 and 2020.

16

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

*Deferred Revenue*

The following table reflects the deferred revenue balance (in thousands):

| | As of October 31, 2021 | | As of April 30, 2021 |
|---|---|---|---|
| Deferred revenue, current | $ | 71,901 | $ | 72,263 |
| Deferred revenue, non-current | | 980 | | 2,964 |
| Total deferred revenue | $ | 72,881 | $ | 75,227 |

Significant changes in the deferred revenue balances during the six months ended October 31, 2021 and 2020 were as follows (in thousands):

| | Deferred Revenue |
|---|---|
| April 30, 2021 | $ 75,227 |
| Performance obligations satisfied during the period that were included in the deferred revenue balance at the beginning of the year | (56,926) |
| Increases due to invoicing prior to satisfaction of performance obligations | 54,580 |
| October 31, 2021 | $ 72,881 |

| | Deferred Revenue |
|---|---|
| April 30, 2020 | $ 60,295 |
| Performance obligations satisfied during the period that were included in the deferred revenue balance at the beginning of the year | (42,312) |
| Increases due to invoicing prior to satisfaction of performance obligations | 63,973 |
| October 31, 2020 | $ 81,956 |

*Remaining Performance Obligation*

Remaining performance obligations are committed and represent non-cancellable contracted revenue that has not yet been recognized and will be recognized as revenue in future periods. Some contracts allow customers to cancel the contracts without a significant penalty, and the cancellable amount of contract value is not included in the remaining performance obligations.

The Company excludes amounts related to performance obligations and usage-based royalties that are billed and recognized as they are delivered or billed and recognized in the same period. This primarily consists of monthly usage-based runtime and hosting charges in the duration of some revenue contracts.

Revenue expected to be recognized from remaining performance obligations was approximately $465.5 million and $293.8 million as of October 31, 2021 and April 30, 2021, respectively, of which $179.4 million and $145.2 million is expected to be recognized over the next 12 months and the remainder thereafter, respectively.

*Customer Concentration and Accounts Receivable*

All of the Company's customers consist of corporate and governmental entities. A limited number of customers have accounted for a large part of the Company's revenue and accounts receivable to date. Two separate customers accounted for 28% and 11%, respectively, of revenue for the three months ended October 31, 2021. Two separate customers accounted for 16% and 13%, respectively, of revenue for the three months ended October 31, 2020. Two separate customers accounted for 25% and 12%, respectively, of revenue for the six months ended October 31, 2021. Two separate customers accounted for 17% and 12%, respectively, of revenue for the six months ended October 31, 2020. Four separate customers accounted for 16%, 15%, 14% and 12% of accounts receivable at October 31, 2021. Four separate customers accounted for 18%, 14%, 14% and 11% of accounts receivable at April 30, 2021.

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

Accounts receivable includes billed and unbilled receivables, net of allowance of doubtful accounts. Trade accounts receivable are recorded at invoiced amounts and do not bear interest. The expectation of collectability is based on a review of credit profiles of customers, contractual terms and conditions, current economic trends, and historical payment experience. The Company regularly reviews the adequacy of the allowance for doubtful accounts by considering the age of each outstanding invoice and the collection history of each customer to determine the appropriate amount of allowance for doubtful accounts. Accounts receivable included unbilled receivables as of October 31, 2021 and April 30, 2021 of $7.3 million and $3.8 million, respectively.

**3.    Fair Value Measurements**

The Company's financial instruments consist primarily of cash equivalents, restricted cash, available-for-sale marketable securities, accounts receivable, and accounts payable. Cash and cash equivalents and available-for-sale marketable securities are reported at their respective fair values on the condensed consolidated balance sheets. The remaining financial instruments are reported on the condensed consolidated balance sheets at amounts that approximate current fair values.

The following table summarizes the types of assets measured at fair value on a recurring basis by level within the fair value hierarchy (in thousands):

| | As of October 31, 2021 | | | | As of April 30, 2021 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| Cash equivalents: | | | | | | | | |
| Money market funds | $ 98,392 | $ — | $ — | $ 98,392 | $ 43,401 | $ — | $ — | $ 43,401 |
| Corporate debt securities | — | 2,588 | — | 2,588 | — | — | — | — |
| Available-for-sale marketable securities: | | | | | | | | |
| U.S. treasury securities | — | 2,000 | — | 2,000 | — | 57,998 | — | 57,998 |
| Certificates of deposit | — | 338,490 | — | 338,490 | — | 422,978 | — | 422,978 |
| U.S. government agencies securities | — | 15,793 | — | 15,793 | — | — | — | — |
| Commercial paper | — | 388,190 | — | 388,190 | — | 494,676 | — | 494,676 |
| Corporate debt securities | — | 160,232 | — | 160,232 | — | 2,368 | — | 2,368 |
| Total cash equivalents and available-for-sale marketable securities | $ 98,392 | $ 907,293 | $ — | $ 1,005,685 | $ 43,401 | $ 978,020 | $ — | $ 1,021,421 |

The estimated fair value of securities classified as Level 2 financial instruments was determined based on third-party pricing services. The pricing services utilize industry standard valuation models, including both income- and market-based approaches, for which all significant inputs are observable, either directly or indirectly, to estimate fair value. Inputs used for fair value measurement categorized as Level 2 include benchmark yields, reported trades, broker or dealer quotes, issuer spreads, two-sided markets, benchmark securities, bids, offers, and reference data including market research publications.

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

**4.  Investments**

*Cash Equivalents and Available-for-Sale Marketable Securities*

The following table summarizes the Company's cash equivalents and available-for-sale marketable securities (in thousands):

| | As of October 31, 2021 | | | | As of As of April 30, 2021 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Cash equivalents: | | | | | | | | |
| Money market funds | $ 98,392 | $ — | $ — | $ 98,392 | $ 43,401 | $ — | $ — | $ 43,401 |
| Corporate debt securities | 2,588 | — | — | 2,588 | — | — | — | — |
| Available-for-sale marketable securities: | | | | | | | | |
| U.S. treasury securities | 2,000 | — | — | 2,000 | 57,993 | 5 | — | 57,998 |
| Certificates of deposit | 338,482 | 9 | (1) | 338,490 | 422,952 | 32 | (6) | 422,978 |
| U.S. government agencies securities | 15,815 | — | (22) | 15,793 | — | — | — | — |
| Commercial paper | 388,178 | 13 | (1) | 388,190 | 494,625 | 64 | (13) | 494,676 |
| Corporate debt securities | 160,470 | 7 | (245) | 160,232 | 2,369 | — | (1) | 2,368 |
| Total cash equivalents and available-for-sale marketable securities | $ 1,005,925 | $ 29 | $ (269) | $ 1,005,685 | $ 1,021,340 | $ 101 | $ (20) | $ 1,021,421 |

The following table summarizes the Company's available-for-sale marketable securities by contractual maturity (in thousands):

| | As of October 31, 2021 | | As of April 30, 2021 | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| Within one year | $ 803,037 | $ 802,986 | $ 977,939 | $ 978,020 |
| After one year through five years | 101,908 | 101,719 | — | — |
| Total | $ 904,945 | $ 904,705 | $ 977,939 | $ 978,020 |

The following table summarizes the fair values and unrealized losses of the Company's available-for-sale marketable securities classified by length of time that the securities have been in a continuous unrealized loss position but were not deemed to be other-than-temporarily impaired, as of October 31, 2021 (in thousands):

| | As of October 31, 2021 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Less Than 12 Months | | 12 Months or Greater | | Total | |
| | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value |
| Certificates of deposit | $ (1) | $ 29,399 | $ — | $ — | $ (1) | $ 29,399 |
| U.S. government agencies securities | — | — | (22) | 15,793 | (22) | 15,793 |
| Commercial paper | (1) | 29,667 | — | — | (1) | 29,667 |
| Corporate debt securities | (73) | 72,601 | (172) | 83,414 | (245) | 156,015 |
| Total | $ (75) | $ 131,667 | $ (194) | $ 99,207 | $ (269) | $ 230,874 |

As of October 31, 2021, the Company had 130 investment positions in an unrealized loss position. As of April 30, 2021, the Company had eight investment positions that were in an unrealized loss position. The Company considers factors such as the duration, the magnitude and the reason for the decline in value, the potential recovery period, creditworthiness of the issuers of the securities and its intent to sell. For marketable securities, it also considers whether (i) it is more likely than not that the

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

Company will be required to sell the debt securities before recovery of their amortized cost basis, and (ii) the amortized cost basis cannot be recovered as a result of credit losses. No significant facts or circumstances have arisen to indicate that there has been any significant deterioration in the creditworthiness of the issuers of the securities held by the Company. Based on the Company's review of these securities, including the assessment of the duration and severity of the unrealized losses and the Company's ability and intent to hold the investments until maturity, there were no other-than-temporary impairments for these marketable securities at October 31, 2021.

**5.    Balance Sheet Details**

*Property and Equipment*

Property and equipment consisted of the following at October 31, 2021 and April 30, 2021 (in thousands):

| | Useful Life (in months) | | As of October 31, 2021 | | As of April 30, 2021 |
|---|---|---|---|---|---|
| Leasehold improvements | * | $ | 8,831 | $ | 8,658 |
| Computer equipment | 36 | | 3,545 | | 2,539 |
| Office furniture and equipment | 60 | | 348 | | 339 |
| Capital in progress | NA | | 74 | | — |
| Property and equipment—gross | | | 12,798 | | 11,536 |
| Less: accumulated depreciation and amortization | | | (7,559) | | (5,403) |
| Property and equipment—net | | $ | 5,239 | $ | 6,133 |

_____
\*    Leasehold improvements are amortized over the shorter of the estimated useful lives of the improvements or the remaining lease term.
NA = Not Applicable

Depreciation and amortization expense related to property and equipment was $1.1 million and $1.0 million for the three months ended October 31, 2021 and 2020, respectively, and $2.2 million and $2.0 million for the six months ended October 31, 2021 and 2020, respectively.

*Accrued Compensation and Employee Benefits*

Accrued compensation and employee benefits consisted of the following at October 31, 2021 and April 30, 2021 (in thousands):

| | As of October 31, 2021 | | As of April 30, 2021 |
|---|---|---|---|
| Accrued bonus | $ | 8,672 | $ | 12,216 |
| Accrued vacation | | 3,862 | | 3,935 |
| Accrued payroll taxes and benefits | | 2,966 | | 3,405 |
| Accrued commission | | 536 | | 1,863 |
| Accrued salaries | | 442 | | 410 |
| Accrued compensation and employee benefits | $ | 16,478 | $ | 21,829 |

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

*Accrued and Other Current Liabilities*

Accrued and other current liabilities consisted of the following at October 31, 2021 and April 30, 2021 (in thousands):

|  | As of October 31, 2021 | As of April 30, 2021 |
|---|---|---|
| Liability for common stock exercised prior to vesting | $ 3,183 | $ 5,331 |
| Accrued general expenses | 6,345 | 3,588 |
| Operating lease liabilities, current | 4,415 | 3,894 |
| Commissions payable to a related party | 18,448 | 3,413 |
| Other | 1,284 | 2,092 |
| Accrued and other current liabilities | $ 33,675 | $ 18,318 |

*Cares Act Loan*

On May 1, 2020, the Company entered into a Paycheck Protection Program ("PPP") Promissory Note and Agreement with Bank of America, pursuant to which the Company received loan proceeds of $6.3 million (the "PPP Loan"). The PPP Loan was made under, and was subject to the terms and conditions of, the PPP which was established under the CARES Act and is administered by the U.S. Small Business Administration. The term of the PPP Loan was two years with a maturity date of May 1, 2022 and contains a favorable fixed annual interest rate of 1.00%. Payments of principal and interest on the PPP Loan were deferred for the first six months of the term of the PPP Loan until November 1, 2020. Principal and interest were payable monthly and could be prepaid by the Company at any time prior to maturity with no prepayment penalties. On August 18, 2020, the Company repaid in full the PPP loan outstanding, including accrued interest of $0.1 million, in the amount of $6.4 million.

**6.    Commitments and Contingencies**

*Noncancelable Purchase Commitments*

The Company entered into a noncancelable arrangement with a web-hosting services provider in November 2019. Under the arrangement, the Company committed to spend an aggregate of at least $30.0 million between November 2019 and November 2022, with a minimum amount of $10.0 million in each of the three years, on services with this vendor. The Company has incurred costs totaling $3.4 million and $3.5 million during the three months ended October 31, 2021 and 2020, respectively, and $6.6 million and $6.1 million during the six months ended October 31, 2021 and 2020, respectively, under the arrangement.

*C3.ai Digital Transformation Institute Grants*

In February 2020, the Company entered into an agreement establishing the C3.ai Digital Transformation Institute ("C3.ai DTI"), a program established to attract many of the world's leading research institutions to join in a coordinated and innovative effort to advance the digital transformation of business, government, and society. As part of the agreement, the Company has agreed to issue grants to C3.ai DTI, which are subject to compliance with certain obligations. The grants shall be paid by the Company over five years in the form of cash, publicly traded securities, or other property of equivalent net value. As of October 31, 2021 and April 30, 2021, the total potential remaining contributions are $37.4 million and $43.1 million, respectively. The future grant payments are conditional in nature and subject to execution of the program in line with specific requirements.

*Leases*

On August 25, 2021, the Company entered into a new lease to acquire approximately 283,015 square feet of office space in several phases in Redwood City, California. The lease is expected to commence in January 2022, when the landlord is expected to deliver the first two phases of leased space to the Company. Total undiscounted base rent payments over the term of this lease are approximately $103.1 million. In addition to base rent, the Company will be responsible for the Company's allocated share of costs incurred and expenditures made by the landlord in the operation and management of the leased space. Under the terms of the lease agreement, the Company has a rent abatement with respect to each phase for the initial six months following the rent commencement date for such phase, with initial monthly base rent payments expected to commence April 1, 2023, which will be approximately $0.5 million at commencement and will increase up to a maximum monthly base rent of

21

approximately $1.0 million. The lease agreement also includes an aggregate tenant improvement allowance of $44.2 million for certain costs. The term of the lease is 126 months from the date that rent commences with respect to phase one of the leased space, which will be nine months after the date when phase one of the leased space is delivered to the Company. Pursuant to the lease agreement, the Company provided the landlord an unconditional and irrevocable letter of credit of $12.6 million, which is subject to reduction pursuant to the terms of the lease agreement. The commencement date for the first two phases of this lease is determined to be in the third quarter of fiscal 2022, therefore the lease is not included in the Company's operating lease right-of-use asset or operating lease liabilities as of October 31, 2021.

*Legal Proceedings*

The Company is involved in various legal proceedings and periodically receives claims arising in the ordinary course of business. In the Company's opinion, resolution of these matters is not expected to have a material adverse impact on its condensed consolidated statement of operations, cash flows, or balance sheet.

*Blattman et al. v. Siebel et al., 15-cv-00530 (D. Del.)*

On October 28, 2014, Eric Blattman and other former unitholders of E2.0 LLC ("E2.0") filed suit in federal court against Thomas M. Siebel and David Schmaier, alleging violation of Section 10(b) of the Securities Exchange Act of 1934 and common law fraud based on alleged misrepresentations made during negotiations leading up to an April 30, 2012 merger between E2.0 and the Company. Plaintiffs thereafter amended their complaint to add the Company as a defendant, and to add breach of contract claims based on alleged violations of certain earn-out and indemnification provisions in the parties' merger agreement. A bench trial was held in February 2019, and in a January 29, 2020 opinion the court ruled in favor of defendants the Company, Siebel and Schmaier on all claims. The court also awarded defendants their reasonable attorneys' fees and costs in defending the action.

In February 2020, plaintiffs appealed only the portion of the district court's ruling related to the alleged breach of contract indemnification claim to the Third Circuit Court of Appeals. On February 17, 2021, the Third Circuit affirmed the judgment and orders of the district court in the Company's and defendants' favor. On August 10, 2021, the special master appointed by the district court to consider an order on recovery of fees and costs issued a recommendation that the Company be awarded $9.7 million in fees and expenses. Plaintiffs have objected to the special master's recommendation and requested an award of $8.3 million, which the Company has opposed. The district court will now consider the special master's recommendation and plaintiffs objection and the Company's opposition and issue an order on fees and costs. The Company intends to continue to pursue recovery of attorney's fees and costs as previously awarded by the district court.

**7.   Redeemable Convertible Preferred Stock and Redeemable Convertible A-1 Common Stock**

Upon completion of the IPO, all 33,628,776 shares of the Company's outstanding redeemable convertible preferred stock, except the Series A* preferred stock, automatically converted into an equivalent number of shares of Class A common stock on a one-to-one basis and all 3,499,992 shares of the Company's outstanding redeemable convertible Series A* preferred stock automatically converted into an equivalent number of shares of the Company's Class B common stock on a one-to-one basis. The carrying value of $399.8 million of all classes of the Company's outstanding redeemable convertible preferred stock was reclassified into stockholders' equity. Additionally, all 6,666,665 shares of the Company's outstanding redeemable convertible Class A-1 common stock automatically converted into an equivalent number of shares of Class A common stock on a one-to-one basis and their carrying value of $18.8 million was reclassified into stockholders' equity. As of October 31, 2021, there were no shares of redeemable convertible preferred stock issued and outstanding. See *Note 1. Summary of Business and Significant Accounting Policies* for more information.

**8.   Stockholders' Equity**

*Preferred Stock*

The Company has authorized the issuance of 200,000,000 shares of undesignated preferred stock with a par value of $0.001 per share with rights and preferences, including voting rights, designated from time to time by the board of directors. As of October 31, 2021, there were no shares of Preferred Stock issued or outstanding.

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

*Common Stock*

The Company has authorized the issuance of 1,000,000,000 shares of Class A common stock and 3,500,000 shares of Class B common stock. The shares of Class A common stock and Class B common stock are identical, except with respect to voting, conversion, and transfer rights. Each share of Class A common stock is entitled to one vote. Each share of Class B common stock is entitled to 50 votes. Class A and Class B common stock have a par value of $0.001 per share and are referred to as common stock throughout the notes to the unaudited condensed consolidated financial statements, unless otherwise noted. Holders of common stock are entitled to receive any dividends as may be declared from time to time by the board of directors.

Shares of Class B common stock may be converted to Class A common stock at any time at the option of the stockholder. Each share of Class B common stock will be automatically converted into one share of Class A common stock upon the earliest of the following: (i) the date that is six months following the death or incapacity of Mr. Siebel; (ii) the date that is six months following the date that Mr. Siebel is no longer providing services to the Company as an officer, employee, director, or consultant; (iii) December 11, 2040, which is the twentieth anniversary of the completion of the IPO; or (iv) the date specified by the holders of a majority of the then outstanding shares of Class B common stock, voting as a separate class. Future transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock.

*Common Stock Subject to Repurchase*

Under the Company's Amended and Restated 2012 Equity Incentive Plan (the "2012 Incentive Plan") and the Company's Amended and Restated 2020 Equity Incentive Plan (the "2020 Incentive Plan"), certain optionholders are allowed to exercise stock options to purchase Class A common stock prior to vesting. The Company has the right to repurchase at the original purchase price any unvested but outstanding common shares upon termination of service of the optionholder. The consideration received for an early exercise of a stock option is considered to be a deposit of the exercise price and the related amount is recorded as a liability. The net proceeds from the early exercise of such options were nil and $1.5 million during the three months ended October 31, 2021 and 2020, respectively, and nil and $1.5 million during the six months ended October 31, 2021 and 2020, respectively. The liability is reclassified into equity on a ratable basis as the stock options vest. Unvested Class A common stock of 621,056 and 1,091,306 shares as of October 31, 2021 and April 30, 2021, respectively, were subject to such repurchase right and are legally issued and outstanding as of each period presented. See *Note 9. Stock-Based Compensation* for more information.

**9.    Stock-Based Compensation**

On June 29, 2012, the Company adopted the 2012 Incentive Plan. The 2012 Incentive Plan provided for the grant of stock-based awards to employees, non-employee directors, and other service providers of the Company. The 2012 Incentive Plan was terminated in December 2020 in connection with the IPO but continues to govern the terms of outstanding awards that were granted prior to the termination of the 2012 Incentive Plan. No further equity awards will be granted under the 2012 Incentive Plan. With the establishment of the 2020 Incentive Plan as further discussed below, upon the expiration, forfeiture, cancellation, or reacquisition of any shares of Class A common stock underlying outstanding stock-based awards granted under the 2012 Incentive Plan, an equal number of shares of Class A common stock will become available for grant under the 2020 Plan.

On November 27, 2020, the Company's board of directors adopted, and its stockholders approved, the 2020 Incentive Plan, which became effective in connection with the IPO. The 2020 Incentive Plan provides for the grant of incentive stock options, nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock units ("RSU") awards, performance awards and other equity awards. The number of shares of Class A common stock reserved for issuance under the 2020 Incentive Plan is subject to automatic evergreen increases annually through (and including) May 1, 2030 pursuant to the terms of the 2020 Incentive Plan. There was an automatic annual increase on May 1, 2021 in the number of shares reserved for future issuance pursuant to the 2020 Incentive Plan in an amount equal to five percent (5%) of the total number of shares of the Company's Class A common stock and Class B common stock outstanding on April 30, 2021.

On November 27, 2020, the Company's board of directors also adopted, and its stockholders also approved, the 2020 Employee Stock Purchase Plan (the "2020 ESPP"), which became effective immediately prior to the IPO. The 2020 ESPP authorizes the issuance of shares of Class A common stock pursuant to purchase rights granted to employees. A total of 3,000,000 shares of Class A common stock were initially reserved for future issuance under the 2020 ESPP. The number of shares of Class A common stock reserved for issuance under the 2020 ESPP is subject to automatic evergreen increases annually through (and including) May 1, 2030 pursuant to the terms of the 2020 ESPP. There was an automatic annual increase

23

**C3.AI, INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

on May 1, 2021 in the number of shares reserved for future issuance pursuant to the 2020 ESPP in an amount equal to one percent (1%) of the total number of shares of the Company's Class A common stock and Class B common stock outstanding on April 30, 2021. The 2020 ESPP permits participants to purchase shares of Class A common stock in an amount not exceeding 15% of their earnings during the relevant offering period. The offering dates and purchase dates for the 2020 ESPP are determined at the discretion of the Company's board of directors. As of October 31, 2021, the Company had not yet launched its 2020 ESPP.

*Stock Options to Acquire Class A Common Stock*

These stock options generally expire 10 years from the date of grant, or earlier if services are terminated. Generally, each stock option for common stock is subject to a vesting schedule such that one fifth of the award vests after the first-year anniversary and one-sixtieth of the award vests each month thereafter over the remaining four years, subject to continuous service.

A summary of the Company's option activity during the six months ended October 31, 2021 is as follows:

| | Options Outstanding | | | |
| --- | --- | --- | --- | --- |
| | Number of Stock Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (years) | Aggregate Intrinsic Value |
| | (in thousands) | | | (in thousands) |
| Balance as of April 30, 2021 | 38,487 $ | 6.39 | 7.98 $ | 2,304,714 |
| Options granted | 3,412 | 55.82 | | |
| Options exercised | (2,735) | 4.22 | | |
| Options cancelled | (1,960) | 10.48 | | |
| Balance as of October 31, 2021 | 37,204 $ | 10.86 | 7.60 $ | 1,274,594 |
| Vested and exercisable as of October 31, 2021 | 14,843 $ | 4.48 | 6.43 $ | 603,201 |
| Vested and expected to vest as of October 31, 2021[1] | 37,825 $ | 10.86 | 7.60 $ | 1,295,871 |

(1) The number of options vested and expected to vest as of October 31, 2021 includes early exercised, unvested Class A common stock. Refer to *Note 8. Stockholders' Equity* for more information.

As of October 31, 2021, there was $147.1 million of unrecognized compensation cost related to stock options which are expected to be recognized over an estimated weighted-average period of 3.4 years.

The grant-date fair value of the options issued for the six months ended October 31, 2021 is estimated on the date of grant using the Black-Scholes-Merton option pricing model. The weighted average assumptions underlying the fair value estimation are provided in the following table:

| | Six Months Ended October 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Valuation assumptions: | | |
| Expected dividend yield | — % | — % |
| Expected volatility | 43.9 % | 43.7 % |
| Expected term (years) | 6.5 | 6.3 |
| Risk-free interest rate | 1.0 % | 0.4 % |

*Restricted Stock Units*

During the fourth quarter of the fiscal year ended April 30, 2021, the Company began granting RSUs to its employees. No RSUs were granted prior to the IPO. The RSUs are typically subject to service-based vesting conditions satisfied over five years with one-fifth of the award vesting after the first-year anniversary and one-twenty-fifth of the award vesting quarterly thereafter. The related stock-based compensation is recognized on a straight-line basis over the requisite service period.

24

C3.AI, INC.
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(**Unaudited**)**

A summary of the Company's RSU activity during the six months ended October 31, 2021 is as follows:

| | RSUs Outstanding | |
| --- | --- | --- |
| | Number of RSUs | Weighted Average Grant Date Fair Value Per Share |
| | (in thousands) | |
| Unvested Balance as of April 30, 2021 | 447 $ | 74.52 |
| RSUs granted | 6,080 | 54.32 |
| RSUs vested | (37) | 70.07 |
| RSUs forfeited | (448) | 58.15 |
| Unvested Balance as of October 31, 2021 | 6,042 $ | 55.43 |

As of October 31, 2021, there was $332.8 million of unrecognized stock-based compensation expense related to outstanding RSUs granted to employees that is expected to be recognized over a weighted-average period of 3.8 years.

*Stock-based Compensation Expense*

The following table summarizes the effects of stock-based compensation on the Company's condensed consolidated statements of operations (in thousands):

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Cost of subscription | $ 2,364 | $ 159 | $ 3,185 | $ 343 |
| Cost of professional services | 685 | 89 | 1,287 | 137 |
| Sales and marketing | 13,555 | 2,190 | 19,690 | 3,045 |
| Research and development | 10,256 | 648 | 13,014 | 1,106 |
| General and administrative | 5,680 | 2,115 | 9,276 | 3,050 |
| Total stock-based compensation expense | $ 32,540 | $ 5,201 | $ 46,452 | $ 7,681 |

*Shareholder Loan*

In January 2018, in connection with the Series F preferred stock financing, the Company issued 1,251,921 shares of Series F preferred stock in exchange for a note receivable of $24.5 million from its chief executive officer ("CEO"). Prior to the automatic conversion of all Series F preferred stock outstanding into Class A common stock upon the completion of the IPO, the underlying shares of Series F preferred stock were legally outstanding though were not included in the carrying amounts of preferred stock as the note receivable is treated as an equity classified stock-based option grant. In September 2020, the Company's CEO paid the outstanding full recourse promissory note and accrued interest in the amount of $26.0 million. No interest income was recorded for the note. Refer to *Note 12. Related Party Transactions* for more information.

**10.  Income Taxes**

Accounting for income taxes for interim periods generally requires the provision for income taxes to be determined by applying an estimate of the annual effective tax rate for the full fiscal year to income or loss before income taxes, adjusted for discrete items, if any, for the reporting period. The Company updates its estimate of the annual effective tax rate each quarter and makes a cumulative adjustment in such period.

The Company recorded income tax expense of nil and $0.2 million for the three months ended October 31, 2021 and 2020, respectively, and $0.4 million and $0.3 million for the six months ended October 31, 2021 and 2020, respectively. Income tax expense consists primarily of income taxes in foreign jurisdictions in which the Company conducts business. Due to the Company's history of losses in the United States, a full valuation allowance on substantially all of the Company's deferred tax assets, including net operating loss carryforwards, research and development credits, and other book versus tax differences, was maintained.

25

The American Rescue Plan Act of 2021 ("ARPA") was enacted by the United States on March 11, 2021. The ARPA did not have a material impact on the Company's provision for income taxes for the three and six months ended October 31, 2021.

**11.  Net Loss Per Share Attributable to Common Stockholders**

Basic and diluted net loss per share attributable to common stockholders is presented in conformity with the two-class method required for participating securities. Class A and B common shares have identical liquidation and distribution rights. Prior to the automatic conversion of all shares of redeemable convertible Class A-1 common stock into Class A common stock upon the completion of the IPO, the shares of redeemable convertible Class A-1 common stock had a liquidation preference, but were legal form common stock and participated in losses equally with all common stockholders.

Prior to the automatic conversion of all of its redeemable convertible preferred stock outstanding into Class A and Class B common stock upon the completion of the IPO, the Company considered all redeemable convertible preferred stock to be participating securities because they participated in any dividends declared on the Company's common stock on an as-if-converted basis. Redeemable convertible preferred stock did not participate in the net loss per share with common stockholders as the holders of the convertible preferred did not have a contractual obligation to share in the Company's losses.

Accordingly, under the two-class method, the net loss is not allocated to the redeemable convertible preferred stock such that the resulting net loss for all periods presented was allocated on a proportionate basis to shares of Class A, Class A-1, and Class B common stock for the number of days that each class was issued and outstanding during the period.

Basic net loss per share attributable to common stockholders is computed by dividing the net loss by the weighted-average number of shares of common stock outstanding during the period, less shares subject to repurchase. Diluted net loss per share attributable to common stockholders is computed by giving effect to all potential dilutive common stock equivalents outstanding for the period to the extent they are dilutive. For purposes of this calculation, the convertible preferred, stock options, and early exercised stock options subject to repurchase are considered to be potential common stock equivalents but have been excluded from the calculation of diluted net loss per share attributable to common stockholders as their effect is anti-dilutive. Basic net loss per share was the same as diluted net loss per share for the periods presented because the Company was in a loss position for the three and six months ended October 31, 2021 and 2020.

The following table sets forth the computation of basic and diluted net loss per share attributable to common stockholders (in thousands, except per share data):

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2021 | | 2020 | | 2021 | | 2020 |
| **Numerator** | | | | | | | | |
| Net loss attributable to common stockholders | $ | (56,739) | $ | (14,944) | $ | (94,198) | $ | (14,794) |
| **Denominator** | | | | | | | | |
| Basic and diluted weighted-average Class A common shares outstanding | | 100,246 | | 31,387 | | 99,558 | | 31,006 |
| Basic and diluted weighted-average Class A-1 common shares outstanding | | — | | 6,667 | | — | | 6,667 |
| Basic and diluted weighted-average Class B common shares outstanding | | 3,500 | | — | | 3,500 | | — |
| **Basic and diluted net loss per share attributable to common stockholders** | | | | | | | | |
| Basic and diluted net loss per Class A common shares outstanding | $ | (0.55) | $ | (0.39) | $ | (0.91) | $ | (0.39) |
| Basic and diluted net loss per Class A-1 common shares outstanding | $ | — | $ | (0.39) | $ | — | $ | (0.39) |
| Basic and diluted net loss per Class B common shares outstanding | $ | (0.55) | $ | — | $ | (0.91) | $ | — |

26

The potential shares of common stock that were excluded from the computation of diluted net loss per share attributable to common stockholders for the period presented because including them would have had an antidilutive effect were as follows:

|  | As of October 31, | |
|---|---|---|
|  | 2021 | 2020 |
| Convertible preferred stock | | |
| Series A* | — | 3,499,992 |
| Series B* | — | 4,559,999 |
| Series B-1A* | — | 2,430,635 |
| Series B-1B* | — | 92,769 |
| Series C* | — | 2,779,738 |
| Series D | — | 12,278,422 |
| Series E | — | 540,003 |
| Series F | — | 5,399,581 |
| Series G | — | 3,893,701 |
| Series H | — | 1,653,928 |
| Stock options | 37,824,606 | 43,428,121 |
| RSUs | 6,041,895 | — |

## 12. Related Party Transactions

*Shareholder Loan*

In January 2018, the Company issued 1,251,921 shares of Series F Preferred Stock in exchange for a non-recourse promissory note to Thomas M. Siebel, the Company's CEO, in the amount of $24.5 million. The promissory note has a term of five years with the ability to renew for up to four successive one year periods and bears interest at a rate of 2.18% per annum, compounded annually. In September 2020, Mr. Siebel paid the outstanding promissory note in full including accrued interest in the total amount of $26.0 million. Refer to *Note 9. Stock-Based Compensation* for more information.

*Revenue Transactions with Baker Hughes Company*

In June 2019, the Company entered into multiple agreements with Baker Hughes Company ("Baker Hughes") under which Baker Hughes received a three-year subscription to use the Company's software. These agreements were revised in June 2020 to extend the term to five years and modify the subscription fees due. Under the agreements as revised in June 2020, Baker Hughes made minimum, non-cancelable revenue commitments, inclusive of their direct subscription fees and third-party revenue generated through a joint marketing arrangement with Baker Hughes, in the amount of $46.7 million in fiscal year 2020, $53.3 million in fiscal year 2021, $75.0 million in fiscal year 2022, $125.0 million in fiscal year 2023, and $150.0 million in fiscal year 2024. The Company also agreed to pay Baker Hughes a sales commission on subscriptions and services offerings it resold in excess of these minimum revenue commitments.

The Company and Baker Hughes further revised these agreements in October 2021 to extend the term by an additional year, for a total of six years, with an expiration date in the fiscal year ending April 30, 2025, to modify the amount of Baker Hughes' annual commitments to $85.0 million in fiscal year 2023, $110.0 million in fiscal year 2024, and $125.0 million in fiscal year 2025, and to revise the structure of the arrangement to further incentivize Baker Hughes' sales of the Company's products and services. Beginning in fiscal year 2023, Baker Hughes' annual commitments will be reduced by any revenue that Baker Hughes generates from certain customers. The revenue generated by Baker Hughes will be reviewed quarterly and adjusted, as needed, to reflect our current assumptions. As part of these revised agreements, the Company also acknowledged that Baker Hughes had met its minimum annual revenue commitment for fiscal year 2022 and earned a sales commission of $16.0 million for fiscal year 2022.

Pursuant to the revised arrangement, the Company acknowledged that Baker Hughes had met its minimum annual revenue commitment for the current fiscal year and recognized $16.0 million of sales commission as deferred costs during the fiscal quarter ended October 31, 2021 related to this arrangement, which will be amortized over an expected period of five years.

27

During the six months ended October 31, 2021, the Company recognized total revenue of $36.7 million related to its arrangement with Baker Hughes. The remaining performance obligations related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $18.7 million related to deferred revenue and $282.3 million of commitments from non-cancellable contracts as of October 31, 2021 and $8.5 million related to deferred revenue and $95.5 million from non-cancellable contracts as of April 30, 2021.

The Company recognized subscription revenue from direct subscription fees from Baker Hughes of $10.0 million and $6.8 million during the three months ended October 31, 2021 and 2020, respectively, and $20.2 million and $13.6 million during the six months ended October 31, 2021 and 2020, respectively. The Company recognized professional services revenue from Baker Hughes of $5.9 million and nil during the three months ended October 31, 2021 and 2020, respectively, and $8.0 million and nil during the six months ended October 31, 2021 and 2020, respectively. As of October 31, 2021 and April 30, 2021, accounts receivable, net included $9.4 million and $15.2 million and deferred revenue, current included $17.5 million and $7.7 million, respectively.

The Company recognized cost of subscription revenue from Baker Hughes, of nil and nil during the three months ended October 31, 2021 and 2020, respectively, and $0.1 million and nil during the six months ended October 31, 2021 and 2020, respectively. As of October 31, 2021 and April 30, 2021, accounts payable included $0.1 million and $0.1 million, respectively.

As of October 31, 2021 and April 30, 2021, the current portion of deferred costs of $5.0 million and $1.7 million, respectively, were included in prepaid expenses and other current assets and the non-current portion of $18.6 million and $6.6 million, respectively, were included in other assets, non-current. The Company amortized $0.4 million and $0.8 million of deferred commissions during the three and six months ended October 31, 2021, and this amount was included in sales and marketing expense in the condensed consolidated statements of operations.

The Company recognized $8.3 million and $16.0 million of sales commission as deferred costs during the fiscal year ended April 30, 2021 and the fiscal quarter ended October 31, 2021, respectively, related to this arrangement. The sales commissions of $8.3 million recognized in the fiscal year ended April 30, 2021 is payable to Baker Hughes over the term of three years based on the agreements, of which the Company paid $3.4 million during the six months ended October 31, 2021. The sales commissions of $16.0 million recognized in the fiscal quarter ended October 31, 2021 will be amortized over an expected period of five years.

As of October 31, 2021 and April 30, 2021, accrued and other current liabilities included $18.5 million and $3.4 million, respectively, and other long-term liabilities included $2.4 million and $4.9 million, respectively.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our unaudited condensed consolidated financial statements and related notes appearing elsewhere in this Quarterly Report on Form 10-Q and our audited consolidated financial statements and the related notes and the discussion under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations" for the fiscal year ended April 30, 2021 included in the Annual Report on Form 10-K for the fiscal year ended April 30, 2021, which was filed with the Securities and Exchange Commission, or SEC, on June 25, 2021. This discussion, particularly information with respect to our future results of operations or financial condition, business strategy and plans, and objectives of management for future operations, includes forward-looking statements that involve risks and uncertainties as described under the heading "Special Note Regarding Forward-Looking Statements" in this Quarterly Report on Form 10-Q. You should review the disclosure under the heading "Risk Factors" in this Quarterly Report on Form 10-Q for a discussion of important factors that could cause our actual results to differ materially from those anticipated in these forward-looking statements. Unless the context otherwise requires, all references in this report to "C3.ai," "C3 AI," the "Company", "we," "our," "us," or similar terms refer to C3.ai, Inc. and its subsidiaries.*

**Overview**

C3 AI is an Enterprise AI software company.

We have built an integrated family of software applications that enables our customers to rapidly develop, deploy, and operate large-scale Enterprise AI applications across any infrastructure. Customers can deploy C3 AI solutions on all major public cloud infrastructures, private cloud or hybrid environments, or directly on their servers and processors. We provide five primary families of software solutions, which we collectively refer to as our C3 AI Software:

- The C3 AI Suite, our core technology, is a comprehensive application development and runtime environment that is designed to allow our customers to rapidly design, develop, and deploy Enterprise AI applications of any type. Our C3 AI Suite enables developers to rapidly build applications by using conceptual models of all the elements required by an Enterprise AI application instead of having to write complex, lengthy, structured programming code to define, control, and integrate the many requisite data and microservices components to work together.

- C3 AI Applications, built using the C3 AI Suite, include a large and growing family of industry-specific and application-specific turnkey AI solutions, ready for installation and deployment.

- C3 AI Ex Machina, our no-code solution that provides secure, easy access to analysis-ready data, and enables business analysts without data science training to rapidly perform data science tasks such as building, configuring, and training AI models.

- C3 AI CRM is a new family of fully AI-enabled, industry-specific CRM solutions that combine the CRM technology leadership and market reach of our partner ecosystem. The C3 AI CRM product family will include sales, marketing, and customer service functionality. The products will be available in vertical market-specific offerings specifically designed to meet the needs of industries such as financial services, healthcare, telecommunications, oil and gas, manufacturing, utilities, aerospace, automotive, public sector, defense, and intelligence.

- C3 AI Data Vision allows analysts to visualize, understand and leverage the hidden relationships between data entities. This product unifies data from across systems to enable deep exploration and insights in near real-time, enabling collaborative data analysis using interactive, intuitive graph network visualizations.

These solutions, and our patented model-driven architecture, enable organizations to simplify and accelerate Enterprise AI application development, deployment, and administration. We significantly reduce the effort and complexity of the AI software engineering problem.

*Initial Public Offering and Concurrent Private Placements*

In December 2020, we completed our initial public offering, or IPO, in which we issued and sold 17,825,000 shares of our Class A common stock at $42.00 per share, which included 2,325,000 shares issued upon the exercise of the underwriters' over-

allotment option to purchase additional shares. We received net proceeds of $694.6 million after deducting underwriting discounts and other offering expenses.

We also completed a concurrent private placement immediately subsequent to the closing of the IPO, in which we issued and sold 2,380,952 and 1,190,476 shares of our Class A common stock at $42.00 per share to Spring Creek Capital LLC, an affiliate of Koch Industries, Inc., and Microsoft Corporation, respectively. We refer to these sales collectively as the Concurrent Private Placement. We received aggregate proceeds of $150.0 million and did not pay underwriting discounts with respect to the shares of Class A common stock that were sold in the Concurrent Private Placement.

*How We Generate Revenue*

We generate revenue primarily from the sale of subscriptions, which accounted for 81% and 87% of our total revenue in the three months ended October 31, 2021 and 2020, respectively, and 85% and 87% of our total revenue in the six months ended October 31, 2021 and 2020, respectively. Our cloud-native software offerings allow us to manage, update, and monitor the software regardless of whether the software is deployed in our public cloud environment, in our customers' self-managed private or public cloud environments, or in a hybrid environment. Our subscription contracts are generally non-cancelable and non-refundable.

We commonly enter into enterprise-wide agreements with entities that include multiple operating units or divisions. For the purpose of this "Management's Discussion and Analysis of Financial Condition and Results of Operations", we use the term customer to mean each distinct division, department, business unit, or group within an entity. As of October 31, 2021, we had 104 customers.

We generally invoice our customers annually in advance and primarily recognize revenue over the contract term on a ratable basis. In addition, customers typically pay a usage-based runtime fees for production use of our C3 AI Software, which is either paid in advance for specified levels of capacity or paid in arrears based on actual usage. Customers who choose to run the software in our cloud environment pay the hosting costs charged by our cloud providers. Our subscriptions also include our maintenance and support services. Additionally, we offer premium stand-ready support services through our C3 AI Center of Excellence, or COE, which are included as part of the subscription when purchased.

We also generate revenue from professional services, which consist primarily of fees associated with our implementation services for new customer deployments of certain of our C3 AI Software. Professional services revenue represented 19% and 13% of our total revenue for the three months ended October 31, 2021 and 2020, respectively, and 15% and 13% of our total revenue for the six months ended October 31, 2021 and 2020, respectively. Our professional services are provided both onsite and remotely, and can include training, application design, project management, system design, data modeling, data integration, application design, development support, data science, and application and C3 AI Software administration support. Professional services fees are based on the level of effort required to perform the specified tasks and the services are typically provided under a fixed-fee engagement with defined deliverables and a duration of less than 12 months. We recognize revenue from our professional services over the period of delivery as services are performed.

We are growing rapidly, with total revenue of $58.3 million and $110.7 million for the three and six months ended October 31, 2021, respectively, representing a 41% and 35% increase compared to the same periods last year. Our subscription revenue grew to $47.4 million and $93.5 million for the three and six months ended October 31, 2021, respectively, representing a 32% and 31% increase compared to the same periods last year.

*Go-to-Market Strategy*

Our go-to-market strategy is focused on large organizations recognized as leaders in their respective industries or public sectors, and who are attempting to solve complicated business problems by digitally transforming their operations. These large organizations, or lighthouse customers, include companies and public agencies within the oil and gas, power and utilities, aerospace and defense, industrial products, life sciences, and financial services industries, among others. This has resulted in C3 AI powering some of the largest and most complex Enterprise AI applications worldwide. These lighthouse customers serve as proof points for other potential customers in their particular industries. Today, we have a customer base of a relatively small number of large organizations that generate high average total subscription contract value, but we expect that, over time, as more customers adopt our technology based on the proof points provided by these lighthouse customers, the revenue represented by these customers will decrease as a percentage of total revenue. As our C3 AI Suite and much of our other C3 AI Software is industry agnostic, we also expect to expand into other industries as we grow.

Acquiring new customers and expanding our business with our existing customers is the intent of our go-to-market effort and drivers of our growth. Making new and existing customers successful is critical to our long-term success. After we help our customers solve their initial use cases, they typically identify incremental opportunities within their operations and expand their use of our products by either purchasing additional C3 AI Software or by subscribing to the C3 AI Suite to develop their own AI applications.

The size and sophistication of our customers' businesses demonstrate the flexibility, speed, and scale of our products, and maximize the potential value to our customers. To be a credible partner to our customers, who often are industry leaders, we deploy a motivated and highly educated team of C3 AI personnel and partners. We go-to-market primarily leveraging our direct sales force. We also complement and supplement our sales force with a number of go-to-market partners.

- *Industry Partners.* We have developed an alliance program to partner with recognized leaders in their respective industries, such as Baker Hughes, Fidelity National Information Services, or FIS, and Raytheon, to develop, market, and sell solutions that are natively built on or tightly integrated with the C3 AI Suite.

- *Consulting and Services Partners.* We partner with a number of systems integrators specializing in Enterprise AI implementations.

- *Hyperscale Cloud and Infrastructure.* We have formed global strategic go-to-market alliances with hyperscale cloud providers including Amazon, FIS, Google, and Microsoft. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology. These partners include Hewlett Packard Enterprise and Intel. These partners supply infrastructure solutions, data management and processing services, or hardware and networking devices (e.g., IoT gateways) to support C3.ai product implementations and complement C3 AI's products.

- *Independent Software Vendors.* We partner with Independent Software Vendors who develop, market, and sell application solutions that are natively built on or tightly integrated with the C3 AI Suite.

**Key Business Metric**

We monitor remaining performance obligations, or RPO, as a key metric to help us evaluate the health of our business, identify trends affecting our growth, formulate goals and objectives, and make strategic decisions. RPO is not necessarily indicative of future revenue growth because it does not account for the timing of customers' consumption or their consumption of more than their contracted capacity. Moreover, RPO is influenced by several factors, including the timing of renewals, the timing of purchases of additional capacity, average contract terms, and seasonality. Due to these factors, it is important to review RPO in conjunction with revenue and other financial metrics disclosed elsewhere in this Quarterly Report on Form 10-Q. RPO was $465.5 million and $293.8 million as of October 31, 2021 and April 30, 2021, respectively. We may experience variations in our RPO from period to period, but RPO has generally increased over the long term as a result of contracts with new customers and increasing the value of contracts with existing customers. These increases are partially offset by revenue recognized on existing contracts during the period.

RPO represents the amount of our contracted future revenue that has not yet been recognized, including both deferred revenue and non-cancelable contracted amounts that will be invoiced and recognized as revenue in future periods. Our RPO as of October 31, 2021 is comprised of $72.9 million related to deferred revenue and $392.6 million of commitments from non-cancellable contracts. Our RPO as of April 30, 2021 is comprised of $75.2 million related to deferred revenue and $218.6 million of commitments from non-cancellable contracts.

RPO excludes amounts related to performance obligations and usage-based royalties that are billed and recognized as they are delivered. This primarily consists of monthly usage-based runtime and hosting charges in the duration of some revenue contracts. RPO also excludes any future resale commitments by our strategic partners until those end customer contracts are signed. Cancellable backlog, not included in RPO, was $63.8 million and $51.3 million as of October 31, 2021 and April 30, 2021, respectively.

**Factors Affecting Our Performance**

We believe that our future success and financial performance depend on a number of factors that present significant opportunities for our business but also pose risks and challenges, including those discussed below and in the section of this

Quarterly Report on Form 10-Q in Part II, Item 1A titled "Risk Factors", that we must successfully address to sustain our growth, improve our results of operations, and establish and maintain profitability.

*Customer Acquisition, Retention, and Expansion*

We are focused on continuing to grow our customer base, retaining existing customers and expanding customers' usage of our C3 AI Software by addressing new use cases across multiple departments and divisions, adding users, and developing and deploying additional applications. All of these factors increase the adoption and relevance of our C3 AI Software to our customers' business and, as an outcome, increases their runtime usage.

We have built a customer-focused culture and have implemented proactive programs and processes designed to drive customer success. These include a robust customer support and success function. For example, as part of our subscription offerings, we provide our customers with the ability to establish a COE, accessing our experienced and specialized resources in key technical areas like application development, data integration, and data science to accelerate and ensure our customers' success developing applications on our C3 AI Suite. We closely monitor the health and status of every customer account through multiple activities, including real-time monitoring, daily and weekly reports to management, as well as quarterly reviews with our customers.

We also intend to attract new customers across multiple industries where we have limited meaningful presence today, yet represent very large market opportunities such as telecommunications, pharmaceuticals, smart cities, transportation, and healthcare, among others.

Historically, we have had a relatively small number of customers with large total subscription contract values. As a result, revenue growth can vary significantly based on the timing of customer acquisition, changes in product mix, and contract durations, renewals, or terminations. We expect the number of customers to increase compared to prior fiscal years as organizations address the importance of digital transformation. The average total subscription contract value as well as the revenue represented by our lighthouse customers as a percentage of total revenue is decreasing and we expect them to continue to decrease as we have restructured our sales organization and expanded our market-partner ecosystem to effectively address small, medium, and large enterprise sales opportunities.

*Technology Innovation*

We intend to continue to invest in our research and development capabilities to extend our C3 AI Software, to expand within existing accounts, and to gain new customers. Our investments in research and development drive core technology innovation and bring new products to market. Our model-driven architecture enables us and our customers to rapidly address new use cases by building new applications and extending and enhancing the features and functionality of current C3 AI Software. By investing to make it easier to develop applications on our C3 AI Suite, our customers have become active developers. With our support, our customers have developed and deployed almost two-thirds of the applications currently in production and running on the C3 AI Suite. Research and development spending has fueled enhancements to our existing C3 AI Suite.

We expect to maintain high levels of investment in product innovation over the coming years as we continue to introduce new applications which address new industry use cases, and new features and functionality for the C3 AI Software. As our business scales over a longer-term horizon, we anticipate research and development spend as a percent of total revenue to decline.

*Brand Awareness*

We believe we are in the early stages of a large and expanding new market for AI enabled digital transformation. As a result, we intend to continue to invest in brand awareness, market education, and thought leadership. We engage the market through digital, radio, outdoor, airport, and print advertising; virtual and physical events, including our C3 AI Transform annual customer conference; and C3 AI Live, a series of livestreamed events featuring C3 AI customers, C3 AI partners, and C3 AI experts in AI, machine learning, and data science.

We anticipate continuing to make significant investments in marketing over the next several years. Over the long term we expect marketing spend to decline as a percent of total revenue as we make ongoing progress establishing C3 AI's brand and reputation and as our business scales.

*Grow Our Go-to-Market and Partnership Ecosystem*

In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, Infor, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our C3 AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our C3 AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3 AI technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts. We intend to grow the business we do with each partner and to add more partners as we expand the vertical markets we serve. We also offer revenue generating trials of our applications as part of our customer acquisition strategy.

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our C3 AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively. Baker Hughes revenue commitments were inclusive of their direct subscription fees of $39.5 million per year with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization. During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement. This arrangement was revised in June 2020 to extend the term by an additional two years, for a total of five years, with an expiration date in the fiscal year ending April 30, 2024 and to modify the annual amount of Baker Hughes' commitments to $53.3 million, $75.0 million, $125.0 million, and $150.0 million, over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. We are obligated to pay Baker Hughes a sales commission on subscriptions to our products and services offerings it resells in excess of these minimum revenue commitments.

We and Baker Hughes further revised these agreements in October 2021 to extend the term by an additional year, for a total of six years, with an expiration date in the fiscal year ending April 30, 2025, to modify the amount of Baker Hughes' annual commitments to $85.0 million in fiscal year 2023, $110.0 million in fiscal year 2024, and $125.0 million in fiscal year 2025, and to revise the structure of the arrangement to further incentivize Baker Hughes' sales of our products and services. Beginning in fiscal year 2023, Baker Hughes' annual commitments will be reduced by any revenue that Baker Hughes generates from certain customers. The revenue generated by Baker Hughes will be reviewed quarterly and adjusted, as needed, to reflect the our current assumptions. As part of these revised agreements, we also acknowledged that Baker Hughes had met its minimum annual revenue commitment for fiscal year 2022 and earned a sales commission of $16.0 million for fiscal year 2022.

Pursuant to the revised arrangement, we acknowledged that Baker Hughes had met its minimum annual revenue commitment for the current fiscal year and recognized $16.0 million of sales commission as deferred costs during the fiscal quarter ended October 31, 2021 related to this arrangement, which will be amortized over an expected period of five years.

Our RPO related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $18.7 million related to deferred revenue and $282.3 million of commitments from non-cancellable contracts as of October 31, 2021 and $8.5 million related to deferred revenue and $95.5 million from non-cancellable contracts as of April 30, 2021.

As of October 31, 2021, the total estimated amount of Baker Hughes' commitments not yet contracted under the direct subscription fee or reseller arrangement under the entire arrangement was $23.7 million.

As of July 31, 2021 and April 30, 2021, the total remaining amount of Baker Hughes' minimum revenue commitments not yet contracted under the direct subscription fee or reseller arrangement, and thus subject to the shortfall annual provisions, under the entire arrangement was $204.4 million and $219.3 million, respectively.

*International Expansion*

The international market opportunity for Enterprise AI software is large and growing, and we believe there is a significant opportunity to continue to grow our international customer base. We believe that the demand for our C3 AI Software will continue growing as international awareness of the benefits of digital transformation and Enterprise AI software grows. We plan to continue to make investments to expand geographically by increasing our direct sales team in international markets and supplementing the direct sales effort with strategic partners to significantly expand our reach and market coverage. We derived approximately 25% and 34% of our total revenue for the three months ended October 31, 2021 and 2020, respectively, and 28% and 32% of our total revenue for the six months ended October 31, 2021 and 2020, respectively, from international customers.

**Impact of COVID-19**

The ongoing COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our business, results of operations, cash flows, and financial condition will depend on future developments that are uncertain. As a result of global business disruption, the COVID-19 pandemic had a significant adverse impact on our conclusion of new and additional business agreements in 2021 and 2020 and may continue to pose challenges until the effects of the pandemic abate.

As a result of the COVID-19 pandemic, we temporarily closed our headquarters and other offices, required our employees and contractors to work remotely, and implemented travel restrictions, all of which represented a significant change in how we operate our business. The operations of our partners and customers have likewise been altered. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, such as the extent and effectiveness of containment actions, the emergence and spread of current and future variants of the COVID-19 virus, and the effectiveness, acceptance, and availability of vaccines against the COVID-19 virus and its variants, the COVID-19 pandemic has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic are likely to affect the rate of global IT spending and could adversely affect demand for our C3 AI Software, lengthen our sales cycles, reduce the value or duration of subscriptions, reduce the level of subscription renewals, negatively impact collections of accounts receivable, reduce expected spending from new customers, cause some of our paying customers to go out of business, limit the ability of our direct sales force to travel to customers and potential customers, and affect contraction or attrition rates of our paying customers, all of which could adversely affect our business, results of operations, and financial condition during fiscal 2022 and potentially future periods.

We will continue to evaluate the nature and extent of the impact of the COVID-19 pandemic on our business. For further discussion of the potential impacts of the ongoing COVID-19 pandemic on our business, operating results, and financial condition, see the section titled "Risk Factors" included in Part II, Item 1A of this Quarterly Report on Form 10-Q. Other factors affecting our performance are discussed below, although we caution you that the ongoing COVID-19 pandemic may also further impact these factors.

**Components of Results of Operations**

*Revenue*

*Subscription Revenue.* Our subscription revenue is primarily comprised of term licenses, stand-ready COE support services, trials of our applications, and software-as-a-service offerings. Sales of our term licenses grant our customers the right to use our software, either on their own cloud instance or their internal hardware infrastructure, over the contractual term. We also offer a premium stand-ready service through our COE. Sales of our software-as-a-service offerings include a right to use our software over the contractual term. Our subscription contracts are generally non-cancelable and non-refundable, with the majority of contracts with customers averaging approximately three years in duration. We generally invoice annually in advance and recognize revenue over the contract term on a ratable basis. In addition, customers pay a usage-based runtime fee for our C3 AI Software, which is either paid in advance for specified levels of capacity and/or paid in arrears based on actual usage. Our subscriptions also include our maintenance and support services. Our maintenance and support services include critical and continuous updates to the software that are integral to maintaining the intended utility of the software over the

34

contractual term. Our software subscriptions and maintenance and support services are highly interdependent and interrelated and represent a single distinct performance obligation within the context of the contract. We currently have a small number of public utility customers that license our offerings under a perpetual license model, and we expect that may continue for the foreseeable future for certain customers due to their specific contracting requirements.

*Professional Services Revenue.* Our professional services revenue primarily includes implementation services, training and prioritized engineering services. We offer a complete range of professional service support both onsite and remotely, including training, application design, project management, system design, data modeling, data integration, application design, development support, data science, and application and C3 AI Software administration support. Professional services fees are based on the level of effort required to perform the specified tasks and are typically a fixed-fee engagement with defined deliverables and a duration of less than 12 months. We recognize revenue for our professional services over the period of delivery as services are performed.

*Cost of Revenue*

*Cost of Subscription Revenue.* Cost of subscription revenue consists primarily of costs related to compensation, including salaries, bonuses, benefits, stock-based compensation and other related expenses for the production environment, support and COE staff, hosting of our C3 AI Software, including payments to outside cloud service providers, and allocated overhead and depreciation for facilities.

*Cost of Professional Services Revenue.* Cost of professional services revenue consists primarily of compensation, including salaries, bonuses, benefits, stock-based compensation and other related costs associated with our professional service personnel, third-party system integration partners, and allocated overhead and depreciation for facilities.

*Gross Profit and Gross Margin*

Gross profit is total revenue less total cost of revenue. Gross margin is gross profit expressed as a percentage of total revenue. Our gross margin has fluctuated historically and may continue to fluctuate from period to period based on a number of factors, including the timing and mix of the product offerings we sell as well as the geographies into which we sell, in any given period. Our gross margins are lower when we provide hosting services to our customers as compared to when a customer hosts our software in their self-managed private or public cloud environments. Our subscription gross margin may experience variability over time as we continue to invest and continue to scale our business. Our professional services gross margin may also experience variability from period to period due to the use of our own resources and third-party system integration partners in connection with the performance of our fixed price agreements.

*Operating Expenses*

Our operating expenses consist of sales and marketing, research and development, and general and administrative expenses. We expect our operating expenses as a percentage of total revenue to increase as we continue to invest to grow our business. Over the long-term, we expect those percentages to stabilize and then move lower as our business matures.

*Sales and Marketing.* Sales and marketing expenses consist of expenditures related to advertising, media, marketing, promotional events, brand awareness activities, business development, customer success and corporate partnerships. Sales and marketing expenses also include employee-related costs, including salaries, bonuses, benefits, stock-based compensation, and commissions for our employees engaged in sales and marketing activities, and allocated overhead and depreciation for facilities.

We expect our sales and marketing expenses will increase in absolute dollar amounts as we continue to invest in brand awareness and programmatic spend to generate demand. We also expect to hire additional sales personnel to increase sales coverage of target industry vertical and geographic markets. Consequently, sales and marketing expense as a percent of total revenue will remain high in the near-term. As our business scales through customer expansion and market awareness, we anticipate that sales and marketing expense as a percent of total revenue to decline over time.

*Research and Development.* Our research and development efforts are aimed at continuing to develop and refine our C3 AI Software, including adding new features and modules, increasing functionality and speed, and enhancing the usability of our C3 AI Software. Research and development expenses consist primarily of employee-related costs, including salaries, bonuses, benefits, and stock-based compensation for our employees associated with research and development related activities.

35

Research and development expenses also include cloud infrastructure costs related to our research and development efforts, and allocated overhead and depreciation for facilities. Research and development costs are expensed as incurred.

We expect research and development expense to increase in absolute dollars as we continue to invest in our existing and future product offerings. We may experience variations from period to period with our total research and development expense as a percentage of revenue as we develop and deploy new applications targeting new use cases and new industries. Over a longer horizon, we anticipate that research and development expense as a percent of total revenue to decline.

*General and Administrative.* General and administrative expense consists primarily of employee-related costs, including salaries, bonuses, benefits, stock-based compensation and other related costs associated with administrative services such as executive management and administration, legal, human resources, accounting, and finance. General and administrative expense also includes facilities costs, such as depreciation and rent expense, professional fees, and other general corporate costs, including allocated overhead and depreciation for facilities.

We expect our general and administrative expense to increase in absolute dollars as we continue to grow our business. As a result of the closing of our IPO, we have incurred and expect to continue to incur additional expenses as a result of operating as a public company, including expenses necessary to comply with the rules and regulations applicable to companies listed on a national securities exchange and related to compliance and reporting obligations pursuant to the rules and regulations of the SEC, as well as higher expenses for general and director and officer insurance, investor relations, and professional services. We expect that general and administrative expense as a percent of total revenue will decline over the long-term as we benefit from the scale of our business infrastructure.

### Interest Income

Interest income consists primarily of interest income earned on our cash, cash equivalents, and available-for-sale marketable securities. It also includes amortization of premiums and accretion of discount related to our available-for-sale marketable securities. Interest income varies each reporting period based on our average balance of cash, cash equivalents, and available-for-sale marketable securities during the period and market interest rates.

### Other (Expense) Income, Net

Other (expense) income, net consists primarily of foreign currency exchange gains and losses, losses from impairment of investments, and realized gains and losses on sales of available-for-sale marketable securities. Our foreign currency exchange gains and losses relate to transactions and asset and liability balances denominated in currencies other than the U.S. dollar. We expect our foreign currency gains and losses to continue to fluctuate in the future due to changes in foreign currency exchange rates.

### Provision for Income Taxes

Our income tax provision consists of an estimate of federal, state, and foreign income taxes based on enacted federal, state, and foreign tax rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in the valuation of our deferred tax assets and liabilities, and changes in tax laws. We maintain a full valuation allowance on our federal and state deferred tax assets as we have concluded that it is not more likely than not that the deferred tax assets will be realized.

**Results of Operations**

The following tables set forth our condensed consolidated statements of operations for the periods presented:

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| | (in thousands) | | (in thousands) | |
| Revenue | | | | |
| Subscription | $ 47,408 | $ 35,854 | $ 93,530 | $ 71,549 |
| Professional services | 10,855 | 5,487 | 17,139 | 10,275 |
| Total revenue | 58,263 | 41,341 | 110,669 | 81,824 |
| Cost of revenue | | | | |
| Subscription [1] | 11,392 | 7,084 | 20,605 | 15,671 |
| Professional services [1] | 4,579 | 2,997 | 8,391 | 4,909 |
| Total cost of revenue | 15,971 | 10,081 | 28,996 | 20,580 |
| Gross profit | 42,292 | 31,260 | 81,673 | 61,244 |
| Operating expenses | | | | |
| Sales and marketing [1] | 46,166 | 22,088 | 82,988 | 36,446 |
| Research and development [1] | 36,523 | 16,134 | 63,235 | 29,398 |
| General and administrative [1] | 15,279 | 7,562 | 27,643 | 13,249 |
| Total operating expenses | 97,968 | 45,784 | 173,866 | 79,093 |
| Loss from operations | (55,676) | (14,524) | (92,193) | (17,849) |
| Interest income | 322 | 288 | 667 | 868 |
| Other (expense) income, net | (1,372) | (578) | (2,271) | 2,440 |
| Net loss before provision for income taxes | (56,726) | (14,814) | (93,797) | (14,541) |
| Provision for income taxes | 13 | 130 | 401 | 253 |
| Net loss | $ (56,739) | $ (14,944) | $ (94,198) | $ (14,794) |

[1] Includes stock-based compensation expense as follows:

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| | (in thousands) | | (in thousands) | |
| Cost of subscription | $ 2,364 | $ 159 | $ 3,185 | $ 343 |
| Cost of professional services | 685 | 89 | 1,287 | 137 |
| Sales and marketing | 13,555 | 2,190 | 19,690 | 3,045 |
| Research and development | 10,256 | 648 | 13,014 | 1,106 |
| General and administrative | 5,680 | 2,115 | 9,276 | 3,050 |
| Total stock-based compensation expense | $ 32,540 | $ 5,201 | $ 46,452 | $ 7,681 |

The following table sets forth our condensed consolidated statements of operations data expressed as a percentage of revenue for the periods indicated:

| | Three Months Ended October 31, | | Six Months Ended October 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Revenue | | | | |
| Subscription | 81 % | 87 % | 85 % | 87 % |
| Professional services | 19 | 13 | 15 | 13 |
| Total revenue | 100 | 100 | 100 | 100 |
| Cost of revenue | | | | |
| Subscription | 20 | 17 | 19 | 19 |
| Professional services | 8 | 7 | 8 | 6 |
| Total cost of revenue | 27 | 24 | 26 | 25 |
| Gross profit | 73 | 76 | 74 | 75 |
| Operating expenses | | | | |
| Sales and marketing | 79 | 53 | 75 | 45 |
| Research and development | 63 | 39 | 57 | 36 |
| General and administrative | 26 | 18 | 25 | 16 |
| Total operating expenses | 168 | 110 | 157 | 97 |
| Loss from operations | (96) | (34) | (83) | (22) |
| Interest income | 1 | 1 | 1 | 1 |
| Other (expense) income, net | (2) | (1) | (2) | 3 |
| Net loss before provision for income taxes | (97) | (34) | (85) | (18) |
| Provision for income taxes | — | — | — | — |
| Net loss | (97)% | (34)% | (85)% | (18)% |

***Comparison of the Three and Six Months Ended October 31, 2021 and 2020***

*Revenue*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
| Revenue | | | | | | | | |
| Subscription | $ 47,408 | $ 35,854 | $ 11,554 | 32 % | $ 93,530 | $ 71,549 | $ 21,981 | 31 % |
| Professional services | 10,855 | 5,487 | 5,368 | 98 % | 17,139 | 10,275 | 6,864 | 67 % |
| Total revenue | $ 58,263 | $ 41,341 | $ 16,922 | 41 % | $ 110,669 | $ 81,824 | $ 28,845 | 35 % |

Subscription revenue accounted for 81% and 87% of our total revenue for the three months ended October 31, 2021 and 2020, respectively. Subscription revenue increased by $11.6 million, or 32%, for the three months ended October 31, 2021, compared to the same period last year, predominantly driven by revenue growth of $11.6 million from new customers or expanding relationships with existing C3 AI customers.

Subscription revenue accounted for 85% and 87% of our total revenue for the six months ended October 31, 2021 and 2020, respectively. Subscription revenue increased by $22.0 million, or 31%, for the six months ended October 31, 2021, compared to the same period last year, predominantly driven by revenue growth of $22.0 million from new customers or expanding relationships with existing C3 AI customers.

Professional services revenue increased by $5.4 million, or 98%, for the three months ended October 31, 2021, compared to the same period last year, predominantly due to the timing and mix of implementation services projects for new and existing C3 AI customers.

Professional services revenue increased by $6.9 million, or 67%, for the six months ended October 31, 2021, compared to the same period last year, predominantly due to the timing and mix of implementation services projects for new and existing C3 AI customers.

*Cost of Revenue*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Cost of revenue | | | | | | | | |
| Subscription | $ 11,392 | $ 7,084 | $ 4,308 | 61 % | $ 20,605 | $ 15,671 | $ 4,934 | 31 % |
| Professional services | 4,579 | 2,997 | 1,582 | 53 % | 8,391 | 4,909 | 3,482 | 71 % |
| Total cost of revenue | $ 15,971 | $ 10,081 | $ 5,890 | 58 % | $ 28,996 | $ 20,580 | $ 8,416 | 41 % |

The increase in cost of subscription revenue for the three months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel related costs of $3.7 million, and higher third-party outsourcing costs of $1.0 million, partially offset by lower overhead costs of $0.2 million.

The increase in cost of subscription revenue for the six months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel related costs of $3.9 million, and higher third-party outsourcing costs of $1.8 million, partially offset by lower overhead costs of $0.7 million.

The increase in cost of professional services revenue for the three months ended October 31, 2021 compared to the same period last year was primarily due to higher third-party outsourcing costs of $0.9 million, and higher overhead costs of $0.6 million.

The increase in cost of professional services revenue for the six months ended October 31, 2021 compared to the same period last year was primarily due to higher third-party outsourcing costs of $1.8 million, higher overhead costs of $1.2 million, and higher personnel-related costs of $0.6 million.

*Gross Profit and Gross Margin*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Gross profit | $ 42,292 | $ 31,260 | $ 11,032 | 35 % | $ 81,673 | $ 61,244 | $ 20,429 | 33 % |
| Gross margin | | | | | | | | |
| Subscription | 76 % | 80 % | | | 78 % | 78 % | | |
| Professional services | 58 % | 45 % | | | 51 % | 52 % | | |
| Total gross margin | 73 % | 76 % | | | 74 % | 75 % | | |

The increases in gross profit was primarily driven by revenue growth from new and existing contracts. Overall, total gross margins decreased for the three and six months ended October 31, 2021 compared to the same periods last year, due to higher personnel-related costs.

39

*Operating Expenses*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Operating expenses | | | | | | | | |
| Sales and marketing | $ 46,166 | $ 22,088 | $ 24,078 | 109 % | $ 82,988 | $ 36,446 | $ 46,542 | 128 % |
| Research and development | 36,523 | 16,134 | 20,389 | 126 % | 63,235 | 29,398 | 33,837 | 115 % |
| General and administrative | 15,279 | 7,562 | 7,717 | 102 % | 27,643 | 13,249 | 14,394 | 109 % |
| Total operating expenses | $ 97,968 | $ 45,784 | $ 52,184 | 114 % | $ 173,866 | $ 79,093 | $ 94,773 | 120 % |

*Sales and Marketing.* The increase in sales and marketing expense for the three months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel-related costs as a result of headcount growth of $14.7 million, and higher advertising spend of $8.6 million.

The increase in sales and marketing expense for the six months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel-related costs as a result of headcount growth of $25.1 million, and higher advertising spend of $19.7 million.

*Research and Development.* The increase in research and development expense for the three months ended October 31, 2021 compared to the same period last year was primarily due higher personnel-related costs as a result of headcount growth of $15.3 million, higher C3.ai DTI contributions of $1.6 million, and higher cloud computing costs of $0.5 million.

The increase in research and development expense for the six months ended October 31, 2021 compared to the same period last year was primarily due higher personnel-related costs as a result of headcount growth of $23.2 million, higher C3.ai DTI contributions of $4.5 million, and higher cloud computing costs of $1.5 million.

*General and Administrative.* The increase in general and administrative expense for the three months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel-related costs as a result of headcount growth of $4.5 million, and higher corporate insurance costs of $1.8 million.

The increase in general and administrative expense for the six months ended October 31, 2021 compared to the same period last year was primarily due to higher personnel-related costs as a result of headcount growth of $8.7 million, higher corporate insurance costs of $3.6 million, and higher professional services costs of $0.7 million.

*Interest Income*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Interest income | $ 322 | $ 288 | $ 34 | 12 % | $ 667 | $ 868 | $ (201) | (23)% |

The increase in interest income for the three months ended October 31, 2021 compared to the same period last year was primarily due to increase in volume of investments, offset by investments that yielded lower returns such as money market funds and government securities.

The decrease in interest income for the six months ended October 31, 2021 compared to the same period last year was primarily due to investments that yielded lower returns such as money market funds and government securities.

*Other (Expense) Income, Net*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Other (expense) income, net | $ (1,372) | $ (578) | $ (794) | 137 % | $ (2,271) | $ 2,440 | $ (4,711) | (193)% |

40

The decrease in other (expense) income, net for the three months ended October 31, 2021 compared to the same period last year was due to foreign currency losses on the remeasurement of Euro-denominated cash and accounts receivable balances.

The decrease in other (expense) income, net for the six months ended October 31, 2021 compared to the same period last year was due to foreign currency losses on the remeasurement of Euro-denominated cash and accounts receivable balances.

*Provision for Income Taxes*

| | Three Months Ended October 31, | | | | Six Months Ended October 31, | | | |
| | 2021 | 2020 | $ Change | % Change | 2021 | 2020 | $ Change | % Change |
| | (in thousands) | | | | (in thousands) | | | |
|---|---|---|---|---|---|---|---|---|
| Provision for income taxes | $ 13 | $ 130 | $ (117) | (90)% | $ 401 | $ 253 | $ 148 | 58 % |

The change in provision for the six months ended October 31, 2021 compared with the same period last year was primarily related to foreign and state tax expense.

## Non-GAAP Financial Measure

In addition to our financial results determined in accordance with generally accepted accounting principles in the United States, or GAAP, we believe free cash flow, a non-GAAP financial measure, is useful in evaluating liquidity and provides information to management and investors about our ability to fund future operating needs and strategic initiatives. We calculate free cash flow as net cash provided by operating activities less purchases of property and equipment and capitalized software development costs. Free cash flow has limitations as an analytical tool, and it should not be considered in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities. This non-GAAP financial measure may be different than similarly titled measures used by other companies. Additionally, the utility of free cash flow is further limited as it does not represent the total increase or decrease in our cash balances for a given period. The following table provides a reconciliation of free cash flow to the GAAP measure of net cash provided by operating activities for the periods presented.

| | Six Months Ended October 31, | |
| | 2021 | 2020 |
| | (in thousands) | |
|---|---|---|
| Net cash (used in) provided by operating activities | $ (17,876) | $ 18,836 |
| Less: | | |
| Purchases of property and equipment | (1,429) | (919) |
| Capitalized software development costs | (500) | — |
| Free cash flow | $ (19,805) | $ 17,917 |
| Net cash provided by investing activities | $ 70,849 | $ 34,849 |
| Net cash provided by financing activities | $ 11,200 | $ 28,214 |

## Liquidity and Capital Resources

Since inception, we have financed operations primarily through sales generated from our customers and sales of equity securities. As of October 31, 2021 and April 30, 2021, we had $167.4 million and $115.4 million of cash and cash equivalents and $803.0 million and $978.0 million of investments, respectively, which were held for working capital purposes. In December 2020, we completed our IPO, which resulted in aggregate net proceeds of $694.6 million, after underwriting discounts and other offering expenses. We also received aggregate proceeds of $150.0 million related to our Concurrent Private Placement and did not pay any underwriting discounts or commissions with respect to the shares that were sold in these private placements. Our investments generally consist of high-grade U.S. treasury securities, certificates of deposit, U.S. government agency securities, commercial paper and corporate debt securities. We have generated operating losses from our operations as reflected in our accumulated deficit of $443.5 million as of October 31, 2021. We expect to continue to incur operating losses and may generate negative cash flows from operations for the foreseeable future due to the investments we intend to make in our business, and as a result we may require additional capital to execute on our strategic initiatives to grow the business.

We believe that existing cash and cash equivalents and investments will be sufficient to support working capital and capital expenditure requirements for at least the next 12 months. Our principal uses of cash in recent periods have been funding our operations and investing in capital expenditures. Our future capital requirements will depend on many factors, including our revenue growth rate, the timing and the amount of cash received from customers, the expansion of sales and marketing activities, the timing and extent of spending to support development efforts, expenses associated with our international expansion, the introduction of C3 AI Software enhancements, and the continuing market adoption of our C3 AI Software. In the future, we may enter into arrangements to acquire or invest in complementary businesses, products, and technologies. We may be required to seek additional equity or debt financing. If we require additional financing, we may not be able to raise such financing on terms acceptable to us or at all. If we are unable to raise additional capital or generate cash flows necessary to expand our operations and invest in continued innovation, we may not be able to compete successfully, which would harm our business, results of operations, and financial condition.

The following table summarizes our cash flows for the periods presented:

| | Six Months Ended October 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| | (in thousands) | |
| Cash (used in) provided by operating activities | $ (17,876) | $ 18,836 |
| Cash provided by investing activities | $ 70,849 | $ 34,849 |
| Cash provided by financing activities | $ 11,200 | $ 28,214 |
| Net increase in cash, cash equivalents, and restricted cash | $ 64,173 | $ 81,899 |

*Operating Activities.* Net cash used in operating activities of $17.9 million for the six months ended October 31, 2021 was due to our net loss of $94.2 million in addition to non-cash charges for stock-based compensation of $46.5 million, depreciation and amortization of $2.4 million, and non-cash operating lease cost of $1.1 million. The $26.9 million cash inflow related to changes in operating assets and liabilities was primarily attributable to a decrease in accounts receivable of $39.0 million inclusive of an increase in related party balances of $5.8 million, and an increase in other liabilities of $13.6 million. This was partially offset by cash outflows related to an increase in prepaid expenses, other current assets and other assets of $15.1 million, a decrease to accrued compensation and employee benefits of $5.4 million, a decrease to deferred revenue of $2.3 million inclusive of an increase in related party balances of $9.8 million, a decrease in accounts payable of $1.7 million, and a decrease in lease liabilities of $1.2 million.

Net cash provided by operating activities of $18.8 million for the six months ended October 31, 2020 was due to our net loss of $14.8 million in addition to non-cash charges for stock-based compensation of $7.7 million, depreciation and amortization of $2.1 million, and non-cash operating lease cost of $1.7 million. The $22.3 million cash inflow related to changes in operating assets and liabilities was primarily attributable to an increase to deferred revenue of $21.7 million inclusive of an increase in related party balances of $14.8 million, an increase in other liabilities of $2.3 million, an increase in accounts payable of $3.2 million and a decrease in prepaid expenses, other current assets and other assets of $0.1 million. This was partially offset by cash outflows related to an increase in accounts receivable of $2.4 million inclusive of an increase in related party balances of $0.2 million, a decrease in lease liabilities of $1.7 million and decrease to accrued compensation and employee benefits of $0.7 million.

*Investing Activities.* Net cash provided by investing activities of $70.8 million for the six months ended October 31, 2021 was primarily attributable to the maturities and sales of investments of $461.6 million, partially offset by purchases of investments of $388.9 million and capital expenditures of $1.9 million.

Net cash provided by investing activities of $34.8 million for the six months ended October 31, 2020 was primarily attributable to the maturity and sale of short-term investments of $164.1 million, partially offset by purchases of investments of $128.3 million and capital expenditures of $0.9 million.

*Financing Activities.* Net cash provided by financing activities of $11.2 million during the six months ended October 31, 2021 was primarily due to $11.3 million of proceeds from the exercise of stock options for Class A common stock.

Net cash provided by financing activities of $28.2 million during the six months ended October 31, 2020 was primarily due to $26.0 million of proceeds from the repayment of our stockholder loan due from our Chief Executive Officer, which was in

connection with the Series F preferred stock financing, and $4.5 million of proceeds from the exercise of stock options for Class B common stock, partially offset by the payment of deferred offering costs related to our IPO of $2.3 million.

**Contractual Obligations and Commitments**

Our contractual obligations and commitments primarily consist of operating lease commitments for our facilities and non-cancelable purchase commitments related to third-party cloud hosting services.

For additional information, refer to *Note 6. Commitments and Contingencies* to our unaudited condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q. There has been no material change in our contractual obligations and commitments other than in the ordinary course of business since our fiscal year ended April 30, 2021. See our Annual Report on Form 10-K for the fiscal year ended April 30, 2021, which was filed with the SEC on June 25, 2021, for additional information regarding our contractual obligations.

**Critical Accounting Policies and Estimates**

Our unaudited condensed consolidated financial statements and the accompanying notes thereto included elsewhere in this Quarterly Report on Form 10-Q are prepared in accordance with GAAP. The preparation of condensed consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs and expenses, and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results could differ significantly from our estimates. To the extent that there are differences between our estimates and actual results, our future financial statement presentation, financial condition, results of operations, and cash flows will be affected.

There have been no material changes to our critical accounting policies and estimates as compared to the critical accounting policies and estimates discussed in the Annual Report on Form 10-K for the fiscal year ended April 30, 2021, which was filed with the SEC on June 25, 2021.

**Recently Adopted Accounting Pronouncements**

See *Note 1. Summary of Business and Significant Accounting Policies* to our unaudited condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q for more information regarding recently issued accounting pronouncements.

**Emerging Growth Company Status**

In April 2012, the Jumpstart Our Business Startups Act, or the JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" may take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. Therefore, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to use the extended transition period under the JOBS Act until the earlier of the date we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our condensed consolidated financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Based on the market value of our Class A common stock held by non-affiliates as of the last business day of our fiscal second quarter ended October 31, 2021, we will cease to be an emerging growth company as of April 30, 2022 and will no longer be able to take advantage of these various exemptions.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of fluctuations in foreign currency exchange rates and interest rates. We do not hold or issue financial instruments for trading purposes.

*Interest Rate Risk*

As of October 31, 2021, we had cash, cash equivalents, and investments of $1.1 billion. As of April 30, 2021, we had cash, cash equivalents, and investments of $1.1 billion. Interest-earning instruments carry a degree of interest rate risk. We do not enter into investments for trading or speculative purposes and have not used any derivative financial instruments to manage our interest rate risk exposure. As of October 31, 2021, a hypothetical 10% relative change in interest rates would not have had a material impact on the value of our cash equivalents or investment portfolio. Any realized gains or losses resulting from such interest rate changes would only occur if we sold the investments prior to maturity.

*Foreign Currency Risk*

Our functional currency is the U.S. dollar. For the three months ended October 31, 2021 and 2020, approximately 17% and 28%, respectively, and for the six months ended October 31, 2021 and 2020, approximately 17% and 26%, respectively of our sales were denominated in euros, respectively, and therefore our revenue, accounts receivable, and cash deposits are subject to foreign currency risk. Our foreign operating expenses are denominated in the local currencies of the countries in which we operate. Our condensed consolidated results of operations and cash flows are, therefore, subject to fluctuations due to changes in foreign currency exchange rates and may be adversely affected in the future due to changes in foreign exchange rates. A hypothetical 10% change in foreign currency exchange rates may result in a material impact on our unaudited condensed consolidated financial statements. To date, we have not had a formal hedging program with respect to foreign currencies, but we may do so in the future if our exposure to foreign currencies should become more significant. As our international operations grow, we will continue to reassess our approach to manage our risk relating to fluctuations in currency rates.

44

**ITEM 4. CONTROLS AND PROCEDURES**

*Evaluation of Disclosure Controls and Procedures*

Our management, including our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable assurance that the objectives of the disclosure controls and procedures are met. Based on such evaluation, our management, including our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective at the reasonable assurance level.

*Changes in Internal Controls*

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Inherent Limitations on Effectiveness of Controls*

The effectiveness of any system of internal control over financial reporting, including ours, is subject to inherent limitations, including the exercise of judgment in designing, implementing, operating, and evaluating the controls and procedures, and the inability to eliminate misconduct completely. Accordingly, in designing and evaluating the disclosure controls and procedures, management recognizes that any system of internal control over financial reporting, including ours, no matter how well designed and operated, can only provide reasonable, not absolute assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs. Moreover, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. We intend to continue to monitor and upgrade our internal controls as necessary or appropriate for our business, but cannot assure you that such improvements will be sufficient to provide us with effective internal control over financial reporting.

# PART II. OTHER INFORMATION

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we may become involved in legal proceedings relating to claims arising from the ordinary course of business. Our management believes that there are currently no claims or actions pending against us, the ultimate disposition of which could have a material adverse effect on our results of operations, financial condition or cash flows.

For additional information on legal proceedings, refer to *Note 6. Commitments and Contingencies—Legal Proceedings* in our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q.

**ITEM 1A. RISK FACTORS**

*You should consider carefully the risks and uncertainties described below, together with all of the other information in this Quarterly Report on Form 10-Q, including the section titled "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations" and our condensed consolidated financial statements and related notes. Our business, results of operations, financial condition and prospects could also be harmed by risks and uncertainties that are not presently known to us or that we currently believe are not material. If any of the risks actually occur, our business, results of operations, financial condition, and prospects could be materially and adversely affected. Unless otherwise indicated, references to our business being harmed in these risk factors will include harm to our business, C3 AI Software (which includes our C3 AI Suite, C3 AI Applications, C3 AI Ex Machina, C3 AI CRM and C3 AI Data Vision), reputation, brand, financial condition, results of operations, and prospects. In such event, the market price of our Class A common stock could decline, and you could lose all or part of your investment.*

**Risks Related to Our Business and Our Industry**

***We have a limited operating history, which makes it difficult to evaluate our prospects and future results of operations.***

We were founded in 2009. As a result of our limited operating history, our ability to forecast our future results of operations is limited and subject to a number of uncertainties, including our ability to plan for and model future growth. Our historical revenue growth should not be considered indicative of our future performance. Further, in future periods, we expect our revenue growth to slow. A number of factors could cause our growth rate to be adversely impacted, including any reduction in demand for our C3 AI Software, increased competition, contraction of our overall market, our inability to accurately forecast demand for our C3 AI Software, or our failure, for any reason, to capitalize on growth opportunities. We have encountered and will encounter risks and uncertainties frequently experienced by growing companies in rapidly changing industries, such as the risks and uncertainties described herein. If our assumptions regarding these risks and uncertainties, which we use to plan our business, are incorrect or change, or if we do not address these risks successfully, our business would be harmed.

***Historically, a limited number of customers have accounted for a substantial portion of our revenue. If existing customers do not renew their contracts with us, or if our relationships with our largest customers are impaired or terminated, our revenue could decline, and our results of operations would be adversely impacted.***

We derive a significant portion of our revenue from a limited number of existing customers. Our top two market partners, each of which has an enterprise agreement with us that may encompass multiple customers, together accounted for 39% and 29% of our revenue for the three months ended October 31, 2021 and 2020, respectively, and 37% and 29% of our revenue for the six months ended October 31, 2021 and 2020, respectively. These partners have been with us for an average of 4.5 years. Each of Baker Hughes Company, or Baker Hughes, and Engie accounted for greater than 10% of our revenue for the three and six months ended October 31, 2021 and 2020. In June 2016, we entered into a master license and services agreement with Engie whereby Engie partners with us to support their digital transformation with a non-exclusive, worldwide license to certain C3 AI Software. This arrangement was revised in June 2019 to extend the term by an additional three years for a total of six years. Our master license and services agreement with Engie is terminable by either party upon 30 days' written notice if the other party materially breaches the agreement or applicable order form and does not cure such breach prior to the end of that 30 day period, and under certain circumstances in connection with a change of control of either party. In April 2019, we entered into a professional services agreement with Engie pursuant to which we develop a customized application for Engie on our C3 AI Suite. This arrangement has a three year term and permits Engie to terminate the contract at the start of the third year subject to a wind down fee of approximately €2.5 million payable by Engie. In October 2020, we entered into a professional services agreement with Engie pursuant to which we develop another customized application for Engie on our C3 AI Suite. This

46

arrangement has a five year term and permits Engie to terminate the contract after the 20th month. Certain of our customers, including customers that, at the time, represented a significant portion of our business, have in the past reduced their spend with us or decided to not renew their subscriptions with us, which has reduced our anticipated future payments or revenue from these customers. It is not possible for us to predict the future level of demand from our larger customers for our C3 AI Software. In addition, our average total subscription contract value is decreasing, and we expect it to continue to decrease as we expand our customer base beyond a small number of large customers to a larger number of smaller customers.

Our customers generally have no obligation to renew, upgrade, or expand their subscriptions with us after the terms of their existing subscriptions expire. In addition, our customers may opt to decrease their usage of our C3 AI Software. As a result, we cannot provide assurance that our customers will renew, upgrade, or expand their subscriptions with us, if they renew at all. If one or more of our customers elect not to renew their subscriptions with us, or if our customers renew their subscriptions with us for shorter time periods, or if our customers decrease their usage of our C3 AI Software, or if our customers otherwise seek to renegotiate terms of their existing agreements on terms less favorable to us, our business and results of operations would be adversely affected. This adverse impact would be even more pronounced for customers that represent a material portion of our revenue or business operations.

*Our business depends on our ability to attract new customers and on our existing customers purchasing additional subscriptions from us and renewing their existing subscriptions.*

To increase our revenue, we must continue to attract new customers. Our success will depend to a substantial extent on the widespread adoption of our C3 AI Software. Although demand for data management, machine learning, analytics, and artificial intelligence platforms and applications has grown in recent years, the market for these platforms and applications continues to evolve. Numerous factors may impede our ability to add new customers, including but not limited to, our failure to compete effectively against alternative products or services, to attract and effectively train new sales and marketing personnel, to develop or expand relationships with partners and resellers, to successfully innovate and deploy new applications and other solutions, to provide a quality customer experience and customer support, or to ensure the effectiveness of our marketing programs. If we are not able to attract new customers, it will have an adverse effect on our business, financial condition and results of operations.

In addition, our future success depends on our ability to sell additional subscriptions for our C3 AI Software to our existing customers, and our customers renewing their subscriptions when the contract term expires. Our customers generally have no contractual obligation to renew, upgrade, or expand their subscriptions after the terms of their existing subscriptions expire. In addition, our customers may opt to decrease their usage of our C3 AI Software. Given our limited operating history, we may not be able to accurately predict customer renewal rates. Our customers' renewal and expansion commitments may decline or fluctuate as a result of a number of factors, including, but not limited to, their satisfaction with our C3 AI Software and our customer support, the frequency and severity of software and implementation errors or other reliability issues, the pricing of our subscriptions or competing solutions, changes in their IT budget, the effects of global economic conditions, and our customers' financial circumstances, including their ability to maintain or expand their spending levels or continue their operations. In order for us to maintain or improve our results of operations, it is important that our customers renew or expand their subscriptions with us. If our customers do not purchase additional subscriptions, increase their usage of our software, or renew their subscriptions with us, our business, financial condition, and results of operations may be harmed.

We have limited historical experience with supporting or selling to smaller, non-enterprise customers. We intend to grow our customer base and further contribute to our overall growth by introducing product offerings with a lower entry price point, such as our no-code offering C3 AI Ex Machina. However, by broadening our customer base to include smaller or mid-size customers, we will be faced with risks that may not be present or that are present to a lesser extent with respect to sales to large organizations. For example, purchases of our C3 AI Ex Machina offering do not typically require the customer to sign a three-year subscription. Because of our limited experience in supporting or selling to smaller, non-enterprise customers, we may be unsuccessful in our efforts to get future smaller customers to renew or expand their subscriptions to our offerings. If such customers do not renew their agreements or renew on less favorable terms or for less usage, our revenue may grow more slowly than expected or decline, and our business, financial condition, and results of operations may be harmed.

Achieving renewal or expansion of usage and subscriptions may require us to engage increasingly in sophisticated and costly sales and support efforts that may not result in additional sales. In addition, the rate at which our customers expand the deployment of our C3 AI Software depends on a number of factors. If our efforts to expand our relationships with our customers are not successful, our business, financial condition, and results of operations may be harmed.

47

***Because we derive substantially all of our revenue from our C3 AI Software, failure of Enterprise AI solutions in general and our C3 AI Software in particular to satisfy customer demands or to achieve increased market acceptance would adversely affect our business, results of operations, financial condition, and growth prospects.***

We derive and expect to continue for the foreseeable future to derive substantially all of our revenue from our C3 AI Software. As such, the market acceptance of Enterprise AI solutions in general, and our C3 AI Software in particular, are critical to our continued success. Market acceptance of an Enterprise AI solution depends in part on market awareness of the benefits that Enterprise AI can provide over legacy products, emerging point products, and manual processes. In addition, in order for cloud-based Enterprise AI solutions to be widely accepted, organizations must overcome any concerns with placing sensitive information on a cloud-based platform. Demand for our platform in particular is affected by a number of other factors, some of which are beyond our control. These factors include continued market acceptance of our C3 AI Software, the pace at which existing customers realize benefits from the use of our platform and decide to expand deployment of our platform across their business, the timing of development and release of new products by our competitors, technological change, reliability and security, the pace at which enterprises undergo digital transformation, and developments in data privacy regulations. We expect that the needs of our customers will continue to rapidly change and increase in complexity. We will need to improve the functionality and performance of our platform continually to meet those rapidly changing, complex demands. If we are unable to continue to meet customer demands or to achieve more widespread market acceptance of Enterprise AI solutions in general or our C3 AI Software in particular, our business operations, financial results, and growth prospects will be materially and adversely affected.

***Our current C3 AI Software, as well as applications, features, and functionality that we may introduce in the future, may not be widely accepted by our customers, may receive negative attention or may require us to compensate or reimburse third parties, any of which may lower our margins and harm our business.***

Our ability to engage, retain, and increase our base of customers and to increase our revenue will depend on our ability to successfully create new applications, features, and functionality, both independently and together with third parties. We may introduce significant changes to our existing C3 AI Software or develop and introduce new and unproven applications, including technologies with which we have little or no prior development or operating experience. These new applications and updates may fail to engage, retain, and increase our base of customers or may suffer from lag in adoption. New applications may initially suffer from performance and quality issues that may negatively impact our ability to market and sell such applications to new and existing customers. The short- and long-term impact of any major change to our C3 AI Software, or the introduction of new applications, is particularly difficult to predict. If new or enhanced applications fail to engage, retain, and increase our base of customers, we may fail to generate sufficient revenue, operating margin, or other value to justify our investments in such applications, any of which may harm our business.

In addition, we are required to compensate or reimburse third parties in connection with certain sales of our current C3 AI Software as part of our partner relationships. In addition, new applications, features and functionality that we introduce in the future or new partner relationships may require us to compensate or reimburse third parties. Any future requirement that we compensate or reimburse third parties would lower our profit margins and harm our business.

***We have a history of operating losses and may not achieve or sustain profitability in the future.***

We incurred net losses in each period since our founding in 2009. We generated net losses of approximately $56.7 million and $14.9 million for the three months ended October 31, 2021 and 2020, respectively, and $94.2 million and $14.8 million for the six months ended October 31, 2021 and 2020, respectively, and net losses of approximately $55.7 million and $69.4 million for the fiscal years ended April 30, 2021 and 2020, respectively. As a result, we had an accumulated deficit of $443.5 million as of October 31, 2021. We expect to continue to incur net losses for the foreseeable future. These losses and accumulated deficit reflect the substantial investments we made to acquire new customers, commercialize our C3 AI Software, and continue to develop our C3 AI Software. While we have experienced revenue growth in recent periods, we do not know whether or when we will generate sufficient revenue to sustain or increase our growth or achieve or maintain profitability in the future. We also expect our costs and expenses to increase in future periods, which could negatively affect our future results of operations if our revenue does not increase. In particular, we intend to continue to expend significant funds to further develop our C3 AI Software and business, including:

48

- investments in our research and development team and in the development of new features and enhancements of our C3 AI Software, including the hiring of additional development staff, and fees paid to third parties for related enhancements;

- investments in sales, marketing, and services, including expanding our sales force and our customer service team, increasing our customer base, increasing market awareness of our C3 AI Software, and development of new technologies;

- expanding our operations and infrastructure; and

- hiring additional employees.

We will also face increased compliance costs associated with growth, the expansion of our customer base, and being a public company. Our efforts to grow our business may be costlier than we expect, our revenue growth may be slower than we expect, and we may not be able to increase our revenue enough to offset our increased operating expenses. We may incur significant losses in the future for a number of reasons, such as the other risks described herein, unforeseen expenses, difficulties, complications or delays, and other unknown events. If we are unable to achieve and sustain profitability, the value of our business and Class A common stock may significantly decrease.

***We face intense competition and could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations.***

The market for our products is intensely competitive and characterized by rapid changes in technology, customer requirements, and industry standards, and frequent new platform and application introductions and improvements. We anticipate continued competitive challenges from current competitors who address different aspects of our offerings. In many cases, these competitors are more established and enjoy greater resources than we do. We also expect competitive challenges from new entrants into the industry. If we are unable to anticipate or effectively react to these competitive challenges, our competitive position could weaken, and we could experience a decline in our growth rate and revenue that could adversely affect our business and results of operations.

Our main sources of current and potential competition fall into several categories:

- internal IT organizations that develop internal solutions and provide self-support for their enterprises;

- commercial enterprise and point solution software providers;

- open source software providers with data management, machine learning, and analytics offerings;

- public cloud providers offering discrete tools and micro-services with data management, machine learning, and analytics functionality;

- system integrators that develop and provide custom software solutions;

- legacy data management product providers; and

- strategic and technology partners who may also offer our competitors' technology or otherwise partner with them, including our strategic partners who may offer a substantially similar solution based on a competitor's technology or internally developed technology that is competitive with ours.

Many of our existing competitors have, and some of our potential competitors could have, substantial competitive advantages such as:

- greater name recognition, longer operating histories, and larger customer bases;

- larger sales and marketing budgets and resources and the capacity to leverage their sales efforts and marketing expenditures across a broader portfolio of products;

- broader, deeper, or otherwise more established relationships with technology, channel, and distribution partners and customers;

- wider geographic presence or greater access to larger customer bases;

- greater focus in specific geographies or industries;

- lower labor and research and development costs;

- larger and more mature intellectual property portfolios; and

- substantially greater financial, technical, and other resources to provide support, make acquisitions, hire talent, and develop and introduce new products.

In addition, some of our larger competitors have substantially broader and more diverse platform and application offerings and may be able to leverage their relationships with distribution partners and customers based on other products or incorporate functionality into existing products to gain business in a manner that discourages potential customers from subscribing to our C3 AI Software, including by selling at zero or negative margins, bundling with other offerings, or offering closed technology platforms. Potential customers may also prefer to purchase from their existing suppliers rather than a new supplier regardless of platform or application performance or features. As a result, even if the features of our C3 AI Software are superior, potential customers may not purchase our offerings. These larger competitors often have broader product lines and market focus or greater resources and may therefore not be as susceptible to economic downturns or other significant reductions in capital spending by customers. If we are unable to sufficiently differentiate our solutions from the integrated or bundled products of our competitors, such as by offering enhanced functionality, performance or value, we may see a decrease in demand for our offerings, which could adversely affect our business, operating results, and financial condition.

Moreover, new innovative start-up companies, and larger companies that are making significant investments in research and development, may introduce products that have greater performance or functionality, are easier to implement or use, or incorporate technological advances that we have not yet developed or implemented, or may invent similar or superior technologies that compete with ours. Our current and potential competitors may also establish cooperative relationships among themselves or with third parties that may further enhance their resources.

Some of our competitors have made or could make acquisitions of businesses that allow them to offer more competitive and comprehensive solutions. As a result of such acquisitions, our current or potential competitors may be able to accelerate the adoption of new technologies that better address customer needs, devote greater resources to bring these platforms and applications to market, initiate or withstand substantial price competition, or develop and expand their product and service offerings more quickly than we can. These competitive pressures in our market or our failure to compete effectively may result in fewer orders, reduced revenue and gross margins, and loss of market share. In addition, it is possible that industry consolidation may impact customers' perceptions of the viability of smaller or even mid-size software firms and consequently customers' willingness to purchase from such firms.

We may not compete successfully against our current or potential competitors. If we are unable to compete successfully, or if competing successfully requires us to take costly actions in response to the actions of our competitors, our business, financial condition, and results of operations could be adversely affected. In addition, companies competing with us may have an entirely different pricing or distribution model. Increased competition could result in fewer customer orders, price reductions, reduced operating margins, and loss of market share. Further, we may be required to make substantial additional investments in research, development, marketing, and sales in order to respond to such competitive threats, and we cannot assure you that we will be able to compete successfully in the future.

***Our sales cycles can be long and unpredictable, particularly with respect to large subscriptions, and our sales efforts require considerable time and expense.***

Our results of operations may fluctuate, in part, because of the complexity of customer problems that our C3 AI Software address, the resource-intensive nature of our sales efforts, the length and variability of the sales cycle for our C3 AI Software, and the difficulty in making short-term adjustments to our operating expenses. The timing of our sales is difficult to predict. The length of our sales cycle, from initial evaluation to payment for our subscriptions is generally six to nine months but can vary substantially from customer to customer and can extend over a number of years for some customers. Our sales efforts involve educating our customers about the use, technical capabilities, and benefits of our C3 AI Software. Customers often undertake a prolonged evaluation process, which frequently involves not only our C3 AI Software but also those of other companies. In addition, the size of potential customers may lead to longer sales cycles. For instance, we invest resources into

50

sales to large organizations and large organizations typically undertake a significant evaluation and negotiation process due to their leverage, size, organizational structure and approval requirements, all of which can lengthen our sales cycle. We may also face unexpected deployment challenges with large organizations or more complicated deployment of our C3 AI Software. Large organizations may demand additional features, support services, and pricing concessions or require additional security management or control features. Some organizations may also require an on-premise solution rather than a cloud solution, which potentially requires additional implementation time and potentially a longer sales cycle. We may spend substantial time, effort and money on sales efforts to large organizations without any assurance that our efforts will produce any sales or that these customers will deploy our C3 AI Software widely enough across their organization to justify our substantial upfront investment. As a result, it is difficult to predict exactly when, or even if, we will make a sale to a potential customer or if we can increase sales to our existing customers.

Individual sales tend to be large as a proportion of our overall sales, which impacts our ability to plan and manage cash flows and margins. These large individual sales have, in some cases, occurred in quarters or years subsequent to those we anticipated, or have not occurred at all. If our sales cycle lengthens or our substantial upfront investments do not result in sufficient revenue to justify our investments, our operating results could be adversely affected. In addition, within each quarter or year, it is difficult to project when a deal will close. Therefore, it is difficult to determine whether we are achieving our quarterly or annual expectations until near the end of the applicable quarter or year. Most of our expenses are relatively fixed or require time to adjust. Therefore, if expectations for our business are not accurate, we may not be able to adjust our cost structure on a timely basis, and our margins and cash flows may differ from expectations.

*Certain revenue metrics such as net dollar-based retention rate or annual recurring revenue may not be accurate indicators of our future financial results.*

Other subscription-based software companies often report on metrics such as net dollar-based revenue retention rate, annual recurring revenue or other revenue metrics, and investors and analysts sometimes look to these metrics as indicators of business activity in a period for businesses such as ours. However, given our large average subscription contract value and our dependence on a small number of high-value customer contracts, these metrics are not accurate indicators of future revenue for any given period of time because the gain or loss of even a single high-value customer contract could cause significant volatility in these metrics. If investors and analysts view our business through these metrics, the trading price of our Class A common stock may be adversely affected.

*Changes in our subscription or pricing models could adversely affect our operating results.*

As the markets for our subscriptions grow, as new competitors introduce new products or services that compete with ours, or as we enter into new international markets, we may be unable to attract new customers at the same price or based on the same pricing model as we have historically used. Regardless of pricing model used, large customers may demand higher price discounts than in the past. As a result, we may be required to reduce our prices, offer shorter contract durations or offer alternative pricing models, any of which could adversely affect our business.

We have limited experience with respect to determining the optimal prices for subscriptions for our C3 AI Software. In the past, we have been able to increase our prices for our C3 AI Software but we may choose not to introduce or be unsuccessful in implementing future price increases. Our competitors may introduce new products that compete with ours or reduce their prices, or we may be unable to attract new customers or retain existing customers based on our historical subscription and pricing models. Given our limited operating history and limited experience with our historical subscription and pricing models, we may not be able to accurately predict customer renewal or retention rates. As a result, we may be required or choose to reduce our prices or change our pricing model, which could harm our business, results of operations, and financial condition.

*Our revenue growth depends in part on the success of our strategic relationships with third parties, including channel partners, and if we are unable to establish and maintain successful relationships with them, our business, operating results, and financial condition could be adversely affected.*

We seek to grow our partner ecosystem as a way to grow our business. We anticipate that we will continue to establish and maintain relationships with third parties, such as channel partners, resellers, OEMs, system integrators, independent software and hardware vendors, and platform and cloud service providers. For example, in June 2019, we entered into a strategic collaboration with Baker Hughes whereby Baker Hughes operates as the exclusive channel partner and reseller of our C3 AI Software in the oil and gas industry and a non-exclusive reseller in other industries. This arrangement was most recently revised

51

in October 2021 and now continues until April 30, 2025. We also have strategic relationships with Amazon Web Services, Fidelity National Information Services, Google, Microsoft, Raytheon and Infor.

We plan to continue to establish and maintain similar strategic relationships in certain industry verticals and otherwise, and we expect our channel partners to become an increasingly important aspect of our business. However, these strategic relationships could limit our ability in the future to compete in certain industry verticals and, depending on the success of our third-party partners and the industries that those partners operate in generally, may negatively impact our business because of the nature of strategic alliances, exclusivity provisions, or otherwise. We work closely with select vendors to design solutions to specifically address the needs of certain industry verticals or use cases within those verticals. As our agreements with strategic partners terminate or expire, we may be unable to renew or replace these agreements on comparable terms, or at all. For instance, our C3 AI Software are marketed in the oil and gas industry on a co-branded basis with Baker Hughes. In the event of any termination, expiration, or renegotiation of the arrangement with Baker Hughes, we may lose the right to continue to co-brand our products in this industry, and it may be difficult for us to arrange for another channel partner to sell our C3 AI Software in the oil and gas industry in a timely manner, and we could lose brand awareness and sales opportunities during the transition.

Our future growth in revenue and ability to achieve and sustain profitability depends in part on our ability to identify, establish, and retain successful strategic partner relationships in the United States and internationally, which will take significant time and resources and involve significant risk. To the extent we do identify such partners, we will need to negotiate the terms of a commercial agreement with them under which the partner would distribute our C3 AI Software. We cannot be certain that we will be able to negotiate commercially attractive terms with any strategic partner, if at all. In addition, all channel partners must be trained to distribute our C3 AI Software. In order to develop and expand our distribution channel, we must develop and improve our processes for channel partner introduction and training. If we do not succeed in identifying suitable strategic partners or maintain our relationships with such partners, our business, operating results, and financial condition may be adversely affected.

Moreover, we cannot guarantee that the partners with whom we have strategic relationships will continue to devote the resources necessary to expand our reach and increase our distribution. In addition, customer satisfaction with services and other support from our strategic partners may be less than anticipated, negatively impacting anticipated revenue growth and results of operations. We cannot be certain that these partners will prioritize or provide adequate resources to selling our C3 AI Software. Further, some of our strategic partners offer competing platforms and applications or also work with our competitors. As a result of these factors, many of the companies with whom we have strategic alliances may choose to pursue alternative technologies and develop alternative platforms and applications in addition to or in lieu of our C3 AI Software, either on their own or in collaboration with others, including our competitors. We cannot assure you that our strategic partners will continue to cooperate with us. In addition, actions taken or omitted to be taken by such parties may adversely affect us. Moreover, we rely on our channel partners to operate in accordance with the terms of their contractual agreements with us. For example, our agreements with our channel partners limit the terms and conditions pursuant to which they are authorized to resell or distribute our C3 AI Software and offer technical support and related services. If we are unsuccessful in establishing or maintaining our relationships with third parties, or if our strategic partners do not comply with their contractual obligations to us, our business, operating results, and financial condition may be adversely affected. Even if we are successful in establishing and maintaining these relationships with third parties, we cannot assure you that these relationships will result in increased customer usage of our C3 AI Software or increased revenue to us.

In addition, some of our sales to government entities have been made, and in the future may be made, indirectly through our channel partners. Government entities may have statutory, contractual, or other legal rights to terminate contracts with our channel partners for convenience or due to a default, and, in the future, if the portion of government contracts that are subject to renegotiation or termination at the election of the government entity are material, any such termination or renegotiation may adversely impact our future operating results. In the event of such termination, it may be difficult for us to arrange for another channel partner to sell our C3 AI Software to these government entities in a timely manner, and we could lose sales opportunities during the transition. Government entities routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government entity refusing to renew its subscription to our C3 AI Software, a reduction of revenue, or fines or civil or criminal liability if the audit uncovers improper or illegal activities.

*If the market for our C3 AI Software fails to grow as we expect, or if businesses fail to adopt our C3 AI Software, our business, operating results, and financial condition could be adversely affected.*

It is difficult to predict customer adoption rates and demand for our C3 AI Software, the entry of competitive platforms, or the future growth rate and size of the cloud-based software and software-as-a-service, or SaaS, business software markets. A substantial majority of our revenue has come from sales of our subscription-based software products, which we expect to continue for the foreseeable future. Although demand for data management, machine learning, and analytics platforms and applications has grown in recent years, the market for these platforms and applications continues to evolve. We cannot be sure that this market will continue to grow or, even if it does grow, that businesses will adopt our C3 AI Software. Our future success will depend in large part on our ability to further penetrate the existing market for Enterprise AI software, as well as the continued growth and expansion of what we believe to be an emerging market for Enterprise AI platforms and applications that are faster, easier to adopt, and easier to use. Our ability to further penetrate the Enterprise AI market depends on a number of factors, including the cost, performance, and perceived value associated with our C3 AI Software, as well as customers' willingness to adopt a different approach to data analysis. We have spent, and intend to keep spending, considerable resources to educate potential customers about digital transformation, artificial intelligence, and machine learning in general and our C3 AI Software in particular. However, we cannot be sure that these expenditures will help our C3 AI Software achieve any additional market acceptance. Furthermore, potential customers may have made significant investments in legacy analytics software systems and may be unwilling to invest in new platforms and applications. If the market fails to grow or grows more slowly than we currently expect or businesses fail to adopt our C3 AI Software, our business, operating results, and financial condition could be adversely affected.

*If we fail to respond to rapid technological changes, extend our C3 AI Software, or develop new features and functionality, our ability to remain competitive could be impaired.*

The market for our C3 AI Software is characterized by rapid technological change and frequent new platform and application introductions and enhancements, changing customer demands, and evolving industry standards. The introduction of platforms and applications embodying new technologies can quickly make existing platforms and applications obsolete and unmarketable. Data management, machine learning, and analytics platforms and applications are inherently complex, and it can take a long time and require significant research and development expenditures to develop and test new or enhanced platforms and applications. The success of any enhancements or improvements to our existing C3 AI Software or any new applications depends on several factors, including timely completion, competitive pricing, adequate quality testing, integration with existing technologies, and overall market acceptance.

Our ability to grow our customer base and generate revenue from customers will depend heavily on our ability to enhance and improve our C3 AI Software, to develop additional functionality and use cases, introduce new features and applications and interoperate across an increasing range of devices, operating systems, and third-party applications. Our customers may require features and capabilities that our current C3 AI Software do not have or may face use cases that our current C3 AI Software do not address. We invest significantly in research and development, and our goal is to focus our spending on measures that improve quality and ease of adoption and create organic customer demand for our C3 AI Software. When we develop a new enhancement or improvement to our C3 AI Software, we typically incur expenses and expend resources upfront to develop, market and promote the new enhancement and improvement. Therefore, when we develop and introduce new enhancements and improvements to our C3 AI Software, they must achieve high levels of market acceptance in order to justify the amount of our investment in developing and bringing them to market. There is no assurance that our enhancements to our C3 AI Software or our new application experiences, functionality, use cases, features, or capabilities will be compelling to our customers or gain market acceptance. If our research and development investments do not accurately anticipate customer demand, or if we fail to develop our C3 AI Software in a manner that satisfies customer preferences in a secure, timely and cost-effective manner, we may fail to retain our existing customers or increase demand for our C3 AI Software.

Moreover, even if we introduce new capabilities in our C3 AI Software, we may experience a decline in revenue from sales of our existing C3 AI Software that is not offset by revenue from the new C3 AI Software capabilities and applications. For example, customers may delay ordering subscriptions of new C3 AI Software capabilities or applications to permit them to make a more thorough evaluation of the C3 AI Software or until industry and marketplace reviews become widely available. Some customers may hesitate to migrate to new C3 AI Software due to concerns regarding the complexity of migration and suite or application infancy issues on performance. In addition, we may lose existing customers who choose a competitor's AI platforms and applications rather than migrate to our new C3 AI Software capabilities and applications. This could result in a temporary or permanent revenue shortfall and adversely affect our business.

Any failure of our C3 AI Software to operate effectively with future infrastructure platforms and technologies could reduce the demand for our C3 AI Software. If we are unable to respond to these changes in a timely and cost-effective manner, our C3 AI Software may become less marketable, less competitive, or obsolete, and our business may be adversely affected.

The introduction of new AI platforms and applications by competitors or the development of entirely new technologies to replace existing offerings could make our C3 AI Software obsolete or adversely affect our business, results of operations, and financial condition. We may experience difficulties with software development, design, or marketing that could delay or prevent our development, introduction, or implementation of new C3 AI Software experiences, features, or capabilities. We have in the past experienced delays in our internally planned release dates of new features and capabilities, and there can be no assurance that new C3 AI Software features or capabilities will be released according to schedule. Any delays could result in adverse publicity, loss of revenue or market acceptance, or claims by customers brought against us, all of which could harm our business. Moreover, new productivity features for our C3 AI Software may require substantial investment, and we have no assurance that such investments will be successful. If customers do not widely adopt our new C3 AI Software features and capabilities, we may not be able to realize a return on our investment. If we are unable to develop, license, or acquire new features and capabilities to our C3 AI Software on a timely and cost-effective basis, or if such enhancements do not achieve market acceptance, our business could be harmed.

*If we were to lose the services of our CEO or other members of our senior management team, we may not be able to execute our business strategy.*

Our success depends in a large part upon the continued service of key members of our senior management team. In particular, our founder and CEO, Thomas M. Siebel, is critical to our overall management, sales strategy, culture, strategic direction, engineering, and operations. In addition, Mr. Siebel is a recognized leader in information technology and is critical to the continued development of our C3 AI Software. All of our executive officers are at-will employees, and we do not maintain any key person life insurance policies. The loss of any member of our senior management team could make it more difficult to execute our business strategy and, therefore, harm our business.

*The failure to effectively develop and expand our marketing and sales capabilities could harm our ability to increase our customer base and achieve broader market acceptance of our C3 AI Software.*

Our ability to expand our customer base and achieve broader market acceptance of our C3 AI Software depends to a significant extent on our ability to continue to expand our marketing and sales operations and the ultimate effectiveness of those operations. We plan to continue expanding our sales force and strategic partners, both domestically and internationally.

Identifying and recruiting qualified sales representatives and training them is time consuming and resource intensive, and they may not be fully trained and productive for a significant amount of time. Our C3 AI Software are complicated and, as such, our sales force and operations require significant time and investment for proper recruitment, onboarding, and training in order for our sales operations to be productive. In addition, as we enter into new markets, expand the capabilities of our C3 AI Suite and offer new C3 AI Software, we may need to identify and recruit additional sales and marketing efforts specific to such strategic expansion. Our efforts to do so may be increasingly resource intensive, time consuming, and ultimately unsuccessful. We also dedicate significant resources to sales and marketing programs, including internet and other online advertising. All of these efforts require us to invest significant financial and other resources. In addition, the cost to acquire customers is high due to these marketing and sales efforts. Our business will be harmed if our efforts do not generate a correspondingly significant increase in revenue. We will not achieve anticipated revenue growth from expanding our sales force if we are unable to hire, develop, and retain talented sales personnel, if our new sales personnel are unable to achieve desired productivity levels in a reasonable period of time, or if our sales and marketing programs are not effective.

In addition, our business would be adversely affected if our marketing and sales efforts are not successful and generate increases in revenue that are smaller than anticipated. If our marketing and sales efforts are not effective, our sales and revenue may grow more slowly than expected or materially decline, and our business may be significantly harmed.

*If we fail to develop, maintain, and enhance our brand and reputation cost-effectively, our business and financial condition may be adversely affected.*

We believe that developing, maintaining, and enhancing awareness and integrity of our brand and reputation in a cost-effective manner are important to achieving widespread acceptance of our C3 AI Software and are important elements in attracting new customers and maintaining existing customers. We believe that the importance of our brand and reputation will

increase as competition in our market further intensifies. Successful promotion of our brand depends on the effectiveness of our marketing efforts, our ability to provide a reliable and useful C3 AI Software at competitive prices, the perceived value of our C3 AI Software, our ability to maintain our customers' trust, our ability to continue to develop additional functionality and use cases and our ability to differentiate our C3 AI Software and capabilities from competitive offerings. Brand promotion activities may not yield increased revenue, and even if they do, the increased revenue may not offset the expenses we incur in building and maintaining our brand and reputation. We also rely on our customer base in a variety of ways, including to give us feedback on our C3 AI Software. If we fail to promote and maintain our brand successfully or to maintain loyalty among our customers, or if we incur substantial expenses in an unsuccessful attempt to promote and maintain our brand, we may fail to attract new customers and partners or retain our existing customers and partners and our business and financial condition may be adversely affected. Any negative publicity relating to our employees, partners, or others associated with these parties, may also tarnish our own reputation simply by association and may reduce the value of our brand. Damage to our brand and reputation may result in reduced demand for our C3 AI Software and increased risk of losing market share to our competitors. Any efforts to restore the value of our brand and rebuild our reputation may be costly and may not be successful.

We also enter into strategic relationships in which we co-brand our products. If these relationships terminate, it may have an adverse effect on our brand. For example, our C3 AI Software are marketed in the oil and gas industry on a co-branded basis with Baker Hughes. In the event of any termination or expiration of the arrangement with Baker Hughes, we may lose the right to continue using the co-brand to market and sell our C3 AI Software in the oil and gas industry, and it may be difficult for us to arrange for another channel partner to sell our C3 AI Software in the oil and gas industry in a timely manner, and we could lose brand awareness and sales opportunities during the transition, which could potentially harm our business.

***We may not successfully manage our growth or plan for future growth.***

Since our founding in 2009, we have experienced rapid growth. The growth and expansion of our business places a continuous and significant strain on our management, operational, and financial resources. Further growth of our operations to support our customer base, our expanding third-party relationships, our information technology systems, and our internal controls and procedures may not be adequate to support our operations. Managing our growth will also require significant expenditures and allocation of valuable management resource, including the challenges of integrating, developing, and motivating a rapidly growing employee base in various countries around the world. Certain members of our management have not previously worked together for an extended period of time, and some do not have experience managing a public company, which may affect how they manage our growth.

In addition, our rapid growth may make it difficult to evaluate our future prospects. Our ability to forecast our future results of operations is subject to a number of uncertainties, including our ability to effectively plan for and model future growth. We have encountered in the past, and may encounter in the future, risks and uncertainties frequently experienced by growing companies in rapidly changing industries. If we fail to achieve the necessary level of efficiency in our organization as it grows, or if we are not able to accurately forecast future growth, our business would be harmed.

***If we are unable to ensure that our C3 AI Software interoperate with a variety of software applications that are developed by others, including our partners, we may become less competitive and our business may be harmed.***

Our C3 AI Software must integrate with a variety of hardware and software platforms, and we need to continuously modify and enhance our C3 AI Software to adapt to changes in hardware and software technologies. In particular, we have developed our C3 AI Software to be able to easily integrate with key third-party applications, including the applications of software providers that compete with us as well as our partners. We are typically subject to standard terms and conditions of such providers, which govern the distribution, operation, and fees of such software systems, and which are subject to change by such providers from time to time. Our business will be harmed if any provider of such software systems:

- discontinues or limits our access to its software;

- modifies its terms of service or other policies, including fees charged to, or other restrictions on us, or other platform and application developers;

- changes how information is accessed by us or our customers;

- establishes more favorable relationships with one or more of our competitors; or

- develops or otherwise favors its own competitive offerings over our C3 AI Software.

Third-party services and products are constantly evolving, and we may not be able to modify our C3 AI Software to assure their compatibility with that of other third parties as they continue to develop or emerge in the future or we may not be able to make such modifications in a timely and cost-effective manner. In addition, some of our competitors may be able to disrupt the operations or compatibility of our C3 AI Software with their products or services, or exert strong business influence on our ability to, and terms on which we, operate our C3 AI Software. Should any of our competitors modify their products or standards in a manner that degrades the functionality of our C3 AI Software or gives preferential treatment to our competitors or competitive products, whether to enhance their competitive position or for any other reason, the interoperability of our C3 AI Software with these products could decrease and our business, results of operations, and financial condition would be harmed. If we are not permitted or able to integrate with these and other third-party applications in the future, our business, results of operations, and financial condition would be harmed.

*Our ability to sell subscriptions to our C3 AI Software could be harmed by real or perceived material defects or errors in our C3 AI Software.*

The technology underlying our C3 AI Software is inherently complex and may contain material defects or errors, particularly when new applications are first introduced, when new features or capabilities are released, or when integrated with new or updated third-party hardware or software. There can be no assurance that our existing C3 AI Software and new applications will not contain defects or errors. Any real or perceived errors, failures, vulnerabilities, or bugs in our C3 AI Software could result in negative publicity or lead to data security, access, retention, or other performance issues, all of which could harm our business. Correcting such defects or errors may be costly and time-consuming and could harm our business. Moreover, the harm to our reputation and legal liability related to such defects or errors may be substantial and would harm our business.

*The failure to attract and retain additional qualified personnel or to maintain our company culture could harm our business and prevent us from executing our business strategy.*

To execute our business strategy, we must attract and retain highly qualified personnel. Competition for executives, data scientists, engineers, software developers, sales personnel, and other key employees in our industry is intense. In particular, we compete with many other companies for employees with high levels of expertise in designing, developing and managing platforms and applications for data management, machine learning, and analytics technologies, as well as for skilled data scientists, sales, and operations professionals. In addition, we are extremely selective in our hiring process which requires significant investment of time and resources from internal stakeholders and management. At times, we have experienced, and we may continue to experience, difficulty in hiring personnel who meet the demands of our selection process and with appropriate qualifications, experience, or expertise, and we may not be able to fill positions as quickly as desired. We recently completed our initial public offering and potential candidates may not perceive our compensation package, including our equity awards, as favorably as employees hired prior to our initial public offering. In addition, our recruiting personnel, methodology, and approach may need to be altered to address a changing candidate pool and profile. We may not be able to identify or implement such changes in a timely manner.

Many of the companies with which we compete for experienced personnel have greater resources than we have, and some of these companies may offer more attractive compensation packages. If the perceived value of our equity awards declines, or if the mix of equity and cash compensation that we offer is unattractive, it may adversely affect our ability to recruit and retain highly skilled employees. Job candidates may also be threatened with legal action under agreements with their existing employers if we attempt to hire them, which could impact hiring and result in a diversion of our time and resources. Additionally, laws and regulations, such as restrictive immigration laws, or export control laws, may limit our ability to recruit internationally. We must also continue to retain and motivate existing employees through our compensation practices, company culture, and career development opportunities.

We believe that a critical component to our success and our ability to retain our best people is our culture. As we continue to grow and develop a public company infrastructure, we may find it difficult to maintain our company culture.

In addition, many of our employees may be able to receive significant proceeds from sales of our equity in the public markets, which may reduce their motivation to continue to work for us. Moreover, the proceeds from our recent initial public

56

offering could create disparities in wealth among our employees, which may harm our culture and relations among employees and our business.

If we fail to attract new personnel or to retain our current personnel, our business would be harmed.

***Our annual and quarterly results and key metrics are likely to fluctuate significantly and may not fully reflect the underlying performance of our business.***

Our annual and quarterly results of operations and key metrics may vary significantly in the future as they have in the past, particularly in light of our dependence on a limited number of high-value customer contracts, and period-to-period comparisons of our results of operations and key metrics may not be meaningful. Accordingly, the results of any one year or quarter should not be relied upon as an indication of future performance. Our results of operations and key metrics may fluctuate as a result of a variety of factors, many of which are outside of our control, and as a result, may not fully reflect the underlying performance of our business. Fluctuation in our annual or quarterly results may negatively impact the value of our securities. Factors that may cause fluctuations in our annual or quarterly results of operations and key metrics include, without limitation, the risk factors listed elsewhere in this section and the factors listed below:

- our ability to generate significant revenue from new offerings;

- our ability to expand our number of partners and distribution of our C3 AI Software;

- our ability to hire and retain employees, in particular those responsible for the selling or marketing of our C3 AI Software;

- our ability to develop and retain talented sales personnel who are able to achieve desired productivity levels in a reasonable period of time and provide sales leadership in areas in which we are expanding our sales and marketing efforts;

- changes in the way we organize and compensate our sales teams;

- the timing of expenses and recognition of revenue;

- our ability to increase sales to large organizations as well as increase sales to a larger number of smaller customers;

- the length of sales cycles and seasonal purchasing patterns of our customers;

- the amount and timing of operating expenses related to the maintenance and expansion of our business, operations, and infrastructure, as well as international expansion and entry into operating leases;

- timing and effectiveness of new sales and marketing initiatives;

- changes in our pricing policies or those of our competitors;

- the timing and success of new platforms, applications, features, and functionality by us or our competitors;

- failures or breaches of security or privacy by us or our suppliers and business partners, and the costs associated with remediating any such failures or breaches;

- changes in the competitive dynamics of our industry, including consolidation among competitors;

- changes in laws and regulations that impact our business;

- any large indemnification payments to our users or other third parties;

- the timing of expenses related to any future acquisitions;

- health epidemics or pandemics, such as the coronavirus, or COVID-19, pandemic;

- civil unrest and geopolitical instability; and

- general political, economic, and market conditions.

***We recognize revenue from subscriptions to our C3 AI Software over the terms of these subscriptions. Consequently, increases or decreases in new sales may not be immediately reflected in our results of operations and may be difficult to discern.***

We recognize revenue from subscriptions to our C3 AI Software over the terms of these subscriptions, which is typically three years for our software other than our C3 AI Ex Machina. As a result, a portion of the revenue we report in each year and each quarter is derived from the recognition of deferred revenue relating to subscriptions entered into during prior periods. Consequently, a decline in new or renewed subscriptions in any single year or quarter may only have a small impact on the revenue that we recognize for that period. However, such a decline will negatively affect our revenue in future periods. Accordingly, the effect of significant downturns in sales and potential changes in our pricing policies or rate of customer expansion or retention may not be fully reflected in our results of operations until future periods. In addition, a significant portion of our costs are expensed as incurred. As a result, growth in the number of new customers could continue to result in our recognition of higher costs and lower revenue in the earlier periods of our subscriptions. Finally, our subscription-based revenue model also makes it difficult for us to rapidly increase our revenue through additional sales in any period, as revenue from new customers or from existing customers that increase their use of our C3 AI Software must be recognized over the applicable subscription term. These risks are further exacerbated by our dependence on high-value customer contracts.

***Any failure to offer high-quality maintenance and support services for our customers may harm our relationships with our customers and, consequently, our business.***

Once our C3 AI Software is deployed, our customers depend on our maintenance and support teams to resolve technical and operational issues relating to our C3 AI Software. Our ability to provide effective customer maintenance and support is largely dependent on our ability to attract, train, and retain qualified personnel with experience in supporting customers with our C3 AI Software such as ours and maintaining the same. The number of our customers has grown significantly and that has and will continue to put additional pressure on our customer maintenance and support teams. We may be unable to respond quickly enough to accommodate short-term increases in customer demand for technical support or maintenance assistance. We also may be unable to modify the future, scope, and delivery of our maintenance services and technical support to compete with changes in the technical services provided by our competitors. Increased customer demand for maintenance and support services, without corresponding revenue, could increase costs and negatively affect our operating results. In addition, if we experience increased customer demand for support and maintenance, we may face increased costs that may harm our results of operations. Further, as we continue to grow our operations and support our global customer base, we need to be able to continue to provide efficient support and effective maintenance that meets our customers' needs globally at scale. Customers receive additional maintenance and support features, and the number of our customers has grown significantly, which will put additional pressure on our organization. If we are unable to provide efficient customer maintenance and support globally at scale or if we need to hire additional maintenance and support personnel, our business may be harmed. Our ability to attract new customers is highly dependent on our business reputation and on positive recommendations from our existing customers. Any failure to maintain high-quality maintenance and support services, a failure of channel parties to maintain high-quality maintenance and support services or a market perception that we do not maintain high-quality maintenance and support services for our customers, would harm our business.

***The COVID-19 pandemic had and could continue to have an adverse impact on our business, our operations, and the markets and communities in which we, our partners, and our customers operate.***

The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The ultimate impact and duration of the COVID-19 pandemic on the global economy and our business are difficult to assess or predict. Actual and potential impacts include:

- our customer prospects and our existing customers may experience slowdowns in their businesses, which in turn may result in reduced demand for our C3 AI Software, lengthening of sales cycles, loss of customers, and difficulties in collections;

- our employees are working from home significantly more frequently than they have historically, and may be required to work from home even more frequently in the future depending on the impact of current and future variants of the

58

COVID-19 virus, which may result in decreased employee productivity and morale, with increased unwanted employee attrition in addition to the increased risk of a cyberattack;

- we continue to incur fixed costs, particularly for real estate, and are deriving reduced or no benefit from those costs;

- we may continue to experience disruptions to our growth planning, such as for facilities and international expansion;

- we continue to incur costs in returning to work from our facilities around the world, including changes to the workplace, such as space planning, food service, and amenities;

- we may be subject to legal liability for safe workplace claims;

- our critical vendors or third-party partners could go out of business;

- in-person marketing events, including industry conferences, have been canceled, and we may continue to experience prolonged delays in our ability to reschedule or conduct in-person marketing events and other sales and marketing activities; and

- our marketing, sales, professional services, and support organizations are accustomed to extensive face-to-face customer and partner interactions, and conducting business virtually is unproven.

The impact of any of the foregoing, individually or collectively, could adversely affect our business, financial condition, and results of operations.

As a result of the COVID-19 pandemic, we temporarily closed our headquarters and other offices, required our employees and contractors to work remotely, and implemented travel restrictions, all of which represented a significant change in how we operate our business. The operations of our partners and customers have likewise been altered. As a result of global business disruption, the COVID-19 pandemic had a significant adverse impact on our conclusion of new and additional business agreements in 2020 and to date in 2021. While several nations and states have begun to relax restrictions imposed to control the spread of the virus, the current spread of the Delta and other COVID-19 variants has posed challenges which threaten to force a reinstatement of some or all of these restrictions. The ultimate duration and extent of the COVID-19 pandemic will depend on future developments that cannot be accurately predicted at this time, such as the extent and effectiveness of containment actions, the emergence and spread of current and future variants of the COVID-19 virus, and the effectiveness, acceptance, and availability of vaccines against the COVID-19 virus and its variants. The COVID-19 pandemic has already had an adverse effect on the global economy, and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic are likely to affect the rate of global IT spending and, despite the measures we have taken to limit or mitigate the impact, have had and could continue to have an adverse effect on the demand for our C3 AI Software, lengthen our sales cycles, reduce the value or duration of subscriptions, reduce the level of subscription renewals, negatively impact collections of accounts receivable, reduce expected spending from new customers, cause some of our paying customers to go out of business, limit the ability of our direct sales force to travel to customers and potential customers, and affect contraction or attrition rates of our paying customers, all of which could adversely affect our business, results of operations, and financial condition during fiscal 2022 and future periods.

Moreover, to the extent the COVID-19 pandemic adversely affects our business, financial condition, and results of operations, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section, including but not limited to, those related to our ability to increase sales to existing and new customers, develop and deploy new offerings and applications and maintain effective marketing and sales capabilities.

***Our actual or perceived failure to comply with privacy, data protection laws, regulations, and obligations could harm our business.***

We collect, receive, store, process, generate, use, transfer, disclose, make accessible, protect, secure, dispose of and share, which we collectively refer to as Process or Processing, customers' proprietary and sensitive data, potentially including personal information, confidential information, protected health information, and financial data.

Data privacy and regulation of privacy, information security and Processing have become significant issues in the United States, countries in Europe, and in other countries in which we operate. The legal and regulatory framework for privacy and security issues is rapidly evolving, and is expected to increase our compliance costs and exposure to liability. There are

59

numerous federal, state, local, and international laws and regulations regarding privacy, data protection, information security and Processing, and protection of personal information and other content, or Data Protection Laws, the scope of which are changing, subject to differing interpretations and may be inconsistent among countries, or conflict with other rules. We are or may also be subject to the terms of our external and internal privacy and security policies, codes, representations, certifications, industry standards, publications and frameworks, or Privacy Policies, and contractual obligations to third parties related to privacy, data protection, and information security and Processing, including contractual obligations to indemnify and hold harmless third parties from the costs or consequences of non-compliance with Data Protection Laws or other obligations, or collectively, including Privacy Policies, Data Protection Obligations. We expect that there will continue to be new Data Protection Obligations, and we cannot yet determine the impact such future Data Protection Obligations may have on our business. Any significant change to Data Protection Laws and Data Protection Obligations, including without limitation, regarding the manner in which the express or implied consent of customers for Processing is obtained, could increase our costs and require us to modify our operations, possibly in a material manner, which we may be unable to complete and may limit our ability to store and Process data and operate our business.

Data Protection Laws and data protection worldwide are, and are likely to remain, uncertain for the foreseeable future, and our actual or perceived failure to address or comply with these laws could: increase our compliance and operational costs; limit our ability to market our products or services and attract new and retain current customers; limit or eliminate our ability to Process data; expose us to regulatory scrutiny, actions, investigations, fines and penalties; result in reputational harm; lead to a loss of business result in litigation and liability, including class action litigation; cause to incur significant costs, expenses and fees (including attorney fees); cause a material adverse impact to business operations or financial results, and; otherwise result in other material harm to our business, or Adverse Data Protection Impact.

We strive to comply with applicable Data Protection Laws, and Data Protection Obligations to the extent possible, but we may at times fail to do so, or may be perceived to have failed to do so. Moreover, despite our efforts, we may not be successful in achieving compliance and may otherwise face Adverse Data Protection Impacts if our employees, partners or vendors do not, or are perceived not to, comply with applicable Data Protection Laws and Data Protection Obligations. We may be subject to, and suffer a an Adverse Data Protection Impact if we fail (or are perceived to have failed) to comply with applicable Data Protection Laws or Data Protection Obligations, or if our Privacy Policies are, in whole or part, found to be inaccurate, incomplete, deceptive, unfair, or misrepresentative of our actual practices. In addition, any such failure or perceived failure could result in public statements against us by consumer advocacy groups, the media or others, which may cause us material reputational harm. Our actual or perceived failure to comply with Data Protection Laws or and Data Protection Obligations could also subject us to litigation, claims, proceedings, actions or investigations by governmental entities, authorities or regulators, which could result in an Adverse Data Protection Impact, including required changes to our business practices, the diversion of resources and the attention of management from our business, regulatory oversights and audits, discontinuance of necessary Processing, or other remedies that adversely affect our business. Furthermore, the costs of compliance with, and other burdens imposed by, laws, regulations, and policies that are applicable to the businesses of our customers relating to privacy, data protection, data security, and other aspects of data Processing may limit the adoption and use of, and reduce the overall demand for, our C3 AI Software.

We also expect that there will continue to be new laws, regulations, and industry standards concerning privacy, data protection, information security and other aspects of data Processing proposed and enacted in various jurisdictions. In Europe, the General Data Protection Regulation (2016/679), or GDPR, went into effect in May 2018 and introduced strict requirements for Processing the personal data of European Union data subjects. The GDPR may apply to us to the extent we Process the personal data of European Union data subjects. Companies that must comply with the GDPR face increased compliance obligations and risk, including more robust regulatory enforcement of data protection requirements, an order prohibiting Processing of European data subject personal data and potential fines for noncompliance of up to €20 million or 4% of the annual global revenues of the noncompliant company, whichever is greater. European data protection laws including the GDPR also generally prohibit the transfer of personal data from the European Economic Area, or EEA, to the United States and most other countries unless the parties to the transfer have established a legal basis for the transfer and implemented specific safeguards to protect the transferred personal data. One of the primary mechanisms allowing U.S. companies to import personal information from Europe in compliance with the GDPR has been certification to the EU-U.S. Privacy Shield and Swiss-U.S. Privacy Shield frameworks administered by the U.S. Department of Commerce. However, the Court of Justice of the European Union, in the "Schrems II" ruling, invalidated framework in July 2020. The Swiss Federal Data Protection and Information Commissioner also has opined that the Swiss-U.S. Privacy Shield is inadequate for transfers of data from Switzerland to the U.S. Authorities in the United Kingdom, whose data protection laws are similar to those of the European Union, may similarly

60

invalidate use of the EU-U.S. Privacy Shield as mechanisms for lawful personal information transfers from those countries to the United States.

The Schrems II decision also raised questions about whether one of the primary alternatives to the EU-U.S. Privacy Shield, namely, the European Commission's Standard Contractual Clauses, can lawfully be used for personal information transfers from Europe to the United States or most other countries. At present, there are few, if any, viable alternatives to the EU-U.S. Privacy Shield and the Standard Contractual, or SCCs. The European Commission recently proposed updates to the SCCs, and additional regulatory guidance has been released that seeks to imposes additional obligations on companies seeking to rely on the SCCs. As such, any transfers by us or our vendors of personal data from Europe may not comply with European data protection law, may increase our exposure to the GDPR's heightened sanctions for violations of its cross-border data transfer restrictions, and may reduce demand from companies subject to European data protection laws

Further, the United Kingdom has exited the EU, with such exit referred to as "Brexit," effective December 31, 2020. The GDPR's data protection obligations continue to form part of the laws in the United Kingdom by virtue of section 3 of the European Union (Withdrawal) Act 2018, as amended (including by the various Data Protection, Privacy and Electronic Communications (EU Exit) Regulations). Going forward, we are exposed to increasing risk for divergence in application, interpretation and enforcement of these two parallel data protection regimes. Further, in June 2021, the European Commission adopted an adequacy decision with regard to personal data transfers to the United Kingdom under the GDPR, meaning that the European Commission determined that personal data receives essentially equivalent levels of protection in the United Kingdom as it would under EU law. This decision, however, does not cover personal data transferred for purposes of UK immigration control and contains a "sunset clause," which mandates that the adequacy decision expire in four years. This adequacy decision may also be reassessed or revoked during its four-year effective period if the European Commission determines that the United Kingdom has deviated from the level of data protection in place at the time of the adequacy decision. If the European Commission alters or revokes its adequacy decision for any reason, from that point onwards, transfers of personal data from the European Economic Area to the United Kingdom will require a valid 'transfer mechanism' and such transfers will need to be made subject to GDPR-compliant safeguards (for example, the Standard Contractual Clauses). We may face challenges in addressing applicable legal requirements resulting from any such alteration or revocation of this adequacy decision, and we may be required to make changes to our policies and practices and incur significant costs and expenses if any uncertainty surrounding the interpretation or continued efficacy of this adequacy decision develops.

In the United States, Data Protection Laws include rules and regulations promulgated under the authority of the Federal Trade Commission, the Electronic Communications Privacy Act, the Computer Fraud and Abuse Act, the California Consumer Privacy Act, or CCPA, and other state and federal laws relating to privacy and data security. For example, the CCPA requires companies that process information on California residents to make new disclosures to consumers about their data collection, use and sharing practices, and allows consumers to opt out of the sale of personal information with third parties and provides a private right of action and statutory damages for data breaches. The CCPA may increase our compliance costs and potential liability. In addition, California voters recently approved the California Privacy Rights Act of 2020, or CPRA, that goes into effect on January 1, 2023. The CPRA would, among other things, give California residents the ability to limit the use of their sensitive information, provide for penalties for CPRA violations concerning California residents under the age of 16, and establish a new California Privacy Protection Agency to implement and enforce the law. The enactment of the CCPA is prompting a wave of similar legislative developments in other states in the United States, which could create the potential for a patchwork of overlapping but different state laws. Some observers have noted that the CCPA could mark the beginning of a trend toward more stringent privacy legislation in the United States, as observed by the recent adoption of more stringent privacy laws in Virginia and Colorado. The adoption of these and other more stringent privacy legislation could increase our potential liability and adversely affect our business, results of operations, and financial condition. Some countries also are considering or have passed legislation requiring local storage and Processing of data, or similar requirements, which could increase the cost and complexity of operating our C3 AI Software and other aspects of our business.

With laws and regulations, the United States, and globally imposing new and relatively burdensome obligations, and with substantial uncertainty over the interpretation and application of these and other laws and regulations, there is a risk that the requirements of these laws and regulations, or of contractual or other obligations relating to privacy, data protection, or information security, are interpreted or applied in a manner that is, or is alleged to be, inconsistent with our management and Processing practices, our policies or procedures, or the features of our C3 AI Software. We may face challenges in addressing their requirements and making necessary changes to our policies and practices, and may incur significant costs and expenses in an effort to do so. Although we endeavor to comply with our Privacy Policies and other privacy-, data protection-, or

61

information security-related obligations, we may at times fail to do so or may be perceived to have failed to do so. Moreover, despite our efforts, we may not be successful in achieving compliance if our employees or vendors to comply with our Privacy Policies and other privacy-, data protection-, or information security-related obligations. Any failure or perceived failure by us to comply with our Privacy Policies and our privacy-, data protection-, or information security-related obligations to customers or other third parties or any of our other legal obligations relating to privacy, data protection, or information security may result in governmental investigations or enforcement actions, litigation, claims, or public statements against us by consumer advocacy groups or others, and could result in significant liability or cause our customers to lose trust in us, which could have an adverse effect on our reputation and business. Furthermore, the costs of compliance with, and other burdens imposed by, the laws, regulations, and policies that are applicable to the businesses of our customers may limit the adoption and use of, and reduce the overall demand for, our C3 AI Software.

Additionally, if third parties we work with, such as vendors or developers, violate Data Protection Laws or Data Protection Obligations, such violations may also put our customers' content at risk and could in turn have an adverse effect on our business. Further, any significant change to Data Protection Laws, Data Protection Obligations, or industry practices regarding the collection, use, retention, security, or disclosure of our customers' content, or regarding the manner in which express or implied consent for the collection, use, retention, or disclosure of such content is obtained, could increase our costs and require us to modify our C3 AI Software, possibly in a material manner, which we may be unable to complete and may limit our ability to store and Process customer data or develop new applications and features.

***If we or our service providers experience a security breach or if unauthorized parties otherwise obtain access to our customers' data, our data, or our C3 AI Software, our platform may be perceived as not being secure, our reputation may be harmed, demand for our platform may be reduced, and we may incur significant liabilities.***

Our C3 AI Software processes, stores, and transmits our customers' proprietary and sensitive data, potentially including personal information, confidential information, protected health information, and financial data. Our C3 AI Software is built to be available on the infrastructure of third-party public cloud providers such as Amazon Web Services, Azure, and Google Cloud Platform. We also use service providers to help us deliver services to our customers. These vendors may Process personal information, protected health information, or other confidential information of our employees, partners or customers. We collect such information from individuals located both in the United States and abroad and may Process such information outside the country in which it was collected. While we and our service providers have implemented a number of security measures designed to protect against security breaches, these measures could fail or may be insufficient, resulting in the unauthorized disclosure, modification, misuse, unavailability, destruction, or loss of our or our customers' data or other sensitive information. Any security breach of our C3 AI Software, our operational systems, our physical facilities, or the systems or facilities of our partners, or the perception that one has occurred, could result in litigation, indemnity obligations, regulatory enforcement actions, investigations, fines, penalties, mitigation and remediation costs, disputes, reputational harm, diversion of management's attention, and other liabilities and damage to our business. Even though we do not control the security measures of third parties, we may be perceived or asserted to be responsible for any breach of such measures or suffer reputational harm even where we do not have recourse to the third party that caused the breach. In addition, any failure by our partners to comply with applicable law or regulations could result in proceedings against us by governmental entities or others, with further financial, operational, and reputational damage.

Cyberattacks, denial-of-service attacks, ransomware attacks, business email compromises, computer malware, viruses, social engineering (including phishing) and other malicious internet-based activity are prevalent in our industry and our customers' industries and such attacks continue to increase. We also utilize third-party providers to host, transmit, or otherwise process electronic data in connection with our business activities. We or our vendors and business partners may experience attacks, unavailable systems, unauthorized access or disclosure due to employee or other theft or misuse, denial-of-service attacks, sophisticated attacks by nation-state and nation-state supported actors, and advanced persistent threat intrusions. Despite our efforts to ensure the security, privacy, integrity, confidentiality, availability, and authenticity information technology networks and systems, Processing and information, we may not be able to anticipate or to implement effective preventive and remedial measures against all data security and privacy threats. We cannot guarantee that the recovery systems, security protocols, network protection mechanisms and other security measures that we have integrated into our systems, networks and physical facilities, which are designed to protect against, detect and minimize security breaches, or those of our vendors and business partners, will be adequate to prevent or detect service interruption, system failure data loss or theft, or other material adverse consequences. No security solution, strategy, or measures can address all possible security threats or block all methods of penetrating a network or otherwise perpetrating a security incident. The risk of unauthorized

62

circumvention of our security measures or those of our third-party providers, clients and partners has been heightened by advances in computer and software capabilities and the increasing sophistication of hackers who employ complex techniques, including without limitation, the theft or misuse of personal and financial information, counterfeiting, "phishing" or social engineering incidents, ransomware, extortion, publicly announcing security breaches, account takeover attacks, denial or degradation of service attacks, malware, fraudulent payment and identity theft. The techniques used to sabotage, disrupt or to obtain unauthorized access to our C3 AI Software, systems, networks, or physical facilities in which data is stored or through which data is transmitted change frequently, and we may be unable to implement adequate preventative measures or stop security breaches while they are occurring. In addition, laws, regulations, government guidance, and industry standards and practices in the United States and elsewhere are rapidly evolving to combat these threats. We may face increased compliance burdens regarding such requirements from regulators and customers regarding our products and services and also incur additional costs for oversight and monitoring of security risks relating to our own supply chain.

The recovery systems, security protocols, network protection mechanisms and other security measures that we have integrated into our C3 AI Software, systems, networks and physical facilities, which are designed to protect against, detect and minimize security breaches, may not be adequate to prevent or detect service interruption, system failure or data loss. Our C3 AI Software, systems, networks, and physical facilities could be breached or personal information could be otherwise compromised due to employee error or malfeasance, if, for example, third parties attempt to fraudulently induce our employees, those of our vendors and business partners, or our customers to disclose information or user names and/or passwords, or otherwise compromise the security of our C3 AI Software, networks, systems and/or physical facilities. Third parties may also exploit vulnerabilities in, or obtain unauthorized access to, platforms, applications, systems, networks and/or physical facilities utilized by our vendors. We and a number of our vendors and business partners have previously been, and may in the future become, the target of cyber-attacks by third parties seeking unauthorized access to our or our customers' data or to disrupt our operations or ability to provide our services. While we have been successful in preventing such unauthorized access and disruption in the past, we may not continue to be successful against these or other attacks in the future.

The costs to respond to a security breach and/or to mitigate any security vulnerabilities that may be identified could be significant, our efforts to address these problems may not be successful, and these problems could result in unexpected interruptions, delays, cessation of service, negative publicity, and other harm to our business and our competitive position. We could be required to fundamentally change our business activities and practices in response to a security breach or related regulatory actions or litigation, which could have an adverse effect on our business.

We have contractual and legal obligations to notify relevant stakeholders of security breaches. Most jurisdictions have enacted laws requiring companies to notify individuals, regulatory authorities, and others of security breaches involving certain types of data. In addition, our agreements with certain customers and partners may require us to notify them in the event of a security breach involving customer or partner data on our systems or those of subcontractors Processing customer or partner data on our behalf. Such mandatory disclosures are costly, could lead to negative publicity, may cause our customers to lose confidence in the effectiveness of our security measures, and require us to expend significant capital and other resources to respond to or alleviate problems caused by the actual or perceived security breach may cause us to breach customer contracts. Depending on the facts and circumstances of such an incident, these damages, penalties and costs could be significant and may not be covered by insurance or could exceed our applicable insurance coverage limits. Such an event also could harm our reputation and result in litigation against us. Any of these results could materially adversely affect our financial performance. Our agreements with certain customers may require us to use industry-standard, reasonable, or other specified measures to safeguard sensitive personal information or confidential information, and any actual or perceived breach of such measures may increase the likelihood and frequency of customer audits under our agreements, which is likely to increase the costs of doing business. An actual or perceived security breach could lead to claims by our customers, or other relevant stakeholders that we have failed to comply with such legal or contractual obligations. As a result, we could be subject to legal action or our customers could end their relationships with us. There can be no assurance that any limitations of liability in our contracts, which we have in certain agreements, would be enforceable or adequate or would otherwise protect us from liabilities or damages.

Litigation resulting from security breaches may adversely affect our business. Unauthorized access to our C3 AI Software, systems, networks, or physical facilities could result in litigation with our customers or other relevant stakeholders. These proceedings could force us to spend money in defense or settlement, divert management's time and attention, increase our costs of doing business, or adversely affect our reputation. We could be required to fundamentally change our business activities and practices or modify our C3 AI Software capabilities in response to such litigation, which could have an adverse effect on our

63

business. If a security breach were to occur, and the confidentiality, integrity or availability of our data or the data of our partners or our customers was disrupted, we could incur significant liability, or our C3 AI Software, systems, or networks may be perceived as less desirable, which could negatively affect our business and damage our reputation.

If we fail to detect or remediate a security breach in a timely manner, or a breach otherwise affects a large amount of data of one or more customers, or if we suffer a cyberattack that impacts our ability to operate our C3 AI Software, we may suffer material damage to our reputation, business, financial condition, and results of operations. Further, we may not have adequate insurance coverage for security incidents or breaches, including fines, judgments, settlements, penalties, costs, attorney fees and other impacts that arise out of incidents or breaches. Depending on the facts and circumstances of such an incident, the damages, penalties and costs could be significant and may not be covered by insurance or could exceed our applicable insurance coverage limits. If the impacts of a security incident or breach, or the successful assertion of one or more large claims against us that exceeds our available insurance coverage, or results in changes to our insurance policies (including premium increases or the imposition of large deductible or co-insurance requirements), it could have an adverse effect on our business. In addition, we cannot be sure that our existing insurance coverage and coverage for errors and omissions will continue to be available on acceptable terms or that our insurers will not deny coverage as to all or part of any future claim or loss. Our risks are likely to increase as we continue to expand our C3 AI Software, grow our customer base, and store, transmit, and otherwise Process increasingly large amounts of proprietary and sensitive data.

***We could suffer disruptions, outages, defects, and other performance and quality problems with our C3 AI Software or with the public cloud and internet infrastructure on which it relies.***

Our business depends on our C3 AI Software to be available without disruption. We have experienced, and may in the future experience, disruptions, outages, defects, and other performance and quality problems with our C3 AI Software. We have also experienced, and may in the future experience, disruptions, outages, defects, and other performance and quality problems with the public cloud and internet infrastructure on which our C3 AI Software relies. These problems can be caused by a variety of factors, including introductions of new functionality, vulnerabilities and defects in proprietary and open source software, human error or misconduct, capacity constraints, design limitations, as well as from internal and external security breaches, malware and viruses, ransomware, cyber events, denial or degradation of service attacks or other security-related incidents.

Further, if our contractual and other business relationships with our public cloud providers are terminated, suspended, or suffer a material change to which we are unable to adapt, such as the elimination of services or features on which we depend, we could be unable to provide our C3 AI Software and could experience significant delays and incur additional expense in transitioning customers to a different public cloud provider.

Any disruptions, outages, defects, and other security performance and quality problems with our C3 AI Software or with the public cloud and internet infrastructure on which it relies, or any material change in our contractual and other business relationships with our public cloud providers, could result in reduced use of our C3 AI Software, increased expenses, including significant, unplanned capital investments and/or service credit obligations, and harm to our brand and reputation, any of which could have a material adverse effect on our business, financial condition, reputation and results of operations.

***Our application for a PPP Loan could in the future be determined to have been impermissible, which could result in damage to our reputation or adversely impact our business.***

In May 2020, given the uncertainty caused by COVID-19 and related events, we applied for and received proceeds of approximately $6.3 million from a loan under the Paycheck Protection Program, or the PPP Loan, of the Coronavirus Aid, Relief, and Economic Security Act, or the CARES Act. The PPP Loan had a term of two years, was unsecured, and was guaranteed by the U. S. Small Business Administration, or the SBA. The PPP Loan carried a fixed interest rate of 1.00% per annum, with the first six months of interest deferred. We repaid the entire balance of the PPP Loan, including accrued interest in August 2020.

In applying for the PPP Loan, we were required to certify, among other things, that the then-current economic uncertainty made the PPP Loan necessary to support our ongoing operations and that we did not, together with our affiliates, then employ more than 500 employees. We made these certifications in good faith after analyzing, among other things, economic uncertainties created by the COVID-19 pandemic, including its impact on our customers and prospects and the global economy, and the potential impact on our business activity.

We believe that we satisfied all eligibility criteria for the PPP Loan, and that our receipt of the PPP Loan was consistent with the objectives of the CARES Act. The certification regarding necessity described above did not at the time contain any objective criteria and continues to be subject to interpretation. If, despite our good-faith belief that we satisfied all eligibility requirements for the PPP Loan, we are later determined to have violated any of the laws or governmental regulations that apply to us in connection with the PPP Loan, such as the False Claims Act, or it is otherwise determined that we were ineligible to receive the PPP Loan, we may be subject to civil, criminal, and administrative penalties, despite the fact that we elected not to use any of the PPP Loan proceeds and repaid the entire balance of the PPP Loan, including accrued interest. Any violations or alleged violations may result in adverse publicity and damage to our reputation, a review or audit by the SBA or other government entity, or claims under the False Claims Act. These events could consume significant financial and management resources and could have a material adverse effect on our business, results of operations, and financial condition.

***We rely on third-party service providers to host and deliver our C3 AI Software, and any interruptions or delays in these services could impair our C3 AI Software and harm our business.***

We currently serve our customers from third-party data center hosting facilities located in the United States, Asia, and Europe. Our operations depend, in part, on our third-party facility providers' ability to protect these facilities against damage or interruption from natural disasters, power or telecommunications failures, criminal acts, and similar events. In the event that our data center arrangements are terminated, or if there are any lapses of service or damage to a center, we could experience lengthy interruptions in our C3 AI Software as well as delays and additional expenses in making new arrangements.

We designed our system infrastructure and procure and own or lease the computer hardware used for our C3 AI Software. Design and mechanical errors, spikes in usage volume, and failure to follow system protocols and procedures could cause our systems to fail, resulting in interruptions in our C3 AI Software. Any interruptions or delays in our service, whether as a result of third-party error, our own error, natural disasters, or security breaches, whether accidental or willful, could harm our relationships with our customers and cause our revenue to decrease and/or our expenses to increase. Also, in the event of damage or interruption, our insurance policies may not adequately compensate us for any losses that we may incur. These factors in turn could further reduce our revenue, subject us to liability and cause us to issue credits or cause customers to fail to renew their subscriptions, any of which could materially adversely affect our business.

***We may face exposure to foreign currency exchange rate fluctuations.***

We sell to customers globally and have international operations primarily in Europe. As we continue to expand our international operations, we will become more exposed to the effects of fluctuations in currency exchange rates. Although the majority of our cash generated from revenue is denominated in U.S. dollars, a small amount is denominated in foreign currencies, and our expenses are generally denominated in the currencies of the jurisdictions in which we conduct our operations. For the three months ended October 31, 2021 and 2020, 17% and 28% of our revenue, respectively, and for the six months ended October 31, 2021 and 2020, 17% and 26% of our revenue, respectively, were denominated in currencies other than U.S. dollars. For the three months ended October 31, 2021 and 2020, 5% and 8% of our expenses, respectively, and for the six months ended October 31, 2021 and 2020, 5% and 9% of our expenses, respectively, were denominated in currencies other than U.S. dollars. Because we conduct business in currencies other than U.S. dollars but report our results of operations in U.S. dollars, we also face remeasurement exposure to fluctuations in currency exchange rates, which could hinder our ability to predict our future results and earnings and could materially impact our results of operations. Therefore, increases in the value of the U.S. dollar and decreases in the value of foreign currencies could result in the dollar equivalent of our revenue being lower. We do not currently maintain a program to hedge exposures to non-U.S. dollar currencies.

***Sales to government entities and highly regulated organizations are subject to a number of challenges and risks.***

We sell to U.S. federal, state, local, and foreign governmental agency customers, as well as to customers in highly regulated industries such as financial services, telecommunications, and healthcare. Sales to such entities are subject to a number of challenges and risks. Selling to such entities can be highly competitive, expensive, and time consuming, often requiring significant upfront time and expense without any assurance that these efforts will generate a sale. Government contracting requirements may change and restrict our ability to sell into the government sector. Government demand and payment for our C3 AI Software is affected by public sector budgetary cycles and funding authorizations, with funding reductions or delays adversely affecting public sector demand for our C3 AI Software.

Further, governmental and highly regulated entities may demand contract terms that differ from our standard arrangements and may be less favorable than terms agreed with other customers. In our experience, government entities often require shorter term subscriptions than our private sector customers due to budget cycles, making one-year subscriptions not uncommon. Government entities and highly regulated organizations typically have longer implementation cycles, sometimes require acceptance provisions that can lead to a delay in revenue recognition, can have more complex IT and data environments, and may expect greater payment flexibility from vendors.

Contracts with governmental entities may also include preferential pricing terms, such as "most favored customer" pricing. In the event that we are successful in being awarded a government contract, the award may be subject to appeals, disputes, or litigation, including but not limited to bid protests by unsuccessful bidders.

As a government contractor or subcontractor, we must comply with laws, regulations, and contractual provisions relating to the formation, administration, and performance of government contracts and inclusion on government contract vehicles, which affect how we and our partners do business with government agencies. As a result of actual or perceived noncompliance with government contracting laws, regulations, or contractual provisions, we may be subject to non-ordinary course audits and internal investigations, which may prove costly to our business, divert management time, or limit our ability to continue selling our products and services to our government customers. These laws and regulations may impose other added costs on our business, and failure to comply with these or other applicable regulations and requirements, including non-compliance in the past, could lead to claims for damages from our partners, downward contract price adjustments or refund obligations, civil or criminal penalties, and termination of contracts and suspension or debarment from government contracting for a period of time with government agencies. Any such damages, penalties, disruption, or limitation in our ability to do business with a government would adversely impact, and could have a material adverse effect on, our business, results of operations, financial condition, public perception and growth prospects.

Governmental and highly regulated entities may have statutory, contractual, or other legal rights to terminate contracts with us or our partners for convenience or for other reasons. Any such termination may adversely affect our ability to contract with other government customers as well as our reputation, business, financial condition, and results of operations. All these factors can add further risk to business conducted with these customers. If sales expected from a government entity or highly regulated organization for a particular period are not realized in that period or at all, our business, financial condition, results of operations, and growth prospects could be materially and adversely affected.

*Our business could be adversely affected if our employees cannot obtain and maintain required security clearances, we cannot obtain and maintain a required facility security clearance, or we do not comply with legal and regulatory obligations regarding the safeguarding of classified information.*

One of our U.S. government contracts requires our employees to maintain security clearances, and also requires us to comply with U.S. Department of Defense, or DoD, security rules and regulations. The DoD has strict security clearance requirements for personnel who perform work in support of classified programs. In general, access to classified information, technology, facilities, or programs are subject to additional contract oversight and potential liability. In the event of a security incident involving classified information, technology, facilities, or programs, or personnel holding clearances, we may be subject to legal, financial, operational and reputational harm. Obtaining and maintaining security clearances for employees involves a lengthy process, and it is difficult to identify, recruit, and retain employees who already hold security clearances. If our employees are unable to obtain security clearances in a timely manner, or at all, or if our employees who hold security clearances are unable to maintain their clearances or terminate employment with us, then a customer requiring classified work could terminate an existing contract or decide not to renew the contract upon its expiration. To the extent we are not able to obtain or maintain a facility security clearance, we may not be able to bid on or win new classified contracts, and our existing contract (and any future contracts we may subsequently obtain) requiring a facility security clearance could be terminated.

*If we are unable to achieve and sustain a level of liquidity sufficient to support our operations and fulfill our obligations, our business, operating results and financial position could be adversely affected.*

We actively monitor and manage our cash and cash equivalents so that sufficient liquidity is available to fund our operations and other corporate purposes. In the future, increased levels of liquidity may be required to adequately support our operations and initiatives and to mitigate the effects of business challenges or unforeseen circumstances. If we are unable to achieve and sustain such increased levels of liquidity, we may suffer adverse consequences including reduced investment in our

C3 AI Software, difficulties in executing our business plan and fulfilling our obligations, and other operational challenges. Any of these developments could adversely affect our business, operating results and financial position.

***We may need additional capital, and we cannot be certain that additional financing will be available on favorable terms, or at all.***

Historically, we have funded our operations and capital expenditures primarily through equity issuances and cash generated from our operations. Although we currently anticipate that our existing cash and cash equivalents and cash flow from operations will be sufficient to meet our cash needs for the foreseeable future, we may require additional financing. We evaluate financing opportunities from time to time, and our ability to obtain financing will depend, among other things, on our development efforts, business plans, operating performance, and condition of the capital markets at the time we seek financing. Future sales and issuances of our capital stock or rights to purchase our capital stock could result in substantial dilution to our existing stockholders. We may sell Class A common stock, convertible securities, and other equity securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, investors may be materially diluted. New investors in such subsequent transactions could gain rights, preferences, and privileges senior to those of holders of our Class A common stock. Any debt financing that we may secure in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. We cannot assure you that additional financing will be available to us on favorable terms when required, or at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth, development efforts and to respond to business challenges could be significantly impaired, and our business, operating results and financial condition may be adversely affected.

***We may acquire other businesses or receive offers to be acquired, which could require significant management attention, disrupt our business or dilute stockholder value.***

We have in the past made, and may in the future make, acquisitions of other companies, products, and technologies. We have limited experience in acquisitions. We may not be able to find suitable acquisition candidates, and we may not be able to complete acquisitions on favorable terms, if at all. Any acquisitions we complete may not ultimately strengthen our competitive position or achieve our goals, and may be viewed negatively by customers, developers, or investors. In addition, we may not be able to integrate acquired businesses successfully or effectively manage the combined company following an acquisition. If we fail to successfully integrate our acquisitions, or the people or technologies associated with those acquisitions, into our company, the results of operations of the combined company could be adversely affected. Any integration process will require significant time and resources, require significant attention from management and disrupt the ordinary functioning of our business, and we may not be able to manage the process successfully, which could harm our business. In addition, we may not successfully evaluate or utilize the acquired technology and accurately forecast the financial impact of an acquisition transaction, including accounting charges.

We may have to pay cash, incur debt, or issue equity securities to pay for any such acquisition, each of which could affect our financial condition or the value of our capital stock. The sale of equity to finance any such acquisitions could result in dilution to our stockholders. If we incur more debt, it would result in increased fixed obligations and could also subject us to covenants or other restrictions that would impede our ability to flexibly operate our business.

***We have business and customer relationships with certain entities who are stockholders or are affiliated with our directors, or both, and conflicts of interest may arise because of such relationships.***

Some of our customers and other business partners are affiliated with certain of our directors or hold shares of our capital stock, or both. For example, in June 2019, we entered into a strategic collaboration agreement with Baker Hughes whereby Baker Hughes had a right to appoint a director. Our director, Lorenzo Simonelli, is an employee of Baker Hughes, and Baker Hughes is a stockholder. We believe that the transactions and agreements that we have entered into with related parties are on terms that are at least as favorable as could reasonably have been obtained at such time from third parties. However, these relationships could create, or appear to create, potential conflicts of interest when our board of directors is faced with decisions that could have different implications for us and these other parties or their affiliates. In addition, conflicts of interest may arise between us and these other parties and their affiliates. The appearance of conflicts, even if such conflicts do not materialize, might adversely affect the public's perception of us, as well as our relationship with other companies and our ability to enter

into new relationships in the future, including with competitors of such related parties, which could harm our business and results of operations.

***Changes in accounting standards and subjective assumptions, estimates and judgments by management related to complex accounting matters could adversely affect our financial results or financial condition.***

GAAP and related accounting pronouncements, implementation guidelines and interpretations with regard to a wide range of matters that are relevant to our business, such as revenue recognition, impairment of intangible assets, lease obligations, vendor allowances, tax matters and litigation, are complex and involve many subjective assumptions, estimates and judgments. Changes in accounting standards or their interpretation or changes in underlying assumptions, estimates or judgments could significantly change our reported or expected financial performance or financial condition. The implementation of new accounting standards could also require certain systems, internal process and other changes that could increase our operating costs.

For example, in October 2021, we amended our agreements with Baker Hughes to extend the term by an additional year, for a total of six years, with an expiration date in fiscal year 2025, to modify the amount of Baker Hughes' annual commitments to $85.0 million in fiscal year 2023, $110.0 million in fiscal year 2024, and $125.0 million in fiscal year 2025, and to revise the structure of the arrangement to further incentivize Baker Hughes' sales of our products and services. Beginning in fiscal year 2023, Baker Hughes' annual commitments will be reduced by any revenue that Baker Hughes generates from certain customers. The amount of revenue generated by Baker Hughes from these customers will be considered to be variable consideration, and we will be required to review our estimates of this amount quarterly and adjust this estimate, as needed to reflect our current assumptions. To the extent that our estimate of this variable consideration in any prior quarter is not accurate, we may be required to adjust our revenue in future periods to adjust for this variance. As a result, our results of operations in any period could be materially and adversely affected.

***Increased scrutiny regarding environmental, employment, social, and governance matters could adversely impact our reputation, our ability to retain employees, and the willingness of customers and others to do business with us.***

There is increasing focus from investors, regulators, and other corporate stakeholders on corporate policies addressing environmental, employment, social, and governance matters. Stakeholder expectations regarding appropriate corporate conduct on these matters are continually evolving, as are expectations regarding appropriate methods and types of related corporate disclosure. Investors, regulators, or other corporate stakeholders may not be satisfied with our existing environmental, employment, social, and governance practices or those of our customers, strategic partners, or vendors. These stakeholders may also be dissatisfied with the pace at which any revisions to our practices or the practices of our customers, strategic partners, or vendors are adopted and implemented. Further, investors and other stakeholders may object to the societal costs or ethical or other implications, or the perceived costs or implications, associated with the use of our products made by one or more of our customers. If any of these events were to occur, our reputation, our ability to retain employees, and the willingness of customers and others to do business with us may be materially and adversely impacted. We may also incur additional costs and require additional resources, which could be material, to monitor, report, and comply with related corporate disclosure obligations in the future, whether those obligations are imposed by law, regulation, or market expectation.

**Risks Related to Our International Operations**

***We are continuing to expand our operations outside the United States, where we may be subject to increased business and economic risks that could harm our business.***

We have customers in more than 10 countries, and 28% of our revenue for the six months ended October 31, 2021 was generated from customers outside of North America. As of October 31, 2021, we had nine international sales locations, and we plan to add local sales support in further select international markets over time. We expect to continue to expand our international operations, which may include opening offices in new jurisdictions and providing our C3 AI Software in additional languages. Any new markets or countries into which we attempt to sell subscriptions to our C3 AI Software may not be receptive. For example, we may not be able to expand further in some markets if we are not able to satisfy certain government- and industry-specific requirements. In addition, our ability to manage our business and conduct our operations internationally in the future may require considerable management attention and resources and is subject to the particular challenges of supporting a rapidly growing business in an environment of multiple languages, cultures, customs, legal and regulatory systems, alternative dispute systems, and commercial markets. Future international expansion will require

investment of significant funds and other resources. Operating internationally subjects us to new risks and may increase risks that we currently face, including risks associated with:

- recruiting and retaining talented and capable employees outside the United States and maintaining our company culture across all of our offices;

- potentially different pricing environments, longer sales cycles, and longer accounts receivable payment cycles and collections issues;

- compliance with applicable international laws and regulations, including laws and regulations with respect to privacy, data protection, and consumer protection, and the risk of penalties to us and individual members of management or employees if our practices are deemed to be out of compliance;

- management of an employee base in jurisdictions that may not give us the same employment and retention flexibility as does the United States;

- operating in jurisdictions that do not protect intellectual property rights to the same extent as does the United States and the practical enforcement of such intellectual property rights outside of the United States;

- foreign government interference with our intellectual property that resides outside of the United States, such as the risk of changes in foreign laws that could restrict our ability to use our intellectual property;

- integration with partners outside of the United States;

- securing our locally operated systems and our data and the data of our customers and partners accessible from such jurisdictions;

- compliance by us and our business partners with anti-corruption laws, import and export control laws, tariffs, trade barriers, economic sanctions, anti-money laundering laws and other regulatory limitations on our ability to provide our C3 AI Software in certain international markets;

- foreign exchange controls that might require significant lead time in setting up operations in certain geographic territories and might prevent us from repatriating cash earned outside the United States;

- political and economic instability;

- COVID-19 or any other pandemics or epidemics that could result in decreased economic activity in certain markets, decreased use of our C3 AI Software, or in our decreased ability to import, export, or sell our C3 AI Software to existing or new customers in international markets;

- changes in diplomatic and trade relationships, including the imposition of new trade restrictions, trade protection measures, import or export requirements, trade embargoes, and other trade barriers;

- generally longer payment cycles and greater difficulty in collecting accounts receivable;

- double taxation of our international earnings and potentially adverse tax consequences due to changes in the income and other tax laws of the United States or the international jurisdictions in which we operate; and

- higher costs of doing business internationally, including increased accounting, travel, infrastructure, and legal compliance costs.

Some of our business partners also have international operations and are subject to the risks described above. Even if we are able to successfully manage the risks of international operations, our business may be adversely affected if our business partners are not able to successfully manage these risks.

Compliance with laws and regulations applicable to our global operations substantially increases our cost of doing business in international jurisdictions. We may be unable to keep current with changes in laws and regulations as they occur. Although we have implemented policies and procedures designed to support compliance with these laws and regulations, there can be no assurance that we will always maintain compliance or that all of our employees, contractors, partners, and agents will comply.

Any violations could result in enforcement actions, fines, civil and criminal penalties, damages, injunctions, or reputational harm. If we are unable to comply with these laws and regulations or manage the complexity of our global operations successfully, we may need to relocate or cease operations in certain foreign jurisdictions.

***We are subject to governmental export and import controls that could impair our ability to compete in international markets or subject us to liability if we are not in compliance with applicable laws.***

Certain of our C3 AI Software is subject to various restrictions under U.S. export control and trade and economic sanctions laws and regulations, including the U.S. Department of Commerce's Export Administration Regulations, or EAR, and various economic and trade sanctions regulations administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, or OFAC. U.S. export control and economic sanctions laws and regulations include restrictions or prohibitions on the sale or supply of certain AI platform and applications, services and technologies to U.S. embargoed or sanctioned countries, governments, persons, and entities. Further, U.S. export laws and regulations include broad licensing requirements, including requiring authorization for the export of certain items. In addition, various countries regulate the import of certain items, including through import permitting and licensing requirements and have enacted or could enact laws that could limit our ability to distribute our C3 AI Software or could limit our customers' ability to implement our C3 AI Software in those countries.

Changes in our C3 AI Software and, if required, obtaining the necessary export license or other authorization for a particular sale, or changes in export, sanctions, and import laws, may result in the delay or loss of sales opportunities, delay the introduction and sale of subscriptions to our C3 AI Software in international markets, prevent our customers with international operations from using our C3 AI Software or, in some cases, prevent the access or use of our C3 AI Software to and from certain countries, governments, persons, or entities altogether. Further, any change in export or import regulations, economic sanctions or related laws, shift in the enforcement or scope of existing regulations or change in the countries, governments, persons, or technologies targeted by such regulations could result in decreased use of our C3 AI Software or in our decreased ability to export or sell our C3 AI Software to existing or potential customers with international operations. Any decreased use of our C3 AI Software or limitation on our ability to export or sell our C3 AI Software would likely harm our business.

In addition, if our channel partners fail to obtain appropriate import, export, or re-export licenses or permits, we may also be adversely affected through reputational harm, as well as other negative consequences, including government investigations and penalties.

Even though we take precautions to ensure that we and our channel partners comply with all relevant regulations, any failure by us or our channel partners to comply with U.S. export control and economic sanctions laws and regulations or other laws could have negative consequences, including reputational harm, government investigations and substantial civil and criminal penalties (e.g., fines, incarceration for responsible employees and managers, and the possible loss of export or import privileges).

***We are subject to the U.S. Foreign Corrupt Practices Act, or FCPA, and similar anti-corruption, anti-bribery, and similar laws, and non-compliance with such laws can subject us to criminal or civil liability and harm our business, financial condition and results of operations.***

We are subject to the FCPA, U.S. domestic bribery laws, the UK Bribery Act, and other anti-corruption and similar laws in the countries in which we conduct activities. Anti-corruption and anti-bribery laws have been enforced aggressively in recent years and are interpreted broadly to generally prohibit companies, their employees, and their third-party business partners or intermediaries, representatives, and agents from authorizing, offering, or providing, directly or indirectly, improper payments or other benefits, directly or indirectly, to government officials or others in the private sector in order to influence official action, direct business to any person, gain any improper advantage, or obtain or retain business. As we increase our international sales and business, our risks under these laws may increase.

As we increase our international sales and business and sales to the public sector, we may engage with third-party business partners and intermediaries to market our C3 AI Software and to obtain necessary permits, licenses, and other regulatory approvals. In addition, we or our third-party business partners or intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities. We can be held liable for the corrupt or other illegal activities of our third-party business partners or intermediaries, our employees, representatives, contractors, and agents, even if we do not explicitly authorize such activities.

These laws also require that we keep accurate books and records and maintain internal controls and compliance procedures designed to prevent any such actions. While we have policies and procedures to address compliance with such laws, our third-party business partners or intermediaries, employees, representatives, contractors, and agents may take actions in violation of our policies and applicable law, for which we may be ultimately held responsible.

Detecting, investigating, and resolving actual or alleged violations of anti-corruption laws can require a significant diversion of time, resources, and attention from senior management, as well as significant defense costs and other professional fees. In addition, noncompliance with anti-corruption, or anti-bribery laws could subject us to whistleblower complaints, investigations, sanctions, settlements, prosecution, enforcement actions, fines, damages, other civil or criminal penalties or injunctions against us, our officers, or our employees, disgorgement of profits, suspension or debarment from contracting with the U.S. government or other persons, reputational harm, adverse media coverage, and other collateral consequences. If any subpoenas or investigations are launched, or governmental or other sanctions are imposed, or if we do not prevail in any possible civil or criminal proceeding, our reputation, business, stock price, financial condition, prospects and results of operations could be harmed.

**Risks Related to Taxes**

***Our results of operations may be harmed if we are required to collect sales or other related taxes for our subscriptions in jurisdictions where we have not historically done so.***

We collect sales tax in a number of jurisdictions. One or more states or countries may seek to impose incremental or new sales, use, or other tax collection obligations on us. A successful assertion by a state, country, or other jurisdiction that we should have been or should be collecting additional sales, use, or other taxes could, among other things, result in substantial tax payments, create significant administrative burdens for us, discourage potential customers from subscribing to our C3 AI Software due to the incremental cost of any such sales or other related taxes, or otherwise harm our business.

***We may be subject to liabilities on past sales for taxes, surcharges, and fees.***

We currently collect and remit applicable sales tax in jurisdictions where we, through our employees, have a presence and where we have determined, based on legal precedents in the jurisdiction, that sales of our C3 AI Software are classified as taxable. We do not currently collect and remit other state and local excise, utility, user, and ad valorem taxes, fees or surcharges that may apply to our customers. We believe that we are not otherwise subject to, or required to collect, any additional taxes, fees or surcharges imposed by state and local jurisdictions because we do not have a sufficient physical presence or "nexus" in the relevant taxing jurisdiction or such taxes, fees, or surcharges do not apply to sales of our C3 AI Software in the relevant taxing jurisdiction. However, there is uncertainty as to what constitutes sufficient physical presence or nexus for a state or local jurisdiction to levy taxes, fees, and surcharges for sales made over the internet, and there is also uncertainty as to whether our characterization of our C3 AI Software as not taxable in certain jurisdictions will be accepted by state and local taxing authorities. Additionally, we have not historically collected value-added tax, or VAT, or goods and services tax, or GST, on sales of our C3 AI Software, generally, because we make almost all of our sales through our office in the United States, and we believe, based on information provided to us by our customers, that most of our sales are made to business customers.

Taxing authorities may challenge our position that we do not have sufficient nexus in a taxing jurisdiction or that our C3 AI Software are exempt from use, telecommunications, VAT, GST, and other taxes, which could result in increased tax liabilities for us or our customers, which could harm our business.

The application of indirect taxes (such as sales and use tax, VAT, GST, business tax, and gross receipt tax) to businesses that transact online, such as ours, is a complex and evolving area. Following the recent U.S. Supreme Court decision in South Dakota v. Wayfair, Inc., states are now free to levy taxes on sales of goods and services based on an "economic nexus," regardless of whether the seller has a physical presence in the state. As a result, it may be necessary to reevaluate whether our activities give rise to sales, use, and other indirect taxes as a result of any nexus in those states in which we are not currently registered to collect and remit taxes. Additionally, we may need to assess our potential tax collection and remittance liabilities based on existing economic nexus laws' dollar and transaction thresholds. We continue to analyze our exposure for such taxes and liabilities. The application of existing, new, or future laws, whether in the United States or internationally, could harm our business. There have been, and will continue to be, substantial ongoing costs associated with complying with the various indirect tax requirements in the numerous markets in which we conduct or will conduct business.

***We may have exposure to greater than anticipated tax liabilities, which could harm our business.***

While to date we have not incurred significant income taxes in operating our business, we are subject to income taxes in the United States and various jurisdictions outside of the United States. Our effective tax rate could fluctuate due to changes in the proportion of our earnings and losses in countries with differing statutory tax rates. Our tax expense could also be impacted by changes in non-deductible expenses, changes in excess tax benefits of stock-based or other compensation, changes in the valuation of, or our ability to use, deferred tax assets and liabilities, the applicability of withholding taxes, and effects from acquisitions.

The provision for taxes on our financial statements could also be impacted by changes in accounting principles, changes in U.S. federal, state, or international tax laws applicable to corporate multinationals such as the recent legislation enacted in the United States, other fundamental changes in law currently being considered by many countries and changes in taxing jurisdictions' administrative interpretations, decisions, policies and positions.

We are subject to review and audit by U.S. federal, state, local, and foreign tax authorities. Such tax authorities may disagree with tax positions we take, and if any such tax authority were to successfully challenge any such position, our business could be harmed. We may also be subject to additional tax liabilities due to changes in non-income based taxes resulting from changes in federal, state, or international tax laws, changes in taxing jurisdictions' administrative interpretations, decisions, policies, and positions, results of tax examinations, settlements, or judicial decisions, changes in accounting principles, changes to our business operations, including acquisitions, as well as the evaluation of new information that results in a change to a tax position taken in a prior period.

***Our ability to use our net operating losses and certain other tax attributes to offset future taxable income or taxes may be subject to certain limitations.***

As of April 30, 2021, we had net operating loss carryforwards, or NOLs, for U.S. federal and state purposes of $308.3 million and $168.6 million, respectively, which may be available to offset taxable income in the future, and portions of which expire in various years beginning in 2029. A lack of future taxable income would adversely affect our ability to utilize these NOLs before they expire. Under the Tax Cuts and Jobs Act of 2017, or the Tax Act, as modified by the CARES Act, federal NOLs incurred in tax years beginning after December 31, 2017 may be carried forward indefinitely, but the deductibility of such federal NOLs in tax years beginning after December 31, 2020 is limited to 80% of taxable income. It is uncertain if and to what extent various states will conform to the Tax Act or the CARES Act. In addition, under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, a corporation that undergoes an "ownership change" (as defined under Sections 382 and 383 of the Code and applicable Treasury Regulations) is subject to limitations on its ability to utilize its pre-change NOLs and certain other tax attributes to offset post-change taxable income or taxes. We may experience a future ownership change under Section 382 of the Code that could affect our ability to utilize our NOLs to offset our income. Furthermore, our ability to utilize NOLs of companies that we have acquired or may acquire in the future may be subject to limitations. In addition, at the state level, there may be periods during which the use of NOLs is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed. For example, on June 29, 2020, the Governor of California signed into law the 2020 Budget Act which temporarily suspends the utilization of NOLs and limits the utilization of research credits to $5.0 million annually for 2020, 2021, and 2022. For these reasons, we may not be able to utilize a material portion of the NOLs reflected on our balance sheet, even if we attain profitability, which could potentially result in increased future tax liability to us and could adversely affect our operating results and financial condition.

**Risks Related to Our Intellectual Property**

***We are currently, and may be in the future, party to intellectual property rights claims and other litigation matters, which, if resolved adversely, could harm our business.***

We primarily rely and expect to continue to rely on a combination of patent, patent licenses, trade secret, domain name protection, trademark, and copyright laws, as well as confidentiality and license agreements with our employees, consultants, and third parties, to protect our intellectual property and proprietary rights. From time to time, are subject to litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. As we face increasing competition and gain an increasingly high profile, the possibility of intellectual property rights claims, commercial claims, and other assertions against us grows. We have in the past been, and may from time to time in the future become, a party to litigation and disputes related to our intellectual property, our business practices, and our C3 AI Software. While we intend to

72

defend any lawsuit vigorously, litigation can be costly and time consuming, divert the attention of our management and key personnel from our business operations, and dissuade potential customers from subscribing to our C3 AI Software, which would harm our business. Furthermore, with respect to lawsuits, there can be no assurances that favorable outcomes will be obtained. We may need to settle litigation and disputes on terms that are unfavorable to us, or we may be subject to an unfavorable judgment that may not be reversible upon appeal. The terms of any settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, our agreements with customers or partners typically include certain provisions for indemnifying them against liabilities if our C3 AI Software infringes a third party's intellectual property rights, including in the third-party open source software components included in our C3 AI Software, which indemnification obligations could require us to make payments to our customers. During the course of any litigation or dispute, we may make announcements regarding the results of hearings and motions and other interim developments. If securities analysts and investors regard these announcements as negative, the market price of our Class A common stock may decline. With respect to any intellectual property rights claim, we may have to seek a license to continue practices found to be in violation of third-party rights, which may not be available on reasonable terms and may significantly increase our operating expenses. A license to continue such practices may not be available to us at all, and we may be required to develop alternative non-infringing technology or practices or discontinue the practices. The development of alternative, non-infringing technology or practices could require significant effort and expense. Our business could be harmed as a result.

*Indemnity provisions in various agreements potentially expose us to substantial liability for intellectual property infringement and other losses.*

Our agreements with customers and other third parties generally include indemnification provisions under which we agree to indemnify them for losses suffered or incurred as a result of claims of intellectual property infringement, or other liabilities relating to or arising from our software, services, or other contractual obligations. Large indemnity payments could harm our business, results of operations, and financial condition. Although we normally contractually limit our liability with respect to such indemnity obligations, generally, those limitations may not be fully enforceable in all situations, and we may still incur substantial liability under those agreements. Any dispute with a customer with respect to such obligations could have adverse effects on our relationship with that customer and other existing customers and new customers and harm our business and results of operations.

*Our failure to protect our intellectual property rights and proprietary information could diminish our brand and other intangible assets.*

As of October 31, 2021, we have ten issued patents in the United States, eleven issued patents in a number of international jurisdictions, 18 patent applications in the United States (including one allowed application and three provisional applications), and 45 patent applications pending internationally. Our issued patents expire between February 23, 2033 and July 30, 2039. The pending patent applications are presently undergoing examination or expected to undergo examination in the near future. These patents and patent applications seek to protect our proprietary inventions relevant to our business, in addition to other proprietary technologies which are maintained as trade secrets. We intend to pursue additional intellectual property protection to the extent we believe it would be beneficial and cost-effective. We make business decisions about when to seek patent protection for a particular technology and when to rely upon copyright or trade secret protection, and the approach we select may ultimately prove to be inadequate. Even in cases where we seek patent protection, there is no assurance that the resulting patents will effectively protect every significant feature of our C3 AI Software. In addition, we believe that the protection of our trademark rights is an important factor in AI platform and application recognition, protecting our brand and maintaining goodwill. If we do not adequately protect our rights in our trademarks from infringement and unauthorized use, any goodwill that we have developed in those trademarks could be lost or impaired, which could harm our brand and our business. Third parties may knowingly or unknowingly infringe our proprietary rights, third parties may challenge our proprietary rights, pending and future patent, trademark and copyright applications may not be approved, and we may not be able to prevent infringement without incurring substantial expense. We have also devoted substantial resources to the development of our proprietary technologies and related processes. In order to protect our proprietary technologies and processes, we rely in part on trade secret laws and confidentiality agreements with our employees, consultants, and third parties. These agreements may not effectively prevent unauthorized disclosure of confidential information and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets, in which case we would not be able to assert trade secret rights or develop similar technologies and processes. Further, laws in certain jurisdictions may afford little or no trade secret protection, and any changes in, or unexpected interpretations of, the intellectual property laws in any country in which we operate may compromise our ability to enforce our intellectual property rights. Costly

73

and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights. If the protection of our proprietary rights is inadequate to prevent use or appropriation by third parties, the value of our C3 AI Software, brand, and other intangible assets may be diminished, and competitors may be able to more effectively replicate our C3 AI Software. Any of these events would harm our business.

***Our use of third-party open source software could negatively affect our ability to offer and sell subscriptions to our C3 AI Software and subject us to possible litigation.***

A portion of the technologies we use incorporates third-party open source software, and we may incorporate third-party open source software in our solutions in the future. Open source software is generally licensed by its authors or other third parties under open source licenses. From time to time, companies that use third-party open source software have faced claims challenging the use of such open source software and requesting compliance with the open source software license terms. Accordingly, we may be subject to suits by parties claiming ownership of what we believe to be open source software or claiming non-compliance with the applicable open source licensing terms. Some open source software licenses require end users who use, distribute or make available across a network software and services that include open source software to offer aspects of the technology that incorporates the open source software for no cost. We may also be required to make publicly available source code (which in some circumstances could include valuable proprietary code) for modifications or derivative works we create based upon, incorporating or using the open source software and/or to license such modifications or derivative works under the terms of the particular open source license. Additionally, if a third-party software provider has incorporated open source software into software that we license from such provider, we could be required to disclose any of our source code that incorporates or is a modification of our licensed software. While we employ practices designed to monitor our compliance with the licenses of third-party open source software and protect our valuable proprietary source code, we may inadvertently use third-party open source software in a manner that exposes us to claims of non-compliance with the terms of their licenses, including claims of intellectual property rights infringement or for breach of contract. Furthermore, there exists today an increasing number of types of open source software licenses, almost none of which have been tested in courts of law to provide guidance of their proper legal interpretations. If we were to receive a claim of non-compliance with the terms of any of these open source licenses, we could be required to incur significant legal expenses defending against those allegations and could be subject to significant damages, enjoined from offering or selling our solutions that contained the open source software, and required to comply with the foregoing conditions, and we may be required to publicly release certain portions of our proprietary source code. We could also be required to expend substantial time and resources to re-engineer some of our software. Any of the foregoing could disrupt and harm our business.

In addition, the use of third-party open source software typically exposes us to greater risks than the use of third-party commercial software because open source licensors generally do not provide warranties or controls on the functionality or origin of the software. Use of open source software may also present additional security risks because the public availability of such software may make it easier for hackers and other third parties to determine how to compromise our C3 AI Software. Any of the foregoing could harm our business and could help our competitors develop platforms and applications that are similar to or better than ours.

***Because of the characteristics of open source software, there may be fewer technology barriers to entry by new competitors and it may be relatively easy for new and existing competitors with greater resources than we have to compete with us.***

One of the characteristics of open source software is that the governing license terms generally allow liberal modifications of the code and distribution thereof to a wide group of companies and/or individuals. As a result, others could easily develop new platforms and applications based upon those open source programs that compete with existing open source software that we support and incorporate into our C3 AI Software. Such competition with use of the open source projects that we utilize can materialize without the same degree of overhead and lead time required by us, particularly if the customers do not value the differentiation of our proprietary components. It is possible for new and existing competitors with greater resources than ours to develop their own open source software or hybrid proprietary and open source software offerings, potentially reducing the demand for, and putting price pressure on, our C3 AI Software. In addition, some competitors make open source software available for free download and use or may position competing open source software as a loss leader. We cannot guarantee that we will be able to compete successfully against current and future competitors or that competitive pressure and/or the availability of open source software will not result in price reductions, reduced operating margins and loss of market share, any one of which could seriously harm our business.

74

*If open source software programmers, many of whom we do not employ, or our own internal programmers do not continue to develop and enhance open source technologies, we may be unable to develop new technologies, adequately enhance our existing technologies or meet customer requirements for innovation, quality and price.*

We rely to a significant degree on a number of open source software programmers, or committers and contributors, to develop and enhance components of our C3 AI Software. Additionally, members of the corresponding Apache Software Foundation Project Management Committees, or PMCs, many of whom are not employed by us, are primarily responsible for the oversight and evolution of the codebases of important components of the open source data management ecosystem. If the open source data management committees and contributors fail to adequately further develop and enhance open source technologies, or if the PMCs fail to oversee and guide the evolution of open source data management technologies in the manner that we believe is appropriate to maximize the market potential of our solutions, then we would have to rely on other parties, or we would need to expend additional resources, to develop and enhance our C3 AI Software. We also must devote adequate resources to our own internal programmers to support their continued development and enhancement of open source technologies, and if we do not do so, we may have to turn to third parties or experience delays in developing or enhancing open source technologies. We cannot predict whether further developments and enhancements to these technologies would be available from reliable alternative sources. In either event, we may incur additional development expenses and experience delays in technology release and upgrade. Delays in developing, completing, or delivering new or enhanced components to our C3 AI Software could cause our offerings to be less competitive, impair customer acceptance of our solutions, and result in delayed or reduced revenue for our solutions.

*Our software development and licensing model could be negatively impacted if the Apache License, Version 2.0 is not enforceable or is modified so as to become incompatible with other open source licenses.*

Components of our C3 AI Software have been provided under the Apache License 2.0. This license states that any work of authorship licensed under it, and any derivative work thereof, may be reproduced and distributed provided that certain conditions are met. It is possible that a court would hold this license to be unenforceable or that someone could assert a claim for proprietary rights in a program developed and distributed under it. Any ruling by a court that this license is not enforceable, or that we may not reproduce or distribute those open source software components as part of our C3 AI Software, may negatively impact our distribution or development of all or a portion of our solutions. In addition, at some time in the future it is possible that the license terms under which important components of the open source projects in our C3 AI Software is distributed may be modified, which could, among other consequences, negatively impact our continuing development or distribution of the software code subject to the new or modified license.

Further, full utilization of our C3 AI Software may depend on software, applications, hardware and services from various third parties, and these items may not be compatible with our C3 AI Software and its development or may not be available to us or our customers on commercially reasonable terms, or at all, which could harm our business.

**Risks Related to Ownership of Our Class A Common Stock**

*The trading price of our Class A common stock may be volatile, and you could lose all or part of your investment.*

The trading price of our Class A common stock has been and will likely continue to be volatile and could be subject to fluctuations in response to various factors, some of which are beyond our control. These fluctuations could cause you to lose all or part of your investment in our Class A common stock. Factors that could cause fluctuations in the trading price of our Class A common stock include the risk factors set forth in this section as well as the following:

- price and volume fluctuations in the overall stock market from time to time;

- high volume retail trading by participants connected in a social network;

- volatility in the trading prices and trading volumes of technology stocks;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- sales of shares of our Class A common stock by us or our stockholders;

75

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors, particularly in light of the significant portion of our revenue derived from a limited number of customers;

- changes in our financial, operating or other metrics, regardless of whether we consider those metrics as reflective of the current state or long-term prospects of our business, and how those results compare to securities analyst expectations, including whether those results fail to meet, exceed, or significantly exceed securities analyst expectations, particularly in light of the significant portion of our revenue derived from a limited number of customers;

- announcements by us or our competitors of new products, applications, features, or services;

- the public's reaction to our press releases, other public announcements, and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our results of operations or fluctuations in our results of operations;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry, or both, or investigations by regulators into our operations or those of our competitors;

- actual or perceived privacy or data security incidents;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses, applications, products, services, or technologies by us or our competitors;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations, or principles;

- any significant change in our management;

- general political and economic conditions and slow or negative growth of our markets; and

- technical factors in the public trading market for our stock that may produce price movements that may or may not comport with macro, industry or company-specific fundamentals, including, without limitation, the sentiment of retail investors (including as may be expressed on financial trading and other social media sites), the amount and status of short interest in our securities, access to margin debt, trading in options and other derivatives on our common stock and other technical trading factors.

Accordingly, we cannot assure you of the liquidity of an active trading market, your ability to sell your shares of our Class A common stock when desired, or the prices that you may obtain for your shares of our Class A common stock. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares of our Class A common stock and may impair our ability to acquire or make investments in complementary companies, products, or technologies by using shares of our common stock as consideration.

In addition, in the past, following periods of volatility in the overall market and in the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

***The dual class structure of our common stock has the effect of concentrating voting control with the holders of our Class B common stock, limiting your ability to influence corporate matters.***

Our Class B common stock has 50 votes per share, and our Class A common stock has one vote per share. As of October 31, 2021, Mr. Siebel and related entities beneficially owned approximately 95.4% of our Class B common stock and approximately 23.8% of our outstanding Class A common stock, resulting in beneficial ownership of capital stock representing

76

approximately 63.1% of the voting power of our outstanding capital stock. Therefore, Mr. Siebel has control over our management and affairs and over all matters requiring stockholder approval, including election of directors and significant corporate transactions, such as a merger or other sale of us or our assets. This concentrated control will limit your ability to influence corporate matters for the foreseeable future, and, as a result, the market price of our Class A common stock could be adversely affected.

Each share of Class B common stock will be automatically converted into one share of Class A common stock upon the earliest of (1) the date that is six months following the death or incapacity of Mr. Siebel, (2) the date that is six months following the date that Mr. Siebel is no longer providing services to us as an officer, employee, director, or consultant, (3) December 11, 2040, and (4) the date specified by the holders of a majority of the then outstanding shares of Class B common stock, voting as a separate class. Future transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, which will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. If, for example, Mr. Siebel retains a significant portion of his holdings of Class B common stock for an extended period of time, he could, in the future, control a majority of the combined voting power of our Class A and Class B common stock. As a board member, Mr. Siebel owes a fiduciary duty to our stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, even a controlling stockholder, Mr. Siebel is entitled to vote his shares in his own interests, which may not always be in the interests of our stockholders generally.

FTSE Russell and Standard & Poor's do not allow most newly public companies utilizing dual or multi-class capital structures to be included in their indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400 and S&P SmallCap 600, which together make up the S&P Composite 1500. Also in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices; however, in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. Under the announced policies, our dual class capital structure would make us ineligible for inclusion in certain indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track these indices will not be investing in our stock. In addition, other stock indices may take similar actions. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from certain stock indices would likely preclude investment by many of these funds and would make our Class A common stock less attractive to other investors. As a result, the trading price and volume of our Class A common stock could be adversely affected.

***Substantial future sales of shares of our Class A common stock and Class B common stock by existing holders in the public market could cause the market price of our Class A common stock to decline.***

Sales of a substantial number of shares of our Class A common stock and Class B common stock (after automatically converting to Class A common stock) in the public market, particularly sales by our directors, executive officers, and principal stockholders, or the perception that these sales might occur, could depress the market price of our Class A common stock.

In addition, as of October 31, 2021, there were 37,824,606 shares of Class A common stock subject to outstanding options under our Amended and Restated 2012 Equity Incentive Plan and 6,041,895 shares of Class A common stock subject to equity awards outstanding under our 2020 Equity Incentive Plan. We have registered all of the shares of Class A common stock issuable upon exercise of outstanding options and upon exercise or settlement of any options or other equity incentives we may grant in the future for public resale under the Securities Act. Accordingly, these shares will become eligible for sale in the public market to the extent any such equity awards are exercised or settled for shares of Class A common stock, subject to compliance with applicable securities laws. In addition, certain of our stockholders have registration rights that would require us to register shares owned by them for public sale in the United States.

Sales of our shares could also impair our ability to raise capital through the sale of additional equity securities in the future and at a price we deem appropriate. These sales could also cause the trading price of our Class A common stock to fall and make it more difficult for you to sell shares of our Class A common stock.

***Provisions in our constituent documents and Delaware law may prevent or frustrate attempts by our stockholders to change our management or hinder efforts to acquire a controlling interest in us, and the market price of our Class A common stock may be lower as a result.***

There are provisions in our certificate of incorporation and bylaws that may make it difficult for a third party to acquire, or attempt to acquire, control of our company, even if a change in control was considered favorable by our stockholders. These include provisions:

- establishing a classified board of directors so that not all members of our board of directors are elected at one time;

- permitting our board of directors to establish the number of directors and fill any vacancies and newly created directorships;

- providing that directors may only be removed for cause;

- prohibiting cumulative voting for directors;

- requiring super-majority voting to amend some provisions in our certificate of incorporation and bylaws;

- authorizing the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- eliminating the ability of stockholders to call special meetings of stockholders;

- prohibiting stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders; and

- our dual class common stock structure as described above.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law, which prohibit a person who owns 15% or more of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired in excess of 15% of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner. Any provision in our certificate of incorporation or our bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our Class A common stock and could also affect the price that some investors are willing to pay for our Class A common stock.

***Our amended and restated certificate of incorporation designates the Court of Chancery of the State of Delaware and, to the extent enforceable, the federal district courts of the United States of America as the exclusive forums for certain disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated certificate of incorporation provides that, unless we consent in writing to the selection of an alternative forum, the sole and exclusive forum for the following types of actions or proceedings under Delaware statutory or common law: (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers, or other employees to us or our stockholders, (3) any action arising pursuant to any provision of the Delaware General Corporation Law, or the certificate of incorporation or the amended and restated bylaws or (4) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware), in all cases subject to the court having jurisdiction over indispensable parties named as defendants. This provision would not apply to suits brought to enforce a duty or liability created by the Exchange Act. In addition, to prevent having to litigate claims in multiple jurisdictions and the threat of inconsistent or contrary rulings by different courts, among other considerations, our amended and restated certificate of incorporation will further provide that the U.S. federal district courts will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act. However, as Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act, and an investor cannot waive compliance with the federal securities laws and the rules and regulations thereunder, there is uncertainty as to whether a court would enforce such a provision. While the Delaware courts have determined that such choice of forum provisions are facially valid, a stockholder may nevertheless

seek to bring a claim in a venue other than those designated in the exclusive forum provisions. In such instance, we would expect to vigorously assert the validity and enforceability of the exclusive forum provisions of our amended and restated certificate of incorporation. This may require significant additional costs associated with resolving such action in other jurisdictions and there can be no assurance that the provisions will be enforced by a court in those other jurisdictions.

These exclusive forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find either exclusive-forum provision in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur further significant additional costs associated with resolving the dispute in other jurisdictions, all of which could seriously harm our business.

***Our Class A common stock market price and trading volume could decline if securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business.***

The trading market for our Class A common stock depends in part on the research and reports that securities or industry analysts publish about us or our business. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If one or more of the analysts who cover us downgrade our Class A common stock or publish inaccurate or unfavorable research about our business, the price of our securities would likely decline. If few securities analysts commence coverage of us, or if one or more of these analysts cease coverage of us or fail to publish reports on us regularly, demand for our securities could decrease, which might cause the price and trading volume of our Class A common stock to decline.

***We are an "emerging growth company," and we intend to comply only with reduced disclosure requirements applicable to emerging growth companies. As a result, our Class A common stock could be less attractive to investors.***

We are an "emerging growth company," as defined in the JOBS Act, and for as long as we continue to be an emerging growth company, we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our Class A common stock less attractive as a result of any choices to reduce future disclosure, there may be a less active trading market for our Class A common stock, and our stock price may be more volatile.

Based on our stock price on October 31, 2021, the last day of our second fiscal quarter, and the public float of our Class A common stock on that date, we will no longer qualify as an "emerging growth company" as of April 30, 2022 and expect to become a large accelerated filer.

***We will continue to incur costs and demands upon management as a result of complying with the laws and regulations affecting public companies in the United States, which may harm our business.***

As a public company listed in the United States, we have incurred and expect to continue to incur significant additional legal, accounting, and other expenses. In addition, changing laws, regulations, and standards relating to corporate governance and public disclosure, including regulations implemented by the SEC and the New York Stock Exchange, may increase legal and financial compliance costs and make some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. We intend to invest resources to comply with evolving laws, regulations, and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If, notwithstanding our efforts, we fail to comply with new laws, regulations, and standards, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

Failure to comply with these rules might also make it more difficult for us to obtain certain types of insurance, including director and officer liability insurance, and we might be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. The impact of these events would also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, on committees of our board of directors, or as members of senior management.

In addition, we may incur significant expenses and devote substantial management attention as we prepare to comply with the additional requirements that will become applicable to us once we cease to be an "emerging growth company," including ensuring compliance with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act and following the accelerated timelines for adopting new accounting pronouncements for public companies. In that regard, we may need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge.

**General Risks**

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

We are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, the Sarbanes-Oxley Act, and the rules and regulations of the applicable listing standards of the New York Stock Exchange. We expect that the requirements of these rules and regulations will continue to increase our legal, accounting, and financial compliance costs, make some activities more difficult, time consuming, and costly, and place significant strain on our personnel, systems, and resources.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. We are continuing to develop and refine our disclosure controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we will file with the SEC is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to our principal executive and financial officers. We are also continuing to improve our internal control over financial reporting. In order to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, we have expended, and anticipate that we will continue to expend, significant resources, including accounting-related costs and significant management oversight.

Our current controls and any new controls that we develop may become inadequate because of changes in conditions in our business. In addition, changes in accounting principles or interpretations could also challenge our internal controls and require that we establish new business processes, systems, and controls to accommodate such changes. We have limited experience with implementing the systems and controls that necessary to operate as a public company, as well as adopting changes in accounting principles or interpretations mandated by the relevant regulatory bodies. Additionally, if these new systems, controls, or standards and the associated process changes do not give rise to the benefits that we expect or do not operate as intended, it could adversely affect our financial reporting systems and processes, our ability to produce timely and accurate financial reports or the effectiveness of internal control over financial reporting. Moreover, our business may be harmed if we experience problems with any new systems and controls that result in delays in their implementation or increased costs to correct any post-implementation issues that may arise.

Further, weaknesses in our disclosure controls and internal control over financial reporting may be discovered in the future. Any failure to develop or maintain effective controls or any difficulties encountered in their implementation or improvement could harm our business or cause us to fail to meet our reporting obligations and may result in a restatement of our financial statements for prior periods. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that we will eventually be required to include in our periodic reports that will be filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our Class A common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the New York Stock Exchange. We are not required to make a formal assessment of the effectiveness of our internal control over financial reporting. We are required to provide an annual management report on the effectiveness of our internal control over financial reporting commencing with our second Annual Report on Form 10-K.

Our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal control over financial reporting until our first Annual Report filed with the SEC where we are an accelerated filer or a large accelerated filer. At such time, our independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which our internal control over financial reporting is documented, designed or operating.

Based on our stock price on October 31, 2021, the last day of our second fiscal quarter, and the public float of our Class A common stock on that date, we will no longer qualify as an "emerging growth company" as of April 30, 2022 and expect to become a large accelerated filer. Any failure to maintain effective disclosure controls and internal control over financial reporting could harm our business and could cause a decline in the trading price of our Class A common stock.

***Any future litigation against us could be costly and time-consuming to defend.***

We have in the past and may in the future become subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by our customers in connection with commercial or intellectual property disputes or employment claims made by our current or former employees. Litigation might result in substantial costs and may divert management's attention and resources, which might seriously harm our business, financial condition, and results of operations. Insurance might not cover such claims, might not provide sufficient payments to cover all the costs to resolve one or more such claims, and might not continue to be available on terms acceptable to us (including premium increases or the imposition of large deductible or co-insurance requirements). A claim brought against us that is uninsured or underinsured could result in unanticipated costs, potentially harming our business, financial position, and results of operations. In addition, we cannot be sure that our existing insurance coverage and coverage for errors and omissions will continue to be available on acceptable terms or that our insurers will not deny coverage as to any future claim.

***Our business could be disrupted by catastrophic events.***

Occurrence of any catastrophic event, including earthquake, fire, flood, tsunami, or other weather event (many of which are becoming more acute and frequent as a result of global climate change), power loss, telecommunications failure, software or hardware malfunctions, pandemics (such as the COVID-19 pandemic), political unrest, geopolitical instability, cyberattack, war, or terrorist attack, could result in lengthy interruptions in our service. In particular, our U.S. headquarters are located in the San Francisco Bay Area, a region known for seismic activity and wild fires, and our insurance coverage may not compensate us for losses that may occur in the event of an earthquake or other significant natural disaster. In addition, acts of terrorism could cause disruptions to the internet or the economy as a whole. Even with our disaster recovery arrangements, our service could be interrupted. If our systems were to fail or be negatively impacted as a result of a natural disaster or other event, our ability to deliver our C3 AI Software to our customers would be impaired, or we could lose critical data. If we are unable to develop adequate plans to ensure that our business functions continue to operate during and after a disaster and to execute successfully on those plans in the event of a disaster or emergency, our business would be harmed.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

*Recent Unregistered Sales of Equity Securities*

None.

*Issuer Purchase of Equity Securities*

The following table contains information relating to the repurchases of our common stock made by us in the three months ended October 31, 2021.

| | Total Number of Shares Purchased [1] | | Average Price Paid per Share |
|---|---|---|---|
| August 1 - August 31, 2021 | 1,077 | $ | 4.61 |
| September 1 - September 30, 2021 | 31,402 | | 4.38 |
| October 1 - October 31, 2021 | 18,973 | | 4.30 |
| Total | 51,452 | $ | 4.36 |

(1) Represents shares of unvested Class A common stock that were repurchased by us from former employees upon termination of employment in accordance with the terms of the employees' stock option agreements. We purchased the shares from the former employees at the respective original exercise prices.

82

**ITEM 6. EXHIBITS**

(a) Exhibits.

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant, as currently in effect. | 8-K | 001-39744 | 3.1 | December 11, 2020 |
| 3.2 | Amended and Restated Bylaws of the Registrant, as currently in effect. | S-1/A | 333-250082 | 3.4 | November 30, 2020 |
| 10.1* | Third Amendment to Lease by and between the Registrant and Google LLC, dated August 25, 2021. | | | | |
| 10.2*# | Office Lease by and between the Registrant and DWF IV 1400-1500 Seaport Blvd, LLC, dated August 25, 2021. | | | | |
| 10.3*+ | Form of Stock Option Grant Notice and Agreement - Early Exercise. | | | | |
| 10.4*# | Third Amendment to Joint Venture Agreement by and between the Registrant and Baker Hughes Holdings LLC, dated October 31, 2021. | | | | |
| 31.1* | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 31.2* | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 32.1* | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |
| 32.2* | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |

_____
\*   Filed herewith.
\+   Indicates management contract or compensatory plan.
\#   Portions of this exhibit (indicated by asterisks) have been omitted as we have determined that (1) the omitted information is not material and (2) the omitted information would likely cause competitive harm to us if publicly disclosed.

(b) Financial Statement Schedules.

All financial statement schedules are omitted because the information required to be set forth therein is not applicable or is shown in the unaudited condensed consolidated financial statements or the notes thereto.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**C3.ai, Inc.**

| | | |
|---|---|---|
| Date: December 1, 2021 | By: | /s/ Thomas M. Siebel |
| | | Thomas M. Siebel |
| | | Chief Executive Officer |
| | | *(Principal Executive Officer)* |
| Date: December 1, 2021 | By: | /s/ David Barter |
| | | David Barter |
| | | Senior Vice President and Chief Financial Officer |
| | | *(Principal Financial and Accounting Officer)* |

84

**Exhibit 10.1**

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE (this "**Amendment**") is made and entered into effective as of August 25, 2021 (the "**Effective Date**"), by and between GOOGLE LLC, a Delaware limited liability company ("**Landlord**"), and C3.AI, INC., a Delaware corporation ("**Tenant**").

R E C I T A L S:

A.    Landlord and Tenant (formerly known as C3 IOT, Inc.) are parties to that certain Lease (as defined below), pursuant to which Landlord is currently leasing to Tenant, and Tenant is currently leasing from Landlord, certain space (the "**Existing Premises**") containing approximately 84,377 rentable square feet located on the second (2nd), fourth (4th) and fifth (5th) floors of that certain building addressed as 1300 Seaport Boulevard, Redwood City, California (the "**1300 Building**"). As used herein, "**Lease**" shall mean and refer, collectively, to the following document(s):

     i.   Triple Net Space Lease dated as of October 28, 2011 (the "**Original Lease**"), between VII Pac Shores Investors, LLC (as predecessor-in-interest to Landlord), and C3, LLC;

     ii.   First Amendment to Lease dated as of April 4, 2017, between Landlord (formerly known as "Google Inc., a Delaware corporation"), and C3 IOT, Inc., a Delaware corporation ("**C3 IOT**") (as successor by merger and name change to "C3, LLC"); and

     iii.   Second Amendment to Lease dated as of November 7, 2017, between Landlord, and C3 IOT (as predecessor-in-interest to Tenant) ("**Second Amendment**").

B.    The Lease Term is currently scheduled to occur on September 30, 2022 (the "**Term Expiration Date**").

C.    Concurrently with entering into this Amendment, Landlord's affiliate, DWF IV 1400-1500 Seaport Blvd, LLC, a Delaware limited liability company ("**1400 Landlord**"), and Tenant have entered into a separate lease (the "**1400 Lease**") for space within that certain building addressed as 1400 Seaport Boulevard, Redwood City, California (the "**1400 Building**"). Pursuant to the 1400 Lease, 1400 Landlord has agreed to use commercially reasonable efforts to deliver to Tenant a portion of the 1400 Building referred to therein as "**Phase 1**" on or before January 1, 2022, but Landlord and Tenant acknowledge and agree that delivery of "Phase 1" may occur later, subject to the terms and conditions of the 1400 Lease. The date that 1400 Landlord delivers to Tenant "Phase 1" is referred to therein as the "**Phase 1 Lease Commencement Date**".

D.    Landlord and Tenant now desire to amend the Lease: (i) to expand the Existing Premises to include that certain space within the 1300 Building containing approximately 15,183 rentable square feet, identified as "C3" on **Exhibit A** attached hereto (the "**Expansion Space**"); and (ii) to modify various terms and provisions of the Lease, all as hereinafter provided.

A G R E E M E N T:

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Capitalized Terms. All capitalized terms when used herein shall have the same meanings given such terms in the Lease unless expressly superseded by the terms of this Amendment.

2.   Expansion Space.

2.1   Addition of Expansion Space. Commencing on the Effective Date of this Amendment (also referred to herein as the "**Expansion Space Commencement Date**"), the Existing Premises shall be expanded to include the Expansion Space, which Expansion Space shall be leased on the same terms and conditions set forth in the Lease, as hereby amended. From and after the Expansion Space Commencement Date, the Existing Premises and the Expansion Space shall be collectively referred to as the "**Premises**" and shall contain a total of approximately 99,560 rentable square feet. Notwithstanding anything in the Lease to the contrary, Tenant shall use the Expansion Space solely for general office purposes. Tenant shall directly provide janitorial services for the Expansion Space.

2.2   Expansion Space Term. The lease term for the Expansion Space (the "**Expansion Space Term**") shall commence on the Expansion Space Commencement Date and shall expire coterminously with the lease term for the Existing Premises on September 30, 2022 (i.e., the Term Expiration Date), subject to extension pursuant to Section 3 below.

2.3   Base Rent for Expansion Space. During the Expansion Space Term, Tenant shall pay monthly installments of Base Rent to Landlord for the Expansion Space as set forth in the following schedule:

| Period of Expansion Space Term | Monthly Installment of Base Rent for Expansion Space |
|---|---|
| Expansion Space Commencement Date – 09/30/21 | $61,339.32 |
| 10/01/21 – Term Expiration Date* | $63,161.28 |

*Subject to extension pursuant to Section 3 below.

2.4   Tenant's Share for Expansion Space. Tenant shall continue to pay Tenant's Share of Operating Expenses in accordance with the terms of the Lease; provided, however, notwithstanding anything to the contrary contained in the Lease, as hereby amended, from and after the Expansion Space Commencement Date, as a result of the addition of the Expansion Space to the Existing Premises pursuant to the applicable provisions of this Amendment above, Tenant's Share of Building 8 items shall be revised to equal 60.44% (i.e., 99,560 rentable square feet within the Existing Premises and the Expansion Space divided by 164,732 rentable square feet within Building 8) and Tenant's Share of Project items shall be 5.95% (i.e., 99,560 rentable square feet within the Existing Premises and the Expansion Space divided by 1,672,073 rentable square feet within the Project).

2.5   Delivery of Expansion Space; Condition of Premises. Landlord shall deliver the Expansion Space to Tenant no later than one (1) business day after the mutual execution and delivery of this Amendment in its current "AS IS" condition as of the Effective

Date. Tenant (i) shall continue to accept and occupy the Existing Premises and the Building, in their current "AS IS" condition as of the Effective Date, and (ii) shall accept the Expansion Space in its current "AS IS" condition as of the Effective Date, without any agreements, representations, understandings or obligations on the part of Landlord to perform or pay for any alterations, repairs or improvements to the Existing Premises or the Expansion Space, except as otherwise expressly set forth in the Lease, as hereby amended.

2.6    No Access Space. Notwithstanding the expansion of the Premises to include the Expansion Space, Landlord and Tenant acknowledge and agree that Tenant shall have no right to use or access that portion of the Expansion Space identified as "No Access" on **Exhibit A** attached hereto (the "**No Access Space**"). Without limiting the foregoing, Tenant shall have no right to use any of the kitchen equipment within such "No Access" space. Landlord reserves the right, exercisable without notice, except as provided herein, and without liability to Tenant for damage or injury to property, person or business and without effecting an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for setoff or abatement of Rent under the Lease, as hereby amended, or affecting any of Tenant's obligations under the Lease, as hereby amended, to enter the No Access Space for any purpose (including, without limitation, to monitor Tenant's compliance with the terms of this Section and to inspect the No Access Space); provided, however, that Landlord shall provide Tenant with reasonable prior notice of any entry into the No Access Space. Notwithstanding anything in the Lease to the contrary, Tenant shall have no responsibility to maintain, repair or replace any kitchen equipment located within the No Access Space.

3.    Conditional Extension of Lease Term. In the event that the "Phase 1 Lease Commencement Date" under the 1400 Lease has not occurred on or before January 1, 2022, then the Lease Term and Expansion Space Term under the Lease shall be automatically extended (the "**Extended Expiration Date**") one day for each day until the occurrence of the Phase 1 Lease Commencement Date. The period from the Term Expiration Date through the Extended Expiration Date is referred to herein as the "**Extended Term**". The Extended Term shall be on all of the same terms and conditions as set forth in the Lease, as hereby amended. For the avoidance of doubt, the Base Rent payable by Tenant during the Extended Term shall continue to be as set forth in the Lease, as hereby amended. By way of illustration, but not by limitation, if the Phase 1 Lease Commencement Date occurs 180 days after January 1, 2022, the Lease Term and the Expansion Space Term shall be extended by an equivalent 180 days. In the event that Tenant exercises the Tenant Termination Right under the 1400 Lease, Tenant shall have no further rights hereunder to extend the Lease Term or Expansion Space Term beyond the Extended Expiration Date as determined under this Section 3 immediately prior to such exercise.

4.    Statutory CASp Disclosure.· For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that neither the Existing Premises nor the Expansion Space have undergone inspection by a Certified Access Specialist (CASp). In addition, the following notice is hereby provided pursuant to Section 1938(e) of the California Civil Code: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of and in connection with such notice: (i) Tenant, having read such notice and understanding Tenant's right to request and obtain a CASp inspection and with advice of counsel, hereby elects not to obtain such CASp inspection and forever waives its rights to

-3-

obtain a CASp inspection with respect to the Premises, the Building and/or the Project to the extent permitted by applicable laws now or hereafter in effect; and (ii) if the waiver set forth in clause (i) hereinabove is not enforceable pursuant to applicable laws now or hereafter in effect, then Landlord and Tenant hereby agree as follows (which constitute the mutual agreement of the parties as to the matters described in the last sentence of the foregoing notice): (A) Tenant shall have the one-time right to request for and obtain a CASp inspection, which request must be made, if at all, in a written notice delivered by Tenant to Landlord within thirty (30) days after the Expansion Space Commencement Date, with respect to the Expansion Space; (B) any CASp inspection timely requested by Tenant shall be conducted (1) between the hours of 9:00 a.m. and 5:00 p.m. on any business day, (2) only after ten (10) days' prior written notice to Landlord of the date of such CASp inspection, (3) in a professional manner by a CASp designated by Landlord and without any testing that would damage the Premises, the Building or the Project in any way, (4) in accordance with all of the provisions of the Lease applicable to Tenant contracts for construction, and (5) at Tenant's sole cost and expense, including, without limitation, Tenant's payment of the fee for such CASp inspection, the fee for any reports and/or certificates prepared by the CASp in connection with such CASp inspection (collectively, the "**CASp Reports**") and all other costs and expenses in connection therewith; (C) Landlord shall be an express third party beneficiary of Tenant's contract with the CASp, and any CASp Reports shall be addressed to both Landlord and Tenant; (D) Tenant shall deliver a copy of any CASp Reports to Landlord within two (2) business days after Tenant's receipt thereof; (E) any information generated by the CASp inspection and/or contained in the CASp Reports shall not be disclosed by Tenant to anyone other than (I) contractors, subcontractors and/or consultants of Tenant, in each instance who have a need to know such information and who agree in writing not to further disclose such information, or (II) any governmental entity, agency or other person, in each instance to whom disclosure is required by law or by regulatory or judicial process; (F) Tenant, at its sole cost and expense, shall be responsible for making any improvements, alterations, modifications and/or repairs to or within the Premises to correct violations of construction-related accessibility standards, including, without limitation, any violations disclosed by such CASp inspection; and (G) if such CASp inspection identifies any improvements, alterations, modifications and/or repairs necessary to correct violations of construction-related accessibility standards relating to those items of the Building and/or the Project located outside the Premises that are Landlord's obligation to repair as set forth in the Lease, then Landlord shall perform such improvements, alterations, modifications and/or repairs as and to the extent required by applicable laws to correct such violations, and Tenant shall reimburse Landlord for the cost of such improvements, alterations, modifications and/or repairs within ten (10) business days after Tenant's receipt of an invoice therefor from Landlord.

5. <u>Brokers</u>. Landlord and Tenant each hereby represents and warrants to the other that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Amendment, other than CBRE, Inc., representing Landlord (the "**Broker**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Amendment. Landlord shall be solely responsible for paying any commission owed to the Broker in connection with this Amendment pursuant to the terms and conditions set forth in a separate written agreement. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including, without limitation, reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any breach of the foregoing representation and warranty by the indemnifying party in connection with this Amendment. The provisions of this Section 5 shall survive the expiration or earlier termination of the Lease.

6. <u>Authority</u>. If Tenant is a corporation, trust, limited liability company or partnership, each individual executing this Amendment on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in

California and that Tenant has full right and authority to execute and deliver this Amendment and that each person signing on behalf of Tenant is authorized to do so. In such event, Tenant shall, within ten (10) days after Landlord's written request, deliver to Landlord satisfactory evidence of such authority, and, upon demand by Landlord, Tenant shall also deliver to Landlord satisfactory evidence of: (i) good standing in Tenant's state of formation; and (ii) qualification to do business in California.

7.    Counterparts. This Amendment may be executed in any number of counterparts, which may be delivered electronically, via facsimile or by other means. Each party may rely upon signatures delivered electronically or via facsimile as if such signatures were originals. Each counterpart of this Amendment shall be deemed to be an original, and all such counterparts (including those delivered electronically or via facsimile), when taken together, shall be deemed to constitute one and the same instrument.

8.    No Options. Notwithstanding anything to the contrary contained in the Lease, as hereby amended, Tenant hereby acknowledges and agrees that: (i) Tenant has no (A) options to extend or renew the Lease, except as set forth in Section 3 above, (B) early termination options, (C) options or rights to expand the Premises or to lease additional space in the real property of which the Premises are a part, (D) rights of first offer and/or rights of first refusal to lease any space in the real property of which the Premises are a part, and (E) options or preferential rights to purchase all or any portion of the Premises or the real property of which the Premises are a part, nor any other rights or interests with respect to the Premises or the real property of which the Premises are a part, other than as "Tenant" under the Lease and the 1400 Lease; and (ii) Tenant is not entitled to any improvement allowance, free or abated rent or any other concessions under the Lease. Section 17 of the Original Lease (Right of First Refusal) is hereby deleted in its entirety and of no further force or effect. Notwithstanding anything to the contrary contained in the Lease, as hereby amended, Landlord hereby acknowledges and agrees that Section 7 of the Second Amendment (Landlord Early Termination Right; Expansion Space) is hereby deleted in its entirety and of no further force or effect.

9.    No Further Modification. Except as set forth in this Amendment, all of the terms and provisions of the Lease are hereby ratified and confirmed and shall remain unmodified and in full force and effect. In the event of any conflict between the terms and conditions of the Lease and the terms and conditions of this Amendment, the terms and conditions of this Amendment shall prevail.

10.    Attorneys' Fees. Notwithstanding anything to the contrary contained in the Lease, should any claim, action or proceeding (including, for the avoidance of doubt, any appeals of a claim, action or proceeding) be commenced between the parties hereto concerning any provision of this Lease, or the rights or duties of any person or entity in relation thereto, each party shall bear its own fees and costs (including, without limitation, attorneys' fees, accounting fees, expert witness fees, consulting fees, court costs, and all other costs) to the extent incurred in prosecuting or defending such claim, action, or proceeding against the other party. Nothing in this Section shall be construed to limit a party's obligation, as may be set forth elsewhere in the Lease, to indemnify another from any fees or costs (including, without limitation, attorneys' fees, accounting fees, expert witness fees, consulting fees, court costs, and all other costs), except to the extent incurred by the indemnified party in an action brought against the indemnifying party to enforce such indemnification provisions under the Lease.

11.    Governing Law; Venue. Notwithstanding anything to the contrary contained in the Lease, the Lease, as hereby amended, is governed by, and shall be interpreted under, the laws of the State of California. Notwithstanding anything to the contrary contained in the Lease, venue for any litigation arising out of the Lease, as hereby amended, shall be a court of

-5-

competent jurisdiction in Santa Clara County, California, or if no court of competent jurisdiction exists there, then the next nearest court of competent jurisdiction.

12.     Coordination with 1400 Lease. Nothing in this Amendment shall modify any of the terms and conditions of the 1400 Lease, and nothing in the 1400 Lease shall modify any of the terms and conditions of the Lease, as hereby amended. The 1400 Lease is referred to herein solely for the purpose of calculating the Extended Term, if applicable, pursuant to Section 3 above.

[SIGNATURES CONTAINED ON THE FOLLOWING PAGE]

-6-

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed by their duly authorized representatives as of the date first above written.

LANDLORD:                                                    TENANT:

GOOGLE LLC,                                                  C3.AI, INC.,
a Delaware limited liability company                        a Delaware corporation


By: /s/ David Radcliffe                                      By: /s/ Thomas M. Siebel
Name: David Radcliffe                                        Name: Thomas M. Siebel
Title: Vice President, Real Estate                           Title: Chief Executive Officer and Chairman


                                                             By: /s/ Brady D. Mickelsen
                                                             Name: Brady D. Mickelsen
                                                             Title: Senior Vice President and General Counsel


-7-

**Exhibit 10.2**

**CERTAIN IDENTIFIED INFORMATION HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO THE REGISTRANT IF PUBLICLY DISCLOSED. [\*\*\*] INDICATES THAT INFORMATION HAS BEEN REDACTED.**

### OFFICE LEASE

This Office Lease (the "**Lease**"), dated as of the date set forth in <u>Section 1</u> of the Summary of Basic Lease Information (the "**Summary**"), below, is made by and between "**Landlord**," as set forth in <u>Section 2</u> of the Summary, and "**Tenant**," as set forth in <u>Section 3</u> of the Summary, upon all of the terms, covenants, conditions and provisions of <u>Articles 1</u> through <u>30</u> of this Lease which follow, all of which are incorporated herein.

### SUMMARY OF BASIC LEASE INFORMATION

| TERMS OF LEASE | DESCRIPTION |
|---|---|
| 1.  Date: | August 25, 2021 |
| 2.  Landlord: | DWF IV 1400-1500 SEAPORT BLVD, LLC,<br>a Delaware limited liability company |
| 3.  Tenant: | C3.AI, INC.,<br>a Delaware corporation |
| 4.  Premises<br>     (<u>Article 1</u>): | |
| 4.1  Building: | That certain building located at 1400 Seaport Boulevard, Redwood City, California (the "**Building**"), which contains approximately 283,015 rentable square feet of space.<br><br>The Building consists of two (2) towers, commonly known as 1400A (the "**1400A Tower**") and 1400B the **1400B Tower**"), each tower containing a total of five (5) floors. |
| 4.2  Project: | The office project of which the Building is a part, which currently contains approximately 1,673,253 rentable square feet of space. |

[*CONTINUED ON NEXT PAGE*]

4.3    Premises:

Approximately 283,015 rentable square feet of space located in the Building, comprising all of the rentable square feet within the Building (the "**Premises**").

The Premises consists of seven (7) phases (each, a "**Phase**"), as follows:

Phase 1 ("**Phase 1**"):    Floor 4 of the 1400A Tower consisting of approximately [***] rentable square feet as well as the existing cafeteria on the 1st floor of the 1400A Tower. For purposes of this Lease, Phase 1 shall be deemed to contain [***] rentable square feet in the aggregate. For clarity, for purposes of this Lease, the 1st floor of the 1400A Tower is treated as not having any leasable area and the square footage thereof is included in the load factor applied to the remainder of the Building, provided that in any event, the 1st floor of the 1400A Tower shall be deemed to be part of the Premises (and in no event shall the 1st floor of the 1400A Tower be deemed to be part of the Common Areas).

Phase 2 ("**Phase 2**"):    Floors 2, 3 and 5 of the 1400A Tower, consisting of approximately [***] rentable square feet, as well as remainder of the entire 1st floor of the 1400A Tower not included in Phase 1. For purposes of this Lease, Phase 2 shall be deemed to contain [***] rentable square feet in the aggregate.

Phase 3 ("**Phase 3**"):    Floor 5 of the 1400B tower consisting of approximately [***] rentable square feet. For purposes of this Lease, Phase 3 shall be deemed to contain [***] rentable square feet in the aggregate.

Phase 4 ("**Phase 4**"):    Floor 4 of the 1400B Tower, consisting of approximately [***] rentable square feet. For purposes of this Lease, Phase 4 shall be deemed to contain [***] rentable square feet.

Phase 5 ("**Phase 5**"):    Floor 3 of the 1400B Tower, consisting of approximately [***] rentable square feet. For purposes of this Lease, Phase 5 shall be deemed to contain [***] rentable square feet.

Phase 6 ("**Phase 6**"):    Floor 2 of the 1400B Tower, consisting of approximately [***] rentable square feet. For purposes of this Lease, Phase 6 shall be deemed to contain [***] rentable square feet.

Phase 7 ("**Phase 7**"):    Floor 1 of the 1400B Tower, consisting of approximately [***] rentable square feet. For purposes of this Lease, Phase 7 shall be deemed to contain [***] rentable square feet.

5.  Lease Term
    (Article 2):

     5.1    Length of Term:

One hundred twenty-six (126) full calendar months after the Phase 1 Rent Commencement Date (as defined in Section 6.1 of the Summary below).

     5.2    Lease Commencement Date:

Phase 1 Lease Commencement Date ("**Phase 1 Lease Commencement Date**"): January 1, 2022.

Phase 2 Lease Commencement Date ("**Phase 2 Lease Commencement Date**"): January 1, 2022.

Phase 3 Lease Commencement Date ("**Phase 3 Lease Commencement Date**"): August 1, 2022.

Phase 4 Lease Commencement Date ("**Phase 4 Lease Commencement Date**"): March 1, 2023.

Phase 5 Lease Commencement Date ("**Phase 5 Lease Commencement Date**"): June 1, 2023.

Phase 6 Lease Commencement Date ("**Phase 6 Lease Commencement Date**"): November 1, 2023.

Phase 7 Lease Commencement Date ("**Phase 7 Lease Commencement Date**"): June 1, 2024.

Each individually, a "**Lease Commencement Date**". Each Lease Commencement Date is subject to change pursuant to Article 2 this Lease.

     5.3    Lease Expiration Date:

The last day of the one hundred twenty-sixth (126th) full calendar month after the Phase 1 Rent Commencement Date, subject to extension pursuant to Section 2.5 of this Lease, unless sooner terminated pursuant to the terms of this Lease.

          5.3.1    [Intentionally Omitted]

          5.3.2    [Intentionally Omitted]

6.  Base Rent
    (Article 3):

See Article 3

[*CONTINUED ON NEXT PAGE*]

-3-

6.1  Rent Commencement Date

With respect to each Phase, the date that is nine (9) months after the applicable Lease Commencement Date for each Phase (as applicable, the "**Phase 1 Rent Commencement Date**", the "**Phase 2 Rent Commencement Date**", the "**Phase 3 Rent Commencement Date**", the "**Phase 4 Rent Commencement Date**", the "**Phase 5 Rent Commencement Date**", "**Phase 6 Rent Commencement Date and the** "**Phase 7 Rent Commencement Date**; and individually, a "**Rent Commencement Date**").

6.2  Base Rent Abatement

Subject to the terms and conditions of this Lease, Landlord hereby agrees that Tenant shall be entitled to an abatement of Base Rent with respect to each Phase during the period of six (6) full calendar months following the applicable Rent Commencement Date for such Phase (each, a "**Phase Abatement Period**"). Landlord and Tenant acknowledge that Tenant's right to receive Base Rent abatement with respect to a Phase during the applicable Phase Abatement Period has been granted to Tenant as additional consideration for Tenant's agreement to enter into this Lease and comply with the terms and conditions otherwise required under this Lease. During any Phase Abatement Period, Tenant shall still be responsible to pay the Base Rent with respect to the other Phase(s) delivered to Tenant.

6.3  Base Rent Abatement; In General

Notwithstanding anything to the contrary contained in Section 6.2 above, if Tenant shall be in default hereunder, and shall fail to cure such default within the time, if any, provided for cure pursuant to this Lease, or if this Lease is terminated for any reason other than in connection with a Landlord default, casualty or condemnation then Tenant shall immediately become obligated to pay to Landlord the unamortized amount of all Base Rent previously abated hereunder during any portion of the Phase Abatement Periods (with such amortization as to any Phase Abatement Period being amortized over the period from the expiration of the applicable Phase Abatement Period until the Lease Expiration Date, together with interest at the Interest Rate (as such term is defined in Section 29.36)).

[*CONTINUED ON NEXT PAGE*]

-4-

| 7. | Tenant's Share (of the Building) (Article 4): | Phase 1:  [***]% |
| | | Phase 2:  [***]% |
| | | Phase 3:  [***]% |
| | | Phase 4:  [***]% |
| | | Phase 5:  [***]% |
| | | Phase 6: [***]% |
| | | Phase 7: [***]% |
| 8. | Permitted Use (Article 5): | General office use consistent with a comparable office building, provided that a portion of the 1st floor of the 1400A Tower may be used for a cafeteria for Tenant's employees and invitees. |
| 9. | Letter of Credit (Article 21): | $[***] (the "**L-C Amount**"), subject to reduction pursuant to Article 21 below and **Exhibit B** attached hereto. |
| 10. | Address of Tenant (Section 29.18): | C3.AI, Inc. |
| | | 1300 Seaport Boulevard Suite 500 |
| | | Redwood City, CA 94063 |
| | | Attention: Chief Executive Officer |
| | | With a copy sent to: |
| | | C3.AI, Inc. |
| | | 1300 Seaport Boulevard Suite 500 |
| | | Redwood City, CA 94063 |
| | | Attention: General Counsel |
| 11. | Address of Landlord (Section 29.18): | c/o Google LLC |
| | | 1600 Amphitheatre Parkway |
| | | Mountain View, California 94043 |
| | | Attention: Lease Administration |
| | | and |
| | | c/o Google LLC |
| | | 1600 Amphitheatre Parkway |
| | | Mountain View, California 94043 |
| | | Attention: Legal Department / RE Matters |
| | | With a copy sent to: |
| | | c/o CBRE, Inc. |
| | | 1800 Seaport Boulevard, 4th Floor |
| | | Redwood City, California 94063 |
| | | Attention: Jessica McNichol |
| 12. | Broker(s) (Section 29.24): | CBRE, Inc. |
| | | 225 W. Santa Clara Street, 12th Floor |
| | | San Jose, California 95113 |
| | | Attention: Advisory & Transaction Services |

13. Tenant Improvement Allowance
(Article 8):

Phase 1:   $[***]

Phase 2:   $[***]

Phase 3:   $[***]

Phase 4:   $[***]

Phase 5: $[***]

Phase 6: $[***]

Phase 7: $[***]

The Tenant Improvement Allowance for each Phase is calculated at the rate of $[***] per rentable square foot per Phase.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]*

-6-

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

LANDLORD:                                          TENANT:

DWF IV 1400-1500 SEAPORT BLVD, LLC,                C3.AI, INC.,
a Delaware limited liability company               a Delaware corporation


By: /s/ David Radcliffe                             By: /s/ Thomas M. Siebel
Name: David Radcliffe                               Name: Thomas M. Siebel
Title: Vice President, Real Estate                  Title: Chief Executive Officer and Chairman


                                                    By: /s/ Brady D. Mickelsen
                                                    Name: Brady D. Mickelsen
                                                    Title: Senior Vice President and General Counsel

-7-

**ARTICLE 1**

**PREMISES, BUILDING, PROJECT, AND COMMON AREAS**

1.1    **Premises, Building, Project and Common Areas**.

1.1.1    **The Premises**. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises. The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions herein set forth, and Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of such terms, covenants and conditions by it to be kept and performed and that this Lease is made upon the condition of such performance. Tenant shall accept the Premises and the Building in their "as-is" condition, and except as specifically set forth in Section 8.6 below, Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises. Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises, the Building or the Project or with respect to the suitability of any of the foregoing for the conduct of Tenant's business, except as specifically set forth in this Lease. The taking of possession of the Premises by Tenant shall conclusively establish that the Premises and the Building were at such time in good and sanitary order, condition and repair. Notwithstanding the foregoing, on the date of delivery of each Phase constituting the Premises, Landlord shall deliver such Phase ("**Delivery Condition**") vacant, free and clear of any tenants, subtenants or other occupants, including, without limitation, the Existing Tenant and Existing Subtenant (as such terms are defined in Section 2.2 below).

1.1.2    **The Building and The Project**. The Premises are a part of the Building. The Building is part of the Project. The "**Project**" means (i) the Building and the Common Areas, (ii) the land (which is improved with landscaping, above ground parking facilities and other improvements) upon which the Building and the Common Areas are located, and (iii) at Landlord's discretion, any additional real property, areas, land, buildings or other improvements added thereto outside of the Project.

1.1.3    **Common Areas**. Tenant shall have the non-exclusive right to use in common with other tenants in the Project, and subject to the rules and regulations referred to in Article 5 of this Lease, those portions of the Project which are provided, from time to time, for use in common by Landlord, Tenant and any other tenants of the Project (such areas, together with such other portions of the Project designated by Landlord, in its discretion, including certain areas designated for the exclusive use of certain tenants, or to be shared by Landlord and certain tenants, are collectively referred to herein as the "**Common Areas**"). The Common Areas include, without limitation, an athletic facility to be available for use by Tenant's employees (the "**Athletic Facility**"), as well as baseball and soccer fields, a water front park, and a perimeter walking/biking trial, and such further portions of the Project or additional or different facilities as Landlord may from time to time designate or install or make available for the use by Tenant in common with others. The manner in which the Common Areas are maintained and operated shall be at the sole discretion of Landlord (provided that Landlord shall maintain the Common Areas in at least as good a condition as exists as of the date of this Lease) and the use thereof shall be subject to such rules, regulations and restrictions as Landlord may make from time to time; provided that rules, regulations and restrictions first affecting the Project after the date of this Lease shall not materially adversely affect Tenant's possession, use or enjoyment of the Premises for the Permitted Use or materially adversely affect Tenant's parking rights under this Lease. Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Common Areas, provided that Landlord shall use commercially reasonable efforts to minimize any interference to the conduct of Tenant's business and Tenant's parking rights under this Lease (subject to Article 28 below).

1.2    **Verification of Rentable Square Feet of Premises and Building**. For purposes of this Lease, the "**rentable square feet**" of the Premises shall be deemed as set forth in Section 4.3 of the Summary and the rentable square feet of the Building shall be deemed as set forth in Section 4.1 of the Summary, and Landlord and Tenant hereby acknowledge and agree that the same shall not be subject to re-measurement or modification.

1.3    **Athletic Facility Memberships**. During the Lease Term, Tenant and its employees shall have access to a number of memberships calculated by *multiplying* a fraction, the numerator of which is the total rentable square footage of all Phases delivered to Tenant at such time, and the denominator of which is the total rentable square footage within the Project (provided that in no event shall such denominator be greater than [***] for purposes of this calculation), *by* [***], which memberships shall entitle such members to the use of the Athletic Facility and all of the amenities thereof at no additional cost; provided, however, that Tenant acknowledges that the cost of operating and maintaining the Athletic Facility will be included in Operating Expenses. Without the consent of Landlord, Tenant may transfer memberships between itself and any of the Permitted Subtenants (as such term is defined in Section 14.9) to the extent and for so long as such Permitted Subtenant subleases space within the Premises.

-8-

## ARTICLE 2

### LEASE TERM

2.1     **Lease Term**. The terms and provisions of this Lease shall be effective as of the date of this Lease. The "**Lease Term**" shall commence on the Phase 1 Lease Commencement Date and shall terminate on the Lease Expiration Date, unless this Lease is sooner terminated as hereinafter provided. Following the Lease Commencement Date for each Phase, upon request of Landlord, Tenant shall execute a commercially reasonable notice confirming the Lease Commencement Date and the Rent Commencement Date for such Phase, the cumulative Base Rent applicable to such Phase and all prior Phases that have been delivered to Tenant, and the Phase Abatement Period applicable to such Phase, the Lease Expiration Date, and any other matters reasonably requested by Landlord.

2.2     **Existing Tenant and Subtenants**. Tenant acknowledges that the Premises is currently the subject of an existing lease (the "**Existing Lease**") with an existing tenant (the "**Existing Tenant**"), and that the Existing Tenant has entered into multiple subleases for portions of the Premises (collectively, the "**Existing Subleases**", and the subtenants thereunder, the "**Existing Subtenants**"). The Existing Lease and the Existing Subleases are scheduled to expire on or before December 31, 2021. Landlord shall use commercially reasonable efforts to cause the Existing Tenant and the Existing Subtenants to vacate and surrender the Premises to Landlord on or before December 31, 2021, subject to the terms and conditions of this Section 2.2 and Section 2.3 and Section 2.4 below. If Landlord is delayed in delivering possession of the Premises to Tenant due to the holding over of the Existing Tenant or any Existing Subtenants or for any other reason beyond Landlord's reasonable control, then Landlord shall not be subject to any liability whatsoever to Tenant for such delay, and such failure shall not affect the validity of this Lease or the obligations of Tenant hereunder. Notwithstanding the foregoing, if the Existing Tenant and Existing Subtenant(s) affecting a Phase have not vacated and surrendered such Phase to Landlord on or before the applicable Lease Commencement Date for such Phase, then the Lease Commencement Date for such Phase shall be extended until the date that Landlord delivers such Phase to Tenant free and clear of the Existing Tenant and Existing Subtenant(s).

2.3     **Delivery of Phase 1**. Notwithstanding the Existing Lease and Existing Sublease(s) affecting Phase 1, Phase 1 is currently vacant, and Tenant desires to occupy Phase 1 as soon as possible after the date of this Lease. Landlord shall use commercially reasonable efforts to terminate the Existing Lease and Existing Sublease(s) affecting Phase 1 as soon as possible after the date of this Lease; provided, however, that Landlord shall have no obligation to incur any expenses in connection with the foregoing and Landlord shall have no obligation to commence or prosecute any unlawful detainer actions against the Existing Tenant and the Existing Subtenants, except as expressly set forth in this Section 2.3. If Landlord delivers Phase 1 to Tenant prior to January 1, 2022 free and clear of the Existing Tenant and Existing Subtenant(s) pursuant the foregoing, then the Phase 1 Lease Commencement Date shall be accelerated to be the date of such delivery.

In the event that the Phase 1 Lease Commencement Date has not occurred on or before June 30, 2022 (as such date shall be extended to the extent of any delays caused by Tenant or any of its agents, employees, contractors or invitees, or any delays caused by Force Majeure (provided that for purposes of this clause, the failure of the Existing Tenant or the Existing Subtenants to vacate and surrender Phase 1 shall not be deemed to be a Force Majeure), the "**Outside Phase 1 Delivery Date**"), then as Tenant's sole and exclusive remedy therefor, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord on or before the date that is thirty (30) days after the Outside Phase 1 Delivery Date (and such termination shall be effective as of the date that is thirty (30) days after Landlord's receipt of such notice) (the "**Tenant Termination Right**"); provided, however, that if Landlord delivers Phase 1 to Tenant free and clear of the Existing Tenant and the Existing Subtenants prior to the effective date of such termination, Tenant's election to terminate shall be deemed void and this Lease shall remain in full force and effect.

In the event that Landlord determines, in its commercially reasonable discretion, that it will be necessary to commence and prosecute any unlawful detainer actions against the Existing Tenant and the Existing Subtenants in order to achieve the Delivery Condition for Phase 1 (the "**Unlawful Detainer Actions**"), then Landlord shall provide written notice thereof to Tenant (the "**Unlawful Detainer Intent Notice**"). Tenant shall have a period of five (5) business days thereafter to elect to waive the Tenant Termination Right, and if Tenant fails to deliver such notice within such five (5) business day period, then Tenant shall be deemed to have waived the Tenant Termination Right. If Tenant elects (or is deemed to have elected) to waive the Tenant Termination Right, then Landlord shall commence and diligently prosecute to completion such the Unlawful Detainer Actions, and Tenant shall have no right to exercise the Tenant Termination Right. If Tenant elects not to waive the Tenant Termination Right, then Landlord shall have no obligation to commence or prosecute any Unlawful Detainer Actions.

The provisions of this Section shall apply to the delivery of Phase 1 only, and to no other Phases.

2.4       **Trigger for Phase Lease Commencement Date**. If Tenant subleases all or a portion of a Phase to a subtenant prior to the applicable Lease Commencement Date for such Phase (including, without limitation, to any Permitted Subtenant pursuant to Section 14.9 below), then notwithstanding anything in this Lease to the contrary, the Lease Commencement Date for the entire Phase affected by such sublease (even if such sublease is only for a portion of such Phase) shall be deemed to commence upon the date the applicable sublease premises is delivered to such subtenant by Tenant pursuant to such sublease (provided any period of early entry afforded to such subtenant shall not be deemed to advance the commencement date thereunder). Further, if Tenant subleases all or a portion of a Phase to a subtenant prior to the expiration of the applicable Phase Abatement Period for such Phase (including, without limitation, to any Permitted Subtenant pursuant to Section 14.9 below), then for purposes of calculating the Transfer Premium (as defined in Section 14.3 below), during the period from the date such subtenant commences to pay rent until the expiration of the applicable Phase Abatement Period for such Phase, Base Rent for such Phase shall be deemed to be equal to the initial Base Rent applicable to such Phase (notwithstanding that such Base Rent is not yet due and payable under this Lease).

2.5       **Option Term**.

2.5.1       **Option Right**. Landlord hereby grants the Tenant named in this Lease (the "**Original Tenant**"), one (1) option to extend the Lease Term for a period of five (5) years (the "**Option Term**"), which option shall be exercisable only by written notice delivered by Tenant to Landlord as provided below, provided that, as of the date of delivery of such notice, Tenant is not in default under this Lease beyond the applicable notice and cure period provided in this Lease and Tenant has not previously been in default beyond the applicable notice and cure period provided in this Lease more than once. Upon the proper exercise of such option to extend, and provided that, at Landlord's option, as of the date immediately preceding the Option Term, Tenant is not in default under this Lease beyond the applicable notice and cure period provided in this Lease and Tenant has not previously been in default beyond the applicable notice and cure period provided in this Lease more than once, the Lease Term, as it applies to the Premises, shall be extended for the Option Term (except that Tenant shall have no further right to extend the Lease Term). The rights contained in this Section 2.5 shall be personal to the Original Tenant and may only be exercised by the Original Tenant or any Permitted Assignee (as defined in Section 14.8 below) (but not any other assignee, sublessee or other transferee of Tenant's interest in this Lease) if the Original Tenant and/or Permitted Subtenants collectively occupy at least seventy-five percent (75%) of the entire Premises.

2.5.2       **Option Rent**. The rent payable by Tenant during the Option Term (the "**Option Rent**") shall be equal to the fair market rent (including additional rent and considering any "base year" or "expense stop" applicable thereto), including all escalations, at which renewal tenants, as of the commencement of the Option Term, are leasing non-sublease, non-encumbered, non-equity space comparable in size, location and quality to the Premises for a term equal to such Option Term, which comparable space is located in first-class office buildings of comparable age and quality in the Project or the vicinity of the Project ("**Comparable Transactions**"), taking into consideration only the following concessions: (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space, and (b) tenant improvements or allowances provided or to be provided for such comparable space, taking into account, and deducting the value of, the existing improvements in the Premises, such value to be based upon the age, quality and layout of the improvements and the extent to which the same could be utilized by Tenant based upon the fact that the precise tenant improvements existing in the Premises are specifically suitable to Tenant. [**\***] The Option Rent shall additionally include a commercially reasonable determination as to whether, and if so to what extent, Tenant must provide Landlord with financial security, such as a security deposit, letter of credit or guaranty, for Tenant's Rent obligations during the Option Term. Such determination shall be made by reviewing the extent of financial security then generally being imposed in Comparable Transactions from tenants of comparable financial condition and credit history to the then existing financial condition and credit history of Tenant (with appropriate adjustments to account for differences in the then-existing financial condition of Tenant and such other tenants).

2.5.3       **Exercise of Option**. The option contained in this Section 2.5 shall be exercised by Tenant, if at all, and only in the following manner: (i) Tenant shall deliver written notice to Landlord not more than seventeen (17) months nor less than fifteen (15) months prior to the expiration of the initial Lease Term, irrevocably exercising its option for the entire Premises then being leased by Tenant; and (ii) Landlord, after receipt of Tenant's notice, shall deliver notice (the "**Option Rent Notice**") to Tenant not less than thirteen (13) months prior to the expiration of the initial Lease Term, setting forth the Option Rent; provided that, within fifteen (15) business days after the date of the Option Rent Notice, Tenant may, at its option, object to the Option Rent contained in the Option Rent Notice, in which case the parties shall follow the procedure, and the Option Rent shall be determined, as set forth in Section 2.5.4 below.

2.5.4       **Determination of Option Rent**. In the event Tenant timely and appropriately objects to the Option Rent, Landlord and Tenant shall attempt to agree upon the Option Rent using reasonable, good-faith efforts. If Landlord and Tenant fail to reach agreement within thirty (30) days following Tenant's timely and

-10-

appropriate objection to the Option Rent (the "**Outside Agreement Date**"), then each party shall make a separate determination of the Option Rent within ten (10) business days after the Outside Agreement Date, and such determinations shall be submitted to arbitration in accordance with Sections 2.5.4.1 through 2.5.4.7 below.

2.5.4.1   Landlord and Tenant shall each appoint one arbitrator who shall by profession be a real estate appraiser who shall have been active over the five (5) year period ending on the date of such appointment in the appraisal of commercial properties in the city in which the Premises is located, provided the arbitrator selected by Landlord shall not have worked for or provided arbitration or appraisal services to Landlord or any affiliates of Landlord during the prior three (3) year period and the arbitrator selected by Tenant shall not have worked for or provided arbitration or appraisal services to Tenant or affiliates of Tenant during the prior three (3) year period. The determination of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's submitted Option Rent is the closest to the actual Option Rent as determined by the arbitrators, taking into account only the requirements of Section 2.5 of this Lease (i.e., the arbitrators may only select Landlord's or Tenant's determination and shall not be entitled to make a compromise determination). Each such arbitrator shall be appointed within fifteen (15) business days after the Outside Agreement Date.

2.5.4.2   The two (2) arbitrators so appointed shall within ten (10) business days of the appointment of the last appointed arbitrator agree upon and appoint a third (3rd) arbitrator who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two (2) arbitrators.

2.5.4.3   The three (3) arbitrators shall within thirty (30) days of the appointment of the third (3rd) arbitrator reach a decision as to whether the parties shall use Landlord's or Tenant's submitted Option Rent, and shall notify Landlord and Tenant thereof.

2.5.4.4   The decision of the majority of the three (3) arbitrators shall be binding upon Landlord and Tenant.

2.5.4.5   If either Landlord or Tenant fails to appoint an arbitrator within fifteen (15) business days after the Outside Agreement Date, then the arbitrator appointed by one of them shall reach a decision, notify Landlord and Tenant thereof, and such arbitrator's decision shall be binding upon Landlord and Tenant.

2.5.4.6   If the two (2) arbitrators fail to agree upon and appoint a third (3rd) arbitrator, or both parties fail to appoint an arbitrator, then the appointment of the third (3rd) or any arbitrator shall be dismissed and the matter to be decided shall be forthwith submitted to arbitration under the provisions of the American Arbitration Association, but subject to the instructions set forth in this Section 2.2.5.

2.5.4.7   The cost of arbitration shall be split evenly between the parties.

## ARTICLE 3

### BASE RENT

Commencing as of the applicable Rent Commencement Date, Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent or, at Landlord's option, at such other place as Landlord may from time to time designate in writing, by a check for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent ("**Base Rent**") for the applicable Phase as calculated as set forth below, payable in equal monthly installments in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever. If any Rent payment date (including any Rent Commencement Date) falls on a day of the month other than the first day of such month or if any payment of Rent is for a period which is shorter than one month, the Rent for any fractional month shall accrue on a daily basis for the period from the date such payment is due to the end of such calendar month or to the end of the Lease Term at a rate per day which is equal to 1/365 of the applicable annual Rent. All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.

The Base Rent shall be calculated as follows:

-11-

| Period | Monthly Base Rent per Rentable Square Foot of all Phases delivered to Tenant (subject to the occurrence of the applicable Rent Commencement Date) |
|---|---|
| Phase 1 Rent Commencement Date-9/30/2023 | $[***] |
| 10/1/2023-09/30/2024 | $[***] |
| 10/1/2024-09/30/2025 | $[***] |
| 10/1/2025-09/30/2026 | $[***] |
| 10/1/2026-09/30/2027 | $[***] |
| 10/1/2027-09/30/2028 | $[***] |
| 10/1/2028-09/30/2029 | $[***] |
| 10/1/2029-09/30/2030 | $[***] |
| 10/1/2030-09/30/2031 | $[***] |
| 10/1/2031-09/30/2032 | $[***] |
| 10/1/2032-Lease Expiration Date | $[***] |

The Base Rent shall be calculated based on the cumulative rentable square feet within the Phase(s) delivered to Tenant (subject to the occurrence of the applicable Rent Commencement Date), provided that the Base Rent with respect to any Phase shall be abated subject to the terms and conditions of Sections 6.2 and 6.3 of the Summary.

**ARTICLE 4**

**ADDITIONAL RENT**

4.1    **General Terms**. In addition to paying the Base Rent specified in Article 3 of this Lease, Tenant shall pay "Tenant's Share" of the annual "Direct Expenses," as those terms are defined in Sections 4.2.1 and 4.2.2 of this Lease, respectively. Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the terms of this Lease, are hereinafter collectively referred to as the "**Additional Rent**," and the Base Rent and the Additional Rent are herein collectively referred to as "**Rent**." All amounts due under this Article 4 as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent. Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 shall survive the expiration of the Lease Term. In addition to Tenant's Share of Direct Expenses, Tenant shall pay to Landlord, as Additional Rent, at the same time and in the same manner as Tenant's Share of Direct Expenses, a management fee (whether provided by an independent management company, by Landlord or by any affiliate of Landlord) (the "**Management Fee**"), provided that for each Expense Year, the Management Fee shall not exceed [***] of the Base Rent for the applicable Expense Year.

4.2    **Definitions of Key Terms Relating to Additional Rent**. As used in this Article 4, the following terms shall have the meanings hereinafter set forth:

4.2.1    "**Tenant's Share**" shall mean the applicable cumulative amount for all Phase(s) delivered to Tenant set forth in Section 7 of the Summary.

-12-

4.2.2    "**Direct Expenses**" shall mean "Operating Expenses" and "Tax Expenses."

4.2.3    "**Expense Year**" shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time to any other twelve (12) consecutive month period, and, in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

4.2.4    "**Operating Expenses**" shall mean all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, renovation, restoration or operation of the Project, or any portion thereof. Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following: (i) the cost of supplying all utilities, the cost of operating, repairing, replacing, maintaining, renovating and restoring the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with a governmentally mandated transportation system management program or similar program; (iii) the cost of all insurance carried by Landlord in connection with the Project as reasonably determined by Landlord, including, without limitation, any commercially reasonable deductibles or self-insured retentions related thereto; provided, however, that in the event that the Project is damaged by an earthquake, if Landlord maintains earthquake insurance (or self-insures such risk) and the deductible or self-insured retention payable by Landlord as a result thereof exceeds $250,000.00, then the total amount of such deductible or self-insured retention shall be amortized with interest at the Interest Rate over the period as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices, consistently applied; (iv) the cost of landscaping, relamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof; (v) the costs incurred in connection with the parking areas servicing the Project, as well as costs incurred in connection with the provision of any shuttle service serving the Project for the purpose of facilitating access to public transportation (provided that Tenant has access to such shuttle service); (vi) fees and other costs, including incentive fees, consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance, replacement, renovation, repair and restoration of the Project (but excluding legal expenses related to the collection of Rent or to the sale, leasing or financing of the Project, and excluding any management fees, except for the Management Fee, which is payable pursuant to <u>Section 4.1</u> above); (vii) payments under any equipment rental agreements and the fair rental value of any management office space; (viii) subject to item (f) below, wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Project; (ix) the costs in connection with any "Underlying Documents" (as that term is defined in <u>Section 5.2</u> below); (x) operation, repair, maintenance, renovation, replacement and restoration of all systems and equipment and components thereof of the Project; (xi) the cost of janitorial in Common Areas, alarm, security and other services, replacement, renovation, restoration and repair of wall and floor coverings, ceiling tiles and fixtures in common areas, maintenance, replacement, renovation, repair and restoration of curbs and walkways, repair to roofs and roof membranes and re-roofing; (xii) amortization (including interest at the Interest Rate on the unamortized cost), over such period of time as Landlord shall reasonably determine, of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Project, or any portion thereof; (xiii) the cost of capital improvements or other costs incurred in connection with the Project (A) which are reasonably intended to effect economies in the operation or maintenance of the Project, or any portion thereof, or to reduce current or future Operating Expenses or to enhance the safety or security of the Project or its occupants, (B) that are required to comply with present or reasonably anticipated conservation programs, (C) which are replacements or modifications of nonstructural items located in the Common Areas required to keep the Common Areas in good order or condition, (D) that are required under any governmental law or regulation which was not promulgated, or which was promulgated but not in effect or applicable to the Project, as of the date of this Lease, (E) which are required in order for the Project, or any portion thereof, to obtain or maintain a certification under the U.S. Green Building Council's Leadership in Energy and Environmental Design ("**LEED**"), or other applicable certification agency in connection with Landlord's sustainability practices for the Project (as such sustainability practices are to be determined by Landlord, in its sole and absolute discretion, from time to time), or (F) that relate to the safety or security of the Project; provided, however, that any capital expenditure shall be amortized with interest at the Interest Rate over the shorter of (Y) its useful life as Landlord shall fair rental value determine in accordance with sound real estate management and accounting practices, consistently applied, or (Z) with respect to those items included under item (A) above, their recovery/payback period as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices, consistently applied; (xiv) the costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in <u>Section 4.2.5</u>, below; (xv) the cost of tenant relation programs reasonably established by Landlord; (xvi) the costs of any additional services not provided to the Project as of the Lease Commencement Date but which are thereafter provided by Landlord in connection with its prudent management of the Project; (xvii) any

-13-

assessments, charges and fees under the CC&Rs; (xviii) the costs and fees related to the Athletic Facility; and (xix) the costs of the Landlord Repair Obligations to the extent includable in Operating Expenses pursuant to Section 7.2.1 below. Notwithstanding the foregoing, for purposes of this Lease, Operating Expenses shall not, however, include:

(a)      costs, including legal fees, space planners' fees, advertising and promotional expenses (except as otherwise set forth above), and brokerage fees incurred in connection with the original construction or development, or original or future leasing of the Project, and costs, including permit, license and inspection costs, incurred with respect to the installation of tenant improvements made for other tenants or occupants in the Project or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for other tenants or occupants of the Project (excluding, however, such costs relating to any common areas of the Project or parking facilities);

(b)      except as set forth in items (xi), (xii), (xiii), and (xiv) above, interest and principal payments on mortgages and other debt costs, if any, penalties and interest;

(c)      costs for which the Landlord is reimbursed by any tenant or occupant of the Project, or by any warrantors or by any other person, or by condemnation proceeds, or by insurance by its carrier or any tenant's carrier or by anyone else (except to the extent of commercially reasonable deductibles or self-insured retentions, which shall be included as Operating Expenses to the extent such forth above), and electric power costs for which any tenant directly contracts with the local public service company;

(d)      any (i) bad debt loss, rent loss, or reserves for bad debts or rent loss or (ii) reserves with respect to parts of the Project other than the Common Areas to the extent such reserves are in excess of commercially reasonable amounts;

(e)      costs associated with the operation of the business of the partnership or entity which constitutes the Landlord, as the same are distinguished from the costs of operation of the Project (which shall specifically include, but not be limited to, accounting costs associated with the operation of the Project). Costs associated with the operation of the business of the partnership or entity which constitutes the Landlord include costs of partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of the Tenant may be in issue), costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Project, and costs incurred in connection with any disputes between Landlord and its employees, between Landlord and Project management, or between Landlord and other tenants or occupants;

(f)      the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Project unless such wages and benefits are prorated to reflect time spent on operating and managing the Project vis-a-vis time spent on matters unrelated to operating and managing the Project; provided, that in no event shall Operating Expenses for purposes of this Lease include wages and/or benefits attributable to personnel above the level of Project manager;

(g)      amount paid as ground rental for the Project or any part thereof by the Landlord or cost incurred in connection with any such ground rental;

(h)      overhead and profit increment paid to the Landlord or to subsidiaries or affiliates of the Landlord for services in the Project to the extent the same exceeds the costs of such services rendered by qualified, first-class unaffiliated third parties on a competitive basis;

(i)      any compensation paid to clerks, attendants or other persons in commercial concessions operated by the Landlord (which shall specifically exclude the parking facilities), provided that any compensation paid to any concierge at the Project shall be includable as an Operating Expense;

(j)      rentals and other related expenses incurred in leasing air conditioning systems, elevators or other equipment which if purchased the cost of which would be excluded from Operating Expenses as a capital cost, except equipment not affixed to the Project which is used in providing janitorial or similar services and, further excepting from this exclusion such equipment rented or leased to remedy or ameliorate an emergency condition in the Project ;

-14-

(k)     all items and services for which Tenant or any other tenant in the Project reimburses Landlord or which Landlord provides selectively to one or more tenants (other than Tenant) without reimbursement;

(l)     any costs expressly excluded from Operating Expenses elsewhere in this Lease;

(m)     rent for any office space occupied by Project management personnel to the extent the size or rental rate of such office space exceeds the size or fair market rental value of office space occupied by management personnel of the comparable buildings in the vicinity of the Building, with adjustment where appropriate for the size of the applicable project;

(n)     costs to the extent arising from the gross negligence or willful misconduct of Landlord or its agents, employees, vendors, contractors, or providers of materials or services;

(o)     attorneys' fees and other costs and expenses incurred in connection with negotiations or disputes with tenants or other occupants of the Project (including costs incurred due to violations by tenants of the terms and conditions of their leases), or any attorneys' fees incurred in connection with the financing, sale or syndication of the Project;

(p)     interest, penalties or other costs arising out of Landlord's failure to make timely payment of any of its obligations under this Lease, including, without limitation, Landlord's failure to make timely payment of any item that is included in Direct Expenses, unless such failure is caused by Tenant failing to pay any Rent when due under this Lease;

(q)     costs of any sign that solely identifies another tenant in the Project;

(r)     any charitable or political contributions;

(s)     costs of correcting defects in the initial design or construction of any portion of the Project or arising from defects in the base, shell or core of the Building;

(t)     artwork, except as required by governmental agencies;

(u)     janitorial services specific to tenantable buildings or space as opposed to the Common Areas;

(v)     costs, liabilities or other amounts incurred by Landlord pursuant to any indemnity obligation of Landlord;

(w)     costs arising from the cleanup, removal, investigation and/or remediation of Hazardous Substances brought upon, kept or used in, on or about the Project (i) prior to the Phase 1 Lease Commencement Date or (ii) after the Phase 1 Lease Commencement Date to the extent such Hazardous Substances are brought upon, kept or used in, on or about the Project after the Phase 1 Lease Commencement Date by Landlord or any other tenant of the Project;

(x)     costs of new or additional buildings or other additional structures not comprising the Project as of the date of this Lease; and

(y)     depreciation.

If Landlord is not furnishing any particular work or service (the cost of which, if performed by Landlord, would be included in Operating Expenses) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, Operating Expenses shall be deemed to be increased by an amount equal to the additional Operating Expenses which would reasonably have been incurred during such period by Landlord if it had at its own expense furnished such work or service to such tenant. If the Project is not at least one hundred percent (100%) occupied during all or a portion of any Expense Year, Landlord may elect to make an appropriate adjustment to the components of Operating Expenses for such year to determine the amount of Operating Expenses that would have been incurred had the Project been one hundred percent (100%) occupied; and the amount so determined shall be deemed to have been the amount of Operating Expenses for such year.

-15-

4.2.5    <u>**Taxes**</u>.

4.2.5.1    **Tax Expenses**" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary, (including, without limitation, real estate taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Project, or any portion thereof), as the same may be increased from time to time, which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing and operation of the Project, or any portion thereof.

4.2.5.2    Tax Expenses shall include, without limitation: (i) Any tax on the rent, right to rent or other income from the Project, or any portion thereof, or as against the business of leasing the Project, or any portion thereof; (ii) Any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, Tax Expenses shall also include any governmental or private assessments or the Project's contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies; (iii) Any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, including, without limitation, any business or gross income tax or excise tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; (iv) Any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises; and (v) All of the real estate taxes and assessments imposed upon or with respect to the Building and all of the real estate taxes and assessments imposed on the land and improvements comprising the Project.

4.2.5.3    Any costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees) incurred in attempting to protest, reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such expenses are incurred. Refunds of Tax Expenses shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based on the Expense Year to which the refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Tax Expenses under this <u>Article 4</u> for such Expense Year. If Tax Expenses for any period during the Lease Term or any extension thereof are increased after payment thereof for any reason, including, without limitation, error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Share of any such increased Tax Expenses. Notwithstanding anything to the contrary set forth in this Lease, only Landlord may institute proceedings to reduce Tax Expenses and the filing of any such proceeding by Tenant without Landlord's consent shall constitute an event of default by Tenant under this Lease. Notwithstanding the foregoing, Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Tax Expenses.

4.2.5.4    Notwithstanding anything to the contrary contained in this <u>Section 4.2.5</u> (except as set forth in <u>Section 4.2.5.2</u> above), there shall be excluded from Tax Expenses (i) all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and state income taxes, and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Project), (ii) any items included as Operating Expenses, (iii) any items paid by Tenant under <u>Section 4.5</u> of this Lease, and (iv) interest, penalties or other costs arising out of Landlord's failure to make timely payment of any of its obligations under this Lease, including, without limitation, Landlord's failure to make timely payment of any taxes to taxing authorities, unless such failure is caused by Tenant failing to pay any Rent when due under this Lease.

4.3    <u>**Allocation of Direct Expenses**</u>.

4.3.1    <u>**Method of Allocation**</u>. The parties acknowledge that the Building is a part of a multi-building project and that the costs and expenses incurred in connection with the Project (*i.e.*, the Direct Expenses) should be shared between the tenants of the Building and the tenants of the other buildings in the Project. Accordingly, as set forth in <u>Section 4.2</u> above, Direct Expenses (which consists of Operating Expenses and Tax

-16-

Expenses) are determined annually for the Project as a whole, and a portion of the Direct Expenses, which portion shall be determined by Landlord on an equitable basis, shall be allocated to the Building (as opposed to any other buildings in the Project) and such portion shall be the Direct Expenses for purposes of this Lease. Such portion of Direct Expenses allocated to the Building shall include all Direct Expenses attributable solely to the Building and an equitable portion of the Direct Expenses attributable to the Project as a whole.

4.3.2 **Cost Pools**. Landlord shall have the right, from time to time, to equitably allocate some or all of the Direct Expenses for the Project among different portions or occupants of the Project (the "**Cost Pools**"), in Landlord's reasonable discretion. Such Cost Pools may include, but shall not be limited to, the office space tenants of a building of the Project or of the Project, and the retail space tenants of a building of the Project or of the Project. The Direct Expenses within each such Cost Pool shall be allocated and charged to the tenants within such Cost Pool in an equitable manner.

4.4 **Calculation and Payment of Additional Rent**. Tenant shall pay to Landlord, in the manner set forth in Section 4.4.1, below, and as Additional Rent, an amount equal to Tenant's Share of Direct Expenses.

4.4.1 **Statement of Actual Direct Expenses and Payment by Tenant**. Landlord shall endeavor to give to Tenant following the end of each Expense Year, a statement (the "**Statement**") which shall state the Direct Expenses incurred or accrued for such preceding Expense Year, and which shall indicate the amount of Tenant's Share of Direct Expenses. Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, Tenant shall pay, with its next installment of Base Rent due, the full amount of Tenant's Share of Direct Expenses for such Expense Year, less the amounts, if any, paid during such Expense Year as "Estimated Direct Expenses," as that term is defined in Section 4.4.2, below, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses, Tenant shall receive a credit in the amount of Tenant's overpayment against Rent next due under this Lease. The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this Article 4. Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, Tenant shall immediately pay to Landlord Tenant's Share of Direct Expenses, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses, Landlord shall, within thirty (30) days, deliver a check payable to Tenant in the amount of the overpayment. The provisions of this Section 4.4.1 shall survive the expiration or earlier termination of the Lease Term.

4.4.2 **Statement of Estimated Direct Expenses**. In addition, Landlord shall endeavor to give Tenant a yearly expense estimate statement by April 1st of each year (the "**Estimate Statement**") which shall set forth Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for the then-current Expense Year shall be and the estimated Tenant's Share of Direct Expenses (the "**Estimated Direct Expenses**"). The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Direct Expenses under this Article 4, nor shall Landlord be prohibited from revising any Estimate Statement or Estimated Direct Expenses theretofore delivered to the extent necessary. Thereafter, Tenant shall pay, with its next installment of Base Rent due, a fraction of the Estimated Direct Expenses for the then-current Expense Year (reduced by any amounts paid pursuant to the last sentence of this Section 4.4.2). Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year, including the month of such payment, and twelve (12) as its denominator. Until a new Estimate Statement is furnished (which Landlord shall have the right to deliver to Tenant at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Direct Expenses set forth in the previous Estimate Statement delivered by Landlord to Tenant.

4.5 **Taxes and Other Charges for Which Tenant Is Directly Responsible**.

4.5.1 Tenant shall be liable for and shall pay before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises. If any such taxes on Tenant's equipment, furniture, fixtures and other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.5.2 If the tenant improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space in the Building are assessed, then the taxes levied against Landlord or

-17-

the property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Section 4.2.1, above.

4.5.3    Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency as Additional Rent (and not as part of Direct Expenses) any (i) rent tax or sales tax, gross receipts tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Project, including the Project parking facility(ies) and taxes or assessments due to any type of ballot measure, including an initiative adopted by the voters or local agency, or a state proposition approved by the voters; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

4.6    **Landlord's Records**. Upon Tenant's written request given not more than ninety (90) days after Tenant's receipt of a Statement for a particular Expense Year, and provided that Tenant is not then in default under this Lease beyond the applicable notice and cure period provided in this Lease, specifically including, but not limited to, the timely payment of Additional Rent (whether or not the same is the subject of the audit contemplated herein), Landlord shall furnish Tenant with such reasonable supporting documentation in connection with said Direct Expenses as Tenant may reasonably request. Landlord shall provide said documentation to Tenant within sixty (60) days after Tenant's written request therefor. Within one hundred eighty (180) days after receipt of a Statement by Tenant (the "**Audit Period**"), if Tenant disputes the amount of Direct Expenses set forth in the Statement, an independent certified public accountant (which accountant (A) is a member of a nationally or regionally recognized certified public accounting firm which has previous experience in auditing financial operating records of landlords of office buildings, (B) shall not already be providing primary accounting and/or lease administration services to Tenant and shall not have provided primary accounting and/or lease administration services to Tenant in the past three (3) years, (C) is not working on a contingency fee basis (*i.e.*, Tenant must be billed based on the actual time and materials that are incurred by the certified public accounting firm in the performance of the audit), and (D) shall not, to the actual then current knowledge of Tenant, then currently be providing accounting and/or lease administration services to another tenant in the Building and/or the Project in connection with a review or audit by such other tenant of Direct Expenses (it being understood that Tenant shall have no independent duty of inquiry to identify any parties then providing such accounting and/or lease administration services to such other tenants)), designated and paid for by Tenant, may, after reasonable notice to Landlord and at reasonable times, audit Landlord's records with respect to the Statement at Landlord's corporate offices, provided that (i) Tenant is not then in default under this Lease (beyond the applicable notice and cure periods provided under this Lease), (ii) Tenant has paid all amounts required to be paid under the applicable Estimate Statement and Statement, and (iii) a copy of the audit agreement between Tenant and its particular certified public accounting firm has been delivered to Landlord prior to the commencement of the audit, provided that Tenant may redact any confidential or proprietary information from such agreement before delivering it to Landlord. In connection with such audit, Tenant and Tenant's certified public accounting firm must agree in advance to follow Landlord's reasonable rules and procedures regarding an audit of the aforementioned Landlord records, and shall execute a commercially reasonable confidentiality agreement regarding such audit. Tenant shall use commercially reasonable efforts to cause any audit report prepared by Tenant's certified public accounting firm ("**Tenant's Accountant**") to be delivered substantially concurrently to Landlord and Tenant within the Audit Period. Tenant's failure to audit the amount of Direct Expenses set forth in any Statement within the Audit Period shall be deemed to be Tenant's approval of such Statement and Tenant, thereafter, waives the right or ability to audit the amounts set forth in such Statement. If after such audit, Tenant still disputes such Direct Expenses, an audit to determine the proper amount shall be made, at Tenant's expense, by an independent certified public accountant (the "**Accountant**") selected by Landlord and subject to Tenant's reasonable approval; provided that if such audit by the Accountant proves that Direct Expenses set forth in the particular Statement were overstated by more than [***], then the commercially reasonable cost of the Accountant in connection with such audit shall be paid for by Landlord and Tenant shall be reimbursed for the commercially reasonable fees cost of the Tenant Accountant. If the audit and review process described above results in a determination that Tenant has overpaid obligations for a preceding period, the amount of such overpayment (plus interest at the Interest Rate) shall be credited against Tenant's subsequent installment obligations to pay Additional Rent or, if this Lease has terminated or expired, paid in lawful money to Tenant within thirty (30) days after the determination of overpayment is delivered to Landlord. In the event that such results show that Tenant has underpaid its obligations for a preceding period, the amount of such underpayment (plus interest at the Interest Rate) shall be paid by Tenant to Landlord with the next succeeding installment obligation of Additional Rent or, if this Lease has terminated or expired, in lawful money within thirty (30) days after the determination of underpayment is delivered to Tenant. Tenant hereby acknowledges that Tenant's sole right to audit Landlord's records and to contest the amount of Direct Expenses payable by Tenant shall be as set forth in this Section 4.6, and Tenant hereby waives any and all other rights pursuant to applicable law to audit such records and/or to contest the amount of Direct Expenses payable by Tenant.

-18-

**ARTICLE 5**

**USE OF PREMISES**

5.1    **Permitted Use**. Tenant shall use the Premises solely for the Permitted Use set forth in Section 8 of the Summary and Tenant shall not use or permit the Premises or the Project to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion.

5.2    **Prohibited Uses**. Tenant further covenants and agrees that Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in **Exhibit A**, attached hereto, or in violation of the laws of the United States of America, the State of California, the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Project) including, without limitation, any such laws, ordinances, regulations or requirements relating to hazardous materials or substances, as those terms are defined by applicable laws now or hereafter in effect, or any easement, license, operating agreement, declaration, restrictive covenant, or instrument recorded against the Project, including, without limitation, any covenants, conditions and restrictions affecting the Project, any reciprocal easement agreements affecting the Project, any parking licenses, and any agreements with transit agencies affecting the Project (collectively, "**Underlying Documents**"). A violation of the Rules and Regulations by Tenant shall be deemed a default under this Article 5. Tenant shall not do or permit anything to be done in or about the Premises which will in any way damage the reputation of the Project or obstruct or interfere with the rights of other tenants or occupants of the Building, or injure or annoy them or use or allow the Premises to be used for any improper, unlawful or objectionable purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises. Tenant shall comply with, and Tenant's rights and obligations under the Lease and Tenant's use of the Premises shall be subject and subordinate to, all recorded easements, covenants, conditions, and restrictions now or hereafter affecting the Project so long as any such recorded easements, covenants, conditions, and restrictions first affecting the Project after the date of this Lease do not materially adversely affect Tenant's possession, use or enjoyment of the Premises for the Permitted Use or materially adversely affect Tenant's parking rights under this Lease.

5.3    **CC&Rs**. Tenant shall comply with all recorded covenants, conditions, and restrictions currently affecting the Project, including, without limitation, that certain Declaration of Covenants, Conditions, Restrictions, Easements and Charges for Commercial Planned Development for Pacific Shores Center, recorded July 21, 2000 as Document No. 2000-089122 in the Official Records of the County of San Mateo, California, as amended by that certain First Amendment to Declaration of Covenants, Conditions, Restrictions, Easements and Charges for Commercial Planned Development for Pacific Shores Center, recorded December 7, 2006 as Document No. 2006-185322 in the Official Records of the County of San Mateo, California, that certain Second Amendment to Declaration of Covenants, Conditions, Restrictions, Easements and Charges for Commercial Planned Development for Pacific Shores Center, recorded April 11, 2007 as Document No. 2007-055324 in the Official Records of the County of San Mateo, California, and that certain Third Amendment to Declaration of Covenants, Conditions, Restrictions, Easements and Charges for Commercial Planned Development for Pacific Shores Center, recorded October 24, 2014 as Document No. 2014-097194 in the Official Records of the County of San Mateo, California (collectively, the "**Current CC&Rs**"). Additionally, Tenant acknowledges that the Project may be subject to any future covenants, conditions, and restrictions and/or amendments to the Current CC&Rs (in any such event, the "**Future CC&R**") which Landlord, in Landlord's discretion, deems reasonably necessary or desirable, and Tenant agrees that this Lease shall be subject and subordinate to the Current CC&Rs and such Future CC&Rs (collectively, the "**CC&Rs**") so long as any Future CC&R first affecting the Project after the date of this Lease does not materially adversely affect Tenant's possession, use or enjoyment of the Premises for the Permitted Use or materially adversely affect Tenant's parking rights under this Lease.

**ARTICLE 6**

**SERVICES AND UTILITIES**

6.1    **Services and Utilities**. Tenant shall be responsible for contracting directly with any applicable public utility company or third party provider for, and shall promptly pay, as the same become due, all charges for, water, gas, electricity, telephone, sewer service, waste pick-up and any other utilities, materials and services furnished directly to or used by Tenant at the Building during the Lease Term, including, without limitation, (i) meter, use and/or connection fees, hook-up fees, or standby fees, and (ii) penalties for discontinued interrupted service. Tenant's use of electricity shall never exceed the capacity of the feeders to the Project or the risers or wiring installations. Notwithstanding the foregoing, Tenant shall have the right to upgrade such capacity, at Tenant's sole cost, in order to accommodate Tenant's use of the Premises at any time during the Lease Term; provided that, any such upgrades by Tenant shall be performed pursuant to the terms and conditions of Article 8 of this Lease. Any

-19-

interruption or cessation of utilities resulting from any causes, including any entry for repairs pursuant to this Lease, and any renovation, redecoration or rehabilitation of any area of the Project, shall not render Landlord liable for damages to either person or property or for interruption or loss to Tenant's business, nor be construed as an eviction of Tenant, nor work an abatement of any portion of Rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof; provided that, to the extent the cause is the failure of Landlord to observe or perform an obligation of Landlord hereunder and such failure materially adversely affects Tenant's possession, use or enjoyment of the Premises for the Permitted Use or materially adversely affects Tenant's parking rights under this Lease, then Landlord shall initiate the cure of such failure, to the extent reasonably possible, promptly after receipt from Tenant of notice of the failure and Landlord, to the extent possible, shall thereafter diligently prosecute said cure to completion.

Tenant acknowledges that Landlord may be required in the future to disclose information concerning Tenant's energy usage to certain third parties, including, without limitation, prospective purchasers, lenders and tenants of the Building ("**Tenant Energy Use Disclosure**"). Tenant shall reasonably cooperate with Landlord with respect to any Tenant Energy Use Disclosure. Without limiting the generality of the foregoing, Tenant shall, within ten (10) days following request from Landlord, disclose to Landlord all non-proprietary, non-confidential information reasonably requested by Landlord in connection with such Tenant Energy Use Disclosure, including, but not limited to, the amount of power or other utilities consumed within the Premises for which the meters for such utilities are in Tenant's name, the number of employees working within the Premises, the operating hours for Tenant's business in the Premises, and the type and number of equipment operated by Tenant in the Premises. Tenant acknowledges that this information shall be provided on a non-confidential basis and may be provided by Landlord to the applicable utility providers, the California Energy Commission (and other governmental entities having jurisdiction), and any third parties to whom Landlord is required to make any Tenant Energy Use Disclosure. Tenant hereby (A) consents to all such Tenant Energy Use Disclosures, and (B) acknowledges that Landlord shall not be required to notify Tenant of any Tenant Energy Use Disclosure. Tenant agrees that none of the "Landlord Parties," as that term is defined in Section 10.1, below, shall be liable for, and Tenant hereby releases the Landlord Parties from, any and all loss, cost, damage, expense and liability relating to, arising out of and/or resulting from any Tenant Energy Use Disclosure. In addition, Tenant represents to Landlord that any and all information provided by Tenant to Landlord pursuant to this paragraph shall be, to the best of Tenant's knowledge, true and correct in all material respects, and Tenant acknowledges that Landlord shall rely on such information. The terms of this paragraph shall survive the expiration or earlier termination of this Lease.

6.2     **Rooftop**. Tenant shall have the right to install equipment including, without limitation, cable, wiring, rooftop antennae, and other equipment associated with Tenant's use of the Premises on the roof of the Building (the "**Rooftop Equipment**") and in the pathways, shafts, risers, raceways, telephone closets, service areas and utility connections and entries into and through the Building to serve Tenant's needs within the Building. Any such installation shall be performed at Tenant's sole cost and expense, pursuant to the terms and conditions of Article 8 of this Lease, and in compliance with all applicable laws, ordinances, regulations and requirements. Tenant shall keep all such Rooftop Equipment in good order, condition and repair, at Tenant's sole cost and expense. Tenant's installation of the Rooftop Equipment shall be done in such a manner as not to void any existing roof warranty in place at the Building (and Tenant shall indemnify and hold Landlord harmless in the event any such warranty is voided as a result of the installation of any Rooftop Equipment by Tenant for any costs and losses incurred by Landlord to the extent such costs or losses are attributable to the voiding of such warranty). Tenant shall, at Tenant's sole cost and expense, be responsible to repair any damage to the Building, including the roof and roof membrane, caused by the installation of any Rooftop Equipment. At the expiration or earlier termination of this Lease, Tenant shall remove any Rooftop Equipment installed by or on behalf of Tenant and repair any damage to the roof or roof membrane caused by the installation or removal of the Rooftop Equipment by Tenant.

6.3     **Telecommunications Services**. Tenant shall arrange for telephone, data transaction, video and other telecommunication services ("**Telecommunication Services**") directly with one or more of Telecommunications Services providers and shall be solely responsible for paying for such Telecommunications Services. All connections for Telecommunications Services which Tenant may desire and the location of all wires and fibers shall be first approved in writing by Landlord (such approval shall not be unreasonably withheld, conditioned or delayed) before the same are installed, and the work in connection therewith shall be performed by contractors approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed). Landlord shall have the right, upon reasonable prior notice to Tenant, to temporarily interrupt or turn off such Telecommunications Services (i) in the event of emergency, (ii) as necessary in connection with maintenance, repairs or construction at the Project, provided that Tenant shall receive reasonable prior written notice thereof and Landlord shall use commercially reasonable efforts to minimize any interference to the conduct of Tenant's business, or (iii) on account of violation by the Tenant's provider of any obligation to Landlord.

-20-

## ARTICLE 7

### REPAIRS

7.1      **Tenant's Obligations**.

7.1.1      **Tenant's Repair Obligations**. Tenant shall, following the applicable Lease Commencement Date with respect to any Phase, at its sole cost and expense, (A) keep, maintain, repair and replace as required, the Phase and every part thereof in a good standard of maintenance, repair and replacement as required, and in good and sanitary condition and (B) maintain the Phase in compliance with all applicable laws, ordinances, regulations and requirements (items (A) and (B) shall collectively be referred to herein as the "**Tenant's Repair Obligations**"), including, without limitation, the following: (1) interior glass and windows; (2) interior and exterior doors, door frames and door closers; (3) interior lighting (including, without limitation, light bulbs and ballasts); (4) the plumbing, sewer, drainage, electrical, fire protection, elevator, escalator, life safety and security systems and equipment, existing heating, ventilation and air-conditioning ("**HVAC**") systems, and all other mechanical, electrical and communications systems and equipment (collectively, the "**Building Systems**") serving the Premises, including (i) any specialty or supplemental Building Systems installed by or for Tenant and (ii) all electrical facilities and equipment, including lighting fixtures, lamps, fans and any exhaust equipment and systems, electrical motors and all other appliances and equipment of every kind and nature located in, upon or about the Premises; (5) all communications systems serving the Premises; (6) all of Tenant's security systems in or about or serving the Premises; (7) Tenant's signage; and (8) interior demising walls and partitions (including painting and wall coverings), equipment, floors, and any roll-up doors, ramps and dock equipment. Tenant shall additionally be responsible, at Tenant's sole cost and expense, to furnish all expendables, including light bulbs, paper goods and soaps, used in the Premises, and, to the extent that Landlord notifies Tenant in writing of its intention to no longer arrange for such monitoring, cause the fire alarm systems serving the Premises to be monitored by a monitoring or protective services firm approved by Landlord in writing (such approval not to be unreasonably withheld, conditioned or delayed). Tenant shall have the non-exclusive benefit of all contract warranties available to Landlord regarding the HVAC systems and equipment.

7.1.2      **Management Standards**. Landlord and Tenant hereby acknowledge that Tenant's in-house facilities management department (collectively, the "**Facilities Team**") is comprised of a multi-disciplined staff of highly trained and professional facilities maintenance, repair and management personnel. Tenant shall cause, throughout the Lease Term, its Facilities Team to continue to maintain materially consistent levels of capability and expertise with the levels of such Facilities Team as of the date of this Lease, and apply such Facilities Team to the Premises as reasonably required to satisfy Tenant's Repair Obligations.

7.1.2.1      **Professional Management**. Tenant shall manage and operate the Premises and perform its duties under this Lease in a manner consistent with the standards followed by Landlord and other institutional owners and management companies that are managing office buildings of comparable age and quality in the Project and in the vicinity of the Project (the "**Management Standard**").

7.1.2.2      **Service Agreements**. All Building Systems, including HVAC, elevators, main electrical, plumbing and fire/life-safety systems, shall be maintained, repaired and replaced by Tenant (i) in a commercially reasonable first-class condition, (ii) in accordance with any applicable manufacturer specifications relating to any particular component of such Building Systems, (iii) in accordance with applicable laws, ordinances, regulations and requirements. Tenant shall contract with a qualified, experienced professional third party service company to perform its maintenance, repair and replacement obligations hereunder with respect to the HVAC systems (which shall provide for and include, without limitation, replacement of filters, oiling and lubricating of machinery, parts replacement, adjustment of drive belts, oil changes and other preventive maintenance, including annual maintenance of duct work, interior unit drains and caulking of sheet metal, and recaulking of jacks and vents on an annual basis), the building fire/life-safety systems and the electrical and plumbing systems (each a "**Service Contract**"). Tenant shall deliver full and complete copies of each Service Contract to Landlord within thirty (30) days after the effective date of such Service Contract. In addition, Tenant shall regularly, in accordance with commercially reasonable standards, generate and maintain preventive maintenance records relating to each Building's mechanical and main electrical systems, including life safety, elevators and the central plant ("**Preventative Maintenance Records**"). In addition, upon Landlord's request, Tenant shall deliver a copy of all current Service Agreements to Landlord and/or a copy of the Preventative Maintenance Records.

7.1.2.3      **Pest Control; Janitorial Obligations**. Tenant shall also be responsible for all pest control within the Premises and the Building, and for all cleaning and trash removal and disposal at and from the Premises and the Building.

-21-

7.1.2.4 **Landlord's Right to Perform Tenant's Repair Obligations**. Tenant shall notify Landlord in writing at least thirty (30) days prior to performing any Tenant's Repair Obligations which affect the Base Building (as defined in Section 8.2 below) (a "**Base Building Work Notice**"). Upon receipt of such notice from Tenant, subject to Section 7.1.2.5 below, Landlord shall have the right to either (i) perform such Tenant's Repair Obligation by delivering notice of such election to Tenant within thirty (30) days following receipt of Tenant's notice, and Tenant shall pay Landlord the cost thereof (including Landlord's reasonable supervision fee [***]) within thirty (30) days after receipt of an invoice therefor, or (ii) require Tenant to perform such Tenant's Repair Obligation at Tenant's sole cost and expense; provided that nothing herein shall limit the Landlord Repair Obligations. If Tenant fails to perform any Tenant's Repair Obligation (including, without limitation, any Tenant's Repair Obligations which affect the Base Building) within a reasonable time period, as reasonably determined by Landlord, then Landlord may, but need not, following delivery of notice to Tenant of such election, make such Tenant's Repair Obligation, and Tenant shall pay Landlord the cost thereof, (including Landlord's reasonable supervision fee [***]) within thirty (30) days after receipt of an invoice therefor.

7.1.2.5 **Replacement of Certain Building Systems**. If a Base Building Work Notice identifies that any of the Building Systems existing in the Premises as of the Phase 1 Lease Commencement Date (and not installed by or for Tenant) (the "**Existing Building Systems**") needs to be replaced, or if Tenant is required to replace any Existing Building Systems pursuant to applicable law first enacted or made effective with respect to the Premises after the date of this Lease (and such replacement requirement is not triggered by any Phase Work, any Alterations, use of the Premises for other than general office use, a "CASp" inspection as described in Article 24 below, or the negligence or willful misconduct of Tenant or any of its agents, employees, contractors, subtenants or invitees), and provided that Tenant is not in default with respect to any of its obligations set forth in this Lease with respect to such Building System (including, without limitation, maintaining the applicable Service Contract), then upon receipt of written notice from Tenant (and the Base Building Work Notice may constitute such written notice), Landlord shall promptly commence to perform such replacement and diligent perform the same to completion, at Landlord's sole cost and expense; provided, however, that the cost of such replacement shall be amortized with interest at the Interest Rate over its useful life as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices, consistently applied, and Tenant shall pay to Landlord, as Additional Rent, the amortized amount, in equal monthly installments, and at the same time and in the same manner as Base Rent under this Lease. If this Lease is terminated for any reason other than in connection with a Landlord default, casualty or condemnation then Tenant shall immediately become obligated to pay to Landlord, as a lump sum, the remaining amortized monthly installments that would have been attributable to the remainder of the Lease Term had it not been so terminated.

7.1.3 **Meeting Requirements**.

7.1.3.1 **Maintenance Meetings**. At the written request of either Landlord or Tenant (a "**MM Request**"), each party shall arrange to meet and confer with the other (at a mutually reasonable and convenient time and location), as to the status of the maintenance, repair and other work required to be performed by each party under this Lease (each, a **Maintenance Meeting**"); provided, however, in no event shall Landlord or Tenant be required to participate in more than one such Maintenance Meeting in any calendar quarter throughout the Lease Term, unless such a Maintenance Meeting is required in connection with an emergency situation or event.

7.1.3.2 **M&R Reports**. In connection with, and in advance of, any such Maintenance Meeting, to the extent the requesting party's MM Request included a request for maintenance and repair reports, documents and back-up materials, the responding party shall promptly deliver any maintenance and repair reports, documents and back-up materials related to the maintenance, repair and other work required to be performed by such party under this Lease, to the extent the same are regularly and customarily generated and maintained by, and in the possession of, its Facilities Team (collectively, the **M&R Reports**"); provided, however, the responding party may also make a prompt written request for such M&R Reports maintained by the requesting party, in which case such request shall also be satisfied prior to the corresponding Maintenance Meeting.

7.1.3.3 **Books and Records**. Tenant shall maintain complete, detailed and accurate records, books and accounts of all funds disbursed in connection with Tenant's management and operation of the Premises (excepting salary disbursements internal to Tenant), including all M&R Reports. Tenant agrees to keep all of the aforementioned documents (collectively, the "**Books and Records**") safe, available and separable from any record not having to do with the Premises. Tenant shall not dispose of any such Books or Records until the same are at least three (3) years old.

7.1.4 **Tenant's Risk Management Obligations**. Tenant shall promptly investigate and make a full timely written report to Landlord as to all alleged accidents known to Tenant and/or all claims for damages relating to the Premises known to Tenant, including any damage or destruction to the Premises. Landlord and

-22-

Tenant shall notify each other immediately of any threatened or pending condemnation, rezoning or other governmental orders, proceedings or lawsuits involving the Premises.

       7.1.5    **Tenant's Responsibilities Upon Termination of Management of the Premises**. Upon the expiration or earlier termination of this Lease for any reason, Tenant shall forthwith, without necessity of demand or notice, deliver the following to Landlord, or Landlord's appointed agent on the effective date of such expiration or early termination (except to the extent that any such item has already been delivered to Landlord).

           7.1.5.1    Copies of the Preventative Maintenance Records for the most recent full calendar year.

           7.1.5.2    Copies of the Books and Records for the most recent full calendar year and any subsequent partial calendar year.

           7.1.5.3    Any third party warranties, guaranties and operating manuals in Tenant's possession relating to the improvements in the Premises and any Building Systems being maintained by Tenant (copies thereof where reasonably acceptable).

           7.1.5.4    All keys related to the telephone closets, janitorial closets, electrical closets, storage rooms, storage areas, rooftop access points, and all other areas which for which Tenant has restricted access.

           7.1.5.5    A certification that Tenant, in connection with the terms and conditions of Section 15.3 of this Lease, has maintained those portions of the Building and Premises required to be maintained by Tenant in accordance with the terms and conditions of this Article 7 and Articles 23 and 24.

     The obligation of Tenant to deliver the foregoing shall survive the expiration or earlier termination of the Lease.

     7.2    **Landlord's Obligations**.

       7.2.1    **Landlord Repair Obligations**. Subject to the provisions of Article 11 and Article 13 hereof, Landlord agrees to maintain, repair and replace as required, in good condition (but in at least as good a condition as exists as of the date of this Lease) (the "**Landlord Repair Obligations**") (a) at Landlord's sole cost and expense, only the structural portions of the roof (specifically excluding the roof membrane or coverings) and the foundation of the Building, and (b) as part of Operating Expenses, (i) exterior glass and windows (including skylights), (ii) the non-structural portions of the roof of the Building, including the roof membrane (including, without limitation, all costs incurred under any third party service contract for the maintenance, repair and replacement of the roof), and (iii) the routine maintenance of the load bearing and exterior walls of the Building, including, without limitation, any painting, sealing, patching and waterproofing of such walls. Notwithstanding any provision in this Section 7.2.1 to the contrary, any damage to the portions of the Building that Landlord is required to repair under this Section 7.2.1 to the extent arising from the negligence or willful misconduct of Tenant or by other persons claiming through Tenant shall be repaired by Landlord, and Tenant shall pay Landlord the cost thereof, including any actual out-of-pocket costs or expenses arising from Landlord's involvement with such repairs and replacements and Landlord's reasonable supervision fee [***], within thirty (30) days after receipt of an invoice therefor. Subject to the other terms and conditions herein, including, without limitation, Article 27 hereof, Landlord may, but shall not be required to, enter the Premises upon prior notice to Tenant, to make such repairs, alterations, improvements or additions to the Premises or to any equipment located in the Premises as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree. In connection with the foregoing, Landlord shall use commercially reasonable efforts to minimize any interference to the conduct of Tenant's business.

     7.3    **Waiver**. Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code or under any similar law, statute, or ordinance now or hereafter in effect.

**ARTICLE 8**

**ADDITIONS AND ALTERATIONS**

     8.1    **Landlord's Consent to Alterations**. Tenant may not make any improvements, alterations, additions or changes to the Premises, the Building or any mechanical, plumbing or HVAC facilities or systems pertaining to the Premises or the Building (collectively, the "**Alterations**") without first procuring the prior written

-23-

consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than thirty (30) days prior to the commencement thereof, and which consent shall be granted or denied within thirty (30) days after such written request and shall not be unreasonably withheld, conditioned or delayed by Landlord, provided it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which adversely affects the Base Building or is visible from the exterior of the Building (a "**Major Alteration**"). Notwithstanding the foregoing, Tenant shall be permitted to make Alterations (including removal and rearrangement of Alterations) following ten (10) business days' notice to Landlord, but without Landlord's prior consent, which (a) are not Major Alterations, (ii) do not require a building permit, and (iii) are reasonably estimated (together with any other Alterations performed without Landlord's consent pursuant to this sentence during the 12-month period ending on the date of such notice) to cost less than $[***] ("**Permitted Alterations**"). Tenant may, at the time Tenant requests Landlord's consent to any Alterations pursuant to this Article 8, or prior to the commencement of any Permitted Alterations, request that Landlord indicate if Landlord shall require Tenant to remove such Alterations at the end of the Lease Term (and Landlord's failure to respond to such request shall be deemed Landlord's election to require such removal). If Landlord responds to such request and indicates in writing that any such Alterations do not need to be removed at the end of the Lease Term, such Alterations shall be referred to herein as the "**Non-Removable Alterations**". The term Alterations as used herein shall expressly include the installation of one or more quick charge stations for electric vehicles in the Building Parking Area (as defined in Article 28 below).

8.2     **Manner of Construction**. Landlord may impose, as a condition of its consent to any and all Alterations or repairs of the Premises or about the Premises, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, subcontractors, materials, mechanics and materialmen selected by Tenant from a list provided and approved by Landlord, the requirement that upon Landlord's request, Tenant shall, at Tenant's expense, remove such Alterations upon the expiration or any early termination of the Lease Term. Landlord may also require, as a condition to its consent to any Alterations, that any architect retained by Tenant in connection with such Alterations be a "CASp," as that term is defined in Article 24 below, and that following the completion of such Alterations, such architect shall certify the Premises as meeting all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53. Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county or municipal laws, rules and regulations and pursuant to a valid building permit, issued by the city in which the Building is located all in conformance with Landlord's construction rules and regulations; provided, however, that prior to commencing to construct any Alteration, Tenant shall meet with Landlord to discuss Landlord's design parameters and code compliance issues. In the event Tenant performs any Alterations in the Premises which require or give rise to governmentally required changes to the "Base Building," as that term is defined below, then Landlord shall, at Tenant's expense, make such changes to the Base Building. The "**Base Building**" shall include the structural portions of the Building, Building foundations, the public restrooms, elevators, exit stairwells and the Building Systems. In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Project or any portion thereof, by any other tenant of the Project, and so as not to obstruct the business of Landlord or other tenants in the Project. Tenant shall not use (and upon notice from Landlord shall cease using) contractors, services, workmen, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with the workforce or trades engaged in performing other work, labor or services in or about the Building or the Common Areas. In addition to Tenant's obligations under Article 9 of this Lease, upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded in the office of the recorder of the county in which the Building is located in accordance with Section 8182 of the California Civil Code or any successor statute and furnish a copy thereof to Landlord upon recordation, and Tenant shall deliver to the Project construction manager a reproducible copy of the "as built" drawings of the Alterations as well as all permits, approvals and other documents issued by any governmental agency in connection with the Alterations.

8.3     **Payment for Improvements**. If payment is made by Tenant directly to contractors, Tenant shall (i) comply with Landlord's requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors, and (ii) sign Landlord's standard commercially reasonable contractor's rules and regulations, provided, with respect to any Alterations, Landlord shall have furnished such rules and regulations to Tenant concurrently with its written consent to the making of such Alterations or prior thereto. Whether or not Tenant orders any work directly from Landlord, Tenant shall pay to Landlord an amount equal to Landlord's then current standard fee to compensate Landlord for all overhead, general conditions, fees and other costs and expenses arising in connection with any Alterations ([***] subject to Section 8.6 below with respect to the Phase Work) (the "**Supervision Fee**"). In addition, Tenant shall reimburse Landlord for Landlord's reasonable, actual, out-of-pocket costs and expenses actually incurred in connection with Landlord's review of any Alterations. At Landlord's option, prior to the commencement of construction of any Alteration, Tenant shall provide Landlord with the reasonably anticipated cost thereof, which Landlord shall disburse during construction pursuant to Landlord's standard, commercially reasonable disbursement procedure.

8.4      **Construction Insurance**. In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant carries "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to Article 10 of this Lease immediately upon completion thereof. In addition, Landlord may, in its commercially reasonable discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee, provided that no such bond or security shall be required in connection with the Phase Work.

8.5      **Landlord's Property**. All Alterations, improvements, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises, from time to time, shall be at the sole cost of Tenant and, except as otherwise expressly set forth hereinbelow, shall be and become the property of Landlord. Notwithstanding the foregoing and absent any written notice from Landlord to the contrary, prior to the end of the Lease Term or any earlier termination of this Lease, Tenant, at Tenant's expense, shall remove any Alterations and/or improvements and/or systems and equipment within the Premises made by or for Tenant that are not normal and customary general office improvements (excluding any Non-Removable Alterations), and shall repair any damage to the Premises and Building caused by such removal and return the affected portion of the Premises to a building standard tenant improved condition as reasonably determined by Landlord; provided, however, Landlord may, by written notice to Tenant prior to the end of the Lease Term, notify Tenant that some or all of such Alterations and/or improvements and/or systems and equipment shall remain within the Premises, in which event Tenant shall have no obligation or right to remove the same. If Tenant fails to complete such removal and/or to repair any damage caused by the removal of any such Alterations and/or improvements and/or systems and equipment in the Premises and return the affected portion of the Premises to a building standard tenant improved condition as reasonably determined by Landlord, (i) Landlord may do so and Tenant shall reimburse Landlord for the actual out-of-pocket costs incurred by Landlord therefor, plus Landlord's reasonable supervision fee ([***]), and (ii) Tenant shall be deemed to be in holdover until such time as the removal and restoration is completed (and, accordingly, the terms of Article 16 of this Lease shall be applicable during such period). Tenant hereby protects, defends, indemnifies and holds Landlord harmless from any liability, cost, obligation, expense or claim of lien in any manner relating to the installation, placement, removal or financing of any such Alterations, improvements, fixtures and/or equipment in, on or about the Premises, which obligations of Tenant shall survive the expiration or earlier termination of this Lease. At any time and from time to time, Tenant may remove from the Premises any of its property, including trade fixtures and movable furniture, inventory and equipment not attached to the Building provided Tenant promptly repairs all damage caused by such removal.

8.6      **Tenant Improvement Allowance**. Commencing on the applicable Lease Commencement Date for a Phase, Tenant may perform tenant improvement work in such Phase in accordance with and subject to the terms and conditions of this Article 8 (as applicable, the "**Phase Work**"). The Phase Work shall be deemed to be an "Alteration" for all purposes of this Lease. Notwithstanding anything in this Lease to the contrary, Tenant shall be entitled to the Tenant Improvement Allowance set forth in Section 13 of the Summary for such Phase (as applicable, the "**Tenant Improvement Allowance**") toward the actual out-of-pocket costs of the applicable Phase Work. The Tenant Improvement Allowance shall only be used by Tenant to pay for the hard costs of the applicable Phase Work, the architectural, engineering and permitting costs related to the applicable Phase Work, and all costs payable to Landlord as set forth in Section 8.3 above with respect to the applicable Phase Work ([***]). In no event shall the Tenant Improvement Allowance be used to pay for any costs in connection with Tenant's moving expenses, for any furniture, fixtures, equipment or any other items of personal property, or for any costs associated with a sublease of any portion of the Premises. Provided Tenant is not in default under the terms of this Lease (beyond any applicable notice and cure periods), Landlord shall reimburse Tenant for the allowable costs (up to the applicable Tenant Improvement Allowance) by the date (the "**Disbursement Deadline**") that is forty-five (45) days following (i) completion of the applicable Phase Work, as evidenced by a certification of completion from the project engineer or architect, (ii) Landlord's receipt of Tenant's invoice of the costs related thereto, together with invoices, receipts and bills substantiating such costs and evidence of payment by Tenant for all such costs by Tenant, (iii) Landlord's receipt of final unconditional lien waivers in a form acceptable to Landlord from all contractors and subcontractors who did work on the applicable Phase Work, (iv) Landlord's receipt of a copy of the final permits approved by the applicable governing authority to the extent required for the applicable Phase Work, and (v) Landlord's receipt of all documentation required for the applicable Phase Work pursuant to this Article 8. In no event shall the Disbursement Deadline occur prior to the applicable Rent Commencement Date. Landlord shall be under no obligation to pay for any of the Phase Work in excess of the applicable Tenant Improvement Allowance, and Tenant shall not be entitled to any unused portion of the applicable Tenant Improvement Allowance upon completion of the applicable Phase Work, except as expressly set forth below. The applicable Tenant Improvement Allowance shall only be available for Tenant's use from the applicable Rent Commencement Date for a Phase through the date that is eighteen (18) months thereafter (as applicable, the "**Allowance Deadline**"), and Tenant waives any and all rights to any unused portion of the applicable Tenant Improvement Allowance if Tenant has not completed the applicable Phase Work and satisfied all other conditions to payment by the Allowance Deadline. Notwithstanding the foregoing, if there is

-25-

any unused portion of the applicable Tenant Improvement Allowance remaining upon completion of the applicable Phase Work, and the applicable Allowance Deadline has not occurred with respect to such remainder, then such remainder may be applicable to the next Phase delivered to Tenant pursuant to the terms and conditions of this Lease. Additionally, if Tenant has utilized all of the Tenant Improvement Allowance for any Phase Work for a prior Phase, and the total cost of such Phase Work exceeds the applicable Tenant Improvement Allowance (the "**Excess Prior Work Costs**"), then the Tenant Improvement Allowance for any later Phase may also be used by Tenant to pay for the Excess Prior Work Costs.

## ARTICLE 9

### COVENANT AGAINST LIENS

Tenant shall keep the Project and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall give Landlord notice at least ten (10) business days prior to the commencement of any such work on the Premises (or such additional time as may be necessary under applicable laws) to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within ten (10) business days after notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease. Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Building or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Building or Premises arising in connection with any such work or respecting the Premises not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Project, Building and Premises.

## ARTICLE 10

### INSURANCE

10.1    **Indemnification and Waiver**. Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever (including, but not limited to, any personal injuries resulting from a slip and fall in, upon or about the Premises) and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant. Tenant further assumes all risk of, and agrees that Landlord and the Landlord Parties shall not be liable for, any and all loss, cost, damage, expense and liability (including, without limitation, court costs and reasonable attorneys' fees) sustained as a result of the Premises not having been inspected by a CASp. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from any cause in, on or about the Premises (including, but not limited to, a slip and fall), any acts, omissions or negligence of Tenant or of any person claiming by, through or under Tenant, or of the contractors, agents, servants, employees, invitees, guests or licensees of Tenant or any such person (collectively, "**Tenant Parties**"), in, on or about the Project or any breach of the terms of this Lease, either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the negligence or willful misconduct of Landlord or Landlord Parties. Tenant hereby acknowledges and agrees that Tenant's indemnity obligations set forth in this Section 10.1 shall include any and all claims relating to or arising as a result of the Premises not having been inspected by a CASp. Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including without limitation, its actual professional fees such as reasonable appraisers', accountants' and attorneys' fees. The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

10.2    **Landlord's Insurance**. Landlord shall maintain "All Risk" Property Insurance covering the Base Building. Such insurance shall be for the full replacement cost and shall include such coverages, from such companies, and on such other terms and conditions, as Landlord may from time to time reasonably determine. At the option of Landlord (in Landlord's sole and absolute discretion), such insurance coverage may include the risks of

-26-

earthquakes, terrorism and/or flood damage. Landlord shall also carry commercially reasonable commercial general liability insurance and such other coverages as Landlord may from time to time reasonably determine. Landlord may elect to self-insure one or more of the foregoing coverages.

10.3    **Tenant's Insurance**. Tenant shall maintain the following coverages in the following amounts.

10.3.1    Commercial general liability insurance covering the insured against claims of bodily injury, personal injury and property damage (including loss of use thereof) arising out of Tenant's operations, and contractual liabilities (covering the performance by Tenant of its indemnity agreements) including a Broad Form endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in Section 10.1 of this Lease, for limits of liability not less than:

10.3.1.1

| Bodily Injury and Property Damage Liability | $5,000,000 each occurrence<br>$5,000,000 annual aggregate |
| --- | --- |
| Personal Injury Liability | $5,000,000 each occurrence<br>$5,000,000 annual aggregate<br>with no deductible |

10.3.2    "All Risk" Property Insurance covering (i) all office furniture, business and trade fixtures, office equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, (ii) any improvements which exist in a Phase as of the applicable Lease Commencement Date (excluding the Base Building) (the "**Original Improvements**"), and (iii) all other improvements, alterations and additions to the Premises made for or on behalf of Tenant. Such insurance shall be for the full replacement cost (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include coverage for damage or other loss caused by fire or other peril including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

10.3.3    Worker's Compensation pursuant to all applicable state and local statutes and regulations; and Employer's Liability with a limit of $1,000,000 each occurrence.

10.3.4    Business interruption, loss of income and extra expense insurance in amounts sufficient to pay for Tenant's expenses and lost income attributable to perils commonly insured against by prudent tenants or attributable to prevention of access to the Premises as a result of such perils.

10.4    **Form of Policies**. The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease. Such insurance shall (i) name Landlord, and any other party the Landlord so specifies, as an additional insured, including Landlord's managing agent, if any; (ii) specifically cover the liability assumed by Tenant under this Lease, including, but not limited to, Tenant's obligations under Section 10.1 of this Lease; (iii) be issued by an insurance company having a rating of not less than A-X in Best's Insurance Guide or which is otherwise acceptable to Landlord and licensed to do business in the State of California; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is non-contributing with any insurance requirement of Tenant; (v) be in form and content reasonably acceptable to Landlord; and (vi) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord. Tenant shall deliver said policy or policies or certificates thereof to Landlord on or before the Lease Commencement Date and at least thirty (30) days before the expiration dates thereof (and Tenant's failure to deliver any such policy, policies or certificates on or before the Lease Commencement Date shall not impact or in any way affect Tenant's obligations to pay Rent under this Lease). In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate, Landlord may, at its option, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord within five (5) days after delivery to Tenant of bills therefor.

10.5    **Subrogation**. Landlord and Tenant intend that their respective property loss risks shall be borne by reasonable insurance carriers to the extent above provided, and, except with respect to any applicable deductible amounts, Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder or actually carried by such party. The parties each hereby waive all rights and claims against each other for such

-27-

losses (except with respect to any applicable deductible amounts) and for any losses for which such party self-insures (except with respect to any applicable self-insurance retention amount, such amount not to exceed what would have been a commercially reasonable deductible amount if such party had elected to insure such risk with an insurance carrier), and waive all rights of subrogation of their respective insurers, provided such waiver of subrogation shall not affect the right to the insured to recover thereunder. The parties agree that their respective insurance policies are now, or shall be, endorsed such that the waiver of subrogation shall not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

10.6    **Additional Insurance Obligations**. Tenant shall carry and maintain during the entire Lease Term, at Tenant's sole cost and expense, increased amounts of the insurance required to be carried by Tenant pursuant to this Article 10 and such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord, but in no event in excess of the amounts and types of insurance then being required by landlords of buildings comparable to and in the vicinity of the Building.

## ARTICLE 11

### DAMAGE AND DESTRUCTION

11.1    **Repair of Damage to Premises by Landlord**. Tenant shall promptly notify Landlord of any damage to the Premises resulting from fire or any other casualty. If the Premises or any Common Areas serving or providing access to the Premises or the Building Parking Area shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the Base Building and such Common Areas (excluding any Alterations made by or for Tenant). Such restoration shall be to substantially the same condition of the Base Building and the Common Areas prior to the casualty, except for modifications required by zoning and building codes and other laws or by the holder of a mortgage on the Building or Project or any other modifications to the Common Areas deemed desirable by Landlord, which are consistent with the character of the Project, provided that access to the Premises, parking and any restrooms serving the Premises shall not be materially impaired. Upon the occurrence of any damage to the Premises, upon notice (the "**Landlord Repair Notice**") to Tenant from Landlord, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3.2(ii) of this Lease with respect to the Original Improvements only, and Landlord shall repair any injury or damage to the Original Improvements installed in the Premises and shall return such Original Improvements to their original condition; provided that if the cost of such repair by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, as assigned by Tenant, the cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's commencement of repair of the damage. In the event that Landlord does not deliver the Landlord Repair Notice within sixty (60) days following the date the casualty becomes known to Landlord, Tenant shall, at its sole cost and expense, repair any injury or damage to the Original Improvements installed in the Premises and shall return such Original Improvements to their original condition. Whether or not Landlord delivers a Landlord Repair Notice, prior to the commencement of construction to repair injury or damage to the Original Improvements, Tenant shall submit to Landlord, for Landlord's review and approval (not to be unreasonably withheld, conditioned or delayed), all plans, specifications and working drawings relating thereto, and Landlord shall select the contractors to perform such improvement work. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or Common Areas necessary to Tenant's occupancy, and the Premises are not occupied by Tenant as a result thereof, then during the time and to the extent the Premises are unfit for occupancy, the Rent shall be abated in proportion to the ratio that the amount of rentable square feet of the Premises which is unfit for occupancy for the purposes permitted under this Lease bears to the total rentable square feet of the Premises; further provided, in the event that fire or other casualty shall have damaged the Building Parking Area, Landlord shall use commercially reasonable efforts to make alternative temporary parking available to Tenant elsewhere in the Project until such damage shall have been repaired. In the event that Landlord shall not deliver the Landlord Repair Notice, Tenant's right to rent abatement pursuant to the preceding sentence shall terminate as of the date which is reasonably determined by Landlord to be the date Tenant should have completed repairs to the Premises assuming Tenant used reasonable due diligence in connection therewith.

11.2    **Landlord's Option to Repair**. Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises, Building and/or Project, and instead terminate this Lease, by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of the damage, such notice to include a termination date giving Tenant sixty (60) days to vacate the Premises, but Landlord may so elect only if the Building or Project shall be damaged by fire or other casualty or cause, whether or not the Premises are affected, and one or more of the following conditions is present: (i) in Landlord's reasonable judgment, repairs cannot reasonably be completed within one hundred eighty (180) days after the date of discovery of the damage

-28-

(when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building or Project or ground lessor with respect to the Building or Project shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt, or shall terminate the ground lease, as the case may be; (iii) the damage is not fully covered by Landlord's insurance policies; (iv) Landlord decides to rebuild the Building or Common Areas so that they will be substantially different structurally or architecturally; (v) the damage occurs during the last twelve (12) months of the Lease Term; or (vi) any owner of any other portion of the Project, other than Landlord, does not intend to repair the damage to such portion of the Project; provided, however, that if Landlord does not elect to terminate this Lease pursuant to Landlord's termination right as provided above, and the repairs cannot, in the reasonable opinion of Landlord, be completed within one hundred eighty (180) days after being commenced, Tenant may elect, no earlier than sixty (60) days after the date of the damage and not later than ninety (90) days after the date Landlord notifies Tenant in writing that the repairs cannot, in the reasonable opinion of Landlord, be completed within one hundred eighty (180) days after being commenced (the "**Repair Estimate**"), to terminate this Lease by written notice to Landlord effective as of the date specified in the notice, which date shall not be less than thirty (30) days nor more than sixty (60) days after the date such notice is given by Tenant. In addition, if neither Landlord nor Tenant elect to terminate the Lease as set forth herein, and the repairs to be made by Landlord have not been substantially completed within the period set forth in the Repair Estimate (such outside date, as extended for delays caused by Force Majeure and delays caused by Tenant or any of its agents, employees, contractors or invitees, the "**Estimated Completion Date**"), then Tenant shall have the right, within five (5) business days after the Estimated Completion Date to terminate this Lease by notice to Landlord (the "**Damage Termination Notice**"), effective as of a date set forth in the Damage Termination Notice (but not less than thirty (30) days after the date of the Damage Termination Notice) (the "**Damage Termination Date**"); provided, however, that if the repairs are substantially completed prior to the Damage Termination Date, then the Damage Termination Notice shall be deemed to be revoked and cancelled and this Lease shall continue in full force and effect. If the Premises are damaged or destroyed by fire or other casualty by any peril within twelve (12) months prior to the last day of the Lease Term, Tenant may terminate this Lease on thirty (30) days' written notice to Landlord.

11.3    **Waiver of Statutory Provisions**. The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or the Project, and any statute or regulation of the State of California, including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code, with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or the Project.

### ARTICLE 12

#### NONWAIVER

No provision of this Lease shall be deemed waived by either party hereto unless expressly waived in a writing signed thereby. The waiver by either party hereto of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No acceptance of a lesser amount than the Rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder, or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

### ARTICLE 13

#### CONDEMNATION

If the whole or any part of the Premises, Building or Project shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises, Building or Project, or if Landlord shall grant a deed

or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. If more than twenty-five percent (25%) of the rentable square feet of the Premises is taken, or if access to the Premises or use of or access to the Building Parking Area is substantially impaired, in each case for a period in excess of one hundred eighty (180) days, Tenant shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority. Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for loss of unamortized costs of the leasehold improvements made at the cost of Tenant and not reimbursed to Tenant as part of the Tenant Improvement Allowance , and any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, so long as such claims do not diminish the award available to Landlord, its ground lessor with respect to the Building or Project or its mortgagee, and such claim is payable separately to Tenant. All Rent shall be apportioned as of the date of such termination. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated and Landlord shall exercise commercially reasonable diligence to restore the Building and the Premises to substantially their former condition to the extent of the award received by Landlord with respect to such taking; provided that, if Landlord shall not substantially restore the useable areas of the Building and the Premises to their former condition, Tenant shall have the right to terminate this Lease. Tenant hereby waives any and all rights it might otherwise have pursuant to Section 1265.130 of The California Code of Civil Procedure. Notwithstanding anything to the contrary contained in this <u>Article 13</u>, in the event of a temporary taking of all or any portion of the Premises for a period of one hundred and eighty (180) days or less, then this Lease shall not terminate but the Base Rent and the Additional Rent shall be abated for the period of such taking in proportion to the ratio that the amount of rentable square feet of the Premises taken bears to the total rentable square feet of the Premises. Landlord shall be entitled to receive the entire award made in connection with any such temporary taking.

**ARTICLE 14**

**<u>ASSIGNMENT AND SUBLETTING</u>**

14.1    <u>**Transfers**</u>. Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers**" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**"). If Tenant desires Landlord's consent to any Transfer, Tenant shall notify Landlord in writing, which notice (the **Transfer Notice**") shall include (i) the proposed effective date of the Transfer, which shall not be less than thirty (30) days nor more than one hundred eighty (180) days after the date of delivery of the Transfer Notice, (ii) a description of the portion of the Premises to be transferred (the "**Subject Space**"), (iii) all of the terms of the proposed Transfer and the consideration therefor, including calculation of the "Transfer Premium," as that term is defined in <u>Section 14.3</u> below, in connection with such Transfer, the name and address of the proposed Transferee, and a copy of all existing executed and/or proposed documentation pertaining to the proposed Transfer, including all existing operative documents to be executed to evidence such Transfer or the agreements incidental or related to such Transfer, (iv) current financial statements of the proposed Transferee for the past two (2) years, including balance sheets, statements of profits and losses, and business credit reports, each certified by an officer, partner or owner thereof, business credit and personal references and history of the proposed Transferee and any other information reasonably required by Landlord which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space, and (v) an executed estoppel certificate from Tenant in form acceptable to Landlord. Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Whether or not Landlord consents to any proposed Transfer, Tenant shall reimburse Landlord for its reasonable, actual, , out-of-pocket expenses involved in reviewing any request for consent (including, without limitation, reasonable attorneys', accountants', architects', engineers' and consultants' fees), within thirty (30) days after written request by Landlord.

14.2    <u>**Landlord's Consent**</u>. Landlord shall not unreasonably withhold, delay or condition its consent to any proposed Transfer of the Subject Space to the Transferee on the terms specified in the Transfer Notice. Landlord shall respond in writing to Tenant's request for consent hereunder within thirty (30) days after Landlord's receipt of such a Transfer Notice. Without limitation as to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Lease and under any applicable law for Landlord to withhold consent to any proposed Transfer where one or more of the following apply:

-30-

14.2.1    The Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Building or the Project;

14.2.2    The Transferee intends to use the Subject Space for purposes which are not permitted under this Lease;

14.2.3    The Transferee is either a governmental agency or instrumentality thereof or a nonprofit organization; or

14.2.4    The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities to be undertaken in connection with the Transfer on the date consent is requested.

If Landlord consents to any Transfer pursuant to the terms of this Section 14.2 (and does not exercise any recapture rights Landlord may have under Section 14.4 of this Lease), Tenant may within six (6) months after Landlord's consent, but not later than the expiration of said six-month period, enter into such Transfer of the Premises or portion thereof, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 14.1 of this Lease, provided that if there are any changes in the terms and conditions from those specified in the Transfer Notice (i) such that Landlord would initially have been entitled to refuse its consent to such Transfer under this Section 14.2, or (ii) which would cause the proposed Transfer to be more favorable to the Transferee than the terms set forth in Tenant's original Transfer Notice, Tenant shall again submit the Transfer to Landlord for its approval and other action under this Article 14 (including Landlord's right of recapture, if any, under Section 14.4 of this Lease). Notwithstanding anything to the contrary in this Lease, if Tenant or any proposed Transferee claims that Landlord has unreasonably withheld or delayed its consent under Section 14.2 or otherwise has breached or acted unreasonably under this Article 14, their sole remedies shall be a suit for contract damages (other than damages for injury to, or interference with, Tenant's business including, without limitation, loss of profits, however occurring) or declaratory judgment and an injunction for the relief sought, and Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Transferee.

14.3    **Transfer Premium**. If Landlord consents to a Transfer, as a condition thereto which the parties hereby agree is reasonable, or if Tenant enters into a sublease with any Permitted Subtenant pursuant to Section 14.9 below, Tenant shall pay to Landlord one hundred percent (100%) of any "Transfer Premium," as that term is defined in this Section 14.3, received by Tenant from such Transferee. "**Transfer Premium**" shall mean all rent, additional rent or other consideration payable by such Transferee in connection with the Transfer in excess of the Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer on a per rentable square foot basis if less than all of the Premises is transferred, after deducting the reasonable expenses incurred by Tenant in connection with such Transfer for (i) any fair market brokerage commission incurred by Tenant in connection with the Transfer, (ii) reasonable attorneys' fees incurred by Tenant in connection with the Transfer and (iii) any changes, alterations and improvements to the Premises in connection with the Transfer. "Transfer Premium" shall also include, but not be limited to, key money, bonus money or other cash consideration paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer. The determination of the amount of Landlord's applicable share of the Transfer Premium shall be made on a monthly basis as rent or other consideration is received by Tenant under the Transfer.

14.4    **Landlord's Option as to Subject Space**. Notwithstanding anything to the contrary contained in this Article 14, in the event Tenant contemplates a Transfer of all or a portion of the Premises, Tenant shall give Landlord notice (the "**Intention to Transfer Notice**") of such contemplated Transfer (whether or not the contemplated Transferee or the terms of such contemplated Transfer have been determined). The Intention to Transfer Notice shall specify the portion of and amount of rentable square feet of the Premises which Tenant intends to Transfer (the "**Contemplated Transfer Space**"), the contemplated date of commencement of the Contemplated Transfer (the "**Contemplated Effective Date**"), and the contemplated length of the term of such contemplated Transfer, and shall specify that such Intention to Transfer Notice is delivered to Landlord pursuant to this Section 14.4 in order to allow Landlord to elect to recapture the Contemplated Transfer Space. Thereafter, Landlord shall have the option, by giving written notice to Tenant within fifteen (15) business days after receipt of any Intention to Transfer Notice, to recapture the Contemplated Transfer Space. Such recapture shall cancel and terminate this Lease with respect to such Contemplated Transfer Space as of the Contemplated Effective Date. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same. If Landlord declines to recapture such Contemplated Transfer Space under this

-31-

Section 14.4, then, subject to the other terms of this Article 14, for a period of nine (9) months (the "**Nine Month Period**") commencing on the last day of such thirty (30) day period, Landlord shall not have any right to recapture the Contemplated Transfer Space with respect to any Transfer made during the Nine Month Period, provided that any such Transfer is substantially on the terms set forth in the Intention to Transfer Notice, and provided further that any such Transfer shall be subject to the remaining terms of this Article 14. If such a Transfer is not so consummated within the Nine Month Period (or if a Transfer is so consummated, then upon the expiration of the term of any Transfer of such Contemplated Transfer Space consummated within such Nine Month Period), Tenant shall again be required to submit a new Intention to Transfer Notice to Landlord with respect any contemplated Transfer, as provided above in this Section 14.4. If Landlord recaptures any Contemplated Transfer Space, Landlord shall, at Landlord's sole expense, promptly construct, paint, and furnish any partitions required to segregate the Contemplated Transfer Space from the remaining Premises retained by Tenant as well as arrange separate metering of utilities and repair any damage created by the partition (except to the extent caused by Tenant or any of its agents, employees, contractors and invitees).

14.5     **Effect of Transfer**. If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space. Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than [***], Tenant shall pay Landlord's costs of such audit. In addition, at Landlord's option, Tenant's understatement of the Transfer Premium shall constitute an uncurable default of this Lease by Tenant without the necessity of any written notice or passage of any cure period.

14.6     **Additional Transfers**. For purposes of this Lease, the term "Transfer" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the partners, or transfer of fifty percent (50%) or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (*i.e.*, whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant or (B) the sale or other transfer of an aggregate of fifty percent (50%) or more of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of an aggregate of fifty percent (50%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period.

14.7     **Occurrence of Default**. Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to: (i) treat such Transfer as cancelled and repossess the Subject Space by any lawful means, or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer. If Tenant shall be in default beyond the applicable notice and cure period provided in this Lease, Landlord is hereby irrevocably authorized to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured. Such Transferee shall rely on any representation by Landlord that Tenant is in default beyond the applicable notice and cure period provided hereunder, without any need for confirmation thereof by Tenant. Upon any assignment, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease. No collection or acceptance of rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Article 14 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing. In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person. If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

14.8     **Non-Transfers**. Notwithstanding anything to the contrary contained in this Article 14, an assignment or subletting of all or a portion of the Premises to an affiliate of Tenant (an entity which is controlled by, controls, or is under common control with, Tenant) or to any entity resulting from the merger or consolidation with or reorganization of Tenant (or of an entity which is controlled by, controls or is under common control with Tenant), or to any person or entity which acquires all or substantially all of the interests of Tenant or all or substantially all of the assets of Tenant (or of an entity which is controlled by, controls or is under common control

-32-

with Tenant) (collectively, a "**Permitted Transferee**"), shall not be deemed a Transfer under this Article 14, provided that (a) Tenant notifies Landlord of any such assignment or sublease and promptly supplies Landlord with any documents or information reasonably requested by Landlord regarding such assignment or sublease or such affiliate, and (b) such assignment or sublease is not a subterfuge by Tenant to avoid its obligations under this Lease. "**Control**," as used in this Section 14.8, shall mean the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, of at least fifty-one percent (51%) of the voting interest in, any person or entity. No assignment or sublease to a Permitted Transferee shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space. A Permitted Transferee that is an assignee of all of Tenant's interest in this Lease is referred to herein as a "**Permitted Assignee**".

14.9    **Permitted Subtenants**. So long as Original Tenant is the tenant under this Lease, Tenant may, from time to time, without the consent of Landlord, (a) enter into one or more subleases with First Virtual Group ("**FVG**") and/or The Thomas and Stacey Siebel Foundation ("**TSSF**"; collectively, the "**Permitted Subtenants**") to occupy and use up to a total of twenty thousand (20,000) rentable square feet within the Premises (calculated in the aggregate), on such terms and conditions as Tenant shall determine in its sole discretion, including without limitation, the making of such Alterations (subject to the terms and conditions of Sections 8.1 through 8.4 above) to separately demise such spaces as Tenant shall determine in its sole discretion, provided that (i) Tenant shall remain liable for the acts and omissions of the Permitted Subtenants to the extent set forth in this Lease, (ii) the Permitted Subtenants shall maintain the same insurance as is required of Tenant as set forth in Article 13 above, and (iii) such subleases shall be subject to all of the terms and conditions of this Lease and (b) FVG shall be permitted to allow TSSF to use a portion of any space subleased by FVG from Tenant at any time and from time to time on such terms as FVG shall determine in its sole discretion, provided that TSSF shall maintain the same liability insurance as is required of Tenant as set forth in Article 13 above. No sublease to a Permitted Subtenant shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space.

## ARTICLE 15

### SURRENDER OF PREMISES; OWNERSHIP AND REMOVAL OF TRADE FIXTURES

15.1    **Surrender of Premises**. No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in writing by Landlord. The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated. The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such subleases or subtenancies.

15.2    **Removal of Tenant Property by Tenant**. Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear (subject to Tenant's Repair Obligations under Section 7.1, above) and repairs which are specifically made the responsibility of Landlord hereunder excepted. Upon such expiration or termination, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, and such items of furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitions and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal.

## ARTICLE 16

### HOLDING OVER

If Tenant holds over after the expiration of the Lease Term or earlier termination thereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further term, and in such case Rent shall be payable at a monthly rate equal to [***] of the Rent applicable during the last rental period of the Lease Term under this Lease. Such

-33-

month-to-month tenancy shall be subject to every other applicable term, covenant and agreement contained herein. Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease. The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any lost profits to Landlord resulting therefrom.

## ARTICLE 17

### ESTOPPEL CERTIFICATES

Within fifteen (15) days following a request in writing by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an estoppel certificate in form delivered by and acceptable to Landlord (or such other form as may be required by any prospective mortgagee or purchaser of the Project, or any portion thereof), (i) certifying, if true, that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying, if true, that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging, if true, that there are not, to Tenant's actual knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed and (iii) certifying as to such other information as may be reasonably requested by Landlord or Landlord's mortgagee or prospective mortgagee. Any such certificate may be relied upon by any prospective mortgagee or purchaser of all or any portion of the Project. Failure of Tenant to timely execute, acknowledge and deliver such estoppel certificate or other instruments shall constitute an acceptance of the Premises and an acknowledgment by Tenant that statements included in the estoppel certificate are true and correct, without exception. Landlord will from time to time provide Tenant with a similar statement within thirty (30) days after Tenant's written request therefor to Landlord.

At any time during the Lease Term, Landlord may require Tenant to provide Landlord with a current financial statement (including a balance sheet, statement of profits and losses, and a business credit report) and such financial statements of the two (2) years prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant. Notwithstanding the foregoing, if at any time during the Lease Term, Tenant is a public company whose financial statements are publicly available and Tenant is in compliance with all applicable reporting and disclosure requirements under applicable law, then such financial statements shall satisfy the obligation set forth in this paragraph.

## ARTICLE 18

### SUBORDINATION

This Lease shall be subject and subordinate to all present and future ground or underlying leases of the Building or Project and to the lien of any mortgage, trust deed or other encumbrances now or hereafter in force against the Building or Project or any part thereof, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages, trust deeds or other encumbrances, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or deed in lieu thereof (or if any ground lease is terminated), to attorn, without any deductions or set-offs whatsoever, to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the ground lessor), if so requested to do so by such purchaser or lienholder or ground lessor, and to recognize such purchaser or lienholder or ground lessor as the lessor under this Lease, provided such lienholder or purchaser or ground lessor shall agree to accept this Lease and not disturb Tenant's occupancy, so long as Tenant timely pays the rent and observes and performs the terms, covenants and conditions of this Lease to be observed and performed by Tenant. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant shall, within ten (10) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases or underlying leases.

Notwithstanding the foregoing provisions of this Article 18, Tenant's agreement to subordinate this Lease to a ground or underlying leases of the Building or Project first entered into after the date of this Lease or to the lien

-34-

of any mortgage, trust deed or other encumbrance on the Building or the Project first placed after the date of this Lease shall not be effective unless Landlord has provided Tenant with a commercially reasonable non-disturbance agreement from the applicable ground lessor, lessor under any underlying lease or holder of such mortgage, deed of trust or other encumbrance. Landlord hereby represents and warrants to Tenant that no ground lease, underlying lease, mortgage or deed of trust encumbers the Building, Common Areas owned by Landlord or the Building Parking Area as of the date of this Lease.

Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

**ARTICLE 19**

**DEFAULTS; REMEDIES**

19.1    **Events of Default**. The occurrence of any of the following shall constitute a default of this Lease by Tenant:

19.1.1    Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due; provided, however, that for the first such late payment in any consecutive twelve (12) month period, such failure shall not be a default as long as such first late payment in such twelve (12) month period is made within 5 days after notice thereof from Landlord; or

19.1.2    Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be a default by Tenant under this Section 19.1.2, any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided that if the nature of such default is such that the same cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default; or

19.1.3    Abandonment of all or a substantial portion of the Premises by Tenant; or

19.1.4    The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease where such failure continues for more than two (2) business days after notice from Landlord.

The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by law.

19.2    **Remedies Upon Default**. Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(i)    The worth at the time of award of the unpaid rent which has been earned at the time of such termination; plus

(ii)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iii)    The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iv)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary

-35-

course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(v)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term **rent**" as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 19.2.1(i) and (ii), above, the "worth at the time of award" shall be computed by allowing interest at the rate of [***] per annum, but in no case greater than the maximum amount of such interest permitted by law. As used in Section 19.2.1(iii) above, the **worth at the time of award**" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus [***].

19.2.2    Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any law or other provision of this Lease), without prior demand or notice except as required by applicable law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3     **Subleases of Tenant**. Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Article 19, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

19.4     **Efforts to Relet**. No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant. Tenant hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease.

19.5     **Landlord Default.** Landlord will be in default under this Lease if Landlord fails to perform any of its obligations hereunder and such failure continues for a period of thirty (30) days after Tenant delivers written notice of such failure to Landlord; provided if such failure cannot reasonably be cured within the thirty (30) day period, Landlord will not be in default hereunder as long as Landlord commences the remedying of such failure within the thirty (30) day period and diligently prosecutes the same to completion.

**ARTICLE 20**

**COVENANT OF QUIET ENJOYMENT**

Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other terms, covenants, conditions, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the terms, covenants, conditions, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord. The foregoing covenant is in lieu of any other covenant express or implied.

-36-

**ARTICLE 21**

**LETTER OF CREDIT**

Concurrently with Tenant's execution of this Lease, Tenant shall deliver to Landlord an unconditional, clean, irrevocable letter of credit (the "**L-C**") in the initial L-C Amount set forth in Section 9 of the Summary, which L-C shall be subject to the terms and conditions of **Exhibit B** attached hereto.

**ARTICLE 22**

**INTENTIONALLY OMITTED**

**ARTICLE 23**

**SIGNS**

23.1    **Interior Signage**. Tenant, at its sole cost and expense, may install identification signage anywhere in the Premises including in any elevator lobby of the Premises, provided that such signs (a) shall be installed in accordance with Article 8, above and (b) shall not be visible from the exterior of the Building.

23.2    **Prohibited Signage and Other Items**. Any signs, notices, logos, pictures, names or advertisements which are installed and visible from the exterior of the Building and have not been separately approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant. Except as otherwise expressly provided in this Lease, Tenant may not install any signs on the exterior or roof of the Building, Project or the Common Areas. Any signs, window coverings, or blinds (even if the same are located behind the Landlord-approved window coverings for the Building), or other items visible from the exterior of the Premises or Building, shall be subject to the prior approval of Landlord, in its sole discretion.

23.3    **Exterior, Monument and Directional Signage**. During the Lease Term, Tenant shall have the exclusive right to display its name and logo and, at the election of Tenant, the names and logos of one or more of the Permitted Subtenants (to the extent and for so long as such Permitted Subtenant subleases space within the Premises), on (a) the exterior of each of the 1400A Tower and the 1400B Tower, in each instance in locations selected by Tenant, (b) listed on separate lines of the monument sign exclusively serving the Building, and (c) listed on all other directional signage for the Project available to all tenants of the Project, subject to availability (collectively, all such Building, monument and directional signage, the "**Signage**"), to the extent permitted under the CC&Rs and all applicable laws, ordinances, regulations and requirements. Notwithstanding the foregoing, in no event shall any Signage depict the name or logo of any competitor of Landlord, provided that the foregoing shall not limit the Original Tenant (i.e., C3.AI, Inc.) from including its name or logo on any Signage. The material, typeface, graphic format and proportions of the Signage, as well as the precise location of the Signage, shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned; provided that the material, typeface, graphic format and proportions of all Project and Building signage displaying the name and logo of Tenant and/or any Permitted Subtenant as of the date of this Lease is deemed pre-approved by Landlord.. Tenant, at its expense, shall be responsible for obtaining all approvals for the Signage from all applicable governmental authorities, and for obtaining and installing the Signage, provided that Landlord reserves the right to install the monument and directional signage at Tenant's expense. The failure of Tenant to obtain such approvals shall not release Tenant from any of its obligations under this Lease. Any approved Signage shall strictly conform to the CC&Rs and all applicable laws, ordinances, regulations and requirements and shall be installed and removed at Tenant's sole expense. Tenant, at its sole expense, shall maintain the Signage in good condition and repair during the Lease Term as part of Tenant's Repair Obligations pursuant to Section 7.1, above. Prior to the expiration or earlier termination of this Lease, Tenant at its sole expense shall remove all of the Signage and repair any and all damage caused to the Building and the Project (including and fading or discoloration) by such signs and/or the removal of such signs from the Building and the Project.

**ARTICLE 24**

**COMPLIANCE WITH LAW**

Tenant shall not do anything or suffer anything to be done in or about the Premises or the Project which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated. At its sole cost and expense, Tenant shall promptly comply with all such governmental measures. Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employees, landlords or tenants, then Tenant

agrees, at its sole cost and expense, to comply promptly with such standards or regulations. Tenant shall be responsible, at its sole cost and expense, to make all alterations to the Premises as are required to comply with the governmental rules, regulations, requirements or standards described in this Article 24, subject to Section 7.1.2.5 above. The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any of said governmental measures, shall be conclusive of that fact as between Landlord and Tenant. For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a person certified as a Certified Access Specialist (CASp). In addition, the following notice is hereby provided pursuant to Section 1938(e) of the California Civil Code: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of and in connection with such notice: (i) Tenant, having read such notice and understanding Tenant's right to request and obtain a CASp inspection and with advice of counsel, hereby elects not to obtain such CASp inspection and forever waives its rights to obtain a CASp inspection with respect to the Premises, the Building and/or the Project to the extent permitted by applicable laws now or hereafter in effect; and (ii) if the waiver set forth in clause (i) hereinabove is not enforceable pursuant to applicable laws now or hereafter in effect, then Landlord and Tenant hereby agree as follows (which constitute the mutual agreement of the parties as to the matters described in the last sentence of the foregoing notice): (A) Tenant shall have the one-time right to request for and obtain a CASp inspection, which request must be made, if at all, in a written notice delivered by Tenant to Landlord within thirty (30) days after the Lease Commencement Date; (B) any CASp inspection timely requested by Tenant shall be conducted (1) between the hours of 9:00 a.m. and 5:00 p.m. on any business day, (2) only after ten (10) days' prior written notice to Landlord of the date of such CASp inspection, (3) in a professional manner by a CASp designated by Landlord and without any testing that would damage the Premises, the Building or the Project in any way, (4) in accordance with all of the provisions of this Lease applicable to Tenant contracts for construction, and (5) at Tenant's sole cost and expense, including, without limitation, Tenant's payment of the fee for such CASp inspection, the fee for any reports and/or certificates prepared by the CASp in connection with such CASp inspection (collectively, the "**CASp Reports**") and all other costs and expenses in connection therewith; (C) Landlord shall be an express third party beneficiary of Tenant's contract with the CASp, and any CASp Reports shall be addressed to both Landlord and Tenant; (D) Tenant shall deliver a copy of any CASp Reports to Landlord within two (2) business days after Tenant's receipt thereof; (E) any information generated by the CASp inspection and/or contained in the CASp Reports shall not be disclosed by Tenant to anyone other than (I) contractors, subcontractors and/or consultants of Tenant, in each instance who have a need to know such information and who agree in writing not to further disclose such information, or (II) any governmental entity, agency or other person, in each instance to whom disclosure is required by law or by regulatory or judicial process; (F) Tenant, at its sole cost and expense, shall be responsible for making any improvements, alterations, modifications and/or repairs to or within the Premises to correct violations of construction-related accessibility standards, including, without limitation, any violations disclosed by such CASp inspection; and (G) if such CASp inspection identifies any improvements, alterations, modifications and/or repairs necessary to correct violations of construction-related accessibility standards relating to those items of the Building and/or the Project located outside the Premises that are Landlord's obligation to repair as set forth in the Lease, then Landlord shall perform such improvements, alterations, modifications and/or repairs as and to the extent required by applicable laws to correct such violations, and Tenant shall reimburse Landlord for the cost of such improvements, alterations, modifications and/or repairs within ten (10) business days after Tenant's receipt of an invoice therefor from Landlord.

## ARTICLE 25

### LATE CHARGES

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee upon the date on which it is due, then Tenant shall pay to Landlord a late charge equal to [***] of the overdue amount plus any reasonable attorneys' fees incurred by Landlord by reason of Tenant's failure to pay Rent and/or other charges when due hereunder. There shall be no late payment charge imposed on the first such late payment in any consecutive twelve (12) month period as long as such first late payment in such twelve (12) month period is made within 5 days after notice thereof from Landlord. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

**ARTICLE 26**

**LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT**

26.1     **Landlord's Cure**. All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent, except to the extent, if any, otherwise expressly provided herein. If Tenant shall fail to perform any obligation under this Lease, and such failure shall continue in excess of the time allowed under Section 19.1.2, above, unless a specific time period is otherwise stated in this Lease, Landlord may, but shall not be obligated to, make any such payment or perform any such act on Tenant's part without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder.

26.2     **Tenant's Reimbursement**. Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, upon delivery by Landlord to Tenant of statements therefor: (i) sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of Section 26.1; (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Article 10 of this Lease; and (iii) sums equal to all expenditures made and obligations incurred by Landlord in collecting or attempting to collect the Rent or in enforcing or attempting to enforce any rights of Landlord under this Lease or pursuant to law, including, without limitation, all reasonable legal fees and other amounts so expended. Tenant's obligations under this Section 26.2 shall survive the expiration or sooner termination of the Lease Term.

**ARTICLE 27**

**ENTRY BY LANDLORD**

Landlord reserves the right at all reasonable times and upon reasonable notice to Tenant, but in no event upon less than forty-eight (48) hours' prior written notice (except in the case of an emergency, in which event no written notice shall be required), to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, or to current or prospective mortgagees, ground or underlying lessors or insurers or, during the last twelve (12) months of the Lease Term, to prospective tenants; (iii) post notices of nonresponsibility; (iv) alter, improve or repair the Premises or the Building, or for structural alterations, repairs or improvements to the Building or the Building's systems and equipment; or (v) perform services required of Landlord. Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) take possession due to any breach of this Lease in the manner provided herein; and (B) perform any covenants of Tenant which Tenant fails to perform (subject to the terms and conditions of this Lease). Landlord may make any such entries without the abatement of Rent, except as otherwise provided in this Lease, and may take such reasonable steps as required to accomplish the stated purposes. Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby. For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults, safes and special security areas designated in advance by Tenant. In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises. Any entry into the Premises by Landlord in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises. No provision of this Lease shall be construed as obligating Landlord to perform any repairs, alterations or decorations except as otherwise expressly agreed to be performed by Landlord herein. Landlord shall use commercially reasonable efforts to minimize any interference to the conduct of Tenant's business during any such entry.

Landlord's entry into the Premises shall be subject to Tenant's commercially reasonable security requirements. Landlord acknowledges and agrees that Tenant may require that Landlord be accompanied by an employee of Tenant during any such entry into the Premises by Landlord. Notwithstanding the foregoing, Landlord may enter the Premises immediately in the event of an emergency without regard to such requirements. If access to the Premises is reasonably required in order for Landlord to perform any of its obligations under this Lease, and if Landlord is not timely provided with access to the Premises as a result of Tenant's security requirements or Tenant's requirement that Landlord be accompanied by an employee of Tenant, then (a) Landlord shall have no liability to Tenant for Landlord's failure to perform such obligations as a result thereof or any damage accrued during such period, (b) Tenant hereby waives all claims against Landlord at law or in equity as a result of such failure by Landlord or any damage accrued during such period, and (c) Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability accrued during any such period.

**ARTICLE 28**

**TENANT PARKING**

During the Term, Tenant shall have the non-exclusive right to use the Project parking facilities allocated to the Building, as identified on **Exhibit C** attached hereto (the "**Building Parking Area**"), for parking of automobiles on a first-come, first-served, as available basis; provided, however, Tenant's use of the Project parking facilities shall never exceed Tenant's equitable allocation of available parking, as reasonably determined by Landlord, but in no event shall be less than [***] (the "**Parking Ratio**"). As part of Tenant's parking rights, Tenant shall have the right to use [***] reserved parking spaces within the Building Parking Area directly in front of the entrance to the 1400A Tower (in a location mutually acceptable to Landlord and Tenant) ("**Tenant Reserved Parking**"), which reserved spaces shall be marked for the exclusive use of the Tenant's employees and guests, including, without limitation, one space for Tenant's Chairman and Chief Executive Officer (at Tenant's sole cost and expense). Tenant shall be responsible for the full amount of any taxes imposed by any governmental authority in connection with the use of the parking facilities by Tenant. Tenant's shall abide by all rules and regulations which are prescribed from time to time for the orderly operation and use of the parking facilities (including any sticker or other identification system established by Landlord and the prohibition of vehicle repair and maintenance activities in the Project's parking facilities) and Tenant shall reasonably cooperate in seeing that Tenant's employees and visitors also comply with such rules and regulations ; provided that any such rules and regulations will be effective as to Tenant when written notice thereof is received by Tenant and no such rules and regulations shall materially adversely affect Tenant's parking rights under this Lease. Tenant's use of the Project parking facilities shall be at Tenant's sole risk and Tenant acknowledges and agrees that Landlord shall have no liability whatsoever for damage to the vehicles of Tenant, its employees and/or visitors, or for other personal injury or property damage or theft relating to or connected with the parking rights granted herein or any of Tenant's, its employees' and/or visitors' use of the parking facilities. Tenant's rights hereunder are subject to the terms of any Underlying Documents. Landlord specifically reserves the right to change the size, configuration, design, layout and all other aspects of the Project parking facilities at any time and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of Rent under this Lease, from time to time, temporarily close-off or restrict access to the Project parking facilities for purposes of permitting or facilitating any such construction, alteration or improvements provided that if any such temporary closure or restriction reduces the available parking spaces in the Building Parking Area to less than the Parking Ratio, then Landlord shall permit Tenant to use other Project parking facilities (as reasonably selected by Landlord), to bring the parking spaces available for Tenant's use back up to the Parking Ratio. Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have all the rights of control attributed hereby to the Landlord. The parking rights granted to Tenant pursuant to this Article 28 are provided to Tenant solely for use by Tenant's own personnel (and the personnel of FVG, TSSF, and any Permitted Transferee, during the terms of their applicable occupancy rights at the Premises, subject to Article 14 above) and such rights may not be transferred, assigned, subleased or otherwise alienated by Tenant without Landlord's prior approval (in Landlord's sole and absolute discretion, except in connection with a Transfer, in which event Landlord's approval shall not be unreasonably withheld, conditioned or delayed).

**ARTICLE 29**

**MISCELLANEOUS PROVISIONS**

29.1    **Terms; Captions**. The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular. The necessary grammatical changes required to make the provisions hereof apply either to corporations or partnerships or individuals, men or women, as the case may require, shall in all cases be assumed as though in each case fully expressed. The captions of Articles and Sections are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning of such Articles and Sections.

29.2    **Binding Effect**. Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

29.3    **No Air Rights**. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease. If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Project, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.4    **Modification of Lease**. Should any current or prospective mortgagee or ground lessor for the Building or Project require a modification of this Lease, which modification will not cause an increased cost or

-40-

expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within ten (10) business days following a request therefor. At the request of Landlord or any mortgagee or ground lessor, Tenant agrees to execute a short form of Lease and deliver the same to Landlord within ten (10) business days following the request therefor.

29.5    **Transfer of Landlord's Interest**. Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Project or Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer and such transferee shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord, and Tenant shall attorn to such transferee.

29.6    **Prohibition Against Recording**. Except as provided in Section 29.4 of this Lease, neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant.

29.7    **Landlord's Title**. Landlord's title is and always shall be paramount to the title of Tenant. Nothing herein contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

29.8    **Relationship of Parties**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

29.9    **Application of Payments**. Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.

29.10    **Time of Essence**. Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.11    **Partial Invalidity**. If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.12    **No Warranty**. In executing and delivering this Lease, Tenant has not relied on any representations, including, but not limited to, any representation as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

29.13    **Landlord Exculpation**. The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Project or the Premises shall be limited solely and exclusively to an amount which is equal to the lesser of (a) the interest of Landlord in the Building or (b) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to eighty percent (80%) of the value of the Building (as such value is determined by Landlord), provided that in no event shall such liability extend to any sales or insurance proceeds received by Landlord or the Landlord Parties in connection with the Project, Building or Premises. Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant. The limitations of liability contained in this Section 29.13 shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for, and Tenant, on behalf of itself and its agents, contractors, subcontractors, employees, invitees and licensees, hereby waives any claim for, any injury or damage to, or interference with, Tenant's business, and any indirect, consequential or punitive damages, including

-41-

but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.14    **Entire Agreement**. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto.

29.15    **Right to Lease**. Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building or Project. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building or Project.

29.16    **Force Majeure**. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, terrorist acts, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant or any monetary obligations of Landlord pursuant to this Lease (collectively, a "**Force Majeure**"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

29.17    **Waiver of Redemption by Tenant**. Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.18    **Notices**. All notices, demands, statements, designations, approvals or other communications (collectively, **Notices**") given or required to be given by either party to the other hereunder or by law shall be in writing, shall be (A) sent by United States certified or registered mail, postage prepaid, return receipt requested ("**Mail**"), (B) transmitted by telecopy (only if a telecopy or facsimile number is set forth for such party in the Summary), if such telecopy is promptly followed by a Notice sent by Mail, (C) delivered by a nationally recognized overnight courier, or (D) delivered personally. Any Notice shall be sent, transmitted, or delivered, as the case may be, to Tenant at the appropriate address set forth in Section 11 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord, or to Landlord at the addresses set forth in Section 12 of the Summary, or to such other places as Landlord may from time to time designate in a Notice to Tenant. Any Notice will be deemed given on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no Notice was given.

29.19    **Joint and Several**. If there is more than one Tenant, the obligations imposed upon Tenant under this Lease shall be joint and several.

29.20    **Authority**. If Tenant is a corporation, trust or partnership, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so. In such event, Tenant shall, within ten (10) days after execution of this Lease, deliver to Landlord satisfactory evidence of such authority and, if a corporation, upon demand by Landlord, also deliver to Landlord satisfactory evidence of (i) good standing in Tenant's state of incorporation and (ii) qualification to do business in California.

29.21    **Attorneys' Fees**. Notwithstanding anything to the contrary contained herein, should any claim, action or proceeding (including, for the avoidance of doubt, any appeals of a claim, action or proceeding) be commenced between the parties hereto concerning any provision of this Lease, or the rights or duties of any person or entity in relation thereto, each party shall bear its own fees and costs (including, without limitation, attorneys' fees, accounting fees, expert witness fees, consulting fees, court costs, and all other costs) to the extent incurred in prosecuting or defending such claim, action, or proceeding against the other party. Nothing in this Section shall be construed to limit a party's obligation, as may be set forth elsewhere in this Lease, to indemnify another from any fees or costs (including, without limitation, attorneys' fees, accounting fees, expert witness fees, consulting fees, court costs, and all other costs), except to the extent incurred by the indemnified party in an action brought against the indemnifying party to enforce such indemnification provisions under this Lease.

-42-

29.22    **Governing Law; Venue**. This Lease is governed by, and shall be interpreted under, the laws of the State of California. Venue for any litigation arising out of this Lease shall be a court of competent jurisdiction in Santa Clara County, California, or if no court of competent jurisdiction exists there, then the next nearest court of competent jurisdiction.

29.23    **Submission of Lease**. Submission of this instrument for examination or signature by Tenant does not constitute a reservation of, option for or option to lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

29.24    **Brokers**. Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate brokers or agents specified in Section 12 of the Summary (the **Brokers**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party. Landlord shall pay all brokerage commissions due to such Brokers arising out of execution of this Lease.

29.25    **Independent Covenants**. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

29.26    **Project or Building Name and Signage**. Landlord shall have the right at any time to change the name of the Project or Building and to install, affix and maintain any and all signs on the exterior and on the interior of the Project or Building as Landlord may, in Landlord's sole discretion, desire. Tenant shall not use the name of the Project or Building or use pictures or illustrations of the Project or Building in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises, without the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed).

29.27    **Counterparts**. This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single lease.

29.28    **Confidentiality**. Tenant acknowledges that the economic terms set forth in this Lease are below fair market rental for the Premises and that Landlord is only willing to enter into this Lease on such economic terms subject to Tenant agreeing to keep the content of this Lease and any related documents strictly confidential, except that Tenant shall be allowed to disclose the content of this Lease and any related documents solely to its financial and legal consultants or as required by law or regulation or required pursuant to a valid order of a court or regulatory agency or , if such information is available from an inspection of public records, including, without limitation, in connection with Tenant's public filings required to comply with applicable securities laws. Tenant acknowledges that the unauthorized disclosure of the content of this Lease and any related documents, and in particular the economic terms of this Lease, would cause Landlord substantial harm and deprive Landlord the benefit of its bargain in entering into this Lease. Accordingly, should Tenant violate the terms of this Section 29.28, Landlord shall be entitled to retroactively (from the date of such violation) and prospectively through the end of the Lease Term, collect from Tenant monthly Base Rent at the rate of $[***] per rentable square feet of the Premises per month (as such amount shall be escalated annually on each anniversary of the date of this Lease by [***]) (the "**Fair Market Rent**"), which Tenant acknowledges may represent the current fair market rental of the Premises on a triple-net basis. In the event Landlord informs Tenant that Tenant has violated the terms of this Section 29.28, Tenant acknowledges and agrees that Tenant shall be obligated to pay the Fair Market Rent until such time as there is an adjudication that Tenant did not violate the terms of this Section 29.28. Any such relief sought by Tenant must be initiated by Tenant, if at all, within ninety (90) days after Tenant's receipt of notice from Landlord that Tenant has violated this Section 29.28 and is responsible for the payment of Fair Market Rent; otherwise, Tenant shall be deemed to have forever waived its right to contest a violation of this Section 29.28. Notwithstanding the foregoing, Tenant may provide copies of the Lease to potential and actual subtenants and assignees of the Lease, provided that prior to such disclosure, Tenant has delivered to Landlord a confidentiality and non-disclosure agreement duly executed and accepted by such subtenant or assignee on Landlord's standard form, and all economic terms of this Lease (including, without limitation, the amount of Base Rent and Tenant Improvement Allowances) shall be redacted from the Lease.

29.29     **Building Renovations**. It is specifically understood and agreed that Landlord has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, Building, or any part thereof and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant except as specifically set forth herein. However, Tenant hereby acknowledges that Landlord is currently renovating or may during the Lease Term renovate, improve, alter, or modify (collectively, the "**Renovations**") the Project (not including the Building). Tenant hereby agrees that such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent. Landlord shall have no responsibility and shall not be liable to Tenant for any injury to or interference with Tenant's business arising from any Renovations permitted hereunder, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from such Renovations, or for any inconvenience or annoyance occasioned by such Renovations. Notwithstanding the foregoing, in the event of any Renovations that permanently reduce the available parking spaces in the Building Parking Area to less than the Parking Ratio, then Landlord shall permit Tenant to use other Project parking facilities (as reasonably selected by Landlord), to bring the parking spaces available for Tenant's use back up to the Parking Ratio. In the event that significant development at the Project disturbs or is reasonably expected by Tenant in the exercise of its good faith judgment to disturb Tenant's use and enjoyment of its allocated parking in the Building Parking Area, Tenant shall have the right to terminate the Lease with twenty-four (24) months prior written notice to Landlord, provided that Tenant shall pay, at the time of delivery of the termination notice, a termination penalty to Landlord equal to the unamortized (as of the date of Lease termination) (i) Base Rent Abatement and (ii) Tenant Improvement Allowance (the "**Disturbance Termination Right**"). By way of illustration, but not by limitation, the Base Rent Abatement and the Tenant Improvement Allowance amortized on a 126-month, straight line basis, is [***]. The Disturbance Termination Right shall automatically expire at the end of the initial Lease Term, and be of no further force and effect.

29.30     **No Violation**. Tenant hereby warrants and represents that neither its execution of nor performance under this Lease shall cause Tenant to be in violation of any agreement, instrument, contract, law, rule or regulation by which Tenant is bound, and Tenant shall protect, defend, indemnify and hold Landlord harmless against any claims, demands, losses, damages, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees and costs, arising from Tenant's breach of this warranty and representation.

29.31     **Communications and Computer Lines**. Tenant may install, maintain, replace, remove or use any communications or computer wires and cables serving the Premises (collectively, the "**Lines**"), provided that (i) Tenant shall obtain Landlord's prior written consent (not to be unreasonably withheld, conditioned or delayed), use an experienced and qualified contractor approved in writing by Landlord, and comply with all of the other provisions of Articles 7 and 8 of this Lease, (ii) an acceptable number of spare Lines and space for additional Lines shall be maintained for existing and future occupants of the Project, as determined in Landlord's reasonable opinion, (iii) the Lines therefor (including riser cables) shall be appropriately insulated to prevent excessive electromagnetic fields or radiation, shall be surrounded by a protective conduit reasonably acceptable to Landlord, and shall be identified in accordance with the "Identification Requirements," as that term is set forth hereinbelow, (iv) any new or existing Lines servicing the Premises shall comply with all applicable governmental laws and regulations, (v) as a condition to permitting the installation of new Lines, Landlord may require that Tenant remove existing Lines located in or serving the Premises and repair any damage in connection with such removal, and (vi) Tenant shall pay all costs in connection therewith. All Lines shall be clearly marked with adhesive plastic labels (or plastic tags attached to such Lines with wire) to show Tenant's name, suite number, telephone number and the name of the person to contact in the case of an emergency (A) every four feet (4') outside the Premises (specifically including, but not limited to, the electrical room risers and other Common Areas), and (B) at the Lines' termination point(s) (collectively, the "**Identification Requirements**"). Unless otherwise instructed by Landlord (by notice to Tenant), Tenant shall, at Tenant's sole cost and expense, prior to the expiration or earlier termination of this Lease, remove any Lines located in or serving the Premises (and repair any resulting damage).

29.32     **Transportation Management**. Tenant shall fully comply with all present or future programs intended to manage parking, transportation or traffic in and around the Project and/or the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities. Such programs may include, without limitation: (i) restrictions on the number of peak-hour vehicle trips generated by Tenant; (ii) increased vehicle occupancy; (iii) implementation of an in-house ridesharing program and an employee transportation coordinator; (iv) working with employees and any Project, Building or area-wide ridesharing program manager; (v) instituting employer-sponsored incentives (financial or in-kind) to encourage employees to rideshare; and (vi) utilizing flexible work shifts for employees.

-44-

29.33    **Development of the Project**.

29.33.1    **Subdivision**. Landlord reserves the right to further subdivide all or a portion of the Project. Tenant agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, any additional documents needed to conform this Lease to the circumstances resulting from such subdivision.

29.33.2    **The Other Improvements**. If portions of the Project or property adjacent to the Project (collectively, the "**Other Improvements**") are owned by an entity other than Landlord, Landlord, at its option, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Project and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Project and the Other Improvements, provided that Tenant's rights under this Lease are not materially impaired, (iii) for the allocation of a portion of the Direct Expenses to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Project, and (iv) for the use or improvement of the Other Improvements and/or the Project in connection with the improvement, construction, and/or excavation of the Other Improvements and/or the Project. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Project or any other of Landlord's rights described in this Lease.

29.33.3    **Construction of Project and Other Improvements**. Tenant acknowledges that portions of the Project and/or the Other Improvements may be subject to demolition or construction following Tenant's occupancy of the Premises, and that such construction may result in levels of noise, dust, obstruction of access, etc. which are in excess of that present in a fully constructed project. Tenant hereby waives any and all rent offsets or claims of constructive eviction which may arise in connection with such demolition or construction.

29.34    **USA Patriot Act**.

29.34.1    **Certification**. Tenant hereby certifies to Landlord that:

(a)    Tenant (which, for purposes of the certification contained in this Section 29.34.1, includes its partners, subpartners, members, parent organizations, affiliates, subsidiaries, principal shareholders and any other constituent entities, and their respective officers, directors, contractors, agents, servants, employees, licensees and invitees) is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "**Executive Order**") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001 (Public Law 107-56), enacted October 26, 2001, as amended (the **USA Patriot Act**");

(b)    Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation or transaction pursuant to the Executive Order, the USA Patriot Act or any other law, order, rule, or regulation, and Tenant does not appear on any of the following lists: (i) the two (2) lists maintained by the United States Department of Commerce (Denied Persons and Entities; the Denied Persons list can be found at http://www.bis.doc.gov/DPL/thedeniallist.asp; the Entity List can be accessed from http://www.bis.doc.gov/Entities/Default.htm); (ii) the list maintained by the United States Department of Treasury (Specially Designated Nationals and Blocked Persons, which can be found at http://www.ustreas.gov/ofac/t11sdn.pdf); (iii) the two (2) lists maintained by the United States Department of State (Terrorist Organizations and Debarred Parties; the State Department List of Terrorists can be found at http://www.state.gov/s/ct/rls/fs/2001/6531.htm; the List of Debarred Parties can be found at http://www.pmdtc.org/debar059.htm); and (iv) any other list of terrorists, terrorist, organizations or narcotics traffickers maintained pursuant to any of the rules and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury, or by any other government or agency thereof (any such designated or listed person, entity, nation or transaction being referred to herein as a **Designated Person or Entity**");

(c)    Tenant is currently in compliance with and will at all times during the Lease Term (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury, and any statute, executive order and other governmental action relating thereto; and

(d)    Tenant is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any Designated Person or Entity.

-45-

29.34.2 **Indemnification**. Tenant hereby agrees to indemnify, defend, protect and hold harmless the Landlord Parties harmless from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorneys' fees and costs) arising from or related to any breach of the certification contained in Section 29.34.1, above.

29.35 **Intentionally Deleted**.

29.36 **Interest Rate**. "**Interest Rate**" shall mean the publicly announced "prime rate" charged by Wells Fargo Bank, N.A. (San Francisco) or its successor, from time to time in effect, plus five (5) percentage points, or in the absence of such prime rate, then at the U.S. Treasury six-month market note (or bond, if so designated) rate as published by any national financial publication selected by Landlord, plus eight (8) percentage points, but in no event more than the maximum rate permitted by law.

**ARTICLE 30**

**HAZARDOUS SUBSTANCES; MOLD CONDITIONS**

30.1    **Prohibition Against Hazardous Substances**.

30.1.1    **Tenant's Prohibition**. Tenant shall not cause or permit any "Hazardous Substances," as that term is defined below, to be brought upon, produced, treated, stored, used, discharged or disposed of in or near the Project without Landlord's prior written consent, which Landlord may give or withhold in its sole and absolute discretion; provided, however, that Landlord's consent shall not be required for normal use in compliance with applicable laws, ordinances, regulations and requirements of customary household and office supplies, including by example but without limitation, mild cleaners, lubricants and copier toner, vehicles located in loading and parking areas, data and telecommunication equipment, batteries, fuel storage tanks, and other materials used in connection with emergency or uninterrupted power supply devices, and other supplies and materials consistent with those used by Tenant in similar or comparable facilities operated by Tenant. Any handling, transportation, storage, treatment, disposal or use of any Hazardous Substances in or about the Project by Tenant, its agents, employees, contractors or invitees shall strictly comply with all applicable laws, ordinances, regulations and requirements, including "Environmental Laws," as that term is defined below. Tenant shall be solely responsible for obtaining and complying with all permits necessary for the maintenance and operation of its business, including, without limitation, all permits governing the use, handling, storage, treatment, transport, discharge and disposal of Hazardous Substances. To the extent reasonably required, Landlord shall, at no out-of-pocket cost to Landlord, reasonably cooperate with Tenant in Tenant's efforts to obtain any such permits or similar authorizations or clearances, including, without limitation, executing applications and taking any other actions required by any state, federal or local governmental body in connection with Tenant's efforts to obtain such permit. Tenant shall indemnify, defend and hold Landlord and the Landlord Parties harmless from and against any and all obligations, losses, claims actions (including remedial and enforcement actions of any king and administrative and judicial proceedings, suits, orders or judgments), causes of action, liabilities, penalties, damages (including consequential and punitive damages, diminution in value of the Premises or the Project, damages for the loss or restriction on use of leasable space or of any amenity of the Premises or the Project, damages arising from any adverse impact on marketing of space in the Project, "Remedial Work," as that term is defined below, required to be performed by Tenant, and sums paid in settlement of claims), costs and expenses (including reasonable attorneys' and consultants' fees and expenses) (collectively, "**Claims**"), which result from or arise out of the use, storage, treatment, transportation, release, or disposal of any Hazardous Substances on or about the Premises during the Lease Term and on or about the Project outside of the Premises by Tenant or any Tenant Parties.

30.1.2    **Landlord Inspections**. Landlord shall have the right, at any time, but not more than two (2) times in any calendar year (unless Landlord has reasonable cause to believe that Tenant has failed to fully comply with the provisions of this Article 30, or unless required by any lender or governmental agency), to inspect the Premises and Project and conduct tests and investigations to determine whether Tenant is in compliance with the provisions of this Article 30; provided, however, that Landlord shall repair any damage caused by such inspections and testing and shall use commercially reasonable efforts to minimize interference with Tenant's use and enjoyment of the Premises. The costs of all such inspections, tests and investigations shall be borne solely by Landlord. The foregoing rights granted to Landlord shall not, however, create (a) a duty on Landlord's part to inspect, test, investigate, monitor or otherwise observe the Premises or Project or the activities of Tenant or any Tenant Party with respect to Hazardous Substances, including, but not limited to, Tenant's operation, use or remediation thereof, or (b) liability on the part of Landlord or any Landlord Party for Tenant's use, storage, treatment, transportation, release, or disposal of any Hazardous Substances, it being understood that Tenant shall be solely responsible for all liability in connection therewith.

-46-

30.2     **Landlord Notification**. Tenant shall promptly provide Landlord with complete copies of all documents, correspondence and other written materials directed to or from, or relating to, Tenant concerning environmental issues at the Premises or the Project, including, without limitation, documents relating to the release, potential release, investigation, compliance, cleanup and abatement of Hazardous Substances, and any claims, causes of action or other legal documents related to same. Within twenty-four (24) hours of any unauthorized release, spill or discharge of Hazardous Substances, in, on, or about the Premises or Project, Tenant shall provide written notice to Landlord fully describing the event. Tenant shall also provide Landlord with a copy of any document or correspondence submitted by or on behalf of Tenant to any regulatory agency as a result of or in connection with any unauthorized release, spill or discharge. Within twenty-four (24) hours of receipt by Tenant of any warning, notice of violation, permit suspension or similar disciplinary measure relating to Tenant's actual or alleged failure to comply with any environmental law, rule, regulation, ordinance or permit, Tenant shall provide written notice to Landlord.

30.3     **Remedial Work**. In the event that any Hazardous Material (other than Mold Conditions) is discovered by Tenant within the Premises after the date of this Lease, Tenant shall promptly notify Landlord, and shall consult with Landlord concerning appropriate procedures to be followed. If any investigation or monitoring of site conditions or any clean-up, containment, restoration, removal or remediation of Hazardous Substances (other than Mold Conditions) (collectively, "**Remedial Work**") is required under any applicable laws, ordinances, regulations and requirements as a result of the handling, use, storage, treatment, transportation or disposal of any Hazardous Substances by Tenant, its agents, employees, contractors or invitees, then Tenant shall perform or cause to be performed the Remedial Work in compliance with applicable laws, ordinances, regulations and requirements. All Remedial Work performed by Tenant shall be performed by one or more contractors, selected by Tenant and reasonably approved in advance in writing by Landlord, and under the supervision of a consulting engineer selected by Tenant and reasonably approved in advance in writing by Landlord. All costs and expenses of such Remedial Work shall be paid by Tenant, including, without limitation, the charges of such contractor(s), the consulting engineer and Landlord's reasonable attorneys' and experts' fees and costs incurred in connection with monitoring or review of such Remedial Work. Notwithstanding any provision of this Lease to the contrary, Tenant shall have no obligation to perform any Remedial Work for any Hazardous Substances (other than Mold Conditions) located in any portion of the Premises prior to the applicable Lease Commencement Date for such Phase and that was not placed thereon or therein or damaged or disturbed by Tenant or any of Tenant Party. For the avoidance of doubt, the inspection and remediation of Mold Conditions is set forth in Section 30.6 below.

30.4     **Intentionally Omitted**.

30.5     **Intentionally Omitted**.

30.6     **Mold**.

30.6.1     **Mold Prevention**. Because mold spores are present essentially everywhere and mold can grow in almost any moist location, Tenant acknowledges the necessity of adopting and enforcing good housekeeping practices, ventilation and vigilant moisture control within the Premises (particularly in kitchen areas, janitorial closets, bathrooms, in and around water fountains and other plumbing facilities and fixtures, break rooms, in and around outside walls, and in and around HVAC systems and associated drains) for the prevention of mold (such measures, **Mold Prevention Practices**"). Tenant will, at its sole cost and expense keep and maintain the Building in good order and condition in accordance with the Mold Prevention Practices and acknowledges that the control of moisture, and prevention of "Mold Conditions," as defined in Section 30.6.2.1, below, within the Premises, are integral to its obligations under this Lease.

30.6.2     **Tenant Obligations**. Tenant, at its sole cost and expense, shall:

30.6.2.1 Regularly monitor the Building for the presence of mold and any conditions that reasonably can be expected to give rise or be attributed to mold or fungus including, but not limited to, observed or suspected instances of water damage, condensation, seepage, leaks or any other water penetration (from any source, internal or external), mold growth, mildew, repeated complaints of respiratory ailments or eye irritation by Tenant's employees or any other occupants of the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises (the "**Mold Conditions**"); and

30.6.2.2 Immediately notify Landlord in writing if it observes, suspects, has reason to believe mold or Mold Conditions at the Premises.

30.6.3     **Landlord Inspections**. In the event of suspected mold or Mold Conditions at the Premises, Landlord may cause an inspection of the Premises to be conducted, during such time as Landlord may designate, to determine if Mold Conditions are present at the Premises.

-47-

30.6.4  **Mold Remedial Work**. If Tenant observes, suspects, has reason to believe mold or Mold Conditions at the Premises, or if Landlord provides written notice to Tenant that it observes, suspects, has reason to believe mold or Mold Conditions at the Premises, then Tenant shall promptly take all actions to clean-up, contain, restore, remove and remediate such Mold Conditions (collectively, "**Mold Remedial Work**"). All Mold Remedial Work shall be performed in accordance with all applicable laws, ordinances, regulations and requirements. All Mold Remedial Work performed by Tenant shall be performed by one or more contractors, selected by Tenant and reasonably approved in advance in writing by Landlord. All costs and expenses of such Mold Remedial Work shall be paid by Tenant, including, without limitation, the charges of such contractor(s) and Landlord's reasonable attorneys' and experts' fees and costs incurred in connection with monitoring or review of such Mold Remedial Work. For the avoidance of doubt, Tenant shall be obligated to perform all Mold Remedial Work regardless of when the mold or Mold Conditions at the Premises first arose, provided that Tenant may use the Tenant Improvement Allowance towards the costs of such Mold Remedial Work in accordance with Section 8.6 above

30.7  **Surrender**. Tenant shall surrender the Building to Landlord upon the expiration or earlier termination of this Lease free of (i) Mold Conditions, debris, waste, and (ii) Hazardous Substances placed on, about or near the Building by Tenant or any Tenant Parties, and in a condition which complies with all Environmental Laws and any additional requirements of Landlord that are reasonably necessary to protect the value of the Building or the Project, including, without limitation, the obtaining of any closure permits or other governmental permits or approvals related to Tenant's use of Hazardous Substances at the Premises. Tenant's obligations and liabilities pursuant to the provisions of this Article 30 shall be in addition to any other surrender requirement in this Lease and shall survive the expiration or earlier termination of this Lease (provided that, with respect to any condition that would have reasonably been discovered by a reasonable inspection of the Premises, Landlord must notify Tenant of such condition within sixty (60) days after the date of Tenant's vacation and surrender of the Premises to Landlord).

30.8  **Definitions**. As used in this Lease, the following terms shall be defined as follows:

30.8.1  "**Hazardous Substances**" means (1) any substance or material that is included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," or "solid waste" in any Environmental Laws (as hereinafter defined); (2) petroleum or petroleum derivatives, including crude oil or any fraction thereof, all forms of natural gas, and petroleum products or by-products or waste; (3) polychlorinated biphenyls (PCB's); (4) asbestos and asbestos containing materials (whether friable or non-friable); (5) lead and lead based paint or other lead containing materials (whether friable or non-friable); (6) urea formaldehyde; (7) microbiological pollutants; (8) batteries or liquid solvents or similar chemicals; (9) radon gas; (10) mildew, fungus, mold, bacteria and/or other organic spore material, whether or not airborne, colonizing, amplifying or otherwise; and (11) any additional substance, material or waste (A) the presence of which on or about the Premises (i) requires reporting, investigation or remediation under any Environmental Laws, (ii) causes or threatens to cause a nuisance on the Premises or any adjacent area or property or poses or threatens to pose a hazard to the health or safety of persons on the Premises or any adjacent area or property, or (iii) which, if it emanated or migrated from the Premises, could constitute a trespass, or (B) which is now or is hereafter classified or considered to be hazardous or toxic under any Environmental Laws.

30.8.2  "**Environmental Laws**" means all statutes, terms, conditions, limitations, restrictions, standards, prohibitions, obligations, schedules, plans and timetables that are contained in or promulgated pursuant to any federal, state or local laws (including rules, regulations, ordinances, codes, judgments, orders, decrees, contracts, permits, stipulations, injunctions, the common law, court opinions, and demand or notice letters issued, entered, promulgated or approved thereunder), relating to pollution or the protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of Hazardous Substances into ambient air, surface water, ground water or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, including but not limited to: the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), 42 U.S.C. 9601 et seq.; Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. 6901 et seq.; Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq.; Toxic Substances Control Act, 15 U.S.C. 2601 et seq.; Clean Air Act, 42 U.S.C. 7401 et seq.; and the Safe Drinking Water Act, 42 U.S.C. § 300f et seq. "Environmental Laws" shall include any statutory or common law that has developed or develops in the future regarding mold, fungus, microbiological pollutants, mildew, bacteria and/or other organic spore material. "Environmental Laws" shall not include laws relating to industrial hygiene or worker safety, except to the extent that such laws address asbestos and asbestos containing materials (whether friable or non-friable) or lead and lead based paint or other lead containing materials.

30.9  **Survival**. Tenant's obligations under this Article 30 shall survive the expiration or earlier termination of this Lease until all Claims within the scope of this Article 30 are fully, finally, and absolutely barred by the applicable statutes of limitations.

-48-

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

-49-

Exhibit 10.3

**C3.ai, Inc.**
**Stock Option Grant Notice**
**(2020 Equity Incentive Plan)**

C3.ai, Inc. (the "**Company**"), pursuant to its 2020 Equity Incentive Plan, as amended (the "**Plan**"), has granted to you ("**Optionholder**") an option to purchase the number of shares of the Class A Common Stock set forth below (the "**Option**"). Your Option is subject to all of the terms and conditions as set forth herein and in the Plan and the Stock Option Agreement – Early Exercise, all of which are attached hereto and incorporated herein in their entirety. Capitalized terms not explicitly defined herein but defined in the Plan or the Stock Option Agreement – Early Exercise shall have the meanings set forth in the Plan or the Stock Option Agreement – Early Exercise, as applicable.

Optionholder: _____
Date of Grant: _____
Vesting Commencement Date: _____
Number of Shares of Class A Common Stock Subject to Option: _____
Exercise Price (Per Share): _____
Total Exercise Price: _____
Expiration Date: _____

**Type of Grant:**    [Incentive Stock Option] OR [Nonstatutory Stock Option]

**Vesting Schedule**:    Subject to the Optionholder's Continuous Service through each applicable vesting date, the Option will vest as follows:

[_____]

**Optionholder Acknowledgements:** By your signature below or by electronic acceptance or authentication in a form authorized by the Company, you understand and agree that:

- The Option is governed by this Stock Option Grant Notice, and the provisions of the Plan and the Stock Option Agreement – Early Exercise, all of which are made a part of this document. Unless otherwise provided in the Plan, this Grant Notice and the Stock Option Agreement – Early Exercise (together, the "**Option Agreement**") may not be modified, amended or revised except in a writing signed by you and a duly authorized officer of the Company.

- If the Option is an Incentive Stock Option, it (plus other outstanding Incentive Stock Options granted to you) cannot be first *exercisable* for more than $100,000 in value (measured by exercise price) in any calendar year. Any excess over $100,000 is a Nonstatutory Stock Option.

- You consent to receive this Grant Notice, the Stock Option Agreement – Early Exercise, the Plan, the Prospectus and any other Plan-related documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

- You have read and are familiar with the provisions of the Plan, the Stock Option Agreement – Early Exercise, and the Prospectus. In the event of any conflict between the provisions in this Grant Notice, the Option Agreement, or the Prospectus and the terms of the Plan, the terms of the Plan shall control.

- The Option Agreement sets forth the entire understanding between you and the Company regarding the acquisition of Class A Common Stock and supersedes all prior oral and written agreements, promises and/or representations on that subject with the exception of other equity awards previously granted to you and any written employment agreement, offer letter, severance agreement, written severance plan or policy, or other written agreement between the Company and you in each case that specifies the terms that should govern this Option.

- Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

1

**C3.ai, Inc.**

By:___

              Signature

Title:___

Date:___

**Optionholder:**

___

              Signature

Date:___

2

Case 4:22-cv-01413-HSG    Document 120-5    Filed 06/30/23    Page 142 of 169

**C3.ai, Inc.**
**2020 Equity Incentive Plan**

**Stock Option Agreement ─ Early Exercise**

As reflected by your Stock Option Grant Notice ("*Grant Notice*") C3.ai, Inc. (the "*Company*") has granted you an option under its 2020 Equity Incentive Plan, as amended (the "*Plan*") to purchase a number of shares of Class A Common Stock at the exercise price indicated in your Grant Notice (the "*Option*"). Capitalized terms not explicitly defined in this Stock Option Agreement – Early Exercise but defined in the Grant Notice or the Plan shall have the meanings set forth in the Grant Notice or Plan, as applicable. The terms of your Option as specified in the Grant Notice and this Stock Option Agreement – Early Exercise constitute your Option Agreement.

The general terms and conditions applicable to your Option are as follows:

**1.    Governing Plan Document.** Your Option is subject to all the provisions of the Plan. Your Option is further subject to all interpretations, amendments, rules and regulations, which may from time to time be promulgated and adopted pursuant to the Plan. In the event of any conflict between the Option Agreement and the provisions of the Plan, the provisions of the Plan shall control.

**2.    Exercise.**

**(a)    Right to Exercise.** You may elect at any time during the term of your Option to exercise all or part of your Option, including the unvested portion of your Option; *provided, however*, that:

**(i)**    a partial exercise of your Option will be deemed to cover first vested shares of Class A Common Stock and then the earliest vesting installment of unvested shares of Class A Common Stock;

**(ii)**    the unvested portion of your Option may not be exercised after your Continuous Service has terminated;

**(iii)**    any shares of Class A Common Stock so purchased from installments that have not vested as of the date of exercise will be subject to the purchase option in favor of the Company as described in the Company's form of Early Exercise Stock Purchase Agreement attached hereto as Exhibit A;

**(iv)**    you will enter into the Company's form of Early Exercise Stock Purchase Agreement attached hereto as Exhibit A with a vesting schedule that will result in the same vesting as if no early exercise had occurred; and

**(v)**    if your Option is an Incentive Stock Option, then, to the extent that the aggregate Fair Market Value (determined at the Date of Grant) of the shares of Class A Common Stock with respect to which your Option plus all other Incentive Stock Options you hold are exercisable for the first time by you during any calendar year (under all plans of the Company and its Affiliates) exceeds $100,000, your option(s) or portions thereof that exceed such limit (according to the order in which they were granted) will be treated as Nonstatutory Stock Options.

**(b)    Method of Exercise.** Subject to Sections 2(a) and 3 herein, your Option will generally be exercisable for whole shares of Class A Common Stock at any time during its term by delivery of payment of the exercise price and applicable withholding taxes and other required documentation to the Plan Administrator in accordance with the exercise procedures established by the

1

Plan Administrator, which may include an electronic submission. Please review the Plan, which may restrict or prohibit your ability to exercise your Option during certain periods.

        **(c)**     **Method of Payment**. To the extent permitted by Applicable Law, you may pay your Option exercise price as follows:

        **(i)**     cash, check, bank draft or money order;

        **(ii)**     subject to Company and/or Committee consent at the time of exercise, pursuant to a "cashless exercise" program as further described in the Plan if at the time of exercise the Class A Common Stock is publicly traded;

        **(iii)**     subject to Company and/or Committee consent at the time of exercise, by delivery of previously owned shares of Class A Common Stock as further described in the Plan; or

        **(iv)**     subject to Company and/or Committee consent at the time of exercise, if the Option is a Nonstatutory Stock Option, by a "net exercise" arrangement as further described in the Plan.

        **3.**     **Term.** You may not exercise your Option before the commencement of its term or after its term expires. The term of your option commences on the Date of Grant and expires upon the earliest of the following:

        **(a)**     immediately upon the termination of your Continuous Service for Cause;

        **(b)**     three months after the termination of your Continuous Service for any reason other than Cause, Disability or death;

        **(c)**     12 months after the termination of your Continuous Service due to your Disability;

        **(d)**     18 months after your death if you die during your Continuous Service;

        **(e)**     immediately upon a Corporate Transaction if the Board has determined that the Option will terminate in connection with a Corporate Transaction,

        **(f)**     the Expiration Date indicated in your Grant Notice; or

        **(g)**     the day before the 10th anniversary of the Date of Grant.

        Notwithstanding the foregoing, if you die during the period provided in Section 3(b) or 3(c) above, the term of your Option shall not expire until the earlier of (i) eighteen months after your death, (ii) upon any termination of the Option in connection with a Corporate Transaction, (iii) the Expiration Date indicated in your Grant Notice, or (iv) the day before the tenth anniversary of the Date of Grant. Additionally, the Post-Termination Exercise Period of your Option may be extended as provided in the Plan.

        To obtain the federal income tax advantages associated with an Incentive Stock Option, the Code requires that at all times beginning on the date of grant of your Option and ending on the day three months before the date of your Option's exercise, you must be an employee of the Company or an Affiliate, except in the event of your death or Disability. If the Company provides for the extended exercisability of your Option under certain circumstances for your benefit, your Option will not necessarily be treated as an Incentive Stock Option if you exercise your Option more than three months after the date your employment terminates.

2

**4.** **Withholding Obligations.**

**(a)** You acknowledge that, regardless of any action taken by the Company, or if different, the Affiliate employing you (the "***Employer***"), the ultimate liability for all income tax (including U.S. federal, state, and local taxes and/or non-U.S. taxes), social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("***Tax-Related Items***") is and remains your responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Option, including the grant of the Option, the vesting of the Option, the exercise of the Option, the subsequent sale of any shares of Class A Common Stock acquired pursuant to the Option and the receipt of any dividends; and (ii) do not commit to and are under no obligation to reduce or eliminate your liability for Tax-Related Items. Further, if you become subject to taxation in more than one country, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one country.

**(b)** Prior to any relevant taxable or tax withholding event, as applicable, you agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any applicable withholding obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from your wages or other cash compensation paid to you by the Company and/or the Employer; (ii) allowing or requiring you to make a cash payment to cover the Tax-Related Items; (iii) withholding from proceeds of the sale of shares of Class A Common Stock acquired upon exercise of this Option either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization without further consent); (iv) withholding from the shares of Class A Common Stock to be issued to you upon exercise of this Option; or (v) any other method of withholding determined by the Company and permitted by applicable law; provided, however, that if you are a Section 16 officer of the Company under the Exchange Act, then the Administrator shall establish the method of withholding from alternatives (i)-(iv) herein and, if the Administrator does not exercise its discretion prior to the applicable withholding event, then you shall be entitled to elect the method of withholding from the alternatives above.

**(c)** The Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable statutory withholding amounts or other applicable withholding rates, including maximum rates applicable in your jurisdiction, in which case you may receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent amount in shares of Class A Common Stock. If the obligation for Tax-Related Items is satisfied by withholding in shares of Class A Common Stock, for tax purposes, you are deemed to have been issued the full number of shares of Class A Common Stock subject to the exercised Option, notwithstanding that a number of the shares of Class A Common Stock is held back solely for the purpose of paying the Tax-Related Items.

**(d)** You agree to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to issue or deliver the shares of Class A Common Stock, or the proceeds of the sale of shares of Class A Common Stock, if you fail to comply with your obligations in connection with the Tax-Related Items.

**5.** **Incentive Stock Option Disposition Requirement.** If your Option is an Incentive Stock Option, you must notify the Company in writing within 15 days after the date of any disposition of any of the shares of the Class A Common Stock issued upon exercise of your Option that occurs within two years after the date of your Option grant or within one year after such shares of Class A Common Stock are transferred upon exercise of your Option.

3

**6.**     **Nature of Grant.** In accepting the Option, you acknowledge, understand and agree that:

(a)     the Plan is established voluntarily by the Company, it is discretionary in nature, and may be amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b)     the grant of the Option is exceptional, voluntary and occasional and does not create any contractual or other right to receive future grants of options or benefits in lieu of options, even if options have been granted in the past;

(c)     all decisions with respect to future Options or other grants, if any, will be at the sole discretion of the Company;

(d)     the Option grant and your participation in the Plan shall not create a right to employment or be interpreted as forming or amending an employment or service contract with the Company, the Employer or any Affiliate;

(e)     you are voluntarily participating in the Plan;

(f)     the Option and any shares of Class A Common Stock acquired under the Plan, and the income from and value of same, are not intended to replace any pension rights or compensation;

(g)     the Option and any shares of Class A Common Stock acquired under the Plan, and the income from and value of same, are not part of normal or expected compensation for any purpose, including, without limitation, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar mandatory payments;

(h)     the future value of the shares of Class A Common Stock underlying the Option is unknown, indeterminable, and cannot be predicted with certainty;

(i)     if the underlying shares of Class A Common Stock do not increase in value, the Option will have no value;

(j)     if you exercise the Option and acquire shares of Class A Common Stock, the value of such shares of Class A Common Stock may increase or decrease in value, even below the exercise price;

(k)     for purposes of the Option, your Continuous Service will be considered terminated as of the date you are no longer actively providing services to the Company or one of its Affiliates (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any), and unless otherwise expressly provided in the Option Agreement or determined by the Company, (i) your right to vest in the Option under the Plan, if any, and (ii) the period (if any) during which you may exercise the Option after such termination of Continuous Service will terminate as of such date and in each instance will not be extended by any notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any); and the Board shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of the Option (including whether you may still be considered to be providing services while on a leave of absence);

(l)     no claim or entitlement to compensation or damages shall arise from forfeiture of the Option resulting from your termination of Continuous Service (for any reason whatsoever, whether or

4

not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed, or the terms of your employment agreement, if any);

(m)    unless otherwise agreed with the Company in writing, the Option and any shares of Class A Common Stock acquired under the Plan, and the income from and value of same, are not granted as consideration for, or in connection with, any service you may provide as a director of the Company or any Affiliate; and

(n)    neither the Company, the Employer or any Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Option or of any amounts due to you pursuant to the exercise of the Option or the subsequent sale of any shares of Class A Common Stock acquired upon exercise.

7.    **Transferability.** Except as otherwise provided in the Plan, your Option is not transferable, except by will or by the applicable laws of descent and distribution, and is exercisable during your life only by you.

8.    **Corporate Transaction.** Your Option is subject to the terms of any agreement governing a Corporate Transaction involving the Company, including, without limitation, a provision for the appointment of a stockholder representative that is authorized to act on your behalf with respect to any escrow, indemnities and any contingent consideration.

9.    **No Liability for Taxes**. As a condition to accepting the Option, you hereby (a) agree to not make any claim against the Company, or any of its Officers, Directors, Employees or Affiliates related to tax liabilities arising from the Option or other Company compensation and (b) acknowledge that you were advised to consult with your own personal tax, financial and other legal advisors regarding the tax consequences of the Option and have either done so or knowingly and voluntarily declined to do so. Additionally, you acknowledge that the Option is exempt from Section 409A for U.S. tax purposes, only if the exercise price is at least equal to the "fair market value" of the Class A Common Stock on the date of grant as determined by the U.S. Internal Revenue Service and there is no other impermissible deferral of compensation associated with the Option. Additionally, as a condition to accepting the Option, you agree not make any claim against the Company, or any of its Officers, Directors, Employees or Affiliates in the event that the U.S. Internal Revenue Service asserts that such exercise is less than the "fair market value" of the Class A Common Stock on the date of grant as subsequently determined by the Internal Revenue Service.

10.    **Severability**. If any part of this Option Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity will not invalidate any portion of this Option Agreement or the Plan not declared to be unlawful or invalid.  Any Section of this Option Agreement (or part of such a Section) so declared to be unlawful or invalid will, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

11.    **Waiver.**  You acknowledge that a waiver by the Company of a breach of any provision of this Option Agreement shall not operate or be construed as a waiver of any other provision of this Option Agreement, or of any subsequent breach of this Option Agreement.

12.    **No Advice Regarding Grant.**  The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding your participation in the Plan, or your acquisition or sale of the underlying shares of Class A Common Stock. You should consult with your own personal tax, legal and financial advisors regarding your participation in the Plan before taking any action related to the Plan.

5

**13.     Data Privacy.** By signing the Grant Notice or otherwise accepting this Option Agreement in accordance with the Company's acceptance procedures, you acknowledge that, in order for the Company to administer the grant of the Option and any future participation in the Plan, the Company and the Employer must collect, process and transfer certain of your personal data, subject to the GDPR privacy policy for employees, workers and contractors (Europe).

**14.     Language.** You acknowledge that you are sufficiently proficient in the English language, or have consulted with an advisor who is sufficiently proficient in English, so as to allow you to understand the terms and conditions of this Option Agreement. If you have received this Option Agreement or any other documents related to the Plan translated into a language other than English, and if the meaning of the translated version is different than the English version, the English version will control.

**15.     Governing Law/Venue.** The Option Agreement and any controversy arising out of or relating to the Option Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to conflict of law principles that would result in any application of any law other than the law of the State of Delaware. For purposes of any action, lawsuit or other proceeding brought to enforce the Option Agreement, relating to it, or arising from it, the parties hereby submit to and consent to the sole and exclusive jurisdiction of the courts of New York County, New York, or the federal courts for the United States for the Southern District of New York, and no other courts where this grant is made and/or to be performed.

**16.     Insider Trading Restrictions / Market Abuse Law.** You may be subject to insider trading restrictions and/or market abuse laws based on the exchange on which the shares of Class A Common Stock are listed and in applicable jurisdictions, including the United States, your country and the designated broker's country, which may affect your ability to accept, acquire, sell or otherwise dispose of shares of Class A Common Stock, rights to shares of Class A Common Stock (*i.e.*, Options) or rights linked to the value of the shares of Class A Common Stock under the Plan during such times as you are considered to have "inside information" regarding the Company (as defined by the laws in the applicable jurisdiction(s)). Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information. Furthermore, you could be prohibited from (i) disclosing the inside information to any third party, which may include fellow employees and (ii) "tipping" third parties or causing them otherwise to buy or sell securities. Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under the Company's insider trading policy, or any other applicable insider trading policy then in effect. You acknowledge that you are responsible for complying with any applicable restrictions and are encouraged to speak with your personal legal advisor for further details regarding any applicable insider-trading and/or market-abuse laws in your country.

**17.     Foreign Asset/Account, Exchange Control and Tax Reporting.** You may be subject to foreign asset/account, exchange control and/or tax reporting requirements as a result of the acquisition, holding and/or transfer of shares of Class A Common Stock or cash (including dividends and the proceeds arising from the sale of shares of Class A Common Stock) derived from your participation in the Plan in, to and/or from a brokerage/bank account or legal entity located outside your country. The Applicable Laws in your country may require that you report such accounts, assets and balances therein, the value thereof and/or the transactions related thereto to the applicable authorities in such country. You may also be required to repatriate sale proceeds or other funds received as a result of your participation in the Plan to your country through a designated bank or broker within a certain time after receipt. You acknowledge that it is your responsibility to be compliant with such regulations and you are encouraged to consult with your personal legal advisor for any details.

**18.     Imposition of Other Requirements.** The Company reserves the right to impose other requirements on your participation in the Plan, on the Option and on any shares of Class A Common Stock acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or

6

administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

19.      **Other Documents.**  You hereby acknowledge receipt of or the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act, which includes the Prospectus.  In addition, you acknowledge receipt of the Company's Trading Policy.

20.      **Questions.** If you have questions regarding these or any other terms and conditions applicable to your Option, including a summary of the applicable federal income tax consequences please see the Prospectus.

\* \* \* \*

7

**Exhibit A**

**C3.ai, Inc.**
**2020 Equity Incentive Plan**

**Early Exercise Stock Purchase Agreement**

**This Agreement** is made by and between C3.ai, Inc., a Delaware corporation (the "***Company***"), and the individual designated on the signature page hereto as a Purchaser ("***Purchaser***").

**Recitals:**

**A.** Pursuant to the exercise of the stock option granted to Purchaser under the Company's 2020 Equity Incentive Plan, as amended (the "***Plan***") and pursuant to the Stock Option Grant Notice and Stock Option Agreement – Early Exercise (collectively, the "***Option Agreement***") dated _____, 20__ by and between the Company and Purchaser (the "***Option***"), Purchaser has elected to purchase _____ of those shares of Class A Common Stock which have not become vested under the vesting schedule set forth in the Option Agreement ("***Shares***").

**B.** As required by the Option Agreement, as a condition to Purchaser's election to exercise the Option with respect to the Shares, Purchaser must execute this Agreement, which sets forth the rights and obligations of the parties with respect to Shares acquired upon exercise of the Option.

The parties agree as follows:

**1.** **Incorporation of Plan and Option by Reference.** This Agreement is subject to all of the terms and conditions as set forth in the Plan and the Option. If there is a conflict between the terms of this Agreement and/or the Option and the terms of the Plan, the terms of the Plan will control. If there is a conflict between the terms of this Agreement and the terms of the Option, the terms of the Option will control. Defined terms not explicitly defined in this Agreement but defined in the Plan will have the same definitions as in the Plan. Defined terms not explicitly defined in this Agreement or the Plan but defined in the Option will have the same definitions as in the Option.

**2.** **Unvested Share Repurchase Option.**

**(a)** **Repurchase Option**. In the event Purchaser's Continuous Service terminates, then the Company has an irrevocable option (the "***Repurchase Option***") for a period of six months after said termination, or such longer period as may be agreed to by the Company and Purchaser (the "***Repurchase Period***"), to repurchase from Purchaser or Purchaser's personal representative, as the case may be, those Shares that Purchaser received pursuant to the exercise of the Option that have not as yet vested as of such termination date in accordance with the Vesting Schedule indicated on Purchaser's Stock Option Grant Notice (the "***Unvested Shares***").

**(b)** **Share Repurchase Price.** The Company may repurchase all or any of the Unvested Shares at the lower of (i) the Fair Market Value of such Shares (as determined under the Plan) on the date of repurchase, or (ii) the price equal to Purchaser's Exercise Price for such Shares as indicated on Purchaser's Stock Option Grant Notice.

**3.** **Exercise of Repurchase Option.** The Repurchase Option will be exercised by written notice signed by such person as designated by the Company, and delivered or mailed as provided herein. Such notice will identify the number of Unvested Shares to be purchased and will notify Purchaser of the time, place and date for settlement of such purchase, which will be scheduled by the Company within the term of the Repurchase Option set forth above. In addition, the Company will be deemed to have exercised the Repurchase Option as of the last day of the Repurchase Period, unless an officer of the Company notifies the holder of the Unvested Shares during the Repurchase Period in writing (delivered or

1

mailed as provided herein) that the Company expressly declines to exercise its Repurchase Option for some or all of the Unvested Shares. The Company will be entitled to pay for any Unvested Shares purchased pursuant to its Repurchase Option at the Company's option in cash or by offset against any amounts owed to the Company by Purchaser, or by a combination of both. Upon exercise of the Repurchase Option and payment of the purchase price in any of the ways described above, the Company will become the legal and beneficial owner of the Unvested Shares being repurchased and all rights and interest therein or related thereto, and the Company will have the right to transfer to its own name the Unvested Shares being repurchased by the Company, without further action by Purchaser.

4.  **Capitalization Adjustments to Class A Common Stock.** In the event of a Capitalization Adjustment, then any and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares will be immediately subject to the Repurchase Option and be included in the word "Shares" for all purposes of the Repurchase Option with the same force and effect as the Shares presently subject to the Repurchase Option, but only to the extent the Shares are, at the time, covered by such Repurchase Option. While the total repurchase price for any Shares subject to the Repurchase Option will remain the same after each such event, the per Share repurchase price upon exercise of the Repurchase Option will be appropriately adjusted.

5.  **Corporate Transactions.** In the event of a Corporate Transaction, then the Repurchase Option may be assigned by the Company to the successor of the Company (or such successor's parent company), if any, in connection with such Corporate Transaction. To the extent the Repurchase Option remains in effect following such Corporate Transaction, it will apply to the new capital stock or other property received in exchange for the Shares in consummation of the Corporate Transaction, but only to the extent the Shares were at the time covered by such right. Appropriate adjustments will be made to the price per Share payable upon exercise of the Repurchase Option to reflect the Corporate Transaction upon the Company's capital structure; *provided, however,* that the aggregate price payable upon exercise of the Repurchase Option will remain the same.

6.  **Escrow of Shares.** As security for Purchaser's faithful performance of the terms of this Agreement and to insure the availability for delivery of Purchaser's Unvested Shares upon exercise of the Repurchase Option herein provided for, Purchaser agrees (a) upon execution of this Agreement, to deliver to and deposit with the Secretary of the Company or the Secretary's designee ("***Escrow Agent***"), as Escrow Agent in this transaction, three stock assignments duly endorsed (with date and number of Shares blank) in the form attached hereto as Exhibit A-1, together with any certificate or certificates evidencing all of the Shares subject to the Repurchase Option; said documents are to be held by the Escrow Agent and delivered by said Escrow Agent pursuant to the Joint Escrow Instructions of the Company and Purchaser set forth in Exhibit A-2, attached hereto and incorporated by this reference, which instructions also will be delivered to the Escrow Agent upon execution of this Agreement, and (b) subject to Section 7, the Company in its sole discretion may hold such shares in book-entry format in the Company's name.

7.  **Rights of Purchaser.** Subject to the provisions of the Option, Purchaser will exercise all rights and privileges of a stockholder of the Company with respect to the Shares deposited in escrow. Purchaser will be deemed to be the holder of the Shares for purposes of receiving any dividends that may be paid with respect to such Shares and for purposes of exercising any voting rights relating to such Shares, even if some or all of such Shares have not yet vested and been released from the Company's Repurchase Option.

8.  **Limitations on Transfer; Legends.** In addition to any other limitation on transfer created by applicable securities laws, Purchaser will not sell, assign, hypothecate, donate, encumber or otherwise dispose of any interest in the Shares while the Shares are subject to the Repurchase Option. The Company may include on any certificate or associate with any book entry evidencing any Shares one or more restrictive legends in the Company's discretion as appropriate to reflect the restrictions contained in this Agreement or as necessary to ensure compliance with applicable securities laws.

2

**9.    Section 83(b) Election.** Purchaser understands that Section 83(a) of the Code taxes as ordinary income the difference between the amount paid for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" includes the right of the Company to buy back the Shares pursuant to the Repurchase Option set forth above. Purchaser understands that Purchaser may elect to be taxed at the time the Shares are purchased, rather than when and as the Repurchase Option expires, by filing an election under Section 83(b) (an "***83(b) Election***") of the Code with the Internal Revenue Service within 30 days of the date of purchase, a copy of which is included as <u>Exhibit A-3</u>. Even if the fair market value of the Shares at the time of the execution of this Agreement equals the amount paid for the Shares, the 83(b) Election must be made to avoid income under Section 83(a) in the future. Purchaser understands that failure to file such an 83(b) Election in a timely manner may result in adverse tax consequences for Purchaser. Purchaser acknowledges that the foregoing is only a summary of the effect of United States federal income taxation with respect to purchase of the Shares, and does not purport to be complete. Purchaser further acknowledges that the Company has directed Purchaser to seek independent advice regarding the applicable provisions of the Code, the income tax laws of any municipality, state or foreign country in which Purchaser may reside, and the tax consequences of Purchaser's death. Purchaser assumes all responsibility for filing an 83(b) Election and paying all taxes resulting from such election or the lapse of the restrictions on the Shares.

**10.    Refusal to Transfer.** The Company is not required (a) to transfer on its books any Shares which have been transferred in violation of any of the provisions set forth in this Agreement, or (b) to treat as owner of such Shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such Shares have been so transferred.

**11.    No Employment Rights.** This Agreement is not an employment contract, and nothing in this Agreement affects in any manner whatsoever the right or power of the Company or its Affiliates to terminate Purchaser's employment for any reason at any time, with or without cause and with or without notice.

**12.    Miscellaneous.**

    **(a)    Notices.** All notices required or permitted hereunder will be in writing and will be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by electronic mail (return receipt requested) or confirmed facsimile if sent during normal business hours of the recipient, and if not during normal business hours of the recipient, then on the next business day, (iii) five calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the other party hereto at such party's address hereinafter set forth on the signature page hereof, or at such other address as such party may designate by 10 days advance written notice to the other party hereto.

    **(b)    Successors and Assigns.** This Agreement will inure to the benefit of the successors and assigns of the Company and, subject to the restrictions on transfer herein set forth, be binding upon Purchaser, Purchaser's successors, and assigns. The Company may assign the Repurchase Option hereunder at any time or from time to time, in whole or in part.

    **(c)    Attorneys' Fees; Specific Performance.** Purchaser will reimburse the Company for all costs incurred by the Company in enforcing the performance of, or protecting its rights under, any part of this Agreement, including reasonable costs of investigation and attorneys' fees. It is the intention of the parties that the Company, upon exercise of the Repurchase Option and payment for the Unvested Shares repurchased, pursuant to the terms of this Agreement, will be entitled to receive the Unvested Shares, *in specie*, in order to have such Unvested Shares available for future issuance without dilution of the holdings of other stockholders. Furthermore, it is expressly agreed between the parties that money damages are inadequate to compensate the Company for the Unvested Shares and that the Company will,

3

upon proper exercise of the Repurchase Option, be entitled to specific enforcement of its rights to purchase and receive the Unvested Shares.

**(d)**     **Governing Law; Venue.** This Agreement will be governed by and construed in accordance with the laws of the State of Delaware. The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement will be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing the Company's principal place of business.

**(e)**     **Further Execution.** The parties agree to take all such further action(s) as may reasonably be necessary to carry out and consummate this Agreement as soon as practicable, and to take whatever steps may be necessary to obtain any governmental approval in connection with or otherwise qualify the issuance of the securities that are the subject of this Agreement. Purchaser further agrees to execute, to the extent requested by the Company, at any time or from time to time, any agreements entered into with holders of capital stock of the Company.

**(f)**     **Independent Counsel.** Purchaser acknowledges that this Agreement has been prepared on behalf of the Company by Cooley LLP, counsel to the Company, and that Cooley LLP does not represent, and is not acting on behalf of, Purchaser in any capacity. Purchaser has been provided with an opportunity to consult with Purchaser's own counsel with respect to this Agreement.

**(g)**     **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and merges all prior agreements or understandings, whether written or oral. This Agreement may not be amended, modified or revoked, in whole or in part, except by an agreement in writing signed by each of the parties hereto.

**(h)**     **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision will be excluded from this Agreement, (ii) the balance of the Agreement will be interpreted as if such provision were so excluded and (iii) the balance of the Agreement will be enforceable in accordance with its terms.

**(i)**     **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of page intentionally left blank]*

4

The parties hereto have executed this Agreement as of _____.

**COMPANY:**

**C3.AI, INC.**

By: _____

              Name: _____

              Title: _____

Email: _____

**PURCHASER:**

_____
(Signature)

_____
Name (Please Print)

_____
Email

**Attachments:**

Exhibit A-1   Assignment Separate from Certificate
Exhibit A-2   Joint Escrow Instructions
Exhibit A-3   Form of 83(b) Election

CERTAIN IDENTIFIED INFORMATION HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO THE REGISTRANT IF PUBLICLY DISCLOSED. [***] INDICATES THAT INFORMATION HAS BEEN REDACTED.

**THIRD AMENDMENT**
**TO**
**JOINT VENTURE AGREEMENT**

THIS THIRD AMENDMENT TO JOINT VENTURE AGREEMENT (this "***Third Amendment***") is made and entered into by and between Baker Hughes Holdings LLC, f/k/a Baker Hughes, a GE company, LLC ("***BH***") and C3.ai, Inc., f/k/a C3 IoT, Inc. ("***C3.ai***") for the purposes of amending that certain Joint Venture Agreement between BH and C3.ai, effective June 6, 2019 (the "***JV Agreement***"), as previously amended by the First Amendment to Joint Venture Agreement, last dated September 26, 2019 (the "***First Amendment***") and by the Second Amendment to Joint Venture Agreement, last dated June 1, 2020 (the "***Second Amendment***"), BH and C3.ai may be collectively referred to herein as the "***Parties***."

With respect to the JV Agreement, BH and C3.ai hereby agree to the following:

1. This Third Amendment is conditioned upon, and will only become effective upon, execution by both Parties of the Third Amendment to the original May 1, 2019 Order Form between the Parties ("**OF Third Amendment**").

2. The Parties acknowledge and agree that upon execution of this Third Amendment and the OF Third Amendment, BH shall have secured the Minimum Annual Revenue Commitment Amount for Year 3 and C3.ai shall pay to BH a sales commission equal to $16,000,000 for Year 3 no later than April 30, 2022.

3. Article 1 of the JV Agreement, entitled "**Certain Definitions**," is hereby amended to include the following additional definitions:

    1.70    "***Year 6***" shall mean the period starting May 1, 2024 and ending on April 30, 2025.

4. Effective May 1, 2022, Section 1.45 of the JV Agreement, entitled "**Minimum Annual Revenue Commitment**," shall be deleted and replaced with the following:

    "**RESERVED**"

5. Section 3.2 of the JV Agreement, entitled "**Resources,**" shall be deleted and replaced with the following:

    (a) BH Sales Personnel. BH will maintain an adequate team of direct sales personnel to originate and help close commercial opportunities for C3 Offerings. The Parties will use the quarterly governance meeting as set forth in Section 7.1 below to review the appropriate BH staffing requirements. If the Parties fail to reach agreement on BH staffing requirements at the quarterly governance meeting, the BH staffing requirements shall remain at the prior quarter's levels.

    (b) C3.ai FDE Personnel. C3.ai will maintain an adequate team of forward deployed engineering personnel (pre-sales) ("FDE") that will assist BH sales team with

customer visits, meetings, demonstrations, and sales calls. The Parties will use the quarterly governance meeting as set forth in Section 7.1 below to review the appropriate C3.ai FDE to BH direct sales full-time equivalents. If the Parties fail to reach agreement on C3.ai staffing requirements at the quarterly governance meeting, the C3.ai staffing requirements shall remain at the prior quarter's levels.

6. <u>C3.ai Training</u>. At the request of BHGE, C3.ai will provide annual sales training and annual train-the-trainer services to up to sixty (60) BH sales personnel at no charge, except reasonable T&E expenses, if applicable, and will certify BH personnel to provide implementation and training to Customers. In addition, C3 will invite third party system integrators recommended by BH from time-to-time to participate in C3 AI's standard Alliance program at no charge to BH.

7. Section 4.1 of the JV Agreement is hereby deleted and replaced with the following:

4.1. <u>Marketing Plan and MDF</u>. The Parties agree to work together to develop within ninety (90) days of the Effective Date, a joint go-to-market plan ("Marketing Plan") to promote and market the C3 Offerings in the BH Field, subject to applicable antitrust and competition law. The Parties will also establish a joint market development fund ("MDF") to support the activities agreed under the Marketing Plan. Each Party agrees to contribute a minimum of [***] per contract year during the Term ("MDF Contribution") to the MDF. The MDF will be used for cooperative marketing and promotion of the C3 Offerings within the BHGE Field. The Parties agree to conduct quarterly meetings to <u>review</u> the allocation of the MDF during the subsequent quarter. The initial such meeting shall be held within ninety (90) days of the Effective Date in connection with the development of the joint go-to-market plan pursuant to this Section 4.1. Notwithstanding any other term of this Agreement, MDF Contributions shall not constitute Revenue hereunder.

In addition, commencing November 1, 2021, until the end of the Term, C3.ai will contribute up to an additional [***] to reimburse BH on an as-requested basis for business development or other sales and marketing expenses incurred in the BH Field (the "**Business Development Funds**"); provided that requests for Business Development Funds from BH may not exceed $[***] in any quarter without C3.ai's consent.

8. Effective May 1, 2022, Sections 5.1, 5.2 and 5.3 of the JV Agreement shall be deleted and replaced with the following:

"**RESERVED**"

9. Section 6.1 of the JV Agreement, entitled "C3 Applications Development" is hereby deleted and replaced with the following:

6.1. <u>C3 Applications Development</u>. C3.ai shall use commercially reasonable efforts to develop and maintain the C3 Applications for Oil and Gas listed in Exhibit E, and the Parties shall otherwise comply with their respective obligations

set forth in Exhibit E. C3.ai warrants that, during the Initial Term, C3.ai shall perform the development efforts set forth in Exhibit E in a professional and workmanlike manner in conformance with generally accepted industry standards. For any breach of a warranty above, BH's remedies shall include, without limitation to other appropriate remedies, re-performance within a reasonable period of time of any such development efforts that fail to conform to the foregoing warranty.

10. Section 7.1 of the JV Agreement, entitled "**Project Leaders**" is hereby deleted and replaced with the following:

7.1 Project Leaders. Promptly upon the Effective Date, each Party will assign an executive project leader ("Project Leader(s)") and an additional program management team to manage its internal activities and to coordinate communication between the Parties for the activities contemplated by this Agreement. Exhibit F sets forth the Project Leaders initially designated by each Party, and can be updated by either Party upon prior written notice to the other Party.

(a) Monthly meetings. Project Leaders and other members of the respective program management teams shall gather no less frequently than monthly to discuss, among other relevant matters, matters relating to the activities conducted under this Agreement and the relationship of the Parties, including, but not limited to the following: (a) any shortfalls for the development or maintenance of the C3 Applications for Oil and Gas as set forth in Section 6.1; (b) staffing requirements for BHGE's sales team as set forth in Section 3.2(a) and for C3.ai's FDEs as set forth in Section 3.2(b); (c) product roadmaps; (d) Customer satisfaction reviews; (e) reviews of Customer delivery capacity; and (f) reviews of C3 Revenue and related booking projections, (g) C3 performance against commercial proposal SLAs. The Parties will promptly identify any additional program management team members as needed and include them in such monthly meetings, as appropriate.

(b) Quarterly Business Review meetings. Project Leaders will meet with management from BH and C3.ai no less than quarterly to discuss matters related to the performance of each Party under this Agreement, including but not limited to measuring progress against key performance indicators ("KPIs") to be determined by the Project Leaders as part of the quarterly business review meetings. Potential KPIs and agreed annual targets will be determined by the Project Leaders no later than April 30, 2022, and shall include, but not be limited to, the following (subject to agreement by the Project Leaders):

    a. Customer acquisition and revenue growth annual plans in the BH Field.
    b. Customer retention.
    c. Trial conversion success in BH Field
    d. Customer satisfaction NPS in BH Field.

In the event the agreed KPIs are underperforming, C3.ai and BH will work together in good faith to identify possible root causes for underperformance and timely prepare an action plan, which shall include, but not be limited to, the following (subject to agreement by the Project Leaders):

(i)  Reprioritizing product roadmap to address product / technology gaps impacting adoption.
(ii) Offering additional training / certification for end customers to address adoption challenges.
(iii)Targeted get-well plans for at risk customers.
(iv)Investment in extended trial support to address trial shortcomings for C3 AI delivered trials.

11. Section 8.4 of the JV Agreement, entitled "**BH Technology License**" is hereby deleted and replaced with the following:

8.4 <u>BH Technology License & Feedback</u>.

(a) <u>BH Technology License</u>. BH may determine that it is in the best interests of both Parties for BH to make available to C3.ai (with C3.ai's advance consent) certain technology (including software or machine learning models) in which BH owns the Intellectual Property Rights and expressly identifies it in writing as "BH Provided Technology – Subject to the JVA License" ("<u>BH Provided Technology</u>") applicable to the BH Field in order to accelerate or improve the achievement of the objectives of this Agreement to effect the digital transformation in the BH Field. Prior to making any BH Provided Technology available to C3 AI, BH will obtain C3 AI's advance agreement to receive such BH Provided Technology. If BH makes available to C3.ai any such BH Provided Technology and C3.ai accepts receipt of such BH Provided Technology, then BH hereby grants to C3.ai a limited, non-transferable, non-sublicensable, non-exclusive, worldwide right to copy, use, modify, and distribute the BH Provided Technology, if any, solely to the extent necessary for C3.ai to satisfy C3.ai's development obligations set forth in Section 6.1. If BH makes available to C3.ai any such BH Provided Technology, C3.ai accepts receipt of such BH Provided Technology, and C3.ai subsequently wishes to use, modify or distribute the BH Provided Technology for any use or purpose outside of the above limited license (e.g., outside the BH Field), the Parties may separately negotiate an assignment or a license to such BH Provided Technology; provided that neither Party shall have any obligation to enter into any such assignment or license. For clarity, the terms of the paragraph, including any such license granted hereunder, shall be retroactive to June 6, 2019.

(b) <u>License to Use Feedback</u>. BH grants to C3.ai and its Affiliates a non-exclusive, worldwide, perpetual, irrevocable, sub-licensable, royalty-free license, without restriction, to use in any manner and incorporate into C3.ai's and/or C3.ai's Affiliates' products or services, any suggestion, enhancement request, recommendation, correction or other feedback provided by BH or its Affiliates

concerning C3.ai's or C3.ai's Affiliates' current or future products or services ("**Feedback**").  Feedback shall not include BH Technology.

12. The first sentence of Section 9.2, entitled "**Non-Use and Nondisclosure**" is hereby deleted and replaced with the following: "Each Party shall maintain the Confidential Information of the other Party in trust and confidence, including using at least those measures it uses to protect its own valuable confidential information, and shall not disclose to any third party or use any Confidential Information of the other Party for any unauthorized purpose."

13. Section 12.1 of the JV Agreement, entitled "**Term**" is hereby deleted and replaced with the following:

12.1    Term. This Agreement shall commence on the Effective Date and unless earlier terminated as set forth below, shall remain in full force and effect until April 30, 2025 (the "*Initial Term*"). The Parties shall negotiate in good faith the renewal(s) of this Agreement for additional three (3) year term(s) a minimum of six (6) months prior to the expiration of the immediately preceding term; provided that, for the avoidance of doubt, any such renewal(s) may or may not include minimum payment obligations (subject to the mutual agreement of the Parties during such negotiations) (each renewal term, if any mutually agreed, shall be referred to as the "**Renewal Term**," and together with the Initial Term, the "**Term**").

For clarity, all references in the JV Agreement to the defined terms "**Initial Term**," "**Referral Term**," and "**Term**" shall now refer to the above language.

14.  Effective May 1, 2022, Sections 12.3(a)(iii) shall be deleted and replaced with the following:

"**RESERVED"**

15. Effective May 1, 2022, Section 12.3(a)(iv) shall be deleted and replaced with the following:

Notwithstanding Section 5.1(a) in the event of any termination of this Agreement by BH pursuant to Sections 12.2, 13.9, or 13.10, BH shall have no further obligation to pay to C3 any amounts unpaid under this Agreement, the original May 1, 2019 Order Form (as amended) between the Parties, and the October 30, 2020 Order Form #3 between the Parties (as amended).

16. Effective May 1, 2022, Exhibit B-1 to the JV Agreement shall be deleted and replaced with the following:

"**RESERVED**"

17. Section 1 of Exhibit D-2 to the JV Agreement is hereby deleted and replaced with the following:

1. <u>Resale</u>.

1.1 Subject to the terms of this Section 1 of this Exhibit D-2, all C3 Offerings must be distributed subject to the terms of an agreement between BH or its Affiliate and the Customer that contains provisions no less protective of C3.ai and the C3 Offerings than those of the Trial MSSA or MSSA, as applicable. The Parties will develop a mutually agreeable process in good faith to obtain each Customer's acceptance of each such agreement. BH or its applicable Affiliate will promptly notify C3.ai in writing if it becomes aware of any suspected or actual breach of any such agreement that is applicable to C3.ai and/or the C3 Offerings, and will cooperate with C3.ai with respect to any investigation by C3.ai of any such suspected or actual breach thereof. Changes to the Trial MSSA or MSSA (as applicable) terms and conditions included in any such agreement are subject to C3.ai's approval. C3.ai shall consider in good faith any such changes requested by a Customer or BH or its Affiliate (including, if applicable, entering into an agreement based on BH's, its Affiliate's or the prospective Customer's form). C3.ai will not unreasonably withhold such approval to the extent such changes are not inconsistent, when the applicable transaction is considered as a whole, with C3.ai's past practice. If requested, C3.ai shall facilitate negotiations of an agreement with a Customer. C3.ai's obligations with regard to the C3 Offerings will be limited to the extent agreed in advance in writing by C3.ai.

1.2 Weekly Document Review

Representatives from sales leadership and sales operations from each Party shall meet on a weekly basis (unless otherwise agreed) to discuss deal progress, deal alignment and deal deliverables. The Parties shall agree to a set of qualification documents and BH shall provide C3 AI with such qualification documents for any potential deals in advance of the weekly sales meeting. The Parties shall agree at such weekly sales meeting, among other things, to categorize each deal as Type 1, Type 2 or Type 3 pursuant to Table 1 below. [***] In the event C3 fails to respond timely to a Type 3 pricing or proposal request, the matter shall be immediately escalated to the Project Leaders for resolution and the Parties will work cooperatively and in good faith to promptly resolve such issue.

Table 1:

| Type 1 | Type 2 | Type 3 |
|---|---|---|
| [***] | [***] | [***] |

2. Section 2.2 of Exhibit D-2 to the JV Agreement is hereby deleted and replaced with the following:

Prices for C3 Offerings ordered by BH or its applicable Affiliate under this Agreement for resale to Customers and payable to C3.ai by BH or such applicable Affiliate (the **"C3.ai Reseller Price"**) shall be as follows:

[***]

BH's or such applicable Affiliate's payments to C3.ai of the C3.ai Reseller Price is not contingent on BH's or such applicable Affiliate's collection from Customers except where BH's collection is contingent on a milestone, KPI or other contingency (with respect to Specified Offerings only). BH and its Affiliates may request a discount to the C3 Price List from time-to-time with respect to prospective Customers. [***]

3. Exhibit E to the JV Agreement, entitled "**Development**," is hereby deleted and replaced in its entirety by the restated Exhibit E, attached hereto as <u>Exhibit B</u>.

4. Exhibit F to the JV Agreement, entitled "**Alliance Management**," is hereby deleted and replaced in its entirety by the restated Exhibit F, attached hereto as <u>Exhibit C</u>.

5. Except as expressly provided herein, the terms and conditions of the JV Agreement are unaltered and remain in full force and effect.

6. This Third Amendment shall be interpreted and construed, and the legal relationships created hereby shall be construed in accordance with the laws of the State of Delaware (USA), without regard to its conflicts of law principles. The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded. In the event that any dispute, claim or controversy arising out of or relating to this Third Amendment or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Third Amendment to mediation or arbitration, exists after the process set forth in Section 7 of the JV Agreement has been completed, the Parties shall refer the dispute, claim or controversy to proceedings under the International Chamber of Commerce (ICC) Mediation Rules (the "**Rules of Mediation**"), to be conducted in San Francisco, California. If any such dispute has not been settled pursuant to the Rules of Mediation within sixty (60) days following the filing of a request for mediation, such dispute, claim or controversy shall thereafter be determined pursuant to the Rules of Arbitration of the International Chamber of Commerce (the "**Rules of Arbitration**") by three arbitrators appointed in accordance with the Rules of Arbitration, which arbitration shall be held in San Francisco, California. Judgement on the award may be entered in the Federal and state courts located in San Francisco, California. This paragraph shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Each of the Parties hereby consents to service of process by registered mail, return receipt requested, at such Party's address. All offers, promises, and conduct, whether oral or written, made in the course of the issue resolution pursuant to Section 7 of the JV Agreement by the Parties or their agents are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding, provided that evidence that is otherwise admissible or discoverable

shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

**In Witness Whereof**, each of the Parties hereto has duly executed this Third Amendment to the JV Agreement as of the last date set forth below.

**C3.ai, Inc. (f/k/a C3 IoT, Inc.)    Baker Hughes Holdings LLC
(f/k/a Baker Hughes, a GE company, LLC)**


/s/ Richard J. Lutton, Jr.      /s/ Dan Brennan
Signature              Signature

Richard J. Lutton, Jr.      Dan Brennan
Name               Name

SVP and General Counsel      VP, Operations
Title               Title

October 31, 2021      October 31, 2021
Date               Date

**EXHIBIT A**

RESTATED EXHIBIT E

**EXHIBIT E**

Development

1.   Development Roadmap

1.1. C3.ai will use commercially reasonable efforts to develop and maintain the C3 Reliability™ for Oil and Gas pursuant to the Product Statement of Direction attached as Appendix E-1 hereto; provided that, at BH's request and upon mutual agreement (not to be unreasonably withheld, conditioned or delayed), the Parties may swap out one or more features for features of a comparable scope, prior to the start of a product specification of a feature.

1.2. C3.ai will use commercially reasonable efforts to develop and maintain the C3 Production Optimization™ for Oil and Gas pursuant to the Product Statement of Direction attached as Appendix E-2 hereto; provided that, at BH's request and upon mutual agreement (not to be unreasonably withheld, conditioned or delayed), the Parties may swap out one or more features for features of a comparable scope, prior to the start of a product specification of a feature.

1.3. In addition, by April 30, 2021, C3.ai will deliver [***] new features to be agreed no later than February 28, 2020, as part of a joint roadmap planning session. Each new feature shall be comparable in scope to a feature agreed prior to April 30, 2020.

1.4. By April 30, 2022, C3.ai will deliver [***] new features to be agreed no later than February 28, 2021, as part of a joint roadmap planning session. Each new feature shall be comparable in scope to a feature agreed prior to April 30, 2020.

1.5. By April 30, 2023, C3.ai will deliver [***] new features to be agreed no later than February 28, 2022, as part of a joint roadmap planning session. Each new feature shall be comparable in scope to a feature agreed prior to April 30, 2020.

1.6. By April 30, 2024, C3.ai will deliver [***] new features to be agreed no later than February 28, 2023, as part of a joint roadmap planning session. Each new feature shall be comparable in scope to a feature agreed prior to April 30, 2020.

1.7. By April 30, 2025, C3.ai will deliver [***] new features to be agreed no later than February 28, 2024, as part of a joint roadmap planning session. Each new feature shall be comparable in scope to a feature agreed prior to April 30, 2020.

1.8. C3.ai and BH will meet and prioritize a joint roadmap every 3 months during the Initial Term, to prioritize the features for subsequent releases of these software products. This meeting will include the executive sponsors, product, customer service, and sales leadership. C3 Product Manager shall define the functional and non-functional requirements for C3 features driven by BHC3 Go To Market priorities or customer feedback. Baker Hughes "product owner" shall define the functional and non-functional requirements for C3 features driven by BH Digital Priorities. Baker Hughes product owner and the C3 Product Manager shall jointly review functional and non-functional requirements to reach a shared understanding of the feature requirements.

1.9. C3.ai will train and enable BH (and potentially other) domain experts to provide high-end domain analytic services to Customers. These analytics should periodically be reviewed for potential generalization and future product roadmap.

2. Delivery and Governance

2.1 Each new feature described in Sections 1.3 to 1.7 above shall only be considered delivered upon completion of all requirements set forth in the applicable feature requirements (as determined in accordance with Section 1.8 above), including, without limitation, the provisioning of all UAT Tasks (as that term is defined below) and correction of all non-compliant (in the reasonable determination of the Parties) items identified in a mutually agreed UAT (as that term is defined below). Within 5 days of receipt of any new feature, BH will notify C3.ai in writing if BH reasonably determines that such new feature fails to meet the requirements set forth in the feature specification,

and upon receipt of such notice, C3.ai will use commercially reasonable efforts to correct the same within a reasonable period of time as specified by the Parties.

Notwithstanding the foregoing, the new feature will be considered delivered while C3.ai corrects any non-compliant items under the applicable UAT, provided that no such corrections are Significant Issues (as defined below).

"**Significant Issues**" means P0 and P1 Defect Levels, as set forth in the table below:

| Defect Level | Defect Definition |
|---|---|
| P0 | Critical – Application does not start and no workaround. |
| P1 | Significant – unavoidable errors in an application causing significant loss of functionality with no workaround |

"**UAT Tasks**" shall mean and include the following:

- Creation and provision of a technical specification document that summarizes the features, UI, data, and machine-learning pipelines used to configure the application or demo (where applicable), including specifications for:
  - Implementation of canonical data model modifications to handle the new datasets.
  - Loading of data (and whether applicable data sets are historical and incremental anonymized, representative, and/or Customer data).
  - Configuration of the BHC3 Application to present the in-scope data through the User Interface.
  - Tuned machine-learning models, as needed, using the in-scope data.

- Creation of a jointly agreed upon System, Integration and User Acceptance Test ("UAT") test plan for the feature, including documenting the test plan, test cases, data used to execute the test cases, timelines, and user acceptance testing procedure by BH of the feature to ensure compliance with the UAT test plan. The UAT test plan may be further modified with agreement between both Parties. Any items of noncompliance against the UAT test plan will be logged as a defect, of which Significant Issues must be resolved before the feature is considered completed.

- Develop feature documentation and training content.

2.2 Product Marketing.

C3 AI shall update (and with respect to new products, develop and deliver) product collateral and demos (in a C3 AI-hosted environment) within 3 months of feature release, including but not limited to:
  a. Product sales presentation
  b. Product eBook
  c. Product FAQ
  d. Product explainer video/web-friendly demo video
  e. Product-focused blogs/technical editorials
  f. Competitive analysis
  g. Customer case studies, once deployed at end customer
  h. Product data sheets
  i. Product web copy

2.3 Governance. To review progress being made and to ensure tight alignment, BH will review the status and deliverables with respect to each new feature with key C3.ai leaders in workshops and steering committee meetings on a weekly basis. If BH raises a concern (email is sufficient) about C3.ai's performance, the Parties shall work cooperatively and in good faith to promptly resolve the issue after receipt of written notice thereof.

3. Professional Services

3.1. C3.ai will manage a C3.ai professional services and data science team and/or with third-party partners to collaboratively deliver use-cases as set forth in statement(s) of work with Customer(s). A use-case can be a custom development project or an implementation of an existing product or early feature development.

3.2. C3.ai will work with system integrators and other relevant partners to provide service capabilities in the appropriate locations to create custom workflows and use cases for Customers. These custom workflows and use

cases should periodically be reviewed with BH for potential generalization and incorporation into the C3.ai product roadmap.

CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a)
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Thomas M. Siebel, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of C3.ai, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 1, 2021                    By:        /s/ Thomas M. Siebel

                                                     Thomas M. Siebel
                                                     Chief Executive Officer and Chairman of the Board of Directors
                                                     *(Principal Executive Officer)*

CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a)
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, David Barter, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of C3.ai, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 1, 2021    By:    /s/ David Barter
                                  David Barter
                                  Senior Vice President and Chief Financial Officer
                                  *(Principal Financial Officer and Principal Accounting Officer)*

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Thomas M. Siebel, Chairman and Chief Executive Officer of C3.ai, Inc. (the "Company"), do hereby certify, to the best of my knowledge and pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

   a.   the Quarterly Report on Form 10-Q of the Company for the period ended October 31, 2021, to which this Certification is attached as Exhibit 32.1 (the "Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

   a.   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: December 1, 2021          By:        /s/ Thomas M. Siebel
                                           Thomas M. Siebel
                                           Chief Executive Officer and Chairman of the Board of Directors
                                           *(Principal Executive Officer)*

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002**

I, David Barter, Senior Vice President and Chief Financial Officer of C3.ai, Inc. (the "Company"), do hereby certify, to the best of my knowledge and pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

a.   the Quarterly Report on Form 10-Q of the Company for the period ended October 31, 2021, to which this Certification is attached as Exhibit 32.2 (the "Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

b.   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: December 1, 2021                                    By:        /s/ David Barter
                                                                                   David Barter
                                                                                   Senior Vice President and Chief Financial Officer
                                                                                   *(Principal Financial Officer and Principal Accounting Officer)*