Harry A. Olivar, Jr. (Cal. Bar No. 143089)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
harryolivar@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
David Myre (Cal. Bar No. 304600)
Jesse Bernstein (admitted *pro hac vice*)
Jacob J. Waldman (admitted *pro hac vice*)
Leigha Empson (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
davidmyre@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for the C3 Defendants*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST,<br><br>           Plaintiff,<br><br>      vs.<br><br>C3.AI, INC., et al.,<br><br>           Defendants. | Case No. 4:22-cv-01413-HSG<br><br>**THE C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Judge:  Hon. Haywood S. Gilliam, Jr.<br>Courtroom:  2, 4th Floor<br>Hearing Date:  November 2, 2023<br>Hearing Time:  2:00 p.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     PLAINTIFFS HAVE FAILED TO PLEAD SECURITIES ACT CLAIMS ...................... 2

    A.     Plaintiffs Do Not Plead an Actionable Misrepresentation or Omission.................. 2

        1.     General Statements About C3's Partnership with Baker Hughes ................ 2

        2.     Statement Acknowledging the Size of Baker Hughes' Sales Force.............. 3

        3.     Statement About Revenue from the Baker Hughes Partnership ................... 4

    B.     Plaintiffs Have Not Pleaded Violations of Item 105 or Item 303 ............................ 6

    C.     The Statute of Limitations Bars Plaintiffs' New Securities Act Allegations............ 8

II.    PLAINTIFFS HAVE FAILED TO PLEAD EXCHANGE ACT CLAIMS ........................ 9

    A.     Plaintiffs Have Failed To Plead an Actionable Misrepresentation or
        Omission................................................................................................................. 9

        1.     Statements Regarding Baker Hughes' 12,000-Person Sales Force.............. 9

        2.     Alleged Failure to Disclose Internal Restructuring.................................... 12

        3.     General Statements About C3's Partnership with Baker Hughes .............. 13

    B.     Plaintiffs Have Failed to Plead a Strong Inference of Scienter............................... 14

        1.     Plaintiffs Have Failed to Plead Intent to Defraud ...................................... 14

        2.     Plaintiffs Have Not Adequately Alleged Motive ........................................ 19

    C.     Plaintiffs Have Failed to Plead Loss Causation ...................................................... 21

        1.     A Materialization of the Risk Theory Is Not Viable in This Circuit........... 21

        2.     Plaintiffs Have Failed to Plead Losses Sufficiently Connected to the
        Alleged Corrective Disclosures.................................................................. 22

    D.     Plaintiffs Have Failed to Plead a Section 20A Claim ............................................. 23

III.   PLAINTIFFS HAVE FAILED TO PLEAD CONTROL PERSON LIABILITY .............. 24

CONCLUSION ................................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ........................................................................................ 22

*In re AST Research Sec. Litig.*,
  887 F. Supp. 231 (C.D. Cal. 1995) .............................................................................. 23

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ....................................................................... 24

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ......................................................................... 16

*Avila v. Bank of Am.*,
  2017 WL 4168534 (N.D. Cal. Sept. 20, 2017) ........................................... 4, 11, 15, 24

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  566 F. App'x 93 (2d Cir. 2014) .................................................................................... 15

*Belodoff v. Netlist, Inc.*,
  2008 WL 2356699 (C.D. Cal. May 30, 2008) .............................................................. 13

*Brady v. Delta Energy & Commc'ns, Inc.*,
  2023 WL 2683203 (C.D. Cal. Jan. 25, 2023) ................................................................ 9

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .............................................................................. 3, 6, 11, 23

*Buban v. O'Brien*,
  1994 WL 324093 (N.D. Cal. June 22, 1994) ............................................................... 23

*In re Canandaigua Sec. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996) .............................................................................. 7

*CheckOut Holdings, LLC v. Amplified Holdings, Inc.*,
  64 F. App'x 631 (9th Cir. 2003) ................................................................................... 17

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 827 (N.D. Ill. 2000) ...................................................................... 19, 20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ....................................................................................... 19

*In re Clearly Canadian Sec. Litig.*,
  875 F. Supp. 1410 (N.D. Cal. 1995) ............................................................................ 12

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

*Colyer v. AcelRx Pharms, Inc.*,
   2015 WL 7566809 (N.D. Cal. Nov. 25, 2015).................................................................18

*Curry v. Yelp Inc.*,
   2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ..................................................................19

*Curry v. Yelp Inc.*,
   2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir.
   2017)..................................................................................................................................11

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005)......................................................................................5, 17

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ...........................................................................23

*In re Eventbrite Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ..............................................................6, 14

*In re Facebook, Inc. Sec. Litig.*,
   477 F. Supp. 3d 980 (N.D. Cal. 2020) ..............................................................................8

*Fadia v. FireEye, Inc.*,
   2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)..................................................................19

*In re Fastly, Inc. Sec. Litig.*,
   2021 WL 5494249 (N.D. Cal. Nov. 23, 2021)..................................................................13

*Fisher v. Nissel*,
   2022 WL 16961479 (C.D. Cal. Aug. 15, 2022) ..................................................................6

*In re FVC.COM Sec. Litig.*,
   32 F. App'x 338 (9th Cir. 2002)......................................................................................15

*Gaylinn v. 3Com Corp.*,
   185 F. Supp. 2d 1054 (N.D. Cal. 2000) ...........................................................................17

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008)............................................................................................14

*Haltman v. Aura Systems, Inc.*,
   844 F. Supp. 544 (C.D. Cal. 1993)...................................................................................25

*Hampton v. Aqua Metals, Inc.*,
   2020 WL 6710096 (N.D. Cal. Nov. 16, 2020).....................................................................3

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)...................................................................23

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .................................................................. 6, 7

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ................................................................................ 25

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ...................................................................... 13

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) .............................................................................. 19, 20

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ................................................................................ 10

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*,
    2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ........................................................... 18

*Irving Firemen's Relief & Ret. Fund v. Uber Tech.*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ........................................................... 12

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016) .................................................................. 18

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .............................................................. 3

*Kairalla v. Adv. Med. Optics, Inc.*,
    2008 WL 2879087 (C.D. Cal. June 6, 2008) ................................................................. 4

*Karri v. Oclaro, Inc.*,
    2020 WL 5982097 (N.D. Cal. Oct. 8, 2020) .............................................................. 13

*Khoja v. Orexigen Therapeutics, Inc.*,
    498 F. Supp. 3d 1296 (S.D. Cal. 2020) ..................................................................... 22

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................................... 5

*Lilley v. Charren*,
    936 F. Supp. 708 (N.D. Cal. 1996) .......................................................................... 25

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    437 F.3d 588 (7th Cir. 2006) .............................................................................. 11, 17

*Markette v. XOMA Corp.*,
    2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ........................................................... 10

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................. 7, 12

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................................. 14, 15, 20

*Muertos Roasters, LLC v. Schneider*,
  2022 WL 3908432 (E.D. Cal. Aug, 30, 2022) ............................................................. 6

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. July 13, 2020) ............................................................ 18

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) .................................................................................. 6, 9

*In re Nextcard, Inc. Sec. Litig.*,
  2006 WL 708663 (N.D. Cal. Mar. 20, 2006) ............................................................ 25

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018) ................................................................. 21, 22

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) ............................................................................ 21, 22

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir.
  2014) ................................................................................................................ 15, 17

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) .............................................................................. 16

*Osher v. JNI Corp.*,
  256 F. Supp. 2d 1144 (S.D. Cal. 2003) ..................................................................... 20

*Pardi v. Tricida, Inc.*,
  2022 WL 3018144 (N.D. Cal. July 29, 2022) ............................................................ 20

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) .................................................................................... 10

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. May 22, 2012) ........................................................... 11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ............................................................................ 17, 18

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) .................................................................................. 21

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .................................................................................. 10

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ..................................................................................... 16

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019) ..................................................................... 3

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012), C3 ......................................................................... 4, 13

*Rihn v. Acadia Pharm. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ........................................................ 18

*S.E.C. v. Todd*,
   642 F.3d 1207 ........................................................................................................... 24

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................. 18, 23

*Sgarlata v. Paypal Holdings, Inc.*,
   2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ........................................................ 24

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) .................................................................................... 7

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .................................................................................... 17

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ........................................................ 10

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ...................................................................................... 6

*Swartzendruber v. Colony Capital, Inc.*,
   2020 WL 7754008 (C.D. Cal. Dec. 10, 2020) ........................................................ 15

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 1044 (N.D. Cal. 2016) ......................................................... 25

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) .................................................... 21, 22

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) ..................................................................... 15

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ........................................................................................ 8

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ....................................................................... 20

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

*In re Wet Seal, Inc. Sec. Litig.*,
     518 F. Supp. 2d 1148 (C.D. Cal. 2007)......................................................................... 14

*Williams v. Boeing Co.*,
     517 F.3d 1120 (9th Cir. 2008)..................................................................................... 8

*In re Worlds of Wonder Sec. Litig.*,
     35 F.3d 1407 (9th Cir. 1994)....................................................................................... 14

*Wozniak v. Align Tech., Inc.*,
     850 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................................... 16

*Zaghian v. Farrell*,
     675 F. App'x 718 (9th Cir. 2017)............................................................................... 10

*Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981 (9th Cir. 2009)................................................................................. 5, 19

**<u>Statutes and Rules</u>**

Rule 9(b)................................................................................................................................. 2, 5

Case No. 4:22-cv-01413-HSG

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

**INTRODUCTION**

The Opposition confirms what the Motion established:  Plaintiffs fail to plead a single false statement, fraudulent intent, or that Defendants caused C3's stock price to fall.  Recognizing these deficiencies, the Opposition scrambles to add facts, including five *new* exhibits (two of which were published *after* the Complaint), and a host of previously unpleaded information contained in new appendices.  This alone confirms that the Complaint cannot stand on its own.  Indeed, Plaintiffs have already begun to back away from their claims by dismissing the underwriter defendants and the Securities Act claims against Abbo and Baker Hughes.

The Court should dismiss all remaining claims for the following reasons:

*First*, Plaintiffs do not identify a single false statement.  The vast majority of the alleged misstatements—particularly concerning C3's access to Baker Hughes' 12,000-person salesforce—are obvious puffery and hyperbole; reasonable investors would take them, at most, as illustrating the value that access to Baker Hughes' customer base could bring (and has, in fact, brought) to C3, and not as a *literal* claim that all 12,000 Baker Hughes salespeople were selling C3 products.  And other statements in C3's SEC filings regarding the C3/Baker Hughes partnership and size of Baker Hughes' salesforce are not even alleged to be false.  Nor can Plaintiffs base a securities fraud claim on C3's supposed failure to disclose the structuring or restructuring of sales teams, which would—contrary to settled securities law—require companies to disclose every ordinary corporate decision and drown investors in immaterial information.

*Second*, Plaintiffs offer no facts suggesting anyone intended to (or did) mislead C3's investors about anything.  Plaintiffs instead ask the Court to infer wrongful intent from stock sales that occurred shortly after the expiration of the post-IPO lock-up period—precisely when an investor would expect insiders to sell.  Regardless, Plaintiffs cannot demonstrate that Class Period sales were unusual without comparing them to Defendants' pre-Class Period sales history—which does not exist because the Class Period begins *at the IPO*.  Nor can Plaintiffs base their claims on sales pursuant to 10b5-1 plans.  Plaintiffs also fail to plead deliberate recklessness—the Complaint asserts Defendants had information contrary to their public statements, but fails to allege what it was.

*Third*, Plaintiffs do not plead loss causation, as the Complaint fails to identify any disclosure

that corrected a prior purported misstatement and resulted in a decline in C3's stock price—the necessary "corrective disclosure." The Opposition instead falls back on a theory that some concealed risk materialized and caused the loss. But the Ninth Circuit does not recognize this theory of loss causation (indeed, Plaintiffs rely almost entirely on Second Circuit authority)—and even if it did, Plaintiffs have failed to identify a *concealed* risk that materialized. Nor have Plaintiffs articulated support for the novel theory that Defendants' stock sales—the likelihood of which was disclosed in the Registration Statement—could constitute corrective disclosures.

*Fourth*, even considering the brand new facts Plaintiffs include in the Opposition, Plaintiffs fail to allege that Defendants traded on inside information to the disadvantage of Plaintiffs.

*Finally*, Plaintiffs cannot sustain their control person claims simply by alleging Defendants' positions at the Company or their "involved" management style (whatever that might mean). Courts routinely dismiss claims based on such allegations, and the same is warranted here.

## ARGUMENT

### I.   PLAINTIFFS HAVE FAILED TO PLEAD SECURITIES ACT CLAIMS

The Opposition *does not dispute* that Plaintiffs' Section 11 claim sounds in fraud, making it subject to Rule 9(b)'s heightened pleading standard. Mot. 8-9. But Plaintiffs fail to plead with particularity that any Defendant made a materially misleading statement or omission.

#### A.   Plaintiffs Do Not Plead an Actionable Misrepresentation or Omission

The Opposition lumps together the purported misstatements—which Defendants took care to address individually (*see* ECF No. 105-1)—confirming that none supports a fraud claim.

##### 1.   General Statements About C3's Partnership with Baker Hughes

Plaintiffs argue C3 misled the market with statements that: (i) C3's "alliances vastly extend [C3's] reach globally," (ii) C3's strategy with its partners "is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate," and (iii) C3 has "done this with [its] strategic vertical industry partner in oil and gas, Baker Hughes." Statement #1 (¶ 74). Plaintiffs claim these statements created the "impression that a large salesforce from Baker Hughes was engaged in selling C3" and because "given the limited nature of the Baker Hughes salesforce selling C3 product[s]," C3 did not actually extend its sales reach. Opp. 21.

As detailed in the Motion, Plaintiffs do not establish that these statements were false. Mot. 9-11. The Complaint does not allege that the Baker Hughes partnership *did not* extend C3's reach or that the partnership did not demonstrate "the value" of C3's AI Suite. Indeed, the challenged statements make no representation about Baker Hughes' salesforce whatsoever, much less the number of salespeople selling C3 products or the revenues brought in through the Baker Hughes partnership. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statement not actionable where it does not create an impression of a state of affairs that differs from reality); *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019) (allegations that statements are misleading because "efficacy" of a strategy is questioned do not allege falsity). In any event, the substantial revenue generated by the Baker Hughes partnership—which Plaintiffs do not dispute—demonstrates the truth of these statements. *See* Mot. 19; *see also infra* at § I(A)(3).

Moreover, statements about "prov[ing] the value" of C3's products and extending C3's reach qualify as routinely-dismissed puffery. Mot. 10-11. The Opposition does not distinguish the authority cited in the Motion, arguing only that the statements in those cases were somehow less "specific" than those alleged here. But Plaintiffs offer no reason why C3's statements that the Baker Hughes partnership would "prove the value" of C3's products or "extend" C3's reach would have been viewed by investors as more specific than statements that a partnership would have a "meaningful revenue impact" by a specific date, *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *13 (N.D. Cal. Apr. 27, 2017), or was "strong validation" of a company's products, *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *13 (N.D. Cal. Nov. 16, 2020) (Gilliam, J.).

**2.      Statement Acknowledging the Size of Baker Hughes' Sales Force**

The Motion makes clear that Statement #2 (¶ 75), a general assertion that C3 had the assistance of "Baker Hughes, which has a 12,000 person sales organization," could not have led a reasonable investor to believe that *every single* Baker Hughes sales person was selling C3 products. Mot. 11. Statement #2 merely notes the size of Baker Hughes' salesforce—which the Complaint does not allege to be inaccurate. The Opposition argues that this statement "created an impression that the full 12,000-person Baker Hughes salesforce" was selling C3 products (Opp. 20), but then effectively concedes that this is speculation not based on the actual statement by contending it would

cause investors to believe that "some *meaningful part* of that salesforce"—*i.e. not* all 12,000 people—was "selling C3 products." *Id.* (emphasis added).  But the Complaint does not allege how many Baker Hughes salespeople were selling C3 products, much less that the number was not "meaningful."  *See Kairalla v. Adv. Med. Optics, Inc.*, 2008 WL 2879087, at *4 (C.D. Cal. June 6, 2008); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (no liability even where "investors would consider the omitted information significant," as long as "the omissions do not make the actual statements misleading").[1]

### 3. Statement About Revenue from the Baker Hughes Partnership

Plaintiffs' allegations concerning Statement #3—that "during the fiscal year ended April 30, 2020, [C3] recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement"—rely entirely on a single, poorly-pleaded Confidential Witness ("FE-1").  Mot. 13.  The Opposition does not offer substantive legal argument or authority as to how FE-1 supports Plaintiffs' claim, but merely reasserts that FE-1 overheard that Baker Hughes brought in no deals as of April 2020.  Opp. 23.

The allegations around FE-1 remain wholly insufficient.  The Company's reported revenue consistently reflected revenue from deals brought in by Baker Hughes and contradicts FE-1's three-year-old hearsay.  For example, C3's 2022 Form 10-K shows that C3 generated over $5.9 million in revenue from Baker Hughes deals in the fiscal year ending April 30, 2020.  Mot. Ex. E at 126 (showing $5.929 million for "[t]otal revenue from certain customers in Oil and Gas field related to the Baker Hughes arrangement").  Plaintiffs have never alleged that the revenue figures in the 2022 Form 10-K—presented in *audited* financials—are inaccurate.

The Opposition does not dispute the veracity of the Form 10-K revenue figures, but instead asks the Court not to consider them because they conflict with FE-1's alleged testimony and thus

---

[1] C3 disclosed that Baker Hughes may not "prioritize or provide adequate resources" toward selling C3 products.  *See* Mot. Ex. B at 22.  The Opposition, for the first time, asserts that the risk disclosures were misleading (Opp. 20), but "Plaintiff cannot amend his complaint with arguments made in his opposition."  *Avila v. Bank of Am.*, 2017 WL 4168534, at *5 (N.D. Cal. Sept. 20, 2017) (Gilliam, J.).  Regardless, Plaintiffs do not plead that the risk—*i.e.*, Baker Hughes *was not* providing adequate resources toward selling C3 products—had materialized at the time of the Registration Statement.

"serve to dispute facts stated in a well-pleaded complaint." Opp. 23 (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018)). That argument is backwards. The Court must first decide whether the Complaint includes adequate facts to call the reported revenue numbers into question. It does not for several reasons.

*First*, Plaintiffs fail to allege any facts establishing that FE-1 had personal knowledge of Baker Hughes' sales. *See infra*; *see also* Mot. 13. The Complaint alleges that FE-1 worked at C3 for just two months during the fiscal year ending April 30, 2020, and includes no allegations about FE-1's duties or direct involvement with Baker Hughes. Mot. 13; *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-1000 (9th Cir. 2009) (confidential witnesses were "simply not positioned to know the information alleged" and relied on "vague" and "unreliable" hearsay). The Opposition underscores the unreliable nature of FE-1's allegations by asserting that FE-1 worked at the Company from "*at least*" March to May 2020, to suggest he *may* have been at the Company longer—illustrating the Complaint's lack of even basic information about FE-1. Regardless, Plaintiffs plead without any specificity that, at best, FE-1 worked at C3 for a couple of months. Plaintiffs are thus also incorrect that it is "plausible that [FE-1] would have heard comments about Baker Hughes' performance during the full fiscal year" (Opp. 25), as they fail to plead FE-1 was present during that time period. Moreover, hearsay assertions attributed to a thinly-sketched confidential witness do not approach the specificity required under Rule 9(b)—to which *all* of Plaintiffs' claims are subject—and the Court should reject speculation about FE-1's uncorroborated hearsay. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

*Second*, the Ninth Circuit's decision in *Khoja* does not preclude the Court from considering C3's revenue reporting. There, the Court refused to judicially notice a narrow set of records because "there [was] a reasonable dispute as to what" each document established because they contained conflicting statements. 899 F.3d at 1000-01. In any event, *Khoja* stands only for the proposition that "well-pleaded" allegations cannot be challenged with documents subject to judicial notice. *Id.* As described above, the allegation that Baker Hughes brought in no deals is not well-pleaded. Accordingly, substantial post-*Khoja* authority provides that a court "is not required to 'accept as true allegations that contradict matters properly subject to judicial notice,'" which of course includes

the 2022 10-K, the veracity of which Plaintiffs do not dispute. *Muertos Roasters, LLC v. Schneider*, 2022 WL 3908432, at *2 (E.D. Cal. Aug, 30, 2022) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)); *see also Fisher v. Nissel*, 2022 WL 16961479, at *4 (C.D. Cal. Aug. 15, 2022). Defendants further address this issue in the C3 Defendants' Request for Judicial Notice (ECF No. 105-2) and the reply in support that accompanies this brief.

Even putting aside the 2022 Form 10-K, Plaintiffs have failed to plead that Statement #3 was material. Baker Hughes' contractual commitments guaranteed a level of income even absent sales, and Plaintiffs acknowledge that "Baker Hughes is required to make up the shortfall in revenue by paying out of pocket, if it cannot bring in a specific minimum number of deals." Opp. 24. Plaintiffs appear to assert (again for the first time in the Opposition) that there is a material difference between revenue "from deals brought in from Baker Hughes" and revenue from Baker Hughes' minimum spend requirement[2] (*id.*), but do not articulate what that material difference is, particularly given Plaintiffs' assertions that investors focused primarily on revenue and remaining performance obligation ("RPO"). *See e.g.,* ¶¶ 13, 61, 173-75, 180-83, 195-96, 198. Thus, even if Statement #3 was inaccurate (it was not), it did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *see also In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836 (9th Cir. 2022) (statement immaterial where plaintiff did not allege "why an investor's assessment . . . would have changed").

**B.    Plaintiffs Have Not Pleaded Violations of Item 105 or Item 303**

The Motion made clear that neither Baker Hughes' supposedly less experienced salesforce, nor the Baker Hughes partnership structure, are "known trends or uncertainties" under Items 105 and 303. Mot. 13-16. The Opposition relies on easily distinguished authority where the relevant partnership was falling apart. Opp. 47-49. For instance, in *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), which involved a different Baker Hughes partnership, the Court found no obligation to disclose partnership issues where "[t]he [recent] contract

---

[2] Plaintiffs fall back on arguing that Statement #3 created the "misimpression that C3's offerings were in high demand." Opp. 23. Plaintiffs' strained reading fails; the statement conveyed nothing about demand for C3's offerings. *In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (insufficient connection between allegedly omitted facts and statement).

negotiation . . . had resulted in a longer-term agreement; Baker Hughes was at that time meeting its purchase obligations; and [the company] had no reason to imagine that Baker [Hughes] would take a contractually insupportable position about the terminability of the contract." *Id.* at \*11-12. Not until Baker Hughes *repudiated* that partnership agreement did the Court find a duty to disclose. *Id.* at 12-13. Here, Plaintiffs take issue only with the structure of the Baker Hughes partnership; they do not claim it was disintegrating or had been repudiated. In fact, Plaintiffs admit Baker Hughes "honored their contract" by meeting payment obligations. Opp. 24. *Hi-Crush* is inapplicable.

Plaintiffs also claim Baker Hughes was "using a small separate salesforce without Baker Hughes' typical connections or experience[,]" and therefore Baker Hughes "made no sales under the partnership." Opp. 47. But, these sorts of alleged "sales strategy failures" do not require disclosure. *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054-55 (N.D. Cal. 2019) (no disclosure required for "sales strategy failures" resulting from "replace[ment] [of] knowledgeable, experienced sales personnel and implement[ation] [of] cost-cutting measures that left the sales organization understaffed and ill-equipped to service existing customers to develop new opportunities"); *see also In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1210-11 (S.D.N.Y. 1996) (noting "competitive business judgment that management makes to improve the business," such as "competitive marketing strategies and plans," "need not be disclosed").

C3 also disclosed risks related to the Baker Hughes arrangement. Mot. 14-15 (citing authority); *see also* Mot. Ex. B. at 22 ("We cannot be certain that [Baker Hughes] will prioritize or provide adequate resources to selling our AI Suite and AI Applications."). Plaintiffs point to *Siracusano* to argue that disclosures of "abstract risks that have already materialized" are "misleading." Opp. 48 (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009)). But *Siracusano* is silent as to affirmative disclosure requirements under Items 105 and 303. *Id.* (concluding defendant "was aware" of undisclosed problem at the time of SEC filing). Critically, the deficient scienter allegations doom the Item 105/303 claims. Mot. 14 n.9. Plaintiffs do not even allege what risks or "negative impacts" (Opp. 48) had "materialized" at the time of the Registration Statement, or that C3 did not believe Baker Hughes was dedicating adequate resources to C3.

The Opposition also attempts improperly to advance several previously unpleaded

allegations to try to bolster Plaintiffs' Item 105 and 303 claims. Plaintiffs assert that "investors would have a reasonable expectation that C3 would exceed its sales minimum," that "investors would find revenue generated by new sales and revenue generated due to a negotiated floor to be materially different," and that as a result, C3 "misled investors regarding the market demand for C3's product." Opp. 49. The Court should disregard these new allegations because "[i]t is well established that a complaint may not be amended by briefs in opposition to a motion to dismiss." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1020 (N.D. Cal. 2020). Further, the attempted additions fail to rise beyond "unwarranted inference[s]" because Plaintiffs identify no disclosures or statements referring to expectations for the volume of Baker Hughes' sales to third parties. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993) ("Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").

### C. The Statute of Limitations Bars Plaintiffs' New Securities Act Allegations

Plaintiffs' Securities Act claims against Abbo and certain alleged misstatements in the Registration Statement (#2, #3) are time barred. *See* Mot. 16-17. Plaintiffs partially concede this point by voluntarily dismissing the Securities Act claims against Abbo and Baker Hughes (Opp. 47 n.16). Nonetheless, Plaintiffs argue that claims arising from Statements #2 and #3 are timely because they relate back to the initial complaint, which includes statements "about C3's relationship with Baker Hughes." Opp. 49-51. Under Ninth Circuit law, it is not enough that statements may relate generally to the same partnership. Instead, claims relate back only if "plaintiff will rely on the same evidence to prove each claim." *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *see* Mot. 16-17. As Plaintiffs concede (Opp. 50), the initial complaint rested on allegations of flawed accounting, a deteriorating partnership, salesforce turnover, and a misstated "total addressable market" (ECF No. 1 ¶ 66).[3] It did not allege that Statements #2 and #3 were misleading,

---

[3] Plaintiffs' new Appendix D (ECF No. 119-4) underscores that the initial complaint identified no statements concerning the size of Baker Hughes' salesforce, and did not claim that the statement about deals brought in by Baker Hughes was false or misleading—it was included only as part of a Registration Statement excerpt that spanned seven pages (ECF No. 1 at 8-14).

and they are not based on the same facts as the original alleged misstatements.[4]  Instead, Plaintiffs' new allegations that Statements #2 and #3 were misleading rest on facts not previously pleaded (*i.e.*, that Baker Hughes brought in no deals and that not all 12,000 salespeople were selling C3 products). The new alleged misstatements do not relate back and are time-barred.  Mot. 16-17.

**II.    PLAINTIFFS HAVE FAILED TO PLEAD EXCHANGE ACT CLAIMS**

The Exchange Act claims fare no better, and also fail for lack of scienter and loss causation.

**A.    Plaintiffs Have Failed To Plead an Actionable Misrepresentation or Omission**

**1.    Statements Regarding Baker Hughes' 12,000-Person Sales Force[5]**

Statements during investor calls that there were "12,000 people selling" for C3 at Baker Hughes were hyperbole, too general to be relied on, and otherwise immaterial given the total mix of market information—including that Baker Hughes met its revenue commitments.  Mot. 17-20.

The Opposition responds that even if Baker Hughes met its minimum revenue commitments, "RPO growth consistently fell short of investor and analyst expectations."  Opp. 19.  But as explained below (*see infra* at § II(C)(2)), Plaintiffs do not make sufficient allegations to tie purportedly "disappointing" RPO results to the Baker Hughes partnership.  And, in reality, C3's revenues increased every single quarter of the Class Period and consistently beat C3's revenue guidance, in part because of the relationship with Baker Hughes.  Mot. 19.  Regardless of how many Baker Hughes salespeople were selling C3 products, Baker Hughes committed to pay C3 a certain amount, and Plaintiffs fail to articulate why an investor's assessment of the Baker Hughes partnership would have changed just because not *every single* Baker Hughes salesperson was selling C3 products.  *See In re Nektar*, 34 F.4th at 836 (omitted information immaterial where plaintiff did

---

[4] *Brady v. Delta Energy & Commc'ns, Inc.*, 2023 WL 2683203, at *5 (C.D. Cal. Jan. 25, 2023) is inapposite.  *See* Opp. 50-51.  There, both complaints relied on similar misstatements, and the second merely identified another loan plaintiffs were induced to extend.

[5] Statements #4-6, #8-13, #15-17.  Statement #12 makes the unchallenged claim that Baker Hughes "has a 12,000-person sales organization" and is the *only* alleged misstatement attributed to Simonelli under Section 10(b).  It is not alleged to be false for the reasons above.  *See supra* at § I(A)(2).

not allege how it would have changed investor's analysis).[6]

The Opposition also attempts to portray these statements as too specific to constitute puffery, claiming 12,000 is an objective number.[7] Plaintiffs have no meaningful response to the fact that a statement can be "so 'exaggerated' . . . that no reasonable investor would rely on it when considering the total mix of information." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000). It is not reasonable to infer that investors would interpret as *literally* true that C3 has "12,000 salespeople selling for us around the world into every oil and gas company on the planet." ¶ 132. Indeed, C3 had previously disclosed that Baker Hughes' *entire salesforce* was made up of 12,000 people (*see supra* re Statement #2). In the context of Statements #1, #2, and #3, among others, it is obvious to any reasonable investor that Siebel was exaggerating, and that in reality these statements illustrate the value that C3—a relatively small company—gained from its access to potential new customers provided by a much larger, global company like Baker Hughes. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (some statements are "such obvious hyperbole that no reasonable investor would rely upon them"); *Markette v. XOMA Corp.*, 2017 WL 4310759, at *8 (N.D. Cal. Sept. 28, 2017) (Gilliam, J.) ("[T]he Court considers the context of the call, and whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available") (internal quotations and citations omitted). And, though the Opposition argues that materiality should be decided later (Opp. 14), courts routinely dismiss claims at the pleading stage based on this exact type of puffery. *See* Mot. 18 (collecting cases).

Plaintiffs also argue that because analysts asked questions about the Baker Hughes relationship, statements about the size of the Baker Hughes salesforce were material. Opp. 15. At best, Plaintiffs' out-of-Circuit authority suggests that information provided to analysts asking

[6] This failure distinguishes this action from Plaintiffs' out-of-circuit authority. *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1250-51 (10th Cir. 2022) (number of employees on internal sales team was "central" to billing growth and a "key business metric").

[7] The statements at issue here are readily distinguishable from the false financials underlying Plaintiffs' authority. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statements that sales were growing when they were not were not puffery); *Zaghian v. Farrell*, 675 F. App'x 718, 720-21 (9th Cir. 2017) (knowing misrepresentation of financial performance).

specifically about a topic might be material considering analysts' interests. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (question specifically related to decline in sales of product at issue). Plaintiffs do not identify a single analyst or investor that asked C3 about the number of Baker Hughes salespeople selling C3 products during the Class Period. Nor is that number material given that it was referenced in response to a general question about Baker Hughes. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *13 (N.D. Cal. May 22, 2012) (puffery inactionable even in response to analyst question).

The fact remains that Plaintiffs never allege *how many* Baker Hughes salespeople were actually selling C3 products, nor explain why the difference would be material to investors.[8] *See Brody*, 280 F.3d at 1006. Plaintiffs try to cure this deficiency by alleging, for the first time in the Opposition, that the sales team was "miniscule" (Opp. 16). This new allegation is improper and should not be considered by the Court. *See Avila*, 2017 WL 4168534, at *5.

To address C3's numerous risk disclosures that it could not guarantee Baker Hughes would devote sufficient resources to selling C3's products (Mot. 18-19; Mot. Ex. B at 22[9]), Plaintiffs argue that Siebel's representations about the size of Baker Hughes' salesforce rendered those warnings meaningless (Opp. 18). But general, exaggerated statements (on which reasonable investors would not have relied) must be viewed in light of the written warnings provided to investors about the very risks Plaintiffs allege were omitted. *See Curry v. Yelp Inc.*, 2015 WL 7454137, at *4, *6 (N.D. Cal. Nov. 24, 2015) (statements that online reviews were "authentic content" were inactionable because "no reasonable investor could have understood Defendants' statements to mean that all Yelp reviews were authentic" and thus alleged fake reviews "did not significantly alter the total mix of information available"), *aff'd*, 875 F.3d 1219 (9th Cir. 2017).[10]

Further, the only statement Plaintiffs argue even related to the quality of Baker Hughes'

---

[8] Plaintiffs originally alleged that C3's *internal* salesforce comprised 700 people. ¶ 148. That figure was inflated by a factor of 10 (Mot. 20 n.12). Plaintiffs have pivoted to claiming the entire company had 700 employees. Opp. 14. This, too, is inaccurate.

[9] *See also, e.g.*, Ex. S at 31 (2021 Form 10-K), Ex. T at 32 (2022 Form 10-K).

[10] Plaintiffs seek to distinguish *Yelp* by claiming Yelp "implicitly" acknowledged its screening technology was imperfect. Opp. 18. But C3 *expressly* acknowledged that Baker Hughes might not devote sufficient resources to C3 products—a greater entry in the total mix of information.

salesforce is that Baker Hughes could provide C3 access to Aramco, a potential customer. Opp. 19 (citing ¶ 134). Plaintiffs never allege Baker Hughes *did not or could not* provide such access, and this statement says nothing about the quality of Baker Hughes' salespeople—which, in any case, C3 had no obligation to disclose. *See McGovney*, 367 F. Supp. 3d at 1059 (dismissing claims based on failure to disclose change in sales team quality).

Finally, Plaintiffs point to a recent statement by Siebel regarding the size of Baker Hughes' work force—*in response to a question about this litigation*—to argue that such a statement cannot be puffery if the Company is continuing to make it. Opp. 17-18. As a preliminary matter, this statement is not referenced in the Complaint, and the attempt by Plaintiffs to incorporate extraneous material should be rejected. *See* C3 Defendants' Opposition to Plaintiffs' Request for Judicial Notice. Further, this statement is irrelevant as to whether statements made years ago during the Class Period were material to investors when they were made. *See, e.g.*, *Irving Firemen's Relief & Ret. Fund v. Uber Tech.*, 2018 WL 4181954, at \*4 (N.D. Cal. Aug. 31, 2018) (Gilliam, J.) (considering only statements within the class period); *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) ("[S]tatements made . . . after the purported class period are irrelevant to plaintiffs' fraud claims."). Plaintiffs cannot create materiality for issues being litigated by using responses to questions about the litigation. This circular approach would produce materiality in every case. In any event, Plaintiffs' own allegations show these statements were accurate. ¶ 152 (C3-related operations moved into Baker Hughes' central 12,000-person organization in October 2021).[11]

### 2.     Alleged Failure to Disclose Internal Restructuring

C3 did not make any false or misleading statements by failing to disclose the brief restructuring of its internal sales team. Mot. 20-21. The Opposition essentially concedes this point by pivoting to a new argument. Plaintiffs now claim that statements about *Baker Hughes'* salesforce (Statements #12-#18) were misleading because C3 failed to disclose the restructuring of its *internal*

---

[11] The Opposition further undermines scienter as to Siebel, acknowledging C3's statement that "Mr. Siebel stated that c3.ai had access to 12,000, to a 12,000-person sales organization at Baker Hughes because he believed it to be true and has no reason to believe it is not true today." Opp. 18.

sales team from July to November 2021. Opp. 22-23. As explained in the Motion (Mot. 20-21), the challenged statements about Baker Hughes made no representation about the structure of C3's internal salesforce. Plaintiffs incorrectly assert that they identified "specific statements about the sales strategy [C3] secretly abandoned" (Opp. 23, without citing the Complaint), but Plaintiffs have not identified a single statement about C3's internal sales team structure. *In re Rigel Pharm.*, 697 F.3d at 880 n.8; *Karri v. Oclaro, Inc.*, 2020 WL 5982097, at \*7 (N.D. Cal. Oct. 8, 2020) (dismissing omission claim for failure to "allege with particularity how such an omission rendered anything in the proxy statement materially misleading"). Plaintiffs argue that the statements about Baker Hughes were misleading because they "concealed the fact that as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, leading them to undertake a risky restructuring." Opp. 22. But nowhere do Plaintiffs allege that C3's restructuring of its own sales force was linked to, much less necessitated by, the structure of C3's arrangement with Baker Hughes, nor that C3 restructured its salesforce to address size constraints.[12] *See Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at \*11 (C.D. Cal. May 30, 2008) (claim dismissed where "the challenged statements are disconnected from the alleged omissions").

Further, Plaintiffs offer no response to the fact that C3 had no independent duty to disclose a change in sales strategy, which it expressly warned investors it might undertake. Mot. 20-21; *see also In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at \*16 (N.D. Cal. Nov. 23, 2021) ("Contrary to the omission plaintiff seeks to emphasize throughout, defendants disclosed the risk faced."). Because there was no statement rendered misleading by C3's internal restructuring, and C3 had no independent duty to disclose it, Plaintiffs have failed to allege a securities fraud claim premised on C3 not disclosing its brief internal change in strategy.

### 3. General Statements About C3's Partnership with Baker Hughes

The Motion established that Abbo's statements that Baker Hughes is a "notable partner[]"

---

[12] By contrast, Plaintiffs' authority addresses misstatements concealing poor results in studies. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1020 (S.D. Cal. 2005) ("Study 806 and the 435 Sub-Study both proved that REMUNE had no effect on secondary markers, while Defendants repeatedly assured the public otherwise.").

and that "[t]he collaboration is I would say is very deep if you will" (¶ 144, Statement #14) was neither alleged to be false nor created any impression of facts different from reality. *See* Mot. 21; *see also id.* (Statement #14 was insufficiently pleaded for the same reasons as Statement #1). The Opposition answers with wordplay, claiming "very deep" was misleading because the Baker Hughes salespeople who were selling C3 products allegedly lacked "long standing deep relationships" (Opp. 21), even though Abbo's statement concerned the depth of the companies' collaboration (which Plaintiffs never allege was false), not the personal relationships of its salespeople. This semantic sleight of hand does not salvage the claim. *See In re Eventbrite, Inc. Sec. Litig.,* 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020*) (no misstatement where alleged omitted facts "bear no connection to the" statement at issue).

### B. **Plaintiffs Have Failed to Plead a Strong Inference of Scienter**

Plaintiffs have failed to allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (citation omitted); *see* Mot. 21-30. Plaintiffs repeatedly fall back on asserting recklessness (Opp. 25), but scienter still requires "specific facts indicating no less than a degree of recklessness that *strongly suggests actual intent.*" *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (emphasis added). Missing are allegations that any Defendant was aware of information rendering statements materially false when made. The only plausible inference is that C3 made every effort to disclose risks associated with the Baker Hughes partnership. Mot. 30; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) ("[D]etailed risk disclosure . . . negates an inference of scienter.") (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994)).

### 1. **Plaintiffs Have Failed to Plead Intent to Defraud**

Although Plaintiffs rely on many of the same generalized allegations of scienter across Defendants, this section addresses allegations specific to each Defendant.

***Siebel:*** Plaintiffs do not allege Siebel was aware of information that contradicted his public statements. Plaintiffs' response falls flat. *First*, Plaintiffs argue Siebel's purported "corrective

disclosure" about the structure of the Baker Hughes sales team means he knew the sales team's structure all along. Opp. 27. But Plaintiffs cannot point to "specific contemporaneous statements or conditions" that demonstrate Siebel's knowledge of the structure of the Baker Hughes' salesforce or C3's internal sales team at the time of the alleged misstatements. *Metzler*, 540 F.3d at 1066. Plaintiffs' "bare inference by hindsight is not permitted under the PSLRA." *In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341 (9th Cir. 2002) (rejecting inference that "because the defendants admit that they knew something later and the 'something' is important, they must have known it earlier"); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) (similar).

*Second*, Plaintiffs rely on Siebel signing the Joint Venture Agreement ("JVA") to infer that Siebel must have known how Baker Hughes would organize its sales team. Opp. 27. But the Complaint does not make a single allegation about the content or signatories of the original JVA, so this new argument should not be considered. *Avila*, 2017 WL 4168534, at *5. Further, Plaintiffs do not explain why the JVA[13] would have informed Siebel that Baker Hughes was creating a separate sales team for C3 products that "sat outside" its core sales team or that salespeople selling C3 products would not have the same industry connections as the rest of the salesforce. *See Swartzendruber v. Colony Capital, Inc.*, 2020 WL 7754008, at *6 (C.D. Cal. Dec. 10, 2020) (finding "little bearing on the scienter analysis" where "Plaintiffs fail to allege any connection between the management agreements and Defendants' alleged misrepresentations"). And even if Siebel was aware of details about Baker Hughes' salesforce, that is not intent to defraud. Rather, the sole plausible inference is that Siebel had no intent to mislead investors, given the total mix of information available, including the Company's transparent risk disclosures. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 566 F. App'x 93, 94 (2d Cir. 2014) (more plausible inference was defendants "did not think there was any need for public disclosure" given existing disclosures); *see also In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011) ("Knowledge of the problem, however, is insufficient to infer that [defendant] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly."), *aff'd*, 768 F.3d 1046 (9th Cir. 2014).

---

[13] The Opposition makes assertions about other changes in the Third Amendment to the JVA (Opp. 27, describing "train the trainer" services), but these are unpleaded and irrelevant to scienter.

-15-                                    Case No. 4:22-cv-01413-HSG

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

*Third*, Plaintiffs again rely on FE-1's claim to have attended sales calls with Siebel from March to May 2020, arguing that, because FE-1 supposedly overheard that Baker Hughes brought in no deals through April 2020, Siebel therefore knew the Registration Statement's representation that C3 recognized the value of deals brought in by Baker Hughes was misleading. *Id.* As explained above (*see supra* at § I(A)(3)), the Registration Statement was not materially misleading. In any event, FE-1's position and knowledge are not adequately alleged such that the Court can credit these allegations. *See id.*; Mot. 13. Nor do Plaintiffs allege the critical connection that Siebel was present at meetings where the purported statement regarding Baker Hughes was even made. Mot. 26. Moreover, this allegation is relevant, at most, to the single statement in the Registration Statement regarding deals brought in by Baker Hughes, and is unrelated to any statement regarding the size of Baker Hughes' salesforce. Nowhere in the Complaint do Plaintiffs allege that the size or structure of Baker Hughes' salesforce was discussed during the purported weekly calls, and Plaintiffs offer no facts suggesting the alleged hearsay that Baker Hughes brought in no deals should have alerted Siebel that his statements regarding the size of Baker Hughes's salesforce were false.

*Fourth*, as the Motion's authority makes clear, the allegation that Siebel had "direct and extensive involvement" in marketing C3, and so must have known about the size of Baker Hughes' salesforce (Opp. 28), is the type of allegation courts routinely reject. Mot. 22-23; *see also In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("[P]laintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the necessity for specially pleading scienter . . . .").

*Fifth*, the request to infer scienter because Siebel spoke about the size of Baker Hughes' salesforce (Opp. 28) is circular and would make scienter a foregone conclusion.[14] *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1044 n.8 (N.D. Cal. 2012) (rejecting similar argument).

---

[14] Plaintiffs' authority supports Defendants. In *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), plaintiff pleaded scienter where a lower-level employee involved in day-to-day operations of the relevant business segment had access to data contrary to public statements, and the Court noted that, by contrast, "the CEO of a large enterprise . . . may be removed from the details of a specific business line." *Id.* at 572. In *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019), the defendant received reports about *specific* problems and admitted to working to fix them.

*Finally*, Plaintiffs do not make a single argument or cite a single allegation that Siebel was aware of C3's brief internal restructuring of its sales team during the short period of reorganization.

***Abbo and Barter:*** Plaintiffs' generic allegations that Abbo and Barter were officers and directors do not establish scienter. Mot. 22-23. The Opposition seeks to infer scienter because Abbo and Barter were officers and directors and "attended meetings and had access to reports and data that undermined Siebel's repeated statements." Opp. 29-30.[15] These are precisely the kind of "[g]eneral allegations of defendants' . . . attendance at meetings, and their receipt of unspecified weekly or monthly reports" that are routinely rejected by this Court and the Ninth Circuit. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005), *abrogated on other grounds by Tellabs*, 551 U.S. at 315-18; *see also Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000).

***Simonelli:*** Simonelli's position as a director and purported access to unspecified "reports and data" (¶ 222) is likewise insufficient to establish scienter. Mot. 22. The Opposition argues, for the first time, that given Simonelli's position as CEO of Baker Hughes (Opp. 29), he could have "cross-check[ed]" C3's statements with "Baker-Hughes-side information." *Id.* But, notably, the Complaint does not allege that he actually did, nor does it identify what "Baker-Hughes-side information" purportedly existed. Plaintiffs again fail to specify any reports or other specific information to which Simonelli supposedly had access, and "[m]ere access to corporate information is inadequate evidence of scienter." *CheckOut Holdings, LLC v. Amplified Holdings, Inc.*, 64 F. App'x 631, 633 (9th Cir. 2003); *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (allegations that "management had an important role in the company" without "detailed allegations about the defendants' actual exposure to information . . . will usually fall short of the PSLRA standard."). And more critically, access to information about Baker Hughes' salesforce does not show that Mr. Simonelli *intended* to mislead investors through C3's statements regarding the partnership. *See In re NVIDIA*, 2011 WL 4831192, at *11.

***Core Operations:*** Plaintiffs fail to adequately plead scienter under a "core operations" theory, which is "not easy" to plead. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d

---

[15] Plaintiffs cite ¶¶ 208-09 to support their argument that Abbo and Barter had access to contrary data, but those paragraphs contain allegations relating only to Siebel's stock sales.

1051, 1062 (9th Cir. 2014); Mot. 25-26.  In this Circuit, Plaintiffs must allege "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement."  *Id.* at 1062 (internal citations omitted).  The Opposition makes no effort to address this standard, likely because the Complaint does not satisfy it.  Mot. 25-26.[16]

*First*, Plaintiffs point to no admission by any Defendant that he was involved in the details of the Baker Hughes partnership or would be privy to the structure of Baker Hughes' sales team. *See Iron Workers Local 580 Joint Funds v. Nvidia Corp.,* 2020 WL 1244936, at *11 (N.D. Cal. Mar. 16, 2020) (core operations requires "detailed involvement" not "higher level information"). Plaintiffs argue the Baker Hughes partnership was not mere "minutiae" (Opp. 31), but offer no allegations showing any Defendant was personally involved in structuring Baker Hughes' sales team.  *Second*, there are no allegations that any Defendant participated in the creation of false reports.  *Intuitive Surgical*, 759 F.3d at 1063.[17]  Thus, neither requirement is met here.

Instead, Plaintiffs point to certain C3 statements describing the benefits of the partnership (Opp. 30-32), but it is not the case that any beneficial part of a business is a "core operation."  *In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020) ("[S]imply alleging that the partnership . . . was crucial does not give rise to a strong inference of scienter.") (Gilliam, J.); *see also NVIDIA*, 768 F.3d at 1064 (rejecting core operations theory even when "the problem

---

[16] Plaintiffs' authority is distinguishable, as the misstatements in those cases related to issues much more central than the structure of a sales team.  *See In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1078-79 (E.D. Wash. 2016) (misstatements about the effectiveness of the company's *only product*); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1134 (N.D. Cal. 2020) (representations that company did not adjust business were misleading where $200 discount was offered on product accounting for 86% of revenue); *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (defendants had access to data showing company was behind schedule in securing certain systems while saying it was "on track").

[17] Plaintiffs claim Siebel knew the Registration Statement was misleading because Baker Hughes brought in no deals, but the statement at issue was not misleading (*see supra* at § I(A)(3)), and does not turn the partnership or its structure into a "core operation."  Even if it were inaccurate, Plaintiffs cannot plead a core operations theory where the statement at issue was not intended to be misleading.  *See Colyer v. AcelRx Pharms, Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015) (dismissing core operations theory because "[k]nowing about the existence of [certain information] and knowing one should report [that information] to the public are two different things.").

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

concerned [NVIDIA's] flagship product and was cause for concern to [its] two largest customers").

### 2.    Plaintiffs Have Not Adequately Alleged Motive

Plaintiffs' motive allegations are insufficient and, in any case, merely alleging motive and opportunity is insufficient.  Mot. 26-30; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 619 (9th Cir. 2017).

*First*, the Motion detailed well-settled law that, to show class-period sales are unusual, Plaintiffs must allege a "'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco,* 552 F.3d at 1005-06; *Curry v. Yelp Inc.*, 2015 WL 1849037, at *13 (N.D. Cal. Apr. 21, 2015) ("The Court has no basis on which to conclude that there exists a strong inference that these sales were out of line with prior trading practices because the Complaint does not allege any information regarding the insider's prior trading practices.").  Plaintiffs respond only that they "provide a detailed accounting of the 20A Defendant stock sales *during the Class Period*." Opp. 32 (emphasis added).  That response essentially concedes the failure to plead pre-Class Period trading, as required to support any motive allegations.  *See, e.g.*, *Yelp*, 2015 WL 1849037, at *13.

Plaintiffs also argue that they need not plead trading history where, as here, the company was not public prior to the class period.  Opp. 32.  To start, Plaintiffs' out-of-Circuit authority on this topic actually found scienter *was not* adequately alleged on the basis of stock sale allegations without a pleaded trading history.  *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841-42 (N.D. Ill. 2000) (finding scienter pleaded based on *other* allegations).  And, authority in this Circuit holds that unavailability of trading history does not relieve Plaintiffs of the obligation to allege it.  *See, e.g.*, *Zucco*, 552 F.3d at 1005 ("Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history."); *see also Yelp*, 2015 WL 1849037, at *13 ("[A] lack of trading history due to a recent IPO may foreclose a plaintiff from one avenue of pleading scienter."); *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *15 (N.D. Cal. Nov. 14, 2016) (inability to allege history due to prior lockup "weighs against scienter").  This disposes of Plaintiffs' motive allegations, and the Court need not consider them.

*Second*, Plaintiffs ignore a wealth of authority that post lock-up sales are typical.  Mot. 28-29; *see also Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th

Cir. 2008) (stock sales not suspicious where "sale allowed [defendant] to capitalize on the expiration of his own ninety-day lock-up period"); *Chu*, 100 F. Supp. 2d at 842 (cited by Plaintiffs) ("[I]n light of the fact that [defendants] sold their stock when it became available to them to sell . . . plaintiffs have not adequately alleged scienter."). Nor do Plaintiffs allege that any sales occurred right before a negative announcement, which weighs against a finding of suspicious sales. *See, e.g.*, *Wenger v. Lumisys, Inc.,* 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998). Indeed, Plaintiffs' sole reason for casting aspersions on post-lockup sales is that the 90-day exemption to the 180-day lockup was suspicious, but they offer no explanation as to why. *See* Opp. 32-33; *see also Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1165 (S.D. Cal. 2003) (it is unclear "why defendants—if they were so eager to rid themselves of [C3] stock—would have entered into the lock-up agreements in the first place"); *Ind. Elec. Workers'*, 537 F.3d at 544.

*Third*, the C3 Defendants' Motion showed that many sales were made pursuant to 10b5-1 plans, and so could not benefit from inside information before it was revealed to the market. Mot. 29; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (sales under pre-determined plans may "rebut [ ] an inference of scienter"); *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *15 (N.D. Cal. July 29, 2022) ("[T]he weight of authority in the Ninth Circuit holds that courts can consider 10b5-1 trading plans when evaluating allegations concerning scienter.") (internal quotations omitted). Plaintiffs respond with the bare assertion that Defendants' 10b5-1 plans are "patently suspicious" because they are undated. Opp. 32-33.[18] For instance, Plaintiffs allege Siebel declined to set up a 10b5-1 plan prior to the IPO or expiry of the 90-day lockup, but *there are no allegations in the Complaint* as to when his 10b5-1 trading plan was entered into—in fact, the Complaint admits Plaintiffs do not know that date. ¶ 165. Nor do Plaintiffs articulate why, even if the plan was entered into in mid-2021, that timing is at all suspicious.

*Fourth*, Plaintiffs try to compensate for failing to allege the percentage of Defendants' shares sold during the Class Period (Mot. 29) with an Appendix of information found nowhere in the Complaint, the sources of which Plaintiffs do not disclose. ECF No. 119-3 (Appendix C).

---

[18] Plaintiffs' failure to plead when those plans were entered into, or that Defendants did so while possessing inside information, distinguishes this case from Plaintiffs' authority. Opp. 33-34.

*Finally*, Plaintiffs' stock sale allegations are weakest as to Barter and Simonelli. Barter made no sales outside of his 10b5-1 plan, which Plaintiffs do not adequately allege was suspicious. ¶ 157. And Plaintiffs nowhere allege what percentage of his holdings Barter sold.

Simonelli is not alleged to have sold *any* personal stock, as every single sale attributed to Mr. Simonelli by Plaintiffs was made by *Baker Hughes*, and Plaintiffs cite no authority that they may impute to Simonelli any motive on the part of Baker Hughes (Opp. 35), particularly when they do not allege he was involved in the decision by Baker Hughes to sell C3 stock.[19] In any event, this imputation is backwards, as the Ninth Circuit is clear that a corporation acts through its "employees and agents" and therefore can "only have scienter through them." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). Plaintiffs do not cite any law suggesting that corporate intent can be imputed back to individuals.

### C.    Plaintiffs Have Failed to Plead Loss Causation

Plaintiffs cannot plead loss causation by "materialization of the risks" in the Ninth Circuit, and the alleged "corrective disclosures" are insufficiently connected to the alleged misstatements.

### 1.    A Materialization of the Risk Theory Is Not Viable in This Circuit

Put simply, the Ninth Circuit does not recognize "materialization of the risk" as a viable theory of loss causation. Mot. 32-34. Plaintiffs confusingly argue that "[c]ourts in the Ninth Circuit have continued to apply the theory," but cite only one case for that proposition, in which the Court stated it was *not* applying a "materialization of the risk" theory: *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *17 n.19. (N.D. Cal. Apr. 17, 2020). Opp. 37. There, defendants cited *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013) and *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018) to argue that "the corrective disclosures . . . were the materialization of a previously-disclosed risk." *In re Twitter*, 2020 WL 4187915, at *17. The Court noted, however, that plaintiffs *were not* relying on a materialization of the risk theory, and distinguished *Nuveen* and *Nguyen* on that basis. *Id.*; *see also*

---

[19] Plaintiffs argue that they may impute Simonelli's scienter to Baker Hughes *and* impute Baker Hughes' scienter to Simonelli. *See* Opp. 35, 43. This should be rejected as circular and, in any case, is unsupported by facts establishing that Simonelli acted with any fraudulent intent.

*Khoja v. Orexigen Therapeutics, Inc.*, 498 F. Supp. 3d 1296, 1325 (S.D. Cal. 2020) (distinguishing *Twitter* where corrective disclosures did not "directly concern[]" fraud). Notably, the Ninth Circuit has expressly declined to endorse this theory. *See Nuveen*, 730 F.3d at 1121.

Even if a materialization of the risk theory were viable, Plaintiffs have failed to plead one. Importantly, the alleged risk that materializes must constructively disclose the fraud, and so link the loss to the fraud. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (materialization of the risk theory may proceed only where the materialization "constructively disclos[es] the fraud"); *Nguyen*, 297 F. Supp. 3d at 500 (dismissing claims premised on materialization of the risk for failure to plead loss attributable to fraud). Here, Plaintiffs do not allege that the purported negative financial announcements and stock price drops *revealed* that "the structure of the [Baker Hughes] partnership [] excluded access to the full 12,000-person salesforce." Opp. 39. The alleged fraud was not constructively disclosed by the allegedly materialized risk.

**2.    Plaintiffs Have Failed to Plead Losses Sufficiently Connected to the Alleged Corrective Disclosures**

Plaintiffs have failed to establish loss causation for the declines in C3 stock alleged on December 1, 2021 and December 2, 2021. To start, Plaintiffs cannot dispute that the first alleged disclosure took place *after market close* on December 1, 2021, and so Defendants could be responsible, *at most*, for any decline on December 2, 2021. Mot. 31-32.

Plaintiffs also fail to link the alleged "disclosures"—some of which are merely Company results—to allegedly concealed information (*i.e.*, the structures of Baker Hughes' salesforce and C3's internal sales team). Mot. 31-32; *see also Nuveen*, 730 F.3d at 1121 (no loss causation without "critical link" of "a causal connection between the alleged misrepresented risks . . . and the economic loss"). Plaintiffs claim a "clear economic link between the undisclosed truth and the foreseeable investor losses" (Opp. 39), but support that claim only with an improper, new theory that "the lack of full support from Baker Hughes' salesforce constrained C3's ability to drive the subscriber revenue growth and RPO that investors and analysts expected." *Id.* Even if the Court were to consider this new assertion, it is at most a novel "non-materialization of the upside" theory—which is not a "loss"—and is unsupported in authority cited by Defendants *or* Plaintiffs. *See supra* at

-22-

Case No. 4:22-cv-01413-HSG

C3 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

§II(C)(1).

**D.      Plaintiffs Have Failed to Plead a Section 20A Claim**

The Section 20A claim fails because Plaintiffs fail to allege a primary violation (Mot. 34) or what inside information Defendants supposedly had at the time of any trade (*see supra* at § II(B)).[20]

The Motion showed Plaintiffs' failure to "specify which of [Plaintiffs'] sales are contemporaneous" with alleged insider sales. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020). Plaintiffs respond with unpleaded facts in Appendix B. Even if the Court considers these, it should reject Plaintiffs' view of "contemporaneous," which would sweep in investors who purchased as much as a *week* after a defendant's sale. *See, e.g.*, Opp. App. B at 1 (sale on September 13, 2021 and purchase on September 20, 2021); *see also Brody*, 280 F.3d at 1001 ("The same day standard is the only reasonable standard . . . ."); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995); *Buban v. O'Brien*, 1994 WL 324093, at *4 (N.D. Cal. June 22, 1994) (three-day gap not "contemporaneous"). "Contemporaneous" appropriately means trading the same day or day after, *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018), and so no plaintiff has standing:[21]

| Plaintiff | Defendant | Defendant Sale Date | Insufficient Because |
|---|---|---|---|
| Samarghandi | Siebel | July 13, 2021 | Sale pursuant to 10b5-1 plan;[22] Sale price higher than purchase price.[23] |
| Samarghandi | Siebel | August 16, 2021 | Sale pursuant to 10b5-1 plan. |
| Samarghandi | Abbo | November 18, 2021 | Sale pursuant to 10b5-1 plan; Sale price higher than purchase price. |

The Opposition asserts nonetheless that, on March 15, 2021, Plaintiff Zavalanski made a

---

[20] Plaintiffs offer no response to the fact that Simonelli did not personally sell any stock and so cannot be liable under Section 20A. Mot. 34. Even if Baker Hughes' sales could be imputed to Simonelli, no Plaintiff traded contemporaneously with Baker Hughes. ECF No. 108 at 14.

[21] Defendants *do not* concede that Samarghandi has 20A standing. Opp. 41. Although he bought on a day Siebel sold (August 16, 2021), Siebel's sale was under a 10b5-1 plan. Mot. 34.

[22] Plaintiffs' authority concerns 10b5-1 plans with modifications not alleged here. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019).

[23] Contrary to Plaintiffs' assertion, *SEB Investment Management AB v. Align Technology, Inc.* relied solely on the fact that a defendant's sale price was higher than a plaintiff's purchase price in rejecting contemporaneity, because it is therefore "impossible that those trades occurred with defendant at an unfair advantage." 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020).

purchase contemporaneous with one of Siebel's sales. Opp. 41 n.14. The Complaint does not allege this, asserting a Section 20A claim only on behalf of Samarghandi and Linder. ¶ 256. Zavalanski is not mentioned in the Complaint section that contains Plaintiffs' Section 20A allegations. ¶¶ 255-69. Plaintiffs' un-pleaded argument should be rejected. *Avila*, 2017 WL 4168534, at *5.

## III.      PLAINTIFFS HAVE FAILED TO PLEAD CONTROL PERSON LIABILITY

Under Ninth Circuit law, control person status cannot be established by officer or director status or vague assertions of "involvement" by individual defendants. Mot. 44-47; *see also S.E.C. v. Todd*, 642 F.3d 1207, 1223 ("The fact that a person is a CEO or other high-ranking officer within a company does not create a presumption that he or she is a 'controlling person.'"). Plaintiffs respond that "[a]llegations that a defendant held a high-level executive position by virtue of which was involved in a company's day-to-day management will suffice to state a claim" for control person liability. Opp. 44. But Plaintiffs' authority is far from the facts alleged here, which do not include how each Defendant was purportedly involved in day-to-day operations. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1157-58 (S.D. Cal. 2008) (finding control based on specific allegations "that each defendant possessed control over the company's day-to-day operations, lending practices and reporting to investors, and exercised that control to cause [company] to engage in the alleged primary violations"). Plaintiffs fail to plead specific facts showing "indicia of 'control,'" such as that "the person managed the company on a day-to-day basis and was involved in the formulation of financial statements." *Id.*; *see also Sgarlata v. Paypal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018) ("[C]onclusory allegations of control over day-to-day activities are insufficient" to support control person liability.)

Seeking to supplement these deficient allegations, the Opposition lists characteristics that supposedly support inferences of control, such as signing SEC filings and press releases (Siebel, Barter, Simonelli), having "access to actual knowledge of confidential proprietary information concerning the Company" (Barter), being a director *before the Class Period* (Abbo), representing the Company "in public forums" (Siebel, Abbo), being a member of the Company's "Thought Leadership" (Siebel, Abbo), and serving on the audit committee (Simonelli). Opp. 44-45. Plaintiffs cite no authority that any of these (apart from audit committee, addressed below) establishes control

person liability.  *Id.*  Indeed, those activities are plainly insufficient under Ninth Circuit precedent. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n.13 (9th Cir. 2000) (no control person liability absent allegations that defendant "exercised any specific control over the preparation and release" of misstatements); *see also Lilley v. Charren*, 936 F. Supp. 708, 716-17 (N.D. Cal. 1996) ("Conclusory allegations based on director or officer status are insufficient as a matter of law.").

Plaintiffs' allegations regarding Simonelli's service on the audit committee are similarly infirm.  Plaintiffs rely on *Thomas v. Magnachip Semiconductor Corp.*, but the court there held that a defendant's role on an audit committee was a sufficient basis for control person status only where disclosures of financial figures are at issue. 167 F. Supp. 3d 1029, 1036, 1044 (N.D. Cal. 2016). *Thomas* specifically recognized the connection between the defendant's membership on the audit committee and the alleged fraud, noting that, as a result of this position, the defendant "should have noticed significant errors in revenue recognition."  167 F. Supp. 3d at 1044.  And *Thomas* found the defendant's role on the audit committee was sufficient only when "combined with other allegations" not present here.  *Id.*; *see also Haltman v. Aura Systems, Inc.*, 844 F. Supp. 544, 549 (C.D. Cal. 1993) ("[S]tatus as a member of [the] Audit Committee, in and of itself, is insufficient" for control person liability.).  The allegations here are more similar to those routinely dismissed against audit committee members.  *See In re Nextcard, Inc. Sec. Litig.*, 2006 WL 708663, at *5 (N.D. Cal. Mar. 20, 2006) (dismissing control person claims against defendant who served on audit committee for failure to "allege that [defendant] was involved in the day to day management of the company"); *Haltman*, 844 F. Supp. at 549 (dismissing control person claims against audit committee member where "there [were] no allegations that [defendant]'s membership on the Audit Committee played a specific role in the creation of the allegedly false and misleading statements").  Further, the majority of challenged statements were made during earnings calls or investor conferences, and Plaintiffs do not even attempt to argue that Simonelli had any role in the content of those statements, much less could control what a company officer said during a live call.

## CONCLUSION

For the foregoing reasons, and those detailed in the opening brief, the Complaint should be dismissed with prejudice.

DATED:  August 23, 2023

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Harry A. Olivar, Jr.*
Harry A. Olivar, Jr. (Cal. Bar No. 143089)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
harryolivar@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
David Myre (Cal. Bar No. 304600)
Jesse Bernstein (admitted *pro hac vice*)
Jacob J. Waldman (admitted *pro hac vice*)
Leigha Empson (admitted *pro hac vice*)
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
davidmyre@quinnemanuel.com
jessebernstein@quinnemanuel.com
jacobwaldman@quinnemanuel.com
leighaempson@quinnemanuel.com

*Attorneys for the C3 Defendants*