1
2
3
4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    THE RECKSTIN FAMILY TRUST, et al.,        Case No. 22-cv-01413-HSG

8                    Plaintiffs,               **ORDER GRANTING IN PART AND**
                                               **DENYING IN PART THE C3**
9           v.                                 **DEFENDANTS' MOTION TO**
                                               **DISMISS, AND GRANTING**
10   C3.AI, INC., et al.,                      **DEFENDANT BAKER HUGHES'**
                                               **MOTION TO DISMISS**
11                   Defendants.
                                               Re: Dkt. Nos. 105, 109
12

13

14          Pending before the Court are motions to dismiss Plaintiffs' putative securities class action

15   filed by the C3 Defendants and Defendant Baker Hughes. Dkt. Nos. 105, 109. Plaintiffs filed an

16   omnibus opposition to Defendants' separately filed motions. *See* Dkt. No. 119. The Court finds

17   the matter appropriate for disposition without oral argument and the matter is deemed submitted.

18   *See* Civil L.R. 7-1(b). For the reasons below, the Court **GRANTS IN PART and DENIES IN**

19   **PART** the C3 Defendants' motion to dismiss, Dkt. No. 105, and **GRANTS** Defendant Baker

20   Hughes' motion to dismiss, Dkt. No. 109. To the extent the motions to dismiss are granted,

21   dismissal is **WITH LEAVE TO AMEND**. The Court further **GRANTS** the C3 Defendants'

22   request for judicial notice, Dkt. No. 105-2, and **GRANTS IN PART and DENIES IN PART**

23   Plaintiffs' request for judicial notice, Dkt. No. 119-5.

24   **I.    BACKGROUND**

25          On March 4, 2022, the Reckstin Family Trust filed this lawsuit, asserting various

26   violations of the Securities and Exchange Acts. *See* Dkt. No. 1. In December 2022, the Court

27   appointed Mark Samarghandi – an investor who purchased shares of C3 stock and claims that he

28   was damaged by Defendants' alleged securities law violations – as Lead Plaintiff, and Hagens

United States District Court
Northern District of California

Berman Sobol Shapiro LLP as lead counsel.  Dkt. No. 66.

On February 2023, Plaintiffs filed an Amended Class Action Complaint ("CAC") against numerous defendants.[1]  *See* Dkt. No. 71 ("CAC") ¶¶ 29–35.  The Court will refer to one subset of defendants as the "C3 Defendants," which includes (i) Defendant C3.ai, Inc. ("C3"), a company incorporated in Delaware and headquartered in Redwood City, California that makes and sells artificial intelligence ("AI") software for enterprise clients using a subscription model, *id.* ¶¶ 4, 29; and (ii) four individually named C3 officers: Thomas M. Siebel ("Siebel"), Edward Y. Abbo ("Abbo"), David Barter ("Barter"), and Lorenzo Simonelli ("Simonelli") (and collectively, the "Individual Defendants"). [2]  *Id.* ¶¶ 31–34.  In addition to the C3 Defendants, Plaintiffs also named Baker Hughes (or "BH") as a Defendant.[3]  Baker Hughes, incorporated in Delaware and headquartered in Houston, Texas, is "one of the world's largest oil field service companies."  CAC ¶ 8.  As relevant here, BH purchased C3's artificial intelligence software for its own use, and also agreed to be "the exclusive seller" for C3's products within the oil and gas industry.  *Id.*

Plaintiffs allege that the C3 Defendants made false or misleading statements concerning the nature of C3's joint venture with "gas monolith" BH during the class period, which they define as starting with C3's IPO on December 9, 2020 and ending the following year on December 2,

---

[1] The parties in the amended complaint differ from those in the original complaint.  The amended complaint dropped most of the previously named C3 Directors, such as Condoleezza Rice and Stephen Ward, while adding others.  And besides the lead plaintiff, the CAC identifies as "Additional Plaintiffs" shareholders Sharen L. Zavalanski, David Linder, and Elizabeth Wensel, all of whom allege that they purchased C3 stock and were subsequently damaged by Defendants' purported misconduct.  CAC ¶¶ 26–28.

[2] Defendant Siebel founded C3 in 2009 and currently serves (and during the relevant period served) as C3's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.  CAC ¶ 31.  Defendant Abbo is C3's President and Chief Technology Officer ("CTO"), the latter being a role he has served in since 2011.  *Id.* ¶ 32.  Before the class period, Abbo also served as C3's CEO (from September 2009-July 2011) and sat on its Board of Directors (from August 2009-November 2020).  *Id.*  Defendant Barter served as C3's Senior Vice President and Chief Financial Officer ("CFO") at the time of C3's initial public offering ("IPO"), but subsequently left the CFO role on December 1, 2021.  *Id.* ¶ 33.  Defendant Simonelli – the Chairman, President, and CEO of Baker Hughes – served as a Director on C3's Board from August 2019 to December 17, 2021.  *Id.* ¶ 34.

[3] The CAC also named ten Underwriter Defendants.  *See* CAC ¶¶ 38–47.  However, because the Underwriter Defendants were voluntarily dismissed with prejudice from this action on June 30, 2023, *see* Dkt. No. 118, which mooted their then-pending motion to dismiss, Dkt. No. 113, the Court will not detail those parties or the allegations made against them.

2021.  CAC ¶¶ 1, 2.  Plaintiffs allege that although the C3 Defendants made statements (both in C3's SEC filings and in public statements) during the class period suggesting that BH's 12,000-person sales team was engaged in selling C3's AI software, C3 "did *not* have Baker Hughes' entire [12,000-person] salesforce at its disposal."  *Id*. ¶ 10 (emphasis added).  Instead, Plaintiffs aver that the sale of C3 products was supposedly handled in a separate unit "outside of [BH's] normal structure . . . staffed with salespeople who lacked the industry expertise and connections of Baker Hughes' normal salesforce."  *Id*.  Plaintiffs contend that the relegation of C3's sales to this inexperienced subunit contributed to lackluster sales performance.  *Id*.

In addition to misleading investors about C3's access to BH's 12,000-person salesforce, Plaintiffs allege that Defendants further concealed a "massive restructuring" of C3's own salesforce in July 2021 despite "the significant risks it posed to the company."  CAC ¶ 11.  Concealing the internal restructuring while touting the strategic partnership between C3 and BH – particularly the vast sales resources available to C3 through that partnership – allegedly "artificially inflated C3's stock."  *Id*. ¶ 12.  Plaintiffs further claim that the Individual Defendants, who knew about the sales issues, then engaged in insider trading by dumping hundreds of millions of dollars in C3 stock upon expiration of the post-IPO lockup period.  *Id*.  Only in December 2021 did Defendant Siebel first publicly reveal that C3 had "secretly" reorganized its direct salesforce and restructured its strategic partnership with Baker Hughes, in part because it "did not have access to Baker Hughes' enormous 12,000-person salesforce nor its deep expertise."  *Id*. ¶ 16.  According to Plaintiffs, the revelations about C3's true sales structure and resources were costly: as of the date the initial complaint was filed (in March 2022), "the price of C3's Class A common stock closed at $20.05, a 52% decline from the $42.00 per share Offering price."  *Id*. ¶ 19.

Based on these allegations, Plaintiffs bring causes of action against Defendants on behalf of putative classes under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act," 15 U.S.C. § 77 et seq); Items 303 and 505 of Regulation S-K (17 C.F.R. §§ 229.303(a)(3)(ii), 229.105(a)); Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. § 78a et seq); and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 (17 CFR 240.10b-5).  *See* CAC ¶¶ 96–116, 240–269.  Defendants have moved to

dismiss the CAC in its entirety.  *See* Dkt. No. 105 ("C3 MTD"), 109 ("BH MTD").[4]  The issues are fully briefed.  *See* Dkt. Nos. 119 ("Opp."), 137 ("C3 Reply"), 139 ("BH Reply").

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.    Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ."  15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b-5,

---

[4] According to its motion, Baker Hughes joins the C3 Defendants' motion to dismiss "in full."  BH MTD at 7.

United States District Court
Northern District of California

which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

## III.    REQUESTS FOR JUDICIAL NOTICE

Defendants have moved the Court to judicially recognize a number of documents they cite in their motion.  Dkt. No. 105-2 ("C3 RJN"). [5]  Plaintiffs have done the same.  Dkt. No. 119-5 ("Pltf RJN").

### A.    Legal Standard

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *In re Eventbrite, Inc. Sec. Litig.*, No. 18-CV-02019-EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28,

---

[5] In its motion, BH does not independently request judicial notice of any materials, but rather indicates that it joins the C3 Defendants' requests.  BH MTD at 9 n. 3.

United States District Court
Northern District of California

1    2020) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)); *Khoja v. Orexigen*

2    *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)); *see also* Fed. R. Civ. P. 12(d).  "This rule

3    does not apply to the incorporation by reference doctrine or judicial notice under Federal Rule of

4    Evidence 201."  *Eventbrite*, 2020 WL 2042078, at *7 (citing *Khoja*, 899 F.3d at 998).

5        A court may take judicial notice of an "adjudicative fact" pursuant to the Federal Rules of

6    Evidence, if that fact is one "that is not subject to reasonable dispute because it: (1) is generally

7    known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

8    determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

9    Thus, under Rule 201, courts may "take judicial notice of matters of public record, but not of facts

10   that may be subject to reasonable dispute."  *United States v. Corinthian Colls.*, 655 F.3d 984, 999

11   (9th Cir. 2011) (internal quotation marks and citation omitted).

12       In the Ninth Circuit, incorporation by reference is a doctrine that "treats certain documents

13   as though they are part of the complaint itself."  *Khoja*, 899 F.3d at 1002.  A document may be

14   incorporated by reference into a complaint "if the plaintiff refers extensively to the document or

15   the document forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908

16   (9th Cir. 2003).  "Once a document is deemed incorporated by reference, the entire document is

17   assumed to be true for purposes of a motion to dismiss, and both parties – and the Court – are free

18   to refer to any of its contents."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir.

19   2014) (internal quotation marks and citation omitted).

20   **B.    Analysis**

21       **i.    The C3 Defendants' Requests**

22       The C3 Defendants request that the Court consider numerous documents outside the

23   pleadings, which can be sorted into two buckets: (1) public documents filed with the SEC and (2)

24   financial analyst reports.  *See generally* C3 RJN.  The Court agrees that consideration of these

25   documents is permissible, and accordingly **GRANTS** Defendants' request, Dkt. No. 105-2.

26       First, the C3 Defendants argue that C3's IPO materials (Exhibits B, C), Forms 10-K

27   (Exhibits D, E, S, T), Forms 8-K (Exhibits A, F, G, H), and proxy statements (Exhibits I, J), as

28   well as Baker Hughes' Forms 4 (Exhibits K, L, M) and Forms 144 (Exhibits N, O), should be

United States District Court
Northern District of California

judicially noticed because they are publicly available documents filed with the SEC.  C3 RJN at 4.[6]  They also argue that the incorporation by reference doctrine provides an alternative basis on which the Court can properly consider Exhibits B-D, K-M and S, since those documents are either referenced extensively in Plaintiffs' complaint or underlay certain of Plaintiffs' claims.  *Id.* at 2–3. Plaintiffs oppose judicial notice of Exhibits A-O because they contend Defendants' request is an improper attempt to rebut Plaintiffs' allegations on the merits.  Opp. at 65–69, Dkt. No. 119-1. They also argue that the filings are susceptible to "varying interpretations," and are therefore improper subjects of judicial notice.  *Id.*

The Court finds that the "accuracy" of these publicly filed SEC documents "cannot reasonably be questioned."  *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018); *see also Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice); *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *4 (N.D. Cal. Nov. 16, 2020) (considering Forms 4 for the purpose of evaluating stock sales and scienter allegations even where Forms 4 are not explicitly cited in complaint); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018) (granting judicial notice as to transcripts of earnings calls and excerpts of SEC filings); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *10 (N.D. Cal. Aug. 30, 2017) ("[B]oth SEC filings and documents on government websites are proper subjects of judicial notice.").  The Court also finds that the documents are suitable subjects of judicial notice as evidence "that the market was aware of the information [they] contain[]."  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).  Accordingly, the Court **GRANTS** Defendants' request for judicial notice as to Exhibits A-O, S, and T.[7]  In doing so, the Court does not assume the truth of any of the facts asserted, or endorse either of the competing inferences that the parties maintain arise out of the financial filings.  *See Pardi v. Tricida, Inc.*, No.

---

[6] For ease of reference, the Court refers to the PDF page number of a document rather than the document's internal pagination throughout this order, unless otherwise noted.

[7] The Court additionally agrees that the incorporation by reference doctrine is a separate basis that permits the Court to consider Exhibits B-D, K-M and S, though not to resolve any factual dispute between the parties as to the substantive truth or falsity of their contents.

United States District Court
Northern District of California

1    21-CV-00076-HSG, 2022 WL 3018144, at *3–4 (N.D. Cal. July 29, 2022) (quoting *Wochos*, 2018

2    WL 4076437, at *2).

3         The C3 Defendants additionally urge the Court to consider three analyst reports (Exhibits

4    P-R) cited in the complaint, both because they are incorporated by reference in Plaintiffs'

5    complaint (by virtue of their loss causation allegations) and also because they are judicially

6    noticeable.  C3 RJN at 3–4.  Plaintiffs oppose the Court's consideration of these documents

7    because Defendants supposedly rely on them "to rebut Plaintiffs 'loss causation arguments and

8    assert that there was a 'far more plausible reason' for the stock price decline than Defendants'

9    omissions and representations," and because the documents are "subject to differing

10   interpretations."  Opp. at 67.  But Plaintiffs do not detail what these differing interpretations might

11   be, and moreover, do not dispute "that analyst reports may be considered to show what

12   information was available to the market, which is the central issue in a loss causation analysis."

13   Dkt. No. 138 at 6–7 (citing *In re Century Aluminum Co. Sec. Litig.*, 2011 WL 830174, at *9

14   ("[C]ourts routinely take judicial notice of analyst reports . . . to determine what may or may not

15   have been disclosed to the public."); *Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *4 (N.D.

16   Cal. June 19, 2020) (similar)).  Accordingly, the Court **GRANTS** Defendants' request for judicial

17   notice as to Exhibits P-R, and will consider these documents not for their truth, but to determine

18   what information may or may not have been publicly disclosed.[8]

19        **ii.    Plaintiffs' Requests**

20        Plaintiffs also request that the Court take judicial notice of five documents they rely on in

21   their opposition to the motions to dismiss.  *See* Pltf RJN.

22        Exhibits 1, 2, and 5 are publicly available documents C3 filed with the SEC that reflect

23   what the market was aware of at the time.[9]  For the same reasons discussed above, the Court

24

25   _____

26   [8] The Court additionally agrees that the incorporation by reference doctrine is a separate basis that permits the Court to consider Exhibits P-R, with the same limitations described above.

27   [9] Exhibit 1 is the Joint Venture Agreement between C3 and Baker Hughes dated June 6, 2019; Exhibit 2 is the Third Amendment to the Joint Venture Agreement between C3 and Baker Hughes, effective May 1, 2022, and Exhibit 3 is the Quarterly Report for the period ended October 31,

28   2021, filed with the SEC on Form 10-Q on December 2, 2021.

**GRANTS** Plaintiffs' request for judicial notice as to these documents.  In so doing, the Court overrules Defendants' objection that Exhibit 1, the Joint Venture Agreement between C3 and BH (which was enclosed as an attachment to the Registration Statement C3 submitted to the SEC), should not be considered under either the incorporation by reference doctrine or the judicial notice doctrine.  Dkt. No. 140 at 2–3.  Although Plaintiffs do not explicitly reference the Joint Venture Agreement ("JVA") by name in their complaint, they do reference a "joint venture" and "deal" – the execution of which underpins their action.  *See* Dkt. No. 142 at 2.  The Court therefore finds that the JVA, a document filed with the SEC, "is not reasonably subject to dispute" and can be considered.  However, in keeping with its previously articulated approach, the Court does not assume the truth of any of the facts asserted in the judicially noticed documents or use those documents to supplement the allegations in Plaintiffs' complaint.  *See* Dkt. No. 140 at 3.

Plaintiffs also seek judicial notice of Exhibits 3 and 4, which are, respectively, a CNBC article titled "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers question metrics," and the video segment from the CNBC business show "Last Call" embedded within the article.  Pltf RJN at 3.  Both reports are dated June 2, 2023, which is years after the class period ended and a month after the C3 Defendants filed their motion to dismiss.  In these media reports – which discuss this very lawsuit in detail – the C3 Defendants purportedly made "public statements [to reporters] reaffirming that their claims regarding the size of Baker Hughes' salesforce were true and accurate representations of fact."  *Id*.  Plaintiffs argue that because the C3 Defendants advanced in their motion to dismiss a position contrary to the one articulated in the news article and video, judicial notice of the media reports is warranted "not for the truth of Defendants' statements, but for the fact that they were made and the context they provide."  *Id*. at 4 (citing *United States v. Kiewit Pacific Co.*, 2013 WL 5770514, at *5 (N.D. Cal. Oct. 24, 2013)).

But the Court is unpersuaded that considering media reports published years after the class period (in response to the very litigation at issue) is a proper application of the judicial notice doctrine, and Plaintiffs do not point to any cases to change that.  While the Court recognizes that judicially noticing news articles may be appropriate in some instances, *see Heliotrope Gen., Inc.*, 189 F.3d at 981 n. 18 (using news article to take judicial notice of what the market knew at the

1    time), this is not such an instance.  Since the reporting postdates the class period, it cannot provide

2    insight into what the market knew during that time.  Dkt. No. 140 at 4–5 (citing *In re Clearly*

3    *Canadian Sec. Litig.*, 875 F. Supp. 1410 (N.D. Cal. 1995)).  The Court therefore **DENIES** judicial

4    notice as to Exhibits 3 and 4.

5    **IV.     DISCUSSION**

6           **A.     Securities Act Claims**

7                 Plaintiffs contend in their CAC that the C3 Defendants made false and misleading

8    statements and material omissions in the Registration Statement that C3 filed in connection with

9    its December 2020 IPO.  CAC ¶¶ 69–108.  According to Plaintiffs, these statements and omissions

10   violated Section 11 of the Securities Act, as well as Items 303 and 105 of Regulation S-K, which

11   imposes additional requirements on SEC registrants.  The C3 Defendants argue, for their part, that

12   Plaintiffs' Section 11 claims sound in fraud and thus must meet the heightened pleading

13   requirements of Rule 9(b).  C3 MTD at 18–19.  They contend that Plaintiffs fail to state a

14   cognizable claim under that standard, and that, in any event, certain of their Section 11 claims are

15   time-barred.  *Id*.

16                **i.     Relation Back**

17                 Before turning to the substance of Plaintiffs' Section 11 claims, the Court considers as a

18   threshold matter whether certain of those claims are in fact untimely under Rule 15, as Defendants

19   urge.  It concludes they are not.

20                 "Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading

21   'relates back' to the date of a timely filed original pleading and is thus itself timely even though it

22   was filed outside an applicable statute of limitations."  *Krupski v. Costa Crociere S. p. A.*, 560

23   U.S. 538, 541 (2010).  "The relation back doctrine of Rule 15(c) is 'liberally applied.'"  *ASARCO,*

24   *LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (citation omitted).  As relevant

25   here, Rule 15(c) provides that an amended pleading adding claims against a previously named

26   party relates back to the date of the original pleading when the amendment asserts a claim or

27   defense that "arose out of the conduct, transaction, or occurrence set out – or attempted to be set

28   out – in the original pleading."  *See* Fed. R. Civ. P. 15(c)(1)(B).  "Claims arise out of the same

1    conduct, transaction, or occurrence if they 'share a common core of operative facts' such that the

2    plaintiff will rely on the same evidence to prove each claim." *Williams v. Boeing Co.*, 517 F.3d

3    1120, 1133 (9th Cir. 2008) (citations omitted); *see also ASARCO*, 765 F.3d at 1004 ("An amended

4    claim arises out of the same conduct, transaction, or occurrence if it 'will likely be proved by the

5    same kind of evidence offered in support of the original pleading.'") (quoting *Percy v. S.F. Gen.*

6    *Hosp.*, 841 F.2d 975, 978 (9th Cir.1988)).  "The Ninth Circuit has made clear that the emphasis is

7    not on the legal theory asserted by Plaintiff, but rather on the operative facts of the claim."

8    *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1133 (C.D. Cal.

9    2011) (citing *FDIC v. Jackson*, 133 F.3d 694, 702 (9th Cir.1998)).

10          Defendants argue that because the original complaint did not include allegations based on

11   statements about either the size of Baker Hughes' salesforce or on the amount of revenue

12   recognized from C3's relationship with Baker Hughes in the fiscal year ending April 2020, the

13   allegations in the amended complaint concerning those two statements cannot not relate back to

14   the original complaint.  C3 MTD at 26–27.  Plaintiffs, on the other hand, contend that the theories

15   they advance in their amended complaint concerning these statements do relate back to the

16   original complaint (and are therefore timely) because the amended complaint merely "refine[d]"

17   the theory of liability arising out of the same "transactions and occurrences" at issue in the original

18   complaint.  *See* Opp. at 63–64.  In other words, even though the original complaint did not allege

19   that Baker Hughes was not deploying 12,000 salespeople on C3's behalf, or that no sales had been

20   made by April 30, 2020, the original complaint *did* make allegations about how the Registration

21   Statement misrepresented the nature of C3's relationship with Baker Hughes – which is, at

22   bottom, what Plaintiffs allege these statements concern.

23          To assess these arguments, the Court starts by examining Plaintiffs' original complaint.  As

24   relevant here, the complaint originally asserted Section 11 claims premised upon misleading

25   statements and material omissions made in the Registration Statement about C3's deteriorating

26   relationship with Baker Hughes, C3's flawed accounting methods, C3's product performance and

27   personnel retention issues, the "scale of [C3's] alliances with its major business partners," and

28   other matters.  Dkt. No. 1 ¶ 6.  Based on these alleged deficiencies, Plaintiffs pled that C3's

United States District Court
Northern District of California

"public statements were materially false and misleading at all relevant times," and quoted dozens of allegedly misleading paragraphs from the Registration Statement. *Id.* ¶¶ 6, 38–41. In the CAC, filed almost a year after the amended complaint, Plaintiffs again bring Section 11 claims, but focus more narrowly on just three statements in the Registration Statement concerning C3's relationship with Baker Hughes (Statement #1), the size of Baker Hughes' workforce (Statement #2), and the revenues recognized from the relationship (Statement #3).[10]

Comparing the original and amended complaints shows that the case theories advanced in the latter do not entirely track those raised in the former, but the Court finds that the initial complaint provided sufficient notice of Plaintiffs' claims regarding the now-challenged statements to warrant relation back. Namely, the original complaint clearly identified Plaintiffs' concerns about the reliability of representations made in C3's Registration Statement concerning its relationship with Baker Hughes, the strength of its corporate relationships, and its financial performance. The CAC presents similar concerns about the Registration Statement, only with a narrowed focus on certain aspects of the Baker Hughes' partnership – namely the lack of staffing commitment and sales generation.[11] Accordingly, and in view of the liberality with which the relation back doctrine is applied, the Court finds that the claims in the amended complaint generally arise out of the "same transaction and occurrence" contemplated in the original complaint, and that the amended claims would "likely be proved by the same kind of similar evidence." *See ASARCO*, 765 F.3d at 1004. Relation back is therefore proper, and the Court will proceed to analyze these statements (identified as #2 and #3 *infra*). That conclusion notwithstanding, Defendants are not foreclosed from raising statute of limitations arguments at

---

[10] For ease, the Court will follow the same numerical identification that Defendants assigned to each challenged statement for purposes of the C3 MTD. *See* Dkt. No. 105-1, Appendix A (chart identifying the statement number, CAC paragraph, date, speaker, and source of each statement challenged in Plaintiffs' CAC).

[11] The Court notes that while Plaintiffs did not make specific allegations about the size of the Baker Hughes workforce or about revenue recognition from the partnership as of April 30, 2020 in their original complaint, they *did* quote Statement #3 as part of a longer Registration Statement excerpt, and also separately excerpted quotes touting the contested 12,000-salesforce figure. Therefore, while Plaintiffs did not necessarily connect all the dots for Defendants in their original filing, Defendants cannot claim to be unfamiliar with these statements.

later stages of the proceeding if further fact development warrants it.

### ii.     Legal Standard

"Section 11 of the Securities Act contains a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with that security that 'contain[s] an untrue statement or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting 15 U.S.C. § 77k(a)).  To allege a Section 11 claim, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Id.* (quotation omitted).  Importantly, "[n]o scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) (citation omitted).

Unlike Section 10(b) claims, the heightened pleading standards of the PSLRA do not apply to Section 11 claims.  *See Rubke*, 551 F.3d at 1161.  However, "[t]he particularity requirements of Rule 9(b) apply to claims brought under [S]ection 11 when such claims are grounded in fraud." *Rigel*, 697 F.3d at 876.  The Ninth Circuit has held that "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its [S]ection 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *Id.*  "To ascertain whether the complaint sounds in fraud, [the Court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* (internal quotation marks and citations omitted).

While Plaintiffs disclaim "any allegation of fraud, recklessness, or intentional misconduct" in incorporating the allegations supporting their Section 11 claims, CAC ¶ 96, Defendants urge that Plaintiffs' fraud allegations cannot be so cleanly excised.  C3 MTD at 18–19.  The Court disagrees: Plaintiffs clearly identify which allegations in their complaint underpin their Section 11 versus Section 10(b) theories, and those allegations are far from "the exact same." *See Rigel*, 697

F.3d at 886; *Rubke*, 551 F.3d at 1161 (concluding that a court can assume a Section 11 complaint sounds in fraud where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act").  In fact, Plaintiffs' claims do not overlap at all: while there are parallels between certain of the statements challenged under each law (namely Statements #2 and #18, and Statements #1 and #14), Plaintiffs have not alleged that any given statement violates both Section 11 and Section 10(b).  This contrasts with the situation in *Rigel*, for instance, where the plaintiff did not adopt all the allegations contained in the complaint, but also did not allege *different* misrepresentations for its Section 11 claim.  *Rigel*, 697 F.3d at 886.  Accordingly, the Court concludes that Plaintiffs' Section 11 claims stand sufficiently alone, such that application of the heightened pleading standard is not warranted.

### iii.   Section 11

Plaintiffs base their Section 11 claims against C3, Simonelli, Siebel, and Barter on three statements in C3's Registration Statement. [12]

#### a.   Statement #1

Plaintiffs allege that the following statement, which describes C3's "Go-To-Market Strategy," is misleading:

> Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. **Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry**

---

[12] Plaintiffs informed the Court in their Opposition that they are withdrawing their Section 11 claim against Abbo.  Opp. at 61 n.16.  As such, the Section 11 analysis applies only to C3, Simonelli, Siebel, and Barter – who the Court will collectively refer to in Sections IV.A.iii and IV.A.iv of this order as "Defendants," and elsewhere in this order as the "Section 11 Defendants."

United States District Court
Northern District of California

1

2

**partner in oil and gas, Baker Hughes**, as well as with our iconic global customers, some of whom are deploying C3 technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations.

3

4   CAC ¶ 74 (bolding in original; underlining added).  While Plaintiffs do not make any specific

5   allegations in the CAC about this statement or how, exactly, it is misleading, their opposition

6   advances the theory that the statement misled the market by creating an impression – based on the

7   claim in the first sentence that the alliances "vastly extend" C3's global reach – that a "large"

8   salesforce was involved with selling C3 products at Baker Hughes when, in reality, it was not.

9   Opp. at 35.  Defendants disagree.  They argue that Plaintiffs do not allege that Statement #1

10   "falsely represented their actual partnership plans and expectations," and that, regardless, the

11   statement is best understood as "classic corporate puffery."  C3 MTD at 20.

12         Plaintiffs' failure to allege in the complaint how this statement was misleading is

13   essentially dispositive.  And even had they done so, the Court is not persuaded that the challenged

14   language could plausibly mislead a reasonable investor.  The first sentence of the challenged

15   statement does not, as Plaintiffs suggest, claim that any *individual* alliance – whether with Baker

16   Hughes, FIS, IMB, Microsoft, or another strategic partner – "vastly extends" C3's reach.  It claims

17   that the "alliances" do.  A plain reading of the challenged language is therefore that the cumulative

18   effect of C3's strategic alliances across various industries is to "vastly extend" its global reach.

19   Since the statement is silent on the impact of any single partnership on C3's reach, the Court finds

20   Plaintiffs' argument that it made any representation about the size of Baker Hughes' salesforce

21   implausible.  Further, for the statement to be misleading about Baker Hughes specifically, it must

22   be true that Baker Hughes did not contribute to extending C3's reach globally – which Plaintiffs

23   do not allege.

24         Moreover, the Court agrees that the claims at issue in this statement – that C3's strategic

25   alliances "vastly extend" its global reach, and that Baker Hughes is a "strategic vertical partner"

26   with whom C3 has realized its partnership strategy of "establish[ing] a significant use case and

27   prov[ing] the value of our AI Suite" – are puffery.  In the securities context, puffery is not

28   actionable because investors "know how to devalue" such subjective statements of corporate

optimism when assessing a corporation.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 (9th Cir. 2010).  The statements at issue here are too vague for a reasonable investor to rely upon in assessing C3 because they are not susceptible to "objective verification."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).  For example, C3's claim that its partnerships have "vastly" expanded its global reach is unquantifiable given the inherent inexactitude of the descriptor "vastly," and its statement that the Baker Hughes partnership is "proving" the value of its AI products is general in nature, given the subjectivity of that proof in this context.  *See Hampton*, 2020 WL 6710096 at *13 (discussing and dismissing as puffery statements such as "[w]e believe this [IB partnership] serves as a strong validation of our technology").

As such, Statement #1 is nonactionable, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Section 11 claim as to this statement.[13]

> b. <u>Statement #2</u>

Next, Plaintiffs allege that the following statement describing C3's "Sales Alliances" is misleading:

> Baker Hughes: Oil, Gas, and Chemicals. In 2019, we a formed a strategic alliance with Baker Hughes, a $24 billion oil and gas services company. Under the terms of this alliance, Baker Hughes has standardized on C3 for all internal use AI applications**. In addition, we are jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization.**

CAC ¶ 75 (emphasis in original).  They contend that the statement is misleading "for failing to disclose the fact that C3 did not have engagement with the Baker Hughes 12,000-person salesforce, but instead set up a separate sales division that relied on a subset of sales people that

---

[13] In any amended complaint, Plaintiffs must fully allege the basis for every claim.  Supplementing allegations through briefing will not be permitted, and the Court will, for example, ignore any arguments only raised in the briefing (but not in the complaint) explaining why a challenged statement is misleading.

United States District Court
Northern District of California

did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce . . . ." *Id.* ¶ 76.  As a result of this structure, they allege that "C3 could not reap the full benefits of a partnership." *Id.*  Defendants, for their part, maintain that because the challenged statement "did not state, suggest, or imply that *all* the people in Baker Hughes' salesforce were working for C3," and because it contains "nothing misleading about C3's description of Baker Hughes' salesforce," Statement #2 is not actionable.  C3 MTD at 21. Defendants further argue that they disclosed to investors that C3 "cannot be certain" that its strategic partners would adequately resource and prioritize sales efforts of C3 products.  *Id.*

Because the Court does not agree that the challenged statement "actively created an impression that the full 12,000-person Baker Hughes was engaged with C3," it finds the statement nonactionable.  Plaintiffs have not alleged that the Baker Hughes salesforce was not actually 12,000 strong, such that the statement does not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  The Court also concludes that Plaintiffs have not plausibly pled that the statement omitted information that rendered it misleading.  Since the omission of the information about the size of BH's C3-focused salesforce did not "make [Statement #2] misleading," *id.*, Defendants were not obligated to disclose it.  And while investors may have been interested to know what proportion of the 12,000-strong BH salesforce was engaged in selling C3 products, "Section 11 does not require the disclosure of all information a potential investor might take into account when making his decision."  *Rubke*, 551 F.3d at 1163.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Section 11 claim as to Statement #2.

### c.  Statement #3

Finally, Plaintiff alleges that the following statement, made in relation to a description of C3's financial performance, is misleading:

> In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for

17

Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization. **During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement.**

CAC ¶ 77.  Plaintiffs allege that this statement was misleading "for stating that C3 recognized revenue from deals brought in by Baker Hughes through the reseller arrangement in the fiscal year ending April 30, 2020 because Baker Hughes had, in fact, brought in *no* deals through the reseller agreement, so it was impossible for C3 to have recognized revenue through the arrangement for fiscal year ending April 30."  *Id*. ¶ 78 (emphasis in original).  To support the allegation that the reseller arrangement yielded "no deals" by the end of that fiscal year, Plaintiffs rely on the testimony of Former Employee No. 1 ("FE-1"), allegedly "a former Vice President who worked at C3 from at least March 2020 to May 2020" who "reported directly to CEO Tom Siebel" and "attended weekly calls . . . where new sales leads were discussed."  *Id*. ¶ 55.  "[D]uring the March 2020 to May 2020 period," FE-1 alleges he heard "the General Manager [of the Oil & Gas segment] regularly report that the Baker Hughes pipeline was non-existent, and that it made no sales as of April 30, 2020."  *Id*. ¶ 67.

Defendants argue that Plaintiffs' claim fails for several reasons.  First, Defendants contend that the Registration Statement tells a different story, and argues that the approximately $6 million delta reported there between the *total* revenue realized from the Baker Hughes arrangement and the revenue realized from their subscription fees "necessarily includes deals brought in by Baker Hughes that generated several million in revenues."  C3 MTD at 22.  Second, they argue that the structure of the Baker Hughes arrangement provided for minimum annual commitments, regardless of what deals were brought in.  *Id*. at 22–23.  Third, they argue that the hearsay attributed to FE-1 is unreliable for a variety of reasons – namely because FE-1 is not described with adequate particularity and his allegations are tension with the "unchallenged" figures in the Registration

18

Statement.  *Id*. at 23.

While it is something of a close question, the Court concludes that Plaintiffs have plausibly alleged that Statement #3 was misleading for suggesting that the Baker Hughes arrangement closed deals by the close of the fiscal year ending April 30, 2020.  In so doing, the Court determines that the allegations made by FE-1 are sufficiently particularized.  Since FE-1 alleges that he was a Vice President who reported directly to Siebel and attended weekly calls on sales across industry segments, the Court disagrees with the suggestion that he was "simply not positioned to know the information alleged."  C3 MTD at 23 (citing and quoting *Zucco Partners*, 552 F.3d at 996–1000).  Based on the seniority that his title and reporting structure suggests, the Court likewise disagrees with the notion that without formal "responsibility for the Baker Hughes partnership," FE-1's recollection about Baker Hughes' sales performance is unreliable.  *Id*.  The allegations describing him, though few, "provide an adequate basis for determining that" FE-1, by virtue of his senior role and presence at key meetings, "[had] personal knowledge of the events [he] report[s]."  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023).  Further, the Court is unpersuaded that the length of FE-1's tenure should discredit his allegations, since it is the *timing* of his employment that is relevant.  Given that he supposedly attended meetings towards the end of the fiscal year where Baker Hughes' sales pipeline and total sales were discussed, the Court finds it plausible that segment directors discussed not just "new leads," but also reported on deals closed across the fiscal year.  Whether he was employed at the time of the IPO is thus inapposite.

Defendants argue that considering FE-1's allegations is additionally problematic since they are "contrary to unchallenged disclosures in the Registration Statement" and "not corroborated by the complaint."  C3 MTD at 23.  But even if it considered the financial figures in the Registration Statement upon which Defendants rely to show that BH *did* close deals, the Court agrees with Plaintiffs that since BH was contractually obligated to cover sales shortfalls up to a minimum threshold, the revenue earned in excess of the subscription revenue does not "necessarily" reflect deals that Baker Hughes closed through the reseller arrangement.  Opp. at 38.  It is plausible, for

example, that the delta represented money BH paid to cover its own sales shortfall.[14]  *Id.*  As such, the Court does not find at this stage that the complaint or judicially noticed documents necessarily contradict FE-1's allegations concerning the lack of deals closed.

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' Section 11 claim based on Statement #3.

### iv.    Items 303 and 105

Plaintiffs also allege that the Registration Statement violated Items 303 and 105 of Regulation S-K, which imposes independent and affirmative disclosure duties on SEC registrants. Item 303 requires that offering materials disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Item 105 requires that registration statements filed on Form S-1 include "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

#### a.   Item 303

To state a Section 11 claim for failure to adhere to Item 303, Plaintiffs must plausibly allege "(1) the existence of a trend or uncertainty; (2) known to management; (3) that is reasonably likely to have a material effect on the registrant's financial condition or results of operation."  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998).  The Ninth Circuit has held that because Section 11 imposes liability if a registrant "omits to state a material fact required to be stated" in the registration statement, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11."  *In re Violin Memory Sec. Litig.*, 2014 WL 5525946,

---

[14] Defendants also argue that Plaintiffs' claim should fail because they do not allege a material difference between (1) revenue earned through BH's sales of C3 products and (2) revenue earned through BH covering sales shortfalls.  C3 Reply at 14.  This argument boils down to a contention that there is not a meaningful difference in terms of company outlook between revenue earned from selling sufficient products and from *not* selling sufficient products.  Though Plaintiffs could have drawn out this significance in their CAC, the Court agrees (at least at the pleading stage) that Plaintiffs' argument that "common sense dictates that investors would find revenue generated by new sales and revenue generated due to a negotiated floor to be materially different" is plausible. Opp. at 63.

United States District Court
Northern District of California

at *15 (N.D. Cal. Oct. 31, 2014) (quoting *Steckman*, 143 F.3d at 1296).

Plaintiffs argue that Defendants violated Item 303 by failing to disclose material and known risks "related to the Baker Hughes partnership, specifically that Baker Hughes was not utilizing its typical salesforce, but instead set up a separate sales division that relied on sales people that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, there was a risk that Baker Hughes would not perform effectively under their partnership." CAC ¶ 84. Defendants argue that Plaintiffs have not adequately alleged that the nature of Baker Hughes' salesforce constituted "a known trend or uncertainty" requiring disclosure, and that, in any event, Defendants provided adequate risk disclosures "sufficient to fulfill any duty under Item 303." C3 MTD at 24–25. In particular, Defendants stress that the Registration Statement disclosed, for instance, that C3 "'cannot guarantee' its strategic partners 'will continue to devote the resources necessary to expand our reach and increase our distribution' or 'will prioritize and provide adequate resources to selling our AI suite and AI Applications,' that 'we cannot assure you that these relationships will result in increased customer usage. . . or increase revenue,' and that absent such relationships 'our business, operating results, and financial condition could be adversely affected.'" *Id*. at 25.

The Court finds that Plaintiffs have not adequately alleged that the structure and staffing of the BH salesforce focused on selling C3 products was a "known risk" requiring disclosure in Plaintiffs' IPO materials beyond what Defendants provided. Defendants' disclosures cautioned investors about the contingencies of their strategic partnerships and the possibility that they would not increase revenues. And while Plaintiffs argue in their Opposition that these disclosures were too abstract to satisfy Defendants' obligations under Item 303 because the risks attendant to the Baker Hughes joint venture had *already* materialized, Opp. at 48, the CAC lacks allegations about "what risks or 'negative impacts' had 'materialized' at the time of the Registration Statement." C3 Reply at 15. Without more specific allegations about what Defendants knew at the time the Registration Statement was filed concerning the risks engendered by the structure and staffing of BH's C3-focused salesforce, the Court concludes that Defendants' disclosures satisfied any duty to disclose they had under Rule 303.

### b.  Item 105

Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §§ 229.105(a); *Steckman*, 143 F.3d at 1296. Plaintiffs maintain that liability arises under this provision for the same reason it does under Item 303: Defendants' failure to disclose the deficient structure and staffing of the Baker Hughes salesforce engaged in selling C3's products.  CAC ¶ 89.  Without more specific allegations about the risks that the structure of the Baker Hughes salesforce presented at the time of the IPO, the Court concludes that Plaintiffs' assertions under Item 105 also fail.

### v.  Section 15

Plaintiffs allege that Siebel (as CEO and signatory to the Registration Statement), Barter (as CFO and signatory to the Registration Statement), Simonelli (as Board Director, Audit Committee Director, and signatory to the Registration Statement), and Abbo (as CTO and C3 "Thought Leader") were controlling persons of C3 when the Registration Statement was submitted, and are therefore liable under Section 15 for violations of the Securities Act.[15]  CAC ¶¶ 109–116, 31–35.  Defendants argue that Plaintiffs' control person arguments fail to state a claim because they rely on the *fact* of Defendants' executive positions rather than specific allegations about how the Defendants were involved in day-to-day company operations or the contested filings.  C3 MTD at 45.

Section 15 allows plaintiffs to bring claims against parties who are "control persons" for a primary violation of the Securities Act of 1933.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) (stating that the "controlling person analysis" for Section 15 is the same as for Section 20(a)).  Plaintiffs must therefore allege (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Having found a primary

---

[15] Plaintiffs informed the Court in their Opposition that they are withdrawing their Section 15 claim against Baker Hughes.  Opp. at 61 n.16.  As such, the Court will only analyze Plaintiffs' Section 15 claims against Siebel, Barter, Abbo, and Simonelli – who the Court will collectively refer to in Section IV.A.v of this order as "Defendants," and elsewhere in this order as the "Section 15 Defendants."

1    violation of Section 11 based on Statement #3, the Court considers whether Defendants Siebel,

2    Barter, Abbo, or Simonelli "exercised actual power or control over the primary violator," which it

3    understands to be C3.  *Id*.

4        The Court concludes that Plaintiffs adequately plead that Individual Defendants Siebel,

5    Barter, and Simonelli meet this standard at this early stage.  These defendants occupied very

6    senior leadership positions, with Barter and Simonelli serving in finance-specific roles.  While "a

7    person's being an officer or director does not create any presumption of control, it is a sort of red

8    light."  *Arthur Children's Tr. v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993).  When that red light is

9    supplemented by "[a]llegations of day-to-day oversight of a company's operations and

10   involvement," a finding of control person liability is justified.  *In re Aqua Metals, Inc. Sec. Litig.*,

11   No. 17-CV-07142-HSG, 2019 WL 3817849, at *10 (N.D. Cal. Aug. 14, 2019).  Here, Plaintiffs

12   make these additional allegations.  Notably, Barter, Simonelli, and Siebel are not only alleged to

13   have received and reviewed copies of SEC filings, but are also alleged to have actually signed the

14   Registration Statement containing Statement #3.  CAC ¶¶ 33, 34.  *Solarcity*, an authority upon

15   which Defendants rely, is certainly distinguishable on this basis.  *See Bao v. Solarcity Corp.*, No.

16   14-CV-01435-BLF, 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016).  Siebel is additionally alleged

17   to have been present at the meeting where comments undermining the veracity of Statement #3

18   were made.  *Id*. ¶ 67.  As such, Plaintiffs' allegations are sufficient to "presume [Barter, Simonelli,

19   and Siebel's] control over the 'transactions giving rise to the alleged securities violation.'"

20   *Howard*, 228 F.3d at 1065.

21       The same cannot be said for Abbo, as Plaintiffs' allegations about his control are too

22   conclusory.  *See CAC* ¶ 35.  Though Plaintiffs allege that he, like the others, "possessed the power

23   and authority to control the contents of C3's SEC filings, press releases, and other market

24   communications," *id*., they do not aver other facts about his day-to-day involvement with the

25   company that make this conclusion plausible.  In short, the Court finds that Plaintiffs have not

26   pled an "ostensible reason for the public to place particular reliance upon [Abbo, C3's CTO and

27   named "Thought Leader"] for the veracity" of the contested financial representation.  *In re Gap*

28   *Stores Sec. Litig*., 457 F. Supp. 1135, 1141 (N.D. Cal. 1978).

******

In sum, the Court **GRANTS** the C3 Defendants' motion to dismiss Plaintiffs' Section 11 claims premised upon Statements #1 and #2, but **DENIES** it as to Statement #3.  It further **GRANTS** the C3 Defendants' motion to dismiss Plaintiffs' claims arising under Items 303 and 105.  Finally, it **GRANTS** the C3 Defendants' motion to dismiss Plaintiffs' Section 15 claim against Abbo, but **DENIES** the motion as to the claims asserted against Siebel, Barter, and Simonelli.

### B.   Exchange Act Claims

#### i.   Section 10(b) and Rule 10b-5

Plaintiffs allege that the C3 Defendants violated Section 10(b) of the of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and implementing Rule 10b-5, 17 C.F.R. § 240.10b-5, by making false statements or omissions about (1) BH's salesforce and (2) the BH/C3 Partnership.[16]  To plead a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: "(1) a material misrepresentation or omission by [Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022).  Here, Defendants assert that Plaintiffs' Exchange Act claims fall short on three bases: falsity, scienter, and loss causation.[17]  While the Court finds falsity and loss causation adequately alleged, it determines that scienter is too thinly pled to state a cognizable claim under the Exchange Act and Rule 10b-5.

//

//

---

[16] Rule 10b-5 of the Exchange Act's implementing regulations is coextensive with Section 10(b). *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002). The Rule prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Glazer Cap. Mgmt., L.P.*, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)).

[17] For purposes of Section IV.B.i, the term "Defendants" means C3, Siebel, Abbo, Barter, and Simonelli.  When referenced elsewhere in this order, the Court will refer to them as the "Section 10(b) Defendants."

### a. Falsity

Plaintiffs allege that Defendants made numerous statements during the class period in violation of Section 10(b) and Rule 10b-5. Defendants contend that the statements challenged in the CAC are not materially false or misleading. *See* C3 MTD at 27–31.

#### 1. Legal Standard

To survive this ground for dismissal, Plaintiffs must identify the statements at issue, set forth what is false or misleading about the statements, and why the statements were false or misleading at the time they were made. *Rigel*, 697 F.3d at 876. The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

"Falsity is alleged when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale*, 845 F.3d at 1275 (quotations and alterations omitted). "To be misleading, a statement must be 'capable of objective verification.'" *Id.* (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). "For example, 'puffing' – expressing an opinion rather than a knowingly false statement of fact – is not misleading." *Id.*; *see also In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) ("Generally, such statements consist of forward-looking or generalized statements of optimism that are 'not capable of objective verification,' and 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'") (citations omitted). However, even "general statements of optimism, when taken in context," may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

"Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09. "An omission is material when there is a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Irving Firemen's Relief & Ret. Fund v. Uber Tech.*, 398 F. Supp. 3d 549, 555–56 (N.D. Cal. 2019) (citation omitted). "Omissions are actionable only where they make the actual statements misleading; it is not sufficient that an investor merely would consider the omitted information significant." *Id.* (internal quotation marks and citation omitted). "And irrespective of whether Plaintiff alleges an omission or misstatement, an actionable representation must be material." *Id.* "For the purposes of a 10b–5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

The Court groups the allegedly misleading statements into two categories and analyzes Plaintiffs' allegations of falsity as they relate to the statements in each.

### 2. Category A: Statements Regarding Baker Hughes' 12,000-Person Salesforce

Plaintiffs contend that the C3 Defendants made more than a dozen misleading statements and omissions during the class period concerning the size of the Baker Hughes salesforce engaged in selling C3 products.[18] Each of these allegations, Plaintiffs contend, "fail[ed] to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce." *See, e.g.*, CAC ¶ 125. Defendants dispute the falsity of the statements, arguing that the challenged statements are "classic puffery that no reasonable investor would have taken literally," did not alter the mix of information in the market, and, ultimately, are immaterial in light of the partnership's strong financial performance. C3 MTD at 28–29.

The Court finds that Plaintiffs have alleged falsity for virtually all of the challenged statements in this category. Unlike Statement #2, analyzed above, Statements #4-6, #8-11, #13, and #15-17 do not just represent that BH's salesforce numbered 12,000 strong, but go further and,

---

[18] These include Statements #4-6, #8-13, and #15-18, as identified in Appendix A, *see* Dkt. No. 105-1.

United States District Court
Northern District of California

as alleged, plausibly suggest that BH's entire 12,000-person salesforce was in fact selling C3 products.  For instance, in a single day at the KeyBanc Emerging Technology Summit, Siebel stated that "Baker Hughes has 12,000 people selling for us around the world" (CAC ¶ 124, Statement #4), "our sales teams are growing, we have 12,000 people at Baker Hughes" (*id.*), and "in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people," CAC ¶ 126, Statement #5.  A week later, Siebel stated on an earnings call that C3's partnership with Baker Hughes "gives [C3] access to 12,000 people now selling with [it] around the world."  CAC ¶ 128, Statement #6.  At the JMP Securities Conference in March 2021, Siebel again repeated the refrain that C3 had "12,000 salespeople selling for [it]" at Baker Hughes (CAC ¶¶ 132, 134, 136, Statements #8–10), and added that the Baker Hughes partnership "allows [C3] to walk immediately into the board room of Aramco," which would otherwise take "10 years" to happen.  CAC ¶ 134, Statement #9. In May, Siebel again stated that through Baker Hughes, C3 has "12,000 people selling C3 [products] for us all around the world every day, 12,000 people."  CAC ¶ 132, Statement #11. Siebel shared similar remarks in August 2021 at Canaccord's 41st Annual Growth Conference (CAC ¶ 142, Statement #13), in September 2021 at the Deutsche Bank Tech Conference (CAC ¶ 146, Statement #15) and at the Piper Sandler 2021 Global Tech Conference (CAC ¶ 148, Statement #16), and in November 2021 at the KeyBanc Summit (CAC ¶ 151, Statement #17).

Since Plaintiffs allege that fewer than 12,000 people at Baker Hughes were selling C3 products, the Court agrees that Siebel's statements are sufficiently alleged to be misleading for representing otherwise.[19]  While Defendants characterize these statements as "puffery," the Court

[19] While it finds almost all of the challenged statements in this category adequately alleged to be misleading (Statements #4-6, #8-11, #13, and #15-17), the Court finds, for the same reason that it determined Plaintiffs' allegations as to Statement #2 were lacking, that Plaintiffs do not adequately allege that Statements #12 or #18 are misleading.  *See* CAC ¶¶ 140 ("We are jointly marketing and selling . . . with the active engagement of Baker Hughes, which has a 12,000-person sales organization."), 153 ("We agreed that . . . Baker Hughes . . . would be marketing our solutions through their 12,000 sales organization globally").  Unlike the other challenged statements in this category, these statements (like Statement #2) simply state the size of Baker Hughes' salesforce, and do not represent or plausibly imply that the entire salesforce was mobilized to sell C3 products.

1    does not agree that they are "obvious hyperbole" that "no reasonable investor would have taken

2    literally."  C3 MTD at 28.  Defendants "point to no reasons why outsiders would have had

3    preexisting expectations about the scope of the partnership with Baker Hughes such that it would

4    be obvious that Siebel's statements that Baker Hughes' full sales team was offering C3 products

5    could not have been literally true."  Opp. at 31.  And regardless, the number of C3 salespeople at

6    Baker Hughes is a figure "capable of objective verification," and is not merely a "mildly

7    optimistic, subjective assessment" of how business is going.  *See Oregon Pub. Emps. Ret. Fund v.*

8    *Apollo Grp. Inc.,* 774 F.3d 598 (9th Cir. 2014).  As such, the Court is unpersuaded that Siebel's

9    statements were puffery.[20]

10       The Court also rejects Defendants' argument that the statements did not alter the mix of

11   information in the market in light of C3's disclosures.  Defendants contend that because the IPO

12   documents disclosed to investors that C3 could not guarantee that its partners would dedicate

13   adequate resources to selling C3's products, "no reasonable investor could think that every single

14   member of Baker Hughes' 12,000-person salesforce was selling C3 products every day."  C3

15   MTD at 28.  The Court disagrees.  The Registration Statement does not say how many BH

16   salespeople C3 and BH agreed would promote C3's products; it only cautions that strategic

17   partners like BH may not leverage adequate internal resources within the scope of whatever

18   agreements are made – be it for 12 or 12,000 salespeople to promote C3.  Siebel's repeated

19   representations that 12,000 people were selling for C3 "every day" are thus plausibly alleged to be

20   new data points beyond those included in the IPO materials that altered the mix of information

21   available to investors.

22       Finally, Defendants argue that the statements – even if misleading – are not material

23   because C3's revenues "increased every single quarter of the Class Period and C3 consistently

24   beat its revenue guidance."  C3 MTD at 29.  This argument is misplaced.  C3's apparently strong

25   ────────────────────

26   [20] The Court further agrees that Plaintiffs have plausibly pled that at least some of Siebel's
     statements explicitly attributed C3's "leverage" in the oil and gas segment to the nature of the
27   Baker Hughes partnership, and specifically connected the "12,000 people selling for [C3]" to C3's
     ability to "walk immediately into the board from of Aramco" years sooner than otherwise.  *See*
28   Statement #9.

United States District Court
Northern District of California

financial performance does not make C3's alleged misleading statements and omissions nonactionable.  Regardless, materiality is "a fact-specific determination that should ordinarily be assessed by a jury" and that may be resolved only on a motion to dismiss if it is "so obvious that reasonable minds could not differ."  *Alameda v. Nuveen Municipal High Income Opportunity Fund*, 2009 WL 1424529, at *7 (N.D. Cal. May 20, 2009) (holding that complaint sufficiently pled materiality).  The Court does not find this to be one of those rare instances: Plaintiffs have pled that the arrangement with Baker Hughes did not result in 12,000 salespeople selling C3 products globally every day, but rather the creation of a smaller, "separate sales division that relied on salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of the typical 12,000-person salesforce."  Plaintiffs have further alleged that as a result, C3 could "not reap the full benefits of the partnership and revenue was far below what C3 had expected" – suggesting that even if revenues were increasing, they were doing so at an slower clip than would have been possible had 12,000 salespeople been activated as represented.  CAC ¶ 150.  The Court therefore finds that Plaintiffs have plausibly pled that the scale of sales resource commitment was a material fact for investors – a conclusion buttressed by the sheer number of times Siebel himself raised the challenged figure in a few short months.

In sum, the Court finds that Plaintiffs have plausibly pled falsity for this category of statements.[21]

### 3.   Category B: Statements Regarding C3's Partnership with Baker Hughes

Next, Plaintiffs argue that C3 misled investors about the partnership with Baker Hughes at least two times during the class period.  They allege the first instance was when C3 stated, in its September 1, 2021 10-Q, that "[o]ur strategic go-to-market alliances vastly extend our reach

---

[21] While it does not affect the Court's ultimate conclusion, the Court notes that it does not find it plausibly pled that the statements made from August 21, 2021 onward (i.e. Statements #13–17) were misleading for the additional reason that they "fail[ed] to disclose C3's failed reorganization of its sales team."  Opp. at 70.  While investors may have been interested to know about changes to C3's internal sales structure (which presumably promoted C3 products across all market segments), Siebel's silence on C3's internal reorganization in the context of a statement about C3's partnership with Baker Hughes and the size of its external salesforce does not render the statement additionally misleading.

1    globally.  Some of our most notable partners include Baker Hughes . . . ."  CAC ¶ 144, Statement

2    #14.  They allege that the second instance was when Abbo, at a Morgan Stanley Conference in

3    March 2021, in response to a question about how C3 selected Baker Hughes as an industry

4    partner, stated that "there is no better partner than Baker Hughes. They basically have a long-

5    standing deep relationships with almost all oil and gas companies, independent national companies

6    out there. The collaboration is I would say is very deep if you will. So we're collaborating on

7    product. We're collaborating on the customer engagement to make them successful and Uwem

8    [Ukpong] and I speak on a multiple times [sic] on a weekly basis. So it's really a very deep

9    partnership between the two companies . . . ."  CAC ¶ 130, Statement #7.

10       Defendants, meanwhile, argue that both statements are nonactionable puffery.  C3 MTD at

11   31.  The Court agrees.  The claim that Baker Hughes is among the notable partners that "vastly

12   extend" C3's global reach is not misleading for the reasons already described in connection with

13   Statement # 1.  *See supra.*  The same is true for Abbo's "no better partner" statements.  Though

14   Plaintiffs allege that this statement was misleading for failing to disclose that Baker Hughes was

15   not utilizing its typical 12,000-person salesforce, the size of the actual salesforce selling C3

16   products was not a fact necessary to "make the statement[] made, in light of the circumstances

17   under which [it was] made, not misleading.'"  *Wochos*, 985 F.3d at 1188.  The statement at issue

18   makes no representations about the size of the salesforce promoting C3 products, and thus does

19   not "affirmatively create an impression of a state of affairs that differs in a material way from the

20   one that actually exist[ed]" regarding the Baker Hughes salesforce.  *Brody*, 280 F.3d at 1006.

21   Moreover, whatever the statement *does* communicate regarding the companies' purportedly strong

22   collaboration is best understood as puffery.  *See Terenzini v. GoodRx Holdings, Inc.*, 2022 WL

23   122944, at *4 (C.D. Cal. Jan 6, 2022) (partnerships creating "deep competitive moat" were

24   unactionable puffery).  Like the claim that the partnership "vastly extends" C3's global reach, the

25   notion that its relationship with Baker Hughes is "very deep" is an "optimistic, subjective

26   assessment" not easily susceptible to objective verification.  *In re Cornerstone Propane Partners,*

27   *L.P.*, 355 F. Supp. 2d at 1087.

28       As such, the Court finds that Plaintiffs have not plausibly pled falsity as to the statements

United States District Court
Northern District of California

30

in Category B.

### b. Scienter

The Court next considers whether Plaintiffs have sufficiently alleged scienter as to the statements in Category A. To sufficiently plead scienter under the PLSRA, Plaintiffs must state with particularity facts that "give rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); *see Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (citation omitted). Deliberate recklessness is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991. "A complaint will survive," the Supreme Court has instructed, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). As such, "[t]he PSLRA's strong inference requirement has teeth," and "is an exacting pleading obligation" that "present[s] no small hurdle for the securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quotation omitted).

Even though the Court found that Plaintiffs did not plausibly plead that Defendants Abbo, Barter, or Simonelli made any false or misleading statements, it will for the sake of completeness, address the scienter allegations as to all Individual Defendants.

#### 1. Defendant Siebel

Plaintiffs allege scienter as to Defendant Siebel based on three theories: (1) direct scienter, (2) core operations, and (2) motive. The Court finds that Plaintiffs' allegations fall shy of adequately alleging that Siebel acted with at least deliberate recklessness when making the statements properly alleged to be false and misleading in Category A.

*Direct Scienter*

According to Plaintiffs, Siebel actually knew of, or had access to, information

1    contradicting his public statements about the size of the Baker Hughes salesforce involved in

2    selling C3 products.  Opp. at 40.  They point to several alleged indicia of this direct knowledge.

3    First, Plaintiffs allege that Siebel had "extensive involvement in developing and marketing C3 and

4    the joint venture" – a sentiment echoed in C3's 2021 10-K, which stated that "Siebel is critical to

5    [C3's] overall management, sales strategy, culture, strategic direction, engineering and operations"

6    and "critical to the continued development of our C3 Suite."  CAC ¶ 204.  Second, Plaintiffs

7    allege that, according to FE-1, Siebel attended weekly sales calls where the Baker Hughes sales

8    pipeline (or lack thereof) was discussed.  Third, Plaintiffs allege that Siebel's repeated

9    commentary on the size of the BH salesforce suggests he knew the salesforce to be smaller than

10   represented, as does his admission in December 2021 that "the management team and I" had been

11   working on restructuring C3's internal sales team over the prior month.[22]

12        Defendants argue that these allegations do not support a strong inference of direct scienter.

13   C3 MTD at 31–35.  The Court ultimately agrees.  The notion that Siebel had access to information

14   that contradicted the alleged misstatements by virtue by his "extensive" but unspecified

15   involvement in the Joint Venture is too general of an allegation "to plead scienter with the

16   requisite specificity."  *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000).  The

17   boilerplate discussion of Siebel's "crucial" role in C3's 10-K does not change that.  After all,

18   "corporate management's general awareness of day-to-day workings of the company's business

19   does not establish scienter – at least absent some additional allegations of specific information

20   conveyed to management and related to the fraud."  *Prodanova v. H.C. Wainwright & Co., LLC*,

21   993 F.3d 1097, 1109 (9th Cir. 2021) (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540

22   F.3d 1049, 1068 (9th Cir. 2008)).

23        But the complaint does not contain the these "additional allegations."  *Id.*  For example, the

24

─────────────────────

25   [22] Plaintiffs additionally argue in their Opposition that scienter is similarly supported because
     Siebel signed the Joint Venture Agreement in 2020, and that former employees told CNBC that
26   Siebel was known to provide "intense oversight" at C3.  Opp. at 41–42.  But as Defendants point
     out, C3 Reply at 23, Plaintiffs did not allege as much in the CAC, and even though the Court did
27   take judicial notice of the 2020 agreement bearing Siebel's signature, it declines to shade in
     Plaintiffs' pleading on this point (i.e. that the signature connotes meaningful familiarity and
28   involvement in the agreement).  Accordingly, the Court will not consider these new arguments.

United States District Court
Northern District of California

1    Court is not convinced that that Siebel's repeated public remarks about the size of Baker Hughes'

2    salesforce or his alleged "corrective disclosure" in December 2021 should be understood as

3    indications that he was knowingly misrepresenting the size of BH's C3-focused salesforce

4    throughout the class period (as opposed to just repeating an incorrect figure numerous times).

5    Plaintiffs have not adequately alleged, for instance, how Siebel's self-described involvement in the

6    internal restructuring of the internal C3 sales team during November 2021 reveals his knowledge

7    about the structure and size of the external C3-focused salesforce at one of C3's numerous

8    strategic partners, or why his familiarity with the BH sales operation as expressed on the

9    December 2021 earnings call (e.g. as involving fewer than 12,000 people) should be understood to

10   have existed earlier.[23]  *See In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341 (9th Cir. 2002)

11   (rejecting the notion that "because the defendants admit that they knew something later and the

12   'something' is important, they must have known it earlier"). [24]  And while the Court, for the

13   reasons already described, finds that Plaintiffs have described FE-1 with "sufficient particularity to

14   support the probability that [he] would possess the information alleged," it does not find that the

15   statements he reported are "themselves [] indicative of [Siebel's] scienter" as to BH's C3-focused

16   salesforce.  *Zucco Partners*, 552 F.3d at 995.  The statement reported by FE-1 relates to BH's

17   sales pipeline and fiscal year revenue, not its sales capacity.  Though it would not be unforeseeable

18   for a weekly sales-centric meeting to at some point discuss the staffing and structure of Baker

19   Hughes' C3-focused salesforce, the topics are distinct enough such that assuming discussion of the

20   latter would require the Court to speculate in a manner inconsistent with the PLSRA's heightened

21   pleading standard.

22              *Core Operations*

23         Plaintiffs next rely on the "core operations" theory of scienter, alleging that Siebel, by

24   virtue of his position at C3, "had actual knowledge of the materially false and misleading

---

[23] Even were it otherwise, the Court notes that Plaintiffs would only be able to plead scienter as to Statement #17.  This statement, made on November 29, 2021, would have been the only one made during the period of Siebel's alleged involvement in and knowledge of the restructuring.

[24] As an unpublished Ninth Circuit decision, *In re FVC.COM Sec. Litigation* is not precedent, but may be considered for its persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

1    statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and

2    the other members of the Class." CAC ¶ 244. "The core operations theory of scienter relies on

3    the principle that corporate officers have knowledge of the critical core operation of their

4    companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir.

5    2014). And as the Ninth Circuit has cautioned, "[p]roof under this theory is not easy." *Id.* at

6    1062. Plaintiffs "must provide either specific admissions by the executives that they were

7    involved in the details of a company's operations or witness statements that the executives were

8    specifically involved in producing the false reports." *Prodanova*, 993 F.3d at 1111. A plaintiff

9    may also meet the standard "[i]n rare circumstances where the nature of the relevant fact is of such

10   prominence that it would be 'absurd' to suggest that management was without knowledge of the

11   matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

12         The Court concludes that the CAC does not plead particularized facts sufficient to support

13   the core operations theory of scienter. First, the CAC does not contain any allegations that Siebel

14   admitted any involvement with the minutiae of Baker Hughes' C3-focused salesforce; it just

15   includes allegations that he was briefly involved in restructuring C3's own internal salesforce. *See*

16   *Prodanova*, 993 F.3d at 1111–12. Second, it does not contain witness statements that Siebel was

17   specifically involved in producing pertinent false reports. And while Plaintiffs take the position

18   that the size of the C3-focused Baker Hughes salesforce was "of such prominence" that Siebel's

19   ignorance of it would be "absurd," even significant features of a business are not necessarily "core

20   operations." *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004 (N.D.

21   Cal. July 13, 2020) (allegations about the crucial nature of a partnership insufficient to give rise to

22   strong inference of scienter); s*ee also Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-

23   HSG, 2018 WL 3126393, at *9 (N.D. Cal. June 26, 2018) (finding that [p]laintiffs failed to allege

24   "specific involvement of the [d]efendants in the details of the purported misrepresentations" even

25   where the alleged misrepresentations concerned the "central cornerstone" of defendants' strategy).

26   Based on Plaintiffs' allegations, C3 strategically partnered with numerous companies across

27   various market segments, such that the Court cannot conclude that the size of the personnel

28   commitment at one of them was "absurd[ly]" obvious to C3's top executive.

Accordingly, the Court finds that Plaintiffs fail to meet to their "high burden of proof" of establishing a "strong inference" of scienter through their core operations theory.

### *Motive*

Plaintiffs also contend that Defendant Siebel's "suspicious patterns of trading" support a "strong inference" of scienter.[25]  Plaintiffs allege that in the months following the expiration of the lock-up period, Siebel sold 9 million shares of C3 stock and earned a "staggering" $600 million in insider sales while in possession of material non-public information.  CAC ¶¶ 159–60.  While Plaintiffs acknowledge that some of those sales were made pursuant to 10b5-1 plans, Plaintiffs point out that those 10b5-1 plans were undated, and that the majority of Siebel's profits ($407 million) flowed from sales without associated 10b5-1 plans.  *Id*. ¶ 165.  Plaintiffs further allege that Siebel's undated 10b5-1 plans are additionally suspicious "in that each plan appears to stop regular transactions" after the December 2, 2021 disclosure.  *Id*. ¶ 167.  Defendants, meanwhile, argue that Plaintiffs' motive allegations are insufficient for a variety of reasons, including their silence as to Siebel's trading history and the percentage of stock he sold.  C3 MTD 37–40.

"To evaluate suspiciousness of stock sales, we consider, inter alia, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004)).  While insider trading may serve as circumstantial evidence of scienter, it "is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Intuitive Surgical*, 759 F.3d at 1063–64 (quoting *Zucco*, 552 F.3d at 1005).

---

[25] In addition to alleging that "suspicious" stock sales evidence his motive, Plaintiffs allege that Siebel's desire to go public also motivated him to make misrepresentations "while soliciting funds from investors in C3's initial public offering."  CAC ¶ 208.  But it is well-settled that "allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter." *Rigel*, 697 F.3d at 884.  If allegations that a given misrepresentation was crucial to an IPO's success were sufficient, the teeth of PLSRA's scienter requirement would be dulled, as "every company that goes public wants to maximize its apparent profitability prior to its IPO . . . ." *Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018).  Accordingly, the Court finds these motive allegations insufficiently particularized.

The Court finds that Plaintiffs' allegations concerning Defendant Siebel's stock profits "do not raise an inference of scienter, let alone a strong inference, because the [CAC] contains no allegations regarding the defendants' prior trading history, which are necessary to determine whether the sales during the class period were 'out of line with' historical practices." *Id.* (footnote omitted). Even where – as here – the class period begins at a company's IPO, Plaintiffs are not relieved of the burden of pleading a prior trading history. *See Zucco*, 552 F.3d at 1005 ("Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history."); *see also Curry v. Yelp Inc.*, 2015 WL 1849037, at *13 (N.D. Cal. Apr. 21, 2015) ("[A] lack of trading history due to a recent IPO may foreclose a plaintiff from one avenue of pleading scienter."). Moreover, the CAC does not contain any allegations concerning what percentage of his holdings Siebel sold. *See Hampton*, 2020 WL 6710096, at *16 (no scienter where the complaint "fails to include any allegations concerning the percentage of their holdings they sold"). Although Plaintiffs try to smuggle that unpled information in through an appendix to their Opposition, the Court declines to consider it.[26]

Because Plaintiffs' motive allegations fall short on two of the three factors the Court must consider, they are insufficient.

*Holistic Assessment*

In sum, read both independently and holistically, "the allegations in the [CAC] at best establish 'mere recklessness or a motive to commit fraud and opportunity to do so.'" *Intuitive Surgical*, 759 F.3d at 1062. Accordingly, the Court finds that Plaintiffs' factual allegations fall short of plausibly pleading the required "strong inference" of scienter as to Defendant Siebel under any of the theories raised in the CAC.

---

[26] In their Opposition, Plaintiffs stress the suspicious timing of Siebel's sales by introducing additional, unpled information concerning the timing of Defendants' 105b-1 plans. *See* Opp. at 47 ("Siebel . . . declined to set up a Rule 10b5-1 trading plan in the lead up to the IPO.") ("That the 20A Defendants failed to enter into 105b-1 trading plans until months after C3's IPO is even more astonishing . . . ."). Since those arguments do not have a factual predicate in the CAC (which states only that Siebel "does not disclose the date of this 10b5-1 plan," CAC ¶ 167, and does not plead that Siebel entered into those plans at a time when he had no access to material non-public information), the Court declines to consider them.

1

### 2. Remainder of Individual Defendants

2       Even though the Court did not find that any Individual Defendant other than Siebel was

3 plausibly alleged to have made a false or misleading statement, it will summarily address the

4 sufficiency of the scienter allegations as to Defendants Abbo, Barter, and Simonelli to provide

5 guidance with respect to any amended complaint.[27]

6             *Abbo*

7       Plaintiffs allege that Defendant Abbo had "'deep' and regular involvement regarding the

8 joint venture" (as evidenced by his self-described weekly calls with Baker Hughes' former

9 Executive Vice President of Alliances and Enterprises), attended internal meetings that gave him

10 access to "internal contemporaneous reports and data" that contradicted his statements to investors

11 about the "deep" partnership between C3 and Baker Hughes, and "received, reviewed and had

12 access to reports and data which undermined C3's representations . . . about the quality and size of

13 the Joint Venture's salesforce." CAC ¶¶ 213, 215.

14       The Court finds these allegations far too vague to give rise to a "strong inference" of

15 scienter. The CAC is silent on the nature of the reports and data at issue, when Abbo reviewed

16 them, and how they contradicted the challenged statement he made about the companies' "very

17 deep" collaboration (i.e. Statement #7). "There is thus no factual basis for the allegation[s] that he

18 acted with knowledge or deliberate recklessness" at the time he made the challenged statement.

19 *Prodanova*, 993 F.3d at 1108; *see also re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005)

20 ("General allegations of defendants' 'hands-on' management style, their interaction with other

21 officers and employees, their attendance at meetings, and their receipt of unspecified weekly or

22 monthly reports are insufficient."), *abrogated on other grounds by Tellabs*, 551 U.S. at 315–18.

23 //

24

25  [27] However, in doing so, it will only address the allegations of scienter that are unique to each

26 Individual Defendant. To the extent that theories of scienter raised and addressed as to Defendant Siebel overlap with those raised as to Defendants Abbo, Barter, and Simonelli, the Court will not

27 repeat its analysis. For instance, the Court will not re-address Plaintiffs' core operations theory or the insider trading motive allegations against Abbo, Barter, and Simonelli, since those allegations

28 rise or fall for the same reasons described in the analysis specific to Siebel.

United States District Court
Northern District of California

1          *Barter*

2         Plaintiffs similarly allege that Defendant Barter, as CFO of C3, "had access to internal

3 contemporaneous reports and data that contradicted the Registration Statement's representations to

4 investors," had "actual knowledge of confidential proprietary information" about the business, and

5 "received, reviewed and had access to reports and data which undermined C3's representations . . .

6 about the quality and size of the Joint Venture's salesforce."  CAC ¶ 218.

7         These thinly pled allegations as to Defendant Barter fail for the same reason described as

8 to Defendant Abbo.

9         *Simonelli*

10         Plaintiffs likewise allege that as the President, CEO, and Chairman of Baker Hughes, and

11 as a Board Member of C3, Defendant Simonelli "was informed at internal meetings and had

12 access to internal contemporaneous reports and data that contradicted his statements to investors"

13 and "received, reviewed and had access to reports and data which undermined C3's

14 representations . . . about the quality and size of the Joint Venture's salesforce."  CAC ¶¶ 222.

15 These generalized allegations too fail for the same reasons.[28]

16        **c.  Loss Causation**

17         Defendants next urge that Plaintiffs fail to allege loss causation.  "[T]o satisfy the loss

18 causation requirement, the plaintiff must show that the revelation of [the relevant]

19 misrepresentation or omission was a substantial factor in causing a decline in the security's price,

20 

21 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[28] Plaintiffs, for the first time in their Opposition, argue that Simonelli could have "cross-
check[ed]" C3's statement with "Baker-Hughes-side information."  Opp. at 29.  Because that

22 allegation was not included in the CAC, the Court declines to consider it.  Moreover, the Court
further observes that the motive allegations premised upon insider trading raised as to Defendant

23 Simonelli are unpersuasive for an additional reason, not otherwise explored above: the fact that
Simonelli may have not personally sold C3 stock.  Though Plaintiffs challenge three trades of C3

24 stock made by "Baker Hughes/Simonelli" on April 7, 9, and 22 in 2021, CAC ¶ 157, Plaintiffs do
not respond to Defendants' argument that Simonelli did not personally sell C3 stock, and that the

25 challenged trades were made by Baker Hughes as a minority owner of C3.  Opp. at 34, *see also*
Reply at 29.  To the extent that Simonelli did not make any trades of personally owned C3 stock

26 (and instead simply signed off on trades of Baker Hughes-owned stock in his executive capacity),
the Court does not see a basis for imputing Baker Hughes' trades to Simonelli for purposes of the

27 motive or insider trading analyses.  *See Prodanova*, 993 F.3d at 1108 (observing that corporation

28 acts through its "employees and agents" and therefore can "only have scienter through them").

United States District Court
Northern District of California

thus creating an actual economic loss for the plaintiff." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)). This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)). However, this is not the only way to meet the pleading burden. Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 1210; *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss . . . by tracing the loss back to 'the very facts about which the defendant lied.'") (citations omitted). There are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause," *First Solar Inc.*, 881 F.3d at 753–54, and a complaint need only "raise a reasonable expectation that discovery will reveal evidence of 'loss causation,'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (citation omitted).

Here, Plaintiffs advance two theories of loss causation. The Court addresses each, and finds that Plaintiffs have adequately alleged loss causation under a corrective disclosure theory.

### 1. Materialization of the Risk

Plaintiffs first allege that C3's poor financial performance, as expressed through "low or missed consumer count, RPO, and revenue capture" was a "materialization of the risks concealed by Defendants' misleading statements and omissions" regarding Baker Hughes' C3-focused salesforce and its relationship with C3, and led to investor losses. Opp. at 50*, see* CAC ¶¶ 172–184. Plaintiffs also point to a decline in Defendants' stock price following each of eight instances of alleged insider trading. Opp. at 50, *see* CAC ¶¶ 185–88. Defendants dispute the viability of the "materialization of the risk" theory in this circuit, and argue that, regardless, Plaintiffs fail to allege "that the purported negative financial announcement and stock price drops *revealed* that 'the structure of the [Baker Hughes] partnership [] excluded access to the full 12,000-person

1    salesforce."  C3 Reply at 30 (emphasis in original).

2         First, the Court observes that the Ninth Circuit has neither adopted nor rejected the

3    "materialization of the risk" theory.  *Nuveen Municipal,* 730 F.3d at 1120 n.5 (noting that while

4    district courts in the circuit have applied the materialization of the risk approach, the Ninth Circuit

5    did not have occasion to "decide whether to endorse" the approach in *Nuveen*).  The absence of the

6    Ninth Circuit's endorsement does not, as Defendants argue, constitute rejection of the theory,

7    Reply at 29, and the absence of rejection does not, as Plaintiffs hint, signal its endorsement.  In the

8    absence of definitive guidance, and since other courts in this district have considered

9    "materialization of the risk" as a way of demonstrating loss causation, *see* Opp. at 51 (citing

10   cases), the Court will do so here out of completeness.  In so doing, however, the Court does not

11   now decide whether it is a legally viable theory, and instead simply analyzes the alleged facts

12   assuming, *arguendo*, that it is.

13        The "materialization of the risk" theory recognizes that "a misstatement or omission is the

14   'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk

15   concealed by the misrepresentations and omissions alleged by a disappointed," even though "it

16   cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or

17   omissions made about it, as opposed to the underlying circumstance that is concealed or

18   misstated."  *Nuveen*, 730 F.3d at 1120 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161,

19   173 (2d Cir. 2005)).  The Court concludes that Plaintiffs' allegations do not place the business risk

20   that caused C3's allegedly poor performance within the "zone of risk" concealed by the

21   misrepresentations about Baker Hughes' C3-focused salesforce.  Plaintiffs argue that the

22   announcements of quarterly and annual results (in March, June, and September 2021) consistently

23   pointed to a variety of disappointing metrics, including on C3's remaining performance

24   obligations ("RPO"), which was the "key" indicator used to "gauge the success of C3's

25   salesforce."[29]  *See* CAC ¶¶ 174, 175, 180, 181, 182.  Plaintiffs allege that these disappointing RPO

26   metrics resulted from C3's lack of access to Baker Hughes' full sales team, which C3 concealed

27

28   ―――――――――――――――――
     [29] Plaintiffs define RPO as "non-cancellable contracted revenue that has not yet been recognize
     and will be recognized as revenue in future periods."  CAC ¶ 173.

when it repeatedly claimed all 12,000 Baker Hughes salespeople were actively selling C3's product.  However, the Court does not agree that so neat a line can be drawn between the concealed fact at issue and C3's disappointing RPO, let alone its overall allegedly poor performance.  While the Court recognizes that RPO may gauge a salesforce's success, it finds significant that the disappointing RPO metrics at issue were not identified as flowing from the oil and gas segment specifically, and, moreover, that analysts identified factors unrelated to the Baker Hughes partnership in explaining those metrics.  *See* Opp. at 43.  As alleged, the two phenomena are too attenuated: without more, C3's disappointing RPO metrics *could* have materialized from the concealed facts concerning the Baker Hughes arrangement, but they also could have materialized from "some other fact."  *First Solar*, 881 F.3d at 753.  Given this, the Court cannot conclude that Plaintiffs have plausibly alleged that "the very facts about which defendant[s] lied" (i.e. the size of Baker Hughes' C3-focused salesforce) "caused [Plaintiffs'] injuries" (i.e. the disappointing RPO metrics and ensuing decline of C3's stock price).  *McCabe*, 494 F.3d at 431.

Plaintiffs' theory does not fare any better as applied to the purported insider sales.  Though they argue that the sales (which occurred eight times between March and November 2021) caused C3's stock price to drop, the Court is unable to conclude that the sales were a materialization of the risks concealed regarding C3's lack of access to Baker Hughes' 12,000-person salesforce.  Even assuming the truth of Plaintiff's allegation that "[l]arge and unusual insider trading is often seen as a signal that the insiders know something the market does not," the allegations are insufficient to allow the Court to conclude that the "something" was C3's lack of access to Baker Hughes' 12,000-person salesforce.

## 2.   Corrective Disclosure

Next, Plaintiffs plead that on a December 1, 2021 conference call, Siebel disclosed the truth about how Baker Hughes' C3-focused salesforce had been operating, which caused C3's stock value to "plummet" 11.20% the next day to $30.04 – the lowest price of the year.[30]  Opp. at

---

[30] The Court understands Plaintiffs allegations to suggest that Siebel's comments took place after the market closed on December 1, 2021.  If that is correct, the Court agrees with Defendants that only the losses on December 2, 2021 are at issue.  C3 MTD at 31–32.

1    53–54, *see* CAC ¶¶ 193–202.  Defendants argue that Plaintiffs "fail to link the December 2, 2021

2    price decline to Mr. Siebel's comments on the December 1, 2021 earnings call concerning the

3    reorganization of C3's internal sales structure or the structure of the Baker Hughes partnership,"

4    and that there are "far more plausible reason[s]" for the price decline than Siebel's comments.  C3

5    MTD at 41.  They further contend that since the risk associated with strategy and partnership

6    changes were disclosed, revelation of those changes could not be a corrective disclosure.  *Id*. at 42.

7            The Court finds that Plaintiffs have done enough at this stage to plead loss causation under

8    this corrective disclosure theory.  "[T]o prove loss causation by relying on one or more corrective

9    disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the

10   truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the

11   company's stock price to decline and the inflation attributable to the misstatements to dissipate."

12   *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020).  As to the first prong, the

13   Court agrees that Siebel's remarks on the December 1, 2021 earnings call disclosed what

14   previously was not: that C3 had not had access to Baker Hughes' full 12,000-person salesforce,

15   and instead had been working through a "new business unit" that "sat outside of Baker Hughes"

16   staffed without "the people with the relationships and . . . quotas and . . . the deep industry

17   expertise."  CAC ¶ 192.  As to the second prong, the Court finds that Plaintiffs have plausibly pled

18   that Siebel's corrective disclosure caused the stock price to decline.  While Defendants contend

19   that independent factors other than the corrective disclosure were equally capable of causing the

20   December 2, 2021 stock drop, that deflection is unpersuasive here.  Unlike the price dips

21   following the financial reporting and insider stock sales discussed above, the December price drop

22   was directly preceded – by less than a day – by comments from Siebel that explicitly contradicted

23   the near dozen public statements he had made over the prior year, and suggested that the structure

24   and staffing of the Baker Hughes' salesforce contributed to poor sales performance.  These

25   comments furnish the analytical missing link between the concealed fact and the allegedly absent

26   RPO growth.  CAC ¶ 190.  The notion that this revelation (and its connection with the poor RPO

27   metrics) was "a substantial factor" in the price drop is made even more plausible by the analyst

28   reports published on December 2 that explicitly discuss the Baker Hughes relationship and the C3

sales apparatus in dissecting the company's financial reports.  CAC ¶¶ 195–198; *see Yaron*, 2020

WL 6750568, at \*5.  Accordingly, the Court concludes that Plaintiffs have adequately pled that

Defendants' December 1, 2021 disclosure of the alleged fraud (and the allegedly middling RPO

metrics resulting from that claimed fraud) caused investors' losses.

\*\*\*\*\*\*

While Plaintiffs have adequately pled falsity and loss causation as to the statements

concerning the size of BH's C3-focused salesforce, the Court **GRANTS** the C3 Defendants'

motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims for failure to plead scienter with

the required particularity.

### ii.   Section 20(a)

Plaintiffs also bring control person liability claims against the Individual Defendants and

Baker Hughes under Section 20(a) of the Exchange Act.  Plaintiffs contend that because of the

Individual Defendants' positions within C3 and Baker Hughes' position as a minority shareholder,

they were control persons within the meaning of Section 20.

Like Section 15 in the context of the Securities Act, Section 20(a) of the Exchange Act

makes certain "controlling" individuals liable for violations of § 10(b).  *Zucco*, 552 F.3d at 990.

In order to prove a prima facie case under Section 20(a), a plaintiff must allege: "(1) a primary

violation of federal securities laws and (2) that the defendant exercised "actual power or control"

over the primary violator."  *Howard*, 228 F.3d at 1065.

Defendants assert that the absence of a well-pled predicate violation of the Exchange Act

sinks this claim.  C3 MTD at 34–35; BH MTD at 8.  The Court agrees.  Accordingly, the Court

**GRANTS** Defendants' motions to dismiss Plaintiffs' Section 20(a) claims.  *See Zucco*, 552 F.3d

at 990.

### iii.   Section 20A

Plaintiffs allege that the Individual Defendants and Baker Hughes also engaged in

unlawful insider trading in violation of Section 20A of the Exchange Act.  CAC ¶¶ 255–69.

Insider trading is defined as "purchasing or selling a security while in possession of

material, nonpublic information." 15 U.S.C. § 78t–1(a).  "Section 20A of the Exchange Act

creates a private cause of action for 'contemporaneous' insider trading. To satisfy § 20A, a plaintiff must plead [(1)] a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur[red] 'contemporaneously.'" *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) (quoting *In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174–75 (C.D. Cal. 2008)); *see also Johnson v. Aljian*, 490 F.3d 778, 779 n. 8 (9th Cir. 2007).

Defendants argue that because the CAC fails to plead a primary violation of securities laws, the insider trading claims must also fail. C3 MTD at 44; BH MTD at 10. The Court agrees. Accordingly, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' Section 20(A) claims.[31] *See Zucco*, 552 F.3d at 990.

## V.    CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** the C3 Defendants' Motion to Dismiss, Dkt. No. 105, and **GRANTS** Defendant Baker Hughes' Motion to dismiss. Dkt. No. 109. Specifically, the Court:

- GRANTS the C3 Defendants' motion to dismiss Plaintiffs' Section 11 claims premised upon Statements #1 and #2, but DENIES the motion to dismiss Plaintiffs' Section 11 claims to the extent they are premised on Statement #3.

- GRANTS the C3 Defendants' motion to dismiss Plaintiffs' claims arising under Items 303 and 105.

- GRANTS the C3 Defendants' motion to dismiss Plaintiffs' Section 15 claim against Abbo, but DENIES that motion as relates to Siebel, Barter, and Simonelli.

- GRANTS the C3 Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5

---

[31] That said, the Court makes a few observations about Plaintiffs' 20A claims. First, it reminds Plaintiffs that they cannot raise any unpled claims, so if they intend to assert a Section 20A on behalf of Plaintiff Zavalanski, they must plead one. *See* CAC ¶ 256 (bringing Section 20A claims "on behalf of Lead Plaintiff, Plaintiff Linder, and all other members of a subclass . . .."). Second, to the extent Simonelli did not make any trades of personally owned C3 stock, the Court reiterates that it does not see a basis for imputing Baker Hughes' trades of C3 stock to him. And finally, the Court notes that unless and until a primary violation of the securities laws is properly pled, it need not decide the bounds of the "contemporaneous" requirement or determine whether trades involving a purchase price lower than the sale price are actionable.

United States District Court
Northern District of California

claims, and accordingly GRANTS the C3 Defendants' and Defendant Baker Hughes' motions to dismiss Plaintiffs' Sections 20(a) and 20A claims.

The Court also **GRANTS** the C3 Defendants' Request for Judicial Notice, Dkt. No. 105-2, and **GRANTS IN PART and DENIES IN PART** Plaintiffs' Request for Judicial Notice, Dkt. No. 119-7.

Since the Court cannot conclude that amendment would be futile, Plaintiffs may file an amended complaint within 21 days of the date of this order. When preparing an amended complaint, Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement or action alleged to have been false or misleading, (B) the reasons the statement or action was false, misleading, or deceptive when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on which the belief is formed. The chart should clearly identify which statements or omissions are attributable to which Defendants, and include a detailed statement of the facts giving rise to a strong inference that each defendant acted with the required state of mind. Plaintiffs should also summarize their allegations regarding what each Defendant knew with regard to the statement or omission, and when they knew it. Such a chart should be included within any amended complaint or attached to any amended complaint. For guidance on the format for such a chart, the Court directs Plaintiffs to review *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

**IT IS SO ORDERED.**

Dated:   2/22/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge

45