Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST, *et al.*, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>   v.<br><br>C3.AI, INC., *et al.*,<br><br>                    Defendants. | No. 4:22-cv-01413-HSG<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2, 4th Floor<br>Hearing Date: September 26, 2024<br>Hearing Time: 2:00 p.m. |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 3

        A.      This Court sustained Plaintiffs' Securities Act claims regarding
                Statement #3. ................................................................................................ 3

        B.      This Court also held that Plaintiffs properly pled falsity for several
                statements attributed to the Section 10(b) Defendants. .............................. 4

        C.      Plaintiffs have alleged additional facts to remedy the scienter
                concerns raised by the Court in the February Order. .................................. 5

        D.      Plaintiffs also supplement the SAC with additional facts regarding
                the JVA amendments, Defendant Abbo's control of C3, and loss
                causation. ...................................................................................................... 6

        E.      As recently as May 2023, Defendant Siebel continued to make the
                same misleading statements at issue in this litigation. ............................... 7

        F.      Additional Procedural History ..................................................................... 8

III.    PLAINTIFFS' SECURITIES ACT CLAIMS NEED NOT BE DISTURBED
        ........................................................................................................................... 8

        A.      This Court previously concluded that Plaintiffs alleged falsity as to
                Statement #3. ................................................................................................ 8

                1.      Defendants provide nothing new to justify the Court's
                        reconsideration of Statement #3. ..................................................... 9

        B.      Defendants fail to meet the heavy burden required to establish
                negative causation. ..................................................................................... 11

        C.      The Securities Act claims against Defendants are timely filed. ................ 12

IV.     PLAINTIFFS' EXCHANGE ACT CLAIMSARE PROPERLY PLED .......................... 13

        A.      The Court's previously finding of falsity under the Exchange Act
                need not be disturbed. ................................................................................ 13

        B.      The SAC effectively remedies the Court's previous concerns
                regarding scienter. ..................................................................................... 14

                1.      New facts show that Defendant Siebel knew or recklessly
                        disregarded the truth regarding C3's access to Baker Hughes
                        full salesforce. ............................................................................... 15

                2.      Scienter for Defendant Simonelli. ................................................. 19

3.   New facts in the SAC provide further support for Plaintiffs' core operations theory. ................................................................. 19

4.   Plaintiffs' additional allegations regarding Defendant Siebel's stock sales remedy the Court's previous concerns regarding motive. ......................................................................... 21

5.   Defendants' nonculpable explanation is not as compelling as Plaintiffs' specific showing of scienter. ..................................... 24

C.   Plaintiffs have already met their burden regarding loss causation ........................ 24

D.   Plaintiffs' Section 20(A) claims may continue. ..................................................... 28

V.   THE COMPLAINT ADEQUATELY ALLEGES BAKER HUGHES' CONTROL ................................................................................................... 32

VI.   THE COMPLAINT ALLEGES SIMONELLI'S CONTROL ........................................ 34

VII.   PLAINTIFFS' OPPOSITION TO C3 DEFENDANTS' REQUEST FOR JUDICIAL NOTICE ................................................................................................ 34

A.   The Court should apply the same reasoning and limitations as it did in the February 2024 Order when taking judicial notice of Defendants' Exhibits B, C, and E. ......................................................... 35

B.   The Court should deny the C3 Defendants' Request for Judicial Notice of Defendants' Exhibits D and F for the same reasons it denied other post-Class-Period documents. ........................................... 36

VIII.   CONCLUSION .................................................................................................... 37

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – ii          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Apparel, Inc. S'holder Litig.*,
   2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ...................................................................... 32

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................................... 21

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...................................................................... 27

*Bao v. Solarcity Corp.*,
   2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .............................................................................. 33

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................................... 31

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................................ 20

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ....................................................................... 34

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ........................................................................... 12

*Buttonwood Tree Value Partners, LP v. Sweeney*,
   910 F. Supp. 2d 1199 (C.D. Cal. 2012) ................................................................................ 18

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ................................................................................ 26

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) ..................................................................................... 25, 27

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 827 (N.D. Ill. 2000) .................................................................................... 23

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ...................................................................... 30

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................................... 22, 29

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................ 28

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................................ 31

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – iii          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*In re Cypress Semiconductor Sec. Litig.*,
836 F. Supp. 711 (N.D. Cal. 1993) ............................................................................... 30

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................................... 25

*In re eHealth, Inc., Sec. Litig.*,
2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ............................................................. 33

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ...................................................................................... 9, 11

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .......................................................................... 31

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ............................................................... 22

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) .................................................................................... 9, 10

*Garbini v. Protection One, Inc.*,
49 F. App'x 169 (9th Cir. 2002) .................................................................................... 12

*Gebhart v. S.E.C.*,
595 F.3d 1034 (9th Cir. 2010)........................................................................................ 14

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008)........................................................................................ 25

*Golden v. Google LLC*,
2023 WL 5154513 (N.D. Cal. Aug. 10, 2023)................................................... 10, 11, 35

*Golub v. Gigamon Inc.*,
372 F. Supp. 3d 1033 (N.D. Cal. 2019) ......................................................................... 33

*In re Gupta Corp. Sec. Litig.*,
900 F. Supp. 1217 (N.D. Cal. 1994) .............................................................................. 33

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020)................................................................ 23

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013)........................................................................................... 12

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................................. 23

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)........................................................................................... 10

*Kuehbeck v. Genesis Microchip Inc.*,
2005 WL 1787426 (N.D. Cal. July 27, 2005)................................................................. 17

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – iv          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*Kuzmenko v. Lynch*,
606 F. App'x 399 (9th Cir. 2015) ...................................................................................... 36

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) .............................................................. 29, 30

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ........................................................................................... 17

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ........................................................................................... 25

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................................... 24, 30

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ............................................................................................. 26

*Murphy v. Precision Castparts Corp.*,
2020 WL 4040827 (D. Or. July 17, 2020) ......................................................................... 34

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D.Utah 2007) ................................................................................. 33

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) .................................................................... 22

*In re Network Assocs., Inc., Sec. Litig.*,
2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) .................................................................. 15

*No. 84 Emp.-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ....................................................................................... 15, 20

*In re Novatel Wireless Sec Litig.*,
2010 WL 11470156 (S.D. Cal. May 12, 2010) .................................................................. 30

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) ................................................................................ 25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ........................................................................................... 22

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ........................................................................................... 28

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ....................................................................................... 14, 18

*In re Petco Animal Supplies Inc. Sec. Litig.*,
2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ..................................................................... 30

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) .................................................................... 10

011089-11/2605872 V2

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
2004 WL 5326262 (N.D. Cal. May 27, 2004) ........................................................................ 29

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................................ 17

*In re Saxton, Inc. Sec. Litig.*,
156 F. App'x. 917 (9th Cir. 2005) .......................................................................................... 18

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ................................................................................................. 16

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ........................................................................................... 29

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................................. 30

*Sgarlata v. PayPal Holdings, Inc.*,
2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ....................................................................... 10

*In re Shoretel, Inc., Sec. Litig.*,
2009 WL 2588881 (N.D. Cal. Aug. 19, 2009) ....................................................................... 12

*In re Silicon Graphics, Inc. Sec. Litig.*,
970 F. Supp. 746 (N.D. Cal. 1997) ........................................................................................ 30

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................. 15, 17, 19, 20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ...................................................................... 33

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................................................ 15, 18, 20, 22

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................ 26, 32

*In re Twitter, Inc. Sec. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020) ................................................................................... 22

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................................... 32

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ............................................................................................ 14, 21

*In re Veritas Software Corp. Sec. Litig.*,
2003 WL 27386177 (N.D. Cal. Dec. 10, 2003) ..................................................................... 11

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ................................................................................................. 8

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – vi          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................. 24

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994)................................................................................. 12

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
    65 F.4th 459 (9th Cir. 2023) ................................................................................. 13

**STATUTES**

15 U.S.C. § 77m............................................................................................................ 12

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................. 8

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b5-1(c)(1)(i) ................................................................................... 22

17 C.F.R. § 240.10b5-1(c)(1)(i)(B).............................................................................. 22

011089-11/2605872 V2

## GLOSSARY OF DEFINED TERMS[1]

| Term | Definition |
| --- | --- |
| Class Period | December 9, 2020 to December 2, 2021 (dates inclusive). |
| Complaint or "Comp." or "SAC" | Second Amended Class Action Complaint, filed April 4, 2024, ECF No. 158. |
| CAC | Amended Class Action Complaint, filed February 15, 2023, ECF No. 71. |
| ¶ __ | Complaint, ¶ __. |
| C3 or "Company" | Defendant C3.ai. |
| Joint Venture Agreement or "JVA" | The agreement between C3 and Baker Hughes whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries. This Agreement is attached as Exhibit 1.[2] |
| C3 MTD, or "Motion," or "Mot." | The C3 Defendants' Notice of Motion and Motion to Dismiss Second Amended Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 167. |
| BH MTD | Baker Hughes' Notice of Motion and Motion to Dismiss With Prejudice; Joinder in C3 Defendants' and Simonelli's Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, ECF No. 171. |
| Simonelli MTD | Defendant Lorenzo Simonelli's Motion to Dismiss Second Amended Class Action Complaint Pursuant to Fed R. Civ. P. 12(b)(6), ECF No. 170. |
| C3 RJN | The C3 Defendants' Request for Judicial Notice in Support of their Motion to Dismiss, ECF No. 167-1. |
| The MTD Motions | The C3 MTD (ECF No. 167); the BH MTD (ECF No. 171); and the Simonelli MTD (ECF No. 170). |
| The Motions | The MTD Motions and the C3 RJN. |

---

[1] All other capitalized terms share the same meaning as the capitalized terms in the Complaint. All emphasized terms are added, unless otherwise indicated.

[2] Exhibit 1 is attached to the June 30, 2023 Declaration of Reed R. Kathrein, ECF No. 120, which was judicially noticed by the Court in its February 2024 Order at 9.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – viii          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

| Term | Definition |
|---|---|
| "Offering Materials" or "Registration Statement" | Includes both the final Prospectus, dated December 8, 2020, and the Registration Statement, dated December 7, 2020. |
| Corporate Defendants | Defendants C3 and Baker Hughes. |
| Individual Defendants | Defendants Siebel, Abbo, Barter, and Simonelli. |
| C3 Defendants | Defendants C3, Siebel, Abbo, Barter, and Simonelli. |
| Defendants | The Corporate Defendants and the Individual Defendants. |
| Section 11 Defendants | Defendants listed under Count I of the Securities Act (C3 and Individual Defendants). |
| Section 15 Defendants | Defendants listed under Count II of the Securities Act (Baker Hughes, Siebel, Abbo, Barter, and Simonelli). |
| Section 10(b) Defendants | Defendants listed under Count III of the Exchange Act (C3, Siebel, and Simonelli). |
| Section 20(a) Defendants | Defendants listed under Count IV of the Exchange Act (Baker Hughes, Siebel, Abbo, Barter, and Simonelli). |
| Section 20A Defendants | Defendants listed under Count V of the Exchange Act (Siebel, Abbo, Barter, Simonelli, and Baker Hughes). |
| RPO or "Remaining Performance Obligations" | The total future obligations customers owe to C3 under existing contracts. |
| Order | February 22, 2024 Order Granting in Part and Denying in Part the C3 Defendants' Motion to Dismiss and Granting Defendant Baker Hughes' Motion to Dismiss. ECF No. 154. |

011089-11/2605872 V2

# I.   INTRODUCTION

This Court has already concluded that Plaintiffs properly alleged: (1) a claim under the 1933 Securities Act based on C3's false statement that the Company recognized revenue through deals brought in by Baker Hughes; (2) that Defendant Siebel made materially misleading statements when he told the public, on eleven separate occasions, that the full 12,000-person salesforce of Baker Hughes was selling C3's products; and (3) that the revelation of the truth caused the price of C3's stock to decline. Order at 44. But the Court also found that the CAC did not contain sufficient allegations to establish a strong inference of scienter.

Plaintiffs' Second Amended Complaint squarely addresses the Court's scienter concerns by including additional allegations of direct scienter, core operations, and motive. In terms of direct scienter, the SAC now pleads that Siebel, himself, signed the Joint Venture Agreement prior to the Class Period and that the JVA disclosed the true number of Baker Hughes employees at C3's disposal. ¶ 170. This is precisely the type of "specific information" about the size of the partnership that this Court found was lacking in the CAC. Order at 32. As for core operations, Plaintiffs now plead additional facts from former employees interviewed by CNBC, who described Defendant Siebel's "intense oversight" type of management style. ¶ 171. The SAC also alleges that Mr. Simonelli only joined the C3 Board *because* of the Joint Venture's execution. ¶¶ 50-53. And finally, the SAC now contains supplemental allegations regarding how Defendant Siebel's C3 stock transactions materially deviated from his typical trading history. ¶ 178. These new allegations, when taken holistically along with Plaintiffs' initial allegations, are more than enough to sustain Plaintiffs' Exchange Act claims.

Yet, in response to this onslaught of scienter facts, Defendants still claim that Plaintiffs' scienter allegations must fail because they do not show that Siebel knew that Baker Hughes was *not* exceeding that minimum. But this turns the scienter inquiry on its head. Given that Siebel knew that Baker Hughes had only committed to a minimum number of employees, unless he had a specific reason to believe that they would exceed it, then he is at least reckless. And there is no fact in the SAC or judicially noticeable documents to give any specific reason to think that Baker Hughes *did* exceed this minimum. Indeed, the SAC alleges that the JVA was amended to only

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 1                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

provide for 60 train-the-trainers, and that even C3's former employees thought it was highly unlikely that the Joint Venture had access to all 12,000 Baker Hughes employees. ¶¶ 57, 98-99.

Apart from scienter, the rest of Defendants' Motions simply attempt to relitigate issues already decided by the Court in its previous Order. For example, Defendants make the same argument that the Court should, on a Rule 12 motion, override FE-1's statements in favor of Defendants' interpretation of government findings. But the Court has already rejected this approach as it would inherently require the Court to choose between "competing interpretations" or "improperly arbitrate factual issues" and thereby go against binding Ninth Circuit authority. Next, Defendants claim that the publicly filed Joint Venture Agreement put the public on notice that less than the full Baker Hughes sales force was selling C3's products. But this argument is meritless. First, unlike Defendant Siebel, investors only had access to a redacted version of the JVA that did not disclose the actual number of committed employees. So they were especially reliant on Siebel's statements regarding the size of the JVA salesforce. Second, as the Court noted in deciding the prior motion, no matter what was disclosed in C3's governmental filings, Siebel's repeated claims to have the full Baker Hughes sales force selling for C3 materially changed the total mix of information available to investors.

Defendants also contest this Court's finding that Plaintiffs had properly pled loss causation by claiming that Siebel's admission on December 1, 2021, that the Baker Hughes sales force selling C3 "sat outside" of the main Baker Hughes sales force only revealed the "structure" of the Baker Hughes sales force selling C3, and not the number of sales people. But this argument is nonsensical. If the C3/Baker Hughes sales people "sat outside" the main Baker Hughes sales force, that must mean that the C3/Baker Hughes sales force was a subset of the full Baker Hughes sales force. And Defendants' negative causation argument regarding the Section 11 claims misses the mark because, to establish negative causation, they must show that the reasons for the decline do not "touch upon" the topic of the restatement. But both the misstatement and the subsequent decline in the price of C3 stock touch on the same subject matter—the failure of the relationship between C3 and Baker Hughes. Finally, because the Complaint alleges primary violations, and that Plaintiffs traded

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 2          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

contemporaneously with Defendants, the Complaint alleges violations of Section 20A for insider trading.

Nor do the Baker Hughes' and Simonelli MTD motions fare any better. Baker Hughes argues that the statute of limitations has run on Plaintiffs' Securities Act claims, but it fails to show that Plaintiffs could have discovered their violation within a year before filing the complaint through reasonable due diligence. Baker Hughes also argues that the Complaint fails to allege that Baker Hughes was a control person regarding C3, but disregards the ample case law, quoted below, showing that large shareholders such as Baker Hughes are routinely found to be control people. Likewise, Simonelli's motion ignores this Court's previous finding that, amongst other things, his finance-specific role on C3's board of directors, as well as his signature on the Registration Statement, demonstrate that Simonelli is a control person. In addition, the Complaint establishes a strong inference of scienter as to Simonelli through the new allegations regarding the contents of the Joint Venture Agreement, of which Simonelli had notice, informing Simonelli of the minimum commitment of Baker Hughes to the joint venture, establishing scienter as to Baker Hughes.

Defendants' Motions should be dismissed in their entirety.

## II.    STATEMENT OF FACTS

The Court is well acquainted with the facts of this case. Order at 2-4. Plaintiffs thus present herein the holdings reflected in this Court's February 22, 2024 Order, as well as selected facts especially pertinent to the issued raised by the most recent MTD Motions.[3]

### A.    This Court sustained Plaintiffs' Securities Act claims regarding Statement #3.

The SAC alleges that Statement #3 is a false and misleading statement regarding C3's financial performance. Statement #3 is an excerpt of the Company's Registration Statement that states: *"[d]uring the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement."* ¶ 66. Plaintiffs allege that this Statement is false and

---

[3] However, should the Court require additional facts, Plaintiffs incorporate by reference the facts included in Plaintiffs' Omnibus Opposition to Defendants' Motion to Dismiss. ECF No. 119 at 5-11.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 3          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

misleading because, according to statements attributed to FE-1—a former Vice President of C3 who reported directly to Defendant Siebel—Baker Hughes had, in fact, brought in **no** deals through the reseller agreement. ¶¶ 41, 56, 173. More specifically, the SAC recounts how FE-1 attended weekly calls where new sales leads were discussed and that, during the March 2020 to May 2020 period, he or she heard "the General Manager [of the Oil & Gas segment] regularly report that the Baker Hughes pipeline was non-existent, and that it made no sales as of April 30, 2020." *Id.* ¶ 56. This Court found that FE-1's statements were sufficiently particularized and did not necessarily contradict C3's SEC filings. Accordingly, this Court denied the C3 Defendants' motion to dismiss Section 11 claims regarding Statement #3. Order at 44.

**B.    This Court also held that Plaintiffs properly pled falsity for several statements attributed to the Section 10(b) Defendants.**

This Court also held in its February 2024 Order that Plaintiffs had properly pled falsity for *eleven statements* regarding C3's access to Baker Hughes' 12,000-person salesforce. Order at 26-29. In so doing, this Court previously considered, and ultimately rejected, the C3 Defendants' claims that these statements were puffery (*id.* at 26-28), did not change the mix of information (*id.* at 28), or were immaterial (*id.* at 28-29). Excerpts of these false statements[4] are listed below and adopt the same numbering and terminology used by this Court in the February Order:

- Statement #4: "***Baker Hughes has 12,000 people selling for us*** around the world into virtually oil and gas company on the planet[.]" ¶ 105.

- Statement #5: "***in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry.*** Come on, for a company like us to get 12,000 people." ¶ 107.

- Statement #6: "So we've aligned in oil and gas with Baker Hughes … ***that gives us access to 12,000 people now selling with us … 12,000 salespeople is a lot of sales capacity***." ¶ 109.

---

[4] The entire text of false statements can be found either at the paragraph of the Complaint identified with each bullet point or in Appendix A to the SAC. ECF No. 158-1.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 4          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

- Statement #8: "*And now with Baker Hughes, we have 12,000 salespeople selling for us around the world* into every oil and gas company on the planet[.]" ¶ 111.

- Statement #9: "[W]e go to market with Baker Hughes. *That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco.* It would take us 10 years to get to the more –[board] room of Aramco, okay, but for Baker Hughes." ¶ 113.

- Statement #10: "I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that *and now we have 12,000 people selling for us at Baker Hughes*." ¶ 115.

- Statement #11: "I was thinking about our partnership with Baker Hughes and oil and gas, *we have 12,000 people selling C3 for us all around the world every day, 12,000 people*." ¶ 117.

- Statement #13: "*And Baker Hughes as 12,000 people selling with us around the world in oil and gas market*[.]" ¶ 119.

- Statement: #15: "So we have go-to-market motion with them at virtually every major order of *12,000 people working with us in all divisions of Baker Hughes*." ¶ 121.

- Statement #16: "I mean, we're 700 people [at C3]. *I have 12,000 people selling for me at Baker Hughes into oil and gas*." ¶ 123.

- Statement #17: "*Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day* …" ¶ 126.

C.     **Plaintiffs have alleged additional facts to remedy the scienter concerns raised by the Court in the February Order.**

In the Order, the Court explained that it ultimately denied Plaintiffs' Exchange Act claims as the then-pled allegations did not support a strong inference of scienter. Order at 43. In response, the SAC now includes several pieces of information to supplement Plaintiffs' scienter allegations. ¶¶ 170-180. For example, as to direct scienter, the SAC now shows that, months before the Class Period, Siebel signed a Joint Venture Agreement with Baker Hughes that identified the actual

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 5                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

number of Baker Hughes employees committed to the agreement. ¶¶ 96, 170. C3 redacted the specific numbers, however, in the version filed publicly. *Id.*

Specifically, the publicly filed agreement signed by Defendant Siebel stated:

> BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3.

¶¶ 96, 170 (redactions in original).

As for core operations theory, the SAC now includes statements from former employees who told CNBC that Siebel provided "intense oversight" at C3. ¶ 171. And finally, the SAC supplements its motive facts to establish the suspicious nature of Defendant Siebel's stock selling patterns. For example, the SAC now shows the percentage of C3 shares that Defendant Siebel sold (59.61%) before he revealed the truth to investors. ¶¶ 21, 178. The SAC also provides more information showing these transactions contradicted his trading history for two reasons: (1) Siebel had not sold stock in any company in which he was required to file an SEC Form 4 since 2005 and (2) Siebel has not sold in C3 stock since the Class Period. ¶ 178.

**D.      Plaintiffs also supplement the SAC with additional facts regarding the JVA amendments, Defendant Abbo's control of C3, and loss causation.**

The SAC also alleges that the Joint Venture Agreement was amended four times, and that with each amendment, Baker Hughes' annual commitments were materially downgraded and the deadlines for the Joint Venture to reach peak annual revenue were repeatedly extended. ¶ 97. The SAC also shows that the parties secretly amended the Agreement to eliminate a minimum FTE requirement and only required that C3 provide "train-the-trainer services for up to 60 salespeople a year." ¶ 99. The SAC also alleges that C3 added only eight customers in a recent quarter. ¶ 57.

The Complaint also adds further facts about the senior and supervisory day-to-day responsibilities of C3's President and Chief Technology Officer Defendant Ed Abbo, including his participation in a key C3 patent, which all support the conclusion that Abbo controls C3 and is derivatively liable for its violations of the securities laws. ¶¶ 36, 39.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 6          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

As for loss causation, the SAC now states that C3 revealed that, for the nine months ended January 31, 2021, the Company recognized total revenue of $21.6 million (less than half of the $53.3 million minimum revenue requirement for the fiscal year ending April 30, 2021) and that, for the three months ended July 31, 2021, the Company recognized total revenue of $16.1 million related to its Joint Venture with Baker Hughes, less than one quarter of the $75 million minimum revenue requirement). ¶ 151.

**E.      As recently as May 2023, Defendant Siebel continued to make the same misleading statements at issue in this litigation.**

On June 2, 2023, CNBC released an exposé on C3 entitled "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers questions metrics."[5] ¶ 57. CNBC's article quotes individuals who worked for Baker Hughes during the Class Period and who stated that C3's products were "difficult to learn." *Id.* Additionally, the CNBC exposé revealed that the 12,000 total salespeople at the company "are not all trained and qualified to sell the C3.ai product" and that "employees were not allowed to sell it without going through a rigorous approval process." *Id.* As a result, the Baker Hughes former employees "had no idea how the [Joint Venture] could certify 12,000 people," as Siebel repeatedly claimed. *Id.* The article also states that "many of the 30 former C3.ai employees who spoke with CNBC said that the company has had a difficult time attracting new customers and that those that have come in the door originated from Siebel's relationships." *Id.* The former employees also revealed Defendant Siebel's "intense oversight" of C3 activities. ¶ 171.

CNBC interviewed Defendant Siebel as part of its exposé. ***During the interview, not only did Seibel confirm that he has repeatedly touted C3's access to all of Baker Hughes' 12,000-person salesforce, but that C3 still had such access***. ¶ 58. However, neither Siebel, nor the corporate representative from Baker Hughes, identified how many Baker Hughes sales personnel were trained to sell C3 products, or how many are actively doing so. ¶ 59.

---

[5] CNBC's article, which includes an interview with Defendant Siebel, was published in June 2023, more than a year after this lawsuit was first filed in March 2022.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 7                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

**F.      Additional Procedural History**

At the end of its February Order, this Court provided Plaintiffs with leave to file a Second Amended Complaint as further amendments "would [not] be futile." *Id.* at 45. The Court ordered that if Plaintiffs sought further amendments, they were also required to provide a statement-by-statement chart with information under 15 U.S.C. § 78u-4(b)(1) and (2). *Id.*

Plaintiffs filed their Second Amended Class Action Complaint on April 4, 2024, to cure the deficiencies the Court identified in the CAC. *See* ¶¶ 19-24. As per the Court's instructions, Plaintiffs also filed a statement-by-statement chart with the information identified in 15 U.S.C. § 78u-4(b)(1) and (2), which was included as Appendix A to the SAC. ECF No. 158-1. Defendants filed their MTD Motions on May 17, 2024. ECF No. 167 (C3 Defendants), ECF No. 170 (Defendant Baker Hughes), ECF No. 171 (Defendant Simonelli).[6]

**III.      PLAINTIFFS' SECURITIES ACT CLAIMS NEED NOT BE DISTURBED**

**A.      This Court previously concluded that Plaintiffs alleged falsity as to Statement #3.**

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The SAC does exactly that.

The Complaint alleges that C3's Offering Materials created the misimpression that C3's offerings were in high demand since Baker Hughes had brought in sales from which C3 would recognize revenue: "***during the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement***." ¶ 66 (referred to by the Court as Statement #3). Plaintiffs explained that Statement #3 was misleading because, as FE-1 described, on weekly

---

[6] Notably, even though Defendant Simonelli joined the C3 Defendants' motion to dismiss during the previous round of briefing, it appears that Defendant Simonelli filed his own separate motion to dismiss for this round of briefing. ECF No.171.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 8                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

sales calls attended by sales VPs from each industry segment, the General Manager of the Oil and Gas segment regularly reported that Baker Hughes had no sales pipeline and had made *no* sales as of April 30, 2020. ¶ 67. The Complaint also alleges that this internal disclosure directly contradicts the Registration Statement's claim that during the fiscal year ended April 30, 2020, C3 recognized revenue from deals brought in by Baker Hughes.

In the previous round of motion to dismiss briefing, Defendants claimed that FE-1 statements were unreliable hearsay because they were "contrary to unchallenged disclosures in the Registration Statement and other disclosures." ECF No. 105 at 13. This Court rejected C3's argument for two reasons. First, it noted that the Court "does not assume the truth of any of the facts asserted" in judicially noticeable SEC filings. Order at 7. Second, even if the Court considered the accuracy of the financial figures, it also found that the judicially noticed documents identified by Defendants did not "contradict FE-1's allegations concerning the lack of deals closed." *Id.* Instead, the Court held that FE-1 statements were sufficiently particularized and that Statement #3 was adequately pled. Order at 19. The Court then denied Defendants' motion to dismiss Plaintiffs' claims regarding Statement #3. *Id.*

### 1.     Defendants provide nothing new to justify the Court's reconsideration of Statement #3.

Defendants now claim that while "the Court previously found allegations regarding FE-1 sufficient to allege Statement #3 was misleading […], a different ruling is warranted in light [of] *Espy* and undisputed audited figures in the 2022 Form 10-K." Mot. at 9. Defendants are wrong.

First, Defendants already highlighted the figures on page 126 of the 2022 10-K, along with the Registration Statement, when they first made their (failed) hearsay argument in the previous round of briefing. *Compare* ECF No. 105 at 12, n. 7, to Mot. at 8. Likewise, Defendants also previously relied on *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023). ECF No. 138 at 2. So Defendants are not providing anything new for the Court to consider this time around.

Second, like before, Defendants' argument is premised on this Court resolving a factual dispute between a confidential witness and Defendants' interpretation of certain governmental filings. Mot. at 8-9. Only now Defendants wish to emphasize a filing that was created six months

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 9          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*after* the close of the class period (and three months after the start of this litigation). But this Court has already denied judicial notice for documents that postdate the class period. *See* § VII.B. *infra.* And for documents where the Court granted judicial notice, it expressly limited the grant so as not to "endorse either of the competing inferences" or "resolve any factual dispute between the parties as to the substantive truth or falsity of their contents." Order at 7, n.7.

Indeed, the limitations imposed by this Court in its holdings reflect ample precedent regarding the nature and contours of the judicial notice doctrine in this Circuit. Courts in the northern district regularly hold that while government filings such as 10-Ks are judicially noticeable, it is only to establish that the filing exists and says what it says, not for the truth of the factual assertions in the 10-K: "[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. … But a court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *5 (N.D. Cal. July 21, 2020) (taking judicial notice of SEC filings "for the sole purpose of determining what representations [defendant] made to the market" but not "the truth of any facts asserted in these documents"); *Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *6 (N.D. Cal. Dec. 13, 2018) (taking judicial notice of press releases incorporated by reference for the fact that press releases were issued and informed the public of the information contained, but not for their truth).

Nor are Defendants' cited cases to the contrary. In *Finjan*, 58 F.4th at 1052 n.1, it is true that the court stated in *dicta* that "[w]hen a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling." But the *Finjan* court also clarified that "if specific facts alleged in the complaint contradict specific facts related in a non-legally-operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, ***the conflict is resolved in the plaintiff's favor***." *Id.* (emphasis added). So even Defendants' reliance on *Finjan* cannot justify a departure from the Court's previous findings. Additionally, the Court's holding in *Golden v. Google LLC*, 2023 WL 5154513, at *2 (N.D. Cal.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 10          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

Aug. 10, 2023), is of little use. In *Golden,* this Court noted that "[t]he Court also need not accept as true allegations that contradict matter properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint." But here, this Court has held that: (1) it will not judicially notice C3's SEC filings for the truth of the factual assertions therein and (2) that FE-1 statements do not necessarily contradict those documents. Thus, the circumstances of this case are distinguishable from the facts alleged by the *pro se* plaintiff in *Golden.* Defendants also cite *Veritas* for the proposition that "the Court may disregard factual allegations if such allegations are contradicted by the facts established by reference to exhibits attached to the complaint." *In re Veritas Software Corp. Sec. Litig.*, 2003 WL 27386177, at *3 (N.D. Cal. Dec. 10, 2003). But, yet again, Defendants' argument disregards the Court's holding that it "does not assume the truth of any of the facts asserted" in judicially noticeable SEC filings. Order at 7.

Finally, Defendants' claim that the recent decision in *Espy v. J2 Global, Inc.*, 99 F.4th 527, 537 (9th Cir. 2024), somehow overturned the Court's previous application of the law is meritless because the facts of *Espy* are clearly distinguishable from those here. More specifically, the plaintiffs in *Espy* sought to have the court rely on former employees' *opinions* of the defendant corporation's management practices. Here the Complaint simply recounts what FE-1 heard at a meeting. Moreover, while the Court in *Espy* noted that the former employee's description of a meeting came closest to alleging scienter, it was unclear "whether those statements come from general knowledge, gossip, or the meeting where [the confidential witness] was present." *Id.* Here, however, the Complaint directly alleges that FE-1 was physically present at the relevant meeting, and directly recounts what FE-1 heard at that meeting. ¶¶ 56, 173. Nor can Defendants suggest otherwise. So *Espy* is of limited application.

For the reasons stated above, the Court need not reconsider its denial of Defendants' motion to dismiss the Section 11 claim as it pertains to Statement #3.

**B.     Defendants fail to meet the heavy burden required to establish negative causation.**

Defendants also contend that dismissal of Plaintiffs' Section 11 claim is justified due to negative causation. Mot at 10. But Ninth Circuit precedent holds that a negative causation defense fails where "the misrepresentation ***touches upon*** the ***reasons*** for an investment's decline in value."

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 11     Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 861 (9th Cir. 2013) (emphasis added); *see also Garbini v. Protection One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994). Moreover, according to the Ninth Circuit, proving the affirmative defense at any stage is a "heavy" burden because it arises out of "Congress' desire to allocate to the defendants the risk of uncertainty in [Section 11] cases." *In re Worlds of Wonder*, 35 F.3d at 1423 (citation omitted).

Here, the SAC pleads that the misrepresentation pertains to the failure of the C3/Baker Hughes partnership to generate sales. ¶¶ 66-67. The corrective disclosure, which discusses the restructuring of that partnership because of poor sales (¶ 158), clearly touches on the topic of the misrepresentation and therefore defeats any claim of negative causation. Defendants' cases are inapposite. For example, Defendants' reliance on *Ambow* is misplaced as the court in that case found that the alleged corrective disclosures "do not reasonably reveal *anything* about the purported misrepresentations alleged in the SCAC." *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *15 (C.D. Cal. Feb. 6, 2014) (emphasis added). Similarly, in *Shoretel*, the court found "[t]o dismiss a complaint based on negative causation, the complaint has to foreclose the possibility that defendants caused plaintiffs' losses." *In re Shoretel, Inc., Sec. Litig.*, 2009 WL 2588881, at *3 (N.D. Cal. Aug. 19, 2009). Here, Defendants can point to no facts apparent from the face of the Complaint that restructuring C3's joint venture with Baker Hughes was not caused at least in part by the JVA's initial failure to generate sales. The Court can therefore disregard Defendants' negative causation contention.

**C.     The Securities Act claims against Defendants are timely filed.**

This Court held in its February Order that Plaintiffs' claims were timely. Order at 10-13. Yet, Defendant Baker Hughes still contends that the statute of limitations for claims arising under the Securities Act states that "[n]o action shall be maintained to enforce any liability … unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Ninth Circuit, interpreting the nearly identical statute of limitations for the Securities Exchange Act, held that a "reasonably diligent plaintiff has not 'discovered' one of the facts constituting a

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 12                   Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023). The Ninth Circuit specified that "a defendant establishes that a complaint is time-barred … if it conclusively shows that either (1) the plaintiff could have pleaded an adequate complaint based on facts discovered prior to the critical date and failed to do so, or (2) the complaint does not include any facts necessary to plead an adequate complaint that were discovered following the critical date." *Id.* at 466.

Baker Hughes wholly disregards this standard in moving to dismiss on statute of limitations grounds, instead citing decisions issued *before* the Ninth Circuit articulated the operative standard in *HP*. And it is no wonder. Under the *HP* standard, and this Court's earlier ruling, Baker Hughes cannot meet its burden of proof. The Court's February Order found that the sufficiency of the false statement in the Registration Statement turned on the allegations derived from FE-1. Order at 18-19. Just like before, Baker Hughes cannot show that Plaintiffs could have discovered FE-1's testimony more than a year before the Consolidated Amended Complaint was filed. So the Securities Act claim against Baker Hughes (and the rest of the Defendants) may continue.

The Court has found that Plaintiffs properly pled Statement #3 as a false and misleading statement and that Plaintiffs' Securities Act claims are timely filed. Defendants' recycled arguments do nothing to change these past conclusions. Nor do Defendants' contentions regarding negative causation even come close to meeting the high threshold required. As such, Plaintiffs' Securities Act claims may continue as to Statement #3.

### IV. PLAINTIFFS' EXCHANGE ACT CLAIMSARE PROPERLY PLED

**A.   The Court's previously finding of falsity under the Exchange Act need not be disturbed.**

In its February Order, this Court found that Plaintiffs had properly pled falsity regarding their 10(b) claims pertaining to Statements 4-6, 8-11, 13, and 15-17. *See* § II.B., *supra*. Still, Defendants ask that the Court expend judicial resources on another look, arguing again that statements regarding the exact number of FTEs selling C3 products would not change the mix of information in the market in light of C3's disclosures. Defendants are wrong—again.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 13          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

Defendants do not dispute that the public version of the Joint Venture Agreement attached to the Registration Statement redacted the number of full-time-equivalent salespeople that Baker Hughes committed to, but the version that Siebel signed had that information unredacted. Mot. at 13-14. In other words, Defendants agree that Siebel knew the minimum number of FTEs were contractually required to sell C3 products, while investors did not. This is the same contention relied on by the Court in the February Order, when finding that "[t]he Registration Statement does not say how many BH salespeople C3 and BH agreed would promote C3's products; it only cautions that strategic partners like BH may not leverage adequate internal resources within the scope of whatever agreements are made – be it for 12 or 12,000 salespeople to promote C3." Order at 28. This Court's holding that Siebel's statements are still materially misleading because "repeated representations that 12,000 people were selling for C3 'every day' are […] plausibly alleged to be new data points beyond those included in the IPO materials that altered the mix of information available to investors" remains true now. Order at 28. Therefore, there is no need to revisit the Court's previous findings regarding falsity for the 10(b) claims.

**B.      The SAC effectively remedies the Court's previous concerns regarding scienter.**

In this Circuit, scienter "may be established ... by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). "In the securities context, 'an actor is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (citation omitted). Although scienter is an inquiry into the defendant's subjective state of mind, "the objective unreasonableness of a defendant's conduct may give rise to an inference of scienter." *Gebhart*, 595 F.3d at 1041-42. An "extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" can supply evidence of scienter. *Id.* (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)); *In re VeriFone*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 14                          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

*Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5").

"Vague or ambiguous allegations are [] properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). As directed by the Supreme Court, "the court's job is not to scrutinize each allegation in isolation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). Rather, the inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 323; *see also No. 84 Emp.-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) ("Beyond each individual allegation, we also consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'") (citation omitted).

A "strong" inference also "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible." *Tellabs, Inc.*, 551 U.S. at 324. A plaintiff carries the burden when "the allegations are accepted as true and taken collectively … a reasonable person deem[s] the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000) ("The PSLRA calls for a 'strong inference,' not an outright confession or an airtight case at the pleading stage.").

As explained below, the additional amendments in the SAC supplement Plaintiffs' previous allegations and expressly address the Court's previous observations. And, when taken in their totality, the SAC sufficiently alleges a strong inference of scienter for both Defendants Siebel and Simonelli.

**1.     New facts show that Defendant Siebel knew or recklessly disregarded the truth regarding C3's access to Baker Hughes full salesforce.**

This Court previously found that "[t]he notion that Siebel had access to information that contradicted the alleged misstatements by virtue by his 'extensive' but unspecified involvement in

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 15                                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

the Joint Venture is too general of an allegation 'to plead scienter with the requisite specificity.'" Order at 32. The Court was also not convinced the CAC provided enough temporal detail to show that Defendant Siebel came across information regarding the size and structure of the JVA before the beginning of the Class Period. *Id.* Both these concerns have been alleviated because the SAC now alleges that the Joint Venture Agreement., which Defendant Siebel himself signed in June 2019, shows that Baker Hughes only committed a specific number of sales personnel to the JVA. ¶¶ 20, 96, 170.

Specifically, the publicly filed agreement signed by Defendant Siebel stated:

> BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3.

¶¶ 96, 170 (redactions in original).

The JVA, which Siebel had direct access to, contained specific information on the size and structure of the JVA. In contrast, investors did not have such specific information because the publicly filed version of the JVA redacted the number of Baker Hughes employees dedicated to the JVA. *Id.* In other words, investors were relying on Defendant Siebel, the JVA's signatory, to communicate what was redacted. Yet Siebel touted no less than eleven times that C3 had the *entire* 12,000-person salesforce at its disposal. *See* SAC, App'x A, ECF No. 158-1. Moreover, Defendant Siebel didn't even change his misleading statements after later amendments to the JVA, or even after Plaintiffs initiated this lawsuit.

The discrepancy between Siebel's public statements and the reality of the JVA that he himself signed, indicates Siebel's deliberate attempt to mislead investors and inflate C3's market potential. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (providing that "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information") (cleaned up) (citing *Berson v. Applied Signal Tech., Inc.*, 527

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 16                Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

F.3d 982, 987 (9th Cir. 2008)). Nor do Defendants' cases suggest otherwise.[7] The Court may now sustain Plaintiffs' Exchange Act claims as to Defendant Siebel based on direct scienter alone.

However, the inference of scienter becomes even more compelling when considering the circumstantial evidence and the totally of Plaintiffs' scienter allegations. For example, the SAC provides strong allegations as to Siebel's direct participation in the management and day-to-day operations of the Company. ¶ 171. The CNBC article also reveals multiple employees describing Siebel providing "intense oversight" of C3 employees. Plaintiffs also allege that Siebel had direct and extensive involvement in C3's partnership with Baker Hughes, including signing of the JVA. ¶ 171. Additionally, FE-1 stated that Siebel attended weekly sales calls where "he received, reviewed, and had access to reports and data … about the quality and size of the Joint Venture's salesforce." ¶ 173. These allegations, when taken together, show that Siebel acted in a "management's role in a corporate structure" and understood the "importance of the corporate information about which management made false or misleading statements." *South Ferry LP*, 542 F.3d at 785. Moreover, analysts covering C3 understood the importance of generating sales, which is why many asked about the Baker Hughes partnership during conferences and earnings calls. *See, e.g.*, ¶¶ 117, 174. Siebel's repeated emphasis on the 12,000 figure demonstrates that he knew that the size of the salesforce was essential for C3's revenues and operations. ¶ 49.

Viewing these allegations holistically, as this Court must do, Plaintiffs have carried their burden to show that Siebel had access to the facts about the actual size of the Baker Hughes' salesforce, which in turn supports an inference that they knew his statements were false. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). Or at the very least, Siebel "had reasonable grounds to believe material facts" about C3's lack of access to the full 12,000 salesforce when he: (1) signed the initial Joint Venture Agreement in 2019; (2) restructured C3's internal salesforce to makeup the deficiencies in July 2021; and (3) amended the Agreement to eliminate a

---

[7] Defendants' cases are distinguishable. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (plaintiffs failed to allege "with particularity" any information showing contradicting information); *Kuehbeck v. Genesis Microchip Inc.*, 2005 WL 1787426, at *10 (N.D. Cal. July 27, 2005) (plaintiff failed to identify "specific internal reports" that would have provided Defendants with particularized and detailed information").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 17       Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

minimum FTE requirement in October 2021. ¶¶ 96, 100, 158. *See In re Oracle Corp.*, 627 F.3d at 390. Therefore, the inference that Defendants made the misleading statements with deliberate recklessness is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.

Yet in their Motion, the C3 Defendants claim that to establish scienter based on Siebel's knowledge of the Joint Venture Agreement, Plaintiffs must not only show that Siebel knew of the contracted minimum number of salespeople, but also that Baker Hughes was not exceeding it. Mot. at 14. But this turns the scienter inquiry on its head. Because Siebel was aware that Baker Hughes had only committed to a specific number of salespeople, then unless Siebel also had specific information that indicated that Baker Hughes exceeded that minimum by devoting its full salesforce to selling C3's products, then Siebel was at least deliberately reckless for making such unreasonable claims. And Defendants point to no information that Siebel received that could have led him to believe that Baker Hughes' full sales force was selling C3's products, let alone any other type of reasonable inference. So Defendants' challenge falls flat. While the PSLRA requires Plaintiffs to allege a strong inference of scienter, it does not permit Defendants to defeat well pled allegations in a complaint through mere speculation.

Defendants also fault the Complaint for not alleging the number salespeople designated by the Joint Venture Agreement as assigned to the Baker Hughes salesforce, but this information was redacted from the public versions of the Joint Venture Agreement. ¶ 170. And even putting the redactions aside, Siebel admitted at the close of the Class Period that the Joint Venture Agreement needed to be restructured *in order* to allow the full Baker Hughes salesforce to sell C3's products, inferring that the original Joint Venture Agreement contemplated that less than the full salesforce would be assigned to the Joint Venture. ¶ 158.

And finally, Defendants' citation to *Saxton* is inapposite. There, the Ninth Circuit found that a defendant's signature on undisclosed loans did not establish scienter regarding the fact that the loans needed to be disclosed under GAAP. *In re Saxton, Inc. Sec. Litig.*, 156 F. App'x. 917, 921 (9th Cir. 2005). But GAAP is inherently subjective and requires the exercise of judgment. *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1208 (C.D. Cal. 2012),

*aff'd sub nom. Buttonwood Tree Value Partners, L.P. v. Sweeney*, 667 F. App'x 238 (9th Cir. 2016). The number of salespeople selling C3 products is a matter of objective fact.

### 2. Scienter for Defendant Simonelli

Simonelli is the Chairman, CEO, and President of Baker Hughes and, in his capacity as a director for C3, he signed the Registration Statement in December 2021 and the 2021 10-K six months later, each of which contained several misrepresentations about the Joint Venture. ¶¶ 181-182. Given his position at Baker Hughes, he was both highly motivated and had the ability to monitor the status and success of the Joint Venture. ¶ 182. Additionally, as a C3 audit committee member, Mr. Simonelli would have been able to readily access and understand "foundational financial documents" underlying these SEC disclosures, including any statements related to the Joint Venture. ¶ 35. While Defendants describe the Joint Venture as mere "minutiae"—and well beyond the radar of an independent director—these characterizations are belied by the fact that Mr. Simonelli only joined the C3 Board *because* of the Joint Venture's execution. ¶¶ 50-53. And while the Court previously found in its Order these allegations insufficiently specific to impute a strong inference of scienter to Simonelli, given that the Complaint now specifically alleges that the Joint Venture Agreement, which was the reason that Simonelli joined the board, specified the minimum number of salespeople to work on the joint venture, the Court can draw a strong inference that Simonelli was familiar with the agreement's contents and therefore was aware of (or deliberately reckless to) the fact that the full Baker Hughes salesforce was not working to sell C3's products.

### 3. New facts in the SAC provide further support for Plaintiffs' core operations theory.

Under the core operations doctrine, "it may be inferred that facts critical to the business's 'core operations' or important transactions are known to key company officers." *South Ferry LP*, 542 F.3d at 781. Scienter can also be inferred even without particularized allegations where the falsity of the information was obvious from the operations of the company and "it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 786.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 19          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

In its February Order, this Court observed that the previous Complaint did not contain any allegations that Sibel had "any involvement with the minutiae of Baker Hughes C3-focused salesforce" and therefore "the Court cannot conclude that the size of the personnel commitment at one of them was 'absurdly' obvious to C3's top executive." Order at 34. However, now the SAC includes allegations that Defendant Siebel personally signed the JVA which specifies exactly what size of the committed personnel at Baker Hughes would be made available to C3. ¶¶ 96, 170. This is precisely the information that this Court found the previous Complaint to be lacking.

Defendants respond by improperly attacking Plaintiffs' individual allegations in isolation. Mot. 13-18. But they cannot overcome the overwhelming inference if drawn from a holistic view (as this Court must when weighing the scienter allegations) that scienter is established. *See South Ferry LP*, 542 F.3d at 784 ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."). According to the SAC, Baker Hughes was C3's biggest client and C3 expected to earn hundreds of millions of dollars in revenue from the JVA. ¶¶ 51, 52. The SAC also shows that Defendant Siebel attended weekly meetings regarding Baker Hughes deal flows. ¶ 173. Moreover, Siebel's own statements expressly state that access to Baker Hughes' 12,000-person salesforce is a key feature and a major premise to the JVA. As Siebel put it during the KeyBanc Summit in 2021: "So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people." ¶ 107. And that the JVA helped C3 "to walk immediately into the board room of Aramco. It would take us 10 years to get to the [board] room of Aramco, okay, but for Baker Hughes." ¶ 113. Indeed, Siebel himself also touted the importance of using all of Baker Hughes' 12,000-person salesforce for C3 products more than a dozen times over the Class Period. *See* SAC, App'x A, ECF No. 158-1.

Given the gravity of the Baker Hughes' transaction on C3's finance and operations, it is clear from the alleged facts that the "problem was severe enough" that Siebel "must have been aware of it." *See Am. W. Holding Corp.*, 320 F.3d at 942; *see also Berson*, 527 F.3d at 988 n.5 (finding core operations doctrine allowed inference of scienter regarding stop-work orders that halted "between $10 and $15 million of work on the company's largest contract with one of its most

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 20      Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

important customers"). *See also In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *11 (C.D. Cal. Aug. 4, 2014) ("the core operations doctrine generally applie[d] to transactions worth millions of dollars or when operational issues affect a significant portion of the company's revenue and are of the type for which company officials are responsible").

Defendants also argue that the Joint Venture Agreement's minimum personnel commitment does not show Siebel's scienter because "it would be logical for Siebel to believe Baker Hughes was training additional salespeople." Mot. 14. However, this argument overlooks critical context here: Siebel was extensively involved in the Baker Hughes partnership and received weekly sales reports on the status of Baker Hughes' sales pipeline. ¶ 56. He was therefore fully aware that Baker Hughes did not provide the level of support he described publicly and did not meet its commitment regarding subscriber revenue growth. In addition, because C3 was only training 60 trainers at Baker Hughes per year, it was unrealistic to expect this small training force to quickly train Baker Hughes' full 12,000-person salesforce even if Siebel had somehow missed any and all discussions of the trainers during the weekly sales calls. Moreover, Defendants' speculation contradicts the statements pled in the SAC from C3's own employees that it was highly unlikely that any significant number of Baker Hughes employees had completed the required training to sell C3 products. ¶¶ 57-58. Given this background, Siebel turned a "blind eye" to argue that he believed Baker Hughes was providing the entire 12,000-person sales team. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d at 708.

Plaintiffs have pled an adequate core operations theory.

### 4. Plaintiffs' additional allegations regarding Defendant Siebel's stock sales remedy the Court's previous concerns regarding motive.

This Court previously explained that three factors are used to evaluate suspiciousness of stock sales: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Order at 35. As explained below, the SAC includes new allegations to satisfy each of these three elements.

*First*, the amount and percentage of shares sold by Siebel was suspicious. The SAC alleges that while in possession of material non-public information, Siebel sold over 9 million C3 shares

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 21          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

in insider sales for proceeds totaling over $600 million. ¶¶ 132-133. *See Tellabs, Inc.*, 551 U.S. at 310 ("personal financial gain may weigh heavily in favor of a scienter inference"). The Court previously pointed out that the "CAC does not contain any allegations concerning what percentage of his holdings Siebel sold." Order at 36. Now, however, the SAC alleges that Siebel's sales amounted to almost 60 percent (59.61%) of his holdings of C3. ¶¶ 21, 178. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (where $900 million in sales represented 2.1% of defendant's holdings, sales support strong inference of scienter); *see also In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) ("$474.49 million in stock proceeds" supportive of scienter despite the percentage retained).

Moreover, the SAC alleges that more than $437 million of Siebel's stock sales were from transactions that were *not* tied to established 10b5-1 plans. ¶¶ 130, 137-139. While the mid-monthly sales beginning on June 14, 2021, were purportedly under a 10b-5 plan, the *date* the plan was adopted is not disclosed, which is improper. *See* 17 C.F.R. § 240.10b5-1(c)(1)(i)(B) (the regulations require a trading plan to specify "the date on which the securities were to be purchased or sold"). This is also why Defendants' cases are inapposite, as in none of those cases were the trading plans either undated or filed during the class period. *See* Mot. at 20.[8] Further, contrary to Defendants' assertion, SEC regulations recognize "a written plan for trading securities" as an affirmative defense to insider trading allegations only if the insider adopted the plan "[b]efore becoming aware of the [material nonpublic] information." 17 C.F.R. § 240.10b5-1(c)(1)(i). So Defendants' contention that the Court resolve all inferences in Defendants' favor, even though Defendants have failed to provide any information about dates, is absurd. Finally, the SAC also pleads that Siebel had no Rule 10b5-1 trading plan for most of his transactions, and that the ones for which he did identify a plan, he entered the plan while having access to material non-public information. ¶ 137.

*Second*, the timing of the sales also raises suspicions. While withholding unfavorable nonpublic information from the investors, Siebel rushed as fast as they could to sell their C3 shares

---

[8] *See In re Nektar Therapeutics*, 2020 WL 3962004, at *16 (N.D. Cal. July 13, 2020); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 22          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

and stopped trading right before the truth was revealed. ¶¶ 130-132, 136-137. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014) (finding allegations that "Defendants sold their shares at times after [defendant company] learned of information that would adversely affect [its] stock, but before the public learned the information," supported an inference of scienter). Defendants' argument that "it is routine for insiders to sell stock after a lockup period expires" ignores Plaintiffs' allegations that Siebel had negotiated a convoluted exception to the standard 180-day lock-up period. ¶ 129. In particular, Siebel was allowed to sell his shares after only 90 days, if *inter alia*, the transactions represented less than 20% of the overall shares and only if the Company had made its first earnings report and the stock price was at least 33% higher than the IPO price over the course of several days. *Id.* Taking full advantage of the unusual 90-day lockup period, Siebel sold almost $200 million worth of stock within the first 100 days of C3 going public. ¶ 176.

***Third***, Siebel's C3 stock sales were sufficiently out of line with both his past and subsequent trading practices. Plaintiffs provide a detailed accounting of Siebel's stock sales during the Class Period. ¶ 130. Moreover, the SAC now pleads additional allegations showing that Siebel had sold no stock in any company for which he was required to file a Form 4 at any point since 2005 and has made no sales since the Class Period.[9] ¶¶ 21, 178. In contrast, he sold almost 60% of his C3 shares during the Class Period. Defendants argue that the SAC does not plead Siebel's pre-Class Period trading history of C3 stock. Mot. at 18. But C3 was not publicly traded before the Class Period. Under such circumstances, Plaintiffs need only plead "a meaningful trading history for purposes of comparison." *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020). *See also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (where plaintiffs, "through no fault of their own, cannot show that the individual defendants' stock sales were drastically out of line with prior sales" because of a lock-up, complaint adequately alleged scienter). At the very least, because the Class Period begins at C3's IPO, whether Siebel's stock sales were inconsistent with his prior trading history for C3 stock is "effectively meaningless" as

---

[9] These additional allegations remedy the deficiency the Court previously identified as "the [CAC] contains no allegations regarding the defendants' prior trading history." Order at 36.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 23            Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

there is no trading period *unaffected* by the false and misleading statements about the size of the Baker Hughes salesforce involved in selling C3 products. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187 (C.D. Cal. 2007).

Under the totality of factors, the allegations summarized above support a finding that Siebel's stock sales are suspicious, and thus raise an inference of scienter.

### 5. Defendants' nonculpable explanation is not as compelling as Plaintiffs' specific showing of scienter.

The logical inference here—that Siebel knew or was deliberately reckless to the falsity of his statements regarding C3's market reach and the strength of its partnership with Baker Hughes—is not rebutted by Defendants' argument that "Siebel honestly believed C3 had sufficiently disclosed the risks around the Baker Hughes partnership." Mot. at 20-21. Relying on *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007), Defendants contend that the Registration Statement provided sufficient risk disclosures as it disclosed to the investors that "C3 could not guarantee that Baker Hughes would provide adequate resources to sell C3 products." Mot. at 21. But as this Court previously found, such generalized disclosure "only cautions that strategic partners like BH may not leverage adequate internal resources within the scope of whatever agreements are made – be it for 12 or 12,000 salespeople to promote C3." Order at 28. "Siebel's repeated representations that 12,000 people were selling for C3 'every day'" provided "new data points beyond those included in the IPO materials." *Id.* The same logic applies to the effect of the Joint Venture Agreement, which was filed with the Registration Statement. Most of the alleged misstatements in the SAC were made *after* the Registration Statement, including many statements made at investor conferences where Defendants can point to no cautionary language at all. And the SAC also alleges that Siebel continues to make the misstatements. ¶ 58. The contention that Siebel's belief in adequate disclosure negates scienter is thus unconvincing, given the specific and repeated assurances he made about the scale of Baker Hughes' salesforce dedicated to C3.

### C. Plaintiffs have already met their burden regarding loss causation

To recover for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must show "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[T]he Ninth Circuit has explained that 'a plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (citation omitted). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "This is not 'a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *Id.* (citation omitted). A plaintiff may show loss causation by showing that a corrective disclosure caused the stock price to decline. *See Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market. *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011).

Here, Plaintiffs plead that on the December 1, 2021 conference call, Siebel revealed for the first time that C3 did not have full access and assistance of Baker Hughes' 12,000-person salesforce, which caused C3's stock value to plummet 11.20% the next day to $30.04—the lowest price of the year. ¶¶ 156-168. This Court agreed and held that "Plaintiffs have adequately pled that Defendants' December 1, 2021 disclosure of the alleged fraud (and the allegedly middling RPO metrics resulting from that claimed fraud) caused investors' losses." Order at 43.

Still, Defendants recycle yet again their previous argument by asserting that the December 1, 2021 disclosure "revealed nothing about the number of Baker Hughes salespeople selling C3 products." Mot. at 23. But this is directly contrary to this Court's prior finding that "Siebel's remarks on the December 1, 2021 earnings call disclosed what previously was not: that C3 had not had access to Baker Hughes' full 12,000-person salesforce[.]" Order at 42. Moreover, Defendants' claim that the disclosure only revealed the "structure," rather than the headcount, of Baker Hughes' sales force selling C3 products is nonsensical. If a separate unit within Baker Hughes was selling C3's products, then it follows that less than all 12,000 of Baker Hughes salespeople were selling C3's products. Notably, Defendants do not dispute this disclosure of the truth caused C3's stock

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 25          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

price to decline. In sum, the Court's prior finding underscores the merit of Plaintiffs' allegations, justifying the same conclusion here.

The SAC further alleges that Defendants' false and misleading statements and omissions regarding C3's sales capabilities and relationship with Baker Hughes were substantial factors in causing the drop in C3's shares. ¶¶ 145-155. Plaintiffs allege that the disappointing RPO performance of the Baker Hughes joint venture contributed to the overall C3's negative financial performance. The company announced disappointing RPO metrics in March and September 2021. In particular, the Baker Hughes joint venture fell short of its proportionate minimum revenue requirements: (1) for the fiscal year ending April 30, 2021, C3 recognized less than half of the $53.3 million minimum revenue requirement; and (2) for the fiscal year ending April 30, 2022, recognized less than one quarter of the $75 million minimum revenue requirement. ¶¶ 147, 151. The SAC also reports that various analysts reacted to C3's disappointing financial performance by dropping their price targets of C3's stock. ¶¶ 147-150, 152-154. As KeyBanc Capital Markets observed, C3's "RPO … declined 1% q/q and adjusted RPO including Baker Hughes was flat. Pipeline conversion remains 'lumpy,' with deal push-outs prompting management to retain rather than raise the FY22 revenue guide." ¶ 154. C3's stock plummeted following its issuance of March and September 2021 quarterly financial results.

Defendants also argue that "Plaintiffs failed to allege a connection between the alleged misstatements (regarding the size of the Baker Hughes salesforce selling C3 products) and any of C3's purportedly disappointing financial results." Mot. at 21-22. But as the Ninth Circuit explained, "[a] plaintiff may [] prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). For example, loss causation has been found where a plaintiff purchased a security that was "readjusted to a lower, more accurate level following the materialization of the risk" that was previously undisclosed, "causing Plaintiff to lose money." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (loss causation

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 26          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

established where "stock steadily declined" as defendant company postponed releasing a financial report and then released a "restatement of its financial results"). The same holds true here. Siebel conceded that Baker Hughes underperformed due to the structure of their partnership that excluded access to the full 12,000-person salesforce, supporting a plausible inference that the facts concealed by Defendants' misstatements were causally linked to the poor performance they revealed throughout the Class Period.

In addition, although there might be other factors unrelated to the Baker Hughes partnership that led to the drop in share prices, "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *21 (N.D. Cal. Nov. 27, 2018) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)). A plaintiff may show loss causation by alleging "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered; that defendants' misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security." *In re Charles Schwab*, 257 F.R.D. at 547 (citation and quotation marks omitted). In that instance, the loss is caused because "the failure to disclose th[e] fact caused [the] injury through [the plaintiff's] undervaluation of the risk it was undertaking in accepting the [investment]." *Id.* (alterations in original) (citation omitted).

Here, Plaintiffs plausibly allege that the *subject* of the fraudulent statements caused their loss. Specifically, Defendants misrepresented or failed to disclose the true scale of C3's sales capability and market reach about the Baker Hughes partnership.[10] This misrepresentation inflated the perceived value of C3, thus exposing investors to greater risks than they were aware of. *In re Charles Schwab*, 257 F.R.D. at 547 (when "defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks

---

[10] Defendants assert that "Siebel's December 1, 2021 discussion of the structure of the Baker Hughes partnership does not reveal anything as to Statement #3, because Siebel said nothing about deals brought in by Baker Hughes for the relevant fiscal year." Mot. at 23. But contrary to Siebel's public statement, the fact that Baker Hughes brought in no deals during the fiscal year ending in April 2020 is part of the alleged fraud. Statement #3 supports the claim that the company's misrepresentations about its partnership with Baker Hughes misled investors, resulting in financial harm.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 27                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

might be deemed to have caused some portion of their losses"). When the truth was revealed on December 1, 2021, the market adjusted to reflect the actual value of the company, causing significant losses for the investors. ¶ 157. So Plaintiffs have sufficiently shown the misstatements and omissions by Defendants were a substantial factor in the decline of C3's share price, showing a causal link between the alleged fraudulent conduct and the economic harm suffered.

Defendant Simonelli also argues that loss causation fails as to Defendants' Registration Statement misstatement. Simonelli notes that the disclosure did not reveal that Baker Hughes had not closed any deals during the period covered by the Registration Statement, but "a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted). Defendants, in the Registration Statement, omitted the fact that the Joint Venture had failed to generate revenues. This led to a restructuring of the Joint Venture that ultimately led to Defendants' admission on December 1, 2021, that the partnership was not working.

### D.  Plaintiffs' Section 20(A) claims may continue.

For a Section 20A claim, a plaintiff must plead (1) an independent violation of another provision of the securities laws, (2) that defendants traded "while in possession of material, nonpublic information," and (3) that trading activity of plaintiffs and defendants occur contemporaneously. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008). Here, Plaintiffs adequately pled an independent violation of Section 10(b) and allege that Defendants sold C3 common stock while in possession of material, non-public information—that C3 did not have the access to and was not leveraging Baker Hughes' "12,000-person sales organization." *See* ¶¶ 128-142 (stock sales), ¶¶ 94-127 (10(b) violation).

Defendants fault Plaintiffs for failing to specify in the count section of the Complaint the precise trades they allege were contemporaneous to Defendants' sales. Mot. at 24. But this allegation is unnecessary to state a Section 20A insider trading claim. While courts require the plaintiff to plead with particularity that they traded contemporaneously with the insider, courts have routinely found the particularity requirement met where the plaintiff provides enough detail, such

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 28                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

as the dates of the trades, to allow a comparison with the insider's trades and to establish the contemporaneous nature of the transactions. *See, e.g.*, *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023) (referring to schedule of plaintiff trades). Here, Plaintiffs have provided such detail by incorporating by reference their previously filed PSLRA certifications, which include all of their Class Period transactions in C3ai securities. ¶¶ 29-32, 217; ECF No. 71-1, 71-2, 71-3.

Defendants concede (as they must) that, among Plaintiffs' transactions, Plaintiff Samarghandi purchased shares of C3 common stock on August 16, 2021, contemporaneous with Siebel's August 16, 2021 sale, and thus has standing to bring a Section 20A claim. But Defendants seem to argue that since Plaintiffs did not buy contemporaneously with each of Siebel's remaining Class Period sales, or with each of the remaining Defendants' Class Period sales, Plaintiffs lack standing to bring Section 20A claims for these specific transactions. Defendants are wrong. "Plaintiffs ... have alleged that they made at least one trade contemporaneously with at least one of Defendants' trades during the Class Period. There is no requirement that Plaintiffs establish a contemporaneous trade for each and every one of Defendants' trades during the Class Period." *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 WL 5326262, at *5 (N.D. Cal. May 27, 2004) (granting class certification for a § 20A claim where plaintiff showed at least one contemporaneous trade with defendants); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 285 (N.D. Cal. 2020) (holding that plaintiff with viable § 20A claim based on one insider trade gives plaintiff standing as a class representative to assert a § 20A claim that encompasses other insider trades).

Next, as pertinent to Abbo, Barter, and Baker Hughes, Defendants urge the Court to dismiss Plaintiffs' Section 20A claim because Plaintiffs' stock purchases occurred days after they sold shares and are thus not "contemporaneous" as a matter of law. *See* Mot. at 24; BH MTD at 18. But the Ninth Circuit has not endorsed the standard Defendants seek to impose here—*i.e.*, that Plaintiff must have traded "on the same day" or "the day after" the insider's sale. *See In re Countrywide*, 554 F. Supp. 2d at 1074-75 ("The duration of the period in which an insider defendant's trade can be considered 'contemporaneous' with the plaintiff's is 'not fixed,' and the Ninth Circuit [has]

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 29     Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

expressly declined to elaborate on its 'exact contours.'"). Courts in this Circuit have routinely found trades to be "contemporaneous" where they were made several days to even weeks after the insider's sale.[11]

That for some of the challenged transactions Plaintiffs bought shares at a price lower than what Defendants sold their shares likewise does not defeat Plaintiffs' Section 20A claims for these transactions. *See, e.g.*, *Lamartina*, 2023 WL 2763541, at *18 (rejecting defendants' argument that lead plaintiff's § 20A claim fails because insider sold his stock at a higher price than lead plaintiff's purchase price). Indeed, Defendants cite no case in which that fact alone was determinative. For example, in *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020), the only case on which Defendants rely, the court noted that a six-day gap between defendant's sale and plaintiff's purchase may be considered contemporaneous, but that there was no evidence that the "trades occurred with defendant at an unfair advantage." *Id.*

Here, in contrast, Plaintiffs have alleged that they were at an informational disadvantage because they were not aware that C3 did not have Baker Hughes' entire salesforce at its disposal, which caused C3 shares to trade at inflated prices and Plaintiffs to overpay for their shares. Defendants, on the other hand, deliberately concealed that C3 was merely using a separate Baker Hughes sales division that relied on a subset of salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and traded on the basis of their knowledge contemporaneously with Plaintiffs, thereby allowing Defendants unjustly to profit on the transactions.

Further, the fact that certain of Defendants' sales were made pursuant to a 10b5-1 trading plan does not defeat Plaintiffs' Section 20A claim. Mot. at 24; BH MTD at 17, n.9. This is because

---

[11] *See, e.g.*, *Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1196 (permitting eight-day gap); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14-15 (N.D. Cal. Aug. 14, 2008) (five-day gap); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (finding seven-or eight-day gap "on the border of an acceptable time period"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) (concluding that six days is outer limit for contemporaneous trading); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five days); *In re Novatel Wireless Sec Litig.*, 2010 WL 11470156, at *6 (S.D. Cal. May 12, 2010) ("Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous.").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 30          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

Defendants enacted these 10b5-1 trading plans *only after* they were in possession of the alleged material, non-public information. ¶ 137. Moreover, at the pleading stage, courts do not accept 10b5-1 trading plans as proof of the disputable conclusion that they rule out the possibility of trading based on non-public, material information. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal. 2019) (citing *Khoja*, 899 F.3d at 999) (holding that 10b5-1 plan does not immunize executive from § 20A liability).

Next, Baker Hughes argues that the Complaint fails to allege a predicate violation necessary to establish Section 20A liability because Baker Hughes' Section 20(a) claim did not "relate[] to insider trading" and cites to *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *27 (C.D. Cal. July 1, 2008). BH MTD at 14. But that case provides them with no support. *Batwin* clarified that what it meant when it said that the Section 20(a) claim by VC defendants did not relate to insider trading was that "20(a) claims against the VC defendants relate to the conduct of Occam, Krausz, and Abbott, and none of these defendants are alleged to have engaged in insider trading." *Id.* Here, by contrast, the Section 20(A) claims against Baker Hughes relate to the conduct of Simonelli, Abbo, Siebel, and Barter, and the Complaint *does* allege that all of them engaged in insider trading, as set forth in this section.

Baker Hughes also makes the argument that the Complaint fails to establish that during the time when Baker Hughes traded, it was in possession of material, non-public information. BH MTD at 15. Given that the alleged material, non-public information about C3.ai in question is the "truth about C3's access to the Baker Hughes salesforce," this argument is ineffective. In any event, the Complaint alleges Baker Hughes' scienter through the scienter allegations against Simonelli. ¶¶ 181-182. *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1087 (N.D. Cal. 2001) (scienter of executive attributable to the company). And Baker Hughes' argument that Plaintiffs failed to plead scienter against it fail for the same reason. *Cf*. BH MTD at 15.

Baker Hughes also claims that the Complaint fails to allege Baker Hughes' knowledge of the falsity of Siebel's statements (*id.*), but lack of knowledge of the false statements does not show that they lacked knowledge of material, non-public information. Further, Baker Hughes argues that any information they had was not material, claiming that the Complaint fails to allege materiality

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 31                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

as to the misleading statements and omissions regarding the size of Baker Hughes' salesforce. *Id.* As set forth in § III.A, *supra,* the Complaint amply alleges materiality, and none of these Defendants are alleged to have engaged in insider trading. *Id.*

Finally, Simonelli contends that because he did not personally sell any C3 stock, he cannot be liable under Section 20A in his own capacity. Simonelli MTD at 15. But this argument ignores Plaintiffs' claim that Simonelli is liable as a control person of Baker Hughes. ¶¶ 181, 208-214.

## V.     THE COMPLAINT ADEQUATELY ALLEGES BAKER HUGHES' CONTROL

Where a minority shareholder (a) has substantial holdings of the controlled person, (b) places its designees on a board, and (c) these designees sign a document containing false statements, courts will find that the minority shareholder is, for pleading purposes, a controlling person. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug. 8, 2013) (finding that a defendant owning 20% of securities whose two nominees on controlled person's board signed a 10-K showed that shareholder controlled the false statements made in the 10-K); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979-80 (N.D. Cal. 2009) (control established as to defendant who was controlled person's "largest shareholder" and had nominee on board who had signed 10-Ks containing false statements). Similarly here, Baker Hughes owned 14.76% of C3's common stock as of the issuance of the Registration Statement. ¶ 54. Baker Hughes placed a designee on the board, Defendant Simonelli, Baker Hughes' CEO. ¶ 89. And Simonelli signed the Registration Statement and C3's annual report. ¶ 182. So the Complaint alleges Baker Hughes' control of C3. Further supporting Baker Hughes' status as a control person is the extensive relationship between Baker Hughes and C3, with Baker Hughes both acting as a large customer of C3 and an important source of sales to third parties. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. at 979-80 (fact that company was third largest customer of issuer supports scienter). Further supporting control is the fact that the designee, Simonelli, was on the audit committee. *See Thomas*, 167 F. Supp. 3d at 1048.

Defendants' case law does nothing to undermine this conclusion. Defendants' citation to *Solarcity* differs because in that case, Elon Musk, while a large shareholder and chairman of the board, was not alleged to be on the audit committee and the complaint only alleged that Musk

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 32                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

signed "certain of SolarCity's financial statements," and not, like here, the precise financial statements alleged to be misleading. *Bao v. Solarcity Corp.*, 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016). The remaining cases cited by Defendants for the proposition that large minority shareholding is not enough to establish control differ because they do not have the particularized allegations in the complaint regarding Simonelli's signing of false financial statements, membership on the audit committee, and status as Baker Hughes' CEO. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000). *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1053 (N.D. Cal. 2019).

Baker Hughes is also liable as a control person of Siebel for his oral statements regarding the C3-Baker Hughes partnership. Baker Hughes' control over the joint venture, which was the topic of the false statements, supports a finding that Baker Hughes controlled C3 for statements about that subject. *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1314 (D. Utah 2007) ("Huff, as CFO responsible for the financial reporting which is the subject matter of the alleged primary violation, is a control person."). Moreover, the Joint Venture Agreement gives Baker Hughes the right to approve any public statement about the joint venture. The Joint Venture Agreement states that "neither Party will issue any press release or public statements regarding the terms and conditions of this Agreement, and/or the details of the relationship between the Parties contemplated hereby, without the prior written approval of the other Party (not to be unreasonably withheld, conditioned or delayed)." Joint Venture Agreement at 13.6, ECF No. 167-4 at 18. Baker Hughes therefore had the explicit contractual right to control Siebel's statements. This fact easily distinguishes *Gupta*, a case from 1994 and the only authority standing for the proposition that control persons are exempt from liability for oral statements of others. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994). *In re eHealth* is wholly inapposite because it only holds that a non-speaker cannot be liable under Section 10(b) of the Exchange Act, not whether they can be liable as control people under Section 20(a). *In re eHealth, Inc., Sec. Litig.*, 2023 WL 6390593, at *9 (N.D. Cal. Sept. 28, 2023).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 33      Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

## VI.    THE COMPLAINT ALLEGES SIMONELLI'S CONTROL

Courts routinely find that members of audit committees, such as Simonelli, can be held liable as control people. "Defendants would also have the Court conclude that the prima facie case requires Lead Plaintiff to demonstrate that the Audit Committee Defendants had the specific ability to control the allegedly false and misleading statements that form the basis of the primary violation. But if that were true, then the Court would be inching dangerously close to shifting the burden of 'culpable participation' to the plaintiff, where it does not belong." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at \*28 (S.D. Cal. May 23, 2017). A finding of control is particularly appropriate here as Simonelli had control of the precise subject matter of both the Registration Statement's false statement and Siebel's subsequent oral misstatements. Defendants' case law is distinguishable for this reason. Moreover, as set forth in the preceding section, Simonelli, through Baker Hughes, had the explicit contractual right to approve any public statements by C3 on the Joint Venture, which covers all the false statements identified in the Complaint. With respect to Simonelli's argument that there can be no control person liability with respect to Siebel's oral statements, it fails for the same reason that Baker Hughes' argument on this point does. Simonelli's sole additional case on this point, *Murphy*, is inapposite as it was decided at summary judgment. *Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at \*25 (D. Or. July 17, 2020). Simonelli's claim that this acts as persuasive authority disregards the fact that a control person can show lack of "culpable participation" in the false statement at summary judgment as an affirmative defense, but that Plaintiffs need not allege culpable participation at the pleading stage. *In re BofI Holding*, 2017 WL 2257980, at \*21. To the extent Simonelli wishes to advance the argument that he had no participation in Siebel's oral statements, he may do so after a factual record has been developed.

## VII.    PLAINTIFFS' OPPOSITION TO C3 DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants ask the Court to take judicial notice of Exhibits A through F, which include the Joint Venture Agreement between C3 and Baker Hughes Holdings LLC ("JVA") (Ex. A); C3's Prospectus (Ex. B); C3's Registration Statement (Ex. C); C3's 2022 Form-10-K (Ex. D); and the

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 34                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

2021 and 2022 Proxy Statements (Exs. E and F).[12] Notably, each document was the subject of earlier Request for Judicial Notice and considered by the Court in its February 2024 Order. Order at 6-10. As such, Plaintiffs submit that the Court apply the same reasoning and limitations as it did five months ago.

**A.      The Court should apply the same reasoning and limitations as it did in the February 2024 Order when taking judicial notice of Defendants' Exhibits B, C, and E.**

These exhibits are SEC filings of C3's final prospectus (Ex. B), C3's Registration Statement (Ex. C), and a Proxy Statement from October 2021 (Ex. E). In the previous round of briefing, Plaintiffs admitted to the authenticity of these SEC filings but objected to judicial notice and incorporation by reference if Defendants use these documents to rebut Plaintiffs' allegations about: Defendants' inadequate risk disclosures, improper revenue recognition practices, suspicious trading, or intent to defraud. *See* ECF No. 119 at 51-54 (citing *Khoja* 899 F.3d at 1000). Ultimately, the Court took judicial notice and incorporated by reference Exhibits. B, C, and E. But in doing so, the Court expressly held that it "does not assume the truth of any of the facts asserted or endorse either of the competing inferences that the parties maintain arise out of the financial filings." Order at 7.

Still, Defendants contend that the Court should change its approach and now *also* assume the truth of any facts asserted in the SEC filings. Yet Defendants simply recycle the same arguments and identify the same precedent it relied on during the previous round of briefing. ECF No. 138 at 2 (citing *In re Finjan*, 58 F.4th at 1052 n.1).[13] Because Defendants have provided nothing new for this Court to consider, the Court should keep with its previously articulated approach and limitations regarding Exhibits B, C, and E.

---

[12] Plaintiffs do not oppose the C3 Defendants' Request for Judicial Notice of Exhibit A.

[13] Defendants also cite another case before this Court, *Golden*, 2023 WL 5154513, at *2. Presumably, the Court was already aware of the *pro se* case (and its limited applicability to this litigation) when it entered its February 2024 Order. Still, *Golden* is inapposite as it holds that the Court "need not" accept allegations that contradict documents properly subject to judicial notice. *Id.* Here, the Court has already held that the FE-1 allegations do not necessarily contradict the judicially noticed documents. Order at 19.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 35          Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

**B.    The Court should deny the C3 Defendants' Request for Judicial Notice of Defendants' Exhibits D and F for the same reasons it denied other post-Class-Period documents.**

Exhibit D is a copy of C3's 2022 10-K that was created seven months after the Class Period and Exhibit F is a copy of a 2022 Proxy Statement created ten months after the Class Period. In its February 2024 Order, the Court took judicial notice of these documents and incorporated them by reference, "as evidence 'that the market was aware of the information [they] contain[],'" Again, the Court expressly noted that it would not let them be used "to endorse … competing inferences" nor "to resolve any factual dispute between the parties as to the substantive truth or falsity of their contents." Order at 7, n.7.

Yet Defendants seek judicial notice of Exhibit D to do just that. According to Defendants, they seek to use Exhibit D to repudiate the Court's prior conclusion that the Registration Statement contained a misrepresentation (Mot. at 8, 24), and to assert that C3's revenues increased during the Class Period (Mot. at 23). Defendants also improperly seek judicial notice of Exhibit F to rebut allegations of suspicious trading and intent to defraud. *Id.* Plaintiffs object to judicial notice as Defendants' intended use of these documents as inconsistent with this Court's previous holding. Order at 7, n. 7.

Moreover, Plaintiffs assert that Exhibits D and F should not be judicially noticed at all—as they were only created several months after the Class Period and therefore irrelevant as to what the market was aware of during the Class Period. Nor does C3 provide any evidence that Defendants were aware of the additional revenues during the Class Period that would contradict the FE-1 statements sustained by this Court. Order at 19. Therefore, the exclusion of Exhibits D and F would be consistent with this Court's established reasoning in this litigation that documents that "postdate[] the class period, … cannot provide insight into what the market knew during the time." Order at 9-10 (denying request for judicial notice as the requested documents were dated "years after the class period ended"); *see also Kuzmenko v. Lynch*, 606 F. App'x 399, 400 (9th Cir. 2015) (denying "request for judicial notice of non-relevant, extra-record information discussed in [petitioner's] opening brief"). The Court should therefore refrain from granting judicial notice to Exhibits D and F.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 36                Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2

## VIII.   CONCLUSION

The Motions to Dismiss should all be denied in their entirety. If, however, the Court grants any part of the three Motions to Dismiss, Plaintiffs request leave to amend the Complaint under Fed. R. Civ. P. 15.

DATED: July 15, 2024

Respectfully Submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
**THE ROSEN LAW FIRM, P.A.**
Los Angeles, CA 90071
Telephone: (213) 785-2610
lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
jstern@rosenlegal.com

*Counsel for Additional Plaintiffs Sharon L.*
*Zavalanski, David Linder, and Elizabeth Wensel*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT – 37                    Case No. 4:22-cv-01413-HSG

011089-11/2605872 V2