# EXHIBIT C

**EFiled: Jul 18 2024 03:47PM EDT**
**Transaction ID 73720174**
**Case No. 2024-0520-NAC**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MICHELE PANKOW, on behalf of
C3.AI, INC.,

    Plaintiff,

    v.

THOMAS M. SIEBEL, EDWARD Y.
ABBO, SHANKAR SASTRY,
LORENZO SIMONELLI, DAVID
BARTER, CONDOLEEZZA RICE,
RICHARD C. LEVIN, MICHAEL G.
MCCAFFERY, BRUCE SEWELL,
LISA A. DAVIS, JIM H. SNABE,
STEPHEN M. WARD, JR., PATRICIA
A. HOUSE, HOUMAN BEHZADI,
BRUCE CLEVELAND,

    Defendants,

C3.AI, INC., a Delaware Corporation,

    Nominal Defendant.

C.A. No. 2024-0520-NAC

**AMENDED PUBLIC VERSION**
**EFILED: July 18, 2024**

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Michele Pankow ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant C3.ai, Inc. ("C3" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the Individual Defendants'

1

(defined below) non-exculpable breaches of fiduciary duties.

Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through her attorneys, which included, among other things, a request and inspection of certain non-public books and records pursuant to 8 *Del. C.* § 220 ("Section 220"), public statements made by the Company and the Individual Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding C3, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant C3 against certain current and/or former officers and directors of the Company based on their non-exculpable breaches of fiduciary duty as alleged in detail herein.

2.      C3 makes and sells artificial intelligence ("AI") software that it sells to enterprise clients. The Company sells its products under a subscription model where, instead of paying once for software, customers pay a recurring subscription fee. This model is referred to as "Software as a Service" or "SaaS."

3.      The Company also has purported strategic partnerships with oil and gas monolith Baker Hughes Co. ("Baker Hughes") related to oil and gas markets; and other strategic partnerships with corporate behemoths RTX (formerly Raytheon), AWS, Intel, and Microsoft. The Company primarily derives revenues from subscriptions of software, which account for 86% of revenues. Term subscriptions of the C3 AI Suite and Applications are usually for a period of three years. Besides deriving subscription revenues, the Company also generates revenues from professional services, which primarily consists of fees related to the implementation of services for new customer deployments of its applications. Professional services are provided both onsite and remotely, and include training, application design, project management, system design, data modeling, data integration, application design, development support, data science, and C3 AI Suite administration support.

4.      C3's fees depend on the level of effort required for specific tasks and are generally a fixed-fee arrangement and recognized as its services are performed.

3

Generally, the Company's professional services revenues have lower margins than subscription revenues.

5.      Because C3 generates most of its revenue through multi-year contracts, an important metric for evaluating the Company's financial performance is "Remaining Performance Obligation" or "RPO." RPO represents the total future obligations remaining under contracts. So, for instance, if a C3 client had a contract under which it was required to pay $10 million per year for three years, and had already paid $5 million, its RPO would be $25 million. C3 reports both Generally Accepted Accounting Principles ("GAAP") RPO, which only includes non-cancellable contracts, and Adjusted RPO, which includes cancellable contracts.

6.      As of the time of its initial public offering (the "IPO"), C3 was not a profitable company. Instead, the Individual Defendants presented C3 as a fast-growing company that was building up a large client base of corporate clients. Key to this effort, then, was sales. Under normal circumstances, a major constraint to sales growth would be the size of C3's salesforce, which numbered approximately 700. But, the Individual Defendants claimed the Company also utilized a much larger salesforce—that of its partner companies, and particularly its most significant partner, Baker Hughes. This was especially important for C3 because, as disclosed in the Company's Registration Statement, the Company's products require lengthy

4

and resource-intensive sales cycles.

7.      On December 9, 2020, pursuant to the Registration Statement, C3's Class A common stock began publicly trading on the New York Stock Exchange ("NYSE") under the trading symbol "AI." That same day, C3 filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement. Pursuant to the Registration Statement, C3 issued 15.5 million shares of its Class A common stock to the public at the offering price of $42 per share for approximate proceeds of $610 million after applicable underwriting discounts and commissions.

8.      The Registration Statement also contained an unusual lockup provision addressing when Company insiders (including certain of the Individual Defendants) could sell their personally held C3 shares. Normal lockup provisions usually forbid insiders from selling shares for 180 days after an IPO to prevent excessive selling pressure in the first few months of trading following an IPO. The C3 lockup provisions, however, were unusual in that they allowed certain C3 executives and other insiders to sell their shares after 90 days, only if, *inter alia*, the transactions represented less than 20% of the insiders' overall shares, the Company had issued its first earnings report, and the stock price was at least 33% higher than the IPO price over the course of several days. As a result, C3's lockup provision

created a perverse incentive for C3 executives to pump up C3's stock price in the first six months following the IPO.

9.      C3's salesforce was critical to its success. As the Registration Statement and the Company's subsequent Annual Reports on SEC Form 10-K and Quarterly Reports on SEC Form 10-Q would state: "To increase our revenue, we must continue to attract new customers…. In addition, our future success depends on our ability to sell additional subscriptions for our C3 AI Suite and C3 AI Applications to our existing customers, and our customers renewing their subscriptions when the contract term expires."

10.     To convince potential investors and stockholders that C3 could execute on its growth plan, the Registration Statement emphasized that one of C3's most important strategic partnerships was with one of the world's largest oil field services companies, Baker Hughes. The Individual Defendants repeatedly represented that Baker Hughes was not only a customer that purchased C3's products for itself; but Baker Hughes also agreed to be the ***exclusive seller for C3's products within the oil and gas industry***. In addition, the Individual Defendants repeatedly told stockholders that Baker Hughes had a significant stake in C3's success— owning about 10% of C3's stock—and that its Chief Executive Officer ("CEO"), defendant Lorenzo Simonelli ("Simonelli"), sat on C3's Board. The Individual

6

Defendants claimed in the Registration Statement and elsewhere that C3 could leverage Baker Hughes' 12,000-person salesforce, with deep industry expertise and connections and track record in already having sold C3's products to others. Another key to C3's success was C3's own field salesforce which, according to the Registration Statement and subsequent SEC Forms 10-K and 10-Q, had been restructured prior to the IPO "to effectively address small, medium, and large enterprise sales opportunities." Each of these statements would prove to be false.

11.    The Company's relationship with Baker Hughes was of paramount importance to stockholders. In June 2019, Baker Hughes entered a deal with C3 whereby Baker Hughes purchased a subscription of C3's suite of AI software for its own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries (the "Joint Venture"). Baker Hughes also agreed to a total revenue commitment to C3 of $50 million, $100 million, and $170 million, for the fiscal years ending April 30, 2020, 2021, and 2022, respectively, inclusive of subscription fees of $39.5 million. In June 2020, the agreement was revised to extend the term by an additional two years, for a total of five years, and modified Baker Hughes' commitments to $53.3 million, $75 million, $125 million, and $150 million for the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively, and reducing subscription fees to $27.2 million. If

7

Baker Hughes failed to generate enough sales to meet the revenue commitments, it was required to pay the difference. If Baker Hughes exceeded the commitment, C3 would pay Baker Hughes a sales commission.

12.    At the same time, Baker Hughes purchased 9,529,762 shares of Class B common stock and 1,283,333 shares of Series G convertible preferred stock at a purchase price of $4.62 per share and $19.8252 per share, respectively. As a result of this purchase, Baker Hughes' CEO, defendant Simonelli, was appointed to the Board of C3.

13.    Prior to the IPO and at the time the Registration Statement became effective, Baker Hughes owned 14.76% of C3's Class A common stock. Immediately after the sale of additional shares to the public in the IPO, Baker Hughes owned 11.65% of the Class A common stock, or 10,813,095 shares.

14.    In the Registration Statement, the Individual Defendants misrepresented and omitted material facts concerning C3's partnership with Baker Hughes. In reality, C3 did not have Baker Hughes' entire salesforce at its disposal. Instead, as the Individual Defendants only later admitted and as discussed below, C3 and Baker Hughes created a separate unit outside of their normal structure (titled "Baker Hughes C3"), which handled sales of C3 products. Because the Baker Hughes C3 unit was staffed with salespeople who lacked the industry connections

8

of Baker Hughes' normal salesforce, *it failed to make any sales as of the fiscal year ending April 30, 2020*.

15. In addition, post-IPO, the Individual Defendants concealed material facts concerning the Company's own field salesforce. Specifically, in July 2021, C3 undertook a massive restructuring of its own salesforce without the Individual Defendants disclosing this material fact to stockholders and the significant risks it posed to the Company. As a consequence of the misrepresented salesforce size and problems, C3 reported little or no growth in RPO each quarter. Both C3 and stockholders looked at one key performance indicator ("KPI") to gauge its success in executing on sales – RPO, which represents the total future obligations customers owe to C3 under existing contracts. As the Individual Defendants stated in C3's Registration Statement: "We monitor [RPO] … as a key metric to help us evaluate the health of our business, identify trends affecting our growth, formulate goals and objectives, and make strategic decisions."

16. In December 2021, the Individual Defendants began to reveal the truth. On December 1, 2021, defendant Thomas M. Siebel ("Siebel") revealed, for the first time, that C3 had secretly reorganized its direct salesforce in July 2021, only to restructure again in the last month of the quarter (essentially admitting that the Individual Defendants were materially concerned with the salesforce by July 2021).

9

Defendant Siebel stated:

> Now historically C3 AI has relied upon a high-touch, white glove service strategic selling model to acquire and obtain customers. In July of 2021, in an attempt to further accelerate revenue scalability and customer adoption, we reorganized sales as an independent unit along traditional hierarchically regimented selling structures like those in place at SAP and IBM. That proved to be a mistake.

> While the revenue came in the quarter was strong, the overall performance of the sales organization and specifically new sales activity in the second quarter was unacceptable. The management team and I have spent the past month restructuring the global sales function, molded in the traditional model that we know to be effective, as a high-touch, classic, strategic selling machine...

17. The Individual Defendants also revealed that C3 had "significantly expanded and restructured its strategic relationship with Baker Hughes for the second time.… The newly expanded contract also introduced a new pricing model and selling structure designed to further accelerate sales of C3 AI software products into the Baker Hughes customer base." When analysts asked about the motivations for restructuring the contract, defendant Siebel revealed that C3 did not have access to Baker Hughes' enormous 12,000-person salesforce nor its deep expertise. Rather, Baker Hughes and C3 had formed the separate, discrete unit called Baker Hughes C3, which had some undisclosed number of salespeople without the required expertise:

> The real motivation behind restructuring Baker Hughes was to basically

10

kind of realign the sales structure. So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay. And those relationship and that expertise are in their four business units. When we first put together the relationship with Baker -- with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships, and they weren't the people with the quotas and they weren't the people with the deep industry expertise and what really did here was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?

18.     Shortly after this announcement, on December 17, 2021, Baker Hughes' CEO, defendant Simonelli, resigned from the C3 Board.

19.     As the restructuring proceeded well into the next year, defendant Siebel would later admit in a November 2022 conference with stockholders that restructuring (which had been hidden since at least July 2021) was a risk stockholders would have wanted to know about:

So, we've made a lot of structural changes in the last year that everybody, I mean, I think many analysts would comment, "Oh, God, how could you, as a public company, you could take all these risks?" Well, guys, the risk is over. I mean, we've made the transition to the consumption pricing model. We have reconstituted the sales organization. We have reconstituted the service organization, and guys, we're off to the races. So I think that the risk is behind us.

11

20.     C3's stock price plummeted following these comments. The Company's stock currently trades at approximately $22 per share, or slightly more than half the IPO price of $42 per share.

21.     As detailed further herein, due to the Individual Defendants' serious misconduct, the Company has been severely damaged. This derivative action seeks to recover those damages for the benefit of the Company from the true wrongdoers – the officers and directors of C3.

## II.     THE PARTIES

### A.     Plaintiff

22.     Plaintiff is a current holder of C3 common stock and has continuously held C3 common stock since March 2021.

### B.     Nominal Defendant

23.     Nominal defendant C3 is a Delaware corporation headquartered in Redwood City, California.  The Company is an AI company. C3's common stock trades on the NYSE under the ticker symbol "AI."

### C.     The Individual Defendants

#### 1.     Current Directors

24.     Defendant Siebel has served as a Company director, Chairman, and the Company's CEO since 2009.

25. Defendant Condoleezza Rice ("Rice") is a current director and has served on the Board since December 2009.

26. Defendant Richard C. Levin ("Levin") is a current director and has served on the Board since August 2010. Defendant Levin is a member of the Audit Committee.

27. Defendant Michael G. McCaffery ("McCaffery") is a current director and has served on the Board since March 2009. Defendant McCaffery is a member of the Audit and Nominating and Governance Committees.

28. Defendant Bruce Sewell ("Sewell") is a current director and has served on the Board since May 2017. Defendant Sewell is a member of the Nominating and Governance Committee.

29. Defendant Lisa A. Davis ("Davis") is a current director and has served on the Board since December 2021. Defendant Davis is a member of the Audit Committee.

30. Defendant Jim H. Snabe ("Snabe") is a current director and has served on the Board since February 2021.

31. Defendant Stephen M. Ward, Jr. ("Ward") is a current director and has served on the Board since 2009. Defendant is a member of the Nominating and Governance Committee.

13

### 2.    Current Officers

32.    Defendant Edward Y. Abbo ("Abbo") served as a Company director from August 2009 to November 2020, and the Company's CEO from September 2009 to July 2011. Defendant Abbo currently serves as the Company's President and Chief Technology Officer.

### 3.    Former Officers

33.    Defendant David Barter ("Barter") is the Company's former Chief Financial Officer ("CFO"). Defendant Barter served as CFO of C3 from October 8, 2020 through December 11, 2021.

34.    Defendant Houman Behzadi ("Behzadi") is the Company's current Executive Vice President.

### 4.    Former Directors

35.    Defendant Shankar Sastry ("Sastry") is a former Company director who served on the Board from January 2009 through February 2023.

36.    Defendant Simonelli served as a Company director from August 2019 until December 17, 2021. He currently serves as the Chairman, President, and CEO of Baker Hughes, and has since 2017.

37.    Defendant Patricia A. House ("House") is a former director and served on the Board between 2009 and February 2023.

14

38.    Defendants Siebel, Abbo, Sastry, Simonelli, Barter, Rice, Levin, McCaffery, Sewell, Davis, Snabe, Ward, House and Behzadi are referred to herein as the "Individual Defendants".

## III.    DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents

15

of the various public statements issued by the Company.

41. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

42. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b. neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c. establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d. neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e. ensure that the Company complied with its legal obligations and

16

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.    ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

43.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein

17

involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## IV.    FACTS

### A.    C3's Background and Operations

44.    C3 is an AI company. AI software allows computer systems to build and perform tasks that usually require human intervention and support, such as speech recognition, decision-making, visual perception, and translation among languages. AI software also can analyze large sets of data and find patterns or anomalies that would be difficult or impossible for humans to find unaided.

45.    "Enterprise" AI software applies AI methods, such as machine learning and neural networks, to lower the cost of production or enhance various business functions like supply chain management, assisting in inventory management, or detecting fraud, etc. Organizations can also use enterprise AI software to increase efficiencies, reduce costs, and improve operations. This is because the traditional process of building software applications by integrating

18

various open-source components and cloud services can be slow, costly, and ineffective. In contrast, C3 asserts that by using its "AI enterprise" technology, companies can speed up software development by 26 times, thereby reducing the amount of code needed to be written by 99%. The enterprise AI software market was valued at $18 billion in 2020 and was expected to grow at a Compound Annual Growth Rate of 24% by 2024.

46.     C3 was founded by defendant Siebel in 2009. Over the next ten years, the Company was rebranded several times to exploit technology trends. For example, the Company was known as "C3 Energy" in 2013, C3 IoT (internet of things) in 2016, and is now known as C3.ai (AI).

47.     C3 operates as an "enterprise AI software company." This means that the Company offers a variety of SaaS applications for enterprises, as well as software solutions and integrated turnkey enterprise AI applications for oil and gas, chemicals, utilities, manufacturing, financial services, defense, intelligence, aerospace, healthcare, and telecommunications market segments. The Company also has purported strategic partnerships with Baker Hughes related to oil and gas markets; FIS related to financial services markets; RTX (formerly Raytheon); and AWS, Intel, and Microsoft.

19

48.     The Company primarily derives revenues from subscriptions of software, which account for 86% of revenues. Term subscriptions of the C3 AI Suite and Applications are usually for a period of three years. Besides deriving subscription revenues, the Company also generates revenues from professional services, which primarily consists of fees related to the implementation of services for new customer deployments of its applications. Professional services are provided both onsite and remotely, and include training, application design, project management, system design, data modeling, data integration, application design, development support, data science, and C3 AI Suite administration support.

49.     C3's fees depend on the level of effort required for specific tasks and are generally a fixed-fee arrangement and recognized as its services are performed. Generally, the Company's professional services revenues have lower margins than subscription revenues.

50.     Because C3 generates most of its revenue through multi-year contracts, an important metric for evaluating the Company's financial performance is RPO, which represents the total future obligations remaining under contracts. So, for instance, if a C3 client had a contract under which it was required to pay $10 million per year for three years, and had already paid $5 million, its RPO would be $25 million. C3 reports both GAAP RPO, which only includes non-cancellable

20

contracts, and Adjusted RPO, which includes cancellable contracts.

51.     As of the time of the IPO, C3 was not a profitable company. Instead, it presented itself as a fast-growing company that was building up a large client base of corporate clients. Key to this effort, then, was sales. Under normal circumstances, a major constraint to sales growth would be the size of C3's salesforce, which numbered approximately 700. But, C3's public filings claimed the Company also utilized a much larger salesforce—that of its partner companies, particularly its most significant partner, Baker Hughes. This was especially important for C3 because, as the Company disclosed in its Registration Statement, C3's products require lengthy and resource-intensive sales cycles.

### B.     The IPO

52.     On November 13, 2020, the Individual Defendants filed the Registration Statement on Form S-1 with the SEC in connection with C3's IPO. The Registration Statement was signed by defendants Siebel, Barter, House, Levin, McCaffery, Rice, Sastry, Sewell, Simonelli and Ward.

53.     On December 8, 2020, the SEC declared the Registration Statement effective and the Company priced the stock at $42 per share. The following day, the Company filed the final Prospectus with the SEC for the IPO and C3's common stock began trading on the NYSE under the ticker "AI."

21

54.     Pursuant to the IPO, the Individual Defendants entered into a 180-day lockup period, restricting them from selling Company common stock acquired through the IPO. However, the Registration Statement included an exception to the 180-day lockup period which stated that the Individual Defendants could make initial stock sales after just 90 days if the following requirements were met: (1) the sales constituted less than 20% of the Individual Defendants' overall stock ownership; (2) the Company had issued a quarterly earnings release announced by press release through a major news service or on a Current Report on SEC Form 8-K; and (3) the last reported closing price of C3's Class A common stock was at least 33% more than the IPO price of the Class A common stock for ten out of any fifteen consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021 occurred within five trading days of a trading black-out period, the above-referenced early expiration period would be the sixth trading day immediately preceding the commencement of the trading black-out period.

55.     Many of the Individual Defendants took great advantage of this 90-day exception, immediately and immensely profiting from the Company's common stock being artificially inflated as a result of their materially false and misleading statements. Eleven of the Individual Defendants—Siebel, Abbo, Barter, McCaffery,

22

Simonelli, Sastry, House, Levin, Sewell, Ward and Behzadi—made insider sales on March 8, 2021, the first eligible trading day after the 90-day lockup period. Collectively, from that lone day of trading, their profits exceeded *$250 million*. In total, during the relevant period, the Individual Defendants personally profited by a staggering *$745 million*.

### C. The Joint Venture

56. In June 2019, Baker Hughes entered into the Joint Venture with C3 whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries.[1] The 2019 Joint Venture Agreement mandated that Baker Hughes maintain an undisclosed minimum number of full-time equivalent ("FTE") sales personnel "to originate and help close commercial opportunities for C3 Offerings." 2019 Joint Venture Agreement at 7. C3, in turn, was also required to provide "train the trainer" services to Baker Hughes personnel.

57. Baker Hughes also agreed to a total revenue commitment to C3 of $50

---

[1] *See*, Joint Venture Agreement between C3.ai and Baker Hughes, a GE company, LLC, dated June 6, 2019, attached as Exhibit 10.10 to C3.ai's Registration Statement filed with the SEC on November 13, 2020.

million, $100 million, and $170 million, for fiscal years ending April 30, 2020, 2021, and 2022, respectively, inclusive of their subscription fees of $39.5 million.

58.    In June 2020, C3 and Baker Hughes revised the Joint Venture Agreement to extend the term by an additional two years, to a total of five years, and modified Baker Hughes' commitments to $53.3 million, $75 million, $125 million, and $150 million for the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively, and reducing their subscription fees to $27.2 million. If Baker Hughes failed to generate enough sales to meet the revenue commitments, it was required to pay the difference. If they exceeded the commitment, C3 would pay it a sales commission.

59.    At the same time, Baker Hughes purchased 9,529,762 shares of Class B common stock and 1,283,333 shares of Series G convertible preferred stock at a purchase price of $4.62 per share and $19.8252 per share, respectively. As a result of this purchase, Baker Hughes' CEO, defendant Simonelli, was appointed to the Board of C3.

60.    Prior to the IPO and at the time the Registration Statement became effective, Baker Hughes owned 14.76% of C3's Class A common stock. Immediately after the sale of additional shares to the public in the IPO, Baker Hughes owned 11.65% of the Class A common stock, or 10,813,095 shares.

24

61.     Unfortunately, the Company's partnership with Baker Hughes was not as represented. As defendant Siebel admitted on December 1, 2021, rather than rely on its main salesforce and existing business units, Baker Hughes "formed a new business unit that was called Baker Hughes C3[] that sat outside of [the Baker Hughes sales] organization. And so they really weren't the people with the relationships, and they weren't the people with the quotas and they weren't the people with the deep industry expertise."

62.     On June 2, 2023, CNBC released an exposé on C3 entitled "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers questions metrics."[2] CNBC's report cited accounts from individuals who worked for Baker Hughes during the two year period spanning December 2020 to December 2021, which completely undermined defendant Siebel's repeated public representations about the size of the Baker Hughes team selling C3 products. Specifically, the Baker Hughes former employees stated that C3's products were "difficult to learn." Additionally, the CNBC exposé revealed that the 12,000 total salespeople at Baker

---

[2] *See*, "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers question metrics," dated June 2, 2023, by Yasmin Khorram and Paige Tortorelli, available as of Apr. 4, 2024 at https://www.cnbc.com/2023/06/02/billionaire-tom-siebel-faces-controversy-at-ai-software-vendor- c3ai-.html.

25

Hughes "are not all trained and qualified to sell the C3.ai product" and that "employees were not allowed to sell it without going through a rigorous approval process." As a result, the Baker Hughes former employees "had no idea how the [Joint Venture] could certify 12,000 people"—as defendant Siebel had repeatedly claimed. The CNBC article also stated that "many of the 30 former C3.ai employees who spoke with CNBC said that the company has had a difficult time attracting new customers and that those that have come in the door originated from Siebel's relationships." Indeed, these sentiments help explain why C3 only added eight customers in a recent quarter (under C3's traditional definition of customer).

63.     On June 2, 2023, CNBC broadcasted its May 2023 video interview with defendant Siebel.[3] During the interview, defendant Seibel confirmed that he had repeatedly touted C3's access to Baker Hughes' 12,000-person salesforce. *Id*. at 1:50. Significantly, defendant Siebel continued to insist to stockholders and the public that C3 in fact had access to the full 12,000 person-strong Baker Hughes salesforce. In the segment discussing defendant Siebel's alleged misconduct, he was

---

[3] Video segment from the June 2, 2023 CNBC business show, "Last Call," concerning C3.ai available as of April 4, 2024 at https://www.cnbc.com/2023/06/02/billionaire-tom-siebel-faces- controversy-at-ai-software-vendor-c3ai-.html.

26

asked "did you say 12,000 were working with Baker Hughes to sell the C3ai product?" Defendant Seibel responded, "I believe it's on the order of 12,000." *Id*. at 1:43.

64. During the CNBC interview, neither defendant Siebel nor the corporate representative from Baker Hughes were able to identify any number of Baker Hughes sales personnel who are trained to sell C3 products, or how many are actively doing so. *Id*. at 2:34.

65. After defendant Siebel's CNBC interview, C3's communications team contacted CNBC, reiterating that "Mr. Siebel stated that c3.ai had access to 12,000, to a 12,000-person sales organization at Baker Hughes because he believed it to be true and has no reason to believe it is not true today." *Id*. at 5:00

66. On December 17, 2023, Baker Hughes' CEO, defendant Simonelli, resigned from the C3 Board.

## V. THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A. <u>False and Misleading Statements in the IPO Offering Documents</u>

67. The Offering Documents, filed in connection with C3's IPO, contained false and misleading statements regarding C3's salesforce size, the nature

27

of the Company's strategic partnerships, especially the relationship between the Company and Baker Hughes, and C3's "Go-to-Market Strategy" business model as it became a publicly traded company.

68.     The Offering Documents stated the following in their discussion of an overview of C3, including the Company's purported "Extensive Partner Ecosystem" and "Sales Alliances," among other things:

**Extensive Partner Ecosystem**

We have established strategic relationships with technology leaders including AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google,

IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

* * *

**Sales Alliances**

Strategic partnerships are core to our growth strategy with market-leading companies offering highly leveraged distribution channels to various markets.

To date, we have established such a partnership with Baker Hughes to address the needs of the global oil and gas market, with FIS to address needs in the financial services market, with Raytheon to serve the U.S. defense and intelligence communities, and with Microsoft and Adobe to address the next generation of CRM.

In addition, we have announced global alliances with AWS, IBM, Intel, and Microsoft to jointly market, sell, and service our combined

28

solutions across industry verticals.

In the majority of our sales opportunities we are aligned with one or more of these partners.

69.     The Offering Documents stated the following about C3's "Go-to-Market Strategy":

Our go-to-market strategy is focused on large organizations recognized as leaders in their respective industries or public sectors, and who are attempting to solve complicated business problems by digitally transforming their operations. These large organizations, or lighthouse customers, include companies and public agencies within the oil and gas, power and utilities, aerospace and defense, industrial products, and financial services industries, among others. This has resulted in C3.ai powering some of the largest and most complex Enterprise AI applications worldwide. ***These lighthouse customers serve as proof points for other potential customers in their particular industries. Today, we have a customer base of a relatively small number of large organizations that generate high average total subscription contract value, but we expect that, over time, as more customers adopt our technology based on the proof points provided by these lighthouse customers, the revenue represented by these customers will decrease as a percentage of total revenue.*** As our AI Suite is industry agnostic, we also expect to expand into other industries as we grow. For example, for the fiscal year ended April 30, 2018, revenue from customers in the financial services, oil and gas, aerospace and defense, manufacturing, and utilities industries represented 0%, 1%, 3%, 29%, and 67% of our total revenue, respectively, and in the six months ended October 31, 2020, revenue from these customers represented 10%, 30%, 16%, 20%, and 25% of our total revenue, respectively.

* * *

The size and sophistication of our customers' businesses demonstrate the flexibility, speed, and scale of our products, and maximize the potential value to our customers. To be a credible partner to our

29

customers, who often are industry leaders, we deploy a motivated and highly educated team of C3 personnel and partners. ***We go-to market primarily leveraging our direct sales force, and during the fiscal year ended April 30, 2020, we substantially increased the number of direct sales resources. We also complement and supplement our sales force with a number of go-to-market partners.***

- *Strategic Vertical Industry Partners*. We have developed an alliance program to partner with recognized leaders in their respective industries, such as Baker Hughes, Fidelity National Information Services, or FIS, and Raytheon, to develop, market, and sell solutions that are natively built on or tightly integrated with the C3 AI Suite.

- *Consulting and Service Partners*. As part of a global industry alliance, we partner with IBM Global Services, as well as a number of systems integrators specializing in Enterprise AI implementations.

- *Hyperscale Cloud and Infrastructure*. We have formed global strategic goto market alliances with hyperscale cloud providers including Amazon, FIS, Google, and Microsoft. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology.

These partners include Hewlett Packard Enterprise, and Intel. These partners supply infrastructure solutions, data management and processing services, or hardware and networking devices (e.g. IoT gateways) to support C3.ai product implementations and complement C3.ai's products.

\* \* \*

*In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. Our strategic go-to-market alliances*

30

*vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world.* Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3.ai technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts. We intend to grow the business we do with each partner and to add more partners as we expand the vertical markets we serve. We also offer revenue generating trials of our applications as part of our customer acquisition strategy.

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization.

31

During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement. This arrangement was revised in June 2020 to extend the term by an additional two years, for a total of five years, with an expiration date in the fiscal year ending April 30, 2024 and to modify the annual amount of Baker Hughes' commitments to $53.3 million $75.0 million, $125.0 million, and $150.0 million, which are inclusive of their revised direct subscription fees of $27.2 million per year over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. Any shortfalls against the total annual revenue commitment made to us by Baker Hughes will be assessed and recorded by us at the end of the fourth quarter of each fiscal year. We are obligated to pay Baker Hughes a sales commission on subscriptions to our products and services offerings it resells in excess of these minimum revenue commitments.

Our RPO related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $19.9 million related to deferred revenue and $20.0 million from non-cancellable contracts as of April 30, 2019, $2.4 million related to deferred revenue and $84.8 million from non- cancellable contracts as of April 30, 2020, and $16.9 million related to deferred revenue and $91.9 million of commitments from noncancellable contracts as of October 31, 2020.

As of July 31, 2019, October 31, 2019, January 31, 2020, April 30, 2020, July 31, 2020, and October 31, 2020 the total remaining amount of Baker Hughes minimum revenue commitments not yet contracted under the direct subscription fee or reseller arrangement, and thus subject to the shortfall annual provisions, under the entire arrangement was $194.0 million, $195.0 million, $190.3 million, $183.8 million, $270.9 million, and $249.9 million, respectively.

70.    The Offering Documents represented that C3's Total Addressable Market, or "TAM", was "estimated to be $174 billion in 2020" and would be "growing to $271 billion in 2024":

32

**Large Total Addressable Market**

We serve a large and rapidly growing market, estimated to be $174 billion in 2020, growing to $271 billion in 2024, based on IDC and Gartner reports.

Our total addressable market, or TAM, comprises multiple enterprise software segments that are growing at a combined compound annual growth rate, or CAGR, of 12%:

- *Enterprise AI Software*. According to IDC, the relatively new but rapidly growing global Enterprise AI software market totaled $18 billion in 2020, and will grow to $44 billion in 2024—a 24% CAGR. We address this market with our AI Suite and full portfolio of AI Applications.

- *Enterprise Infrastructure Software*. The C3 AI Suite replaces a wide range of existing enterprise infrastructure software categories, including Application Development, Application Infrastructure and Middleware, Data Integration Tools and Data Quality Tools, and Master Data Management Products. According to Gartner, the size of the infrastructure software market across these four segments totaled $63 billion in 2020, and will grow to $82 billion in 2024—a 7% CAGR.

- *Enterprise Applications*. C3 AI Applications address a wide range of Analytics and Business Intelligence use cases as well as the Customer Experience and Relationship Management (CRM) segment. According to Gartner, the size of the software market across these segments totaled $93 billion in 2020, and will grow to $145 billion in 2024—a 12% CAGR. C3.ai is an active participant in the Enterprise AI/ML, Data Analytics, Cloud Computing, and Digital Transformation markets. According to IDC, by 2022, 65% of CIOs will digitally empower and enable front-line workers with data, AI, and security and by 2025, 80% of CIOs alongside lines-of business will implement intelligent capabilities to sense, learn, and predict changing customer behaviors.

71.    The Offering Documents also touted about C3's "extensive partner ecosystem," stating the following, in relevant part:

We have established strategic relationships with technology leaders including Amazon Web Services, or AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

We form go-to-market and product co-development alliances with our partners that combine our AI expertise and technology with our partners' deep domain expertise to bring next-generation C3.ai solutions to joint customers.

Our partnerships include strategic alliance across four categories:

- *Industry Partners*. Each industry partnership focuses on a key vertical. We have formed global strategic alliances in the energy industry with France based global energy leader ENGIE (also a customer); in oil and gas with Baker Hughes, a global leader in oilfield services (also a customer); and in financial services with FIS, leading technology provider to the global financial services industry; and in the U.S. Federal and aerospace sectors with Raytheon, one of the world's largest aerospace and defense manufacturers.

- *Hyperscale Cloud and Infrastructure Partners*. We have formed global strategic go-to-market alliances with hyperscale cloud providers including Amazon, Microsoft, and Google. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology. These partners include Hewlett Packard Enterprise and Intel.

- *Consulting and Services*. We have formed a global strategic go-to-market alliance with IBM Global Business Services, who employs more than 100,000 service professionals. We have also established

34

partnerships with select specialized systems integrators that provide application design and development, data engineering, data science, and systems integration services, including Aubay, BGP, CMC, Data Reply, Infoedge Technology, Informatica El Corte Ingles, Intelia, Neal Analytics, Ortec, Pariveda, SCAP, and Synechron. These alliances are focused on helping organizations accelerate their Enterprise AI and digital transformation programs.

- *Independent Software Vendors*. Our ISV partners develop, market, and sell application solutions that are natively built on or tightly integrated with the C3 AI Suite. The C3 AI Suite enables ISVs to deliver AI capabilities to their installed user base that enhance or complement existing ISV application functionality. As of September 20, ISV partners include ENGIE, FIS, and Ortec.

### B.    <u>KeyBanc Emerging Technology Summit</u>

72.    On February 24, 2021, defendant Siebel spoke at the KeyBanc Emerging Technology Summit, emphasizing C3's building of "vertical markets sales organizations," including the Company's relationship with Baker Hughes, stating, in relevant part:

So the distribution model looks like geographically we're applying major account groups, enterprise groups, middle market groups and mass market groups. This is what we are doing with this capital that we raised to the markets. And then ***we are building vertical markets sales organizations for financial services, manufacturing, aerospace, health, telco, utilities and oil and gas.*** You see that we have made a number in each of these we're aligned with –we're aligning with a market partner, for example, in oil and gas we go to market with Baker Hughes. ***Baker Hughes has 12,000 people selling for us around the world into virtually every oil and gas company on the planet*** in for a safe energy, clean energy, sustainability we go to market with ENGIE on Paris.

35

In financial services, we've formed an alliance with FIS, that is both selling our products and replatforming their products on our – using the C3 AI suite in telco – excuse me, in defense, and intel – intelligence communities we go to market with Raytheon. We'll be announcing – in the next few weeks a new relationship in manufacturing. And then you can expect we will be forming a large relationship within health and telecommunications. We have a very significant partnership with Microsoft, and AWS, and we go to market with Google and IBM and Intel, Nvidia is a large partner.

And so how does this work? So, this for example, if we're calling on Bank of America this will be my group in New York working with my financial services group, working FIS, partnering with IBM to make Bank of America successful. This would be Royal Dutch Shell, well (00:20:51) out of Amsterdam working with my sales and marketing group working with Baker Hughes, working with Microsoft to make them successful. So, that's the model. ***And so, we're working towards – couple of years ago we had 16 sales teams and these – our sales teams are growing, we have 12,000 people at Baker Hughes, tens of thousands of people at Microsoft.*** Thousands of people at FIS, more to follow, but we can see that the vision is across all geographies and all indices through these partnerships to have tens to hundreds of thousands of people standardizing on this technology stack and serving customers.

73. Later during the KeyBanc Emerging Technology Summit, defendant Siebel was asked about the value of C3's Baker Hughes partnership and partnerships with other companies in other verticals. Defendant Siebel replied:

They're useful, they're invaluable, and they're core to the strategy. Let's think about Baker Hughes. So, Baker Hughes is one of the three large oil and gas service providers, the other two being of course Halliburton and Schlumberger. Okay. We have partnered exclusively with Baker Hughes where they've agreed they're going to build all of their software solutions on the C3 AI Suite. This replaces with the

36

previous stack that they brought over from GE. Okay. ***So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people.***

      **C.**      **March 1, 2021 Press Release and Third Quarter 2021 Earnings Conference Call**

74.      On March 1, 2021, the Individual Defendants caused the Company to issue a press release announcing C3's financial results for the third quarter of the 2021 Fiscal Year ("3Q 2021 Press Release"). The 3Q 2021 Press Release stated, in relevant part:

> We continue to establish our leadership as the only enterprise AI software pure play," said CEO Thomas M. Siebel. "This is a large and rapidly growing market; we continue to innovate; we continue to expand our market-partner ecosystem and associated distribution capacity; and we continue to demonstrate technology leadership. I believe that we are increasingly well- positioned to establish a global market leadership position in enterprise AI software.

>                                  * * *

> C3 AI significantly expanded its market-partner ecosystem to broaden its distribution and service network globally. In addition to expanding its market partnership activities with Microsoft, Baker Hughes, and ENGIE, C3 AI extended our relationship with Raytheon to serve the defense and intelligence communities; with FIS, a global financial services software company, to serve the banking and financial services industries; and with Infor to serve the global ERP market.

75.      That same day, on March 1, 2021, an earnings conference call was held with analysts and stockholders to discuss C3's financial results for the third

quarter of the 2021 Fiscal Year (the "Q3 2021 Earnings Call"). During the Q3 2021

Earnings Call, defendant Siebel stated:

> We continue to expand our market partner ecosystem and the associated increased distribution capacity associated with that. We continue to demonstrate technology leadership. I believe that we are increasingly well positioned to establish a global market leadership position in enterprise AI software. So let's talk about the financial highlights. All in all, it was a strong third quarter. Revenue in the third quarter was $49.1 million. $42.7 million of that was subscription revenue, an increase of 23% from a year earlier.

76.     Also, during the Q&A portion of the Q3 2021 Earnings Call, analyst

Brad Sills ("Mr. Sills") asked the following question pertaining to C3's partnerships

with other companies:

> Oh, great. Hey, thanks guys for taking my question and congratulations on your first quarter as a public company. I wanted to ask about the vertical partner focus here. Obviously, you talked about some leverage that you'll see here from some of these partnerships could you help us understand for perhaps some of the newer ones like Raytheon FIS, these are relatively new verticals for the company. What kind of resources are committed from these partners? How are you going to market together? How are you expected to get that leverage through these partnerships? Thank you so much.

77.     Defendant Siebel responded to Mr. Sills' question by stating the

following:

> Hey, Brad. I'll fill this one because it's kind of sales to marketing related. Well, as you know, we're going to market across three plains. We have horizontal market partners like say Microsoft would be the largest, but also IBM NVIDIA. We're building a geographic marketing

38

organization in North America, Asia Pacific, okay, and in Europe. And then across all sectors, we have vertical market sales organizations in oil and gas, in utilities, in financial services, in precision health, et cetera. And you can get expect that each of the – the goal is that each of these vertical markets we will align with a leveraged market partner. So the classic case is Baker Hughes. *So we've aligned in oil and gas with Baker Hughes, this is a 24 roughly, I think, billion-dollar oil services company that gives us access to 12,000 people now selling with us around the world. And there's virtually not one of the largest, say 20 or 30 oil companies, that we're not in active sales motion with, whether it's Aramco, ADNOC, Rosneft Gazprom, Shell, and 12,000 salespeople is a lot of sales capacity.*

### D.    Morgan Stanley Virtual Conference

78.    On March 2, 2021, defendant Abbo spoke at the Morgan Stanley Virtual Conference. During the conference, defendant Abbo replied to a question asking how C3 chose Baker Hughes as the Company's partner for the energy industry:

Well, first of all, the software we're talking about really is – requires the main knowledge and domain expertise and obviously, Baker Hughes has extensive domain knowledge in this industry as a leader in oil field services. So it was not it was not difficult to make that selection or Conner, we're not talking about general purpose software like SAP and ERP enterprise resource planning software. We're really talking about software that is deep domain experience and expertise and the AI in ML models are basically capturing the inherent processes and the know-how of the industry to basically improve the operations of that particular industry. *And so there is no better partner than Baker Hughes. They basically have a long-standing deep relationships with almost all oil and gas companies, independent national companies out there. The collaboration is I would say is very deep if you will. So we're collaborating on product. We're collaborating on the customer*

39

*engagement to make them successful and Uwem [Ukpong] and I speak on a multiple times on a weekly basis. So it's really a very deep partnership between the two companies. Our objective is to drive digital transformation for large – medium and large oil and gas companies. So that's why we chose Baker Hughes.*

### E.      March 2, 2021 JMP Securities Conference

79.      Also on March 2, 2021, defendant Siebel spoke at a JMP Securities Conference, during which he stated that "*now with Baker Hughes, we have 12,000 salespeople selling for us around the world and into every oil and gas company on the planet, Aramco, ADNOC, Gazprom, Rosneft, Exxon, you name it*." Later during the conference, defendant Siebel was asked about C3's go-to-market strategy and how C3 would work to enlarge the Company's customer base. Defendant Siebel replied:

> Yes, we have a pretty complex go-to-market strategy. So we have horizon, we have geographical organizations, APAC EMEA. Okay and the North American Group, within which we are building a major accounts group, an enterprise sales group, a middle market group and a mass market group. Then we're building vertical market sales organizations for oil and gas, for utilities for tele-communications, for healthcare, for aerospace and for defense.

> Okay. And within each of those, we're building a major accounts group, a strategic accounts group, a middle market group and a mass market group. *Then associated with each of the verticals we're aligning with a market partner, which gives us market leverage, for example at oil and gas, we go to market with Baker Hughes. That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more – [board] room of Aramco, okay, but for Baker Hughes.*

40

80.    Also, during the JMP Securities Conference, defendant Siebel stated the following about C3's relationship with Baker Hughes:

I think that Microsoft – I mean, these guys at Microsoft – Now, let's talk a little bit about what's going on with Microsoft today? We are in sales motion, an enterprise sales motion aligned with the Azure people, and SAT, and JP, and (inaudible) and probably 200 accounts around the world, in major account selling were, four legged sales calls and if it's oil and gas, it's a six legged sales call. For example at, Shell, okay, we'll have Baker Hughes, we'll have C3 and we will have Microsoft and we'll bring all of our services. And Shell way quite honestly doesn't know where Microsoft lets off and C3 starts and Baker Hughes picks up, and they don't care. They just know that they have all the services that they need. ***So that we have a similar relationship with them in CRM. I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that and now we have 12,000 people selling for us at Baker Hughes.***

### F.    May 24, 2021 JP Morgan Global Tech Conference

81.    On May 24, 2021, defendant Siebel attended the JP Morgan Global Tech Conference. During the conference, defendant Siebel reiterated that C3's partnership with Baker Hughes involved "12,000 people selling C3 for us all around the world every day, 12,000 people."

### G.    June 25, 2021 Annual Report on Form 10-K

82.    On June 25, 2021, C3 filed its Annual Report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by defendants Siebel, Barter, House, Levin, McCaffrey, Rice, Sastry, Sewell, Simonelli, Snabe, and Ward, and contained certifications, pursuant to Rules 13a-

41

14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley

Act of 2002 ("SOX"), signed by defendants Barter and Siebel, attesting to the

accuracy of the financial statements contained in the 2021 10-K, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors. The 2021 10-K stated

the following regarding C3's strategic partnership with Baker Hughes, in relevant

part:

> Baker Hughes: Oil, Gas, and Chemicals. In 2019, we a formed a
> strategic alliance with Baker Hughes, a $24 billion oil and gas services
> company. Under the terms of this alliance, Baker Hughes has
> standardized on C3 AI for all internal use AI applications. ***In addition,
> we are jointly marketing and selling a range of Enterprise AI
> solutions to address the entire value of upstream, mid-stream, and
> downstream activity under the BHC3 brand to oil and gas companies
> globally with the active engagement of Baker Hughes, which has a
> 12,000-person sales organization.***

### H.    August 12, 2021 Canaccord Genuity 41st Annual Growth Conference

83.    On August 12, 2021, defendant Siebel attended the Canaccord Genuity

41st Annual Growth Conference. During the conference, defendant Siebel stated the

following C3's strategic partnership with Baker Hughes:

> We're forming major account groups, enterprise sales groups, middle
> market groups and then mass market groups in each vertical market
> where we've been building out very significant market partners, who
> distribute these products with us for example in oil and gas at Baker

Hughes. And *Baker Hughes has 12,000 people selling with us around the world in oil and gas market, and since then we've penetrated Baker Hughes, Shell, Coke, MEG, LyondellBasell, Georgia – Flint Hills Research.*

## I.     August 20, 2021 Annual Proxy Statement on Form DEF 14A

84.     On August 20, 2021, the Company filed its annual proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). The 2021 Proxy Statement announced a forthcoming annual meeting of shareholders on October 6, 2021 and asked C3 shareholders to: (1) re-elect defendants House, Sastry, and Siebel to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as C3's independent registered public accounting firm for the 2022 Fiscal Year.

85.     The 2021 Proxy Statement stated the following regarding the Board's risk oversight functions:

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cyber security, legal and compliance, and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to- day management of risks we face, while our board of directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

While our board of directors is ultimately responsible for risk oversight, our board committees assist our board of directors in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee

43

assists our board of directors in fulfilling its oversight responsibilities with respect to risk management in our major financial risk exposures and the areas of internal control over financial reporting and disclosure controls and procedures. Our nominating and corporate governance committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management associated with board organization, membership and structure, and corporate governance. Our compensation committee assesses risks created by the incentives inherent in our compensation policies and practices. Our board of directors appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

Our board of directors believes that open communication with management is essential for effective risk management and oversight. Our board of directors meets with our Chief Executive Officer and other members of our senior management team at quarterly meetings of our board of directors, where, among other topics, management reports to and seeks guidance from our board of directors and its committees with respect to the most significant risks that could affect our business, such as legal risks, information security, cyber security, and privacy risks, and financial, tax, and compliance related risks. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

86.     The 2021 Proxy Statement also listed certain responsibilities of the

Company's Audit Committee, which consisted of defendants Levin, McCaffrey, and

Simonelli at the time. The 2021 Proxy Statement provided as follows:

The primary purpose of the audit committee is to discharge the responsibilities of our board of directors with respect to our corporate accounting and financial reporting processes, systems of internal control and financial statement audits, and to oversee our independent registered public accounting firm. Specific responsibilities of our audit

committee include:

- helping our board of directors oversee our corporate accounting and financial reporting processes;

- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;

- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;

- reviewing and approving related person transactions;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually that describes our internal quality control procedures, any material issues with such procedures and any steps taken to deal with such issues when required by applicable law; and

- approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

87.    The 2021 Proxy Statement also provided the following regarding the

Company's Corporate Governance Guidelines and the C3 Code:

Our board of directors has adopted corporate governance guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a code of business conduct and ethics that applies to all of

45

our employees, officers, and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. The full text of our corporate governance guidelines and our code of business conduct and ethics is posted on the Governance section of our investor relations website ir.c3.ai. We intend to post on our website all disclosures that are required by law or NYSE listing standards concerning any amendments to, or waivers from, any provision of the code.

## J.     September 1, 2021 Press Release and First Quarter 2022 Earnings Conference Call

88.     On September 1, 2021, the Company filed its Quarterly Report with the SEC for the first quarter of the 2022 Fiscal Year (the "1Q22 10-Q"). The 1Q22 10-Q which was signed by defendants Siebel and Barter and also contained SOX certifications signed by defendants Siebel and Barter attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 1Q22 10-Q boasted about C3's "field sales organization" and the Company's "strategic go-to-market alliances," including its "notable" partnership with Baker Hughes:

> In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that they serve. ***Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes...*** Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and

46

services resources that we can leverage to engage and serve customers anywhere in the world. Using our C3 AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our C3 AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3 AI technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts.

### K.      September 10, 2021 Deutsche Bank Tech Conference

89.      On September 10, 2021, defendant Siebel attended the Deutsche Bank Tech Conference. During the conference, Patrick Colville ("Mr. Colville") interviewed defendant Siebel. During the interview, Mr. Colville asked defendant Siebel the following question regarding C3's partnership with Baker Hughes:

Okay. Yes. And I guess, I mean, a key partner both historically and going forward, it's been Baker Hughes. C3 has got an amazingly close partnership with them and my conscience is they can use C3 software both internally in their environment and resells the software. Can you just help us understand that partnership and just kind of help us understand how's it kind of doing in a moment?

90.      Defendant Siebel responded by stating the following about C3 and Baker Hughes:

Yes. Baker Hughes, we entered into a strategic partnership with them

47

some years ago. They do use the application for some internal applications, like inventory optimization and what have you, and we go to market with them globally. ***So we have go-to-market motion with them at virtually every major order of 12,000 people working with us in all divisions of Baker Hughes and we have sales marketing activities going on in virtually every oil and gas company in the world*** and they're in various stages of early stages, running pilots, in some cases, running production applications in places like Shell, LyondellBasell, and Koch, but that's a strategic partnership and it's extraordinary positive.

### L.    September 13, 2021 Piper Sandler Global Tech Conference

91.    On September 13, 2021, defendant Siebel attended the Piper Sandler 2021 Global Tech Conference. During the conference, analyst Arvind Ramnani asked defendant Siebel the following question regarding C3's partnership with Baker Hughes:

Terrific, terrific. And I think your go-to-market approach is also very unique, right. I mean, it's -- kind of building AI company is difficult, but also some of the approach you've taken is I think quite different. Looking to have really leveraged partners such as Baker Hughes, FIS in specific verticals, what is the rationale for partnering with these vertical leaders versus sort of really going after the market by yourself?

92.    Defendant Siebel responded by stating the following about C3 and Baker Hughes:

Well, it gives us market leverage, I mean, we're 700 people. ***I have 12,000 people selling for me at Baker Hughes into oil and gas.*** At FIS, I have thousands of people selling with me into the financial services and banking market. I saw with Microsoft across a wide range of markets.

48

**M.     November 29, 2021 KeyBanc Summit**

93.     On November 29, 2021, defendant Siebel attended the KeyBanc Summit. During the summit, Michael Turtis, during an interview, asked defendant Siebel the following question regarding C3's partnership with Baker Hughes:

> So speak of these verticals, I want to switch over to your go-to-market strategy, which is quite powerful and unique in terms of the way that you've entered some of these verticals by partnering with some of the other participants in those vertical industries. So, I talked about Baker Hughes, about Raytheon, FIS, what would you want for the strategy in general? And then I'd like at some point maybe to finish on Microsoft because you've got a formal unannounced partnership there. But let's talk through some of these others as well.

94.     Defendant Siebel responded by stating the following about C3 and Baker Hughes:

> Our market, we have a relatively complex go-to-market strategy where we are organized both geographically, vertically and by market partner. So I have geographic coverage for North America, for EMEA and for APAC. Within each of those, I have enterprise sales groups, middle market sales groups and then marketplace sales group, selling the mass audiences. Orthogonal to that we have the vertical market sales organization that we're developing product and fielding sales and service organizations for the oil and gas industry, for the utility industry, for the telecommunications industry, for the financial services industry, what have you. In each of those verticals I am forming partnerships with a highly leveraged market partner. For example, in oil gas, I go to market with Baker Hughes. ***Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day*** to name the company, be it Rosneft Gazprom, Chevron, whoever it may be.

95.     Later during the summit, defendant Siebel responded to another

question pertaining to the size and nature of C3's partnership with Baker Hughes by stating the following:

> Well, let's look at the history of Baker Hughes. Baker Hughes, of course, was acquired by GE Oil & Gas. And so the leadership of GE Oil & Gas went over to run Baker Hughes and they took the Predix with them. So, Predix was their digital platform to reach the oil and gas industry. And after some time, they made this decision to switch from Predix to C3 AI for reasons that I'll let you ask them sometime. And the nature of the relationship that we entered into with Baker Hughes, it was a strategic partnership where they took an equity position in C3 that was pretty significant. ***We agreed that we would go to market with no other oil and gas service provider that Baker Hughes would be our sole provider and that they would be marketing our solutions through their 12,000-person sales organization globally.***

96.    Based on the above statements by the Individual Defendants, C3 stockholders unequivocally believed that Baker Hughes had 12,000 salespeople selling C3's products. As discussed below, however, this was unequivocally false.

## VI.    THE TRUTH EMERGES

97.    On December 1, 2021, the Individual Defendants caused C3 to issue a press release that disclosed C3's financial performance for the second quarter of the 2022 Fiscal Year. The press release revealed that C3's non-GAAP adjusted RPO showed *zero* growth year-over-year, even when accounting for an incremental $45 million increase in the value of the Baker Hughes contract after the restructuring of C3's Joint Venture with Baker Hughes.

98.     Later that day, on December 1, 2021, C3 held an earnings conference call with analysts and investors to discuss C3's financial performance for the second quarter of the 2022 Fiscal Year. During the call, defendant Siebel revealed that C3 initiated a large salesforce restructuring in July 2021 and also initiated another restructuring at the end of the second quarter of 2021:

> Now historically C3 AI has relied upon a high-touch, white glove service strategic selling model to acquire and obtain customers. In July of 2021, in an attempt to further accelerate revenue scalability and customer adoption, we reorganized sales as an independent unit along traditional hierarchically regimented selling structures like those in place at SAP and IBM. That proved to be a mistake.

> While the revenue came in the quarter was strong, the overall performance of the sales organization and specifically new sales activity in the second quarter was unacceptable. The management team and I have spent the past month restructuring the global sales function, molded in the traditional model that we know to be effective, as a high-touch, classic, strategic selling machine. That process is now complete and the early indicators are quite positive. Our customer has increased. Our sales visibility has increased and the amount of revenue of Q3 revenue that we have closed as of the end of November, gives us very high confidence levels in our Q3 revenue forecast.

99.     Also, during the December 1, 2021 earnings conference call, defendant Siebel revealed that C3 did not enjoy full access to Baker Hughes' 12,000-person salesforce and that, contrary to the Individual Defendants' prior repeated representations, Baker Hughes made an ***entirely separate*** sales division that was not as established nor as well-connected as the real Baker Hughes salesforce. Defendant

51

Siebel revealed, in relevant part:

> ***The real motivation behind restructuring Baker Hughes was to basically kind of realign the sales structure.*** So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay.
>
> And those relationship and that expertise are in their four business units. ***When we first put together the relationship with Baker -- with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships and they weren't the people with the quotas and they weren't the people with the deep industry expertise and what really did here was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?***

100.    On this news, the price of the Company's common stock fell by $3.79 per share, or more than 11%, from its closing price of $33.83 per share on December 2, 2021, to close at $30.04 per share on December 3, 2021.

101.    However, also during the December 1, 2021 earnings conference call, the Individual Defendants continued to make materially false and misleading statements. The Individual Defendants claimed that the third amendment to the Baker Hughes Joint Venture was a positive development for the Company because

52

it increased total revenue commitments to C3.

102.    On December 2, 2021, defendant Siebel attended the annual Virtual Wells Fargo TMT Summit. During the summit, defendant Siebel stated the following: "If we look at the analysts' predictions for the size of the enterprise AI software market, this promises to be on the order of a $300 billion software market in, say, 2025."

### A.    The Spruce Point Capital Management Report

103.    On February 16, 2022, Spruce Point Capital Management ("Spruce Point") issued a report ("the Spruce Point Report") which urged stockholders of C3 to sell their holdings. The Spruce Point Report revealed C3's thrice restructured partnership with Baker Hughes and that C3's largest customer by sales (constituting about 30% of all C3 sales in the 2021 Fiscal Year) supported the Company's sales through minimum guarantees.

104.    The Spruce Point Report further cited the account of a former C3 employee which depicted the partnership as "a marriage that is not working." For instance, when the Joint Venture agreement between the Company and Baker Hughes was amended for the third time on October 31, 2021, the remaining minimum revenue commitment for the 2022 Fiscal Year was removed and Baker Hughes' peak revenue commitment was reduced and delayed until the 2025 fiscal

53

year. The third amendment also featured other difficult provisions for the Company, including price discounts to prospective customers.

105.    Further, the Spruce Point Report questioned whether the partnership between Baker Hughes and C3 would continue after the current agreement ended. The Spruce Point Report also revealed that C3 was paying Baker Hughes $25 million in sales commissions on what Spruce Point determined to be a maximum of $11 million of eligible revenues for commission payments. Making matters worse, the Company agreed to pay the lucrative commissions despite the Baker Hughes Joint Venture not being on track to hit the minimum revenue requirement for the 2022 Fiscal Year.

106.    Additionally, the Spruce Point Report revealed that, contrary to the Individual Defendants' statements during the December 1, 2021 earnings conference call, the third amendment to the Joint Venture between C3 and Baker Hughes would reduce the net cash commitments made to C3 from Baker Hughes. The Spruce Point Report also revealed that other highly-touted partnerships with companies like Google, Microsoft, AWS, and Intel either were not as significant as C3 had represented or had not expanded to the level C3 had stated publicly. For instance, sales agents from Hewlett Packard and Microsoft were not familiar with C3's name and did not attempt to sell Spruce Point employees any C3 products or services.

54

Additionally, despite C3's representations about its "strategic alliance with Google Cloud," Spruce Point revealed that C3 was not even mentioned as a "Featured Partner Solution" on Google Cloud's AI and machine learning website.

107.    The Spruce Point Report also revealed that, during the IPO process, C3's TAM was materially inflated from $170 billion to $271 billion. The Offering Documents stated that C3's market would grow to $271 billion by 2024. C3's September 2020 prospectus, however, just two months before the IPO, represented that the Company catered to "a large and rapidly growing market, estimated to be $106 billion in 2020, growing to $170 billion in 2024."

108.    Lastly, the Spruce Point Report revealed that the Company suffered from significant turnover issues, involving employees from the sales teams all the way up to the CFO. The Spruce Point Report stressed that C3 had three CFOs at the Company since the start of the Company's IPO process in September 2020. Specifically, the Spruce Point Report emphasized that defendant Barter resigned after just 14 months with C3, forfeiting more than 900,000 unvested options—a package worth about $20 million. The Spruce Point Report noted that a former C3 employee recounted having four different bosses in only six months, stating that "attrition is a real problem."

55

109.   On this news, the Company's stock price fell by $1.01 per share, or nearly 4%, from its closing price of $25.71 per share on February 15, 2021 to close at $24.70 per share on February 16, 2022.

## VII.   INTERNAL, BOARD LEVEL DOCUMENTS CONFIRM THE INDIVDIUAL DEFENDANTS' KNOWLEDGE OF THE MISCONDUCT DESCRIBED HEREIN

110.   As evidenced by confidential, non-public Board-level materials obtained from the Company pursuant to Section 220, the Board held multiple meetings during 2021 where Board members discussed the Baker Hughes Joint Venture and the Company's relationship with Baker Hughes. The only reasonable inference is that each director present at these meetings was fully aware of the contours of the Company's relationship with Baker Hughes. Importantly, the frequency with which Board-level materials show that the Board discussed the Company's Baker Hughes relationship strongly supports the reasonable inference that the Board was fully aware that not all 12,000+ Baker Hughes employees were selling C3 products.

111.   On February 21, 2021, the Audit Committee held a meeting. C3_220_Pankow_00000652. Present were defendants Levin, Simonelli, McCaffrey, Siebel. *Id.* At this meeting:

Mr. Barter discussed fiscal Q3 2021 financial performance. He reported

56

on key income statements and balance sheet items. Mr. Barter then reviewed key financial performance metrics and other notable transactions in the quarter. Discussion ensued.

The Committee discussed the expected earnings call and disclosure to be provided."

*Id.*

112. On February 23, 2021, the Board held a meeting. C3_220_Pankow_00000648. Present were defendants Siebel, House, Levin, McCaffery, Rice, Ward, Sastry, Sewell and Simonelli. *Id.* During this meeting, defendant Siebel "presented an update on the state of the Company, including a review of Q3 financial results, and expected Q4 results." C3_220_Pankow_00000650. The meeting minutes further state that defendant Siebel "then reviewed the current management team and discussed future hires." *Id.* Furthermore, "discussion ensued". *Id.* Most importantly, the meeting minutes state that "Mr. Reznik[4] reviewed the status of strategic partnerships and alliances." *Id.* Again, "[d]iscussion ensued." *Id.* It is reasonable to infer that the "discussion" following Mr. Reznick's presentation included the details of the Company's most important alliance with Baker Hughes, including the truth regarding the actual number of Baker Hughes employees involved in selling C3's products. The slides

4    Gene Reznick ("Mr. Reznick") was C3's General Manager of Industries and Alliances.

from this meeting also confirm that Baker Hughes Joint Venture bookings were well under target. C3_220_Pankow_00001362.

113. On May 25, 2021, the Board held a meeting. C3_220_Pankow_00000188. Present were defendants Siebel, Abbo, Barter, House, Levin, McCaffery, Rice, Ward, Sastry, Snabe, Sewell and Simonelli. *Id.* The meeting minutes state that "the Board discussed potential transactions with Baker Hughes and Mr. Simonelli provided background from the Baker Hughes perspective." C3_220_Pankow_00000189. The materials presented to the Board members from this meeting contain a detailed PowerPoint slide presentation on what appears to be each topic presented by management. One set of slides is titled "Q1 FY 2022 Objectives Finance and Accounting." C3_220_Pankow_00000894. This presentation contains slides on sales objectives for the quarter, including by breaking out oil and gas. C3_220_Pankow_00000900. It also contains "Sales Objectives" for the Oil & Gas division, wherein the second "goal" is described as "Drive BH to onboard 10 qualified sales executives in direct quota carrying roles by July 31". C3_220_Pankow_00000915. A reasonable director would of course understand that onboarding just ten qualified sales executives at Baker Hughes would be wholly unnecessary if the entirety of Baker Hughes' 12,000+ sales employees were already selling C3's products. Thus, it is reasonable to infer that the Board members who

58

were present at this meeting and received these materials knew perfectly well that the myriad public statements claiming 12,000+ Baker Hughes employees were selling C3's products were false.

114.    The Audit Committee held a meeting on June 18, 2021; present were defendants Levin, Simonelli, McCaffery, Siebel, Ward and Barter. C3_220_Pankow_00000193. The meeting minutes state that the directors discussed the Company's forthcoming Annual Report on Form 10-K. *Id.*

115.    Board materials dated November 12, 2021 provide an overview of the "3rd Amendment to BHC3 JVA" and provide details on changes made to the Joint Venture partnership. C3_220_Pankow_00001673. A slide states that the "new model will streamline sales process and keep focus on customer acquisition and retention." *Id.*

## VIII.  INSIDER SALES

116.    In connection with the IPO, insiders including the Individual Defendants entered a 180-day lockup.

117.    However, the Registration Statement carved out an exception to the standard 180-day lockup. Insiders could initiate stock sales after only *90 days* if certain conditions were met: (1) C3 had issued a quarterly earnings release announced by press release through a major news service or on a Current Report on

59

SEC Form 8-K and (2) the last reported closing price of the Class A common stock was at least 33% greater than the initial public offering price of the Class A common stock for 10 out of any 15 consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021, occurs within five trading days of a trading black-out period, the above-referenced early expiration period will be the sixth trading day immediately preceding the commencement of the trading black-out period.

118.    The charts below identify the dates and amounts of C3 stock sold by certain of the Individual Defendants during the relevant period. For purposes of this section, the "Insider Selling Defendants" refers to defendants Siebel, House, Levin, McCaffery, Sastry, Sewell, Ward, Abbo, Barter, Behzadi and Simonelli.

### A.    Defendant Siebel

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 2,263,241 | $84.82 | $191,957,307 |
| March 15, 2021 | 1,138,024 | $84.01 | $95,605,800 |
| June 7, 2021 | 1,294,356 | $62.42 | $80,791,078 |
| June 10, 2021 | 705,644 | $58.96 | $41,604,976 |
| June 14, 2021 | 680,909 | $59.39 | $40,440,348 |
| July 13, 2021 | 667,291 | $53.65 | $35,803,283 |
| August 16, 2021 | 653,945 | $46.22 | $30,224,071 |
| September 13, 2021 | 640,866 | $49.13 | $31,485,574 |
| October 13, 2021 | 484,149 | $46.17 | $22,352,186 |
| November 15, 2021 | 615,488 | $48.36 | $29,762,880 |
| **Total:** | **9,143,913** | | **$600 million** |

### B.    Defendant House

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 237,940 | $85.93 | $20,447,135 |
| September 10, 2021 | 100,000 | $50.66 | $5,066,000 |
| September 10, 2021 | 100,000 | $50.66 | $5,066,000 |
| September 23, 2021 | 46,000 | $49.50 | $2,277,000 |
| **Total:** | **383,940** | | **$27.8 million** |

### C.    Defendant Levin

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 69,261 | $89.05 | $6,167,345 |
| March 10, 2021 | 6,713 | $89.00 | $597,457 |
| June 17, 2021 | 9,000 | $60.00 | $540,000 |
| June 22, 2021 | 10,000 | $60.16 | $601,600 |
| **Total:** | **94,974** | | **$7.9 million** |

### D.    Defendant McCaffery

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 15, 2021 | 189,483 | $87.90 | $16,655,176 |

### E.    Defendant Sastry

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 14, 2021 | 50,000 | $69.22 | $3,461,000 |

### F.    Defendant Sewell

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|

61

| March 8, 2021 | 34,986 | $88.56 | $3,098,465 |

### G.    Defendant Ward

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 5,000 | $91.37 | $456,850 |
| March 9, 2021 | 146,461 | $86.14 | $12,615,418 |
| March 10, 2021 | 11,000 | $86.86 | $955,427 |
| July 1, 2021 | 20,000 | $63.20 | $1,264,000 |
| **Total:** | **182,461** | | **$15.3 million** |

### H.    Defendant Abbo

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 258,717 | $86.09 | $22,273,937 |
| March 11, 2021 | 83,236 | $86.65 | $7,212,588 |
| June 17, 2021 | 86,768 | $59.28 | $5,143,462 |
| July 15, 2021 | 86,768 | $51.69 | $4,485,221 |
| August 19, 2021 | 34,707 | $44.96 | $1,560,343 |
| September 16, 2021 | 34,707 | $50.30 | $1,745,683 |
| October 21, 2021 | 34,707 | $47.65 | $1,653,714 |
| November 18, 2021 | 23,138 | $43.44 | $1,005,070 |
| **Total:** | **642,748** | | **$45.0 million** |

### I.    Defendant Barter

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 12, 2021 | 170,333 | $45.04 | $7,671,798 |
| November 12, 2021 | 14,844 | $46.29 | $687,075 |
| **Total:** | **185,177** | | **$8.3 million** |

### J.    Defendant Behzadi

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 8, 2021 | 50,000 | $87.93 | $4,396,550 |
| March 9, 2021 | 50,000 | $86.12 | $4,306,250 |
| March 10, 2021 | 97,839 | $86.61 | $8,473,444 |
| June 8, 2021 | 70,000 | $63.21 | $4,424,980 |
| July 9, 2021 | 70,000 | $58.38 | $4,086,600 |
| August 16, 2021 | 15,887 | $47.39 | $752,837 |
| September 1, 2021 | 15,887 | $53.91 | $856,420 |
| September 10, 2021 | 30,000 | $50.95 | $1,528,350 |
| October 4, 2021 | 15,887 | $44.48 | $706,701 |
| October 11, 2021 | 30,000 | $44.68 | $1,340,400 |
| November 15, 2021 | 15,887 | $49.84 | $791,887 |
| **Total:** | **461,387** | | **$31.7 million** |

### K.    Defendant Simonelli

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 7, 2021 | 873,431 | $64.25 | $56,117,095 |
| April 9, 2021 | 189,188 | $60.86 | $11,513,887 |
| April 22, 2021 | 170,000 | $67.99 | $11,557,841 |
| **Total:** | **1,232,619** | | **$79 million** |

119.    The size of the insider sales executed by the Insider Selling Defendants is nothing short of staggering. For example, defendant Siebel, alone, sold more than *9 million* C3 shares between March 8, 2021, and November, 2021. Collectively, the Insider Selling Defendants sold more than *12 million* shares of C3 stock over a period spanning only *nine months*.

63

120.    The Individual Selling Defendants' motive to issue the repeated false statements alleged herein is highlighted by the suspicious timing of their insider selling. The Individual Selling Defendants rushed as fast as they could to sell their C3 shares with knowledge of the false statements in the Registration Statement and the other SEC filings cited herein, as well as the myriad oral statements by defendant Siebel. For example, on March 8, 2021—the very first day that the 90 day "early bird" lockup expired— defendants Siebel, Levin, Sewell and Ward reaped more than ***$200 million in a single day***. Defendant McCaffery joined his fellow directors by selling $16.6 million just a week later on March 15, 2021. By June 7, 2021—the date where the 180-day lockup would have expired—the Insider Selling Defendants' insider sales totaled over ***$559 million***.

121.    The rush of early transactions appears especially suspicious because trading of C3 stock by the Individual Defendants becomes virtually non-existent after material, adverse, inside information was disclosed on December 2, 2021. For example, defendant Siebel executed approximately 11 insider transactions from March 8, 2021 to November 15, 2021, which netted him over $630 million—but, conspicuously, defendant Siebel has not made any other sales of C3 stock since November 2021.

**IX.    THE FEDERAL SECURITIES FRAUD CLASS ACTION AGAINST C3 AND CERTAIN OF THE INDIVIDUAL DEFENDANTS HAS BEEN PARTIALLY SUSTAINED**

122.    Following the emergence of the truth regarding C3's Joint Venture with Baker Hughes, C3 investors filed a class action suit against the Company, Baker Hughes, and defendants Abbo, Barter, Siebel and Simonelli for purported violations of the federal securities laws. *See Reckstein Family Trust et al. v. C3.ai, Inc. et al.,* Case No. 22-cv-1413-HSG (N.D. Cal.) (the "Securities Action").

123.    The defendants' motion to dismiss the Securities Action was denied in part by U.S. District Judge Haywood S. Gilliam, Jr. ("Judge Gilliam") in an order dated February 22, 2024.   The Lead Plaintiff in the Securities Action filed an Amended Complaint on April 4, 2024.

**X.    DAMAGES TO C3**

124.    C3 has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

125.    As a direct and proximate result of the Individual Defendants' conduct, C3 has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

> a.    legal fees associated with the lawsuits filed against C3 and its
>
> officers and directors for violations of the federal securities

laws, including the Securities Action;

b.  loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

c.  Costs and expenses associated with the Company's failure to file accurate reports with the SEC;

d.  Damages resulting from the Insider Selling Defendants' unlawful insider stock sales; and

e.  loss of revenues and profits.

## XI.   DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

126.  Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

127.  Plaintiff is a current stockholder of the Company, was a stockholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein and has been a stockholder of the Company continuously since March 2021.

128.  Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

129.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

130.    The Board currently consists of nine (9) directors: defendants Siebel, Rice, Levin, McCaffery, Sewell, Davis, Snabe, Ward, and non-party KR Sridhar ("Sridhar").  A derivative plaintiff need only demonstrate reason to doubt that at least half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least five (5) current directors of C3 are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.    Defendant Siebel is Not Independent

131.    Defendant Siebel is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Siebel's principal professional occupation is his employment as CEO of the Company.

132.    Accordingly, defendant Siebel is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation.   The Company's Proxy Statements on Form DEF 14A also admit that defendant Siebel is not independent.

**B.    A Majority of the Board Members Face a Substantial Likelihood of Liability Because Non-Public Board-Level Materials Show They Had Actual Knowledge of – or Recklessly Disregarded – Material Undisclosed Facts**

133.    As alleged in ¶¶110-115 based on confidential, non-public, Board-level evidence obtained pursuant to Section 220, a majority of the current members of the Board, including defendants Siebel, Rice, Levin, McCaffery, Sewell, Davis, Snabe and Ward, were present for Board meetings where senior C3 officers detailed the status of the Company's strategic partnership with Baker Hughes. Thus, these eight defendants each *knew* the Company did not have access to Baker Hughes' 12,000+ strong sales force. Likewise, these defendants *knew* the Company was substantially underperforming with regard to sales not only to other Oil & Gas division potential customers, but also through the Joint Venture itself. Plaintiff's allegations of director knowledge come directly from the Board's own meeting minutes and meeting materials.

134. For example, seven current directors – defendants Siebel, Rice, Levin, McCaffery, Sastry, Sewell, and Ward – were present at a February 23, 2021 Board meeting wherein they discussed "the status of strategic partnership and alliances" with Mr. Reznik, the Company's General Manager of Industries and Alliances. C3_220_Pankow_00000648. *Id.*

135. Eight current directors – defendants Siebel, Rice, Levin, McCaffery, Ward, Sastry, Snabe and Sewell -- were present at the Board's May 25, 2021, meeting during which "the Board discussed potential transactions with Baker Hughes and Mr. Simonelli provided background from the Baker Hughes perspective." C3_220_Pankow_00000189. The materials presented to the Board members in connection with this meeting contain a detailed PowerPoint slide presentation which contains "Sales Objectives" for the Oil & Gas division, wherein the second "goal" is described as "Drive BH to onboard 10 qualified sales executives in direct quota carrying roles by July 31". C3_220_Pankow_00000915. Any reasonable director (as Plaintiff alleges that each of defendants Siebel, Rice, Levin, McCaffery, Ward, Sastry, Snabe and Sewell undoubtedly were) would have understood that onboarding just *ten* qualified sales executives at Baker Hughes would be wholly unnecessary if the entirety of Baker Hughes' 12,000+ sales employees were already selling C3's products. Thus, the only reasonable inference

69

is that the Board members who were present at this meeting and received these materials knew perfectly well that the myriad public statements claiming 12,000+ Baker Hughes employees were selling C3's products were false.

136.   Given that the evidence obtained via Section 220 shows that defendants Siebel, Rice, Levin, McCaffery, Ward, Sastry, Snabe and Sewell were present for these detailed presentations, their failure to ensure that the Company's public statements to stockholders were truthful and accurate regarding the true nature of the Baker Hughes Joint Venture by enabling or acquiescing to the misconduct raises doubt as to these directors' disinterestedness, making demand futile for these directors.

### C.   A Majority of the Board Members Face a Substantial Likelihood of Liability Because They Signed False and Misleading SEC Filings

137.   The Individual Defendants had a duty to ensure that the Company's SEC filings did not contain material omissions. Again, each Individual Defendant failed to do so. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

138.   A majority of the members of the current Board – defendants Siebel, Levin, McCaffrey, Rice, Sewell, Snabe, and Ward – signed the Company's materially false and misleading 2021 10-K. The 2021 10-K included the following

70

false and misleading statement regarding C3's strategic partnership with Baker

Hughes, in relevant part:

> Baker Hughes: Oil, Gas, and Chemicals. In 2019, we a formed a strategic alliance with Baker Hughes, a $24 billion oil and gas services company. Under the terms of this alliance, Baker Hughes has standardized on C3 AI for all internal use AI applications. ***In addition, we are jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization.***

139.    It was misleading to suggest that the Company was "jointly marketing

and selling" C3's products with the active engagement of Baker Hughes and its

12,000+ sales organization when in truth, the actual number of Baker Hughes

employees actively selling C3's products was miniscule, as defendants Siebel,

Levin, McCaffrey, Rice, Sewell, Snabe, and Ward knew from their Board meetings

and information provided to them by C3's senior management (including defendant

Siebel) . As such, defendants Siebel, Levin, McCaffrey, Rice, Sewell, Snabe, and

Ward knowingly and/or recklessly breached their fiduciary duties by misleading

stockholders. Such behavior constitutes bad faith under Delaware law, which is non-

exculpable and is not protected under the business judgment rule. Thus, there is

reason to doubt the disinterestedness of defendants Siebel, Levin, McCaffrey, Rice,

Sewell, Snabe, and Ward, each of whom faces a substantial likelihood of liability.

71

Demand is thus futile and excused.

**D.      A Majority of the Board Members Are Directly Interested Because They Personally Profited From Sales of C3 Stock Made While in Possession of Material, Adverse, Non-Public Information**

140.    Defendants Siebel, Levin, McCaffery, Sewell and Ward each sold a material amount of C3 stock while in possession of material, adverse, non-public information regarding the truth about the Company's Joint Venture with Baker Hughes. These Insider Selling Defendants collectively sold approximately $642.9 million in C3 stock before the truth was disclosed and the Company's stock price fell precipitously, and those direct financial benefits were not shared with C3 shareholders. These five directly interested Insider Selling Defendants constitute a majority of the members of the current Board, rendering the Board unable to disinterestedly consider a demand against a majority of its members who personally financially benefited from their own misconduct.

**E.      C3 is a Controlled Company By Defendant Siebel**

141.    Defendant Siebel is the founder of C3. According to the Company's most recent Proxy Statement on Form DEF 14A, filed with the SEC on August 24, 2023, defendant Siebel has majority control over the Company by virtue of his ownership of both Class A (21.6%) and Class B (87.8%) stock, giving him **55.5%**

72

of the total voting power of the Company. *See* Page 60. Accordingly, defendant Siebel's ability to substantially influence the Board (by, among other things, retaining majority control over the election of and retention of ***all other directors***) renders the Board beholden to and controlled by him and thus makes the Board incapable of independently and disinterestedly investigating any misconduct committed by one another who engaged in and materially benefited from the fraudulent misconduct outlined herein.

**COUNT I**

**Breach of Fiduciary Duty Against the Individual Defendants**

142.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.   The Individual Defendants, as current or former C3 officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

144.   By virtue of their positions as C3 directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

145. Each Individual Defendant was required to: (a) use his or her ability to control and manage C3 in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of C3 rather than his or her own interests.

146. By their acts alleged herein, including but not limited to causing and/or permitting C3 to issue false and misleading statements while concealing material adverse information, the Individual Defendants each breached their fiduciary duties.

147. The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

148. C3 has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT II

### Breach of Fiduciary Duty Against the Insider Selling Defendants for Insider Selling (*Brophy*)

149. Defendants Siebel, Levin, McCaffery, Sewell and Ward, by virtue of their positions and relationships with C3, had access, directly or indirectly, to material information about C3 that was not generally available to the public, as described above.

150. The information described above was a proprietary asset belonging to the Company, which defendants Siebel, Levin, McCaffery, Sewell and Ward used

74

for their own benefit when they sold C3 common stock.

151. These defendants' sales of C3 common stock while in possession and control of the proprietary, non-public information described above were breaches of their fiduciary duty of loyalty.

152. Because the use of the Company's proprietary information for their own gain constitutes a non-exculpated breach of the defendants' fiduciary duties, the Company is entitled to disgorgement of the unlawful profits defendants Siebel, Levin, McCaffery, Sewell and Ward obtained thereby.

## COUNT III

### Unjust Enrichment Against the Individual Defendants

153. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of C3.

154. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to the Company.

155. Plaintiff, as a stockholder and representative of C3, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

75

156. Plaintiff, on behalf of C3, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Directing C3 to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to C3 restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

76

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

Dated: May 15, 2024

/s/ P. Bradford deLeeuw
P. Bradford deLeeuw (DE #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

*Attorneys for Plaintiff*

*Of Counsel:*

Rusty E. Glenn (*pro hac vice anticipated*)
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel. (303) 861-3003
Email: rusty@shumanlawfirm.com

Brett D. Stecker (*pro hac vice anticipated*)
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Avenue
Ardmore, PA 19003
Tel. (303) 861-3003
Email: brett@shumanlawfirm.com

77

D. Seamus Kaskela (*pro hac vice anticipated*)
Adrienne Bell (*pro hac vice anticipated*)
**KASKELA LAW LLC**
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Tel. (888) 715-1740