Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST, et al., | No. 4:22-cv-01413-HSG |
| Plaintiffs, | <u>CLASS ACTION</u> |
| v. | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| C3.AI, INC., et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

I. NATURE OF THE ACTION ...................................................................................... 1

II. SUMMARY OF AMENDMENTS ............................................................................. 6

III. JURISDICTION AND VENUE ................................................................................. 7

IV. PARTIES .................................................................................................................... 8

    A. Lead Plaintiff ................................................................................................ 8

    B. Additional Plaintiffs .................................................................................... 8

    C. Corporate Defendants ................................................................................... 9

    D. Individual Defendants .................................................................................. 9

    E. Relevant Non-Parties ................................................................................. 11

        1. Former Employees of C3 ............................................................... 11

V. FACTUAL BACKGROUND .................................................................................. 11

    A. Artificial Intelligence ................................................................................. 11

    B. Background on C3 ....................................................................................... 11

    C. Background on the Baker Hughes / C3 Joint Venture ................................ 13

VI. SECURITIES ACT MISLEADING STATEMENTS AND OMISSIONS ............. 16

VII. CLASS ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ...................... 17

VIII. CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT .......................... 19

COUNT I Violations of Section 11 of the Securities Act Against Defendants C3.ai
    Simonelli, Siebel, and Barter ..................................................................... 19

COUNT II Violations of Section 15 of the Securities Act Against Baker Hughes,
    Siebel, Abbo, Barter, and Simonelli ........................................................... 20

IX. THE EXCHANGE ACT FRAUDULENT CONDUCT DURING THE
    CLASS PERIOD ......................................................................................... 21

    A. Siebel's Knowledge of the Lack of Access to Baker Hughes' Full
        Sales Force .................................................................................... 21

B. The Parties Secretly Amend Agreement to Eliminate the Minimum Required FTE Sales Personnel ................................................................22

C. The Lack of Access to Baker Hughes' Sales Personnel Forces a Risky and Ultimately Failed Reorganization of C3's Sales Team ........................22

D. Exchange Act Defendants' Misleading Statements During the Class Period..................................................................................................................23

E. Insider Stock Sales ......................................................................................31

1. The Individual Defendants and Baker Hughes sold more than $730 million worth of C3 shares while in possession of material non-public information in violation of the Exchange Act.........................31

2. The Majority of the Stock Profits Came from Early Transactions That Took Place Before the Expiry of C3's Standard 180-day Lockup Agreement .....................................................................37

3. The Majority of the $730 million Earned by the Individual Defendants Were from Transactions That Were Not Tied to Established 10b5-1 Plans.........................................................37

X. LOSS CAUSATION .........................................................................................39

A. Negative Financial Performance Proximately Caused by the Fraud.....................40

B. Corrective Disclosures Regarding the Truth About C3's Salesforce ....................43

XI. FURTHER ALLEGATIONS IN SUPPORT OF SCIENTER FOR THE EXCHANGE ACT CLAIMS ..........................................................................46

A. Additional Facts in Support of Defendant Siebel's Scienter.................................47

B. Additional Facts in Support of Defendant Simonelli's Scienter ...........................50

XII. NO SAFE HARBOR ........................................................................................51

XIII. THE PRESUMPTION OF RELIANCE.............................................................52

XIV. CLASS ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS .................53

XV. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT .................55

COUNT III Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants C3.ai, Siebel, and Simonelli.....................55

COUNT IV Violations of Section 20(a) of the Exchange Act Against Defendants Siebel, Abbo, Barter, Simonelli and Baker Hughes .........................................57

COUNT V Violations of Section 20A of the Exchange Act Against Defendants
    Siebel, Abbo, Barter, Simonelli, and Baker Hughes ..........................................................58

PRAYER FOR RELIEF ..................................................................................................................60

DEMAND FOR TRIAL BY JURY ................................................................................................61

Lead Plaintiff Mark Samarghandi ("Lead Plaintiff") and additional named plaintiffs Sharon L. Zavalanski, David Linder, and Elizabeth Wensel (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the undersigned counsel's ongoing independent investigation, which includes without limitation: (a) review and analysis of regulatory filings made by C3, Inc. ("C3" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) research reports from securities and financial analysts; (c) review and analysis of press releases and media reports issued by and disseminated by C3 concerning the Company and other facts related to this action; (d) price and volume data for C3 Common A stock; (e) consultation with experts; (f) accounts from former employees of C3; and (g) additional materials and data concerning the Company and industry as identified herein.

## I.   NATURE OF THE ACTION

1. This federal securities class action arises from Defendants' false and misleading statements and material omissions regarding C3's most important strategic partnership with oil and gas monolith Baker Hughes, and C3's own salesforce. As set forth herein, the Registration Statement issued in connection with C3's initial public offering conducted on or about December 9, 2020 (the "IPO" or "Offering"), represented that C3 had access to and was leveraging Baker Hughes' extensive marketing, sales, and services resources, boasting of Baker Hughes' "12,000-person sales organization." The Registration Statement also stated that Baker Hughes had already brought in deals generating revenue for C3. These representations allowed the Company to go public, raising over $610 million in proceeds. The Registration Statement, however, failed to disclose that C3 did not have access to and was not able to utilize the 12,000-person salesforce—but instead set up sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce. And, contrary to the Registration Statement at the time of the IPO,

THIRD AMENDED CLASS ACTION COMPLAINT - 1                    Case No. 4:22-cv-01413-HSG

Baker Hughes had brought in no deals through its reseller agreement with C3—so it was impossible for C3 to have recognized new deal revenue through the arrangement. Finally, after the IPO but during the Class Period, Defendant Siebel began falsely claiming that Baker Hughes' full 12,000-person strong salesforce was selling for C3. These post-IPO representations and omissions further inflated the price of C3's Class A common stock until the Company's lack of access to Baker Hughes' full salesforce and the undisclosed risks when C3 would go on to report decreasing key financial metrics, and ultimately the truth, thereby causing the stock price to plummet.

2.    By this action, Plaintiffs seek redress for losses they and other C3 investors suffered. Specifically, Plaintiffs bring this case on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) C3 Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's initial public offering conducted on or about December 9, 2020 (the "IPO" or "Offering") ("Section 11 Subclass"); and/or (b) C3 Class A common stock between December 9, 2020, and December 2, 2021, both dates inclusive (the "Class Period") ("Section 10b Subclass"); and/or (c) C3 Class A common stock contemporaneously with the Individual Defendants' sales during the Class Period ("Section 20A Subclass") (collectively the "Class" or "Class Members").

3.    Plaintiffs pursue claims against Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

4.    By way of background, C3 makes and sells artificial intelligence ("AI") software that it sells to enterprise clients. It sells its products under a subscription model where, instead of paying once for software, customers pay a recurring subscription fee. This model is referred to as "Software as a Service" or "SaaS." As a relatively small and young company, C3's strategy involved forming alliances with marquee high-profile companies in various industries to bolster their credibility.

5.    On December 9, 2020, pursuant to the Registration Statement, C3's Class A common stock began publicly trading on the New York Stock Exchange ("NYSE") under the trading symbol "AI." That same day, C3 filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement. Pursuant to the Registration Statement, C3 issued 15.5 million shares of its Class A common stock to the public at the offering

THIRD AMENDED CLASS ACTION COMPLAINT - 2                    Case No. 4:22-cv-01413-HSG

price of $42.00 per share for approximate proceeds to the Company of $610 million after applicable underwriting discounts and commissions.

6.      The Registration Statement also contained an unusual lockup provision addressing when Company insiders could sell their personally-held C3 shares. Normal lockup provisions usually forbid insiders from selling their shares for 180 days after an initial public offering to prevent excessive selling pressure in the first few months of trading following an IPO. The C3 lockup provisions, however, were unusual in that they allowed certain C3 executives and other insiders to sell their shares after 90 days, only if, *inter alia*, the transactions represented less than 20% of the insiders' overall shares, the Company had issued its first earnings report, and the stock price was at least 33% higher than the IPO price over the course of several days. As a result, C3's lockup provision created a perverse incentive for C3 executives to pump up C3's stock price in the first six months following the IPO.

7.      C3's salesforce was critical to its success. As the Registration Statement and subsequent 10-Ks and 10-Qs would state: "To increase our revenue, we must continue to attract new customers…. In addition, our future success depends on our ability to sell additional subscriptions for our C3 AI Suite and C3 AI Applications to our existing customers, and our customers renewing their subscriptions when the contract term expires."

8.      To convince investors that C3 could execute on its growth plan, the Registration Statement emphasized that one of C3's most important strategic partnerships was with one of the world's largest oil field services companies, Baker Hughes. C3 represented that Baker Hughes was not only a customer that purchased C3's product for itself; but Baker Hughes also agreed to be the exclusive seller for C3's product within the oil and gas industry, and had been selling deals that contributed to revenue to C3 as of April 30, 2020.

9.      Unbeknownst to investors, the Registration Statement misrepresented and omitted material facts concerning C3's partnership with Baker Hughes. In reality, Baker Hughes had made no sales as of April 30, 2020.

THIRD AMENDED CLASS ACTION COMPLAINT - 3                                    Case No. 4:22-cv-01413-HSG

10. After the IPO, Siebel further inflated Defendants' fabrications related to Baker Hughes, falsely boasting that Baker Hughes was leveraging its entire salesforce to sell C3 products, a fact that he repeated at least 12 times during the Class Period.

11. In reality, C3 did not have Baker Hughes' entire salesforce at its disposal. Instead, as later admitted, C3 and Baker Hughes created a separate unit outside of their normal structure (titled "Baker Hughes C3"), which handled sales of C3 products. Because this unit was staffed with a small number of salespeople who lacked the industry expertise and connections of Baker Hughes' normal salesforce, it failed to make any sales as of the fiscal year ending April 30, 2020, and failed to hit sales targets in multiple quarters during the Class Period.

12. Defendants' statements and omissions concerning C3's salesforce subsequent to the IPO artificially inflated C3's stock, allowing Defendants to immediately begin dumping their stock when the 90-day lockup expired. This drove down the price of C3's stock, as investors saw this as an indicator that Defendants knew something they did not—and they did.

13. Further, as a consequence of the misrepresented salesforce size and problems, C3 reported little or no growth in RPO each quarter. Both C3 and investors looked at one key performance indicator ("KPI") to gauge its success in executing on sales: remaining performance obligations, or "RPO." RPO represents the total future obligations customers owe to C3 under existing contracts. As C3 stated in its Registration Statement: "We monitor remaining performance obligations … as a key metric to help us evaluate the health of our business, identify trends affecting our growth, formulate goals and objectives, and make strategic decisions." These reported results further drove down C3's stock price as investors and analysts tried to figure out what was hamstringing C3. Contributing to C3's poor performance on two quarters during the Class Period was Baker Hughes' failure to keep pace with their contractually obligated minimum sales.

14. Additionally, the Individual Defendants dumped over $730 million worth of stock during the Class Period, further driving down C3's stock price.

15. Finally, in December 2021, Defendants began to reveal the truth. On December 1, 2021, Thomas Siebel revealed, for the first time, that it "significantly expanded and restructured its strategic relationship with Baker Hughes for the second time.… The newly expanded contract also

THIRD AMENDED CLASS ACTION COMPLAINT - 4                    Case No. 4:22-cv-01413-HSG

introduced a new pricing model and selling structure designed to further accelerate sales of C3 AI software products into the Baker Hughes customer base." When analysts asked the motivations for the restructuring of the contract, Defendant Siebel revealed that C3 did not have access to Baker Hughes' full 12,000-person salesforce nor its deep expertise. Rather, Baker Hughes and C3 had formed a separate, discrete unit called Baker Hughes C3, which had some undisclosed number of salespeople without the required expertise:

> The real motivation behind restructuring Baker Hughes was to basically kind of realign the sales structure. So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay. And those relationship and that expertise are in their four business units. When we first put together the relationship with Baker -- *with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those organization. And so they really weren't the people with the relationships, and they weren't the people with the quotas and they weren't the people with the deep industry expertise* and *what really did here* was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?

16.    C3's stock price plummeted and the analysts were brutal in their assessment. For example, one analyst for Canaccord Genuity commented:

> There were really four things that left us feeling a bit uneasy about the print: (1) non-GAAP adjusted *RPO showed zero growth year-over-year, and that's inclusive of an incremental $45M from the Baker Hughes expansion/renegotiation (i.e. business not yet sold)*; (2) while the Baker Hughes restructuring is probably a good thing over the long run, *the fact that (a) the deal needed to be revisited at all, and (b) it added $45M and an additional year, essentially averaging down future commitments, tells us that execution against the original plan was not feasible*; (3) C3 noted that it restructured its own direct salesforce in July, from a strategic accounts focused team to more of a global top-down/hierarchical model, only to have to go back to its original structure a few months later because the new model wasn't working – *that doesn't sound good*; and (4) CFO David Barter, who was brought on board in the weeks leading up to the IPO, announced his intentions to leave the firm in mid-December, which regardless of explanation always raises questions and adds a bit of risk. Now it's possible that we're being too cynical, perhaps looking for issues where there are none, but the reality is that it's been a bumpy road for this business and stock since its IPO.

THIRD AMENDED CLASS ACTION COMPLAINT - 5                    Case No. 4:22-cv-01413-HSG

17. As of the time the initial complaint in this action was filed, the price of C3's Class A common stock closed at $20.05, a 52% decline from the $42.00 per share Offering price, damaging investors.

18. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of C3's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.   SUMMARY OF AMENDMENTS

19. On February 22, 2024, the Court granted in part Defendants' motion to dismiss the first amended complaint without prejudice. *Reckstin Fam. Tr. v. C3.ai, Inc.*, 2024 WL 734497 (N.D. Cal. Feb. 22, 2024). In relevant part, the Court dismissed the first amended complaint's allegations under Section 10(b) of the Securities Exchange Act, finding that the first amended complaint did not allege a strong inference of scienter as to defendant Siebel noting that "corporate management's general awareness of day-to-day workings of the company's business does not establish scienter – at least absent some additional allegations of specific information conveyed to management and related to the fraud" and that the complaint does not contain such "additional allegations". *Id*. at *19 (internal quotations and citations omitted). The Court also found that the allegations of motive due to insider sales were insufficiently pled. *Id*. at *21. Plaintiffs respectfully submit that this Second Amended Complaint cures the deficiencies the Court identified in the first amended complaint and provides precisely the type of allegations that establish a strong inference of scienter.

20. First, the Complaint alleges that Siebel signed a joint venture agreement (the "Joint Venture Agreement") with Baker Hughes that contained the actual number of Baker Hughes employees committed to the agreement. Given that Siebel admitted at the end of the class period that Baker Hughes had never committed to using their full salesforce to sell C3 products, Siebel's signature on a document identifying the true number of Baker Hughes employees working on the joint venture creates a strong inference that he was aware that his statements were false when made.

21. Second, the complaint provides additional information demonstrating the suspicious nature of Siebel's stock sales. It shows that Siebel had not sold stock in any company in which he was required to file an SEC Form 4 since 2005 and has not made any sales since the Class Period.

¶ 178, *infra.* The complaint also shows that he sold 59.61% of his C3 holdings at artificially inflated prices before the disclosure of the concealed facts. *Id.*

22. Third, the Complaint provides additional allegations to establish that the declines in the price of C3 stock in March and September 2021 were due to poor performance in the Baker Hughes/C3 Joint Venture. *See, section X, infra.*

23. Fourth, the Complaint adds further facts concerning the senior and supervisory day-to-day responsibilities of C3's President and Chief Technology Officer Defendant Ed Abbo supporting the conclusion that Abbo controls C3 and is derivatively liable for its violations of the securities laws. ¶¶ 36, 39 *infra.*

24. Fifth, the Complaint removes false statements and loss causation allegations relating to materialization of the risks the Court found insufficient at this stage of the litigation.[1] Finally, as directed by the Court, the Complaint attaches as Appendix A, which is a statement-by-statement chart containing the information specified by the Court and in the same format as *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

### III. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) and 20A of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). C3 is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

---

[1] Lead Plaintiff reserves any rights to re-allege those allegations after discovery, or to assert materialization of risk in proving further damages at the expert stage.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.     PARTIES

### A.     Lead Plaintiff

29.     Lead Plaintiff Mark Samarghandi purchased shares of C3 as reflected in his Certification (ECF No. 30-2). These shares were issued pursuant and traceable to the Registration Statement, and Lead Plaintiff was damaged as a result of Defendants' federal securities law violations, including the false and/or misleading statements and/or material omissions alleged herein.

### B.     Additional Plaintiffs

30.     Plaintiff Sharon L. Zavalanski purchased shares of C3 as reflected in her Certification, attached as Exhibit A to the first Amended Complaint (ECF No. 71-1). Plaintiff was damaged as a result of Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

31.     Plaintiff David Linder purchased shares of C3 as reflected in his Certification, attached as Exhibit B to the first Amended Complaint (ECF No. 71-2). Plaintiff was damaged as a result of Defendants' federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

32.     Plaintiff Elizabeth Wensel purchased shares of C3 as reflected in her Certification, attached as Exhibit C to the first Amended Complaint (ECF No. 71-3). These shares were issued pursuant or traceable to the Registration Statement, and Plaintiff was damaged as a result of Defendants' federal securities law violations, including the false and/or misleading statements and/or material omissions alleged herein.

THIRD AMENDED CLASS ACTION COMPLAINT - 8                    Case No. 4:22-cv-01413-HSG

## C.    Corporate Defendants

33.    Defendant C3, Inc. is a Delaware corporation with principal executive offices located at 1300 Seaport Boulevard, Suite 500, Redwood City, California 94063. The Company's Class A common stock trades in an efficient market on the NYSE under the trading symbol "AI."

34.    Defendant Baker Hughes Company "Baker Hughes" is a Delaware corporation with principal executive offices located at 17021 Aldine Westfield Road, Houston, Texas 77073. Baker Hughes Holdings LLC is a majority-owned indirect subsidiary of Baker Hughes Company and any securities owned directly by Baker Hughes Holdings LLC may be deemed to be beneficially owned by Baker Hughes. Pursuant to the Joint Venture Agreement between Baker Hughes and C3, "neither [Baker Hughes or C3] will issue any press release or public statements regarding the terms and conditions of this Agreement, and/or the details of the relationship between the Parties contemplated hereby, without the prior written approval of the other Party (not to be unreasonably withheld, conditioned or delayed). This gave BH authority to control the statements of C3 and Siebel about the Joint Venture. This demonstrates Baker Hughes' authority over C3.

## D.    Individual Defendants

35.    Defendant Thomas M. Siebel ("Siebel") has served as C3's Chief Executive Officer and Chairman of the Board of Directors at all relevant times. Defendant Siebel signed the Registration Statement filed with the SEC. Siebel founded C3 in 2009. Prior to founding C3, Siebel founded and ran Siebel Systems.

36.    Defendant Edward Y. Abbo ("Abbo") is currently C3's President and Chief Technology Officer. Mr. Abbo has served as C3's Chief Technology Officer since July 2011. He also previously served as Chief Executive Officer of C3 from September 2009 to July 2011 and was a member of C3's board of directors from August 2009 until November 2020. According to C3's Registration Statement, Mr. Abbo is recognized (along with Mr. Siebel) as C3's "Thought Leadership" due to their "decades of technology leadership," which allows them to "engage strategically with the executive leadership of leading corporations and government entities." Abbo is identified as an inventor on the patent for what C3 called its "secret sauce", according to an article by ZDNet on November 16, 2020. Abbo demonstrated control over the partnership between C3 and

THIRD AMENDED CLASS ACTION COMPLAINT - 9                    Case No. 4:22-cv-01413-HSG

Baker Hughes by speaking in detail about the partnership on March 2, 2021, at a Morgan Stanley Virtual Conference.

37. Defendant David Barter ("Barter") served as C3's Senior Vice President and Chief Financial Officer at the time of the IPO. He served as CFO from October 8, 2020, to December 1, 2021. Defendant Barter Signed the Registration Statement.

38. Defendant Lorenzo Simonelli ("Simonelli") is the Chairman, President, and Chief Executive Officer of Baker Hughes. Simonelli served as a Director on C3's board from August 2019 until December 17, 2021. Simonelli signed or authorized the signing of the Registration Statement filed with the SEC. C3 touts Mr. Simonelli's "significant experience in the energy industry" in its Registration Statement. Also, according to C3's Registration Statement, Mr. Simonelli serves as an independent director on C3's Audit Committee and is identified as an "audit committee financial expert" within the meaning of SEC regulations, who "can read and understand fundamental financial statements." Mr. Simonelli signed or authorized the signing of the Registration Statement filed with the SEC.

39. Defendants Siebel, Abbo, Barter, and Simonelli (referred to as the "Individual Defendants") possessed the power and authority to control the contents of C3's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of C3's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with C3 and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

40. C3, Baker Hughes, and the Individual Defendants are sometimes referred to herein collectively as the "Defendants."

**E.    Relevant Non-Parties**

**1.    Former Employees of C3**

41.    Former Employee No. 1 ("FE-1") is a former Vice President who worked at C3 from at least March 2020 to May 2020, which included the end of C3's fiscal year. FE-1 reported directly to CEO Tom Siebel throughout FE-1's tenure at C3. FE-1 also attended weekly calls with C3's entire salesforce, as well as Defendant Siebel, where new sales leads were discussed.

**V.    FACTUAL BACKGROUND**

**A.    Artificial Intelligence**

42.    Artificial Intelligence ("AI") software allows computer systems to build and perform tasks that usually require human intervention and support, such as speech recognition, decision-making, visual perception, and translation among languages. AI software also can analyze large sets of data and find patterns or anomalies that would be difficult or impossible for humans to find unaided.

43.    "Enterprise" AI software applies artificial intelligence methods, such as machine learning and neural networks, to lower the cost of production or enhance various business functions like supply chain management, assisting in inventory management, or detecting fraud, etc. Organizations can also use enterprise AI software to increase efficiencies, reduce costs, and improve operations. This is because the traditional process of building software applications by integrating various open-source components and cloud services can be slow, costly, and ineffective. In contrast, C3 asserts that by using its "AI enterprise" technology, companies can speed up software development by 26 times, thereby reducing the amount of code needed to be written by 99%. The enterprise AI software market was valued at $18 billion in 2020 and is expected to grow at a Compound Annual Growth Rate of 24% by 2024.

**B.    Background on C3**

44.    C3 was founded by Defendant Siebel in 2009. Over the next ten years, it rebranded itself several times to exploit technology trends. For example, the company was known as "C3 Energy" in 2013, C3 IoT (internet of things) in 2016, and is now known as C3.ai (artificial intelligence).

THIRD AMENDED CLASS ACTION COMPLAINT - 11                              Case No. 4:22-cv-01413-HSG

45.    C3 operates as an "enterprise AI software company." This means that the Company offers a variety of SaaS applications for enterprises, as well as software solutions and integrated turnkey enterprise AI applications for oil and gas, chemicals, utilities, manufacturing, financial services, defense, intelligence, aerospace, healthcare, and telecommunications market segments. The Company also has purported strategic partnerships with Baker Hughes related to oil and gas markets; FIS related to financial services markets; Raytheon; and AWS, Intel, and Microsoft.

46.    The Company primarily derives revenues from subscriptions of software, which account for 86% of revenues. Term subscriptions of the C3 AI Suite and Applications are usually for a period of three years. Besides deriving subscription revenues, the company also generates revenues from professional services, which primarily consists of fees related to the implementation of services for new customer deployments of its applications. Professional services are provided both onsite and remotely, and include training, application design, project management, system design, data modelling, data integration, application design, development support, data science, and C3 AI Suite administration support.

47.    C3's fees depend on the level of effort required for specific tasks and are generally a fixed-fee arrangement and recognized as its services are performed. Generally, the Company's professional services revenues have lower margins than subscription revenues.

48.    Because C3 generates most of its revenue through multi-year contracts, an important metric for evaluating the Company's financial performance is "Remaining Performance Obligation" or "RPO." RPO represents the total future obligations remaining under contracts. So, for instance, if a C3 client had a contract under which it was required to pay $10 million per year for three years, and had already paid $5 million, its RPO would be $25 million. C3 reports both GAAP RPO, which only includes non-cancellable contracts, and Adjusted RPO, which includes cancellable contracts.

49.    As of the time of the IPO, C3 was not a profitable company. Instead, it presented itself as a fast-growing company that was building up a large client base of corporate clients. Key to this effort, then, was sales. **Under normal circumstances, a major constraint to sales growth would be the size of C3's salesforce, which numbered approximately 700. But, C3 claimed, it also utilized a much larger salesforce—that of its partner companies, particularly its most**

**significant partner, Baker Hughes.** This was especially important for C3 because, as the Company disclosed in its Registration Statement, their products require lengthy and resource-intensive sales cycles.

**C.     Background on the Baker Hughes / C3 Joint Venture**

50.     In June 2019, Baker Hughes entered a deal with C3 whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries ("Joint Venture").[2] The 2019 Joint Venture Agreement mandated that Baker Hughes maintain an undisclosed minimum number of full-time equivalent ("FTE") sales personnel "to originate and help close commercial opportunities for C3 Offerings." 2019 Joint Venture Agreement at 7. C3, in turn, was also required to provide "train the trainer" services to Baker Hughes personnel.

51.     Baker Hughes also agreed to a total revenue commitment to C3 of $50.0 million, $100.0 million, and $170.0 million, for fiscal years ending April 30, 2020, 2021, and 2022, respectively, inclusive of their subscription fees of $39.5 million.

52.     In June 2020, C3 and Baker Hughes revised the Joint Venture Agreement to extend the term by an additional two years, to a total of five years, and modified Baker Hughes' commitments to $53.3 million, $75.0 million, $125.0 million, and $150.0 million for the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively, and reducing their subscription fees to $27.2 million. If Baker Hughes failed to generate enough sales to meet the revenue commitments, it was required to pay the difference. If they exceeded the commitment, C3 would pay it a sales commission.

53.     At the same time, Baker Hughes purchased 9,529,762 shares of Class B common stock and 1,283,333 shares of Series G convertible preferred stock at a purchase price of $4.62 per share and $19.8252 per share, respectively. As a result of this purchase, Baker Hughes' CEO Simonelli was appointed to the board of C3.

---

[2] *See*, Joint Venture Agreement between C3.ai and Baker Hughes, a GE company, LLC, dated June 6, 2019, attached as Exhibit 10.10 to C3.ai's Registration Statement filed with the SEC on November 13, 2020.

54.     Prior to the IPO and at the time the Registration Statement became effective, Baker Hughes owned 14.76% of C3's Class A common stock. Immediately after the sale of additional shares to the public in the IPO, Baker Hughes owned 11.65% of the Class A common stock or 10,813,095 shares.

55.     Unfortunately, the Baker Hughes partnership was not as represented. As Siebel admitted on December 1, 2021, rather than rely on their main salesforce and existing business units, Baker Hughes "formed a new business unit that was called Baker Hughes C3[] that sat outside of [the Baker Hughes sales] organization. And so they really weren't the people with the relationships, and they weren't the people with the quotas and they weren't the people with the deep industry expertise."

56.     Defendant Siebel's admissions are corroborated by FE-1. According to FE-1, C3 held regular sales calls, typically on Thursdays, where the sales VPs from each segment (e.g., financial services, oil & gas, government, telco, and utilities) reported on their segment's pipeline. FE-1 indicated that he, along with Defendant Siebel, attended these weekly sales calls. FE-1 stated that, during the March 2020 to May 2020 period, he recalled hearing the General Manager, Oil & Gas, regularly report that the Baker Hughes pipeline was non-existent, and that it had made no sales as of April 30, 2020.

57.     On June 2, 2023, CNBC released an exposé on C3 entitled "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers questions metrics."[3] The article cites accounts from individuals who worked for Baker Hughes during Class Period, which completely undermine Siebel's repeated representations about the size of the Baker Hughes team selling C3ai. Specifically, the Baker Hughes former employees stated that C3's products were "difficult to learn." Additionally, the CNBC exposé revealed that and the 12,000 total salespeople at the company "are not all trained and qualified to sell the C3.ai product" and that "employees were not allowed to sell it without going through a rigorous approval process." As a result, the Baker Hughes former employees "had no idea

---

[3] *See*, "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers question metrics," dated June 2, 2023, by Yasmin Khorram and Paige Tortorelli, available as of Apr. 4, 2024 at https://www.cnbc.com/2023/06/02/billionaire-tom-siebel-faces-controversy-at-ai-software-vendor-c3ai-.html.

how the [Joint Venture] could certify 12,000 people"—as Siebel's repeatedly claimed. The article also states that "many of the 30 former C3.ai employees who spoke with CNBC said that the company has had a difficult time attracting new customers and that those that have come in the door originated from Siebel's relationships." Indeed, these sentiments help explain why C3 only added eight customers in a recent quarter (under C3's traditional definition of customer).



58.    On June 2, 2023, CNBC broadcasted its May 2023 video interview with Siebel.[4] During the interview, Seibel confirmed that he has repeatedly touted C3's access to Baker Hughes' 12,000-person salesforce. *Id*. at 1:50. Significantly, in the interview, Siebel continued to insist to the public that C3 in fact had access to the full 12,000 person-strong Baker Hughes sales force. In the segment discussing his alleged fraud, he was asked "did you say 12,000 were working with Baker Hughes to sell the C3ai product?" Seibel responded, "I believe it's on the order of 12,000." *Id*. at 1:43.

---

[4] Video segment from the June 2, 2023 CNBC business show, "Last Call," concerning C3.ai available as of April 4, 2024 at https://www.cnbc.com/2023/06/02/billionaire-tom-siebel-faces-controversy-at-ai-software-vendor-c3ai-.html.

THIRD AMENDED CLASS ACTION COMPLAINT - 15                    Case No. 4:22-cv-01413-HSG

59.     During the interview neither Siebel—nor the corporate representative from Baker Hughes—were able to identify *any* number of Baker Hughes sales personnel who are trained to sell C3 products, or how many are actively doing so. *Id*. at 2:34.



60.     After Siebel's interview, C3's communications team contacted CNBC, reiterating that "Mr. Siebel stated that c3.ai had access to 12,000, to a 12,000-person sales organization at Baker Hughes because he believed it to be true and has no reason to believe it is not true today." *Id.* at 5:00

61.     On December 17, 2021, Baker Hughes' CEO Simonelli resigned from the C3 Board of Directors.

## VI.     SECURITIES ACT MISLEADING STATEMENTS AND OMISSIONS

62.     Defendants made false and misleading statements and material omissions in the Registration Statement regarding the size and experience of the Baker Hughes salesforce, in violation of Sections 11 and 15 of the Securities Act.

63.     On November 13, 2020, C3 filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 8, 2020. It was signed by Defendants Siebel, Barter, and Simonelli.

64.     On December 9, 2020, pursuant to the Registration Statement, C3's Class A common stock began publicly trading on the NYSE under the trading symbol "AI." That same day, C3 filed

THIRD AMENDED CLASS ACTION COMPLAINT - 16                                   Case No. 4:22-cv-01413-HSG

the prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

65.    Pursuant to the Registration Statement, C3 issued 15.5 million shares of its Class A common stock to the public at the Offering price of $42.00 per share for approximate proceeds to the Company of $610 million after applicable underwriting discounts and commissions.

66.    In describing factors affecting the Company's performance, the Registration Statement stated, in relevant part:

> In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization. **During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement.**

67.    The foregoing statement was misleading for stating that C3 recognized revenue from deals brought in by Baker Hughes through the reseller arrangement in the fiscal year ending April 30, because Baker Hughes had, in fact, brought in *no* deals through the reseller agreement, so it was impossible for C3 to have recognized revenue for deals made through the arrangement for fiscal year ending April 30.

### VII.    CLASS ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

68.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Section 11 Subclass defined in ¶ 1 herein, namely, all persons or entities who purchased or otherwise acquired C3 Class A common stock in the IPO or thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with C3's IPO on December 9, 2020. Excluded from the Class are Defendants, the officers and directors of C3 and Baker Hughes, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from this Class are all option trades and transactions to cover short sales of Class A common stock.

69.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of Class Members. Record owners and other Class Members may be identified from records maintained by Shattuck, its transfer agent, or nominees, and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

70.    Plaintiffs' claims are typical of the claims of Class Members, as all Class Members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.    Plaintiffs will fairly and adequately protect the interests of the Class Members and have retained counsel competent and experienced in class and securities litigation.

72.    Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws;

(b)    whether the Registration Statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and

(c)    to what extent the Class Members have sustained damages and the proper measure of damages.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

THIRD AMENDED CLASS ACTION COMPLAINT - 18                    Case No. 4:22-cv-01413-HSG

## VIII.   CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

### COUNT I
**Violations of Section 11 of the Securities Act Against Defendants
C3.ai Simonelli, Siebel, and Barter**

74.    Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

75.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants C3, Simonelli, Siebel, and Barter (the "Section 11 Defendants"). For purposes of this Section 11 claim, Plaintiffs are not required to allege, and they do not allege, that any Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 11 claim.

76.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

77.    C3 is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

78.    As issuer of the shares, C3 is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement. As signatories of the Registration Statement, directors of the issuer, or a person performing similar functions as to a director, the Individual Defendants were responsible for their contents and dissemination.

79.    None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

80.    The Section 11 Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement. By reasons of the conduct alleged, the Company and the Individual Defendants violated Section 11 of the Securities Act.

81.    By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

THIRD AMENDED CLASS ACTION COMPLAINT - 19                    Case No. 4:22-cv-01413-HSG

82.     Plaintiffs acquired C3 shares pursuant and/or traceable to the Registration Statement for the IPO.

83.     Plaintiffs and the Class have sustained damages. The value of C3 securities has declined substantially subsequent to and because of Defendants' violations.

84.     At the time they purchased the Class A common stock, Plaintiffs (and the Class) were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before the Company's subsequent admissions.

85.     This claim is brought within one year after discovery of the misleading statements and omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against Baker Hughes, Siebel, Abbo, Barter, and Simonelli**

86.     Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

87.     This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o. For purposes of this Section 15 claim, Plaintiffs are not required to allege that any Defendant acted with scienter or fraudulent intent, and do not, as those are not elements of a Section 15 claim.

88.     Defendants Baker Hughes, Siebel, Abbo, Barter, and Simonelli (the "Control Person Defendants"), by virtue of their offices, directorship, or stockholding, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of C3 within the meaning of Section 15 of the Securities Act.

89.     Because Baker Hughes owned 14.7% of C3's Class A common stock, it designated its Chairman, CEO and President, Simonelli, to serve on C3's board of directors. This further evidences its control over C3.

90.     The Control Person Defendants had the power and influence and exercised the same to cause C3 to engage in the acts described herein. Indeed, the Individual Defendants were touted in the Registration Statement as "key executives," the loss of which would impede business operations.

91.     The Control Person Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

92.     By virtue of the conduct alleged herein, the Control Person Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

93.     This claim was brought within one year after discovery of the misleading statements and omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

## IX.     THE EXCHANGE ACT FRAUDULENT CONDUCT DURING THE CLASS PERIOD

94.     All of the preceding allegations in the Complaint are repeated and realleged herein as they are also applicable to the Class's claims under Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934. Moreover, the statement identified in paragraph 66, *supra*, is also being brought under the 1934 Act.

95.     All of the allegations that follow this paragraph in the Complaint are exclusive to the Class's claims under Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 and are not applicable to the Class's claims under the Securities Act of 1933.

## A.     Siebel's Knowledge of the Lack of Access to Baker Hughes' Full Sales Force

96.     C3 included a redacted copy of the C3/Baker Hughes Joint Venture Agreement, dated June 6, 2019, as an exhibit to its Registration Statement. The publicly filed version stated "BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3." (redaction and brackets in original). The actual unredacted Joint Venture Agreement, which Siebel signed, contained the actual number of FTE sales personnel, putting Siebel on notice of the small size of the salesforce dedicated to selling C3's products.

**B.    The Parties Secretly Amend Agreement to Eliminate the Minimum Required FTE Sales Personnel**

97.    The Joint Venture Agreement was amended at least four times: September 2019 ("First Amendment"), June 2020 ("Second Amendment"), October 2021 ("Third Amendment"), and January 2023 ("Fourth Agreement"). With each amendment, Baker Hughes' annual commitments were materially downgraded and the deadline for the Joint Venture to reach peak annual revenue was extended. *Id*.

98.    As noted above, the 2019 Joint Venture Agreement also mandated that Baker Hughes maintain an undisclosed minimum number of full-time equivalent ("FTE") sales personnel "to originate and help close commercial opportunities for C3 Offerings." 2019 JVA at 7. C3, in turn, was also required to provide "train the trainer" services to Baker Hughes personnel.

99.    Unknown to investors until after the close of the Class Period (i.e., December 2, 2021), in October 2021, through the Third Amendment, C3 and Baker Hughes amended the Agreement to eliminate a minimum FTE requirement and C3 needed only to provide "train-the-trainer services for up to 60 salespeople a year."[5] So, even under the most optimistic scenarios, it would take several years for 60 Baker Hughes trainers to train any material amount of the 12,000 Baker Hughes workforce to a level where they could effectively sell C3 products. *Id*.

**C.    The Lack of Access to Baker Hughes' Sales Personnel Forces a Risky and Ultimately Failed Reorganization of C3's Sales Team**

100.    After going public, C3 struggled to meet market expectations regarding subscriber revenue growth and RPO. Expecting the full support of Baker Hughes' salesforce, analysts and investors expected revenue growth that C3 could not achieve without it, and C3's own much smaller salesforce could not make up the difference. As a result, in July 2021, C3 quietly attempted to restructure and reconstitute the salesforce to do more with less, adopting a more traditional and hierarchical sales structure. Ultimately, the new sales structure performed unacceptably and as a result, in November 2021, management scrambled to reverse their failed reorganization.

---

[5] *See* Third Amendment to Joint Venture Agreement between C3.ai and Baker Hughes, LLC, effective May 1, 2022, at 1-2, which was attached as Exhibit 10.4 to C3.ai's quarterly report filed with the SEC on December 2, 2021.

THIRD AMENDED CLASS ACTION COMPLAINT - 22                    Case No. 4:22-cv-01413-HSG

**D.    Exchange Act Defendants' Misleading Statements During the Class Period**

101.    The Exchange Act Defendants made false and misleading statements and material omissions during the Class Period regarding the size and experience of the Baker Hughes salesforce, in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b5 promulgated thereunder.

102.    The Class Period begins on December 9, 2020, when C3's Class A Common Stock began publicly trading on the NYSE.

103.    The Registration Statement contained misleading statements and omissions of material fact for the reasons more fully described in Section VI, *supra* and incorporated by reference as if fully set forth here.

104.    Following the IPO, Defendants continued to issue false and misleading statements and omit material facts.

105.    On February 24, 2021, at a KeyBanc Emerging Technology Summit, Siebel stated the following:

> So the distribution model looks like geographically we're applying major account groups, enterprise groups, middle market groups and mass market groups. This is what we are doing with this capital that we raised to the markets. And then we are building vertical markets sales organizations for financial services, manufacturing, aerospace, health, telco, utilities and oil and gas. You see that we have made a number in each of these we're aligned with –we're aligning with a market partner, for example, in oil and gas we go to market with Baker Hughes**. Baker Hughes has 12,000 people selling for us around the world into virtually every oil and gas company on the planet in for a safe energy,** clean energy, sustainability we go to market with ENGIE on Paris.
>
> In financial services, we've formed an alliance with FIS, that is both selling our products and replatforming their products on our – using the C3 AI suite in telco – excuse me, in defense, and intel – intelligence communities we go to market with Raytheon. We'll be announcing – in the next few weeks a new relationship in manufacturing. And then you can expect we will be forming a large relationship with in health and telecommunications. We have a very significant partnership with Microsoft, and AWS, and we go to market with Google and IBM and Intel, Nvidia is a large partner.
>
> And so how does this work? So, this for example, if we're calling on Bank of America this will be my group in New York working with my financial services group, working FIS, partnering with IBM to make Bank of America successful. This would be Royal Dutch Shell, well (00:20:51) out of Amsterdam working with my sales and marketing group working with Baker Hughes, working with Microsoft to make

them successful. So, that's the model. **And so, we're working towards – couple of years ago we had 16 sales teams and these – our sales teams are growing, we have 12,000 people at Baker Hughes**, tens of thousands of people at Microsoft. Thousands of people at FIS, more to follow, but we can see that the vision is across all geographies and all indices through these partnerships to have tens to hundreds of thousands of people standardizing on this technology stack and serving customers.

106. The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

107. On that same call, Siebel responded to a question:

**Question – Michael Turits:** I think Tom one of the things that I've been fascinated with is the kind of the partnership that you have. And you touched on those a little bit. But some of them like Baker Hughes are in specific areas like energy. Are those useful and are there others like so in other verticals that have been a supplement to what you – how you help out this specific different – specific vertical solutions?

**Answer – Thomas M. Siebel:** They're useful, they're invaluable and they're core to the strategy. Let's think about Baker Hughes. So, Baker Hughes is one of the three large oil and gas service providers, the other two being of course Halliburton and Schlumberger. Okay. We have partnered exclusively with Baker Hughes where they've agreed they're going to build all of their software solutions on the C3 AI Suite. This replaces with the previous stack that they brought over from GE. Okay. **So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people.**

108. The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having

THIRD AMENDED CLASS ACTION COMPLAINT - 24                    Case No. 4:22-cv-01413-HSG

access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

109. On an earnings call dated March 1, 2021, the following exchange occurred between an analyst and Siebel, in relevant part:

**Brad Sills, Analyst**

Oh, great. Hey, thanks guys for taking my question and congratulations on your first quarter as a public company. I wanted to ask about the vertical partner focus here. Obviously, you talked about some leverage that you'll see here from some of these partnerships could you help us understand for perhaps some of the newer ones like Raytheon FIS, these are relatively new verticals for the company. What kind of resources are committed from these partners? How are you going to market together? How are you expected to get that leverage through these partnerships? Thank you so much.

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Hey, Brad. I'll fill this one because it's kind of sales to marketing related. Well, as you know, we're going to market across three plains. We have horizontal market partners like say Microsoft would be the largest, but also IBM NVIDIA. We're building a geographic marketing organization in North America, Asia Pacific, okay, and in Europe. And then across all sectors, we have vertical market sales organizations in oil and gas, in utilities, in financial services, in precision health, et cetera. And you can get expect that each of the – the goal is that each of these vertical markets we will align with a leveraged market partner. So the classic case is Baker Hughes**. So we've aligned in oil and gas with Baker Hughes, this is a 24 roughly, I think, billion-dollar oil services company that gives us access to 12,000 people now selling with us around the world. And there's virtually not one of the largest, say 20 or 30 oil companies, that we're not in active sales motion with, whether it's Aramco, ADNOC, Rosneft Gazprom, Shell, and 12,000 salespeople is a lot of sales capacity.**

110. The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

111. On March 2, 2021, at a JMP Securities conference, Siebel stated, in relevant part:

After that we formed a relationship with Baker Hughes and – but we saw we leveraged our relationship with Shell and our relation with Baker Hughes. And now with Baker Hughes, we have 12,000 salespeople selling for us around the world into every oil and gas company on the planet, Aramco, ADNOC, Gazprom, Rosneft, Exxon, you name it.

112. The foregoing statement was misleading for failing to disclose that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

113. At the same conference, Siebel had the following exchange with an analyst:

**Patrick Walravens, Analyst**

All right, good. So this leads us really nicely to the question someone in the audience, just asked, which is and I'll just read it to you, which is, could you talk a bit about your go-to-market strategy and how you would grow your number of customers?

**Thomas M. Siebel, Founder and Chief Executive Officer**

Yes, we have a pretty complex go-to-market strategy. So we have horizon, we have geographical organizations, APAC EMEA. Okay and the North American Group, within which we are building a major accounts group, an enterprise sales group, a middle market group and a mass market group. Then we're building vertical market sales organizations for oil and gas, for utilities for tele-communications, for healthcare, for aerospace and for defense.

Okay. And within each of those, we're building a major accounts group, a strategic accounts group, a middle market group and a mass market group. **Then associated with each of the verticals we're aligning with a market partner, which gives us market leverage, for example at oil and gas, we go to market with Baker Hughes. That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco. It would take us 10 years to get to the more –[board] room of Aramco, okay, but for Baker Hughes.**

114. The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory

THIRD AMENDED CLASS ACTION COMPLAINT - 26          Case No. 4:22-cv-01413-HSG

sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

115. At that same conference, Siebel made the following statement:

> I think that Microsoft – I mean, these guys at Microsoft – Now, let's talk a little bit about what's going on with Microsoft today? We are in sales motion, an enterprise sales motion aligned with the Azure people, and SAT, and JP, and (inaudible) and probably 200 accounts around the world, in major account selling were, four legged sales calls and if it's oil and gas, it's a six legged sales call. For example at, Shell, okay, we'll have Baker Hughes, we'll have C3 and we will have Microsoft and we'll bring all of our services. And Shell way quite honestly doesn't know where Microsoft lets off and C3 starts and Baker Hughes picks up, and they don't care. They just know that they have all the services that they need. **So that we have a similar relationship with them in CRM. I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that and now we have 12,000 people selling for us at Baker Hughes**

116. The foregoing statement was misleading for failing to disclose that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

117. On a May 24, 2021 JP Morgan Global Tech Conference, Siebel stated, in relevant part:

> The – I was thinking about our partnership with Baker Hughes and oil and gas, we have 12,000 people selling C3 for us all around the world every day, 12,000 people.

118. The foregoing statement was misleading for failing to disclose that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits

of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, which was inadequate as structured to continue to meet growth targets.

119.    On August 12, 2021, at Canaccord's 41st Annual Growth Conference, Siebel stated, in pertinent part:

> We're forming major account groups, enterprise sales groups, middle market groups and then mass market groups in each vertical market where we've been building out very significant market partners, who distribute these products with us for example in oil and gas at Baker Hughes. **And Baker Hughes as 12,000 people selling with us around the world in oil and gas market, and since then we've penetrated Baker Hughes,** Shell, Coke, MEG, LyondellBasell, Georgia – Flint Hills Research.

120.    The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, leading the company to attempt a risky restructuring of their existing salesforce that moved away from their typical high-touch sales strategy.

121.    On September 10, 2021, at a Deutsche Bank Tech Conference, Siebel had the following exchange with an interviewer:

> **Patrick Colville**
>
> Okay. Yes. And I guess, I mean, a key partner both historically and going forward, it's been Baker Hughes. C3 has got an amazingly close partnership with them and my conscience is they can use C3 software both internally in their environment and resells the software. Can you just help us I guess understand that partnership and just kind of help us understand how's it kind of doing in a moment?
>
> **Thomas M. Siebel, Chairman and Chief Executive Officer**
>
> Yes. Baker Hughes, we entered into a strategic partnership with them some years ago. They do use the application for some internal applications, like inventory optimization and what have you, and we go to market with them globally. **So we have go-to-market motion with them at virtually every major order of 12,000 people working**

**with us in all divisions of Baker Hughes and we have sales marketing activities going on in virtually every oil and gas company in the world and they're in various stages of early stages, running pilots, in some cases, running production applications in places like Shell,** LyondellBasell, and Koch, but that's a strategic partnership and it's extraordinary positive.

122.    The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, leading the company to attempt a risky restructuring of their existing salesforce that moved away from their typical high-touch sales strategy.

123.    On September 13, 2021, at the Piper Sandler 2021 Global Tech Conference, Siebel had the following exchange with an analyst:

**Arvind Ramnani, Analyst**

Terrific, terrific. And I think your go-to-market approach is also very unique, right. I mean, it's -- kind of building AI company is difficult, but also some of the approach you've taken is I think quite different. Looking to have really leveraged partners such as Baker Hughes, FIS in specific verticals, what is the rationale for partnering with these vertical leaders versus sort of really going after the market by yourself?

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Well, it gives us market leverage, I mean, we're 700 people. I have 12,000 people selling for me at Baker Hughes into oil and gas. At FIS, I have thousands of people selling with me into the financial services and banking market. I saw with Microsoft across a wide range of markets.

124.    The foregoing statement was misleading for failing to disclose the fact that C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own

salesforce, leading the company to attempt a risky restructuring of their existing salesforce that moved away from their typical high-touch sales strategy.

125.    On October 31, 2021, Baker Hughes and C3 restructured (but did not disclose) their joint venture agreement to remedy the deficiencies with Baker Hughes relegating sales of C3 products to a separate unit with Baker Hughes to address that Baker Hughes had relegated sales of C3 products to a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical 12,000-person salesforce, and that as a result, C3 could not reap the full benefits of the partnership and revenue was far below what C3 had expected. Baker Hughes first made available its regular 12,000-person salesforce to market C3 products following its October 31, 2021 restructuring of its joint venture agreement with C3. C3 did not disclose publicly the restructuring of the joint venture agreement at this time.

126.    On November 29, 2021, at a KeyBanc Summit, Siebel had the following exchange with an interviewer:

**Michael Turtis**

So speak of these verticals, I want to switch over to your go-to-market strategy, which is quite powerful and unique in terms of the way that you've entered some of these verticals by partnering with some of the other participants in those vertical industries. So, I talked about Baker Hughes, about Raytheon, FIS, what would you want for the strategy in general? And then I'd like at some point maybe to finish on Microsoft because you've got a formal unannounced partnership there. But let's talk through some of these others as well.

**Thomas M. Siebel, Chairman and Chief Executive Officer**

Our market, we have a relatively complex go-to-market strategy where we are organized both geographically, vertically and by market partner. So I have geographic coverage for North America, for EMEA and for APAC. Within each of those, I have enterprise sales groups, middle market sales groups and then marketplace sales group, selling the mass audiences. Orthogonal to that we have the vertical market sales organization that we're developing product and fielding sales and service organizations for the oil and gas industry, for the utility industry, for the telecommunications industry, for the financial services industry, what have you. In each of those verticals I am forming partnerships with a highly leveraged market partner. For example, in oil gas, I go to market with Baker Hughes. **Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day to name the company, be it Rosneft Gazprom, Chevron, whoever it may be.**

127.    The foregoing statement was misleading for failing to disclose the fact that until October 31, 2021 (at the earliest), C3 did not have access to the full 12,000-person Baker Hughes salesforce. Rather, Baker Hughes set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership. It was also misleading because it failed to disclose that C3 had recently amended its arrangement with Baker Hughes because of these deficiencies. It was also misleading for concealing the risk that, as a result of not having access to the full Baker Hughes salesforce, C3's growth was constrained by the size of its own salesforce, leading the company to attempt a risky restructuring of their existing salesforce that moved away from their typical high-touch sales strategy.

**E.    Insider Stock Sales**

**1.    The Individual Defendants and Baker Hughes sold more than $730 million worth of C3 shares while in possession of material non-public information in violation of the Exchange Act.**

128.    In connection with the IPO, insiders including the Individual Defendants entered a 180-day lockup.

129.    However, the Registration Statement for C3 had carved out an exception to the standard 180-day lockup. Insiders could initiate stock sales after only *90 days* if certain conditions were met: (1) C3 had issued a quarterly earnings release announced by press release through a major news service or on a report on Form 8-K and (2) the last reported closing price of the Class A common stock was at least 33% greater than the initial public offering price of the Class A common stock for 10 out of any 15 consecutive trading days, including the last day, ending on or after March 8, 2021, or the Early Release. Further, if March 8, 2021, occurs within five trading days of a trading black-out period, the above-referenced early expiration period will be the sixth trading day immediately preceding the commencement of the trading black-out period.

130.    Chart A identifies below the dates and amounts of C3 stock sold by the Individual Defendants and Baker Hughes during the Class Period.

| Chart A: Individual Defendants' Insider Trading From March 8, 2021 - December 2, 2021 | | | | | |
|---|---|---|---|---|---|
| **Defendant** | **Date** | **# of Shares** | **Price** | **10b5-1 Plan?** | **Amount Earned** |
| Siebel | Mar 8, 2021(*) | 2,263,241 | $84.82 | N | $191,957,307 |
| Siebel | Mar 15, 2021(*) | 1,138,024 | $84.01 | N | $95,605,800 |
| Siebel | June 7, 2021(*) | 1,294,356 | $62.42 | N | $80,791,078 |
| Siebel | June 10, 2021 | 705,644 | $58.96 | N | $41,604,976 |
| Siebel | June 14, 2021 | 680,909 | $59.39 | Y (undated) | $40,440,348 |
| Siebel | July 13, 2021 | 667,291 | $53.65 | Y (undated) | $35,803,283 |
| Siebel | Aug 16, 2021 | 653,945 | $46.22 | Y (undated) | $30,224,071 |
| Siebel | Sept 13, 2021 | 640,866 | $49.13 | Y (undated) | $31,485,574 |
| Siebel | Oct 13, 2021 | 484,149 | $46.17 | Y (undated) | $22,352,186 |
| Siebel | Nov 15, 2021 | 615,488 | $48.36 | Y (undated) | $29,762,880 |
| **SIEBEL SUBTOTAL** | | | | | **$600,027,503** |
| Abbo | Mar 8, 2021(*) | 258,717 | $86.09 | N | $22,273,937 |
| Abbo | Mar 11, 2021(*) | 83,236 | $86.65 | N | $7,212,588 |
| Abbo | June 17, 2021 | 86,768 | $59.28 | Y (undated) | $5,143,462 |
| Abbo | July 15, 2021 | 86,768 | $51.69 | Y (undated) | $4,485,221 |
| Abbo | Aug 19, 2021 | 34,707 | $44.96 | Y (undated) | $1,560,343 |
| Abbo | Sept 16, 2021 | 34,707 | $50.30 | Y (undated) | $1,745,683 |
| Abbo | Oct 21, 2021 | 34,707 | $47.65 | N | $1,653,714 |
| Abbo | Nov 18, 2021 | 23,138 | $43.44 | Y (undated) | $1,005,070 |
| **ABBO SUBTOTAL** | | | | | **$45,080,018** |
| Barter | Oct 12, 2021 | 170,333 | $45.04 | Y (undated) | $7,671,798 |
| Barter | Nov 12, 2021 | 14,844 | $46.29 | Y (undated) | $687,075 |
| **BARTER SUBTOTAL** | | | | | **$8,358,873** |
| BakerHughes | April 7, 2021(*) | 873,431 | $64.25 | N | $56,117,095 |
| BakerHughes | April 9, 2021(*) | 189,188 | $60.86 | N | $11,513,887 |
| BakerHughes | April 22, 2021(*) | 170,000 | $67.99 | Y(3/22/2021) | $11,557,841 |
| **BAKER HUGHES / SIMONELLI SUBTOTAL** | | | | | **$79,188,823** |
| **TOTAL** | | | | | **$732,655,217** |

(*) refers to transactions that took place between 90 and 181 days of trading post-IPO.

131.    Chart B identifies the total amounts of C3 stock traded as well as the profits earned by the Individual Defendants and Baker Hughes on the first day of the lockup expiring (90 days after the IPO), between 90 days and 181 days of the IPO, and within one year of the IPO.

| Chart B: Total Shares Traded & Profits Earned 3/8/21 – 2/2/21 | | | | |
|---|---|---|---|---|
| | **Number of Shares Traded** | **Profits Earned on First Day of 90-Day Lockup Expiry (March 8)** | **Profits Earned Between 90 and 181 Days of IPO** | **Profits Earned Within One Year of IPO** |
| **Individual Defendants/Baker Hughes** | 11,204,457 | $214,231,244 | $79,188,823 | $732,655,217 |

132.    Chart C identifies specific stock sales that coincide with particular Plaintiffs' purchases:

### CHART C: CONTEMPORANEOUS TRADE EXAMPLES

**A.    Examples of Contemporaneous Trades by Plaintiffs and Siebel**

| Party | Date | Transaction | No. Shares | Price |
|---|---|---|---|---|
| **Siebel** | **03/15/21** | **Sale** | **1,138,024** | **$84.01** |
| Samarghandi | 03/18/21 | Purchase | 100 | $75.43 |
| Samarghandi | 03/18/21 | Purchase | 200 | $75.43 |
| **Siebel** | **07/13/21** | **Sale** | **667,291** | **$53.65** |
| Samarghandi | 07/14/21 | Purchase | 50 | $51.5000 |
| Samarghandi | 07/14/21 | Purchase | 38 | $51.7500 |
| Samarghandi | 07/14/21 | Purchase | 62 | $51.7500 |
| Samarghandi | 07/14/21 | Purchase | 50 | $51.7000 |
| Samarghandi | 07/14/21 | Purchase | 50 | $52.0000 |
| Samarghandi | 07/14/21 | Purchase | 50 | $52.5000 |
| Samarghandi | 07/14/21 | Purchase | 50 | $52.9500 |
| Samarghandi | 07/14/21 | Purchase | 50 | $53.3200 |
| **Siebel** | **08/16/21** | **Sale** | **653,945** | **$46.22** |
| Samarghandi | 08/16/21 | Purchase | 250 | $46.4000 |
| Samarghandi | 08/16/21 | Purchase | 500 | $48.0000 |

| Samarghandi | 08/17/21 | Purchase | 250 | $45.0000 |
| Samarghandi | 08/17/21 | Purchase | 250 | $45.0000 |
| **Siebel** | **09/13/21** | **Sale** | **640,866** | **$49.13** |
| Samarghandi | 09/20/21 | Purchase | 150 | $47.1800 |
| **Siebel** | **11/15/21** | **Sale** | **615,488** | **$48.36** |
| Samarghandi | 11/18/21 | Purchase | 400 | $40.4900 |
| Samarghandi | 11/18/21 | Purchase | 100 | $40.6300 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.6500 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.8600 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 150 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 213 | $41.4500 |
| Samarghandi | 11/18/21 | Purchase | 12 | $41.4400 |
| Samarghandi | 11/18/21 | Purchase | 100 | $42.0000 |
| Samarghandi | 11/18/21 | Purchase | 25 | $42.9300 |
| Samarghandi | 11/18/21 | Purchase | 100 | $42.9300 |
| Samarghandi | 11/18/21 | Purchase | 400 | $40.4900 |

## B.      Examples of Contemporaneous Trades by Plaintiffs and Abbo

| Party | Date | Transaction | No. Shares | Price |
|---|---|---|---|---|
| **Abbo** | **03/08/21** | **Sale** | **258,717** | **$86.09** |
| **Abbo** | **03/11/21** | **Sale** | **83,236** | **$86.65** |
| Zavalanski | 03/15/21 | Purchase | 25 | $89.65 |
| **Abbo** | **06/17/21** | **Sale** | **86,768** | **$59.28** |

THIRD AMENDED CLASS ACTION COMPLAINT - 34                    Case No. 4:22-cv-01413-HSG

| Samarghandi | 06/18/21 | Purchase | 100 | $59.23 |
|---|---|---|---|---|
| **Abbo** | **07/15/21** | **Sale** | **86,768** | **$51.69** |
| Samarghandi | 07/16/21 | Purchase | 100 | $50.72 |
| Samarghandi | 07/19/21 | Purchase | 150 | $49.57 |
| Samarghandi | 07/19/21 | Purchase | 100 | $49.63 |
| **Abbo** | **08/19/21** | **Sale** | **34,707** | **$44.96** |
| Linder | 08/24/21 | Purchase | 1,000 | $49.93 |
| Linder | 08/24/21 | Purchase | 1,000 | $49.92 |
| **Abbo** | **09/16/21** | **Sale** | **34,707** | **$50.30** |
| Samarghandi | 09/20/21 | Purchase | 150 | $47.18 |
| Samarghandi | 09/21/21 | Purchase | 350 | $46.95 |
| **Abbo** | **10/21/21** | **Sale** | **34,707** | **$47.65** |
| Samarghandi | 10/27/21 | Purchase | 250 | $43.9600 |
| Samarghandi | 10/27/21 | Purchase | 250 | $44.2900 |
| Samarghandi | 10/28/21 | Purchase | 250 | $44.4700 |
| **Abbo** | **11/18/21** | **Sale** | **23,138** | **$43.44** |
| Samarghandi | 11/18/21 | Purchase | 250 | $40.4600 |
| Samarghandi | 11/18/21 | Purchase | 400 | $40.4900 |
| Samarghandi | 11/18/21 | Purchase | 100 | $40.6300 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.6500 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.8600 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 150 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |

## C.  Examples of Contemporaneous Trades by Plaintiffs and Barter

| Party | Date | Transaction | No. Shares | Price |
|---|---|---|---|---|

| Barter | 11/12/21 | Sale | 14,844 | $46.29 |
|---|---|---|---|---|
| Samarghandi | 11/18/21 | Purchase | 250 | $40.4600 |
| Samarghandi | 11/18/21 | Purchase | 400 | $40.4900 |
| Samarghandi | 11/18/21 | Purchase | 100 | $40.6300 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.6500 |
| Samarghandi | 11/18/21 | Purchase | 500 | $40.8600 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 150 | $41.1700 |
| Samarghandi | 11/18/21 | Purchase | 100 | $41.1700 |

D.    **Examples of Contemporaneous Trades by Plaintiffs and Baker Hughes**

| Party | Date | Transaction | No. Shares | Price |
|---|---|---|---|---|
| **Baker Hughes** | **04/7/21** | **Sale** | **873,431** | **$64.25** |
| **Bakers Hughes** | **04/9/21** | **Sale** | **189,188** | **$60.86** |
| Samarghandi | 04/12/21 | Purchase | 1,000 | $60.00 |
| **Baker Hughes** | **4/22/21** | **Sale** | **170,000** | **$67.99** |
| Linder | 4/30/21 | Purchase | 1,000 | $64.26 |

133.    The size of the insider trading conducted by Defendants Siebel, Abbo, Barter, and Simonelli between March 8, 2021, and the close of the Class Period only nine months later can only be described as staggering. For example, Defendant Siebel, alone, sold more than 9 million C3 shares between March 8, 2021, and December 2, 2021. Likewise, Defendant Baker Hughes sold 1.2 million shares between March 8, 2021, and December 2, 2021. Defendant Abbo sold more than 642,000 shares and Defendant Barter sold more than 185,000 shares during this period. Collectively, Defendants Siebel, Abbo, Barter, and Baker Hughes sold more than 11 million shares of C3 stock in only nine months.

134.    Chart A also shows that Defendants Siebel, Abbo, Barter, and Baker Hughes profited handsomely from their transactions. Defendant Siebel made over $600 million in selling C3 shares. Defendant Abbo made over $45 million. Defendant Barter made $8.3 million and Defendant Baker Hughes made $79 million. Collectively, *Defendants Siebel, Abbo, Barter, and Simonelli profited over $732 million in nine months of selling their C3 shares.*

### 2.    The Majority of the Stock Profits Came from Early Transactions That Took Place Before the Expiry of C3's Standard 180-day Lockup Agreement

135.    The Individual Defendants' motive to issue the false statements is highlighted by the suspicious timing of their insider selling. The Individual Defendants rushed as fast as they could to sell their C3 shares with knowledge of the false statements in the Registration Statement. For example, on March 8, 2021—the very first day that the 90 day "early bird" lockup expired—*Defendants Siebel and Abbo earned $214 million in a single day*. And by June 7, 2021—the date where the 180-day lockup would have expired—*Defendants Siebel and Abbo's insider sales totaled over $395 million*.

136.    The amount of profit generated early in the Class Period is evidence of a strong motive to withhold material insider information from investors and sell before the public could truly assess C3's financial information.

137.    Finally, the rush of early transactions appears especially suspect because trading of C3 stock by the Individual Defendants and Baker Hughes become virtually non-existent after material inside information was disclosed on December 2, 2021. For example, Defendant Siebel made approximately 11 transactions from March 8, 2021, to November 15, 2021, which netted Defendant Siebel over $630 million—but, conspicuously, Defendant Siebel has not made any other sale of C3 stock since November 2021.

### 3.    The Majority of the $730 million Earned by the Individual Defendants Were from Transactions That Were Not Tied to Established 10b5-1 Plans

138.    Motive can also be demonstrated by showing that Defendants embarked on unusual patterns of trading. Often, corporate officers and directors rely upon previously established 10b5-1 plans to dispel any hint of insider trading. Importantly, these plans must be entered into when the person or entity does not possess material nonpublic information. Here, Chart A indicates that several

C3 stock transactions were made not pursuant to a 10b5-1 plan—and those that were subject to a plan were not properly identified and/or established before Defendant had access to material nonpublic information.

139.    For example, Defendant Siebel's disclosures do not identify a 10b5-1 plan for the following transactions: March 8, 2021 ($191 million); March 15, 2021 ($95 million); June 7, 2021 ($80 million); and June 10, 2021 ($41 million). ***These non-10b5-1-plan-transactions equal more than $407 million in profit.*** And while Defendant Siebel does reference a 10b5-1 plan for his later transactions,[6] he does not disclose the date of this 10b5-1 plan.

140.    Likewise, Defendant Abbo's March 8, 2021 ($22 million), March 11, 2022 ($7.2 million), and October 21, 2021 ($1.6 million) transactions do not reference a 10b5-1 plan. ***These non-10b-5-1-plan-transactions equal more than $30 million in profit.*** And—like his fellow "Thought Leader," Defendant Siebel—Defendant Abbo's transactions that do reference a 10b5-1 plan are undated.[7] Thus, Defendant Abbo, too, does not disclose the date of the 10b5-1 plan.

141.    Defendant Siebel's and Defendant Abbo's undated 10b5-1 plans are also suspicious in that each plan appears to stop regular transactions after the December 2, 2021 disclosure. As Chart A demonstrates, between June 2021 (when Defendants Siebel and Abbo purportedly begin C3 stock transactions pursuant to an undated 10b5-1 plan) and November 2021, both Defendant Siebel and Defendant Abbo make monthly sales of C3 stock. However, these regular monthly sale transactions conspicuously stop by early December 2021. And these transactions have not restarted as of the filing of this Amended Complaint.[8]

142.    Defendants Barter and Baker Hughes also exhibit suspicious patterns of trading. For example, Defendant Barter's only two C3 transactions occur on October 12, 2021 ($7.6 million) and November 12, 2021 ($687,075), and are not subject to a 10b5-1 plan that has an effective date.

_____

[6] Defendant Siebel's later transactions are: June 14, 2021 ($40 million); July 13, 2021 ($35 million); August 16, 2021 ($30 million); September 13, 2021 ($31 million); October 13, 2021 ($22 million); and November 15, 2021 ($29 million).

[7] Defendant Abbo's later transactions are: June 17, 2021 ($5 million); July 15, 2021 ($4.4 million); August 19, 2021 ($1.5 million); September 15, 2021 ($1.7 million); and November 18, 2021 ($1 million).

[8] According to public records, Defendant Abbo made one sale transaction of C3 stock on June 22, 2022, but this was for only 175 shares and Defendant Abbo made only $3,362 from the sale.

THIRD AMENDED CLASS ACTION COMPLAINT - 38                    Case No. 4:22-cv-01413-HSG

Defendant Baker Hughes, on the other hand, did point to a dated Rule 10b5-1 plan, dated March 22, 2021, for at least one of its three transactions. But such a plan is still inadequate as Defendant Simonelli had access to material inside information by mid-March 2021 by virtue of his position as a C3 board member, audit committee member, and President of Baker Hughes.

143.    Taken collectively, the exceedingly large size of the C3 transactions by the Individual Defendants, the fact that the vast majority of the Individual Defendants' profits were realized in the very early days of trading when material inside information was still being withheld from the public, and that most of the profits were collected outside of established 10b5-1 plans all point to strong motive for insider trading.

## X.    LOSS CAUSATION

144.    As detailed herein, Defendants' materially false and misleading statements and/or omissions concealed risks in investing in C3 and the true state of its business, thereby artificially inflating the price of C3 Class A common stock and/or maintaining inflation in the stock price. Had Defendants been truthful about C3's business, Plaintiff and other Class members would not have purchased or otherwise acquired their C3 Class A common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of C3 Class A common stock and that the revelation of the relevant truth concealed by those misrepresentation and omissions would cause C3 prices to decline. The economic losses (i.e., damages suffered by Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact. C3 stock could not have been issued, or would have been sold at lower prices, had investors been aware of Defendants' fraudulent scheme.

145.    Throughout the Class Period, a series of disclosures or events revealed the true state of C3's business through either disclosures of facts which were proximately caused by the undisclosed truth, or actually disclosed the underlying truth or omission. These disclosures caused material declines in the market value of the Company's securities, removing the artificial inflation, thereby causing Plaintiffs and other Class members to suffer significant losses and damages.

**A.    Negative Financial Performance Proximately Caused by the Fraud**

146.    Investors' expectations of C3's business prospects were based upon false and misleading statements and omissions regarding C3's purported salesforce and relationship with Baker Hughes. As the Registration Statement and subsequent 10-Ks and 10-Qs would state: "To increase our revenue, we must continue to attract new customers…. In addition, our future success depends on our ability to sell additional subscriptions for our C3 AI Suite and C3 AI Applications to our existing customers, and our customers renewing their subscriptions when the contract term expires." Another key to C3's success was its own field salesforce which, according to the Registration Statement and subsequent 10-Ks and 10-Qs, had been restructured prior to the IPO "to effectively address small, medium, and large enterprise sales opportunities."

147.    Both C3 and investors looked at one key performance indicator ("KPI") to gauge the success of C3's salesforce: remaining performance obligations ("RPO"). RPOs are committed and represent non-cancellable contracted revenue that has not yet been recognized and will be recognized as revenue in future periods. As C3 stated: "We monitor remaining performance obligations, or RPO, as a key metric to help us evaluate the health of our business, identify trends affecting our growth, formulate goals and objectives, and make strategic decisions."

148.    After hours on March 1, 2021, C3 announced third quarter fiscal 2021 results in a press release. On March 2, 2021, C3 filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal quarter ended January 31, 2021 (the "Q3 2021 10-Q"). C3 disclosed that, for the nine months ended January 31, 2021, the Company recognized total revenue of $21.6 million related to its Joint Venture with Baker Hughes, less than half of the $53.3 million minimum revenue requirement for the fiscal year ending April 30, 2021, meaning that Baker Hughes was not on track to meet its minimum revenue requirements. J.P. Morgan summarized C3's quarterly financial results, noting:

> Calculated Billings Missed. RPO Declined Sequentially. Calculated billings for FQ3 declined 10% y/y, below consensus expectation of +14% y/y growth, partially because of timing of invoices pushing. Additionally, GAAP RPO declined 7% sequentially and 6% y/y, partially as the company issued contracts with a higher portion of cancellable component, adjusted for which it declined ~3% sequentially, in line with a year ago. Current RPO also declined about

THIRD AMENDED CLASS ACTION COMPLAINT - 40                                    Case No. 4:22-cv-01413-HSG

~2% sequentially. Presumably investors would rather see these indicators inflecting upward vs. contracting…

149.    Canaccord Genuity Capital Markets, noting a sequential deceleration in RPO, lowered its price target from $140 to $120, stating:

> If we had to paint with a broad brush, we'd characterize C3's FQ3 results as fine, not great. *The firm posted the obligatory upside required of every newly minted IPO,* and revenue guidance for FQ4 was slightly ahead of expectations. Investors looking to make sense of what was actually sold in the quarter really have two data points to which they can point: deferred revenue, which is susceptible to the timing of invoicing, and Adjusted RPO, which normalizes for contracts that increasingly include cancellable backlog. Given that Adjusted *RPO is probably the cleaner data point, that was up 16% y-o-y in the quarter, a modest deceleration sequentially*. While we expect growth to accelerate in the quarters and years ahead, this was a bit below expectations, and that's what likely drove the stock lower after hours.

150.    Piper Sandler lowered its price target from $151 to $141. Wedbush lowered its price target from $200 to $175.

151.    Immediately following C3's issuance of its quarterly results, C3's stock dropped $22.55 or 18.63% , to close at $98.50 on March 2, 2021. C3's stock continued to fall over the following two days to $88.51, for a total three day drop of 26.9%.

152.    On September 1, 2021, C3 announced the Company's Q1 fiscal 2022 results after the close of trading. That same day, C3 hosted an earnings call with investors and analysts to discuss the Company's Q1 fiscal 2022 results (the "Q1 2022 Earnings Call"). On September 2, 2021, C3 filed a Quarterly Report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended July 31, 2021 (the "Q1 2022 10-Q"). These revealed that GAAP RPO grew only about 6% y/y for FQ1, decelerating from prior quarter's about 23% growth. PF RPO, which includes cancellable RPO, decelerated from about 40% y/y in the prior quarter. Some large deals were pushed out of FQ1 and into FQ2, contributing to volatility in the metrics. Defendants attributed this to a slower-than-expected month of July (when unbeknownst to investors, the Company was restructuring and reconstituting its salesforce). In addition, C3 disclosed that, for the three months ended July 31, 2021, the Company recognized total revenue of $16.1 million related to its Joint Venture with Baker Hughes, less than one quarter of the $75 million minimum revenue

THIRD AMENDED CLASS ACTION COMPLAINT - 41                    Case No. 4:22-cv-01413-HSG

requirement for the fiscal year ending April 30, 2022, meaning that Baker Hughes was not on track to meet its minimum revenue requirements. As a result, C3 stock plummeted $5.44, or 10.24%, a drop from $53.11 to close at $47.67 on September 2, 2021.

153. Canaccord Genuity dropped its price target from $75 to $50, below C3's current stock price of $53.11, stating:

> C3 AI is the kind of story where it's all about the big picture – that enterprise AI is a huge market, that C3 has developed something unique with its model driven architecture, that the firm has the right partners in place to co-develop and distribute its applications, etc. We're onboard with all of this, so the operative question is when is the right time to step up? Our view is that 19x EV/R for what now looks to be a 30% or so grower is still a bit on the pricey side. We're certainly getting closer, and it's possible that RPO growth accelerates from here (particularly if management commentary about deals pushing from Q1 to Q2 plays out), ***but until we get the sense that either investors are getting comfortable with the quarterly swings in bookings/RPO or that growth is set to be sustainably faster than trend, we think the prudent move with AI is to be patient. As such, our HOLD rating is for now unchanged.***

154. J.P. Morgan similarly dropped its price target from $84 to $53, stating:

> RPO metrics continue to be lumpy quarter-to-quarter, creating uncertainty despite what appears to be an otherwise accelerating trend. GAAP RPO grew ~6% y/y for FQ1, decelerating from prior quarter's ~23% growth. PF RPO, which includes cancellable RPO, performed better at ~28% y/y growth for FQ1, though still decelerating from ~40% y/y in the prior quarter. The company mentioned that some large deals pushed out of FQ1 and into FQ2, contributing to volatility in the metrics. This was primarily attributed to a slower-than-expected month of July, in our view potentially due to increased vacationing and renewed COVID-19 uncertainty, though the company believes the slippage to be transitory. …Overall, though we remain positive on C3's technology and the secular opportunity, we think investors continue to look for a stronger growth + margin profile coupled with better consistency and trend of leading metrics. We remain UW, PT to $53.

155. Piper Sandler dropped its price target from $98 to $78 "given our conservatism around out-year RPO growth." KeyBanc Capital Markets cautioned that "RPO … declined 1% q/q and adjusted RPO including Baker Hughes was flat. Pipeline conversion remains 'lumpy,' with deal push-outs prompting management to retain rather than raise the FY22 revenue guide." Wedbush dropped its price target from $100 to $70.

156.    The declines in the price of the C3 stock and resulting losses are directly attributable to concealed facts that were previously misrepresented or concealed by Defendants. Had Plaintiffs known of the material adverse information not disclosed by Defendants or been aware of the truth behind their material misstatements, they would not have purchased the C3 stock at artificially inflated prices. As a result of their purchases of the C3 stock, Plaintiffs suffered economic loss and damages, as contemplated by the federal securities laws.

**B.    Corrective Disclosures Regarding the Truth About C3's Salesforce**

157.    When the truth about Defendants' materially false, misleading, and incomplete statements, were disclosed, the price of C3's securities fell, as the prior inflation came out of the Company's stock price.

158.    On December 1, 2021, C3's stock plummeted from $36.96 to $33.83, a drop of $3.13 or 8.47%. After the market closed, C3 announced the Company's Q2 fiscal 2022 results. That announcement revealed the non-GAAP adjusted RPO showed *zero growth* year-over-year, and that was inclusive of an incremental $45M from the Baker Hughes expansion/renegotiation (i.e., business not yet sold).

159.    During a conference call that day, Defendant Siebel disclosed for the first time that C3 did not have full access and assistance of Baker Hughes' 12,000-person salesforce. Rather, Baker Hughes instead set up a separate sales division that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, there was a risk that Baker Hughes would not perform effectively under their partnership. Siebel stated:

> **The real motivation behind restructuring Baker Hughes was to basically kind of realign the sales structure.** So Baker Hughes is, I think roughly $28 billion business and they run four central business units and, you know the real relationship with Baker Hughes has to the deep, deep industry expertise in oil and gas, process industries and kind of manifest -- chemicals, petrochemical business and they are kind of the masters in the universe of that and they have these unbelievably close relationships going back, now I think 70 years with everybody in the world from Rosneft to Gazprom to Aramco to Shell, Chevron, you name it, okay.
>
> And those relationship and that expertise are in their four business units. **When we first put together the relationship with Baker -- with C3 AI-Baker Hughes, they basically formed a new business unit that was called Baker Hughes C3[]. That sat outside of those**

**organization. And so they really weren't the people with the relationships and they weren't the people with the quotas and they weren't the people with the deep industry expertise and what really did here was as we restructured it in a way, that we put all the sale resources end of the quota in operating units of Baker Hughes. Okay?**

160.    On December 2, 2021, C3 filed a Quarterly Report on Form 10-Q with the SEC reporting the Company's financial and operating results for the quarter ended October 31, 2021 (the "Q2 2022 10-Q"). C3's stock plummeted another $3.79 or 11.20% to $30.04—the lowest of the year and well off the high of 177.47 on December 22, 2020—just days after the IPO offering.

161.    Analyst response to these revelations was brutal. Piper Sandler lowered its price target from $78 to $44 and again on January 13, 2021 stated: "limited NT upside from bookings/revenue expansion, the reorganization of its sales structure in 2Q22 after an attempted transition to a hierarchical model, and a third turnover at CFO since October 2020. Further, we acknowledge end-market AI application demand appears to outstrip platform modernization initiatives, which could result in smaller deal sizes with lower average TCV."

162.    Canaccord Genuity stated in its December 1, 2021 Research Report, entitled, "We fear there's less than meets the eye with FQ2 ... we're left with lingering questions," "if our assessment of bookings execution year-to-date is correct, unless we see pretty significant improvement in the back half of this year, it's going to be hard for C3 to hit consensus revenue targets that call for 30%+ growth in F2023. … the bottom line is that, until we get more comfort around new business visibility/execution, partner contribution, deal size and vertical diversification, etc., we continue to believe the correct rating for AI is HOLD…. **Implications for RPO.** It's important to understand that C3's current and total RPO numbers now include backlog from the amended BH agreement that was not previously included. What that means is that, on an adjusted basis, total RPO was actually flat year-over-year, going from $554M to $553M, and that that number includes $45M in incremental RPO from the agreement restructuring, which means RPO excluding Baker Hughes actually declined by about that amount."

163.    According to The Fly, BofA analyst Brad Sills downgraded C3 (AI) to Underperform from Neutral with a price target of $40, down from $65, following what he called a "disappointing"

Q2 report that featured lighter than expected subscription revenue and a sequential decline in Remaining Performance Obligations, or RPO, excluding the impact from the Baker Hughes (BKR) agreement reallocation from cancellable to non-cancellable RPO. He thinks that near-term uncertainty introduced by execution challenges and the departure of CFO David Barter are likely to be an overhang on the shares, Sills said.

164. Deutsche Bank cut its price target from $50 to $36 in its December 2, 2021 Research Report, stating:

> Quite a lot to parse through this quarter. 2Q subscription revenue was below Consensus estimates; customer adds were disappointing; there was an abrupt CFO transition; and C3 restructured its sales function! Furthermore, Baker Hughes increased its commitment to C3 but extended the contract term - lowering the annual contract value from $117M between FY22-24 to $99M FY22-25…. Customer count rose by just 6 logos to 104, vs. the 9 logos added in 1Q and 11 in 2Q FY21. This is concerning given C3 must expand its TAM beyond the 2K largest enterprises in the world - a move which would make results more predictable and reduce tail risk from concentration…. C3 restructured its sales function. The company tried a lower touch sales model in July '21, to a classic enterprise sales model (a la SAP, IBM, Oracle etc.). Management claims this didn't work and new business activity was disappointing. The company reengineered sales back to a high touch strategic function. We applaud management for its experimenting with new models, ***but these changes will probably increase the market's perception of execution risk.***

165. J.P. Morgan stated in its December 2, 2021 research report, entitled "Sales Re-Org Creates a Speed-Bump, But Product Innovations Continue":

> C3 reported a mixed FQ2 as it works through sales organization-related challenges and accounting noise resulting from an updated Baker Hughes contract….Key Takeaways: 1) Top Line Beat; Mixed Bag Under the Hood. Total revenue came in at $58.3M vs. consensus $57M, but missed on sub revenue, which came in at $47.4M vs. $50M consensus, balanced by higher-than-expected services revenue. Concurrently, Q2 billings declined 60% sequentially compared to Q1's 18% growth, but we remind investors this is a lumpy business for now. 2) ***Back to Basics. C3 attributed the sales headwinds to a sales model re-organization executed in July that converted it into a more traditional, regimented structure like that of SAP or IBM. Subsequently, the company realized that this was a "mistake" as Q2 sales performance, specifically in terms of new sales, proved "unacceptable." As a result, C3 spent the first couple weeks of November reverting to a more proven and reliable sales model.*** 3) Baker Hughes 3.0. The company once again expanded and restructured its contract with Baker Hughes, most notably (a) increasing the contract value by $45M and (b) updating terms such that ~$357M is now "guaranteed" revenue over a 3.5 year and thus

THIRD AMENDED CLASS ACTION COMPLAINT - 45                    Case No. 4:22-cv-01413-HSG

recognizable as GAAP RPO. 4) Pay Attention to "Total Backlog." The Baker Hughes contract restructuring generated noise around RPO metrics. Net-net, we think investors should pay attention to what we are calling "Total Backlog," or GAAP RPO + Cancellable Backlog + Baker Hughes Non-Cancellable Backlog. From this perspective, Q2 Total Backlog declined sequentially from $562M to $553M (-1.5% sequentially), or $508M (-9.6%) ex-Baker Hughes contract expansion.

J.P. Morgan then dropped its price target approximately 25%.

166. Wedbush analyst Daniel Ives cut the target on C3 Class A to $45 from $70.

167. The decline in the price of C3's stock was a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The timing and magnitude of C3's stock price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' fraudulent conduct.

168. In order to artificially boost its stock price following the decline caused by its fraud, C3 said on December 15, 2021, that its board authorized the repurchase of up to $100 million of its Class A common stock over the next 18 months, causing its stock to pop 12.28% ($3.83) to $35.01. Still, the next day, Morgan Stanley cut its price target from $45 to $31.

169. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired C3's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of C3 securities and that the corrective disclosure of Defendants' misrepresentations and omissions would cause the price of C3 securities to decline.

## XI. FURTHER ALLEGATIONS IN SUPPORT OF SCIENTER FOR THE EXCHANGE ACT CLAIMS

170. Numerous facts in addition to those set forth above give rise to a strong inference that Defendants Siebel, Barter, and Simonelli knew, or were deliberately reckless in not knowing, that

their statements about the Joint Venture were false and misleading or omitted material facts necessary to make them not misleading when made.

A.      **Additional Facts in Support of Defendant Siebel's Scienter**

171.      ***Siebel signed the Joint Venture Agreement that Included the True Size of Baker Hughes' Salesforce Dedicated to C3.*** C3 included a redacted copy of the C3/Baker Hughes Joint Venture Agreement, dated June 6, 2019, as an exhibit to its Registration Statement. The publicly filed version stated "BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3." (redaction and brackets in original). The actual unredacted Joint Venture Agreement, which Siebel signed, contained the actual number of FTE sales personnel, putting Siebel on notice of the small size of the salesforce dedicated to selling C3's products. Given  the importance of the contract and Siebel's signature on the contract supports an inference that he reviewed the contract prior to signing. In the alternative, if he did not read such an important contract prior to signing it, Siebel was reckless.

172.      ***Siebel's direct and extensive involvement in developing and marketing C3 and the Joint Venture.*** Siebel, via his role as Founder, Chairman, and CEO, has been with the Company since its inception, and was its CEO during the entirety of the Class Period. He also directly participated in the management and day-to-day operations of the Company. Indeed, C3's 2021 10-K acknowledges that "Siebel is critical to our overall management, sales strategy, culture, strategic direction, engineering and operations" and "critical to the continued development of our C3 Suite." Several former employees of C3 also told CNBC that Siebel was known to provide "intense oversight" at C3.

173.      ***Siebel has repeatedly acknowledged that the Joint Venture represents one of C3's core operations***. Defendant Siebel made many misrepresentations and omissions regarding the importance of the Baker Hughes partnership. For example, the Registration Statement states that Baker Hughes is one of "our most notable partners" and that this partnership is "core to our growth

strategy" and represents "a significant use case [to] prove the value of our AI Suite with a flagship customer."

174.    ***Siebel was informed of the status of C3's sales pipeline at internal meetings.*** Siebel was informed of C3's sales pipeline at internal meetings and had access to internal contemporaneous reports and data that contradicted his statements to investors. Due to Siebel's active participation in the management and day-to-day operations of the Company, he had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Siebel attended meetings, as well as received, reviewed, and had access to reports and data which undermined his representations to investors about the quality and size of the Joint Venture's salesforce. For example, FE-1 has stated that Defendant Siebel attended weekly sales meetings, along with FE-1, where he recalled hearing the General Manager, Oil & Gas, regularly report that the Baker Hughes pipeline was non-existent, and that it had made no sales as of April 30, 2020. In addition, according to the Complaint filed the Delaware Chancery Court in *Pankow v. Siebel*, C.A. 2024-0520- - a shareholder derivative case in which plaintiffs received confidential internal company documents pursuant to a request under Section 220 of Title 8 of the Delaware Corporate Code - on May 25, 2021 the board of directors of C3 held a meeting. Defendants Simonelli and Siebel were present at that meeting. The materials presented to the Board members from the meeting contained a detailed PowerPoint slide presentation that appears to outline certain  topics presented by management at this meeting. One topic included was "Sale Objectives" for the Oil and Gas division, which lists a second goal of "Drive BH to onboard 10 qualified sales executives in direct quota carrying roles by July 31". This both shows that Siebel discussed the size of Baker Hughes' sales force at board meetings and put Siebel on notice that less than the full Baker Hughes sales force was selling C3's products, onboarding a mere 10 salespeople into the Joint Venture would be far too trivial to discuss at the board level if it was true that C3 had access to anywhere near the full 12,000 person Baker Hughes sales force. Counsel for plaintiffs have conferred with counsel for plaintiffs in *Pankow* and they stated that they stand by their complaint.

175.    ***Siebel repeatedly spoke on the subject matters misrepresented***. Defendant Siebel made repeated statements to investors about the Joint Venture throughout the Class Period in a

THIRD AMENDED CLASS ACTION COMPLAINT - 48                                    Case No. 4:22-cv-01413-HSG

multitude of press releases, social media messages, quarterly and annual reports filed with the SEC and signed by and/or approved by Defendant Siebel, and earnings calls. *See,* Appendix A. Having spoken on these subjects so many times, Defendant Siebel either knew, or was deliberately reckless in not knowing, that the statements about the Joint Venture were false and misleading and omitted material information.

176. ***Siebel's misrepresentations were necessary to go public***. Defendant Siebel made many of his misrepresentations and omissions while soliciting funds from investors in C3's initial public offering, with these misstatements allowing the Company to exploit the extremely frothy climate for technology IPOs. Once public, C3 executives and insiders, including Defendant Siebel, sold substantial amounts of personal shares in C3, which they otherwise could not have accomplished without becoming a public company.

177. ***Siebel's insider sales during the Class Period were unusual and suspicious in both timing and amount.*** Defendant Siebel's first significant sale occurred on March 7, 2021, the very first day of the unusual 90-day lockup period. Siebel made almost $192 million on that transaction alone. The second significant sale occurred only one week later, on March 16, 2021, and netted Defendant Siebel an additional $95 million dollars. In other words, Siebel sold almost $200 million worth of stock within the first 100 days of C3 going public. But Siebel was not done. He chose to sell C3 stock repeatedly over the course of nine months, earning ***a staggering $600 million in insider sales***.

178. Apart from the behemoth size of Siebel's C3 stock profits, the timing of the various transactions is also suspicious. For example, while the Registration Statement includes the standard 180-day lockup agreement, Siebel had also negotiated a convoluted exception for himself and a select few. According to the Registration Statement, Siebel and a handful of others were allowed to sell their shares after only 90 days, if *inter alia*, the transactions represented less than 20% of the overall shares and only if the Company had made its first earnings report and the stock price was at least 33% higher than the IPO price over the course of several days.

179. Siebel's sales were also out of line with both his past and subsequent trading practice. Siebel had sold no stock in any company for which he was required to file a Form 4 at any point

THIRD AMENDED CLASS ACTION COMPLAINT - 49                    Case No. 4:22-cv-01413-HSG

since 2005. Siebel's sales, as set forth in Paragraphs 128-142 above. Siebel's sales amounted to almost 60 percent  (59.61%) of his holdings,  and have been confined to the Class Period with no sales since. While the mid-monthly sales beginning on June 14, 2021 are all purportedly pursuant to a 10b-5 plan, the date the plan was adopted is not disclosed, and mysteriously they stop just before the end of the Class Period. Siebel has made no further sales of his personally held C3 shares in the ensuing three plus years.

180.    ***Siebel's admission that he knew that the Joint Venture was hobbled by a tiny and untested salesforce supports a strong inference of scienter.*** On December 1, 2021, almost one year after C3's IPO, Defendant Siebel disclosed to the public what he had known all along. Siebel acknowledged during C3's Q2 2022 Earnings Call that, from its inception, the Baker Hughes Joint Venture consistent of "a new business unit … that sat kind of outside those organizations [within Baker Hughes that did have deep relationships and expertise]." According to Siebel, the Joint Venture salesforce "weren't the people with the relationship, and they weren't the people with the quotas, and they weren't the people with the deep industry expertise."

181.    The foregoing facts, particularly when considered collectively, support a strong inference of Siebel's scienter.

## B.    Additional Facts in Support of Defendant Simonelli's Scienter

182.    ***Simonelli understood that the Joint Venture represented one of C3's core operations***. Baker Hughes is one of the world's largest companies providing oilfield services. Baker Hughes does not itself produce petroleum products but provides products and services to companies that do. The company is organized into four segments: oilfield services, oilfield equipment, turbomachinery & process solutions, and digital solutions. It has a salesforce of 12,000, with detailed industry knowledge and deep industry connections. Baker Hughes also owned more than 10% of C3 stock and Defendant Simonelli is the President, CEO and Chairman of Baker Hughes. As a control person for both C3 and Baker Hughes, Defendant Simonelli was aware of the critical role that the Joint Venture played to C3's future performance. Simonelli obtained his board seat at C3 based on Baker Hughes' substantial stock purchase and its Joint Venture Agreement with C3. As such,

Simonelli knew the nature and status of the Joint Venture Agreement was important to both Baker Hughes and to C3.

183. ***Simonelli was informed at internal meetings and had access to internal contemporaneous reports and data that contradicted his statements to investors.*** By signing and authorizing SEC filings and press releases that directed investors to the Company's website for more information about C3 and its products, Simonelli represented that he had reviewed, approved of, and authorized the statements made on the website. Because of this position of control and authority, his ability to exercise power and influence over C3's conduct and his access to material inside information about C3 during the Class Period, Simonelli, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act. Due to Simonelli's participation on the C3 Board of Directors, he had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Simonelli also attended meetings, as well as received, reviewed and had access to reports and data which undermined C3's representations to investors about the quality and size of the Joint Venture's salesforce.

184. The above paragraph supports an inference that Simonelli was aware of the status of the C3 Baker Hughes sales force.

185. The foregoing facts, particularly when considered collectively, support a strong inference of Defendants' scienter.

## XII.  NO SAFE HARBOR

186. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about C3's current and

historical financial accounting practices, financial condition, and internal controls, among other topics.

187.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding C3's financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by C3 were insufficient to insulate Defendants from liability for their materially false and misleading statements.

188.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of C3 who knew that the statement was false when made.

## XIII.   THE PRESUMPTION OF RELIANCE

189.    At all relevant times during the Class Period, the market for C3's common stock was efficient for the following reasons, among others:

(a)    C3's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, C3 filed periodic reports with the SEC and the New York Stock Exchange;

(c)    C3 regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

THIRD AMENDED CLASS ACTION COMPLAINT - 52                    Case No. 4:22-cv-01413-HSG

(d)    C3 was followed by at least 20 securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' salesforce and certain customers. Each of these reports was publicly available and entered the public market place.

190.    As a result of the foregoing, the market reasonably and promptly digested current information regarding C3 from all publicly available sources and reflected such information in the price of C3's common stock. All purchasers of C3 Class A common stock during the Class Period suffered similar injury through their purchase of C3 Class A common stock at artificially inflated prices, and a presumption of reliance applies.

191.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XIV.    CLASS ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS

192.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves, the Section 10b Subclass, and the Section 20A Subclass defined in ¶ 1 herein, namely, all persons and entities other than Defendants that purchased or otherwise acquired C3 Class A common stock (a) during the Class Period; and were damaged thereby ("Section 10b Subclass") and/or (b) contemporaneously with the Individual Defendants' sales during the Class Period (the "20A Subclass"). Excluded from the Section 10b Subclass and the Section 20A Subclass are Defendants, the officers and directors of C3 and Baker Hughes, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from this Class are all option trades and transactions to cover short sales persons that were net short-sellers and option purchasers of Class A common stock.

193.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, C3 securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only

through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by C3 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

195.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

196.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Registration Statement for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of C3;

- whether the Individual Defendants negligently prepared the Registration Statement for the IPO and, as a result, the Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- Whether the Individual Defendants caused C3 to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of C3 securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

197.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

THIRD AMENDED CLASS ACTION COMPLAINT - 54                    Case No. 4:22-cv-01413-HSG

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

198. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- C3 securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold C3 securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

199. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

200. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XV.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT III
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants C3.ai, Siebel, and Simonelli**

201. Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein.

202. This Count is asserted against C3.ai, Siebel and Simonelli ("10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

203. During the Class Period, the 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of C3 securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire C3 Class A Common Stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

204. Pursuant to the above plan, scheme, and course of conduct, each of the 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for C3 Class A Common Stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about C3's finances and business prospects.

205. By virtue of their positions at C3, the 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made although such facts were readily available to the Exchange Act Defendants. Said acts and omissions

THIRD AMENDED CLASS ACTION COMPLAINT - 56                    Case No. 4:22-cv-01413-HSG

of the 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the 10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

206. The 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of C3. As officers and/or directors of a publicly held company, the 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to C3's businesses, operations, future financial condition and future prospects.

207. By reason of the conduct alleged herein, the 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

208. This action was filed within five years of each Class member's purchase of C3 Class A common stock and within two years of the discovery of Defendants' false and misleading statements. It is therefore timely.

**COUNT IV**
**Violations of Section 20(a) of the Exchange Act Against**
**Defendants Siebel, Abbo, Barter, Simonelli and Baker Hughes**

209. Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs as if fully set forth herein.

210. During the Class Period, the Control Person Defendants participated in the operation and management of C3, and conducted and participated, directly and indirectly, in the conduct of C3's business affairs. Because of their senior positions, they knew the adverse non-public information about C3's misstatement of income and expenses and false financial statements.

211. As officers, directors, and controlling shareholders of a publicly owned company, the Control Person Defendants had a duty to disseminate accurate and truthful information with respect to C3's financial condition and results of operations, and to correct promptly any public statements issued by C3 which had become materially false or misleading.

212.    Because of their positions of control and authority as senior officers, the Control Person Defendants were able to, and did, control the contents of the various reports, press releases and public filings which C3 disseminated in the marketplace during the Class Period concerning C3's results of operations. Throughout the Class Period, the Control Person Defendants exercised their power and authority to cause C3 to engage in the wrongful acts complained of herein. The Control Person Defendants, therefore, were "controlling persons" of C3 within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of C3 securities.

213.    Each of the Control Person Defendants, therefore, acted as a controlling person of C3. By reason of their senior management positions and/or being directors of C3, each of the Control Person Defendants had the power to direct the actions of, and exercised the same to cause, C3 to engage in the unlawful acts and conduct complained of herein. Each of the Control Person Defendants exercised control over the general operations of C3 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

214.    By reason of the above conduct, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by C3.

215.    This action was filed within five years of each Class member's purchase of C3 Class A common stock and within two years of the discovery of Defendants' false and misleading statements. It is therefore timely.

**COUNT V**
**Violations of Section 20A of the Exchange Act**
**Against Defendants Siebel, Abbo, Barter, Simonelli, and Baker Hughes**

216.    Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein.

217.    This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t(a) on behalf of Lead Plaintiff, Plaintiff Linder and all other members of a subclass (the "Subclass") of those who purchased shares of C3 common stock contemporaneously with the sales of C3 common stock by Defendants Siebel, Abbo, Barter, Simonelli and Baker Hughes (collectively,

THIRD AMENDED CLASS ACTION COMPLAINT - 58                    Case No. 4:22-cv-01413-HSG

the "Section 20A Defendants") on or about the dates set forth about in Section VIII.B. As previously detailed above, at the time of such sales, the Section 20A Defendants were in possession of material, nonpublic information as alleged herein concerning the truth about C3's access to the Baker Hughes salesforce (the "material inside information").

218.    As set forth in the sworn certification previously filed in this action, Plaintiffs purchased C3 Class A common stock on the dates and for the prices indicated, and thus traded contemporaneously with the previously referenced trades in C3 shares made the dates set forth in their previously filed certifications by the Section 20A Defendants.

219.    Section 20A of the Exchange Act provides that:

> Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable … to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

220.    As set forth herein, and for the reasons stated in Counts I through III above, the Section 20A Defendants violated Exchange Act Section 10(b), SEC Rule 10b-5 promulgated thereunder, and Exchange Act Section 20(a).

221.    Additionally, the Section 20A Defendants violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling, on or about March 8, 2021, shares of C3 Class A common stock that they owned, either directly, indirectly or beneficially, while in possession of material, nonpublic adverse information concerning C3's true business and financial condition, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

222.    Defendants Siebel and Simonelli, by virtue of their positions as directors of C3, owed a fiduciary to C3 shareholders to not trade on, or to cause or permit entities that they controlled (including Baker Hughes) to trade on, undisclosed, non-public information. Defendant Simonelli also benefitted, either directly or indirectly, from the ill-gotten profits obtained by Baker Hughes in connection those entities' use of material inside information.

223.    Contemporaneously with the Section 20A Defendants' insider sales of C3 Class A common stock, the Plaintiffs purchased shares of C3 Class A common stock on a national securities exchange and in an open and efficient market, while the Section 20A Defendants were in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning C3's true business and financial condition.

224.    The Plaintiffs have been damaged as a result of the violations of the Exchange Act alleged herein.

225.    By reason of the violations of the Exchange Act alleged herein, the Section 20A Defendants are liable to the Plaintiffs and other members of the Subclass who purchased shares of C3 Class A common stock contemporaneously with the Section 20A Defendants' sales of C3 Class A common stock.

226.    Plaintiffs and the other members of the Subclass, who purchased contemporaneously with the Section 20A Defendants' insider sales of C3 Class A common stock, seek disgorgement by the Section 20A Defendants of profits gained or losses avoided from the Section 20A Defendants' transactions in C3 Class A common stock contemporaneous with the Section 20A Plaintiffs and other members of the Subclass.

227.    In addition, Defendant Simonelli is liable for Baker Hughes's violations of Section 20A as alleged herein as controlling persons of Baker Hughes, as provided under subsection (b)(3) of Section 20A.

228.    Plaintiffs and the other members of the Subclass have been damaged as a result of the violations of the Exchange Act alleged herein.

229.    This action was brought within five years after the date of the last transaction that is the subject of the 20A Defendants violation of Section 20A.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

THIRD AMENDED CLASS ACTION COMPLAINT - 60                    Case No. 4:22-cv-01413-HSG

A.      Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein and certifying Plaintiffs as Class representatives;

B.      Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class, their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED: February 14, 2025            Respectfully submitted,

                                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                    By:      */s/ Reed R. Kathrein*
                                             REED R. KATHREIN

                                    Reed R. Kathrein (139304)
                                    Lucas E. Gilmore (250893)
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                    715 Hearst Avenue, Suite 300
                                    Berkeley, CA 94710
                                    Telephone: (510) 725-3000
                                    Facsimile: (510) 725-3001
                                    reed@hbsslaw.com
                                    lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
THE ROSEN LAW FIRM, P.A.
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile:  (213) 226-4684
lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice* application forthcoming)
THE ROSEN LAW FIRM, P.A.
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
jstern@rosenlegal.com

*Counsel for Additional Plaintiffs Sharon L.*
*Zavalanski, David Linder, and Elizabeth Wensel*