Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for*
*Lead Plaintiff Mark Samarghandi*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE RECKSTIN FAMILY TRUST, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>C3.AI, INC., *et al.*,<br><br>Defendants. | No. 4:22-cv-01413-HSG<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2, 4th Floor<br>Hearing Date: June 26, 2025<br>Hearing Time: 2:00 p.m. |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ..................................................................................... 4

      A.    This Court sustained Plaintiffs' Securities Act claims regarding
            Statement #3. ............................................................................................. 4

      B.    This Court also held that Plaintiffs properly pled falsity for several
            statements attributed to the Section 10(b) Defendants. ............................. 5

      C.    Plaintiffs have alleged more facts to remedy the scienter concerns
            raised by the Court in the February Order. ............................................... 6

      D.    Plaintiffs also supplement the TAC with additional facts regarding
            the JVA amendments, Defendant Abbo's control of C3, and loss
            causation. ................................................................................................... 8

      E.    As recently as May 2023, Defendant Siebel continued to make the
            same misleading statements at issue. ......................................................... 8

      F.    Plaintiffs have uncovered more evidence of Defendants'
            contemporaneous trading that was previously found to be
            insufficeint. ............................................................................................... 9

      G.    Additional Procedural History .................................................................. 9

III.  PLAINTIFFS' SECURITIES ACT CLAIMS NEED NOT BE
      DISTURBED ....................................................................................................... 10

      A.    This Court previously concluded that Plaintiffs alleged falsity as to
            Statement #3. ............................................................................................. 10

            1.    Defendants provide nothing new to justify the Court's
                  reconsideration of Statement #3. ................................................... 11

      B.    Defendants fail to meet the "heavy" burden required to establish
            negative causation. .................................................................................... 13

      C.    The Securities Act claims against Defendants are timely filed. ............... 14

IV.   PLAINTIFFS' EXCHANGE ACT CLAIMS ARE PROPERLY PLED .......................... 15

      A.    The Court need not reconisder its previous finding of falsity under
            the Exchange Act. ...................................................................................... 15

      B.    The TAC effectively remedies the Court's previous concerns over
            scienter. ...................................................................................................... 16

            1.    Plainitffs' allegations that Defendant Siebel received direct
                  notice of C3's limited access to Baker Hughes' salesforce
                  support a strong inference of scienter. ........................................... 18

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – i                          Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

2.  Plaintiffs' circumstantial allegations of scienter, in combination with their direct notice allegations, raise a strong inference of scienter. ........................................................... 23

3.  New facts in the TAC provide even more support for Plaintiffs' core operations theory. ........................................... 25

4.  Plaintiffs' additional allegations regarding Defendant Siebel's stock sales remedy the Court's previous concerns over motive. ..................................................................................... 27

5.  Defendants' nonculpable explanation is not as compelling as Plaintiffs' specific showing of scienter. .................................. 29

6.  Scienter for Defendant Simonelli. .............................................. 30

C.  Plaintiffs have already met their burden regarding loss causation. ...................... 31

D.  Plaintiffs' Section 20A claims may continue. ....................................................... 35

V.  PLAINTIFFS HAVE ESTABLISHED CONTROL PERSON LIABILITY. .................. 37

A.  The Complaint properly pleads Section 20(a) claims for Defendants Siebel, Barter, and Simonelli. ................................................... 37

B.  The TAC adequately alleges Baker Hughes' control. ........................................... 40

C.  The Complaint alleges Simonelli's Control. ......................................................... 42

VI.  PLAINTIFFS' OPPOSITION TO THE C3 DEFENDANTS' REQUEST FOR JUDICIAL NOTICE ...................................................................... 43

A.  The Court should apply the same reasoning and limitations as it did in the February Order when taking judicial notice of Defendants' Exhibits B, C, and E. ................................................................ 43

B.  The Court should deny the C3 Defendants' Request for Judicial Notice of Defendants' Exhibits D and F for the same reasons it denied other post-Class-Period documents. ............................................ 44

VII.  CONCLUSION ....................................................................................................... 45

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................................................................. 25

*Al-Thani v. Wells Fargo & Co.*,
   2009 WL 55442 (N.D. Cal. Jan. 7, 2009) ....................................................... 38, 39

*In re Am. Apparel, Inc. S'holder Litig.*,
   2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) .................................................... 40

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) .................................................... 25

*In re Apollo Grp., Inc. Sec. Litig.*,
   2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ...................................................... 20

*In re Aqua Metals, Inc. Sec. Litig.*,
   2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ................................................... 38

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................. 33

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................................. 38

*Bao v. SolarCity Corp.*,
   2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ...................................................... 39, 40

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .......................................................................... 22, 25

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ................................................ 38, 42

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ....................................................... 14

*Buban v. O'Brien*,
   1994 WL 324093 (N.D. Cal. June 22, 1994) .................................................... 35

*In re Cell Therapeutics, Inc. Class Action Litig.*,
   2011 WL 444676 (W.D. Wash. Feb. 4, 2011) ................................................... 35

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ............................................................. 33

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) ........................................................................... 31, 33, 34, 41

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ......................................................................... 29

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...................................................................................... 21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..................................................................... 27

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ............................................................ 20

*In re Connetics Corp. Sec. Litig.*,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ............................................................ 35

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ....................................................................... 20

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..................................................................... 27

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................. 35, 37

*Curry v. Yelp Inc.*,
2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ............................................................ 16

*In re Cypress Semiconductor Sec. Litig.*,
836 F. Supp. 711 (N.D. Cal. 1993) ............................................................................ 35

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................................................. 31

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024) ...................................................................................... 11

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................. 19, 20, 36

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ............................................................ 28

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) .............................................................................. 11, 12, 44

*In re Gap Stores Sec. Litig.*,
457 F. Supp. 1135 (N.D. Cal. 1978) .......................................................................... 39

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – iv                         Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

*Garbini v. Protection One, Inc.*,
49 F. App'x 169 (9th Cir. 2002) ....................................................................................... 13

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) .................................................................................... 16, 17

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................................... 31

*Glen Holly Entm't., Inc. v. Tektronix, Inc.*,
100 F. Supp. 2d 1086 (C.D. Cal. 1999) ........................................................................... 16

*Golden v. Google LLC*,
2023 WL 5154513 (N.D. Cal. Aug. 10, 2023) ............................................................ 13, 44

*Golub v. Gigamon Inc.*,
372 F. Supp. 3d 1033 (N.D. Cal. 2019) ........................................................................... 41

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) .................................................................. 29

*Hessefort v. Super Micro Computer, Inc.*,
2021 WL 1169906 (N.D. Cal. Mar. 29, 2021) .................................................................. 39

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ........................................................................................... 13

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ......................................................................................... 41

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .............................................................................. 41

*In re Intuitive Surgical Sec. Litig.*,
2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ................................................................. 20

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................................... 28

*Johns v. Bayer Corp.*,
2010 WL 2573493 (S.D. Cal. June 24, 2010) .................................................................. 19

*Kasilingam v. Tilray, Inc.*,
2024 WL 4350118 (S.D.N.Y. Sept. 30, 2024) ................................................................. 28

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................... 12, 36, 43

*Kuehbeck v. Genesis Microchip Inc.*,
2005 WL 1787426 (N.D. Cal. July 27, 2005) .................................................................. 23

*Kuzmenko v. Lynch,*
  606 F. App'x 399 (9th Cir. 2015) ............................................................................ 45

*Kyung Cho v. UCBH Holdings, Inc.,*
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) .................................................................. 20

*Lamartina v. VMware, Inc.,*
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ........................................................ 37

*Lipton v. Pathogenesis Corp.,*
  284 F.3d 1027 (9th Cir. 2002) ................................................................................. 23

*Maine State Ret. Sys. v. Countrywide Fin. Corp.,*
  2011 WL 4389689 (C.D. Cal. May 5, 2011) ........................................................... 19

*In re MannKind Securities Actions,*
  835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................................... 38

*May v. KushCo Holdings, Inc.,*
  2020 WL 6587533 (C.D. Cal. Sept. 25, 2020) ........................................................ 23

*Metzler Inv. GmbH v. Corinthian Colls., Inc.,*
  540 F.3d 1049 (9th Cir. 2008) ................................................................................. 31

*Middlesex Ret. Sys. v. Quest Software Inc.,*
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................. 29, 35

*Mineworkers' Pension Scheme v. First Solar Inc.,*
  881 F.3d 750 (9th Cir. 2018) ................................................................................... 33

*Mulderrig v. Amyris, Inc.,*
  492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................... 21

*Murphy v. Precision Castparts Corp.,*
  2020 WL 4040827 (D. Or. July 17, 2020) .............................................................. 42

*In re Nektar Therapeutics,*
  2020 WL 3962004 (N.D. Cal. July 13, 2020) ......................................................... 28

*In re Network Assocs., Inc., Sec. Litig.,*
  2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ....................................................... 17

*No. 84 Emp.-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) ................................................................................... 17

*In re Novatel Wireless Sec Litig.,*
  2010 WL 11470156 (S.D. Cal. May 12, 2010) ....................................................... 35

*In re Novatel Wireless Sec. Litig.,*
  830 F. Supp. 2d 996 (S.D. Cal. 2011) ............................................................... 31, 35

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)..................................................................................................27

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013)..................................................................................................34

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010)....................................................................................................17

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997)....................................................................................................16

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ...........................................................................35

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020)..........................................................................12

*Plevy v. Haggerty*,
   38 F. Supp. 2d 816 (C.D. Cal. 1998)........................................................................................16

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
   2023 WL 4418886 (N.D. Cal. May 24, 2023) .........................................................................19

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)..................................................................................................24

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton
   Interactive, Inc.*,
   665 F. Supp. 3d 522 (S.D.N.Y. 2023).......................................................................................44

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)....................................................................................................22

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..............................................................................36, 37

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   742 F. Supp. 3d 1003 (N.D. Cal. 2024) ...................................................................................21

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011)..................................................................................................41

*Sgarlata v. PayPal Holdings, Inc.*,
   2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) .........................................................................12

*In re Shoretel, Inc., Sec. Litig.*,
   2009 WL 2588881 (N.D. Cal. Aug. 19, 2009)..........................................................................14

*In re Silicon Graphics, Inc. Sec. Litig.*,
  970 F. Supp. 746 (N.D. Cal. 1997) ....................................................................................... 35

*In re Silver Lake Grp., LLC Sec. Litig.*,
  108 F.4th 1178 (9th Cir. 2024) ............................................................................................. 35

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................. 17, 18, 24, 25

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ................................................................ 40, 42

*In re Stratosphere Corp. Sec. Litig.*,
  1 F. Supp. 2d 1096 (D. Nev. 1998) ........................................................................................ 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................................................. 17, 24, 27

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................................... 33, 35, 40

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020) .................................................................................... 28

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................... 40

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ............................................................................... 17, 20, 26

*In re Veritas Software Corp. Sec. Litig.*,
  2003 WL 27386177 (N.D. Cal. Dec. 10, 2003) ...................................................................... 13

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................................ 10

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .................................................................................................. 20

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) .................................................................................. 30

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .................................................................................................. 13

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
  65 F.4th 459 (9th Cir. 2023) .................................................................................................. 14

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – viii                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

**STATUTES**

15 U.S.C. § 77m ............................................................................................................... 14

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................... 10

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b5-1(c)(1)(i) ......................................................................................... 28

17 C.F.R. § 240.10b5-1(c)(1)(i)(B) .................................................................................. 28

## GLOSSARY OF DEFINED TERMS[1]

| Term | Definition |
|---|---|
| Class Period | December 9, 2020 to December 2, 2021 (dates inclusive). |
| Complaint or "TAC" | Third Amended Class Action Complaint, filed February 14, 2024, ECF No. 198. |
| SAC | Second Amended Class Action Complaint, filed April 4, 2024, ECF No. 158. |
| CAC | Amended Class Action Complaint, filed February 15, 2023, ECF No. 71. |
| ¶ __ | Complaint, ¶ __. |
| C3 or "Company" | Defendant C3.ai. |
| Joint Venture Agreement or "JVA" | The agreement between C3 and Baker Hughes whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries.[2] |
| C3 MTD, or "Motion," or "Mot." | The C3 Defendants' Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 201. |
| BH MTD | Baker Hughes' Notice of Motion and Motion to Dismiss With Prejudice; Joinder in C3 Defendants' and Simonelli's Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, ECF No. 203. |
| Simonelli MTD | Defendant Lorenzo Simonelli's Motion to Dismiss Second Amended Class Action Complaint Pursuant to Fed R. Civ. P. 12(b)(6), ECF No. 202. |
| C3 RJN | The C3 Defendants' Request for Judicial Notice in Support of their Motion to Dismiss, ECF No. 201-1. |
| The MTD Motions | The C3 MTD (ECF No. 201); the BH MTD (ECF No. 203); and the Simonelli MTD (ECF No. 202). |

---

[1] All other capitalized terms share the same meaning as the capitalized terms in the Complaint. All emphasized terms are added, unless otherwise indicated.

[2] This Agreement is attached as Exhibit 1 to the June 30, 2023 Declaration of Reed R. Kathrein, ECF No. 120, which was judicially noticed by the Court in its February 2024 Order. Order at 9.

| Term | Definition |
|---|---|
| "Offering Materials" or "Registration Statement" | Includes both the final Prospectus, dated December 8, 2020, and the Registration Statement, dated December 7, 2020. |
| Corporate Defendants | Defendants C3 and Baker Hughes. |
| Individual Defendants | Defendants Siebel, Abbo, Barter, and Simonelli. |
| C3 Defendants | Defendants C3, Siebel, Abbo, Barter, and Simonelli. |
| Defendants | The Corporate Defendants and the Individual Defendants. |
| Section 11 Defendants | Defendants listed under Count I of the Securities Act (C3 and Individual Defendants). |
| Section 15 Defendants | Defendants listed under Count II of the Securities Act (Baker Hughes, Siebel, Abbo, Barter, and Simonelli). |
| Section 10(b) Defendants | Defendants listed under Count III of the Exchange Act (C3, Siebel, and Simonelli). |
| Section 20(a) Defendants | Defendants listed under Count IV of the Exchange Act (Baker Hughes, Siebel, Abbo, Barter, and Simonelli). |
| Section 20A Defendants | Defendants listed under Count V of the Exchange Act (Baker Hughes, Siebel, Abbo, Barter, and Simonelli). |
| RPO or "Remaining Performance Obligations" | The total future obligations customers owe to C3 under existing contracts. |
| February Order or Order | February 22, 2024 Order Granting in Part and Denying in Part the C3 Defendants' Motion to Dismiss and Granting Defendant Baker Hughes' Motion to Dismiss. ECF No. 154. |
| LTA Order | February 13, 2025 Order Granting Plaintiffs' Motion for Leave to Amend, Terminating as Moot Defendants' Motions for Joinder, and Terminating as Moot Defendants' Pending Motions to Dismiss. ECF No. 197. |

## I.   INTRODUCTION

This Court has already concluded that Plaintiffs properly alleged: (1) a claim under the 1933 Securities Act based on C3's false statement that the Company recognized revenue by April 30, 2020 through deals brought in by the Baker Hughes Joint Venture; (2) that Defendant Siebel made materially misleading statements when he expressly told the public, on eleven separate occasions, that the full 12,000-person salesforce of Baker Hughes was selling C3's products; and (3) that the revelation of the truth caused the price of C3's stock to decline. Order at 44. The Court found, however, for the purposes of the 1934 Act violation, that the only missing piece is the lack of sufficient allegations to establish a strong inference of scienter on behalf of Defendant Siebel and others. As such, here, the main dispute for this Court to resolve is whether Plaintiffs have remedied the last remaining pleading deficiency with appropriate allegations of scienter that would allow the 1934 Exchange Act claims to continue.

Plaintiffs' Third Amended Complaint squarely addresses the Court's scienter concerns by including additional allegations of direct scienter, core operations, and motive. In terms of direct scienter, the TAC now pleads that Defendants knew or should have known that C3 could not access Baker Hughes' full 12,000-person salesforce, as the size of the Baker Hughes' salesforce was discussed during at least one C3 board meeting attended by both Simonelli and Siebel, *see* ¶ 174. The TAC also pleads that Siebel, himself, signed the Joint Venture Agreement before the Class Period, which disclosed that only a minimum number, or in other words a subset, of Baker Hughes 12,000 employees are actually at C3's disposal. ¶ 171. These details are precisely the type of "specific information" about Siebel's access to information about the size of the partnership that this Court found was lacking in the CAC. Order at 32. As for core operations, Plaintiffs now plead additional facts from former employees interviewed by CNBC, who described Defendant Siebel's "intense oversight" type of management style. ¶ 173. The TAC also alleges that a strong inference of Mr. Simonelli's knowledge accrues as he only joined the C3 board **because** of the Joint Venture's execution. ¶¶ 50-53. And finally, the TAC now contains supplemental allegations regarding how Defendant Siebel's C3 stock transactions materially deviated from his typical

personal trading history. ¶ 179. These new allegations, when taken holistically along with Plaintiffs' initial allegations, are more than enough to sustain Plaintiffs' Exchange Act claims.[3]

Moreover, Defendants' motion does nothing to undercut the strong inference of scienter properly pled in the TAC. Instead, Defendants' challenges to scienter simply mischaracterize Plaintiffs' allegations and therefore easily dismissed. For example, Defendants argue that the JVA evidence is insufficient to show that Siebel knew Baker Hughes was *not* exceeding that minimum number of salespeople required by the JVA. But this turns the scienter inquiry on its head. Given that Siebel knew that Baker Hughes had only committed to a minimum number of employees, unless he had a specific reason to believe that they would exceed it, then by definition Siebel knew that only a subset of (i.e. ***not*** "all 12,000") Baker Hughes employees were selling C3 products, or he at least showed a reckless disregard for the truth. And, notably, Defendants point to no fact in the TAC or judicially noticeable documents to give any reason to think that Baker Hughes *did* exceed this minimum. Indeed, the TAC alleges that the JVA was amended to only provide for 60 train-the-trainers, and that even C3's former employees thought it was highly unlikely that the Joint Venture had access to all 12,000 Baker Hughes employees. ¶¶ 57, 98-99.

As for the board materials, Defendants do not challenge the existence of the May 25, 2021 PowerPoint presentation or claim that Plaintiffs have misstated what was written on the specific slide at issue. Defendants also do not assert that Siebel was never provided the PowerPoint slide as part of his board participation. Defendants also do not dispute that the presentation deck Plaintiffs rely on was prepared specifically for C3's May 25, 2021 board of directors meeting or claim that Defendants Siebel and Simonelli did not attend the May 25, 2021 meeting. Instead, Defendants simply speculate, while citing nothing, as to whether Siebel actually reviewed the board materials he was directly assigned as a C3 board member, while also improperly challenging Plaintiffs' reasonable interpretation of those materials. But Defendants' alternative history claiming that Defendant Siebel either did not review the PowerPoint referencing C3's biggest customer either in advance of the meeting, or that the PowerPoint was never presented would force this Court to draw

---

[3] As per the Court's instructions, Plaintiffs have summarized the initial and new scienter allegations in Appendix A to the TAC.

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 2                                   Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

competing interpretations in favor of Defendants, an inappropriate request at the motion to dismiss stage, *see* § IV.B.1, *supra*.

Apart from scienter, the rest of Defendants' Motions simply attempt to relitigate issues already decided by the Court in its previous Order. For example, Defendants make the same argument that the Court should, on a Rule 12 motion, override FE-1's statements in favor of Defendants' interpretation of SEC findings filed after the Class Period. But the Court has already rejected this approach as it would inherently require the Court to choose between "competing interpretations" or "improperly arbitrate factual issues" and thereby go against binding Ninth Circuit authority. Next, Defendants claim that the publicly filed Joint Venture Agreement put the public on notice that less than the full Baker Hughes sales force was selling C3's products. But this argument is meritless. First, unlike Defendant Siebel, investors only had access to a redacted version of the JVA that did not disclose the actual number of committed employees. So, in reality, they were especially reliant on Siebel's statements regarding the size of the JVA salesforce, which he was happy to do on at least eleven occasions. Finally, as the Court noted in deciding the prior motion, no matter what was disclosed in C3's SEC filings, Siebel's repeated claims to have the full Baker Hughes sales force selling for C3 materially changed the total mix of information available to investors.

Defendants also again contest this Court's finding that Plaintiffs had properly pled loss causation by claiming that Siebel's admission on December 1, 2021, that the Baker Hughes sales force selling C3 "sat outside" of the main Baker Hughes sales force only revealed the "structure" of the Baker Hughes sales force selling C3, and not the number of sales people. Once again, this argument fails. If the C3/Baker Hughes salespeople "sat outside" the main Baker Hughes sales force, that must mean, again, that the C3/Baker Hughes sales force was a subset of the full Baker Hughes sales force. And Defendants' negative causation argument about the Section 11 claims misses the mark because, to establish negative causation, they must show that the reasons for the decline do not "touch upon" the topic of the restatement. But both the misstatement and the subsequent decline in the price of C3 stock touch on the same subject matter—the failure of the relationship between C3 and Baker Hughes. And it is black letter law that because the Complaint

alleges primary violations and Plaintiffs traded contemporaneously with Defendants, the TAC alleges violations of Section 20A for insider trading.

Finally, for similar reasons, Baker Hughes' and Simonelli's MTD motions also fail. Baker Hughes argues that the statute of limitations has run on Plaintiffs' Securities Act claims, but it fails to show that Plaintiffs could have discovered their violation within a year before filing the complaint through reasonable due diligence. Baker Hughes also argues that the Complaint fails to allege that Baker Hughes was a control person regarding C3, but disregards the ample case law showing that large shareholders can be control people. Likewise, Simonelli's motion ignores this Court's previous finding that, among other things, his finance-specific role on C3's board of directors, as well as his signature on the Registration Statement, demonstrate that Simonelli is a control person. The Complaint also establishes a strong inference of scienter as to Simonelli through the new allegations regarding the contents of the Joint Venture Agreement and the May 25, 2021 board meeting, which Simonelli attended.

Defendants' Motions should be dismissed in their entirety and the Court should allow Plaintiffs' 1933 Act and 1934 Act claims to continue.

## II.    STATEMENT OF FACTS

The Court is well acquainted with the facts of this case. *See* Order at 2-4. Plaintiffs thus present herein the holdings reflected in this Court's February 22, 2024 Order, as well as selected facts especially pertinent to the issues raised by the most recent MTD Motions.[4]

**A.    This Court sustained Plaintiffs' Securities Act claims regarding Statement #3.**

The TAC alleges that Statement #3 is a false and misleading statement regarding C3's financial performance. Statement #3 is an excerpt of the Company's Registration Statement that states: "*[d]uring the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement*." ¶ 66. Plaintiffs allege that this Statement is false and

---

[4] However, should the Court require additional facts, Plaintiffs incorporate by reference the facts included in Plaintiffs' omnibus oppositions to Defendants' motions to dismiss. ECF No. 119 at 5-11; ECF No. 176 at 3-8.

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 4                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

misleading because, according to statements attributed to FE-1—a former Vice President of C3 who reported directly to Defendant Siebel—Baker Hughes had, in fact, brought in **no** deals through the Joint Venture reseller arrangement by April 30, 2020. ¶¶ 41, 56, 174. More specifically, the TAC recounts how FE-1 attended weekly calls where new sales leads were discussed and that, during the March 2020 to May 2020 period, he or she heard "the General Manager [of the Oil & Gas segment] regularly report that the Baker Hughes pipeline was non-existent, and that it made no sales as of April 30, 2020." *Id.* ¶ 56. FE-1 also stated that Defendant Siebel attended these calls on a regular basis and was present when the General Manager stated that there were no sales attributed to the Baker Hughes pipeline. ¶¶ 41,56, 174. Previously, this Court found that FE-1's statements were sufficiently particularized and did not necessarily contradict C3's post-Class-Period SEC filings. Accordingly, this Court denied the C3 Defendants' motion to dismiss Section 11 claims regarding Statement #3. Order at 44.

**B.      This Court also held that Plaintiffs properly pled falsity for several statements attributed to the Section 10(b) Defendants.**

This Court also held in its February 2024 Order that Plaintiffs had properly pled falsity for *eleven statements* regarding C3's access to Baker Hughes' 12,000-person salesforce. Order at 26-29. In so doing, this Court previously considered, and ultimately rejected, the C3 Defendants' claims that these statements were puffery (*id.* at 26-28), did not change the mix of information (*id.* at 28), or were immaterial (*id.* at 28-29). For the Court's reference, excerpts of these false statements[5] are listed below and adopt the same numbering and terminology used by this Court in the February Order:

- Statement #4: "***Baker Hughes has 12,000 people selling for us*** around the world into virtually every oil and gas company on the planet[.]" ¶ 105.

- Statement #5: "***in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry.*** Come on, for a company like us to get 12,000 people." ¶ 107.

---

[5] The entire text of false statements can be found either at the paragraph of the Complaint identified with each bullet point or in Appendix A to the TAC. ECF No. 198-1.

- Statement #6: "So we've aligned in oil and gas with Baker Hughes … *that gives us access to 12,000 people now selling with us … 12,000 salespeople is a lot of sales capacity*." ¶ 109.

- Statement #8: "*And now with Baker Hughes, we have 12,000 salespeople selling for us around the world* into every oil and gas company on the planet[.]" ¶ 111.

- Statement #9: "[W]e go to market with Baker Hughes. *That gives us 12,000 people selling for us and allows us to walk immediately into the board room of Aramco.* It would take us 10 years to get to the more – [board] room of Aramco, okay, but for Baker Hughes." ¶ 113.

- Statement #10: "I would say the second most mature partnership that we have Baker Hughes, I think we're seven quarters into that *and now we have 12,000 people selling for us at Baker Hughes*." ¶ 115.

- Statement #11: "I was thinking about our partnership with Baker Hughes and oil and gas, *we have 12,000 people selling C3 for us all around the world every day, 12,000 people*." ¶ 117.

- Statement #13: "*And Baker Hughes as 12,000 people selling with us around the world in oil and gas market*[.] " ¶ 119.

- Statement: #15: "So we have go-to-market motion with them at virtually every major order of *12,000 people working with us in all divisions of Baker Hughes*[.]" ¶ 121.

- Statement #16: "I mean, we're 700 people [at C3]. *I have 12,000 people selling for me at Baker Hughes into oil and gas*." ¶ 123.

- Statement #17: "*Baker Hughes is of course one of the largest oil and gas service providers and they have 12,000 people selling with us around the world every day* …." ¶ 126.

**C.  Plaintiffs have alleged more facts to remedy the scienter concerns raised by the Court in the February Order.**

In the Order, the Court explained that it ultimately denied Plaintiffs' Exchange Act claims as the then-pled allegations did not support a strong inference of scienter. Order at 43. In response,

the TAC now includes several pieces of information to supplement Plaintiffs' scienter allegations. ¶¶ 171-181.

For example, as to direct scienter, the TAC shows that Defendants Simonelli and Siebel were present during at least one C3 board meeting where the size of Baker Hughes' salesforce was discussed, and the document presented at that meeting put Siebel on notice that C3 lacked access to the full 12,000-person Baker Hughes salesforce. A detailed PowerPoint presentation was presented to the C3 board and one of the topics covered in the presentation was "Sale Objectives" for the Oil and Gas division. Under that topic, one of the defined objectives of C3 was "Drive BH [Baker Hughes] to onboard 10 qualified sales executives in direct quota carrying roles by July 31." ¶ 174. Defendants Simonelli and Siebel, aware of their fiduciary obligations to C3 as board members, would have reviewed the preparation materials prior to the meeting and/or reviewed materials that were presented at the meeting, or were reckless in not having done so. Common sense also dictates that if C3 already had access to the full Baker Hughes salesforce, the onboarding of ten salespeople would not rise to the level where the C3 board of Directors needed to be informed.

The TAC further alleges that months before the Class Period, Siebel signed a Joint Venture Agreement with Baker Hughes that identified the actual number of Baker Hughes employees committed to the Joint Venture. ¶¶ 96, 171. C3 redacted the specific numbers, however, in the version filed publicly. *Id.*

The publicly filed agreement signed by Defendant Siebel stated:

> BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3.

¶¶ 96, 171 (redactions in original).

As for core operations theory, the TAC now includes statements from former employees who told CNBC that Siebel provided "intense oversight" at C3. ¶ 172. And finally, the TAC supplements its motive facts to establish the suspicious nature of Defendant Siebel's stock selling patterns. For example, the TAC now shows the percentage of C3 shares that Defendant Siebel sold (59.61%) before he revealed the truth to investors. ¶¶ 21, 179. The TAC also provides more

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 7                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

information showing these transactions contradicted his trading history for two reasons: (1) Siebel had not sold stock in any company in which he was required to file an SEC Form 4 since 2005 and (2) Siebel has not sold in C3 stock since the Class Period. ¶ 179.

D.    **Plaintiffs also supplement the TAC with additional facts regarding the JVA amendments, Defendant Abbo's control of C3, and loss causation.**

The TAC also alleges that the Joint Venture Agreement was amended four times, and that with each amendment, Baker Hughes' annual commitments were materially downgraded and the deadlines for the Joint Venture to reach peak annual revenue were repeatedly extended. ¶ 97. Through the third amendment, the parties secretly eliminated a minimum FTE requirement and only required that C3 provide "train-the-trainer services for up to 60 salespeople a year." ¶ 99. The TAC also alleges that C3 added only eight customers in a recent quarter. ¶ 57.

The Complaint also adds further facts about the senior and supervisory day-to-day responsibilities of C3's President and Chief Technology Officer, Defendant Ed Abbo, including his participation in a key C3 patent, which all support the conclusion that Abbo controls C3 and is derivatively liable for its violations of the securities laws. ¶¶ 36, 39.

As for loss causation, the SAC now states that C3 revealed that, for the nine months ended January 31, 2021, the Company recognized total revenue of $21.6 million (less than half of the $53.3 million minimum revenue requirement for the fiscal year ending April 30, 2021) and that, for the three months ended July 31, 2021, the Company recognized total revenue of $16.1 million related to its Joint Venture with Baker Hughes, less than one quarter of the $75 million minimum revenue requirement. ¶ 152.

E.    **As recently as May 2023, Defendant Siebel continued to make the same misleading statements at issue.**

On June 2, 2023, CNBC released an exposé on C3 entitled "Billionaire Tom Siebel faces tumult at C3.ai as investor lawsuit, short sellers questions metrics."[6] ¶ 57. CNBC's article quotes individuals who worked for Baker Hughes during the Class Period and who stated that C3's products were "difficult to learn." *Id.* Additionally, the CNBC exposé revealed that the 12,000 total

_____

[6] CNBC's article, which includes an interview with Defendant Siebel, was published in June 2023, more than a year after this lawsuit was first filed in March 2022.

salespeople at the company "are not all trained and qualified to sell the C3.ai product" and that "employees were not allowed to sell it without going through a rigorous approval process." *Id.* As a result, the Baker Hughes former employees "had no idea how the [Joint Venture] could certify 12,000 people," as Siebel repeatedly claimed. *Id.* The article also states that "many of the 30 former C3.ai employees who spoke with CNBC said that the company has had a difficult time attracting new customers and that those that have come in the door originated from Siebel's relationships." *Id.* The former employees also revealed Defendant Siebel's "intense oversight" of C3 activities. ¶ 172.

CNBC interviewed Defendant Siebel as part of its exposé. ***During the interview, not only did Seibel confirm, again, that he has repeatedly touted C3's access to <u>all</u> of Baker Hughes' 12,000-person salesforce, but that C3 still had such access***. ¶ 58. Yet, both Siebel and the corporate representative from Baker Hughes refused to identify how many Baker Hughes sales personnel were trained to sell C3 products, or how many are actively doing so. ¶ 59.

**F.     Plaintiffs have uncovered more evidence of Defendants' contemporaneous trading that was previously found to be insufficeint.**

The TAC also provides more information showing that the trading activity of Plaintiffs and Defendants occurred contemporaneously. ¶ 132. This evidence further supports Plaintiffs' allegation that the individual Defendants and Baker Hughes engaged in unlawful insider trading in violation of Section 20A of the Exchange Act.

**G.     Additional Procedural History**

The Court granted Plaintiffs' motion for leave to file a Third Amended Class Action Complaint. Motion for Leave to Amend, ECF No. 197. In accordance with the Court's instructions, Plaintiffs filed their Third Amended Class Action Complaint on February 14, 2025, to cure the deficiencies the Court identified in the previous complaint. ECF No. 198. Plaintiffs also filed a statement-by-statement chart with the information identified in 15 U.S.C. § 78u-4(b)(1) and (2), which was included as Appendix A to the TAC. ECF No. 198-1. Defendants filed their MTD Motions on March 25, 2025. ECF No. 201 (C3 Defendants), ECF No. 202 (Defendant Simonelli), ECF No. 203 (Defendant Baker Hughes).

## III.    PLAINTIFFS' SECURITIES ACT CLAIMS NEED NOT BE DISTURBED

### A.    This Court previously concluded that Plaintiffs alleged falsity as to Statement #3.

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The TAC does exactly that.

The Complaint alleges that C3's Offering Materials created the misimpression that C3's offerings were in high demand since Baker Hughes had brought in sales from which C3 would recognize revenue: "***during the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement***." ¶ 66 (referred to by the Court as Statement #3). Plaintiffs explained that Statement #3 was misleading because, as FE-1 described, on weekly sales calls attended by sales VPs from each industry segment, the General Manager of the Oil and Gas segment regularly reported that Baker Hughes had no sales pipeline and had made *no* sales as of April 30, 2020. ¶ 56. The Complaint also alleges that this internal disclosure directly contradicts the Registration Statement's claim that during the fiscal year ended April 30, 2020, C3 recognized revenue from deals brought in by Baker Hughes.

In the first round of motion to dismiss briefing, Defendants claimed that FE-1 statements were unreliable hearsay because they were "contrary to unchallenged disclosures in the Registration Statement and other disclosures." ECF No. 105 at 13. This Court rejected C3's argument for two reasons. First, it noted that the Court "does not assume the truth of any of the facts asserted" in judicially noticeable SEC filings. Order at 7. Second, even if the Court considered the accuracy of the financial figures created after the close of the class period, it also found that the judicially noticed documents identified by Defendants did not "contradict FE-1's allegations concerning the lack of deals closed." *Id.* Instead, the Court held that FE-1 statements were sufficiently

particularized and that Statement #3 was adequately pled. Order at 19. The Court then denied Defendants' motion to dismiss Plaintiffs' claims regarding Statement #3. *Id.*

Despite this Court's clear reasoning and findings, Defendants nevertheless recycle, again, the same arguments, but without anything new for this Court to consider. As such, there is no need for the Court to (again) revisit its previous holdings.

### 1. Defendants provide nothing new[7] to justify the Court's reconsideration of Statement #3.

Defendants claim that the Court should reconsider its decision denying Defendants' motion to dismiss as to Statement #3 because of the Ninth Circuit's decision in *Espy,* and because of the "undisputed[] … financial statements in C3's 2022 Form 10-K." Mot. at 9-10. Defendants are wrong for two reasons.

First, Defendants' claim that the recent decision in *Espy v. J2 Global, Inc.*, 99 F.4th 527, 537 (9th Cir. 2024), somehow overturned the Court's previous application of the law is meritless because the facts of *Espy* are clearly distinguishable from those here. The plaintiffs in *Espy* sought to have the court rely on former employees' *opinions* of the defendant corporation's management practices, which the court declined to do. Here the Complaint simply recounts the *facts* of what FE-1 heard at a meeting. Moreover, while the Court in *Espy* noted that the former employee's description of a meeting came closest to alleging scienter, it was unclear "whether those statements come from general knowledge, gossip, or the meeting where [the confidential witness] was present." *Id.* Here, however, the Complaint directly alleges that FE-1 was present at the relevant meeting and directly recounts what FE-1 heard at that meeting. ¶¶ 56, 174. FE-1 also states that Defendant Siebel was present for this same meeting. Nor can Defendants suggest otherwise. So *Espy* is of no use here.

---

[7] Defendants already highlighted the figures on page 126 of the 2022 10-K, along with the Registration Statement, when they first made their (failed) hearsay argument in the original round of briefing. Compare ECF No. 105 at 12, n.7, to Mot. at 9. Likewise, Defendants also previously relied on *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023). ECF No. 138 at 2. So Defendants are not providing anything new for the Court to consider this time around.

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 11                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

Second, Defendants' argument is premised on this Court resolving a factual dispute between a confidential witness and Defendants' interpretation of certain governmental filings. Mot. at 8-9. Only now Defendants wish to emphasize a filing that was created six months *after* the close of the class period (and three months after the start of this litigation). But this Court has already denied judicial notice for documents that postdate the class period as they "cannot provide insight into what the market knew at the time [of the class period]." Order at 9-10. And for documents where the Court granted judicial notice, it expressly limited the grant so as not to "endorse either of the competing inferences" or "resolve any factual dispute between the parties as to the substantive truth or falsity of their contents." Order at 7, n.7.

Indeed, the limitations imposed by this Court in its holdings reflect much precedent about the nature and contours of the judicial notice doctrine in this Circuit. Courts in the northern district regularly hold that while government filings such as 10-Ks are judicially noticeable, it is only to establish that the filing exists and says what it says, not for the truth of the factual assertions in the 10-K: "[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. … But a court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *5 (N.D. Cal. July 21, 2020) (taking judicial notice of SEC filings "for the sole purpose of determining what representations [defendant] made to the market" but not "the truth of any facts asserted in these documents"); *Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *6 (N.D. Cal. Dec. 13, 2018) (taking judicial notice of press releases incorporated by reference for the fact that press releases were issued and informed the public of the information contained, but not for their truth).

Nor are Defendants' cited cases to the contrary. In *Finjan*, the court stated in *dicta* that "[w]hen a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling." *In re Finjan*, 58 F.4th at 1052 n.1. But the *Finjan* court also clarified that "if specific facts alleged in the complaint contradict specific facts related in a non-legally-

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 12                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, ***the conflict is resolved in the plaintiff's favor***." *Id.* (emphasis added). So even Defendants' reliance on *Finjan* cannot justify a departure from the Court's previous findings. Additionally, the Court's holding in *Golden v. Google LLC*, 2023 WL 5154513, at \*2 (N.D. Cal. Aug. 10, 2023), does not apply. In *Golden,* this Court noted that "[t]he Court also need not accept as true allegations that contradict matter properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint." *Id.* But here, this Court has held that: (1) it will not judicially notice C3's SEC filings for the truth of the factual assertions therein and (2) that FE-1's statements do not necessarily contradict those documents. Thus, the circumstances of this case are distinguishable from the facts alleged by the *pro se* plaintiff in *Golden*. Defendants also cite *Veritas* for the proposition that "the Court may disregard factual allegations if such allegations are contradicted by the facts established by reference to exhibits attached to the complaint." *In re Veritas Software Corp. Sec. Litig.*, 2003 WL 27386177, at \*3 (N.D. Cal. Dec. 10, 2003). But, yet again, Defendants' argument disregards the Court's holding that it "does not assume the truth of any of the facts asserted" in judicially noticeable SEC filings. Order at 7.

For the above reasons, the Court need not reconsider its denial of Defendants' motion to dismiss the Section 11 claim as it pertains to Statement #3.

**B.      Defendants fail to meet the "heavy" burden required to establish negative causation.**

Defendants also contend that dismissal of Plaintiffs' Section 11 claim is justified due to negative causation. Mot at 10. But Ninth Circuit precedent holds that a negative causation defense fails where "the misrepresentation ***touches upon*** the ***reasons*** for an investment's decline in value." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 861 (9th Cir. 2013) (emphasis added); *see also Garbini v. Protection One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994). Moreover, according to the Ninth Circuit, proving the affirmative defense at any stage is a "heavy" burden because it arises out of "Congress' desire to allocate to the defendants the risk of uncertainty in [Section 11] cases." *In re Worlds of Wonder*, 35 F.3d at 1423 (citation omitted).

Here, the TAC pleads that the misrepresentation pertains to the failure of the C3/Baker Hughes partnership to generate sales. ¶¶ 66-67. The corrective disclosure, which discusses the restructuring of that partnership because of poor sales (¶ 158), clearly touches on the topic of the misrepresentation and therefore defeats any claim of negative causation. And Defendants' cases do not show otherwise. For example, Defendants' reliance on *Ambow* is misplaced as the court in that case found that the alleged corrective disclosures "do not reasonably reveal *anything* about the purported misrepresentations alleged in the SCAC." *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *15 (C.D. Cal. Feb. 6, 2014) (emphasis added). Similarly, in *Shoretel*, the court found "[t]o dismiss a complaint based on negative causation, the complaint has to foreclose the possibility that defendants caused plaintiffs' losses." *In re Shoretel, Inc., Sec. Litig.*, 2009 WL 2588881, at *3 (N.D. Cal. Aug. 19, 2009). Here, Defendants can point to no facts apparent from the face of the Complaint that restructuring C3's Joint Venture with Baker Hughes was not caused at least in part by the JVA's initial failure to generate sales. The Court can therefore disregard Defendants' negative causation contention.

## C.   The Securities Act claims against Defendants are timely filed.

This Court held in its February Order that Plaintiffs' claims were timely. Order at 10-13. Yet Defendant Baker Hughes again contends that the statute of limitations for claims arising under the Securities Act states that "[n]o action shall be maintained to enforce any liability … unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Ninth Circuit, interpreting the nearly identical statute of limitations for the Securities Exchange Act, held that a "reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023) (citation omitted). The Ninth Circuit specified that "a defendant establishes that a complaint is time-barred … if it conclusively shows that either (1) the plaintiff could have pleaded an adequate complaint based on facts discovered prior to the critical date and

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 14          Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

failed to do so, or (2) the complaint does not include any facts necessary to plead an adequate complaint that were discovered following the critical date." *Id.* at 466.

Baker Hughes wholly disregards this standard in again moving to dismiss on statute of limitations grounds, instead citing decisions issued *before* the Ninth Circuit articulated the operative standard in *HP*. And it is no wonder. Under the *HP* standard, and duly reflected in this Court's earlier ruling, Baker Hughes cannot meet its burden of proof. The Court's February Order found that the sufficiency of the false statement in the Registration Statement turned on the allegations derived from FE-1. Order at 18-19. And just like before, Baker Hughes cannot show that Plaintiffs could have discovered FE-1's testimony more than a year before the Consolidated Amended Complaint was filed. So the Court need not disturb its finding that the Securities Act claim against Baker Hughes (and the rest of the Defendants) was timely and may continue.

The Court has found that Plaintiffs properly pled Statement #3 as a false and misleading statement and that Plaintiffs' Securities Act claims are timely filed. Defendants' recycled arguments do nothing to change these past conclusions. Nor do Defendants' contentions regarding negative causation even come close to meeting the high threshold required. Thus, the Court need not revisit its previous finding that Plaintiffs' Securities Act claims may continue for Statement #3.

## IV.   PLAINTIFFS' EXCHANGE ACT CLAIMS ARE PROPERLY PLED

**A.   The Court need not reconisder its previous finding of falsity under the Exchange Act.**

In its February Order, this Court found that Plaintiffs had properly pled falsity regarding their 10(b) claims pertaining to Statements 4-6, 8-11, 13, and 15-17. *See* § II.B., *supra*. Defendants ask that the Court again revisit its falsity determination, arguing that Plaintiffs' new allegations in the TAC about the JVA's minimum salesperson provision render Siebel's statements immaterial puffing. Mot. at 12-13. Defendants are wrong.

First, the JVA's minimum salesperson provision does not transform Siebel's statements into mere exaggeration or hyperbole. *Id.* at 13. As this Court previously explained, "the number of C3 salespeople at Baker Hughes is a figure 'capable of objective verification,' and is not merely a

'mildly optimistic, subjective assessment' of how business is going."[8] Order at 28. Defendants' reliance on *Yelp* falls short, because in that case "[d]efendants both explicitly and implicitly acknowledged that some Yelp reviews were inauthentic. Those acknowledgements, along with a common-sense understanding of what it means for a website to host user-generated content, demonstrates that no reasonable investor could have understood Defendants' statements to mean that all Yelp reviews were authentic." *Curry v. Yelp Inc.*, 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017). Here, there is no evidence that Siebel ever acknowledged, until the end of the Class Period, that the full Baker Hughes salesforce was not working on C3, and there is no reason to think ordinary investors would have had a common-sense understanding that Baker Hughes was not devoting its full (or close to full) salesforce to C3 when Siebel was repeating the full 12,000 figure at least eleven times during the class period.

Second, although the JVA provision itself was public, C3 expressly *redacted the number* of full-time-equivalent salespeople that Baker Hughes committed to provide. Order at 28. Because of this redaction, Defendant Siebel, who signed the *unredacted* version of the JVA, served as investors' primary source for understanding Baker Hughes' actual numerical commitment of salespeople. The Court's previous findings regarding falsity for the 10(b) claims therefore remain true because eleven "repeated representations that 12,000 people were selling for C3 'every day' are [] plausibly alleged to be new data points beyond those included in the IPO materials that altered the mix of information available to investors." Order at 28.

**B.    The TAC effectively remedies the Court's previous concerns over scienter.**

In this Circuit, scienter "may be established ... by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). "In the securities context, 'an

---

[8] Defendants' caselaw are inapposite as, unlike here, the statements at issue in those cases were not subject to objective verification. *Glen Holly Entm't., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) (representations that the defendant made "high priority" development of a number of different products and that the developed technology was "superior to Avid's" are examples of puffery); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998) (similar); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (similar).

actor is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (citation omitted). Although scienter is an inquiry into the defendant's subjective state of mind, "the objective unreasonableness of a defendant's conduct may give rise to an inference of scienter." *Gebhart*, 595 F.3d at 1041-42. An "extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" can supply evidence of scienter. *Id.* (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5").

"Vague or ambiguous allegations are [] properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). As directed by the Supreme Court, "the court's job is not to scrutinize each allegation in isolation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). Rather, the inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 323; *see also No. 84 Emp.-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) ("Beyond each individual allegation, we also consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'") (citation omitted).

A "strong" inference also "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible ...." *Tellabs*, 551 U.S. at 324. A plaintiff carries the burden when "the allegations are accepted as true and taken collectively ... a reasonable person deem[s] the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5,

2000) ("The PSLRA calls for a 'strong inference,' not an outright confession or an airtight case at the pleading stage.").

As explained below, the new amendments in the TAC supplement Plaintiffs' previous allegations and expressly address the Court's previous observations as to what Plaintiffs were required to plead to sustain their 10(b) claims. And, when taken in their totality, as this Court must, the TAC sufficiently alleges a strong inference of scienter for both Defendants Siebel and Simonelli.

**1.      Plainitffs' allegations that Defendant Siebel received direct notice of C3's limited access to Baker Hughes' salesforce support a strong inference of scienter.**

This Court previously found that "[t]he notion that Siebel had access to information that contradicted the alleged misstatements by virtue by his 'extensive' but unspecified involvement in the Joint Venture is too general of an allegation 'to plead scienter with the requisite specificity.'" Order at 32. The Court also explained: "[t]hough it would not be unforeseeable for a weekly sales-centric meeting to at some point discuss the staffing and structure of Baker Hughes' C3-focused salesforce, the topics are distinct enough such that assuming discussion of the latter would require the Court to speculate in a manner inconsistent with the PLSRA's heightened pleading standard." *Id.* at 33. The new allegations in the TAC alleviate these concerns by showing that (1) Siebel attended a May 25, 2021 C3 board meeting where the materials presented put him on notice that less than the full 12,000-person Baker Hughes salesforce was selling C3's products, ¶ 174; and (2) the Joint Venture Agreement, which Siebel himself signed in June 2019, shows that Baker Hughes is only required to commit to a minimum number of sales personnel to the JVA. ¶¶ 20, 96, 170. These newly alleged facts demonstrate that Siebel knew or recklessly disregarded the truth regarding C3's access to Baker Hughes full salesforce. *See South Ferry LP*, 542 F.3d at 785 (holding that "detailed and specific allegations about management's exposure to factual information within the company" support an inference of scienter).

*First*, the TAC alleges that the board of directors of C3 met on May 25, 2021. Siebel was present at that meeting. During the meeting, a PowerPoint presentation was delivered to the board. One of the topics covered in the presentation was "Sale Objectives" for the Oil and Gas division.

Under that topic, one of the defined objectives was "Drive BH [Baker Hughes] to onboard 10 qualified sales executives in direct quota carrying roles by July 31." ¶ 174. A reasonable interpretation (as well as common sense) suggests that if C3 truly had access to the full 12,000-person Baker Hughes salesforce, onboarding only ten salespeople into the Joint Venture would have been far too trivial to merit board-level attention. The evidence thus strongly supports the inference that the actual size of the Baker Hughes salesforce involved in selling C3's products was discussed and that Siebel—who attended the meeting—knew that fewer than the full 12,000-person workforce was engaged in selling C3's products as early as May 2021.

Defendants do not deny that this meeting occurred. Nor do they deny that the PowerPoint was distributed to C3's board or that its contents as described by the TAC are inaccurate. Instead, Defendants ask the Court to disregard this newly uncovered evidence simply because the allegations were "borrowed from the *Pankow* Action." Mot. at 17-18. *Pankow v. Siebel et al.*, C.A. No. 2024-0520-NAC (Del. Ch.), is a shareholder derivative case in which plaintiffs received confidential internal company documents pursuant to a request under Section 220 of Title 8 of the Delaware Corporate Code. As Plaintiffs have previously explained, after Plaintiffs' counsel reviewed the unsealed amended complaint filed in the *Pankow* action, they contacted the counsel representing the *Pankow* plaintiffs to discuss the complaint before moving for leave to amend. ¶ 174. These actions are sufficient to establish evidentiary support. *See Johns v. Bayer Corp.*, 2010 WL 2573493, at *2 (S.D. Cal. June 24, 2010) (denying motion to strike as counsel had contacted the attorney who filed the source complaint to discuss the basis for his claims); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (collecting cases). It is no surprise then that Defendants' cited cases also confirm that Plaintiffs' counsel's approach was reasonable under the circumstances. *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (district court found that proper "investigation" includes "contacting the attorneys whose allegations they copied to discuss the basis for the claims").[9]

---

[9] The rest of Defendants' cases are of little value as they are highly distinguishable. *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2023 WL 4418886, at *5 (N.D. Cal. May 24, 2023) (dismissed counsel's independent corroboration efforts as they took place *after*

Defendants' attempts to mischaracterize Plaintiffs' allegations as "speculation" also fails. Mot. at 18. Allegations reflecting information from other complaints are routinely allowed in district courts across the country. *See In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *4 (N.D. Cal. Sept. 29, 2017) ("Plaintiffs also rely on public documents filed in a derivative action to establish the Board's knowledge of and involvement with … reporting issues"); *Evanston Police Pension Fund*, 411 F. Supp. 3d at 593 (collecting cases). The Ninth Circuit has also expressly relied upon complaints from other cases incorporated into an operative complaint without issue. *In re VeriFone*, 704 F.3d at 707.

Next, Defendants argue that Plaintiffs' allegations do not support a strong inference of scienter because they did not plead particularized facts (1) showing that C3 directors actually read or discussed the contents of the slide at the board meeting or (2) rebutting the possibility that the reference to "10 qualified sales executives" pertained to senior corporate executives at the highest levels rather than" rank-and-file salespeople." Mot. at 18-19.

Plaintiffs are required to make a showing reflecting a strong inference of scienter, "but do not have to conclusively eliminate all doubt." *Id*; *see also Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (a strong inference of scienter "is not an irrefutable inference"). Here, Plaintiffs' allegation that the slides were prepared for the May 25 board meeting supports a strong inference that Siebel was aware of the onboarding information—either through the presentation delivered at the meeting or through the preparatory materials provided in advance.[10] It is also reasonable to assume that if Defendant Siebel failed to review C3 board materials before a board meeting discussing C3's biggest reseller agreement and proof of concept, then it was reckless of him to do

___

filing of the complaint); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (plaintiffs relied entirely on another complaint as the sole basis for their scienter allegations). And in both *In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011), and *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012), the courts specifically relied on the reasoning in *Connetics*.

[10] Defendants' case is distinguishable because, in that instance, the plaintiffs relied on confidential witnesses who lacked personal knowledge of the defendants' awareness of the documents. *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *19 (N.D. Cal. Dec. 17, 2019). Yet, here, this Court has already found that FE-1's statements properly plead personal knowledge of events. *See* Order at 19.

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 20                                      Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

so. Courts routinely find that alleging defendants' access to information showing the falsity of their statements supports a strong inference of scienter, and do not require specific allegations that they actually reviewed the relevant information. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020) holding that top executives with access to relevant information that contradicted their statements supported an inference that defendants knew those statements were false); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (particularized allegations that defendants had "actual access to the disputed information" may raise a strong inference of scienter).

And at any rate, Defendants' attempt to wildly reinterpret Siebel's exposure to board materials collapses when read in context. The slide states that the sales executives were to have "direct quota carrying roles"—a term commonly understood to refer to individuals who are directly responsible for meeting specific sales targets, not senior corporate executives removed from day-to-day sales functions. ECF No. 189 at 3-4. Moreover, the goal was to onboard ten such sales executives within a period of less than two months. That timeline may be realistic for hiring experienced salespeople or mid-level managers, but it is not a reasonable timeframe for identifying, hiring, and then onboarding ten senior-level *executives* of the caliber described in Defendants' opposition—as those types of hiring negotiations are exceedingly extensive and complex. Defendants' interpretation would also require the Court to assume that Siebel had the authority to dictate top-tier personnel decisions at Baker Hughes, a separate corporate entity. At bottom, Defendants' alternative reading of the board materials merely raises a factual issue or competing inference that "is not appropriately addressed at this [Rule 12] stage." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1109 (D. Nev. 1998) (assessing whether to accept the defendants' interpretation of the documents would require resolving factual disputes, which is impermissible at the motion to dismiss stage).

**Second**, the JVA's minimum salesperson provision further indicates Siebel's deliberate attempt to mislead investors. The publicly filed agreement signed by Siebel stated:

> BHGE will maintain an adequate direct sales and marketing force to originate and help close commercial opportunities for C3 Offerings, including a minimum of dedicating [***] full-time equivalent ("FTE") sales personnel during Year 1, [***] FTE sales personnel during Year 2, and [***] FTE sales personnel during Year 3.

¶¶ 96, 171 (redactions in original).

The JVA, which Siebel had direct access to, contained specific information on the size and structure of the JVA. Contrary to Defendants' assertion that the minimum commitment is "part of the total mix of information available to investors," Mot. at 16, investors did not have such specific information because the publicly filed version of the JVA redacted the number of Baker Hughes employees dedicated to the JVA. *Id.*; *see supra* § IV.A. In other words, investors were relying on Defendant Siebel, the JVA's signatory, to communicate what was redacted. Yet Siebel touted no less than eleven times that C3 had the *entire* 12,000-person salesforce at its disposal. *See* TAC, App'x A, ECF No. 198-1. Moreover, tellingly, Defendant Siebel didn't even change his misleading statements after later amendments to the JVA … or even after Plaintiffs initiated this lawsuit.

The discrepancy between Siebel's public statements and the reality of the unredacted JVA that he himself signed, indicates Siebel's deliberate attempt to mislead investors and inflate C3's market potential. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (providing that "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information") (cleaned up) (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

Yet in their Motion, the C3 Defendants claim that to establish scienter based on Siebel's knowledge of the Joint Venture Agreement, Plaintiffs must not only show that Siebel knew of the contracted minimum number of salespeople, but also that Baker Hughes was not exceeding it. Mot. at 15. But this argument reverses the proper scienter analysis. Because Siebel was aware that Baker Hughes had only committed to a specific number of salespeople, then unless Siebel also had specific information that showed that Baker Hughes exceeded that minimum by devoting its full salesforce to selling C3's products, then Siebel was at least deliberately reckless for making such

unreasonable claims. And Defendants point to no information that Siebel received that could have led him to believe that Baker Hughes' full sales force was selling C3's products, let alone any other type of reasonable inference. So Defendants' challenge falls flat. While the PSLRA requires Plaintiffs to allege a strong inference of scienter, it does not permit Defendants to defeat well-pled allegations in a complaint through mere speculation. Nor do Defendants' cases suggest otherwise.[11]

Defendants also fault the TAC for not alleging the number of salespeople designated by the Joint Venture Agreement as assigned to the Baker Hughes salesforce, but this information was redacted from the public versions of the Joint Venture Agreement. ¶ 171. And even putting the redactions aside, Siebel admitted at the close of the Class Period that the Joint Venture Agreement needed to be restructured *in order* to allow the full Baker Hughes salesforce to sell C3's products, inferring that the original Joint Venture Agreement contemplated that less than the full salesforce would be assigned to the Joint Venture. ¶ 159.

The Court may now sustain Plaintiffs' Exchange Act claims as to Defendant Siebel based on direct scienter alone.

### 2. Plaintiffs' circumstantial allegations of scienter, in combination with their direct notice allegations, raise a strong inference of scienter.

The inference of scienter becomes even more compelling when considering the circumstantial evidence and the totality of Plaintiffs' scienter allegations. For example, the TAC provides strong allegations as to Siebel's direct participation in the management and day-to-day operations of the Company. ¶ 172. The CNBC article also reveals multiple employees describing Siebel providing "intense oversight" of C3 employees. Plaintiffs also allege that Siebel had direct and extensive involvement in C3's partnership with Baker Hughes, including signing of the JVA. ¶ 172. Additionally, FE-1 stated that Siebel attended weekly sales calls where he "received,

---

[11] Defendants' cases are distinguishable. *May v. KushCo Holdings, Inc.*, 2020 WL 6587533, at *8 (C.D. Cal. Sept. 25, 2020) (plaintiffs failed to plead each defendant's actual knowledge of the underlying accounting principles); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (plaintiffs failed to allege "with particularity" any information showing contradicting information); *Kuehbeck v. Genesis Microchip Inc.*, 2005 WL 1787426, at *10 (N.D. Cal. July 27, 2005) (plaintiff failed to identify "specific internal reports" that would have provided Defendants with particularized and detailed information).

reviewed, and had access to reports and data … about the quality and size of the Joint Venture's salesforce." ¶ 174. These allegations, when taken together, show that Siebel acted in a "management's role in a corporate structure" and understood the "importance of the corporate information about which management made false or misleading statements." *South Ferry LP*, 542 F.3d at 785. Moreover, analysts covering C3 understood the importance of generating sales, which is why many specifically asked about the Baker Hughes partnership during conferences and earnings calls. *See, e.g.*, ¶¶ 117, 175. Siebel's repeated emphasis on the 12,000 sales person figure demonstrates that he very much knew that the size of the salesforce was essential for C3's revenues and operations. ¶ 49.

Defendants respond by improperly attacking Plaintiffs' individual allegations in isolation, because this Court is required to assess scienter allegations holistically. Mot. at 17-20. Nor can Defendants overcome the overwhelming inference if drawn from a holistic view (as this Court must when weighing the scienter allegations) that scienter is established. *See South Ferry LP*, 542 F.3d at 784 ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."). The TAC is replete with allegations supporting a strong inference that Siebel had access to facts showing that only a fraction of the 12,000-strong Baker Hughes salesforce were selling C3 product, including: that the C3 board meeting discussed onboarding 10 salespeople; that Siebel signed the initial Joint Venture Agreement in 2019, which required only a minimum commitment of sales personnel from Baker Hughes; that he is one of the C3's highest-ranking executives responsible for overseeing and managing the Baker Hughes partnership; and that the JVA represent a "proof of concept" for future revenue pathways (and in turn higher stock valuations). TAC at ¶¶ 1, 8.

Taken together, these allegations give rise to a compelling inference that, at a minimum, Siebel was deliberately reckless in representing that C3 had access to the full 12,000-person Baker Hughes salesforce. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017).

**3.    New facts in the TAC provide even more support for Plaintiffs' core operations theory.**

Under the core operations doctrine, "it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers." *South Ferry LP*, 542 F.3d at 781. The TAC sufficiently demonstrates how critical the partnership with Baker Hughes was to C3's success. Indeed, Baker Hughes was C3's biggest client and C3 expected to earn hundreds of millions of dollars in revenue from the JVA. ¶¶ 51-52. The TAC also shows that Defendant Siebel attended weekly meetings regarding Baker Hughes deal flows and touted the JVA as a "proof of concept" for future revenue opportunities. ¶ 174. Siebel's own statements also expressly state that access to Baker Hughes' 12,000-person salesforce is a key feature of the JVA. As Siebel put it during the KeyBanc Summit in 2021: "So, Baker Hughes – this partnership – in partnership with Baker Hughes, we have 12,000 people selling every day into the oil and gas industry. Come on, for a company like us to get 12,000 people." ¶ 107. And that the JVA helped C3 "to walk immediately into the board room of Aramco. It would take us 10 years to get to the [board] room of Aramco, okay, but for Baker Hughes." ¶ 113. Indeed, Siebel himself also touted the importance of using all of Baker Hughes' 12,000-person salesforce for C3 products a dozen times over the Class Period. *See* TAC, App'x A, ECF No. 198-1.

Given the gravity of the Baker Hughes' transaction on C3's finance and operations, it is clear from the alleged facts that the "problem was severe enough" that Siebel, as C3's CEO, "must have been aware of it." *See Am. W. Holding Corp.*, 320 F.3d at 942; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) ("[W]e may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue."); *Berson*, 527 F.3d at 988 n.5 (finding core operations doctrine allowed inference of scienter regarding stop-work orders that halted "between $10 and $15 million of work on the company's largest contract with one of its most important customers"); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *11 (C.D. Cal. Aug. 4, 2014) ("The core operations doctrine generally applie[d] to transactions worth millions of dollars or when operational issues affect a

significant portion of the company's revenue and are of the type for which company officials are responsible.").

In its February Order, this Court observed that the previous Complaint lacked any allegations that Siebel "admitted any involvement with the minutiae of Baker Hughes' C3-focused salesforce" and therefore "the Court cannot conclude that the size of the personnel commitment at one of them was 'absurdly' obvious to C3's top executive." Order at 34. The TAC cures that deficiency by pleading that the size of Baker Hughes' sales force was discussed at the board meeting on May 25, 2021, which Siebel attended. ¶ 174. And Siebel personally signed the JVA, which specifies in the unredacted version that Siebel himself signed what size of the committed personnel at Baker Hughes would be made available to C3. ¶¶ 96, 171.

Without addressing the board materials, Defendants argue only that the Joint Venture Agreement's minimum personnel commitment does not show Siebel's scienter because "it would be logical for Siebel to believe Baker Hughes was training additional salespeople." Mot. at 15. That said, this argument overlooks critical context here: Siebel was extensively involved in the Baker Hughes partnership and received weekly sales reports on the status of Baker Hughes' sales pipeline. ¶ 56. He therefore knew that Baker Hughes did not provide the level of support he described publicly and did not meet its commitment about subscriber revenue growth. In addition, because C3 was only training 60 trainers at Baker Hughes per year, it was unrealistic to expect this small training force to quickly train Baker Hughes' full 12,000-person salesforce even if Siebel had somehow missed any and all discussions of the trainers during the weekly sales calls. Moreover, Defendants' speculation contradicts the statements pled in the TAC from C3's own employees that it was highly unlikely that any significant number of Baker Hughes employees had completed the required training to sell C3 products. ¶¶ 57-58. Given this background, Siebel turned a "blind eye" to argue that he believed Baker Hughes was providing the entire 12,000-person sales team. *See In re VeriFone*, 704 F.3d at 708.

Plaintiffs have pled an adequate core operations theory.

**4. Plaintiffs' additional allegations regarding Defendant Siebel's stock sales remedy the Court's previous concerns over motive.**

The Ninth Circuit and the Supreme Court have made clear that courts assessing the sufficiency of scienter allegations in a complaint should not scrutinize "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically." *Tellabs*, 551 U.S. at 310. While "'motive and opportunity' evidence alone is insufficient to establish scienter at the pleadings stage," even Defendants' own cited case acknowledges that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012). Here, Siebel's suspicious stocks trading, combined with both direct and circumstantial evidence of scienter discussed above (*supra* § IV.B.1&2), taken as a whole (as this Court must do), give rise to a strong inference of scienter.

This Court previously explained that three factors are used to evaluate suspiciousness of stock sales: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Order at 35. The TAC includes new allegations to satisfy each of these three elements.

*First*, the amount and percentage of shares sold by Siebel was suspicious. The TAC alleges that while in possession of material nonpublic information, Siebel sold over 9 million C3 shares in insider sales for proceeds totaling over $600 million. ¶¶ 133-134. *See Tellabs*, 551 U.S. at 310 ("personal financial gain may weigh heavily in favor of a scienter inference"). The Court previously pointed out that the "CAC does not contain any allegations concerning what percentage of his holdings Siebel sold." Order at 36. Now, however, the TAC alleges that Siebel's sales amounted to almost 60 percent (59.61%) of his holdings of C3. ¶¶ 21, 179. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (where $900 million in sales represented 2.1% of defendant's holdings, sales support strong inference of scienter); *see also In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) ("$474.49 million in stock proceeds" supportive of scienter despite the percentage retained).

Moreover, the TAC alleges that more than $437 million of Siebel's stock sales were from transactions that were *not* tied to established 10b5-1 plans. ¶¶ 130, 138-140. While the mid-monthly sales beginning on June 14, 2021, were purportedly under a 10b-5 plan, the *date* the plan was adopted is not disclosed, which is improper. *See* 17 C.F.R. § 240.10b5-1(c)(1)(i)(B) (the regulations require a trading plan to specify "the date on which the securities were to be purchased or sold"). This is also why Defendants' cases are not on point, as in none of those cases were the trading plans either undated or filed during the class period. *See* Mot. at 28.[12] Further, contrary to Defendants' assertion, SEC regulations recognize "a written plan for trading securities" as an affirmative defense to insider trading allegations only if the insider adopted the plan "[b]efore becoming aware of the [material nonpublic] information." 17 C.F.R. § 240.10b5-1(c)(1)(i). As such, Defendants' contention that the Court resolve all inferences in Defendants' favor, even though Defendants have failed to provide any information about dates, is absurd. Finally, the TAC also pleads that Siebel had no Rule 10b5-1 trading plan for most of his transactions, and that the ones for which he did identify a plan, he entered the plan while having access to material nonpublic information. ¶ 138.

***Second***, the timing of the sales also raises suspicions. While withholding unfavorable nonpublic information from the investors, Siebel rushed as fast as he could to sell his C3 shares and stopped all trading right before the truth was revealed. ¶¶ 130-133, 137-138. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 839 (N.D. Cal. 2014) (finding allegations that "Defendants sold their shares at times after [defendant company] learned of information that would adversely affect [its] stock, but before the public learned the information," supported an inference of scienter). Defendants' argument that "it is routine for insiders to sell stock after a lockup period expires" (Mot. at 23), ignores Plaintiffs' allegations that Siebel had negotiated a convoluted exception to the standard 180-day lock-up period. ¶ 129. In particular, Siebel was allowed to sell his shares after only 90 days if, *inter alia*, the transactions represented less than 20% of the overall shares and only if the Company had made its first earnings report and the stock price was at least 33% higher than

[12] *See In re Nektar Therapeutics*, 2020 WL 3962004, at *16 (N.D. Cal. July 13, 2020); *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *17 (N.D. Cal. Nov. 23, 2021); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020); *Kasilingam v. Tilray, Inc.*, 2024 WL 4350118 (S.D.N.Y. Sept. 30, 2024).

the IPO price over the course of several days. *Id.* Taking full advantage of the unusual 90-day lockup period, Siebel sold almost **$200 million** worth of stock within the first 100 days of C3 going public (and within 10 days of the lockup expiring). ¶ 177.

*Third*, Siebel's C3 stock sales were sufficiently out of line with both his past and subsequent trading practices. Plaintiffs provide a detailed accounting of Siebel's stock sales during the Class Period. ¶ 130. Moreover, the TAC now pleads additional allegations showing that Siebel had sold no stock in any company for which he was required to file a Form 4 at any point since 2005 and has made no sales since the Class Period ended.[13] ¶¶ 21, 179. In contrast, Siebel sold almost 60% of his C3 shares during the Class Period. Defendants argue that the TAC does not plead Siebel's pre-Class Period trading history of C3 stock. Mot. at 22. But C3 was not publicly traded before the Class Period. Under such circumstances, Plaintiffs need only plead "a meaningful trading history for purposes of comparison." *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020). *See also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (where plaintiffs, "through no fault of their own, cannot show that the individual defendants' stock sales were drastically out of line with prior sales" because of a lock-up, complaint adequately alleged scienter). At the very least, because the Class Period begins at C3's IPO, whether Siebel's stock sales were inconsistent with his prior trading history for C3 stock is "effectively meaningless" as there is no trading period *unaffected* by the false and misleading statements about the size of the Baker Hughes salesforce involved in selling C3 products. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187 (C.D. Cal. 2007).

Under the totality of factors, the allegations summarized above support a finding that Siebel's stock sales are suspicious and thus raise an inference of scienter.

### 5. Defendants' nonculpable explanation is not as compelling as Plaintiffs' specific showing of scienter.

The logical inference here—that Siebel knew or was deliberately reckless to the falsity of his statements regarding C3's market reach and the strength of its partnership with Baker Hughes—

---

[13] These additional allegations remedy the deficiency the Court previously identified as "the [CAC] contains no allegations regarding the defendants' prior trading history." Order at 36.

is not rebutted by Defendants' argument that Siebel simply made "off-the-cuff" misstatements with no intention to deceive investors. Mot. at 24-25. Relying on *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007), Defendants contend that the Registration Statement provided sufficient risk disclosures as it disclosed to the investors that "C3 could not guarantee that Baker Hughes would provide adequate resources to sell C3 products." Mot. at 24.

But as this Court previously found, such generalized disclosure "only cautions that strategic partners like BH may not leverage adequate internal resources within the scope of whatever agreements are made – be it for 12 or 12,000 salespeople to promote C3." Order at 28. "Siebel's repeated representations that 12,000 people were selling for C3 'every day'" provided "new data points beyond those included in the IPO materials." *Id.* The same logic applies to the effect of the Joint Venture Agreement, which was filed with the Registration Statement. Most of the alleged misstatements in the TAC were made *after* the Registration Statement, including many statements made at investor conferences where Defendants can point to no cautionary language at all. And the TAC also alleges that Siebel continues to make the misstatements. ¶ 58. The contention that Siebel's belief in adequate disclosure negates scienter is thus unconvincing.

### 6.   Scienter for Defendant Simonelli

Simonelli is the Chairman, CEO, and President of Baker Hughes. Simonelli also, in his capacity as a director for C3, signed the Registration Statement in December 2021 and the 2021 10-K six months later, each of which contained several misrepresentations about the Joint Venture. ¶¶ 7, 182-183. Given his position at Baker Hughes, he was both highly motivated and had the ability to monitor the status and success of the Joint Venture. *Id.* Additionally, as a C3 audit committee member, Mr. Simonelli would have been able to readily access and understand "foundational financial documents" underlying these SEC disclosures, including any statements related to the Joint Venture. ¶ 38. While Defendants describe the Joint Venture as mere "minutiae"—and well beyond the radar of an independent director—these characterizations are belied by the fact that Mr. Simonelli only joined the C3 board *because* of the Joint Venture's execution. ¶¶ 50-53. And while the Court previously found in its Order these allegations insufficiently specific to impute a strong inference of scienter to Simonelli, given that the Complaint now specifically alleges that the

Joint Venture Agreement (which was the reason that Simonelli joined the C3 board) specified the minimum number of salespeople to work on the Joint Venture, the Court can draw a strong inference that Simonelli was familiar with the agreement's contents and therefore was aware of (or deliberately reckless to) the fact that the full Baker Hughes salesforce was not working to sell C3's products. Finally, the Complaint now alleges that Defendant Simonelli was also present at the May 25, 2021 board meeting—which included the detailed PowerPoint referenced herein that, under the topic of "Sale Objectives" for the Oil and Gas division, lists as a goal: "Drive BH to onboard 10 qualified sales executives in direct quota carrying roles by July 31." ¶ 174. As such, it is reasonable to infer Defendant Simonelli's scienter in light of his attendance at this meeting for the same reasons as for Defendant Siebel. *See* § IV.B.3, *supra*.

**C.    Plaintiffs have already met their burden regarding loss causation.**

To recover for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must show "'*loss causation*,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[T]he Ninth Circuit has explained that 'a plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (citation omitted). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "This is not 'a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation." *Id.* (citation omitted). A plaintiff may show loss causation by showing that a corrective disclosure caused the stock price to decline. *See Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). A "corrective disclosure" is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market. *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011).

Here, Plaintiffs plead that on the December 1, 2021 conference call, Siebel revealed for the first time that C3 did not have full access and assistance of Baker Hughes' 12,000-person salesforce, which caused C3's stock value to plummet 11.20% the next day to $30.04—the lowest

price of the year. ¶¶ 157-169. This Court agreed and held that "Plaintiffs have adequately pled that Defendants' December 1, 2021 disclosure of the alleged fraud (and the allegedly middling RPO metrics resulting from that claimed fraud) caused investors' losses." Order at 43.

Still, Defendants recycle—yet again—their previous argument by asserting that the December 1, 2021 disclosure "revealed nothing about the number of Baker Hughes salespeople selling C3 products." Mot. at 27. But this is directly contrary to this Court's prior finding that "Siebel's remarks on the December 1, 2021 earnings call disclosed what previously was not: that C3 had not had access to Baker Hughes' full 12,000-person salesforce[.]" Order at 42. Moreover, Defendants' claim that the disclosure only revealed the "structure," rather than the headcount, of Baker Hughes' sales force selling C3 products is nonsensical. If a separate unit of X salespeople within Baker Hughes was selling C3's products, then it follows that fewer than 12,000 of Baker Hughes salespeople (12,000 - X salespeople) were selling C3's products. Defendants do not dispute this disclosure of the truth caused C3's stock price to decline. In sum, the Court's prior finding underscores the merit of Plaintiffs' allegations, justifying the same conclusion here.

The TAC further alleges that Defendants' false and misleading statements and omissions regarding C3's sales capabilities and relationship with Baker Hughes were substantial factors in causing the drop in C3's shares. ¶¶ 146-156. Plaintiffs allege that the poor RPO performance of the Baker Hughes Joint Venture contributed to the overall C3's negative financial performance. The company announced disappointing RPO metrics in March and September 2021. In particular, the Baker Hughes Joint Venture fell short of its proportionate minimum revenue requirements: (1) for the fiscal year ending April 30, 2021, C3 recognized less than half of the $53.3 million minimum revenue requirement; and (2) for the fiscal year ending April 30, 2022, recognized less than one quarter of the $75 million minimum revenue requirement. ¶¶ 148, 152. The TAC also reports that various analysts reacted to C3's disappointing financial performance by dropping their price targets of C3's stock. ¶¶ 148-151, 153-155. As KeyBanc Capital Markets observed, C3's "RPO … declined 1% q/q and adjusted RPO including Baker Hughes was flat. Pipeline conversion remains 'lumpy,' with deal push-outs prompting management to retain rather than raise the FY22 revenue

guide." ¶ 155. C3's stock plummeted following its issuance of March and September 2021 quarterly financial results.

Defendants argue that Plaintiffs "failed to plead a connection between the alleged misstatements (regarding the size of the Baker Hughes salesforce selling C3 products) and any of C3's purportedly disappointing financial results." Mot. at 25. But as the Ninth Circuit explained, "[a] plaintiff may [] prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). For example, loss causation has been found where a plaintiff purchased a security that was "readjusted to a lower, more accurate level following the materialization of the risk" that was previously undisclosed, "causing Plaintiff to lose money." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1046 (N.D. Cal. 2016) (loss causation established where "stock steadily declined" as defendant company postponed releasing a financial report and then released a "restatement of its financial results"). The same holds true here. Siebel conceded that Baker Hughes underperformed due to the structure of their partnership that excluded access to the full 12,000-person salesforce, supporting a plausible inference that the facts concealed by Defendants' misstatements were causally linked to the poor performance they revealed throughout the Class Period.

In addition, although there might be other factors unrelated to the Baker Hughes partnership that led to the drop in share prices, "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value[.]" *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *21 (N.D. Cal. Nov. 27, 2018) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005)). A plaintiff may show loss causation by alleging "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;' that defendants' 'misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of' the security." *In re Charles Schwab*, 257 F.R.D. at 547 (citation omitted). In that case, the loss is caused because "the failure to disclose th[e] fact

caused [the] injury through [the plaintiff's] undervaluation of the risk it was undertaking in accepting the [investment]." *Id.* (alterations in original) (citation omitted).

Here, Plaintiffs plausibly allege that the *subject* of the fraudulent statements caused their loss. Defendants misrepresented or failed to disclose the true scale of C3's sales capability and market reach about the Baker Hughes partnership.[14] This misrepresentation inflated the perceived value of C3, thus exposing investors to greater risks than they were aware of. *In re Charles Schwab*, 257 F.R.D. at 547 (when "defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses"). When the truth was revealed on December 1, 2021, the market adjusted to reflect the actual value of the company, causing significant losses for the investors. ¶ 158. As such, Plaintiffs have sufficiently shown the misstatements and omissions by Defendants were a substantial factor in the decline of C3's share price, showing a causal link between the alleged fraudulent conduct and the economic harm suffered.

Defendant Simonelli also argues that loss causation fails as to Defendants' Registration Statement misstatement. Simonelli notes that the disclosure did not reveal that Baker Hughes had not closed any deals during the period covered by the Registration Statement, but "a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted). Defendants, in the Registration Statement, omitted the fact that the Joint Venture had failed to generate revenues. This led to a restructuring of the Joint Venture that ultimately led to Defendants' admission on December 1, 2021, that the partnership was not working.

---

[14] Defendants assert that "Siebel's December 1, 2021 statement that the salesforce was restructured during 2021 did not reveal anything about the FY 2020 revenues that were the subject of Statement #3." Mot. at 27. But contrary to Siebel's public statement, the fact that Baker Hughes brought in no deals during the fiscal year ending in April 2020 is part of the alleged fraud. Statement #3 supports the claim that the company's misrepresentations about its partnership with Baker Hughes misled investors, resulting in financial harm.

**D.    Plaintiffs' Section 20A claims may continue.**

For a Section 20A claim, a plaintiff must plead (1) an independent violation of another provision of the securities laws, (2) that defendants traded "while in possession of material, nonpublic information," and (3) that trading activity of plaintiffs and defendants occur contemporaneously. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008). Here, Plaintiffs adequately plead an independent violation of Section 10(b) and allege that Defendants sold C3 common stock while in possession of material, non-public information—that C3 did not have the access to and was not leveraging Baker Hughes' "12,000-person sales organization." *See* ¶¶ 128-143 (stock sales), ¶¶ 94-127 (10(b) violation).

Defendants argue that Plaintiffs' trades are too distant in time to be contemporaneous. But the Ninth Circuit has not defined the temporal limit for contemporaneous trades, only stating that the parties must have "engaged in transactions close in time." *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1190 (9th Cir. 2024). And multiple district courts within the Ninth Circuit have contemporaneousness to hold up to four days after the insider's trades. *See Thomas*, 167 F. Supp. 3d at 1049 (one day later); *In re Novatel Wireless*, 830 F. Supp. 2d at 1010 (four business days); *In re Cell Therapeutics, Inc. Class Action Litig.*, 2011 WL 444676, at *9 (W.D. Wash. Feb. 4, 2011) (two business days); *Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1196 (eight-day gap); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14-15 (N.D. Cal. Aug. 14, 2008) (five-day gap); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (finding seven- or eight-day gap "on the border of an acceptable time period"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) (concluding that six days is outer limit for contemporaneous trading); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (five days); *In re Novatel Wireless Sec Litig.*, 2010 WL 11470156, at *6 (S.D. Cal. May 12, 2010) ("Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous."). In contrast, Defendants' only citation is to *Buban v. O'Brien*, 1994 WL 324093, at *3-4 (N.D. Cal. June 22, 1994), a 20-year-old unpublished opinion, and highly unavailing in light of the many cases cited herein by Plaintiffs.

Next, Defendants try to argue that because some of Plaintiffs' purchases were at higher prices than Defendants' sales, it is "impossible that those trades occurred with defendant at an unfair advantage," Mot. at 28 (quoting *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020)). This argument misconstrues *Align Tech*, where both the defendants and the plaintiffs were alleged to have *sold* shares contemporaneously—meaning that plaintiffs got a better price than Defendants. But while getting a higher price is good news for a seller, for a buyer, it is bad news. And Plaintiffs here are purchasers. Here, by contrast, because Plaintiffs purchased at a higher price than Defendants, they received, from their perspective, a worse price.

Finally, the fact that certain of Defendants' sales were made pursuant to a 10b5-1 trading plan does not defeat Plaintiffs' Section 20A claim. Mot. at 28; BH MTD at 4-5, 14, n.8. This is because Defendants enacted these 10b5-1 trading plans *only after* they were in possession of the alleged material, non-public information. ¶ 138. Moreover, at the pleading stage, courts do not accept 10b5-1 trading plans as proof that necessarily rules out the possibility of trading based on non-public, material information. *See Evanston Police Pension Fund*, 411 F. Supp. 3d at 605 (citing *Khoja*, 899 F.3d at 999) (holding that 10b5-1 plan does not immunize executive from § 20A liability).

Baker Hughes, in its brief, contends that Plaintiffs fail to sufficiently allege that it was in possession of material, nonpublic information when it sold stock. Baker Hughes cannot credibly argue that it was unaware of the size of its own salesforce dedicated to selling C3 products, so instead it claims that the Complaint fails to allege that Baker Hughes was aware that the information was material or nonpublic. First, Baker Hughes cites no authority holding that, in addition to showing that it was aware of the information, that the Complaint also affirmatively alleges that Baker Hughes was aware that the information was not public or material to investors. In addition, given the allegations in the Complaint about the importance of the Baker Hughes partnership to C3, Baker Hughes had every reason to know the materiality of that information. Furthermore, in the absence of some affirmative disclosure made or at least reviewed by Baker Hughes about the true size of C3's salesforce, it was at least reckless to assume that information about the true size of the sales force was not public. Baker Hughes also claims Plaintiffs must allege that Baker Hughes

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 36                        Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

intended to defraud investors. But their citation to *Countrywide* does not support that position. *Countrywide* merely noted that the complaint alleged an intent to defraud, not that such a showing was required under Section 20A. *In re Countrywide*, 588 F. Supp. 2d at 1203.

Baker Hughes also argues that because Plaintiffs' purchases were at lower prices than Baker Hughes' sales, they are immunized from liability. *SEB Inv. Mgmt.*, 485 F. Supp. 3d at 1136. But the Ninth Circuit has imposed no such requirement. *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023) (rejecting defendants' argument that lead plaintiff's § 20A claim fails because insider sold his stock at a higher price than lead plaintiff's purchase price).

Finally, Simonelli contends that because he did not personally sell any C3 stock, he cannot be liable under Section 20A in his own capacity. Simonelli MTD at 15. But this argument ignores Plaintiffs' claim that Simonelli is liable as a control person of Baker Hughes. ¶¶ 209-215.

## V.   PLAINTIFFS HAVE ESTABLISHED CONTROL PERSON LIABILITY.

### A.   The Complaint properly pleads Section 20(a) claims for Defendants Siebel, Barter, and Simonelli.

In its February Order, the Court allowed the control person claims for Defendants Siebel, Barter, and Simonelli as they pertain to the Securities Act to continue. And while the Court granted dismissal for the 1934 Exchange Act claims, it did so on the basis that there was no 10(b) primary violation at the time of the CAC. Order at 23. Because the TAC now properly pleads a primary violation of Section 10(b) of the Exchange Act, the Court may apply the same reasoning as it did in the February Order when it determined that the control person allegations for Defendants Siebel and Barter met the standard for "exercising actual power or control over C3" and allow these claims to continue. Order at 23.

As for Defendant Abbo, in its Order, the Court dismissed all control person claims against Defendant Abbo after determining that the CAC did not plead adequate allegations showing that Defendant Abbo had "day-to-day involvement with [C3]". Order at 23. The TAC ameliorates the deficiencies identified by the Court in its previous Order by providing additional facts as to Defendant Abbo's intensive scientific research work and how he represented C3 at conferences. *See* § II.D, *supra*.

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. "Whether a defendant 'is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *In re MannKind Securities Actions*, 835 F. Supp. 2d 797, 819 (C.D. Cal. 2011). "'[T]o make out a prima facie case, [plaintiffs need not] show actual participation or the exercise of actual power.'" *Id.*

Allegations that a defendant held a high-level executive position by virtue of which the defendant was involved in a company's day-to-day management will suffice to state a claim, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1157 (S.D. Cal. 2008), as will a defendant's actual authority, even if never exercised, to control the contents of the statements the plaintiffs allege to be false. *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *29 (S.D. Cal. May 23, 2017). Indeed, allegations that a high-level officer's "participation in and/or awareness of [the company's] operations," and "direct and supervisory involvement in the day-to-day operations of [the company]" suffice to allege control. *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *10 (N.D. Cal. Aug. 14, 2019) (plaintiffs only had position allegations as to a specific defendant, Murphy).

The TAC also goes well above the minimum. For example, the TAC alleges that Siebel either signed or approved a multitude of press releases, social media messages, quarterly and annual reports filed with the SEC. ¶ 182. He also regularly leads C3's earnings calls. *Id.* Siebel also made public statements on behalf of C3 more than twelve times over the course of the Class Period. *See* § II.D; Appendix E. Siebel has also been characterized as providing "intense oversight" over C3 operations. *See* § II.G. Similarly, the Complaint alleges that Barter signed the 2021 10-K and the 10-Q for Q1 2022 (¶¶ 37, 63), and he "had access to actual knowledge of confidential proprietary information concerning the Company and its business, financial performance, operations, and products" which "undermined C3's representations to investors about the quality and size of the Joint Venture's salesforce." ¶ 183. Messrs. Siebel and Barters' alleged actions and responsibilities pertaining to C3 are a far cry from the defendant in *Al-Thani v. Wells Fargo & Co.*, 2009 WL

55442, at *9 (N.D. Cal. Jan. 7, 2009), who was an investment advisor and where plaintiffs had provided *zero* assertions of the advisor having any control over another subsidiary.

As for Abbo, the Complaint alleges that he is currently the Chief Technology officer at C3, and that he was also CEO of C3 for several years. ¶ 32. Abbo also served on C3's board of directors for eleven years—including when C3 submitted its draft Registration Statement to the SEC. ¶ 32. Indeed, he only resigned from the C3 board in November 2020, mere weeks before the start of the Class Period. *Id.* And like Siebel, Abbo represented C3 in public forums. ¶ 130. The Complaint also states that Abbo is the only other individual besides Siebel who is characterized as part of C3's "Thought Leadership." *Id.* All these facts suggest that, unlike the Vice-President of Distribution from *In re Gap Stores Sec. Litig.*, 457 F. Supp. 1135, 1141 (N.D. Cal. 1978), here the public would have "place[d] a particular reliance upon [Abbo's extensive and recent experience at the highest echelons of C3's leadership]" when evaluating C3's public filings. Abbo is a control person under Section 20(a).

And Defendants' cases do not say otherwise. For example, Defendants' citation to *SolarCity* is distinguishable because in that case, Elon Musk, while a large shareholder and chairman of the board, was not alleged to be on the audit committee, and the complaint only alleged that Musk signed "certain of SolarCity's financial statements," not the precise financial statements alleged to be misleading. *Bao v. SolarCity Corp.*, 2016 WL 54133, at *9 (N.D. Cal. Jan. 5, 2016). *Wells Fargo* addressed what must be alleged to show a parent's control of a subsidiary, which is not at issue here. *Al-Thani*, 2009 WL 55442, at *9. *Gap* was a pre-*Janus* case finding that the complaint failed to allege a *primary violation* of the securities law by a non-signing defendant, not a control violation. *In re Gap Stores*, 457 F. Supp. at 1141. And finally, *Hessefort v. Super Micro Computer, Inc.*, 2021 WL 1169906, at *15 (N.D. Cal. Mar. 29, 2021), is distinguishable because in that case, unlike here, the subject matter of the control person's statements was unrelated to the subject matter of the fraud, and that Vice President of Investor Relations was not a sufficiently senior position to show control. *Hessefort*, 2021 WL 1169906, at *15. Here the TAC adequately alleges that Abbo's control can be established through his job title, his intensive scientific research for C3 as represented by his patent, and that he made statements on the very subject matter of the fraud.

**B.      The TAC adequately alleges Baker Hughes' control.**

Where a minority shareholder (a) has substantial holdings of the controlled person, (b) places its designees on a board, and (c) these designees sign a document containing false statements, courts will find that the minority shareholder is, for pleading purposes, a controlling person. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug. 8, 2013) (finding defendant owning 20% of securities whose two nominees on controlled person's board signed 10-K showed that shareholder controlled the false statements made in the 10-K); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979-80 (N.D. Cal. 2009) (control established as to defendant who was controlled person's "largest shareholder" and had nominee on board who had signed 10-Ks containing false statements).

Similarly, here, Baker Hughes (a) owned 14.76% of C3's common stock as of the issuance of the Registration Statement, ¶ 54; (b) placed a designee on the C3 board, Defendant Simonelli, Baker Hughes' CEO, ¶ 89; and (c) Simonelli signed the Registration Statement, ¶ 63. Hence, the Complaint adequately alleges Baker Hughes' control of C3. Moreover, further supporting Baker Hughes' status as a control person is the extensive relationship between Baker Hughes and C3—with Baker Hughes both acting as a large customer of C3 and an important source of sales to third parties. *See In re UTStarcom*, 617 F. Supp. at 979-80 (fact that company was third-largest customer of issuer supports scienter). Further supporting control is that the designee, Simonelli, was also on the audit committee. *See Thomas*, 167 F. Supp. 3d at 1048.

Defendants' case law does nothing to undermine this conclusion. Defendants' citation to *SolarCity* differs because in that case, Elon Musk, while a large shareholder and chairman of the board, was not alleged to be on the audit committee and the complaint only alleged that Musk signed "certain of SolarCity's financial statements," and not, as here, the precise financial statements alleged to be misleading. *SolarCity*, 2016 WL 54133, at *9. And the remaining cases cited by Defendants for the proposition that large minority shareholding is not enough to establish control are inapposite because they do not have the same particularized allegations as what Plaintiffs have pled here: Simonelli's signing of false financial statements, membership on the audit committee, and Simonelli's status as Baker Hughes' CEO. *See In re Splash Tech. Holdings, Inc.*

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 40                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

*Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000); *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1053 (N.D. Cal. 2019).

Baker Hughes is also liable as a control person of Siebel for his oral statements regarding the C3-Baker Hughes partnership. It is well established in this Circuit that authority over a particular statement establishes control person liability with respect to that statement. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (reversing dismissal and finding that a complaint alleged control person liability where the defendant had "authority over the process of preparing and releasing the financial statements"); *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (overturning grant of summary judgment, holding that "actual authority over the preparation and presentation to the public of financial statements is sufficient to demonstrate control"). *In re Charles Schwab*, 257 F.R.D. at 555 ("the authority to sign and certify the contents of a registration statement implies the authority to effectuate changes to that statement by withholding certification"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031-32 (S.D. Cal. 2005) ("the authority to control the contents of IRC's quarterly reports, press releases and presentations to securities analysts"). Moreover, the Ninth Circuit has instructed that "in order to make out a prima facie case [of control person liability], it is not necessary to show actual participation or the exercise of actual power." *Howard*, 228 F.3d at 1065.

Here, the TAC pleads that the Joint Venture Agreement gives Baker Hughes the right to approve any public statement about the Joint Venture. The Joint Venture Agreement also states that "neither [Baker Hughes or C3] will issue any press release or public statements regarding the terms and conditions of this Agreement, and/or the details of the relationship between the Parties contemplated hereby, without the prior written approval of the other Party (not to be unreasonably withheld, conditioned or delayed)." ¶ 34. Baker Hughes therefore had the explicit contractual right to control Siebel's statements about the Joint Venture. In its motion, Baker Hughes argues that this language does not apply to Siebel's unscripted public remarks. Yet, fatally, Baker Hughes points to nothing in the contract that would create such a large loophole in an agreement that otherwise places strict controls over C3's public comments on their partnership. Moreover, given that Siebel repeated his misstatements about the size of the Baker Hughes salesforce selling C3's products a

dozen times during the class period, it is simply implausible that his doing so without the consent of Baker Hughes would not constitute a breach of the Joint Venture Agreement. *Splash Tech.* and *SolarCity* have no relevance here because those cases concern general allegations of control, not specific authority over the primary violator's statements. *See In re Splash Tech. Holdings*, 2000 WL 1727405, at *16.

**C.     The Complaint alleges Simonelli's Control.**

Courts routinely find that members of audit committees, such as Simonelli, can be held liable as control people. Indeed, Defendant's own cited case states: "Defendants would also have the Court conclude that the prima facie case requires Lead Plaintiff to demonstrate that the Audit Committee Defendants had the specific ability to control the allegedly false and misleading statements that form the basis of the primary violation. But if that were true, then the Court would be inching dangerously close to shifting the burden of 'culpable participation' to the plaintiff, where it does not belong." *In re BofI Holding*, 2017 WL 2257980, at *28.

A finding of control is particularly appropriate here as Simonelli being put on the board precisely because of the execution of the JVA, and subsequently placed on the C3 audit committee, Simonelli had control of the precise subject matter of both the Registration Statement's false statement and Siebel's subsequent oral misstatements. Hence, Defendants' case law is distinguishable for this reason. Moreover, as explained in the preceding section, Simonelli, through Baker Hughes, had the explicit contractual right to approve any public statements by C3 on the Joint Venture, which covers all the false statements identified in the Complaint. With respect to Simonelli's argument that there can be no control person liability with respect to Siebel's oral statements, it also fails for the same reason. Simonelli's sole additional case on this point, *Murphy*, is irrelevant as it was decided at summary judgment. *Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at *25 (D. Or. July 17, 2020). Simonelli's claim that this acts as persuasive authority disregards the fact that a control person can show lack of "culpable participation" in the false statement at summary judgment as an affirmative defense, but that Plaintiffs need not allege culpable participation at the pleading stage. *In re BofI Holding*, 2017 WL 2257980, at *21. To the

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS – 42                                    Case No. 4:22-cv-01413-HSG
011089-11/3148046 V1

extent Simonelli wishes to argue that he had no participation in Siebel's oral statements, he may do so after a factual record has been developed.

## VI.   PLAINTIFFS' OPPOSITION TO THE C3 DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants once again ask the Court to take judicial notice of Exhibits A through F, which include the Joint Venture Agreement between C3 and Baker Hughes Holdings LLC ("JVA") (Ex. A); C3's Prospectus (Ex. B); C3's Registration Statement (Ex. C); C3's 2022 Form-10-K (Ex. D); and the 2021 and 2022 Proxy Statements (Exs. E and F).[15]

Notably, each document was the subject of an earlier Request for Judicial Notice and considered by the Court in its February Order. Order at 6-10. And Defendants acknowledge that the Court has already entered orders regarding their requests for judicial notice and incorporation by reference. ECF No. 201-1 at 1.

As such, for the below reasons, Plaintiffs submit that the Court apply the same holdings, reasoning, and limitations as it did in its February Order.

**A.   The Court should apply the same reasoning and limitations as it did in the February Order when taking judicial notice of Defendants' Exhibits B, C, and E.**

These exhibits are SEC filings of C3's final prospectus (Ex. B), C3's Registration Statement (Ex. C), and a Proxy Statement from October 2021 (Ex. E). Plaintiffs previously admitted to the authenticity of these SEC filings but objected to judicial notice and incorporation by reference if Defendants use these documents to rebut Plaintiffs' allegations about: Defendants' inadequate risk disclosures, improper revenue recognition practices, suspicious trading, or intent to defraud. *See* ECF No. 119 at 51-54 (citing *Khoja*, 899 F.3d at 1000). Ultimately, the Court took judicial notice and incorporated by reference Exhibits B, C, and E. But in doing so, the Court expressly held that it "does not assume the truth of any of the facts asserted or endorse either of the competing inferences that the parties maintain arise out of the financial filings." Order at 7.

Still, Defendants contend that the Court should change its approach and now assume the truth of any facts asserted in the SEC filings. Yet Defendants still recycle the same arguments and

---

[15] Plaintiffs do not oppose the C3 Defendants' Request for Judicial Notice of Exhibit A.

identify the same precedent it relied on during the previous round of briefing. ECF No. 138 at 2 and (citing *In re Finjan*, 58 F.4th at 1052 n.1).[16] And Defendants' new case is simply inapposite.[17] Because Defendants have provided nothing new for this Court to consider, the Court should keep with its previously articulated approach and limitations regarding Exhibits B, C, and E.

**B.      The Court should deny the C3 Defendants' Request for Judicial Notice of Defendants' Exhibits D and F for the same reasons it denied other post-Class-Period documents.**

Exhibit D is a copy of C3's 2022 10-K that was created seven months after the Class Period and Exhibit F is a copy of a 2022 Proxy Statement created ten months after the Class Period. In its February 2024 Order, the Court took judicial notice of these documents and incorporated them by reference, "as evidence 'that the market was aware of the information [they] contain[],'" Again, the Court expressly noted that it would not let them be used "to endorse … competing inferences" nor "to resolve any factual dispute between the parties as to the substantive truth or falsity of their contents." Order at 7, n.7.

Yet Defendants seek judicial notice of Exhibit D to do just that. According to Defendants, they seek to use Exhibit D to repudiate the Court's prior conclusion that the Registration Statement contained a misrepresentation (Mot. at 8, 24), and to assert that C3's revenues increased during the Class Period (Mot. at 23). Defendants also improperly seek judicial notice of Exhibit F to rebut allegations of suspicious trading and intent to defraud. *Id.* Plaintiffs object to judicial notice as Defendants' intended use of these documents as inconsistent with this Court's previous holding. Order at 7, n.7.

___

[16] Defendants also cite another case before this Court, *Golden*, 2023 WL 5154513, at *2. Presumably, the Court was already aware of the *pro se* case (and its limited applicability to this litigation) when it entered its February Order. Still, *Golden* is inapposite as it holds that the Court "need not" accept allegations that contradict documents properly subject to judicial notice. *Id.* Here, the Court has already held that the FE-1 allegations do not necessarily contradict the judicially noticed documents. Order at 19.

[17] In *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 541 (S.D.N.Y. 2023), the court relied on judicially noticed earnings disclosures that were created contemporaneously with the purported false statements to assess falsity and the state of mind of the speaker. In contrast, here, Defendants seek to rely on Form 10-K filing created seven months after the end of the Class Period, and as such cannot be similarly used.

Moreover, Plaintiffs assert that Exhibits D and F should not be judicially noticed at all—as they were only created several months after the Class Period and therefore irrelevant as to what the market was aware of during the Class Period. Nor does C3 provide any evidence that Defendants were aware of the additional revenues during the Class Period that would contradict the FE-1 statements sustained by this Court. Order at 19. Therefore, the exclusion of Exhibits D and F would be consistent with this Court's established reasoning in this litigation that documents that "postdate[] the class period, … cannot provide insight into what the market knew during the time." Order at 9-10 (denying request for judicial notice as the requested documents were dated "years after the class period ended"); *see also Kuzmenko v. Lynch*, 606 F. App'x 399, 400 (9th Cir. 2015) (denying "request for judicial notice of non-relevant, extra-record information discussed in [petitioner's] opening brief"). The Court should therefore refrain from granting judicial notice to Exhibits D and F.

At bottom, for the above reasons, the Court need not disturb its original order regarding Defendants' requests for judicial notice and/or incorporation by reference.

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion.

DATED: May 2, 2025                    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
catherineg@hbsslaw.com

*Lead Counsel and Counsel for
Lead Plaintiff Mark Samarghandi*

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
**THE ROSEN LAW FIRM, P.A.**
Los Angeles, CA 90071
Telephone: (213) 785-2610
lrosen@rosenlegal.com

Jonathan Stern (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
jstern@rosenlegal.com

*Counsel for Additional Plaintiffs Sharon L.
Zavalanski, David Linder, and Elizabeth Wensel*