United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE RECKSTIN FAMILY TRUST, et al.,

Plaintiffs,

v.

C3 AI, INC., et al.,

Defendants.

Case No.  22-cv-01413-HSG

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT**

Re: Dkt. Nos. 201, 202, 203

Pending before the Court are motions to dismiss Plaintiffs' putative securities class action filed by the C3 Defendants, Defendant Lorenzo Simonelli, and Defendant Baker Hughes.  Dkt. Nos. 201, 202, 203.  Plaintiffs filed an omnibus opposition to Defendants' separately filed motions.  *See* Dkt. No. 204.  The Court finds the matter appropriate for disposition without oral argument and the matter is deemed submitted.  *See* Civil L.R. 7-1(b).  The Court **GRANTS IN PART AND DENIES IN PART** the motions.

I.    **BACKGROUND**

The parties are familiar with the facts alleged and parties named in this securities class action, which the Court recited in its order on the first set of motions to dismiss.  *See* Dkt. No. 154.

Plaintiffs initially filed this lawsuit on March 4, 2022, asserting claims against the C3 Defendants, Simonelli, and several other individual defendants who served as C3 Directors.  Dkt. No. 1.  After the Court appointed Lead Plaintiff and lead counsel, Plaintiffs filed an Amended Class Action Complaint ("CAC") in February 2023 against several defendants, including naming Baker Hughes as a defendant for the first time.  Dkt. No. 71.  The Court granted in part and denied in part Defendants' motions to dismiss, Dkt. No. 154, and Plaintiffs then filed a Second Amended Complaint, Dkt. No. 158.  After Defendants moved to dismiss, but before the briefing was

complete, Plaintiffs sought leave to file a Third Amended Complaint, which the Court granted. Dkt. No. 197.

On February 14, 2025, Plaintiffs filed this operative complaint.[1] Dkt. No. 198 ("TAC"). As relevant at this stage, Plaintiffs add allegations that Siebel signed a joint venture agreement (the "JVA") that "contained the actual number of Baker Hughes employees committed to the agreement." TAC ¶ 20. Plaintiffs also allege that Siebel was made aware through materials prepared for a May 2021 board meeting that Baker Hughes' full salesforce was not employed to sell C3 products. *Id.* ¶ 174. Plaintiffs add allegations regarding Defendants' stock sales and the supervisory day-to-day responsibilities of Defendant Abbo, who the Court previously dismissed from Plaintiffs' Section 15 claim, and regarding certain statements that Siebel made in an interview with CNBC, of which the Court previously declined to take judicial notice. *Id.* ¶¶ 36, 39, 57–60; *see also* Dkt. No. 154 at 9–10. Finally, Plaintiffs removed certain allegedly false statement and loss causation allegations that the Court previously found insufficient. TAC ¶ 24.

Plaintiffs bring causes of action against Defendants on behalf of putative classes under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act," 15 U.S.C. § 77 *et seq.*); Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. § 78a *et seq.*); and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 (17 CFR 240.10b-5). See TAC ¶¶ 74–93, 201–229. Defendants have moved to dismiss the TAC in its entirety.

---

[1] The TAC asserts claims against several defendants. The Court will refer to one subset of defendants as the "C3 Defendants," which includes (i) Defendant C3.ai, Inc. ("C3"), a company incorporated in Delaware and headquartered in Redwood City, California that makes and sells artificial intelligence ("AI") software for enterprise clients using a subscription model, TAC ¶¶ 4, 33; and (ii) four individually named C3 officers: Thomas M. Siebel ("Siebel"), Edward Y. Abbo ("Abbo"), David Barter ("Barter"), and Lorenzo Simonelli ("Simonelli") (and collectively, the "Individual Defendants"). [1] *Id.* ¶¶ 35–38. In addition to the C3 Defendants, Plaintiffs also named Baker Hughes (or "BH") as a Defendant. Baker Hughes, incorporated in Delaware and headquartered in Houston, Texas, is "one of the world's largest oil field service companies." *Id.* ¶ 8. The Court detailed the roles each of the Individual Defendants in relation to C3 and BH. *See* Dkt. No. 154 at 2 n.2.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.    Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six

elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

## III.   REQUEST FOR JUDICIAL NOTICE

Defendants seek judicial notice or incorporation by reference of several documents they cite in their motion. Dkt. No. 201-1 ("C3 RJN"). [2]

### A.   Legal Standard

As a general matter, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Fed. R. 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, there are two exceptions to this rule: the incorporation-by-reference doctrine and judicial notice under Fed. R. Evid. 201. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Both procedures permit district courts to consider materials outside a complaint without converting a motion to dismiss into a summary judgment. *Id.* at 998; *see also Lee*, 250 F.3d at 688–89.

The incorporation by reference doctrine is a judicially created doctrine that allows a court

---

[2] In its motion, BH does not independently request judicial notice of any materials, but indicates that it joins the C3 Defendants' requests. BH MTD at 6.

United States District Court
Northern District of California

to consider certain documents as though they were part of the complaint itself. *Khoja*, 899 F.3d at 1002. This doctrine is to prevent a plaintiff from cherry-picking certain portions of documents that support his claims, while omitting portions that weaken his claims. *Id.* Incorporation by reference is appropriate "if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim." *Id.* at 1002. However, "the mere mention of the existence of a document is insufficient to incorporate the contents" of a document. *Id.* at 1002. Under the incorporation-by-reference doctrine, a court may consider evidence on which the complaint "necessarily relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). If these conditions are met, the court may treat such a document as part of the complaint, and may assume the truth of the document's contents for purposes of a motion to dismiss under Rule 12(b)(6). *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, while a court "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss . . . it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1002.

Fed. R. Evid. 201(b) permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In *Khoja*, the Ninth Circuit discussed the judicial notice rule and incorporation by reference doctrine, noting that a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has held that if a court takes judicial notice of a document, it must specify what facts it judicially notices from the document. *Id.* at 999. Further, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* As an example, the Ninth Circuit held that for a transcript of a conference call, the court may take judicial notice of the fact that there was a conference call on

the specified date, but may not take judicial notice of a fact mentioned in the transcript, because the substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id.* at 999–1000.

### B. Analysis

The C3 Defendants request that the Court consider several documents outside the pleadings that fall into two categories: (1) documents that are incorporated by reference into the complaint and (2) documents filed with the SEC.[3] *See generally* C3 RJN at 3–4.

Except for one document, the Court has already found that each of these documents is judicially noticeable.[4] *See* Dkt. No. 154 at 7. The Court finds that the incorporation by reference doctrine allows it to consider Exhibits A–C, but not to resolve any factual dispute between the parties as to the substantive truth or falsity of their contents. *See* Dkt. No. 154 at 7 n. 7. Additionally, the Court again finds that Exhibits B–D are proper subjects of judicial notice. *Id.* at 7 (citing *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006)).

In taking judicial notice of these documents, the Court fully incorporates the reasoning detailed in its prior order. *See* Dkt. No. 154 at 7–8 (citing *Pardi v. Tricida, Inc.*, No. 21-CV-00076-HSG, 2022 WL 3018144, at *3–4 (N.D. Cal. July 29, 2022)). C3 Defendants urge the Court to consider Exhibit D in evaluating Plaintiff's claims because "Plaintiffs do not contest the accuracy of the financial reporting in the 2022 Form 10-K," C3 RJN at 5, and because "the accuracy of these publicly filed SEC documents cannot reasonably be questioned," Dkt. No. 154 at 7 (quoting *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018). But "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899, F.3d at 999. The Court therefore reiterates that it "does not assume the truth of any of

---

[3] The documents consist of Exhibit A, the June 6, 2019 C3-Baker Hughes Joint Venture Agreement ("JVA"); Exhibit B, the C3 December 8, 2020 Prospectus; Exhibit C, the C3 December 7, 2020 Registration Statement; Exhibit D, the C3 June 22, 2022 Form 10-K; Exhibit E, August 20, 2021 Proxy Statement; and Exhibit F August 24, 2022 Proxy Statement. *See* Dkt. No. 201-1 at 2.

[4] Exhibits B–F here correspond to Exhibit B–C, E, and I–J in the C3 Defendants' first request for judicial notice, respectively. *See* Dkt. No. 105-2 at 5.

6

the facts asserted, or endorse either of the competing inferences that the parties maintain arise out of the financial filings." Dkt. No. 154 at 7.

## IV.   DISCUSSION

### A.   Securities Act Claims

Plaintiffs contend in their TAC that C3, Simonelli, Siebel, and Barter made false and misleading statements and material omissions in the Registration Statement that C3 filed in connection with its December 2020 IPO. TAC ¶¶ 74–85. According to Plaintiffs, these statements and omissions violated Section 11 of the Securities Act. Plaintiffs also assert a claim under Section 15 against BH, Siebel, Abbo, Barter, and Simonelli, alleging that these Defendants are liable for Section 11 violations as "control persons" under the Securities Act. TAC ¶¶ 86–93. Defendants argue that Plaintiffs do not allege an actionable misstatement or omission for their Section 11 claim, and that without a claim for primary liability, they also cannot assert a Section 15 claim. Defendant Baker Hughes also asserts that the Section 15 claim is untimely, and Defendant Abbo argues that Plaintiffs' allegations remain conclusory as to him.

### i.   Section 11

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides a private cause of action for investors who purchase securities pursuant to a registration statement containing "an untrue statement of a material fact" or a registration statement that omits "to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Hunt v. PricewaterhouseCoopers LLP (PwC)*, 159 F.4th 603, 611 (9th Cir. 2025) (quoting 15 U.S.C. § 77k(a)). To state a Section 11 claim, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quotations omitted). Section 11 imposes strict liability. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) ("No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions.").

Unlike Section 10(b) claims, the heightened pleading standards of the PSLRA do not apply

United States District Court
Northern District of California

to Section 11 claims. *See Rubke*, 551 F.3d at 1161. However, "[t]he particularity requirements of Rule 9(b) apply to claims brought under [S]ection 11 when such claims are grounded in fraud." *Rigel*, 697 F.3d at 876. The Ninth Circuit has held that "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its [S]ection 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *Id*. "To ascertain whether the complaint sounds in fraud, [the Court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Id*. (internal quotation marks and citations omitted).

Plaintiffs have narrowed the basis of their Section 11 claim against C3, Simonelli, Siebel, and Barter to a single statement in C3's Registration Statement.[5] Plaintiffs allege that the following statement, made in relation to a description of C3's financial performance, is misleading:

> In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization. **During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement.**

TAC ¶ 66. As was the case in the CAC, Plaintiffs allege this statement was misleading "for stating that C3 recognized revenue from deals brought in by Baker Hughes through the reseller arrangement in the fiscal year ending April 30, 2020 because Baker Hughes had, in fact, brought in *no* deals through the reseller agreement, so it was impossible for C3 to have recognized revenue through the arrangement for fiscal year ending April 30." *Id*. ¶ 67 (emphasis in original). To

---

[5] The Court refers to this statement as "Statement 3," consistent with how Plaintiffs designated it in the CAC and the parties' briefing.

support their allegations, Plaintiffs rely on the testimony of Former Employee No. 1 ("FE-1"), a "former Vice President who worked at C3 from at least March 2020 to May 2020" who "reported directly to CEO Tom Siebel" and "attended weekly calls . . . where new sales leads were discussed." *Id*. ¶ 41. "[D]uring the March 2020 to May 2020 period," FE-1 alleges he heard "the General Manager [of the Oil & Gas segment] regularly report that the Baker Hughes pipeline was non-existent, and that it had made no sales as of April 30, 2020." *Id*. ¶ 56.

### a. Plaintiffs Adequately Allege a Section 11 Claim

The Court previously found that although it was a "close question," ultimately Plaintiffs "plausibly alleged that Statement #3 was misleading for suggesting that the Baker Hughes arrangement closed deals by the close of the fiscal year ending April 30, 2020." Dkt. No. 154 at 19. In doing so, the Court "determine[d] that the allegations made by FE-1 are sufficiently particularized." *Id.* Defendants nonetheless again argue for dismissal of Plaintiffs' Section 11 claim for two reasons. First, Defendants argue that the Ninth Circuit's decision in *Espy v. J2 Global, Inc.*, 99 F.4th 527 (9th Cir. 2024), which was issued after the Court's order on the CAC, bars Plaintiffs from relying on FE-1's hearsay allegations to support their Section 11 claim. Dkt. No. 201 ("C3 MTD") at 16. Second, Defendants argue that the Court should reject FE-1's allegations because "they are contrary to the undisputed, *audited* financial statements in C3's 2022 Form 10-K," of which the Court previously took judicial notice. *Id.* at 17. The Court is not persuaded by either argument.

First, the Court finds *Espy* distinguishable. There, the plaintiff alleged that J2 Global "shrouded underperforming acquisitions and . . . questionable [investments]" to enrich its executives and board members while misleading its investors through omissions in various public statements. *Espy*, 99 F.4th at 533–34. To support the scienter prong of his § 10(b) claim, the plaintiff relied on statements of two confidential witnesses. *Id.* at 536. The Ninth Circuit discounted those statements, finding that they failed to "establish reliability or personal knowledge," or "simply amount[ed] to criticisms" of the company's management practices and compensation structures." *Id*. Defendants assert that the Ninth Circuit disregarded the witnesses' statements because they relied on "secondhand information" that amounted to little more than

9

"general allegations." *See* C3 MTD at 16 (quoting *Espy*, 99 F.4th at 537).  But the reasoning in *Espy* was more nuanced.  The Ninth Circuit found that the statements offered by the confidential witnesses amounted to opinions about the performance and motives of a company executive, which the witnesses based largely on second-hand information.  *See Espy*, 99 F.4th at 537 (discussing one witness' "criticisms" and another's "critiques" of a company executive's performance in carrying out and incentives in structuring business deals).  Additionally, the Ninth Circuit found that the plaintiff came "closest to alleging scienter" through the second witness' description of a meeting he attended where they discussed an executive's motives for an allegedly questionable acquisition.  *Espy*, 99 F.4th at 537.  The witness was not present for the *full* meeting, however, and it was not clear whether his statements about the acquisition were based on "general knowledge, gossip, or the meeting where FE2 was present."  *Id.*  The Ninth Circuit therefore disregarded his statements about the acquisition.  *Id.*

By contrast, the Court has already found—and finds again—that the allegations regarding FE-1 are "sufficiently particularized" to support Plaintiffs' allegations that Statement #3 was misleading.  Dkt. No. 154 at 19.  *Espy* does not change this analysis.  As the Court previously found, the allegations support an inference that FE-1, "by nature of his senior role and presence at key meetings, '[had] personal knowledge of the events [he] report[s].'"  *Id.* (citing *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023) ("*Glazer II*").  And unlike in *Espy*, FE-1's statements do not amount to conclusions or opinions about whether, based on "gossip" or "hearsay," the Baker Hughes partnership had produced no sales.  Instead, he alleges that he learned as much directly from the person charged with developing the sales pipeline.  Specifically, FE-1 reports that he attended "weekly sales calls" where, during the relevant period, he heard "the General Manager [for] Oil & Gas regularly report that the Baker Hughes pipeline was non-existent, and that it had made no sales as of April 30, 2020."  TAC ¶ 56.

Finally, the Court has already considered, and rejected, arguments similar to those the C3 Defendants advance now regarding C3's 2022 Form 10-K.  *See* Dkt. No. 154 at 19–20 (considering the argument that FE-1's allegations are "contrary to unchallenged disclosures in the Registration Statement and not corroborated by the complaint.") (internal quotations omitted).  It

United States District Court
Northern District of California

United States District Court
Northern District of California

is true that "[w]hen a general conclusion in a complaint contradicts specific facts retold in a document . . . subject to judicial notice, those facts are controlling." *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023). But where, as here, the complaint alleges facts that "contradict specific facts in a non-legally operative document . . . subject to judicial notice, the conflict is resolved in the plaintiff's favor."[6] *Id.*; *see also Khoja*, 899 F.3d at 1003 ("Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the district court converts the defendant's motion to dismiss into a motion for summary judgment, the plaintiff receives no opportunity to respond to the defendant's new version of the facts."). The Court has taken judicial notice of the 2022 Form 10-K for what C3 reported to the market, but not for the truth of any underlying statements in that document, *i.e.*, what if any revenue C3 actually realized. Further, Plaintiffs allege facts contradicting statements in the 2022 Form 10-K, and at this stage the Court must resolve those factual disputes in Plaintiffs' favor. *In re Finjan*, 58 F.4th at 1052 n.1. The Court therefore rejects the C3 Defendants' argument that the Form 10-K fatally undermines Plaintiffs' allegations. *See Khoja*, 899 F.3d at 1003.

### b. Negative Causation

Defendants also argue that the TAC "establishes the defense of negative causation" as to Plaintiffs' Section 11 claim. C3 MTD at 18. "The affirmative defense of negative causation prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (citing 15 U.S.C. § 77k(e)). To satisfy the "heavy burden" of this affirmative defense, a defendant must show "that the depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement." *Id.* (quotations omitted). And to overcome this defense, a plaintiff need only show that "the misrepresentation *touches upon* the *reasons* for the investment's decline in value." *In re Worlds of Wonder Sec. Litig.,* 35

---

[6] Of course, in general, Form 10-Ks are "legally operative" in the sense that the SEC requires them to be filed. But the Form 10-K at issue here is not the legally operative document for purposes of assessing Plaintiffs' allegations: the TAC is.

F.3d 1407, 1422 (9th Cir. 1994) (quotations omitted).

The Court finds Plaintiffs' allegations adequate to overcome the negative causation defense at this stage. Plaintiffs allege that in its Registration Statement, C3 stated that it "recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement." TAC ¶ 66. They allege that this statement was "misleading for stating that C3 recognized revenue from deals brought in by Baker Hughes through the reseller arrangement." *Id.* ¶ 67. And they allege that the stock price "plummeted" after Defendant Siebel's revelation that C3 restructured its deal with Baker Hughes, and that the motivation for doing so was that "C3 did not have access to Baker Hughes' full 12,000-person salesforce nor its deep expertise" in sales in the oil and gas industry. TAC ¶¶ 15–16. Rather, the original deal with Baker Hughes involved a new unit, "C3 AI-Baker Hughes," which "sat outside" of Baker Hughes and therefore did not include "people with the relationships," "quotas" or "deep industry expertise." TAC ¶ 15. The alleged misrepresentation that the reseller arrangement would generate revenue by bringing in deals certainly "touches upon the reasons" for the decline in the C3 stock price: Plaintiffs allege that the stock declined because the team of salespersons supporting the reseller arrangement were not, in fact, the "people with the relationships" or "deep industry expertise." *Id.*; *see also In re Worlds of Wonder Sec. Litig.,* 35 F.3d at 1422. The TAC "on its face does not foreclose the possibility that defendants caused plaintiffs' losses," *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *3 (N.D. Cal. Aug. 17, 2006), and Defendants have not established that the stock drop necessarily "resulted from factors other than" the alleged misstatement, *see In re Worlds of Wonder*, 35 F.3d at 1421–22. Therefore, the Court finds that Defendants have failed to meet their burden to show that the TAC itself establishes a negative causation defense.

### ii. Section 15

#### a. Statute of Limitations

The Court finds that Plaintiffs' Section 15 claim against BH is time-barred. "A district court may dismiss a claim if the running of the statute is apparent on the face of the complaint [but] . . . only if the assertions of the complaint, read with the required liberality, would not permit

12

the plaintiff to prove that the statue was tolled." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011). The statute of limitations governing claims under Section 11 runs for one year. *See Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995 (N.D. Cal. 2024) ("Because Section 15 controlling person liability is 'created under' Section 11 and exists 'to the same extent' as the underlying Section 11 liability, both Section 11 and Section 15 claims are subject to the same . . . limitations period."). The limitations period begins when "the plaintiff did in fact discover or when a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (cleaned up); 15 U.S.C. § 77m. In the statute of limitations context, a plaintiff has "discovered" facts when they "can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023) ("*HP*"). Thus, "a defendant establishes that a complaint is time-barred . . . if it conclusively shows that either (1) the plaintiff could have pleaded an adequate complaint based on facts discovered prior to the critical date [] and failed to do so, or (2) the complaint does not include any facts necessary to plead an adequate complaint that were discovered following the critical date." *Id.* Here, BH was not named as a defendant until February 14, 2023, so the relevant statute of limitations question is whether Plaintiffs were able to plead the facts constituting the claimed violation with sufficient detail and particularity one year before the CAC was filed, *i.e.*, the "critical date" of February 14, 2022. *See Merck*, 559 U.S. at 638.

The Court finds that, on the face of the complaint, Plaintiffs discovered the facts necessary to sufficiently plead the elements of their Section 11 claim before February 14, 2022. The gravamen of Plaintiffs' Section 11 claim is that Defendants engaged in fraud by misrepresenting the success of the C3 / BH partnership. This has been the case from the start: even though Plaintiffs did not include allegations concerning Siebel's December 1, 2021 statement until they filed the CAC, *see* Dkt. No. 71, in the original complaint they directly alleged that Defendants misrepresented the success of the C3 / Baker Hughes partnership. Dkt. No. 1 ¶ 42. In the CAC and again in the TAC, Plaintiffs refined this theory to allege that C3 misleadingly suggested in its Registration Statement that BH had made sales under the reseller arrangement by April 30, 2020,

13

and that the stock price plummeted when the nature of the salesforce charged with making such sales was disclosed by Siebel's statement on December 1, 2021. *See* TAC ¶¶ 15–16, 66–67, 145, 157–160. Further, their allegations establish that they knew that Siebel's statement was a corrective disclosure under their theory, because the market "promptly digested current information regarding C3 from all publicly available sources and reflected such information in the price of C3's common stock." *Id.* ¶ 190.

In asserting that their claim against BH is timely, Plaintiffs rely heavily on *HP*. But the Court finds that case distinguishable, and further finds that the Ninth Circuit's approach there supports the Court's finding here. In *HP*, the Ninth Circuit analyzed whether the plaintiff's allegations were based on information that came to light before or after the "critical date." 65 F.4th at 466–67. If the plaintiff "knew or reasonably could have known of the elements of its claim before this critical date," the claim would be time-barred, but "if any element of the claim was discovered after the critical date, then the claim is timely." *Id.* The defendant had made an alleged misrepresentation before this critical date, but the plaintiff had not discovered (and could not have discovered) facts to adequately allege the scienter prong of its 10(b) claim until the SEC issued an order "revealing that ostensibly innocuous statements were actually intentional misrepresentations." *Id.* at 467. The Ninth Circuit therefore found that the claim was timely. *Id.*

By contrast, here, Plaintiffs allege facts showing that they "knew or reasonably could have known of the elements of [their] claim" well before the critical date, February 22, 2022. *Id.* at 466–67. First, unlike the Exchange Act claims at issue in *HP*, Plaintiffs here are not required to plead scienter to adequately allege a Section 11 claim. Second, even making all inferences in Plaintiffs' favor, Plaintiffs were immediately aware of their fraud claim on December 1, 2021, when Siebel made the alleged corrective disclosure, because they allege that the market "promptly digested current information regarding C3 from all publicly available sources and reflected such information in the price of C3's common stock." TAC ¶ 190. And based on these allegations, Plaintiffs were also aware of a possible claim against BH well before the critical date, since they knew of the C3 / BH partnership all along, and because Siebel's purported corrective disclosure concerned that partnership. In other words, "[BH] can show that [Plaintiffs] could have pleaded

14

[their] claim based solely on things that [they] knew or should have known prior to the critical date." *HP*, 65 F.4th at 467. Plaintiffs try to sidestep this conclusion, asserting that they could not sufficiently state a Section 11 claim without FE-1's testimony, and that because it is not clear on the face of the complaint when they discovered his testimony, their claim against BH should survive. Opp. at 27. But these arguments ignore the Ninth Circuit's guidance that "rather than determine exactly when the plaintiffs discovered the facts necessary to plead their complaint," courts must evaluate "whether events preceding the critical date were sufficient to allege the facts constituting the violation." *HP*, 65 F.4th at 466.[7] Accordingly, the Court **GRANTS** the motion to dismiss the Section 15 claim as to Baker Hughes.

### b. Control Person Liability

Defendants Siebel, Barter, and Simonelli assert that the Section 15 claims should be dismissed because there is no predicate liability under Section 11. Because the Court once again finds that the Section 11 claim survives as to these defendants, it **DENIES** the motion to dismiss Plaintiffs' Section 15 claim as to Siebel, Barter, and Simonelli.

As to Defendant Abbo, the Court once again finds that Plaintiffs' allegations are "too conclusory." Dkt. No. 154 at 23. Plaintiffs add new allegations that Abbo is an inventor "on the patent for what C3 called its 'secret sauce'" and that he spoke publicly about the partnership with Baker Hughes at a virtual conference in 2021. TAC ¶ 36. But these allegations do not move the needle. The Court finds that Plaintiffs again fail to adequately plead an "ostensible reason for the public to place particular reliance upon [Abbo] for the veracity of the contested financial representation." Dkt. No. 154 at 23 (quotations omitted). Accordingly, the Court **GRANTS** the motion to dismiss Plaintiffs' Section 15 claim as to Abbo.

\*\*\*\*\*\*

In sum, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' Section 11 claims premised on Statement #3. It further **GRANTS** the motion to dismiss Plaintiffs' Section 15 claim

---

[7] The Court also rejects Plaintiffs' assertion that it previously decided the timeliness of the Section 15 claim as to BH. Opp. at 26. In truth, Plaintiffs *withdrew* that claim as to BH, and the Court's prior order relied on that withdrawal in its analysis of the relation-back doctrine. Dkt. No. 154 at 22 n.15.

against Abbo and Baker Hughes, but **DENIES** the motions to dismiss as to the claims asserted against Siebel, Barter, and Simonelli.

### B.    Exchange Act Claims

#### i.    Section 10(b) and Rule 10b-5

Plaintiffs allege that the C3, Siebel, and Simonelli violated Section 10(b) of the of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and implementing Rule 10b-5, 17 C.F.R. § 240.10b-5, by making false statements or omissions about (1) BH's salesforce and (2) the success of sales under the C3 / BH JVA.[8]  To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: "(1) a material misrepresentation or omission by [Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  Defendants challenge Plaintiffs' Exchange Act claims on three bases: falsity, scienter, and loss causation.[9] The Court finds that Plaintiffs' new allegations again fail to adequately plead scienter.

#### c.  Scienter

To sufficiently plead scienter for their Section 10(b) and Rule 10b-5 claims, Plaintiffs must state with particularity facts that "give rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A); *see Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016).  "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (citation omitted).  Deliberate recklessness is "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that

---

[8] Rule 10b-5 of the Exchange Act's implementing regulations is coextensive with Section 10(b). *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002). The Rule prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Glazer II*, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)).

[9] For purposes of Section IV.B.i, the term "Defendants" means C3, Siebel, and Simonelli.

the actor must have been aware of it." *Zucco Partners*, 552 F.3d at 991. "A complaint will survive," the Supreme Court has instructed, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). As such, "[t]he PSLRA's strong inference requirement has teeth," and "is an exacting pleading obligation" that "present[s] no small hurdle for the securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quotation omitted).

The Ninth Circuit directs district courts to conduct a two-part inquiry when considering the sufficiency of scienter allegations. First, the court "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Glazer II*, 63 F.4th at 766. If not, then the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id.* (citation omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 1. Siebel

Plaintiffs again allege that Defendant Siebel acted with scienter based on three theories: (1) direct scienter, (2) core operations, and (3) motive. The Court finds that Plaintiffs' allegations still fall short of adequately pleading scienter.

*Direct Scienter*

In granting Defendants' first motions to dismiss as to the Exchange Act claims, the Court found that Plaintiffs' allegations of Siebel's "'extensive' but unspecified involvement in the Joint Venture [were] too general of an allegation 'to plead scienter with the requisite specificity.'" Dkt. No. 154 at 32 (quoting *Gaylinn v. 3Com Corp.*, 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000)). Plaintiffs now add two sets of allegations to bolster their claim that Siebel knew, or had access to, information contradicting his public statements about the size of the Baker Hughes salesforce

17

involved in selling C3 productions.  First, they rely on allegations in another complaint (the "*Pankow* action") regarding materials Siebel purportedly had access to in connection with a C3 board of directors meeting.  TAC ¶¶ 174.  Specifically, as alleged in the *Pankow* action, Siebel and Simonelli attended a May 25, 2021 board meeting where presentation topics included "Sales Objectives" for the Oil and Gas division, and a PowerPoint slide listed a goal of "Drive BH to onboard 10 qualified sales executives in direct quota carrying roles by July 31."  *Id.*  Plaintiffs allege that this "shows that Siebel discussed the size of Baker Hughes' sales force at board meetings" and put him "on notice that less than the full Baker Hughes sales force was selling C3's products" because "onboarding a mere 10 salespeople" would be "too trivial to discuss" if C3 had access to anywhere near the full 12,000 Baker Hughes salesforce.  *Id.*  Plaintiffs also allege that they have "conferred" with the *Pankow* counsel, who say they "stand by their complaint."  *Id.*

Defendants argue that Plaintiffs cannot rely on these allegations because they did not adequately investigate them, and that even if the Court considers them, they do not meet the scienter threshold.  C3 MTD at 24–25.  The Court agrees on the second point.[10]  The Court finds that Plaintiffs' allegations stemming from the *Pankow* action are too conclusory to support a strong inference of scienter.  Plaintiffs jump from allegations that Siebel attended a meeting where the sales executive onboarding goal was listed in a PowerPoint presentation to the assertion that these materials "show" Siebel discussed this goal, or at the very least was deliberately reckless for not reviewing the materials before the board meeting.  TAC ¶ 174; Opp. at 32.  Plaintiffs offer no additional allegations that this topic was actually discussed at the meeting, let alone that Siebel discussed it.  And the Court rejects the argument that failing to review these materials at the level

---

[10] Several courts in this circuit have expressed skepticism of plaintiffs who piggyback on "allegations from other complaints or documents, which are unproved and are contested . . . to establish facts to demonstrate *scienter*" in a 10(b) claim or Rule 10b-5 claim. *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (collecting cases).  And although the Ninth Circuit considered extrinsic allegations in *In re VeriFone Holdings Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012), that case involved an SEC complaint.  In the Court's view, a complaint by an enforcement agency might well merit different treatment given the unique ethical duties and investigative powers of such agencies.  *See, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 589–93 (N.D. Cal. 2019).  Ultimately, the Court need not definitively decide this issue, because even if it considers Plaintiffs' allegations based on the *Pankow* action, the Court finds they are insufficient to support a strong inference of scienter.  *See infra*.

United States District Court
Northern District of California

of granular detail Plaintiffs would demand reflects recklessness sufficient to support an inference of scienter. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (scienter requires "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."). In any event, the Court finds that any inferences that could be drawn from the allegations in the *Pankow* action do not show that Siebel had information that directly contradicted his statements concerning the size of the salesforce. As Defendants rightly point out, "[a] statement regarding onboarding *executives* says nothing about the number of *salespeople* selling C3 products." Dkt. No. 206 at 13. Rather, the Court agrees that "[t]he goal of adding executive level salespeople is entirely consistent with the need to work and coordinate with, and supervise, a 12,000-person sales force." C3 MTD at 26.

Plaintiffs also suggest that because the Court "already found that FE-1's statements properly plead personal knowledge of events," they need not allege any further basis for their assertions regarding what was discussed at the board meeting. Opp. at 32 n.10. But Plaintiffs have not alleged that FE-1 attended the relevant board meeting, or was aware of what Siebel did (or did not do) to prepare for it. Further, the Court already rejected the notion that Plaintiffs could rely on FE-1's statements as "'indicative of Siebel's scienter' as to BH's C3-focused salesforce," because those statements relate to "BH's sales pipeline and fiscal year revenue, not its sales capacity," which are distinct topics. Dkt. No. 154 at 33. Plaintiffs' new allegations do not cure these deficiencies. *See Zucco Partners*, 552 F.3d at 996 (to support an inference of scienter, witness declarations must provide specific facts showing a connection between the false statement and the knowledge of the person who made it). The Court therefore finds that the allegations stemming from the *Pankow* action are insufficient to support direct scienter.

Plaintiffs also seek to remedy prior deficiencies identified by the Court with respect to the JVA. They allege that Siebel signed an unredacted version of the JVA that "contained the actual number of FTE sales personnel, putting Siebel on notice of the small size of the salesforce dedicated to selling C3's products." TAC ¶ 96. Plaintiffs assert that when viewed holistically

with circumstantial allegations of scienter, these new facts "raise a strong inference of scienter."[11] Opp. at 35.  Defendants respond that on its face the JVA itself did not establish "the actual number" of BH salespersons dedicated to selling C3 products, but instead set a minimum number of salespeople.  C3 MTD at 22.  The Court agrees.  Plaintiffs' new allegations do not show that Siebel had "specific information . . . related to the fraud" that actually contradicted his allegedly misleading statements about the size of the BH salesforce.  *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1109 (9th Cir. 2021); *see also In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (no scienter absent specific allegations as to "how the [document's] contents contradicted defendants' public statements").  Plaintiffs argue that the JVA "contained specific information on the size" of the BH salesforce that made Siebel aware of the "discrepancy between" the numbers in the JVA and his public statements and therefore show his "deliberate attempt to mislead investors and inflate C3's market potential."  Opp. at 34.  But on its face, the JVA does not contain "information directly at odds" with Siebel's public statements, because it sets a floor, not an actual number of salespeople or a ceiling lower than reflected in Siebel's statements.  *In re Northpoint Communications Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).  The Court finds that the JVA does not plausibly support an inference that Siebel "deliberate[ly] attempt[ed] to mislead investors and inflate C3's market potential," Opp. at 34, because doing so still "would require the Court to speculate in a manner inconsistent with the PLSRA's heightened pleading standard,"  Dkt. No. 154 at 33.

*Core Operations*

Plaintiffs again rely on the core operations doctrine to support scienter.  The Court previously found insufficient Plaintiffs' allegations that Siebel, by virtue of his position at C3, had

---

[11] These circumstantial allegations include Siebel's direct participation in the management and day-to-day operations of the company, TAC ¶ 172, a 2023 CNBC article in which C3 employees stated that Siebel had "intense oversight," *id.* ¶¶ 57–60, and statements by FE-1 regarding Siebel's attendance at weekly calls "about the quality and size of the Joint Venture's salesforce," *id.* ¶ 174. The Court finds statements from outside the class period irrelevant to Siebel's scienter during the class period and therefore declines to consider the 2023 CNBC news article.  And the Court previously considered—and rejected—Plaintiffs' remaining allegations as supporting an inference of scienter.  Dkt. No. 154 at 32–33.  The allegations in the TAC do not alter the Court's prior analysis.

actual knowledge that his statements and omissions were materially false and misleading and evinced an intent to deceive Plaintiffs. Dkt. No. 154 at 34–35. Plaintiffs now argue that these deficiencies have been cured by their additional allegations concerning the May 25, 2021 board of directors meeting and Siebel's signature on the JVA. Opp. at 34. But for the reasons discussed above, even taken together these allegations do not meet the standard, and the Court again finds that Plaintiffs' allegations under a core operations theory of scienter fall short of their "exacting pleading obligation[s]." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). Plaintiffs still do not, as they must, "produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Retirement System of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1062 (9th Cir. 2014).

> *Motive*

Plaintiffs again assert that the Siebel's stock sales are "suspicious" and add allegations of the size and percentage of shares sold to support a finding of scienter. TAC ¶¶ 133–34, 179; Opp. at 39–41. As the Court previously explained, "[t]o evaluate suspiciousness of stock sales, we consider, inter alia, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). Insider trading "is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Intuitive Surgical*, 759 F.3d at 1063–64 (quoting *Zucco Partners*, 552 F.3d at 1005).

The Court previously rejected Plaintiffs' assertions of scienter based on Siebel's stock sales, because they made no allegations of consistency with prior trading history. Dkt. No. 154 at 36. Plaintiffs now contend that they have cured this deficiency by alleging that Siebel has sold "no stock in any company for which he was required to file a Form 4 at any point since 2005 and has made no sales since the Class Period ended." Opp. at 41. But, as Defendants argue, Siebel's prior trading history in other companies is not probative of his "consistency with prior trading history" in C3 stock. *Oracle Corp.*, 380 F.3d at 1232. Plaintiffs assert that all they must allege is

21

a "meaningful trading history for purposes of comparison," but neither of the cases they cite for this proposition suggest that sales of stock in other companies establish the relevant comparison.[12] The Court therefore rejects their assertion that the new allegations concerning Siebel's trading history in the stock of other companies supports a finding of scienter.

As to the timing of the sales, Plaintiffs argue that Siebel "rushed as fast as he could to sell his C3 shares and stopped all trading right before the truth was revealed." Opp. at 40. But the allegations in the TAC show that, as pled, the last sale not subject to a 10b5-1 plan took place on June 10, 2021, over five months before the alleged corrective disclosure on December 1, 2021. Plaintiffs suggest that the Court should consider suspicious any sales that were subject to a 10b5-1 plan, because they allege the plan was undated and that Siebel had access to material nonpublic information. TAC ¶¶ 138, 179. But to plead possession of such information, "a plaintiff must 'allege specifically what information [a defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage.'" *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1191 (9th Cir. 2024) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). Plaintiffs do not make any such allegations. And, for the reasons discussed above, the Court finds that Plaintiffs' new allegations regarding the May 2021 board of directors meeting and Siebel's signature on the JVA do not cure these deficiencies.

Finally, as to the size of Siebel's stock sales, Plaintiffs again allege that he sold over 9 million C3 shares during the Class period for a total of over $600 million, and they now add that these sales constituted 60 percent of his holdings and that he made $437 million from transactions not tied to established 10b5-1 plans. TAC ¶¶ 133–34, 179. But Plaintiffs neither explain how they calculated the percentage of shares sold, nor respond to Defendants' argument that the Ninth Circuit has found the proper way to calculate an owner's trading potential is a measure of "actual stock shares plus exercisable stock options." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970,

---

[12] *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020) found that the allegations of motive failed because one defendant "did not sell any such stock during the Class Period, and instead acquired $200,000 of stock," and Plaintiffs did make any allegations about the percentage of holdings sold by other defendants. And *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000), found that the plaintiffs, through no fault of their own, could *not* plead scienter because the defendants had not sold any stock of the company in question.

United States District Court
Northern District of California

986 (9th Cir. 1999). The Court therefore finds conclusory Plaintiffs' allegation that Siebel's C3 stock sales represented nearly 60 percent of his holdings in the company. And even assuming the size and percentage of Siebel's stock sales, the Court finds that the "timing of [those] sales undermines any inference of scienter," because they took place nearly half a year before the alleged disclosure. *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *15 (N.D. Cal. Sept. 30, 2024).

*Holistic Review*

Having considered the allegations both independently and holistically, the Court again finds that TAC "at best establish[es] mere recklessness or a motive to commit fraud and opportunity to do so." *Intuitive Surgical*, 759 F.3d at 1062. This is not enough. To establish scienter, a plaintiff must allege deliberate recklessness, which the Ninth Circuit has defined as "more than *mere* recklessness or a motive to commit fraud." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quotations omitted). "Instead, deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (quoting *Zucco Partners*, 552 F.3d at 991). Accordingly, the Court finds that Plaintiffs do not plausibly allege the required "strong inference" of scienter as to Defendant Siebel under any of the theories raised in the TAC.

### 2. Simonelli

Plaintiffs repeat allegations from the CAC that as the President, CEO and Chairman of Baker Hughes, and as a Board Member and Audit Committee Director of C3, Simonelli "was informed at internal meetings and had access to internal contemporaneous reports and data that contradicted his statements to investors" and "received, reviewed and had access to reports and data which undermined C3's representations . . . about the quality and size of the Joint Venture's salesforce."[13] TAC ¶ 183. As Defendants point out, it is unclear whether Plaintiffs seek to hold

---

[13] As discussed in the Court's prior order, Plaintiffs' allegations based on these claims are too generalized because they are "silent on the nature of the reports and data at issue, when [Simonelli] reviewed them, and how they contradicted the challenged statement." Dkt. No. 154 at 37–38 (analyzing generality of allegations as to Defendant Abbo and finding that allegations as to

Simonelli liable for Siebel's oral statements. To the extent they do, such liability is foreclosed. *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142–43 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it . . . And it is the speaker who takes credit—or blame—for what is ultimately said.").

As to Simonelli's liability for Statement #3, the Court finds that Plaintiffs' new allegations concerning the May 2021 board meeting and JVA do not support a finding of scienter. As Simonelli points out, the May 2021 "board materials post-date the December 2020 Registration by many months, and are wholly unrelated to the topic of sales in fiscal year 2020 (ended April 30, 2020)," so they "plainly do not bear on Simonelli's state of mind in December 2020." Dkt. No. 209 at 10. The Court finds these allegations even weaker to establish Simonelli's scienter than they were with respect to Plaintiffs' (ultimately unsuccessful) arguments as to Siebel. Plaintiffs allege that because of the Joint Venture, Simonelli was appointed to the board of C3, but they do not allege any specific facts showing he was aware of the key alleged fact that BH had brought in no deals through the reseller agreement for fiscal year 2020. The Court finds these thinly pled allegations as to Defendant Simonelli do not give rise to a "strong inference" of scienter.

\*\*\*\*\*\*

Because Plaintiffs again fail to plead scienter with the required particularity as to statements concerning the size of BH's C3-focused salesforce, the Court **GRANTS** the C3 Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims.[14]

### i. Section 20(a) and Section 20A

Defendants argue that the absence of a well-pled predicate violation of the Exchange Act is fatal to these claims. C3 MTD at 34–35; BH MTD at 8, Simonelli MTD at 15–20. The Court agrees. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech.*,

---

Simonelli failed for the same reasons). Plaintiffs' assertion that Simonelli was a member of the Audit Committee does not cure these pleading deficiencies.

[14] And because the Court finds that Plaintiffs again "failed to adequately allege scienter, it need not address the parties' loss causation" or falsity arguments. *Costabile v. Natus Medical Inc.*, 293 F. Supp. 3d 994, 1020 n.8 (N.D. Cal. 2018).

856 F.3d 605, 623 (9th Cir. 2017) ("Plaintiff has not sufficiently alleged violations of Section 10(b) and Rule 10b-5. And, without *1021 'a primary violation of federal securities law,' Plaintiff cannot establish control person liability." (citation omitted)).  Accordingly, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' Section 20(a) and 20A claims.  *See Zucco Partners*, 552 F.3d at 990.

## V.    CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** the C3 Defendants' motion to dismiss, Dkt. No. 201, **GRANTS** Defendant Simonelli's motion to dismiss, Dkt. No. 202, and **GRANTS** Defendant Baker Hughes' motion to dismiss, Dkt. No. 203.  Specifically, the Court:

- **DENIES** the motion to dismiss Plaintiffs' Section 11 claims to the extent they are premised on Statement #3.
- **GRANTS** the C3 Defendants' motion to dismiss Plaintiffs' Section 15 claim against Baker Hughes and Abbo, but **DENIES** that motion as relates to Siebel, Barter, and Simonelli.
- **GRANTS** the C3 Defendants' and Defendant Simonelli's motions to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims, and accordingly **GRANTS** the motions to dismiss Plaintiffs' Sections 20(a) and 20A claims as to the C3 Defendants and Baker Hughes.
- **GRANTS** the C3 Defendants' Request for Judicial Notice, Dkt. No. 201-1.

Because Plaintiffs have now had multiple opportunities to amend, and significant guidance from the Court on how they needed to do so, to the extent the Court dismisses Plaintiffs' claims, it does so without further leave to amend.  *See Zucco Partners*, 552 F.3d at 1007 ("[T]he district court's discretion to deny leave to amend is particularly broad" where "the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims.").

Finally, the Court **SETS** a case management conference in this case on April 7, 2026, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video,

and audio capabilities.  The Court **DIRECTS** the parties to meet and confer and file a joint case management statement by March 31, 2026.

     **IT IS SO ORDERED.**

Dated:    3/12/2026

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

26